FILED

2009 Jul-31  PM 06:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ALABAMA

### WESTERN DIVISION

|  |  |  |
|---|---|---|
| **JEFF HICKS, on behalf of himself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) ) | **CIVIL ACTION NO.:** **7:08-cv-00536-LSC** |
| **MERCEDES-BENZ U.S. INTERNATIONAL, INC., an Alabama Corporation,** | ) ) ) ) | |
| **Defendant.** | ) ) | |

---

## PLAINTIFF'S RESPONSE TO MERCEDES-BENZ U.S. INTERNATIONAL, INC.'S MOTION FOR SUMMARY JUDGMENT

Mark R. Thierman (pro hac vice)
laborlawyer@pacbell.net
**THIERMAN LAW FIRM, APC**
7287 Lakeside Drive
Reno, Nevada  89511
Tel: (775) 284-1500

Thomas F. Campbell, SB # ASB-5900-M60T
tcampbell@campbelllitigation.com
D. Keiron McGowin, SB # ASB-1623-I48D
kmcgowin@campbelllitigation.com
**CAMPBELL LAW**
A Professional Corporation
100 Concourse Parkway, Suite 115
Birmingham, Alabama  35244
Tel:  (205) 397-0307
Fax:  (205) 278-6654

## TABLE OF CONTENTS

Page No.

STATEMENT OF FACTS ............................................................... 1

    I.    RESPONSE TO MBUSI'S STATEMENT OF FACTS ................. 1

    II.   ADDITIONAL UNDISPUTED FACTS ......................................... 14

    III.  ADDITIONAL DISPUTED FACTS .............................................. 14

ARGUMENT ............................................................................... 15

    I.    LEGAL STANDARD ..................................................................... 17

    II.   THE FLSA REQUIRES OVERTIME PREMIUM PAY
           AND THE EMPLOYER HAS THE BURDEN OF
           PROVING ANY EXEMPTION ...................................................... 18

    III.  MBUSI CANNOT MEET ITS BURDEN TO PROVE
           THE EXECUTIVE EXEMPTION BECAUSE PLAINTIFF
           IS JUST A WORKING FORMAN, NOW CALLED
           WORKING SUPERVISOR IN THE NEW REGULATIONS
           AT C.F.R. § 541.106(c) (2006) ......................................................... 19

           A.    MBUSI FAILS THE "SALARY BASIS" TEST
                    REQUIRED FOR ANY WHITE COLLAR
                    EXEMPTION ........................................................................ 22

           B.    MBUSI FAILS THE "PRIMARY DUTIES" TEST
                    REQUIRED FOR ANY WHITE COLLAR
                    EXEMPTION ........................................................................ 25

C.   **MBUSI FAILS THE FOURTH "AUTHORITY TO HIRE AND FIRE" OR "PARTICULAR WEIGHT" TESTS REQUIRED FOR ANY WHITE COLLAR**

**EXEMPTION** ........................................................................ 33

IV.   **LIQUIDATED DAMAGES AND THREE-YEAR PUTATIVE CLASS PERIOD**.............................................................................. 35

**CONCLUSION** ..................................................................................................... 35

## STATEMENT OF FACTS

## I.   RESPONSE TO MBUSI'S STATEMENT OF FACTS

8.   GLs manage assigned groups of TMs and TLs[1]; i.e., teams, working on the production lines in a department and Mercedes-Benz defines these production lines as "operational units."  Plaintiff works in the Paint Department. The Paint Department is recognized as a department or subdivision of the MBUSI Alabama plant.  Plaintiff's "team" is 1 of 4 that work in the Paint Department.  At any one time, there can be as many as 116 teams all doing the same production functions.  *Hicks Decl. ¶¶ 15-16[2] and Pl. Dep., pp. 172-73/lns 18-23 & ln. 1, p. 17/lns. 11-20, 177-7/ lns. 8-23 & 17, 285/lns. 1-16, Ex. 3.[3]*  AMs manage the production lines in their area of the department.  *Pl. Dep., Ex. A.*  Managers manage the departments.  *Pl. Dep, Ex. A.*

10/11.   Plaintiff has filed concurrently herewith objections to this evidence.

15.   Plaintiff did receive a raise to $61,700.  GLs have an average base of

---

[1]Plaintiff has 3 TLs and 14 TMs assigned to him.  *Pl. Dep., pp. 174-75.  MSJ, p. 6, ¶ 23.*  This is out of 393 TLs and 2,048 TMs in the various groups working on the production lines within the various departments.  *Jones Decl. ¶ 7, MSJ, p. 2, ¶ 2, p. 3, ¶¶ 3-7.*

[2]Declaration of Plaintiff Jeff Hicks is attached as Exhibit 1 to Declaration of Mark R. Thierman In Support of Plaintiff's Response to Mercedes-Benz U.S. International, Inc.'s Motion for Summary Judgment (hereinafter, "Thierman Declaration") attached to Plaintiff's Evidentiary Submission.  Exhibits B, C, and D will be filed under seal upon order of the Court in Response to Plaintiff's Motion for Leave to File Under Seal.

[3]Deposition of Plaintiff Jeff Hicks w/Exhibits is attached as Exhibit B to Mercedes-Benz U.S. International, Inc.'s Evidentiary Submission in Support of its Motion for Summary Judgment.

$67,000. Before MBUSI issued its April 7, 2008 memo, this base covered 45 hours of time a week for 48 weeks (two weeks' vacation, one week of holidays, and five sick or personal days). (Vacation is tracked in half-day increments.)  This equates to $31.01 per hour, about 5% more than TLs, who earn approximately $29.16 per hour. TMs earn approximately $27.77 per hour.  If a TM works 45 hours a week, he or she will make $1,319.08, while the GL will make $1,495.45 (almost the same amount) for the same time (when calculating earnings based on TMs receiving overtime after 40 hours versus GLs receiving overtime after 45 hours). *Hicks Decl.  ¶ 24, Exs. 1-2.* TMs and TLs receive an adjustment for "coverall pay"; i.e., time for donning and doffing cover-alls, in the approximate amount of $1,400-1,500/year.  GLs are not given this allowance. *Pl. Dep., p. 84-85, lns.1-23 & lns. 1-6, and Hick Decl.  ¶¶ 6 & 21.*

18.     After he was promoted to GL, Plaintiff was sent to Germany to observe a GL for six weeks and worked on the line while he was "observing." *Pl. Dep., 99/lns. 7-13 .*

19.     Plaintiff was trained in Prevention and Harassment and Giving Constructive Feedback as a TM; in Civil Treatment Communication Skills, H.R. Benefits, H.R. Policy, and Leader as a Company Spokesperson as a TL; in Labor Relations 2 years after his promotion to GL; and in Corporate Policies & Guidelines and Human Resources Training 3 years after his promotion to GL.

*Pl. Dep., Ex. A.*

20.     On non-production Fridays, if there was no work for the GLs, GLs were to bank hours for that Friday.  Banked hours for Fridays would be paid back 1 for 1 (if the GLs did not have vacation to cover the time off).  For every hour short of 40, GLs lost a premium hour, even though the pay-rates were much higher for the premium hours.  If there was insufficient premium hours to give back, MBUSI docked GLs earned, accrued vacation time.  If there was insufficient vacation time accrued, then GLs had to make up the hours less than 40 at some other time.  *Hicks Decl. ¶ 23; Pl. Dep., pp. 197-99.*

21.     Plaintiff, in reality, does not operate his line as an "operational unit." *Pl. Dep., p. 172-73, lns. 18-23 & ln. 1.*

25.     a.     ***Machinery***:  TMs, TLs, and GLs "manage" machinery by informing maintenance when a machine is down.  Plaintiff only logs the down time of machinery.  *Pl. Dep., p. 114/lns. 18-19, p. 182, lns. 7-18.* ***Materials***:  Materials are managed by TLs.  Finance sets the budget.  If Plaintiff is over budget, he tells Finance why by referring to parts logs.  Then the TLs reduce costs through parts management.  *Pl. Dep., pp. 114/lns. 18-19, 148/lns. 17-22, 149/lns. 1-23, pp. 150-51/lns. 10-23 and 1-23, 280/lns. 4-22.* ***Manpower***:  The system of rotation was designed by upper management.  Plaintiff can only change the rotation when employees are absent.  TLs fill out the rotation sheets to accommodate absences.

3

Plaintiff signs off when the rotation is completed. *Pl. Dep., p. 210-13, Ex. 40, p. 2, lns. 12-17, Ex. 40, p. 2, lns. 14-17.* If someone is absent, TLs borrow TM(s) from other TL(s). If the TL is unable to find a replacement, both the TL and GL fill in on the line. *Pl. Dep., pp. 44-45, Ex. 40, p. 2, lns. 23-25.* **Methods:** Plaintiff does not assign work to employees. Assignments are set up by pre-set rotation schedules and performed pursuant to standard method procedures (SMPs). SMPs are developed, tested, and rewritten by the TMs and TLs. TLs, GLs, and AMs sign off on the changes. *Pl. Dep., 35-36/lns. 19-23 & 1-8, 114/lns. 3-22, Ex. 40, p. 3, lns. 18-20.* TLs, GLs and engineers ensure the TMs follow the SMPs. *Pl. Dep., pp. 35/lns. , 114, 165-66, and Thierman Decl., Ex. B.*

      b.    **Safety:** TMs, TLs, GLs, AMs, and Mgrs. are responsible for safety. *Thierman Decl., Exs. B-D.* TLs, Plaintiff, the safety manager, and the AM fill out safety checklists once a week. *Pl. Dep., pp. 134/lns. 5-20, 238/lns. 9ˉ14.* ***Quality standards and problem solving:*** TLs are primarily responsible for responding to line pulls to resolve problems on the line, although Plaintiff assists in responding to line pulls. *Pl. Dep., pp. 142-43/lns 21-23, and Thierman Decl., Ex.B.* GLs spend the bulk of their day at the end of the line checking quality, because that is what they are told to do. *Pl. Dep., pp. 135/lns. 9-16, 136/lns. 3-6, p. 311, lns. 5-7, 307/lns. 8-23, 309/lns. 1-10, 332/lns. 13-15.* TLs and Plaintiff holler to the dent doctors on the line to handle dent defects. *Pl. Dep., p. 313/lns. 19-23,*

*324-25/lns. 20-23 and lns. 1-4.* Both TLs and Plaintiff catch quality defects and provide feedback down the line. *Pl. Dep., pp. 223/lns. 12-16, 325/lns. 1-4.*

      c.    ***Manages line staffing and attendance according to plan***: GLs input time into the computer system. *Pl. Dep., pp. 161, 164, 201.* GLs fill in vacation requests on the vacation board. *Pl. Dep., pp. 58/lns. 17-20.* Per company policy, GLs fill in standard counseling forms for unexcused "emergency vacations"; e.g., doctor's appointments. *Pl. Dep., pp. 58/lns. 17-20.* Three occurrences result in a corrective performance review (CPR) . Level I and II CPRs are approved by the AM, Manager and an HR representative. A Level III CPR and final termination are also approved by the Unit VP and HR VP. *Pl. Dep., pp. 61-63, Jones Decl., Ex. 2, p. 8 of 9.* If someone wants an early out, an AM or HR makes that decision. Pl. Dep., pp. 168/lns. 1-10, 206-7/lns. 9-21. GLs do not hire, fire or effectively recommend personnel actions. Hicks Decl. ¶ 12. ***Initiates problem solving and support resources***: When an employee has a dispute, they normally go to HR "because they walk the line a lot" or to TLs. The TLs report the dispute to GLs, just because GLs have more time to report the dispute to HR. TMs and TLs also fill out concerns resolution forms that go directly to HR. If Plaintiff hears about a dispute or conflict, he contacts HR to resolve it and sends the TMs to the "team center" to meet with an HR representative for dispute resolution. *Pl. Dep., pp. 46/lns. 11-23, 266/lns. 10-20, Ex. 40, p.4, lns. 4-5.* When

a TL or TM comes back from a medical leave of absence, GLs ask how they are doing. If the TL or TM has been put on medical restrictions, medical and the ergonomist meet with them. GLs "participate" by relaying the TL or TM's job duties. *Pl. Dep., pp. 118-19*. If a TM is injured, the TL, GL, and AM problem solve to figure out what happened. *Pl. Dep., p. 165/lns. 7-12*. For quality problems off the line, GLs fill in problem-solving forms and standard counseling forms if a countermeasure is not performed. Three occurrences result in a CPR. *Pl. Dep. pp. 228-32, 264/lns. 1-13.*

      f.    ***Monitors key measurables***: Quotas are set by management and relayed to the teams by the AM at 1:00 p.m. every day. *Pl. Dep., Ex. 40, pp. 5-6/lns. 24-25 & lns. 1-2*. TMs, TLs, and Plaintiff have a clock and know what they have to run every hour to make their goal for the day. TMs and TLs will decide if an area of the line needs to run through a break. If that occurs, Plaintiff will leave the end of the line to help that area run through their break. *Pl. Dep., pp. 65-66.* GLs prepare leave-over logs for the next shift, containing percentages run on the previous shift. *Pl. Dep., pp. 86-88/lns. 12-23*. GLs attend monthly lunchbox meetings with management. GLs are not paid for working through meal breaks when attending these lunchboxes. *Pl. Dep., pp. 109-10/lns. 9-23 & 1-6, Hicks Decl. ¶ 7*. Plaintiff has been too busy working on the line to attend a lunchbox meeting in the last year. *Pl. Dep., p. 110/lns. 13-16.*

g.    See 25.b. supra, "*Quality standards and problem solving*."

i.    ***Ensures policies are consistently enforced***:  HR e-mails a list of standard training for all employees, including GLs, that must be performed.  *Pl. Dep., pp.  153-155*.  GLs review policies from an HR "toolbox" in a 5-minute meeting every morning.  *Pl. Dep., pp. 134-35/lns. 1-23 & lns. 1-5, 305-6/lns. 1-23 & lns. 1-19, Ex. 2, Ex. 40, p. 5, lns. 19-23.*

j.    ***Training***:  TMs, TLs and GLs perform training.  TLs are primarily responsible for training and for seeing new employees are trained.  *Pl. Dep., p. 51, lns. 2-21, and Thierman Decl., Ex. B*.  TMs, TLs, GLs and AMs sign off on the training.  *Pl. Dep., p. 51-52/lns. 1-23 & lns. 1-8*.  HR e-mails a list of standard training for all employees, including GLs, that must be performed, such as 11-minute films, which are watched by all staff during downtime.  *Pl. Dep., pp. 154-55/lns 10-23 & lns. 1-3.*  **Feedback and coaching**:  Both TLs and GLs perform feedback and coaching.  *Pl. Dep., pp. 223/lns. 12-16, 325/lns. 1-4, 325, and Thierman Decl., Ex. B*.  **Performance evaluations**:  Plaintiff conducts performance evaluations ("PE") once a year.  *Pl. Dep., p. 246/lns. 2-15*.  This is only one step in the evaluation process, which requires adequate performance in class(es), assessment by an outside group, and peer assessment on a 1-5 rating system.  *Pl. Dep., pp. 40-41/lns. 19-23 & lns. 1-3, 75-76, 289, Ex. 40, p. 3, lns. 1-7*.  The PE must be approved by both the AM and HR before the GL may sign.  AMs

7

and HR can and do make changes to the PE. *Pl. Dep., p. 247/lns. 17-23, Ex. 40, p. 5, lns. 15-19.* The Manager then must sign off. *Pl. Dep., p. 246-47, Ex. 40, p. 5, lns. 12-19.*

        k.    ***Initiates continuous improvement activities***: TLs rotate through continuous improvement. Plaintiff was in continuous improvement for six months. GLs did not attend. The "instructor" of the CI was an AM. *Pl. Dep., pp. 68-72.* ***Leads the implementation of management activities:*** GLs simply fill out company-mandated forms and relay company edicts from superiors to co-workers and report back observations to higher-level decision makers. *Hicks Decl. ¶ 13, Pl. Dep., pp. 228/lns.7-9, Ex. 40, p. 5, lns. 6-7.*

    26.    Plaintiff spends the first 30 minutes **pre**-shift reviewing the leave-over log, updating the attendance board, checking call-ins, and observing and communicating with the TMs. *Pl. Dep., Ex. 2, "Pre-Shift Requirements."*

    27.    Plaintiff conducts a 5-minute meeting reviewing quality focus, manpower, safety message and HR "toolbox" material, announcing milestones, and relaying information from a prior15-minute meeting with the AM. *Pl. Dep., p.135/lns. 2-3, 305-06/lns. 1-23 & lns. 1-19, Ex. 2, Ex. 40, p. 4, lns. 19-23.* Plaintiff estimates he spends approximately 3% of his time in meetings. *Pl. Dep., Ex. 40, p. 1, ln. 11.*

    28.    Engineers, suppliers, TLs and GLs update the SQDCM board. GLs

simply fill in blanks on forms that are created by supervisors for them and post information on the board. *Pl. Dep., Ex. 40, p. 5, lns. 3-11.*

29.    On each day shift, Plaintiff meets for 3-5 minutes with suppliers. The suppliers walk the line and also discuss issues with TMs and TLs. *Pl. Dep., p. 153/lns. 3-7, 154/lns. 5-9.*

30.    Plaintiff "observes, interacts and supports" TMs and TLs while working the line. *Pl. Dep., pp. 136, 137/lns. 21-22, 143, 148, 312, Ex. 39, p. 1, Ex. 40, p. 1.*

31.    Plaintiff performs these duties while working on the line with his co-workers and "helps to clean at the end of the day, the whole nine yards…" *Pl. Dep., p. 135-36/lns. 9- 23 & lns. 3-6, Ex. 39, p. 1, lns. 4-5, Ex. 40, p. 1, lns. 9-14.*

32.    TLs are primarily responsible for responding to pulls on the line. *Pl. Dep., pp. 142-43/lns. 21-23 & lns. 1-2, and Thierman Decl., Ex. B.* Plaintiff responds to the pulls to help out, and "a lot of times," TMs ask for his opinion because he has 12 years' experience as a TM, TL and GL. *Pl. Dep. 143/lns. 6-23.*

37.    There are four dent doctors on the line and TLs and GLs holler for them to fix dents. *Pl. Dep., p. 313/lns. 16-23, 324-25/lns. 20-23 & lns. 1-23.*

38.    Plaintiff sands defects all day long. Plaintiff has a sanding pad in his hand all day long. *Pl. Dep., 314/lns. 7-10.* TLs and GLs find quality defects and provide feedback to TMs, decide to sand paint defects, or holler for the dent

doctors on the line. *Pl. Dep., pp. 55-56/lns. 4-23 & lns. 1-20, 223/lns. 12-16, 313-14, 325/lns. 6-23.*

41.     For example, a distorted hem sealer was reported by quality control. The countermeasure implemented was Plaintiff told the TM to complete his process the next time. *Pl. Dep., pp. 230-31/ln. 1 & lns. 1-9.* A TM slipped on a grate. The TMs, TLs and Plaintiff decided the countermeasure would be to wrap tie the grates together so no one else would slip. *Pl. Dep., pp. 234-35/lns. 13-23 & lns. 1-7.*

42.     Plaintiff fills out standard counseling forms when a countermeasure is not performed or when an employee is absent without a doctor's excuse. Three occurrences result in a CPR. CPRs must ultimately be approved by the Manager/AM, Team Relations Representative, Employment/Team Relations Manager or AM, Unit VP and HR VP before a termination may occur. The termination may also be appealed. *Pl. Dep., pp. 58/lns. 17-20, 61-63, and MBUSI Evidentiary Submission, Ex. A, Jones Decl., Ex. 2, p. 8 of 9.*

48.     The rotation schedule is created by upper management. Plaintiffs can only change rotation schedules to fill in for a TMs' absence. *Pl. Dep., pp. 211-13, Ex. 40, p. 2, lns. 12-17.*

49.     Nonexempt TLs and GLs perform these functions. *Pl. Dep., pp. 35-38, 44-45,55-56, 114, 142-43, 165-66, 223, 325, 332, 334, & Thierman Decl., Ex. B.*

50.     If a TL has a problem with a TM or with quality, the TL handles it his or herself or calls the GL or HR. *Pl. Dep., pp. 35-38, 44-45,55-56, 114, 142-43, 165-66, 223, 313, 325, 332, 334, and Thierman Decl., Ex. B.*

51.     See 25a, "*Manpower*," and 25b, "*Initiates Problem Solving and Support Resources,*" supra.

52.     Plaintiff has nothing to do with granting FMLA or STD. He once reported an FMLA and STD decision to an employee by showing her the e-mail from HR. *Pl. Dep., p. 260/lns. 10-20.*

53.     Plaintiff can reassign one of his 14 TMs temporarily to one of his other lines. Any permanent reassignment would be subject to the company's bidding process. *Pl. Dep., pp. 285/lns. 9-16, Ex. 40, p. 2, lns. 4-11.*

54.     SMPs are developed, tested, and rewritten by the TMs and TLs. The TL, GL, and AM sign off on the changes. TLs, GLs and engineers are responsible for seeing TMs are following the SMPs. *Pl. Dep., pp. 34-38, 114, 165-66, and Thierman Decl., Ex. B.*

56., 57. & 58.  See 51, supra.

59.     Plaintiff enters TL/TMs' time into a computer system. *Pl. Dep., pp. 160-61/lns. 17-23 and lns. 1-5, 164/lns. 6-8, 201/lns. 1-12, & Thierman Decl., Ex. B.*

61.     See 25j, "*Performance evaluations*," supra.

62.     Plaintiff's "recommendations" carry little weight. *Hicks Decl. ¶ 12,*

11

*Ex. 40, p. 2, lns. 25-26, through p. 3, lns. 1-17.*

63.   See 25j, "*Performance evaluations*," supra.

64.   See 25j, "*Performance evaluations*," and 62, supra.

65.   When Plaintiff gave one temporary employee a "nonsatisfactory" on her PE because of attendance, she unilaterally decided not to return to work at MBUSI. *Pl. Dec., pp. 203-05.*

66.   Plaintiff can recommend to suspend someone, but actual suspension would have to be approved by the AM and HR.  Plaintiff does not recall ever recommending suspension. *Pl. Dep., Ex. 40., p. , lns. 18-23.*

67 &69.   See 25e, "*Initiates problem solving and support resources*," supra.

70.   See 25j, "*Training*," supra.

71.   TLs are primarily responsible for training and TLS, GLs and AMs sign off on the training. *Pl. Dep., pp. 51-55.*

75.   TMs, TL, GLs, AMs sign off on Level 3 training. *Pl. Dep., pp. 52, 1-4.*

76.   Plaintiff told the TL, "who owns parts," to reduce the inventory. *Pl. Dep., p. 280/lns. 19-22.*

77.   People volunteered to clean during a July shutdown and Plaintiff charted who would be there on what days. *Pl. Dep., p. 281/lns. 17-21.*

79.   Plaintiff mainly observes his TMs from his position on the line and

focuses them on their duties in a 5-minute morning meeting when he reads the leave-over log. *Pl. Dep., p. 116-17, lns. 10-23 & lns. 1-4, 119/lns. 6-19. 135-36/ln. 23 & lns. 1-6, 283/lns. 1-5.*

80.     Plaintiff simply relays the functions the TM normally performs. *Pl. Dep., p. 118/lns. 11-19.*

81. & 82.     See 25b, "*Safety,*" supra.

84.     Plaintiff keeps copies of company forms filled out by TMs and TLs and PEs in file cabinets that are kept locked to preserve confidentiality. *Pl. Dep., pp. 158-161.*

85.     See 25a, "*Materials,*" supra.

86.     TLs and GLs' communicate on the line with TMs. *Pl. Dep., p. 251-52/lns. 20-23 & lns. 1-7.*

87.     The precise language at MBUSI's cite is, "No, my team – they look for me for support if they have got an issue, but they know their job. It goes by SMP." *Pl. Dep., p. 158/lns. 8-12.*

99.     In implementing the 03/06 memo, MBUSI would not pay OT to GLs whenever the line was not running. *Hicks Decl. ¶ 8.*

100.   As worded, Plaintiff understood that MBUSI would pay OT and GLs did not have to work casual hours. *Pl. Dep., p. 190/lns. 8-9*

101.   Plaintiff estimates that the time each GL spent working "off the

clock" (i.e., when the line is not running) without any compensation was approximately 10+ hours/week prior to the 04/07/08 memo and approximately 5-10 hours/week after the 04/07/08 memo. *Hicks Decl. ¶¶ 10 and 21.*

## II.     ADDITIONAL UNDISPUTED FACTS

1.     Plaintiff is on the sixth level of a six-level "leadership" hierarchy. *Thierman Decl., Ex. D.*

## III.    ADDITIONAL DISPUTED FACTS

1.     Plaintiff's paycheck evidences 3 hours of OT being paid at $149.50, which means the OT rate is $49.67, a shift premium pay on an hourly basis. It indicates 2.5 hours of shift premium OT. It indicates some benefits are credited on an hourly basis rather than a weekly or even daily basis. The paystub has a section for "other benefits and information" that is kept on an hourly basis rather than in dollars. It indicates Plaintiff earned 4.10 hours of Group Life Time (G.T.L.) for the period for a year-to-date total of 52.04. Neither number is divisible by 8, which means it is not kept on a daily basis. *Hicks Decl. ¶ 5 , Ex. 3.*

2.     If GLs ever take off for less than a day, they have to use vacation or emergency vacation to cover the time. *Hicks Decl. ¶ 21.*

3.     In an affidavit to the NLRB, Plaintiff swore he spent "80-90%" of his time checking the quality of the cars. *Pl. Dep., Ex. 39, p.1.* In a supplemental affidavit to the NLRB, Plaintiff swore he spent approximately 90% of his time

checking quality at the end of the line and 7% of his day following up on quality

issues off the line. *Pl. Dep., Ex. 40, p. 1, ln. 8-11.*

## ARGUMENT

Plaintiff's position is that he is not exempt, because he is not paid a true

salary and because his duties are more accurately described by the regulations at

29 C.F.R. § 541.106(c) (2006) as a working foreman/supervisor for which

overtime must be paid. As stated by the 11th Circuit in *Morgan v. Family Dollar*

*Stores*, 551 F.3d 1233, 1269, fn 59 (11th Cir. Ala. 2008), quoting the Secretary of

Labor's comments in the federal register when enacting the new white collar

exemption regulations:

> The new regulations illustrate this proposition through this example: [A]
> relief supervisor or working supervisor whose primary duty is performing
> nonexempt work on the production line in a manufacturing plant does not
> become exempt merely because the nonexempt production line employee
> occasionally has some responsibility for directing the work of other
> nonexempt production line employees when, for example, the exempt
> supervisor is unavailable. Similarly, an employee whose primary duty is to
> work as an electrician is not an exempt executive even if the employee also
> directs the work of other employees on the job site, orders parts and
> materials for the job, and handles requests from the prime contractor.

Before the filing of this complaint, MBUSI maintained a written policy of

paying all its "Group Leaders" overtime at one and one half their regular rate of

pay for all hours worked in excess of <u>45</u> hours a week. The memo stated that the

time Group Leaders were required, suffered or permitted to work between 40 and

45 hours per week (five hours per week) was designated as "casual overtime" for

which the employees received no compensation at all. See, Hicks Decl., Ex. 1.

The memo did promise to pay overtime to Group Leaders at one and one-half their

regular rate for all hours worked in excess of 45 a week, as well as all hours

worked in the sixth consecutive day of work, Saturday without regard to the

"casual time." The practice in fact was to pay Group Leaders overtime pay

whenever they worked more than 40 hours in a week while the production line was

running, but not when they were required to be working before or after the line was

running. But the Fair Labor Standards Act, 29 U.S.C.§207(a)(1), requires an

employer to pay overtime at one and one-half times the regular hourly rate of pay

for all hours worked in excess of 40 in a work week no matter what other

employees are doing, unless an exemption in the FLSA applies.

By memo dated April 7, 2008, about one week after service of this lawsuit

on MBUSI, MBUSI eliminated the references to five hours a week "casual

overtime" and said it was paying all Group Leaders overtime based upon a 40 hour

workweek.[4]  See, Hick Decl., Ex. 2. Like all other Group Leaders, Plaintiff was

required to work overtime without payment of premium compensation at one and

one-half times his regular rate for all hours worked over forty (40) per week in

violation of the federal Fair Labor Standards Act 29 U.S.C. § 207(a)(1).

---

[4]The memos are admissible evidence on the issue of damages, among other things, because they
show that from three years of the filing of this lawsuit until April 7, 2008, Defendant worked
employees at least 5 hours a week overtime without compensation while on actual knowledge of
the illegality of the practice.

16

MBUSI's only defense to its failure to pay overtime to Plaintiff is to claim

the executive exemption under 29 U.S.C. §13(a). However, like all Group

Leaders, Plaintiff spent the majority of his time performing manual tasks on a

production assembly line, his "team" or group was not a permanent or fixed

subdivision of the company and he had no power to hire or fire any individuals, or

to effectively recommend personnel actions.

## I.    LEGAL STANDARD

The party seeking summary judgment bears the burden of demonstrating that

no genuine dispute exists as to any material fact in the case. *Adickes v. S.H. Kress*

*and Co.,* 398 U.S. 144, 157 (1970) and *Clemons v. Dougherty County, Georgia,*

684 F.2d 1365, 1368 (11th Cir. 1982). In determining whether a movant has met

this burden, the court must review the evidence and all factual inferences therefrom

in the light most favorable to the party opposing the motion. *Adickes,* supra, 398

U.S. at 15. "Summary judgment should only be entered when the moving party

has sustained its burden of showing the absence of a genuine issue as to any

material fact when all evidence is viewed in the light most favorable to the non-

moving party." *Morrison v. Washington County, Alabama*, 700 F.2d 678, 682

(11th Cir. 1983), cert. denied, 464 U.S. 864 (1983), citing *Adickes*, 398 U.S. at

157. All reasonable doubts about the facts should be resolved in favor of the non-

moving party. *Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.,* 750 F.2d

838, 841 (11th Cir.1985). If reasonable minds could differ on any inferences

arising from undisputed facts, summary judgment should be denied. *Id.* "When

more than one inference reasonably can be drawn, it is for the trier of fact to

determine the proper one." *Carlin Communication, Inc. v. Southern Bell*

*Telephone and Telegraph Co.,* 802 F.2d 1352, 1356 (11th Cir.1986), citing

*Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485, 495 (5th Cir. Unit

B 1982).

## II.  THE FLSA REQUIRES OVERTIME PREMIUM PAY AND THE EMPLOYER HAS THE BURDEN OF PROVING ANY EXEMPTION

Section 7(a) of the Fair Labor Standards Act, 29 U.S.C. § 207(a)(1),[5]

requires that employers pay their employees time and a half their regular rate for

hours an employee works in excess of a 40-hour workweek. *Alvarez Perez v.*

*Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008); *Allen v.*

*Bd. of Pub. Educ., 495 F.3d 1306, 1314* (11th Cir. 2007). *Morgan v. Family Dollar*

*Stores*, 551 F.3d 1233, 1266 (11th Cir. 2008). Section 13(a)(1) of the FLSA, 29

U.S.C. § 213(a)(1) says that the FLSA's requirements "shall not apply with respect

to . . . any employee employed in a bona fide executive . . . capacity." "[T]he

---

[5]Text of Act: "Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-197 (U.S. 1974).

The FLSA is a broad remedial statute and its exemptions are to be narrowly construed. *See Arnold v. Ben Kanowsky, Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Salyer v. Ohio Bureau of Workers' Compensation*, 83 F.3d 784, 786 (6th Cir. 1996), *Bridewell v. Cincinnati Reds*, 155 F.3d 828, 832 (6th Cir. 1998). Given the remedial nature of the FLSA, the court will construe exemptions narrowly against the employer. *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1157 (11th Cir. 2008). *Abel v. Southern Shuttle Servs.*, 2008 U.S. App. LEXIS 24394 (11th Cir. Nov. 28, 2008). As recently stated by the 11th Circuit Court of Appeals in *Gregory v. First Title of Am., Inc.*, 2009 U.S. App. LEXIS 1630, 4-5 (11th Cir. Jan. 27, 2009):

> It is well established that the employer "bears the burden of proving the applicability of a FLSA exception by clear and affirmative evidence. *Klinedinst v. Swift Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001) (quotation marks omitted). We have held that a FLSA exemption must be narrowly construed so that it applies to those plainly within its terms and spirit. *Nicholson v. World Bus. Network, Inc.*, 105 F.3d 1361, 1364 (11th Cir. 1997).

## III.   MBUSI CANNOT MEET ITS BURDEN TO PROVE THE EXECUTIVE EXEMPTION BECAUSE PLAINTIFF IS JUST A WORKING FOREMAN, NOW CALLED WORKING SUPERVISOR IN THE NEW REGULATIONS AT 29 C.F.R. § 541.106(c) (2006)

The only overtime exemption that MBUSI argues is applicable is the so-

called white collar, executive exemption under Section 13(a)(1) of the FLSA, 29 U.S.C.S. § 213(a)(1), which exempts "any employee employed in a bona fide executive. . ." The statute does not define a bone fide executive, but allows the Secretary of Labor to establish regulations to clarify this issue. Regulations of the Secretary of Labor promulgated pursuant to an express delegation of legislative authority are to be given controlling weight unless found to be arbitrary, capricious, or contrary to the statute. See *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 843-44 (1984). Agency opinion letters "do not warrant Chevron-style deference." *Christensen v. Harris County,* 529 U.S. 576, 587 (2000). They are, however, "entitled to respect under . . . *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944), but only to the extent that those interpretations have the power to persuade." *Id.* (quotation marks omitted).

Here, there are actually two sets of regulations applicable to defining the executive exemption. In August 2004, the Secretary of Labor extensively revised its white collar exemption regulations, stating that it was not changing the substance or intent of these regulations at all, but merely clarifying them.[6] The

---

[6]As stated in *Heffelfinger v. Elec. Data Sys. Corp.,* 580 F. Supp. 2d 933, 950 (C.D. Cal. 2008): "... the amendments were not meant to effect any substantive change in the exemptions. See *IntraComm, Inc. v. Bajaj,* 492 F.3d 285, 295 n. 7 (4th Cir. 2007) ("This interpretation is strengthened by the fact that the preamble to the proposed amended regulations state that the changes were made 'to simplify and update the current regulations' [quoting 58 Fed. Reg. 15,560, 15,573 (Mar. 31, 2003)], not to effect a major alteration in how exemptions are construed").

new regulations state at 29 CFR 541.100(a) that:

> The term "employee employed in a bona fide executive capacity" in
> section 13(a)(1) of the Act shall mean any employee: **(1)** Compensated
> on a salary basis at a rate of not less than $455 per week (or $380 per
> week, if employed in American Samoa by employers other than the
> Federal Government), exclusive of board, lodging or other facilities; **(2)**
> Whose primary duty is management of the enterprise in which the
> employee is employed or of a customarily recognized department or
> subdivision thereof; **(3)** Who customarily and regularly directs the work
> of two or more other employees; **and (4)** Who has the authority to hire
> or fire other employees or whose suggestions and recommendations as to
> the hiring, firing, advancement, promotion or any other change of status
> of other employees are given particular weight.[7]

(Emphasis Added).

The "working foreman" concept is useful, because it helps to distinguish

between a manager of a recognized subdivision and a mere strawboss or team lead

of subordinate employees. *Shockley v. City of Newport News,* 997 F.2d 18 (4th

Cir. 1993). The old "working foreman" regulations, 29 C.F.R. § 541.115 (1992),

even includes the term "Group Leaders" as an example of a class of non-exempt

working foreman. The 11th Circuit in *Morgan* used both the new "Working

Supervisor" regulations as well as the old "working foreman" regulations to

explain why 14,000 Dollar Family Store managers were not exempt executive

---

[7]The new regulations say at 29 CFR 541.100(b) that "The phrase "salary basis" is defined at §
541.602; "board, lodging or other facilities" is defined at § 541.606; "primary duty" is defined at
§ 541.700; and "customarily and regularly" is defined at § 541.701.

employees. The former 29 C.F.R. § 541.115(b) (1992) provides[8]:

> One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates. Such employees, sometimes known as strawbosses, or gang or group leaders perform the same kind of work as that performed by their subordinates, and also carry on supervisory functions. Clearly, the work of the same nature as that performed by the employees' subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption does not apply. ("Substantial," as used in this section, means more than 20 percent. See discussion of the 20-percent limitation on non-exempt work in § 541.112.) A foreman in a dress shop, for example, who operates a sewing machine to produce the product is performing clearly non-exempt work. However, this should not be confused with the operation of a sewing machine by a foreman to instruct his subordinates in the making of a new product, such as a garment, before it goes into production.

The employer **must meet every one of the four parts** to this regulation if its claim for exemption is to prevail.

## A.   MBUSI FAILS THE "SALARY BASIS" TEST REQUIRED FOR ANY WHITE COLLAR EXEMPTION

Last year, MBUSI stopped building cars at the Alabama plant on Fridays. In order to keep their hours up, some Team Members had to come into the plant to help with cleaning activities. The days a Group Leader was not scheduled to work, he had to take as a vacation day or Friday bank time in which you owe the company back the time that the Group Leader worked less than forty hours in a week. An employee who was off on a Friday could be paid, but he had to pay the

---

[8]According to the Department of Labor's explanation of the new regulations published in the federal register, one reason for the new regulation was to delete archaic terms like "strawboss" without disturbing the impact or effect of the concepts of the old regulations.

company back in overtime at the regular hourly rate. In other words, MBUSI tracked time and if the employee worked less than forty hours in a week, the employee was charged either against his or her vested accrued vacation time, his or her non-casual overtime or owed the company back the time, hour- for-hour.

For example, Plaintiff worked 1.5 hours of overtime and they made him put it in Friday bank time. He was also forced to take one Friday as a vacation day and he worked the other Friday. He did not ask for vacation or to use banked time. He expressed to MBUSI that he was willing and able to work all Fridays. MBUSI said that Group Leaders could only work from the schedule and that he had to use all his earned vacation time before he could bank any time. Plaintiff's experience was pursuant to a policy that applied to all Group Leaders alike. Hicks Decl. ¶ 16.

Obviously, one cannot maintain a bank of hours unless the defendant was counting hours worked, which violates the whole concept of a fixed salary for all hours worked required by the salary test of all the white collar exemptions. In addition, the deduction for not working due to a lack of work rather than the needs of the employee is anathema to a salary concept, because it puts the burden of unproductive hours on the employee instead of the employer. The "deal" with a salary is that the salary will be constant whether the employee works long and hard, or whether, through no fault of the employee, the employee cannot work a full week. Otherwise, a salary is not a two-way street.

In order to take advantage of the executive exemption from overtime, it is

necessary, but not sufficient, that the employees be paid on a true salary basis. 29

C.F. R. § 541.602(a) which states:

> General rule. An employee will be considered to be paid on a "salary
> basis" within the meaning of these regulations if the employee regularly
> receives each pay period on a weekly, or less frequent basis, a
> predetermined amount constituting all or part of the employee's
> compensation, which amount is not subject to reduction because of
> variations in the quality or quantity of the work performed. Subject to
> the exceptions provided in paragraph (b) of this section, an exempt
> employee must receive the full salary for any week in which the
> employee performs any work without regard to the number of days or
> hours worked. Exempt employees need not be paid for any workweek in
> which they perform no work. An employee is not paid on a salary basis
> if deductions from the employee's predetermined compensation are made
> for absences occasioned by the employer or by the operating
> requirements of the business. If the employee is ready, willing and able
> to work, deductions may not be made for time when work is not
> available.

None of the exceptions to the prohibition on deductions applies here, primarily

because the deductions were on an hourly basis rather than in full day increments.

MBUSI's policy of tracking and paying for extra hours worked, and

subtracting hours less than 40 not worked especially due to the unavailability of

work rather than the employee's own decision to take time off when there was

work to be done, does not meet the salary test because MBUSI varied the Group

Leaders' compensation in relation to the time they worked. Clearly, there was a

companywide policy to vary the pay for Group Leaders by the quantity or quality

of their work by reducing earned vacation time or by requiring the employee to

24

"make up" time later. It is inconsistent for MBUSI to argue that it paid everyone a salary, but that it tracked hours and added and subtracted hours to make up time where no work was available. Plaintiff could not come and go as the work demanded without regard to overtime hours or docking pay for less than a full day's absence. Plaintiff was paid hourly, although not for all hours worked, rather than a true salary. MBUSI's pay pattern for all Group Leaders violates the salary test.

## B. MBUSI FAILS THE "PRIMARY DUTIES" TEST REQUIRED FOR ANY WHITE COLLAR EXEMPTION

MBUSI also fails the second element of the executive exemption test; i.e., the "primary duty" is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof. The phrase "a customarily recognized department or subdivision" is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. *Gorman v. Cont'l Can Co.*, 1986 U.S. Dist. LEXIS 30856 (N.D. Ill. Jan. 3, 1986) While the regulations and the commentary in the federal register recognize that teams may constitute a recognized subdivision of the business, the regulations say this requires a case-by-case analysis and is rebutted when the teams don't do anything specialized and different from other teams. As stated at 69 FR 22122, 22134:

Finally, the Department observes that "groupings" or "teams" may constitute a department or subdivision under the existing definition, but a case-by-case analysis is required. See *Gorman v. Continental Can Co.*, 1985 WL 5208, at *6 (N.D. Ill. 1985) (department or subdivision can "include small groups of employees working on a related project within a larger department, such as a group leader of four draftsmen in the gauge section of a much larger department").

A Group Leader is in charge of a team of people, who may be doing the same thing as another team or who may be doing something different. The teams change with the needs of production. They are not a department or other recognized subdivision of the business. "A customarily recognized department or subdivision must have a permanent status and a continuing function." 29 CFR 541.103. While the "Paint Department" may have a permanent status and continuing function, each of the three to five "groups" within the Paint Department does not. Group Leaders don't run the departments in which they work. There is more than one Group Leader in the Paint Department, and there is more than one group in almost every other department of the company. A group is not a subdivision of the Department and a group is not fixed and permanent. A group is simply a crew of employees who are assigned a series of tasks, all of whom report to MBUSI's Departmental supervisor. There were about 116 Group Leaders which means there were 116 groups. No factory has 116 different departments with each department being a unique operation within the plant. Groups were often redundant, i.e. more than one group would do the same thing as another

26

group at the same time, in a parallel operation. Thus, the groups were not stand-alone departments or recognized subdivisions of the business, but simply crews or teams of employees, one or more levels below a subdivision. Therefore, they do not meet the test of the exemption.

Plaintiff is the quintessential example of a non-exempt working foreman/supervisor. One overriding purpose of the new regulations was to clarify that tradesmen were not exempt no matter how big a crew they were in charge of. "The final rule, however, includes even stronger language in new section 541.3, which states that none of the section 13(a)(1) exemptions apply to the skilled trades, no matter how highly compensated they are." 69 FR 22122, 22137. The group leaders were painters, assembly workers, and metal fabricators. These are production trades, blue collar workers, who are not exempt no matter how many people are on their team. As stated at 29 CFR 541.3

> The section 13(a)(1) exemptions and the regulations in this part do not apply to manual laborers or other "blue collar" workers who perform work involving repetitive operations with their hands, physical skill and energy. Such nonexempt "blue collar" employees gain the skills and knowledge required for performance of their routine manual and physical work through apprenticeships and on-the-job training, not through the prolonged course of specialized intellectual instruction required for exempt learned professional employees such as medical doctors, architects and archeologists. Thus, for example, non-management production-line employees and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers and laborers are entitled to minimum wage and overtime premium pay

under the Fair Labor Standards Act, and are not exempt under the regulations in this part no matter how highly paid they might be.

Plaintiff is a quality control person who works side-by-side with his or her co-workers on the assembly line 80-90% of the time and who simply relays company edicts from superiors to his or her co-workers and reported back observations to higher level decision makers. Plaintiff does not exercise independent discretion in running the business or a division or subdivision thereof. As such, Plaintiff fits the definition contained in the federal regulations at 29 C.F.R. 541.106(c) of a working foreman, now called a working supervisor, who is required to be paid overtime as a non-exempt employee. *Morgan*, supra, 551 F.3d at 1268 ("Similarly, an employee whose primary duty is to perform nonexempt work does not become exempt merely because she has some responsibility for occasionally directing the work of nonexempt employees.") As stated by the regulations:

> In contrast, a relief supervisor or working supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees when, for example, the exempt supervisor is unavailable. Similarly, an employee whose primary duty is to work as an electrician is not an exempt executive even if the employee also directs the work of other employees on the job site, orders parts and materials for the job, and handles requests from the prime contractor.

The bulk of Plaintiff's day and his primary duties consist of quality control

28

and physical labor as a tradesman or skilled, senior production line worker. Plaintiff is charged with looking for paint imperfections using a card supplied by the MBUSI to measure the acceptable size of any blemish before it has to be reported. He is essentially a quality control person working on the line alongside of the production workers.[9]

In addition to routine physical craft labor[10] which encompasses the majority of Plaintiff's job, Plaintiff's daily duties primarily consisted of reviewing the log from the previous shift indicating what work still needed to be completed from that previous shift, updating the attendance board, updating the SQDCM board,[11] checking call ins, greeting other employees as they come into the center, having a 5-minute meeting with the group relaying company information from "toolboxes" or other company-prepared communications, attending a 5-minute supplier meeting and 15-minute AM meeting, filling in for operators on the line during breaks and absences, performing quality checks at the end of the line, signing all sheets that require signatures, and completing the leave over-log for the next shift.

---

[9]Both Plaintiff and his non-exempt Team Leaders perform quality control, e.g., by performing quality checks on the line, feeding back to Team Members, sanding out blemishes, hollering for dent doctors, responding to line pulls, and otherwise ensuring Team Members are following SMPs.

[10]Like in *Morgan*, Plaintiff performs physical labor on the line right down to cleaning up with the nonexempt workers at the end of the day. 551 F.3d at 1241.

[11]Maintaining a bulletin board about management tasks is not the same thing as managing, the former being clerical in nature.

Plaintiff typically engaged in the same routine every day. Plaintiff estimates that meetings and off-the-line quality checks comprised approximately 10% of his working day.

Group Leaders are the classic example of working foremen, who are not exempt from overtime compensation as explained in the regulations of the Secretary of Labor at 29 C.F.R. §541.106, formerly at 29 C.F.R. §541.115(b).[12] Plaintiff did no more than lead a crew or group, transmit orders and observations to and from superiors, make self-evident decisions (and thus does not exercise discretion) based upon his skill and experience in the trade (rather than engage in intellectual independent selection based upon analysis and application of general principles of policy and business judgment).

---

[12]The pre-2004 regulations at 29 C.F.R. § 541.115(b) (1992) called these employees working foremen instead of working supervisors, stating that:

> One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates. Such employees, sometimes known as strawbosses, or gang or group leaders perform the same kind of work as that performed by their subordinates, and also carry on supervisory functions. Clearly, the work of the same nature as that performed by the employees' subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption does not apply. ("Substantial," as used in this section, means more than 20 percent. See discussion of the 20-percent limitation on non-exempt work in § 541.112.) A foreman in a dress shop, for example, who operates a sewing machine to produce the product is performing clearly non-exempt work. However, this should not be confused with the operation of a sewing machine by a foreman to instruct his subordinates in the making of a new product, such as a garment, before it goes into production.

The managers and assistant managers are the supervisory personnel of the plant. Obviously, if the power and discretion is vested in the managers and assistant managers, it can't be vested in the Group Leaders. Having 116 Group Leaders is simply too many "supervisors" to be exercising independent judgment in an assembly line situation where the goal is a consistency of quality in the product. To say it another way, not since the invention/adoption of the assembly line in automotive manufacture by Henry Ford in the early 1900's does an automobile manufacture like Mercedes Benz allow employees on the line to exercise idiosyncratic judgment and discretion. The duties of a quality control Group Leader on the line can't involve independent judgment, because all the cars or parts produced by one group must be identical to the same cars or parts produced by another group. The fact that the groups are redundant; i.e., that two or more groups within a department do the same thing in parallel operation, belies that a Group Leader makes any kind of decision 'of significance' independently. If this were a "one time" or "one off" custom car manufacturer, maybe there would be more opportunity for Group Leaders to make independent decisions of significance. But the demands for a uniform product combined with a high level of on-site supervision by assistant managers, and the lack of opportunity to deviate from established policies, requires the Group Leaders to follow established policies, make routine decisions based on experience and knowledge of the trade rather than

exercise of independent judgment and the application of broad principles to specific problems and to perform almost clerical tasks on a repetitive basis.

In addition, Plaintiff did not earn significantly more than other non-exempt employees they supposedly supervised, a secondary indication of lack of authority. See, *Morgan v. Family Dollar Stores, supra*. Plaintiff is paid approximately $31.77 an hour, about 4% more than the next level down the hierarchy, a team leader who is paid between $29 and $30 an hour. The regular assemblyline worker is paid approximately 28 dollars an hour, and was paid overtime after 40 hours of work, instead of only after 45 hours. In most cases, if there if the assembly line worker works at least 5 hours a week overtime, he or she will make more than a Group Leader for the same hours, which means the actual hourly rate for Group Leaders is often less than the rank and file workers. In a 45 hour work week, a rank and file assembly line worker who made only three dollars an hour less than a Group Leader but was paid overtime after 40 hours in the week, made $1,330, while the Group Leader made $1,240 because he was not paid for the last five hours of his work. Since all Group Leaders worked least 5 hours of mandatory overtime a week, euphemistically called "casual overtime" by the MBUSI, their average hourly rate of pay was only 28.50 (40 hours times $31 an hour divided by 45 hours worked), only 50 cents per hour more than the employees they supposedly supervised.

## C.   MBUSI FAILS THE FOURTH "AUTHORITY TO HIRE AND FIRE" OR "PARTICULAR WEIGHT" TESTS REQUIRED FOR ANY WHITE COLLAR EXEMPTION

It is undeniable that Group Leaders don't hire or fire anyone, the fourth criteria.  Nor are Group Leaders' recommendations given "particular weight" within the meaning of 29 CFR 541.100(a).  In *Morgan*, 551 F.3d at 1256, the Court of Appeals sustained a $35 Million verdict on behalf of opt-in class of 1,424 store managers who claimed they were entitled to overtime compensation and were not exempt as executives under Section 13(a)(1) of the FLSA. The Court of Appeals said the jury could reasonably find that the store managers did not meet the fourth criteria of 29 CFR 541.100(a) (firing and hiring or effectively recommending), because "[a]lthough store managers interview and recommend hourly associate candidates, they need district manager approval to hire them.  The district manager--not the store manager--also has the authority to terminate employees.  The manual notes that "[p]rior to termination, Store Management should discuss the situation and its recommendation with the District Manager, or if unavailable, with the Regional Vice President."  Of course, no Group Leader can hire or fire since written policies vest these management functions and other personnel decisions in upper-level managers.  The input argument was shot down in *Morgan* at 1257, when the Court of Appeals said even though "district managers frequently follow the store managers' hiring and firing recommendations,"

33

> Most store managers follow corporate policy and obtain the district
> manager's approval before hiring or firing hourly employees. Family
> 29 Dollar's policies do not require that store managers' hiring or firing
> recommendations be given any particular weight.

Here, like all Group Leaders, Plaintiff does not even have the direct

authority to hire and fire that the store managers had in *Morgan*. Rather, Group

Leaders give Team Members annual performance evaluations ("PEs"). The PEs

must be approved by an Assistant Manager and HR before the Group Leader is

even allowed to sign the PE. The Assistant Manager and HR can and do change

Plaintiff's PEs. Thereafter, the Manager must sign off. The PEs are only one of

several evaluation tools utilized by MBUSI's Management in determining whether

to promote an employee. Management also takes into consideration performance

in classes, peer reviews on a 1-5 score basis from all co-workers within the group,

and scores from outside assessment teams. As well, Group Leaders are required to

fill in standard counseling forms when TMs and TLs in their group take

"emergency vacations"; e.g., doctor's appointments, without a doctor's excuse.

Group Leaders are required to fill out standard counseling forms when TMs or TLs

fail to perform a quality control countermeasure. Three such forms result in a

Level I corrective performance review (CPR). This is the limit of the Group

Leaders' independent discretion relating to CPRs. Level I and Level II CPRs must

be approved by Department Manager/Assistant Manager, Team Relations

Representative, and Employment/Team Relations Manager or Assistant Manager.

For a Level III CPR and final termination, a Unit Vice President and HR Vice President's approval is also required. Thereafter, there is an appeal process of all performance reviews resulting in termination. Obviously, Plaintiff does not have the authority to hire or fire and his recommendations are given no particular weight in MBUSI's decisions relating to hiring, firing, promotion or advancement.

## IV. LIQUIDATED DAMAGES AND THREE-YEAR PUTATIVE CLASS PERIOD

Approximately one week after this lawsuit was filed, MBUSI issued a revised memo declaring it would pay overtime at time and one-half the regular rate to all Group Leaders who work more than 40 hours in a week and omitted any reference to "casual overtime." Plaintiff believes this is not a coincidence and that the Court can draw an adverse inference of admission of willful liability from this sudden re-wording, which MBUSI asserts has the same effect. Finally, liquidated damages are an appropriate remedy when an employer violates the provisions of 29 U.S.C. § 207. 29 U.S.C. § 216(b).

## CONCLUSION

For each of the foregoing reasons MBUSI's Motion for Summary Judgment should be denied in its entirety.

Dated this 31st day of July, 2009.          THIERMAN LAW FIRM


          /s/ Mark R. Thierman
          MARK R. THIERMAN

35

laborlawyer@pacbell.net
THOMAS F. CAMPBELL
tcampbell@campbelllitigation.com
D. KEIRON McGOWIN
kmcgowin@campbelllitigation.com

Attorneys for Plaintiffs

## CERTICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on all parties to this action by electronic mail delivery through the Court's CM/ECF as listed below:

>Ashley H. Hattaway
>ahattaway@burr.com
>Michael L. Lucas
>mlucas@burr.com
>BURR & FORMAN, LLP
>3400 Wachovia Tower
>420 20th Street North
>Birmingham, AL 35203
>Phone: (205) 451-5204
>Fax: (205) 458-5100

This the 31st day of July, 2009.

>/s/Mark R. Thierman
>Of Counsel