

FILED
2011 Sep-12  AM 09:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **JEFF HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **vs.** | ) | **7:08-cv-00536-LSC** |
| | ) | |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

| | | |
|---|---|---|
| **GRALYN LAWSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **7:09-cv-01157-TMP** |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## DEFENDANT MERCEDES-BENZ U.S. INTERNATIONAL, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT AS TO PLAINTIFFS WHO WERE EXEMPT BECAUSE THEY WERE HIGHLY COMPENSATED

---

1931420 v1

Respectfully submitted:

Michael L. Lucas (LUC004)
Ashley H. Hattaway (HAT007)
BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama 35203
(205) 251-3000

September 12, 2011

Mercedes-Benz U.S. International,
Inc. (MBUSI)

1931420 v1

# <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

I.   SUMMARY OF THE ARGUMENT ..................................................................2

II.  STATEMENT OF FACTS ..........................................................................3

    A.   Group Leader Roles and Responsibilities .............................................3

    B.   Group Leader Training ...........................................................................6

    C.   Group Leader Job Duties .......................................................................7

    D.   Group Leader Pay .................................................................................13

    E.   James Davis - 2006, 2007, 2008 ..........................................................14

    F.   Robert Little - 2006, 2007, 2008, 2010 ...............................................23

    G.   Jimmy Skelton - 2006, 2007, 2008, 2010 ............................................31

    H.   Steven Munoz - 2006, 2007 .................................................................39

    I.   Kelly Pitman - 2007 ..............................................................................52

    J.   Danny Bankston - 2009 ........................................................................54

    K.   Mario Cohen - 2009 ..............................................................................65

    L.   Clarence Allen Ozier - 2009 .................................................................73

    M.   Gene Upton - 2009 ................................................................................81

    N.   Thomas Daniels - 2010 .........................................................................95

    O.   Phillip Cooper - 2010 ..........................................................................109

    P.   Susan Pope - 2010 ...............................................................................124

<div align="center">i</div>

      R.      Timothy Lee - 2010 ...................................................................136

      S.      Marcus Garth - 2010 .................................................................150

      T.      Marianne Magner - 2010 ..........................................................164

      U.      Cathy Williams - 2008 ..............................................................176

III.     ARGUMENT .........................................................................................188

IV.     CONCLUSION ......................................................................................196

Certificate of Service ...........................................................................................197

Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI") submits this Brief in Support of Its Motion for Final Summary Judgment as to Plaintiffs Who Were Exempt Because They Were Highly Compensated.[1]   Sixteen plaintiffs **(James Davis, Robert Little, Jimmy Skelton, Steven Munoz, Kelly Pitman,[2] Danny Bankston,[3] Mario Cohen, Clarence Allen Ozier, Gene Upton, Thomas Daniels, Phillip Cooper, Susan Pope, Timothy Lee, Marcus Garth, Marianne Magner and Cathy Williams)** in the above-styled <u>Lawson v. MBUSI</u> case are exempt from Fair Labor Standards Act ("FLSA") overtime pay requirements in certain years because they were highly compensated employees in those years.[4]

---

[1]      MBUSI filed a Motion To Drop All Plaintiffs From The Case Except Gralyn Lawson (Doc. # 37 (<u>Lawson</u> case)) because the plaintiffs were not properly joined in the <u>Lawson</u> case.  The Court indicated in a status conference that the <u>Lawson</u> plaintiffs were improperly joined, that it did not plan to drop any plaintiffs from the <u>Lawson</u> case as requested by MBUSI, but that it did plan to sever the plaintiffs' claims.  The Court later instructed MBUSI to file its summary judgment motions as to the plaintiffs' claims in this case.  On August 5, 2011, the Court entered an order finding the Motion to Drop moot and therefore denied the Motion.

[2]      Kelly Pitman also is subject to MBUSI's previously filed Motion For Final Summary Judgment As To Plaintiffs Whose Claims Are Time Barred.  (Doc. # 50 (<u>Lawson</u> case)).

[3]      Danny Bankston also is subject to MBUSI's previously filed Motion For Final Summary Judgment As To Plaintiffs Whose Claims Are Barred By Judicial Estoppel.  (Doc. # 47 (<u>Lawson</u> case)).

[4]      As set out in MBUSI's previously filed Motion For Summary Judgment As To The Applicable Statute Of Limitations, the two year statute of limitations applies to this case so that any claims beyond the two years prior to the date on which the plaintiffs filed their Consents to Sue are time barred.  (Doc. # 52 (<u>Lawson</u> case)).  If the Court grants that motion, the year 2006 is not relevant to the case.  Because the Court has not yet ruled on that motion, MBUSI includes the year 2006 in this motion out of an abundance of caution but does not waive its argument that the two year statute of limitations applies.

## I.   <u>**SUMMARY OF ARGUMENT**</u>

The highly compensated issue is an easy one.  To be highly compensated and thus exempt under the FLSA, the employee needs only to (1) have been paid total annual compensation of at least $100,000.00; and (2) customarily and regularly perform any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee.  The Court does not have to decide the primary duty of these plaintiffs as it would for other exemptions.  The facts that follow are voluminous because they are the facts that reflect the job duties of each individual, but the Court's role on the highly compensated issue is simple.  It need only determine that each individual made over $100,000.00 in the relevant years and that each individual customarily and regularly performed at least one exempt duty.  Then the Court may grant summary judgment and dismiss the claims of the Group Leaders who were highly compensated and therefore exempt for the years specified.

## II.    STATEMENT OF FACTS

### A.    GROUP LEADER ROLES AND RESPONSIBILITIES

1.    MBUSI designed the GL[5] position to be a supervisory, exempt position.  (Schwartz Decl. ¶¶ 11, 13; Farrington Expert Report; Piekarski Expert Report).[6]

2.    The GL job description was developed by MBUSI employees who were experienced in compensation and benefits.  (Schwartz Decl. ¶¶ 9-11).

3.    MBUSI began developing its production job positions by soliciting input from its production managers.  These persons had substantial automotive industry experience.  In developing the GL job description, MBUSI also relied on what other automotive companies did and similar other job descriptions in place with other automotive companies.  The GL position at MBUSI is commonly classified as a supervisory position in the automotive industry.  (Schwartz Decl. ¶¶ 11-13).

4.    The same MBUSI employees who were experienced in compensation and benefits worked on determining whether the GL position at MBUSI was exempt or non-exempt.  They relied on the regulations promulgated by the

---

[5]    Throughout this brief Team Members are referred to as "TMs;" Team Leaders are referred to as "TLs;" Group Leaders are referred to as "GLs;" Assistant Managers are referred to as "AMs;" and Vice Presidents are referred to as "VPs."

[6]    The Declaration of Peter Schwartz is attached as Ex. 27 to MBUSI's Evidentiary Submission (Volume 2).  The Expert Report of Brian T. Farrington is attached as Ex. 28 to MBUSI's Evidentiary Submission (Volume 2).  The Expert Report of Michael Piekarski is attached as Ex. 29 to MBUSI's Evidentiary Submission (Volume 2).

Department of Labor in reaching this determination.  They concluded that the GL position was an exempt position based on these regulations.  In addition, they knew that the industry standard for this position was to classify it as an exempt position. (Schwartz Decl. ¶¶ 10, 13).

5.     The role of a TM as designed by MBUSI is to build quality in each station in which the TMs work.  (Jones Decl. ¶ 3; Jones Decl. Ex. A).[7]

6.     The role of a TL as designed by MBUSI is to be a role model and coach for his or her TMs.  (Jones Decl. ¶ 3; Jones Decl. Ex. A).

7.     The role of a GL as designed by MBUSI is to manage his or her line as an operational unit and to be responsible to accomplish the company's goals and targets.  (Jones Decl. ¶ 3; Jones Decl. Ex. A).

8.     The role of an AM as designed by MBUSI is to manage and lead his or her various operational units/specialists in his or her area and to manage cross-functional issues to accomplish the company's goals and targets.  (Jones Decl. ¶ 3; Jones Decl. Ex. A).

9.     The role of a Manager as designed by MBUSI is to manage and lead his or her department safely, to maintain today's success and to develop strategies to prepare his or her department for tomorrow's needs and challenges.  (Jones Decl. ¶ 3; Jones Decl. Ex. A).

---

[7]     The Declaration of Marcus Jones with exhibits to the declaration are attached as Ex. 30 to MBUSI's Evidentiary Submission (Volume 3).

10.     MBUSI developed a Roles and Responsibilities Card to reflect the roles and responsibilities of production and maintenance employees as designed by MBUSI and provided that card to its employees.  (Jones Decl. ¶ 4; Jones Decl. Ex. B).

11.     The Roles and Responsibilities Card provided that the roles and responsibilities of a GL are as follows:

> a.     Manages the manpower, material, machinery and methods in his area and ensures successful output by his group.
>
> b.     Confirms the integrity of production system elements, such as safety, quality standards and problem solving.
>
> c.     Manages line staffing and attendance according to plan.
>
> d.     Knows the technical aspects of building a vehicle and how it impacts other functions and systems.
>
> e.     Initiates, facilitates and monitors problem solving and manages support resources to resolve issues.
>
> f.     Monitors key measurables in his group and initiates problem solving as necessary while managing his group.
>
> g.     Ensures that quality goals for his group are met and that he and his group are using the quality feedback and escalation systems correctly.
>
> h.     Keeps TMs informed, encourages communication, creates enthusiasm and maintains high morale.
>
> i.     Ensures policies are consistently enforced.
>
> j.     Ensures development of TMs through performance evaluations, training, feedback and coaching.

      k.     Initiates continuous improvement activities and leads the implementation of his TMs' ideas and management initiatives.

(Jones Decl. Ex. B).

12.    MBUSI provided training on the Roles and Responsibilities to GLs. (Jones Decl. ¶ 5; Jones Decl. Ex. C).

13.    GLs usually are evaluated by an AM, and they are evaluated on various leadership behaviors, such as thinks strategically and establishes direction; leads change; shows and supports top performance; shares knowledge and experience; drives value creation; focuses on customer and markets needs; drives innovation; challenges and develops people to top performance; builds a diverse culture of collaboration and learning; executes decisions and delivers results; and demonstrates accountability and credibility.  (Jones Decl. ¶ 6; Jones Decl. Ex. D).

**B.    GROUP LEADER TRAINING**

14.    MBUSI has a Pre-Group Leader Academy and a Group Leader Academy which cover topics such as the Role of the Group Leader, Leadership Communications, MPS Basics, Annual Planning Process, Standardized Work, SAP DMT & Scrap, Roles and Responsibilities, HR Policies and Practices, Safety Leadership, Time and Attendance, Labor Relations and Civil Treatment.  (Jones Decl. ¶¶ 7-11; Jones Decl. Exs. E, F, G & H).

15.    MBUSI has a Group Leader Self-Sufficiency Program which trains GLs on skillsets such as problem solving, networking, technical skills,

documentation, assuming ownership of the line, communicating, building and maintaining positive relationships, organizing and people development.  (Jones Decl. ¶¶ 12-15; Jones Decl. Exs. I, J & K).

16.    MBUSI has provided GLs training in other topics such as rotation planning, validating training levels, managing downtime and communication. (Jones Decl. ¶¶ 16-18; Jones Decl. Exs. L & M).

17.    GLs have participated in LSI which is a Leadership Initiative available only to Group Leaders and managers above them.  (Jones Decl. ¶ 19; Jones Decl. Ex. N).

### C.    GROUP LEADER JOB DUTIES

18.    The Job Description for GLs states that the purpose of the GL position is "[t]o direct Team Leaders and other Team Members in the execution of the teams' responsibilities.  Responsible for the teams' achieving the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony."  (Jones Decl. ¶ 20; Jones Decl. Ex. O).

19.    MBUSI expects GLs to be present in the team center before the shift and perform certain pre-shift duties such as reviewing the handover log,[8] assessing

---

[8]    Handover logs are written communications between GL counterparts on varying shifts and are also referred to as shift logs, turnover logs, carryover logs and/or checklists. (Jones Decl. ¶ 21; Jones Decl. Ex. P).

the manpower situation, evaluating the start-up condition and participating in management shift preparation meetings.  (Jones Decl. ¶¶ 22-23; Jones Decl. Ex. Q).

20.     MBUSI also requires that GLs be present at the line during the first hour, last hour and 15 minutes before and after breaks to monitor operations, verify quality and safety, develop a rapport with the team and supervise TMs and TLs. (Jones Decl. ¶ 24; Jones Decl. Ex. Q).

21.     MBUSI also expects that at the end of the shift GLs will be present in the team center and will complete their handover log.  (Jones Decl. ¶ 25; Jones Decl. Ex. Q).

22.     MBUSI requires that a GL be in the shop at all times for supervision of TMs and TLs.  (Jones Decl. ¶ 26; Jones Decl. Ex. Q).

23.     GLs are responsible for SQDCM (Safety, Quality, Delivery, Cost, Morale) in their groups.  (Jones Decl. ¶ 27; Jones Decl. Ex. R).

24.     GLs complete evaluations on TLs and TMs in their group, and if the TL or TM has an overall "S" on the evaluation, the GL completes a potential appraisal of the TL or TM and rates him or her as ready or not ready for promotion.  (Jones Decl. ¶¶ 28-30; Jones Decl. Exs. S, T).

25.     The GL's performance evaluation and potential appraisal of the TM or TL are considered in selecting a TM or TL for promotion.  (Jones Decl. ¶ 31; Jones Decl. Ex. U, pp. 5-6).

26.     A TM or TL generally is not promoted unless the GL has rated the TM or TL as ready for promotion, and the GL's assessment of the TM or TL is followed barring exceptional circumstances.  (Jones Decl. ¶ 32).

27.     If a GL gives a TM or TL an "N" in any area of a performance evaluation other than attendance, the TM or TL cannot be promoted.  (Jones Decl. ¶ 33; Jones Decl. Ex. U, p. 6).

28.     The evaluation is made a part of the TM's personnel file.  (Jones Decl. ¶ 34).

29.     GLs complete Corrective Performance Reviews ("CPRs") for discipline of employees.  (Jones Decl. ¶ 35; Jones Decl. Ex. V).

30.     CPRs are reviewed by other managers and by MBUSI Human Resources ("HR")[9] who rely on the information provided by the GL in reviewing the discipline.  (Jones Decl. ¶ 36).

31.     A TM with a CPR is eligible for discharge depending on the number of CPRs and the type of misconduct.  (Jones Decl. ¶¶ 38-40; Jones Decl. Exs. W, X).

_____

[9]     MBUSI's Human Resources Department is sometimes referred to as Team Relations.  (Jones Decl. ¶ 37).

32.    A TM or TL with an active CPR cannot be promoted.  (Jones Decl. ¶ 41; Jones Decl. Ex. U, p. 6).

33.    GLs complete progress evaluations for TMs following their introduction period.  (Jones Decl. ¶ 42; Jones Decl. Ex. Y).

34.    MBUSI has a Circle of Skills Training program that it uses to train TMs on the work processes.  The Circle of Skills consists of four training levels. A TM who is at Level 1 is a beginner on the process.  A TM who is at Level 2 can work the process with assistance.  A TM who is at Level 3 can work by himself on the process.  A TM who is at Level 4 can train others on the process.  (Jones Decl. ¶ 43; Jones Decl. Ex. Z).

35.    Usually, TLs create training plans for the TMs, and the TLs or other trainers train the TMs.  GLs review and sign off on the training plans and in some cases create or give input on the training plans and/or train TMs.  (Jones Decl. ¶ 44; Jones Decl. Ex. AA).

36.    GLs also sign off on the Circle of Skills form which consists of pie charts reflecting the training levels for TMs.  A TM cannot progress to Level 3 or Level 4 unless the GL verifies by signing off that the TM is trained to that level. (Jones Decl. ¶ 45; Jones Decl. Ex. Z).

37.    GLs can request that their TMs participate in training courses, for example training in working with others, handling conflicts and communication skills.  (Jones Decl. ¶ 46; Jones Decl. Ex. BB).

38.    GLs track attendance, vacation, emergency vacation and enter time worked for the TMs in their group.  (Jones Decl. ¶ 47; Jones Decl. Exs. CC, DD).

39.    Under MBUSI's Attendance Policy, TMs receive occurrences for certain absences and when they receive a certain number of occurrences they are disciplined.  (Jones Decl. ¶ 48).

40.    GLs keep attendance calendars for TMs in their group where they code absences, document reasons for absences, track occurrences, keep track of vacation balances and document discussions with TMs about absences and occurrences for absences.  (Jones Decl. ¶ 49; Jones Decl. Ex. EE).

41.    GLs must approve scheduling for elective short-term disability leaves of absence.  (Jones Decl. ¶ 50; Jones Decl. Ex. FF).

42.    GLs observe TMs and TLs to see if they perform processes in accordance with the company's Standard Methods and Procedures (SMPs) and Job Element Sheets (JESs).  (Jones Decl. ¶ 51).

43.    GLs and TLs can revise SMPs and JESs, with approval.  If a TL revises an SMP or JES, the GL must sign off on the revision.  (Jones Decl. ¶ 52; Jones Decl. Exs. GG, HH).

44.     GLs complete MPS-Problem Solving Forms for quality and safety issues and equipment breakdowns.  These forms are sometimes referred to as "5 Why" forms.  The forms are used to determine the root cause of a problem, to determine a countermeasure to prevent the problem from reoccurring and to implement the countermeasure.  (Jones Decl. ¶ 53; Jones Decl. Ex. II).

45.     GLs observe their areas for safety conditions and complete STOP Audit Checklists or other audit cards wherein they document safe conditions they observed and what they did to encourage continued safe performance or unsafe conditions they observed and what they did to correct and prevent reoccurrence of the unsafe condition.  (Jones Decl. ¶ 54; Jones Decl. Exs. JJ, KK).

46.     GLs participate on the Safety Committee where they discuss the shop safety performance, the status of open safety items, audit findings and fixes, new ideas for improvement and decisions on themes and audit plans for the month. (Jones Decl. ¶ 55; Jones Decl. Ex. LL).

47.     GLs complete Continuous Improvement Activity forms to suggest changes to improve safety, quality, delivery, cost, morale or mutilation.  (Jones Decl. ¶ 56; Jones Decl. Ex. MM).

48.     Body Shop GLs review and sign off on station logs which reflect which TMs worked which stations.  (Jones Decl. ¶ 57; Jones Decl. Ex. NN).

49.    Assembly GLs track Top 5 Quality Issues and complete problem solving forms which includes determining whether the TM with the quality issue was following the process.  (Jones Decl. ¶ 58; Jones Decl. Ex. OO, PP).

### D.    GROUP LEADER PAY

50.    GLs are paid an annual salary.  (Jones Decl. ¶ 59).

51.    MBUSI structures the base salaries of GLs so that they are paid approximately 10% more than a TL and approximately 15% more than a TM. (Jones Decl. ¶ 59).

### E.   JAMES DAVIS - 2006, 2007, 2008

52.   James "Eddie" Davis ("Davis") **admitted in Response to a Request for Admission that he was properly classified under the FLSA as an exempt employee.** (Davis Dep., pp. 208-09; Davis Dep. Ex. 10, #43).[10]

53.   He began employment at MBUSI in September, 1996.  (Davis Dep., pp. 6, 13).

54.   Davis was promoted to GL in July, 2003.  (Davis Dep., p. 54; Davis Dep. Ex. 1).

55.   In 2006, in 2007 and also in 2008, MBUSI paid Davis over $100,000.00 in compensation, including at least $455.00 per week in salary. (Davis Dep. Ex. 10,  #41; Compensation Decl. ¶ 4).[11]

56.   During 2006, 2007 and 2008, Davis was the GL of Assembly Maintenance Plant 2, and he had approximately thirty TMs and TLs in his group. (Davis Dep., pp. 78, 85).

57.   He supervised the TLs and TMs in his group.  (Davis Dep., pp. 208, 210; Davis Dep. Ex. 10, #1).

58.   A Manager or AM was not always present in his group, and he led his group independently of his Manager or AM.  (Davis Dep. Ex. 10, #33).

---

[10]     The Deposition of James Davis and exhibits to the deposition are attached as Ex. 32 to MBUSI's Evidentiary Submission (Volume 4).

[11]     The Compensation Declaration of Mark Jones is Ex. 31 to MBUSI's Evidentiary Submission (Filed Under Seal) (Volume 3).

59.    He gave work directions and assignments to the members of his group.  (Davis Dep. Ex. 10, #2).

60.    He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Davis Dep., p. 212; Davis Dep. Ex. 10, #5 & Ex. 11).

61.    The essential functions listed in the GL job description were the actual essential functions of Davis' job.  (Davis Dep., pp. 212-13; Davis Dep. Ex. 11).

62.    Davis' primary duty, responsibility or function as a GL was to oversee the work and performance of his TMs and to direct their work so it complied with MBUSI standards.  (Davis Dep., p. 234).

63.    In Assembly Maintenance Plant 2, his responsibilities were to walk his group, observe his TMs, respond to problems that his TMs or TLs had, and to attend meetings.  (Davis Dep., p. 147).

64.    Davis did his best to ensure that his group was meeting its tasks, completing its goals and keeping the line running on a day-to-day basis.  (Davis Dep., p. 202).

65.    He was there to see that his group was following directions and to report what his group was doing.  (Davis Dep., p. 203).

66.    He led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Davis Dep. Ex. 10, ##25, 26 & 28).

67.    Davis spent a significant portion of his day responding to problems in his group.  (Davis Dep., pp. 139-41).

68.    He shared his knowledge and experience with his group.  (Davis Dep. Ex. 10, #30).

69.    Davis ensured that the TMs in his group were following company policies and work rules and that these policies and rules were enforced.  (Davis Dep., p. 70; Davis Dep. Ex. 10, #14).

70.    Davis observed his group's work performance "quite often."  (Davis Dep., pp. 129-31).

71.    If Davis saw a TM having a problem, he would schedule him for training.  (Davis Dep., pp. 130-31).

72.    If his TMs or TLs continued to have problems repairing equipment, he would be involved in problem solving, such as if training was needed to perform the job.  (Davis Dep., p. 144).

73.    Davis was responsible for overseeing the training in his group, and he directed training and retraining in skills for TMs when he deemed appropriate. (Davis Dep., p. 162; Davis Dep. Ex. 10, #19).

74.    It was his responsibility to have his TMs trained to operate in as many different areas as possible for manpower flexibility.  (Davis Dep., pp. 162, 167).

75.    Davis would verify that TMs were trained at the level indicated on the Circle of Skills form and would sign off on the form.  (Davis Dep., pp. 162-65; Davis Dep. Ex. 3).

76.    He was responsible for making sure the TMs got the training they needed.  (Davis Dep., pp. 166-67).

77.    Davis trained TMs in new procedures.  (Davis Dep., pp. 71-73).

78.    In Assembly Maintenance Plant 2, Davis conducted daily shift start up meetings for his TLs where he covered safety, HR and operational issues.  (Davis Dep., pp. 95-97).

79.    He also met daily with the other GLs and the AMs, Managers, VPs and Engineers, and in those meetings he reported on any breakdowns that caused downtime and received feedback that he would relay to his TMs and TLs.  (Davis Dep., pp. 112-14).

80.    He also met daily with his AM, the Manager of Maintenance and the Assembly Engineers to discuss breakdowns, downtime and countermeasures to avoid breakdowns, and he would communicate that information to his group. (Davis Dep., pp. 115-16).

81.    Davis managed attendance in his group and ensured that his group was properly staffed.  (Davis Dep., pp. 210-11; Davis Dep. Ex. 10, #3).

82.    Davis managed vacation scheduling, timekeeping and attendance tracking for his TLs and TMs and decided how to classify absences based on MBUSI guidelines.  (Davis Dep., pp. 117, 167-68; Davis Dep. Ex. 10, #4).

83.    He could approve or deny vacation and emergency vacation requests according to the guidelines.  (Davis Dep., pp. 167-68, 170-71).

84.    If a TM had too many absences, he could prepare a CPR.  (Davis Dep., p. 168).

85.    If a TM was out, Davis could adjust the manpower by moving TMs from team to team within their same shift.  (Davis Dep., pp. 169-70).

86.    Davis made sure his TMs worked within their medical restrictions. (Davis Dep., p. 169).

87.    He could approve or deny the time period for TM elective short-term disability requests.  (Davis Dep., pp. 171-72; Davis Dep. Ex. 4).

88.    He prepared safety, overtime, attendance and cost reports to post in the team center, and he tracked the information for those reports.  (Davis Dep., pp. 118-19, 123-24).

89.    He reported any major items that took place during the day to his AM and Manager.  (Davis Dep., pp. 121, 126).

90.     He evaluated his TMs and TLs and rated them as satisfactory or not satisfactory in various performance categories.  (Davis Dep., pp. 121, 176, 179, 181; Davis Dep. Ex. 5 & Ex. 10, #6).

91.     He also rated them as ready for promotion or needs development before promotion, wrote "supervisor comments" about their readiness for promotion and signed the evaluation as the supervisor.  (Davis Dep., pp. 180-81; Davis Dep. Exs. 5-6 & Ex. 10, #7).

92.     Davis' rating of a TM as ready or not ready for promotion was considered and normally followed in determining if the TM would be promoted. (Davis Dep. Ex. 5, p. 3; Jones Decl. ¶¶ 31-32).

93.     If he rated a TM as not satisfactory, the TM was not eligible for promotion.  (Davis Dep., pp. 181-82).

94.     Davis' ratings of his TMs were based on his observations of them performing their work.  (Davis Dep., p. 182).

95.     Davis tried to make sure his TMs and TLs followed the roles and responsibilities for their jobs.  (Davis Dep., pp. 187-88).

96.     If a TM refused to do what Davis told him to do, the TM was insubordinate.  (Davis Dep., p. 188).

97.    If Davis had a TM who had a discipline problem, Davis would counsel him and put a note in the confidential files that he kept on TMs.  (Davis Dep., p. 189; Davis Dep. Ex. 10, #9).

98.    If the TM did not improve, he would determine if a CPR was warranted and would draft one.  (Davis Dep., p. 189-94; Davis Dep. Ex. 7).

99.    He also would let TMs know if they were not complying with the safety policies and would initiate a CPR if he felt that was necessary.  (Davis Dep., pp. 151-52; Davis Dep. Ex. 10, #10).

100.   When there was an injury in his group, he prepared a 5 Why problem solving report which he reviewed with the TM and presented to the AM.  (Davis Dep., pp. 152-53).

101.   He also completed or signed off on 5 Why reports for equipment breakdowns.  (Davis Dep., pp. 156-58).

102.   Davis would follow up to make sure the countermeasure in the 5 Why form was completed.  (Davis Dep., pp. 159-60).

103.   He also would make sure that TMs were following the countermeasure procedures and correct them if they were not.  (Davis Dep., pp. 160-62).

104.   He worked with his AM to address manpower issues and to solve problems in his group.  (Davis Dep., pp. 149-50).

105.   He initiated, facilitated and monitored problem solving in his group. (Davis Dep. Ex. 10, #12).

106.   He ensured that production and quality goals were met in his group. (Davis Dep. Ex. 10, ##13 & 22).

107.   He initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Davis Dep. Ex. 10, #16).

108.   Davis was responsible for keeping supplies and other costs within budget.  (Davis Dep., p. 173).

109.   Davis was responsible for the morale of his group, and if the morale of his group was suffering, he was instructed to come up with a solution to improve it.  (Davis Dep., p. 220).

110.   Davis' TMs would come to him when they had conflicts among themselves, and he would help them resolve the conflicts.  (Davis Dep., pp. 194-96; Davis Dep. Ex. 10, #18).

111.   He ensured that his group was working safely and he monitored the environment for safety hazards.  (Davis Dep. Ex. 10, #17).

112.   Davis was involved in planning weekend work, and part of his job was to control weekend work.  (Davis Dep., pp. 222-23).

113.    Davis made sure his group worked efficiently so overtime could be minimized, and he had to explain to the AM why overtime was needed.  (Davis Dep., pp. 174-76).

114.    His group had SQDCM targets it had to meet, and he had to explain to his AM if his group did not meet them.  (Davis Dep., pp. 124-25).

115.    If his TMs and TLs had continuing problems with the performance of their job duties, that reflected poorly on him as a GL; and if they did a good job, that also reflected on him.  (Davis Dep., pp. 145-46).

116.    He showed and supported top performance in his group.  (Davis Dep. Ex. 10, #29).

117.    In 2006, 2007 and 2008, Davis was rated on various leadership criteria or competencies and received a successful rating, with which he agreed. (Davis Dep., pp. 216-25; Davis Dep. Exs. 13, 14 & 15).

118.    He used his best judgment in performing all of his duties as a GL and, he fulfilled all the roles and responsibilities of a GL.  (Davis Dep. Ex. 10, ##23 & 24).

### F.      ROBERT LITTLE - 2006, 2007, 2008, 2010

119.    Robert Little ("Little") began employment at MBUSI on May 6, 1996. (Little Dep. Ex. 22).[12]

120.    Little was promoted to GL in September, 2003.  (Little Dep., p. 16, Little Dep. Ex. 1).

121.    From his promotion to present, he has been the only GL in Paint Maintenance.  (Little Dep., pp. 24, 26).

122.    In 2006, in 2007, in 2008 and in 2010, MBUSI paid Little over $100,000.00 in compensation, including at least $455.00 per week in salary. (Compensation Decl. ¶ 5; Little Responses to Request for Admission ("RFA") #41).[13]

123.    As a Paint Maintenance GL, Little had 47 TMs and TLs in his group. (Little Dep., p. 25).

124.    He supervised the TLs and TMs in his group.  (Little RFA #1).

125.    A Manager or AM was not always present in his group, and he led his group independently of his Manager or AM.  (Little RFA #33).

126.    He took control of situations in his area that arose with his AM was absent.  (Little RFA #32).

---

[12]      The Deposition of Robert Little and exhibits to the deposition are attached as Ex. 33 to MBUSI's Evidentiary Submission (Volume 4).

[13]      Little Responses to Requests for Admission are attached as Ex. 34 to MBUSI's Evidentiary Submission (Volume 4).

127.   He gave work directions and assignments to the members of his group.  (Little RFA #2).

128.   He ensured that company policies and work rules were enforced in his group.  (Little RFA #14).

129.   He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Little RFA #5).

130.   He made decisions about his group and carried out his plans for the group.  (Little RFA # 35).

131.   He led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Little RFA ##25, 26 & 28).

132.   His duties included making sure the TMs and the equipment were ready to run, making sure the TMs completed preventative maintenance ("PM") orders, and attending meetings.  (Little Dep., pp. 26-28).

133.   His duties differed from those performed by the TMs in his group. (Little RFA #34).

134.   Little worked on machinery but not frequently, and when he did he retained his GL responsibilities.  (Little Dep., pp. 49-51).

135.   He never performed production work.  (Little Dep., pp. 68-69).

136.   If equipment was down, he tried to find out what was wrong with the equipment and if his TMs needed help.  (Little Dep., pp. 36-37).

137.   On various days, Little went to parts meetings, efficiency meetings, problem-solving meetings and PM review meetings.  (Little Dep., p. 37).

138.   Little went to parts meeting so that he could plan the work for his group.  (Little Dep., pp. 37-38).

139.   He went to efficiency meetings with the AM and the Engineers to discuss the efficiency of the equipment so that he would know if he needed to pay particular attention to certain equipment to make sure it ran more efficiently. (Little Dep., pp. 38-39).

140.   In the PM meetings, they reviewed the PM tasks for the year to see if there needed to be any changes.  (Little Dep., pp. 40-41).

141.   Each week Little gave the PMs for the week to the TLs to distribute to their teams, and he reviewed the PMs to see if they had been completed.  (Little Dep., pp. 42-44).

142.   Part of his job was making sure all of the PMs were completed by the group.  (Little Dep., pp. 43-44, 47).

143.   Each week Little compiled, reviewed and jointly prepared with Engineers and TMs a list of weekend work for the TMs.  (Little Dep., p. 44).

144.   Little also shared company information with his group, such as safety and HR information.  (Little Dep., p. 47).

145.   As a GL, Little could direct training and retraining in skills for TMs in his group, and he did so as he deemed appropriate.  (Little RFA #19).

146.   Little trained his group on lock-out, tag-out procedures.  (Little Dep., pp. 55-57).

147.   Little reviewed and signed off on Circle of Skills documents that reflected the training level of his TMs.  (Little Dep., pp. 86-87; Little Dep. Ex. 9).

148.   If he saw something on those documents that he believed was incorrect, he would investigate the matter.  (Little Dep., pp. 87-88).

149.   He approved orders by his TMs for parts and tools.  (Little Dep., pp. 67-68).

150.   He evaluated TMs and TLs in his group.  (Little Dep., p. 69, 73; Little Dep. Ex. 2; Little RFA #6).

151.   He rated their performance as satisfactory or not satisfactory in various categories.  (Little Dep., pp. 69-70; Little Dep. Ex. 2).

152.   He provided his opinion as to whether the TM was ready for promotion to the next level, and he indicated the determination on the evaluation. (Little Dep., p. 74; Little Dep. Ex. 2; Little RFA #7).

153.   Little's rating of a TM as ready or not ready for promotion was considered and normally followed in determining if the TM would be promoted. (Little Dep. Ex. 2, p. 3; Jones Decl. ¶¶ 31-32).

154.   TMs he recommended for promotion have been promoted to TLs. (Little Dep., p. 75).

155.   If Little rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

156.   He reviewed the completed evaluation with the TM.  (Little Dep., pp. 72-73).

157.   Little managed attendance in his group and made sure his group was properly staffed.  (Little RFA #3).

158.   Little managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Little RFA #4).

159.   Little allowed his TLs to handle vacation requests unless there was a problem with the requests, such as too many people were already off work.  (Little Dep., p. 77).

160.   Little completed a 5 Why report if a TM was injured, and he worked with the TM and the AM to develop a countermeasure to prevent the injury from happing again.  (Little Dep., pp. 77-79; Little Dep. Ex. 4).

161.   He communicated the countermeasure to the other TLs and TMs. (Little Dep., pp. 79-80).

162.   One countermeasure included Little talking with an injured TM about taking time to observe conditions.  (Little Dep., p. 80; Little Dep. Ex. 4).

163.   He also reviewed 5 Why reports completed by TMs when there were certain equipment breakdowns which occurred weekly.  (Little Dep., pp. 88-89; Little Dep. Ex. 10).

164.   Little counseled TMs on performance, quality of work and conduct. (Little RFA #9).

165.   Little talked to a TM who made inappropriate comments to another TM and let him know what consequences could happen if he repeated the improper conduct.  (Little Dep., pp. 81-82; Little Dep. Ex. 6).

166.   Little and the AM counseled an employee about getting along with others.  (Little Dep., p. 83; Little Dep. Ex. 7).

167.   When a TM filed a concerns resolution, Little looked into the matter, answered the concern, and called the Safety Department to address the concern. (Little Dep., p. 84; Little Dep. Ex. 8).

168.   Little had the authority to initiate a CPR on a TM when he deemed necessary.  (Little RFA #10).

169.   Little initiated, facilitated and monitored problem solving in his group.  (Little RFA #12).

170.   He ensured that production and quality goals were met in his group. (Little RFA ##13 & 22).

171.   He initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Little RFA #16).

172.   Little participated in walks of his area with the Safety Committee so that he could know if there were any safety issues that needed to be addressed by his group.  (Little Dep., pp. 90-92).

173.   Depending on the safety issue, he would direct a TL or TM to handle the issue or he would list it as weekend work.  (Little Dep., pp. 92-93).

174.   He also participated in shop safety walks with the AM and the Engineers to look for safety issues and determine how to fix them.  (Little Dep., pp. 111-12).

175.   Little ensured his group worked safely, and he monitored the environment for safety hazards.  (Little RFA #17).

176.   He handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in a TM issue or conflict.  (Little RFA #18).

177.   He shared his knowledge and experience with his group.  (Little RFA #30).

178.   Little helped prepare a list of GL responsibilities, and that list is a fair summary of what he does on his own and with assistance from the AM, Engineers or the Safety Department.  (Little Dep., pp. 101-03; Little Dep. Ex. 14).

179.   That list included items such as manage TM schedules for proper coverage, manage training schedule and work schedule, manage in shop training, HR issues, responsible to ensure that all safety concerns are resolved, safety training review and coordinate activities with production and engineering.  (Little Dep., pp. 101-03; Little Dep. Ex. 14).

180.   Little used his best judgment in performing all of his GL duties, and he fulfilled all of the roles and responsibilities of his GL position.  (Little RFA ##23 & 24).

181.   In 2007, 2008, 2009 and 2010, Little was rated on various leadership criteria or competencies and received a successful rating, with which he agreed. (Little Dep., pp. 111, 114-16; Little Dep. Exs. 16-19).

182.   Little showed and supported top performance in his group.  (Little RFA #29).

### G.     JIMMY SKELTON - 2006, 2007, 2008, 2010

183.   Jimmy Skelton ("Skelton") began employment at MBUSI in May, 1998.  (Skelton Dep., p. 29).[14]

184.   In 2004, Skelton was promoted to GL.  (Skelton Dep., p. 30; Skelton Dep. Exs. 1 & 2).

185.   From the time he was promoted until present, he has been the only GL in Assembly Maintenance Plant 1.  (Skelton Dep., pp. 38, 45, 53).

186.   In 2006, in 2007, in 2008 and in 2010, MBUSI paid Skelton over $100,000.00 in compensation, including at least $455.00 per week in salary. (Compensation Decl. ¶ 6; Skelton RFA #41).[15]

187.   In Assembly Maintenance Plant 1, Skelton had twelve TMs and TLs in his group.  (Skelton Dep., pp. 47-52).

188.   In his job as GL, he supervised the TLs and TMs.  (Skelton RFA #1).

189.   He gave work directions and assignments to the members of his group.  (Skelton RFA #2).

190.   He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Skelton RFA #5).

---

[14]     The Deposition of Jimmy Skelton and exhibits to the deposition are attached as Ex. 35 to MBUSI's Evidentiary Submission (Volume 4).

[15]     Skelton Responses to Requests for Admission are attached as Ex. 36 to MBUSI's Evidentiary Submission (Volume 4).

191.   He made sure that company policies and work rules were enforced in his  group.  (Skelton RFA #14).

192.   He tried to make sure that his TMs and TLs maintained the equipment.  (Skelton Dep., p. 257).

193.   He led his group in meeting company standards; he led change in his group; and he used leadership skills in his position.  (Skelton RFA ##25, 26 & 28).

194.   Skelton spent about four to five hours a day walking the line and observing.  (Skelton Dep., pp. 96, 105-06).

195.   He also checked PMs and work orders to see what was due, what his group needed to concentrate on, if there was a pattern in equipment breakdowns and who needed to look at the equipment.  (Skelton Dep., pp. 97-105).

196.   He assisted TLs and TMs by providing them his expertise, making sure they had the parts and tools to do their job and communicating their need for additional resources to persons outside their group, such as Engineers.  (Skelton Dep., pp. 91, 113-18, 132, 184-85; Skelton RFA #30).

197.   On occasion, Skelton pulled a wire or turned a wrench if the TM needed assistance.  (Skelton Dep., p. 132).

198.   He did not spend most of his day doing repairs or other physical labor on the line.  (Skelton Dep., pp. 133-34).

199.   When Skelton was a TL, he did actual maintenance on the line. (Skelton Dep., pp. 125-27).

200.   Skelton's AM was over Assembly Maintenance Plant 1 and Plant 2, which were about a quarter mile apart, and his AM spent more time in Plant 2 because there was more production there.  (Skelton Dep., pp. 53-54).

201.   He saw his AM about twice a day.  (Skelton Dep., p. 163).

202.   Skelton led his group independently of his AM or his Manager. (Skelton RFA #33).

203.   Skelton managed attendance in his group and made sure his group was properly staffed.  (Skelton Dep., p. 167; Skelton RFA #3).

204.   Skelton's TMs called-in to him if they were going to be absent from work.  (Skelton Dep., p. 92).

205.   Skelton moved TMs from one area to another to cover manpower shortages.  (Skelton Dep., pp. 93-94).

206.   He managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Skelton RFA #4).

207.   He entered time for TMs and resolved errors in their time sheets. (Skelton Dep., pp. 75-79).

208.   If a TM was not meeting the attendance guidelines, Skelton notified his AM & HR and drafted a CPR.  (Skelton Dep., pp. 171, 228-29).

209.   Skelton had the authority to initiate a CPR on a TM when he deemed necessary.  (Skelton RFA #10).

210.   He kept notes on TM absences so that if he saw a pattern of attendance issues he could take further action.  (Skelton Dep., pp. 227-29, 234-36, 244-49; Skelton Dep. Ex. 8, p. 2, Ex. 9, Ex. 11).

211.   Skelton counseled TMs and TLs on performance, quality of work and conduct.  (Skelton Dep., pp. 229-43, 252-56; Skelton Dep. Exs. 8, 9, 10 & 13; Skelton RFA #9).

212.   For example, Skelton counseled a TM on being in her assigned area on time, wearing her safety shoes and not soliciting money from TMs on the line. (Skelton Dep., pp. 229-234; Skelton Dep. Ex. 8).

213.   He counseled another TM about how the TM was talking to other TMs and about putting his hands on people.  (Skelton Dep., pp. 236-43; Skelton Dep. Ex. 10).

214.   He talked with another TM about hanging out on the production line and distracting production TMs, about how he talked to people on the radio and about cursing his TL.  (Skelton Dep., pp. 252-56; Skelton Dep. Ex. 13).

215.   Skelton expected TMs to follow his instruction or direction.  (Skelton Dep., pp. 232, 256).

216.   Skelton handled employee issues and conflicts in his group and decided when to involve higher management or Team Relations in a TM issue or conflict.  (Skelton RFA #18).

217.   Skelton talked with TMs to resolve conflicts with weekend work. (Skelton Dep., pp. 67-68).

218.   He could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Skelton RFA #19).

219.   He signed off on Circle of Skills training for TMs in his group if he agreed their performance was at the required level.  (Skelton Dep,. pp. 165-66).

220.   He trained new employees on the equipment.  (Skelton Dep., pp. 176-77).

221.   He was responsible for scheduling members of his group for training. (Skelton Dep., pp. 177-81).

222.   Twice a day, Skelton checked for issues from the end of the previous shift, determined what the group needed to be aware of and so advised the TLs. (Skelton Dep., pp. 87, 120-21).

223.   He then met with the TMs and went over issues from the previous shift and SQDCM.  (Skelton Dep., pp. 91-92, 122).

224.   He completed the SQDCM board for his group.  (Skelton Dep., p. 193).

225.   He decided on a weekly safety topic to include on the board to help avoid accidents and injuries.  (Skelton Dep., pp. 193-94).

226.   He also ensured that his group worked safely, and he monitored the environment for safety hazards.  (Skelton RFA #17).

227.   Skelton initiated, facilitated and monitored problem solving in his group.  (Skelton RFA #12).

228.   He completed 5 Why problem solving forms for certain breakdowns two to three times a month to keep the breakdown from reoccurring.   (Skelton Dep., pp. 195-98).

229.   Skelton met weekly with the Maintenance Engineers, the AM and the Manager to look at problem areas and the efficiency of the shop and to come up with solutions to problems.  (Skelton Dep., pp. 182-83).

230.   He also completed 5 Why forms when a TM had an accident to determine what caused the accident and how to correct it.  (Skelton Dep., pp. 220, 223; Skelton Dep. Ex. 7).

231.   He initiated continuous improvement activities in his group and lead the implementation of initiatives in his group.  (Skelton RFA #16).

232.   Skelton reported how much his group spent each month for purposes of budgeting.  (Skelton Dep., pp. 200-01).

233.    When Skelton saw TMs make mistakes he would correct them so they would work better or safer.  (Skelton Dep., p. 185).

234.    Skelton annually evaluated the performance of TMs and TLs in his group.  (Skelton Dep., pp. 202-06; Skelton RFA #6).

235.    As part of that evaluation, he provided an opinion as to whether his TMs and TLs were ready for promotion.  (Skelton Dep., p. 207; Skelton RFA #7).

236.    Skelton's rating of a TM as ready or not ready for promotion was considered and normally followed in determining if a TM would be promoted. (Jones Decl. ¶¶ 31-32).

237.    Every TL and TM in his group who has been promoted was recommended by him for promotion.  (Skelton Dep., p. 208).

238.    If he rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

239.    He informed TMs when they did not get a promotion for which they applied.  (Skelton Dep., pp. 250-52; Skelton Dep. Ex. 12).

240.    In 2007, 2008 and 2010, Skelton was rated on various leadership behaviors and received a successful rating, with which he agreed.  (Skelton Dep., pp. 212-18, 220-21; Skelton Dep. Exs. 3,4 & 5).

241.   He helped TMs develop in their jobs and manage their teams and he was very good at planning work including weekends and shutdowns.  (Skelton Dep., pp. 213-14, 217-18).

242.   He did a presentation with Engineers to VPs, Managers and an AM about what was accomplished over the plant shutdown.  (Skelton Dep., pp. 149, 152).

243.   He worked on improving his team's performance and motivation of his team.  (Skelton Dep., p. 214).

244.   He showed and supported top performance in his group.  (Skelton RFA #29).

245.   Skelton ensured that his group met its quality and production goals. (Skelton RFA ##13 & 22).

246.   He used his best judgment in performing all of his GL job duties. (Skelton RFA #23).

247.   He fulfilled all of the roles and responsibilities of his GL position. (Skelton RFA #24).

### H.    STEVEN MUNOZ - 2006, 2007

248.   Steven Munoz ("Munoz") began employment at MBUSI in 1997. (Munoz Dep., pp. 23-24).[16]

249.   In June, 2004, Munoz was promoted to GL while in Germany. (Munoz Dep., p. 48; Munoz Dep. Ex. 1).

250.   When he returned from Germany in 2005, he became a GL for Logistics in the Body Shop and held that position until January 5, 2009.  (Munoz Dep., pp. 46-50, 59-60, 62).

251.   Munoz transferred to another position at MBUSI on January 5, 2009, and he was no longer a Group Leader after that date.  (Munoz Dep., pp. 59-60; Munoz Dep. Ex. 2).

252.   In 2006 and in 2007, MBUSI paid Munoz over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 7; Munoz RFA #41).[17]

253.   As a Group Leader in Logistics, Munoz had two groups with a total of 20 TMs and TLs.  (Munoz Dep., pp. 50, 62).

---

[16]    The Deposition of Steven Munoz and exhibits to the deposition are attached as Ex. 37 to MBUSI's Evidentiary Submission (Volume 4).

[17]    Munoz Responses to Request for Admission are attached as Ex. 38 to MBUSI's Evidentiary Submission (Volume 4).

254.   One of his groups was the logistics group, and those TMs unloaded raw goods or materials and staged them throughout the Body Shop with forklifts. (Munoz Dep., pp. 50-51).

255.   The other group was the conveyance group, and those TMs fed the production line with raw goods using forklifts and tuggers.  (Munoz Dep., p. 51).

256.   There was one TL over each group.  (Munoz Dep., p. 56).

257.   As GL, Munoz supervised the TLs and TMs in his group.  (Munoz RFA #1).

258.   He gave work directions and assignments to members of his group. (Munoz RFA #2).

259.   He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Munoz RFA #5).

260.   He was trained in the following GL tasks and tried to do these things as a GL:  manage his daily activities using a GL checklist; manage his area utilizing SQDCM vision; lead by example; confirm the integrity of the MBUSI production system; ensure the integrity of the TL; ensure that company policies and rules are enforced; and foster open communications.  (Munoz Dep., pp. 130-31; Munoz Dep. Ex. 5).

261.   He was also trained in GL roles and responsibilities, standards, requirements and activities, such as managing the manpower/material/ machinery/methods in his group and ensuring a successful output of his business unit, and he tried to put that into place in his group.  (Munoz Dep., pp. 131-32; Munoz Dep. Ex. 6).

262.   He fulfilled all the roles and responsibilities of the GL position and used his best judgment in performing his GL duties.  (Munoz Dep., pp. 135-37; Munoz Dep. Ex. 11; Munoz RFA ##23 & 24).

263.   He made sure that company policies and work rules were enforced in his  group.  (Munoz Dep., pp. 127-28; Munoz RFA #14).

264.   He led his group in meeting company standards; led change in his group; and used leadership skills.  (Munoz RFA ##25, 26 & 28).

265.   A Manager or AM was not always present in his group, and he could and did lead his group independently of his Manager or AM.  (Munoz RFA #33).

266.   As a GL, he performed duties that differed from those performed by the TMs in his group.  (Munoz RFA #34).

267.   He made decisions about his group and carried out his plans for the group.  (Munoz RFA #35).

268.   He was responsible for safety, morale, floor layouts and process changes. (Munoz Dep., pp. 63-64, 120-21; Munoz Dep. Ex. 3).

269.   Munoz walked the floor in the Body Shop where his TMs were located and observed them performing their duties to see if they were following their processes.  (Munoz Dep., p. 64).

270.   He checked to see if the TMs were performing their operational and cleaning duties.  (Munoz Dep., pp. 110-13).

271.   When he saw a TM not following the process he approached the TM and explained the process to him.  (Munoz Dep., p. 65).

272.   If the TM did not correct his actions, Munoz would escalate the problem because he "couldn't let somebody continue to not perform their -- their functions."  (Munoz Dep., pp. 65-66).

273.   He would tell the AM that the TM was having an issue, that he talked to the TM and that the TM was not improving.  (Munoz Dep., p. 68).

274.   If a TM had repetitive problems, Munoz made notes in the TM's folder that he kept on each TM.  (Munoz Dep., pp. 66-67).

275.   Munoz counseled TMs and TLs on performance, quality of work and conduct.  (Munoz RFA #9).

276.   As a GL, he had the authority to initiate a CPR on a TM when he deemed necessary and did initiate CPRs for attendance and safety issues.  (Munoz Dep., pp. 101, 103; Munoz RFA #10).

277.   He met with TMs about CPRs and told them what would happen if they did not improve.  (Munoz Dep., pp. 102-13).

278.   When a TM received a CPR for a forklift violation, Munoz reviewed forklift safety material with him.  (Munoz Dep., pp. 104-05).

279.   Munoz ensured that his group worked safely, and he monitored the environment for safety hazards.  (Munoz RFA #17).

280.   For example, he observed TMs to see if they had on their Personal Protective Equipment ("PPE") and to see if they were operating forklifts safely and correctly.  (Munoz Dep., p. 83).

281.   When he saw a TM do something unsafe, he talked to the TM about it. (Munoz Dep., pp. 82-83).

282.   He discussed safety issues with his group in start-up meetings. (Munoz Dep., pp. 83-84).

283.   He completed STOP Audit Checklists.  (Munoz Dep., p. 84).

284.   When he had a TM complain of an injury he notified the AM and took the TM to the Medical Department.  (Munoz Dep., p. 85).

285.   When he had a TM with medical restrictions, he limited the TM's duties to stay within the restrictions.  (Munoz Dep., pp. 89-90).

286.   When a TM wanted to take elective short term disability leave, he discussed the request with the TM and signed the request form if he approved of the scheduling of the leave.  (Munoz Dep., p. 91; Munoz Dep. Ex. 4).

287.   When Munoz saw TMs do something good, whether safety or performance related, he encouraged them.  (Munoz Dep., pp. 84-85).

288.   To increase morale, he did things with his group like have lunches or potlucks.  (Munoz Dep., pp. 92-93).

289.   He managed attendance in his group and ensured that his group was properly staffed.  (Munoz RFA # 3).

290.   He managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Munoz Dep., p. 69; Munoz RFA #4).

291.   He entered time for TMs and TLs in the payroll system and talked with them about any errors in their time sheets.  (Munoz Dep., pp. 141-43).

292.   He tracked a TM's days off on a board posted in the team center, on individual attendance records for the TMs and in the payroll system.  (Munoz Dep., pp. 69, 78-79).

293.   When a TM asked to use a vacation or emergency vacation day, Munoz determined if the request was in the standard for how many people could be off in his group, and then allowed or disallowed it.  (Munoz Dep., pp. 69-70, 74-75).

294.   When a TM wanted an exception to be made to the standard, Munoz consulted with the AM, looked to see if the jobs in his group were covered and called other GLs to see if he could borrow a TM.  (Munoz Dep., pp. 71-74).

295.   When a TM was on leave, Munoz put his TL in the TM's rotation or covered it with a TL from another group.  (Munoz Dep., p. 92).

296.   He adjusted rotation schedules when TMs were out.  (Munoz Dep., pp. 137-38).

297.   When a TM took a day off that was out of the standard, the TM had to bring Munoz documentation of the reason for the absence, which affected whether the absence was approved, and Munoz kept it in the TM's file.  (Munoz Dep., pp. 80-81).

298.   Munoz initiated, facilitated and monitored problem solving in his group.  (Munoz RFA #12).

299.   He completed 5 Why problem solving forms when his group was charged with causing downtime in production.  (Munoz Dep., pp. 85-86).

300.   Munoz investigated the cause of the downtime.  (Munoz Dep., pp. 86-87).

301.   Munoz discussed a countermeasure with his AM to prevent the problem from happing again and then Munoz shared the countermeasure with an individual TM or with the group as appropriate.  (Munoz Dep., pp. 87-88).

302.   Countermeasures included Munoz instructing a TM; Munoz training a TM; and Munoz revising the SMPs and making the group aware of it.  (Munoz Dep., p. 88).

303.   Munoz was responsible for creating layouts when there were changes in processes that affected his area.  (Munoz Dep., p. 93).

304.   He worked on designing the layout so that his group could accomplish what it needed to accomplish after the change.  (Munoz Dep., p. 94).

305.   He solicited the input of the TMs and tried to make the layout in the way that best accommodated his TMs.  (Munoz Dep., pp. 94-95).

306.   He also worked on layouts for an expansion of the Body Shop and gave input on what would be most efficient for the TMs or how the layouts could best be arranged for their duties.  (Munoz Dep., pp. 115-16).

307.   He also revised and wrote new SMPs or JESs when there were process changes.  (Munoz Dep., pp. 95-97).

308.   When a TL wrote a SMP, Munoz reviewed it and could make changes.  (Munoz Dep., p. 96).

309.   After Munoz made a process change, he reviewed it with the group. (Munoz Dep., p. 97).

310.   He watched TMs to make sure they performed new processes correctly.  (Munoz Dep., p. 100)

311.   As a GL, Munoz could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Munoz RFA #19).

312.   Munoz and the TLs developed training plans for new TMs and trained them.  (Munoz Dep., pp. 97-98).

313.   Munoz updated the Circle of Skills with the level to which a TM was trained based on his experience with or observations of the TM and what the TLs told him.  (Munoz Dep., pp. 98-99).

314.   He walked the floor and observed TMs to make sure they were working at the correct level.  (Munoz Dep., pp. 99-100).

315.   As a GL, he had an annual budget, and he had to control what his group spent on supplies.  (Munoz Dep., pp. 105-06).

316.   He tried to get TMs to not be wasteful with supplies and tried to stay within the budget.  (Munoz Dep., p. 106).

317.   Once the budget was set, his role was controlling costs to be within budget.  (Munoz Dep., p. 107).

318.   Munoz ensured that quality and production goals were met in his group.  (Munoz RFA ##13 & 22).

319.   Munoz had start-up meetings with his group, and he attended pre-production meetings, follow-up or mid-shift production meetings and HR meetings.  (Munoz Dep., pp. 126-27).

320.   In the production meetings, he met with the Managers and the other GLs for the Body Shop; he updated them on any issue from his group that would affect production; and he learned information that would affect his group such as production issues, build numbers, schedules and show cars.  (Munoz Dep., pp. 128-29).

321.   He checked the staging areas to make sure there were enough parts available, and if there were not, he would find out why.  (Munoz Dep., p. 111).

322.   He communicated with inventory control to make sure his group had the correct material flow and did not cause downtime.  (Munoz Dep., pp. 107-08).

323.   He made sure TMs did daily checklists for the forklifts and tuggers and reported to the forklift vendor if repairs were needed.  (Munoz Dep., pp. 108-09).

324.   His goal was to make sure there was enough equipment running for his group to accomplish its tasks.  (Munoz Dep., p. 109).

325.   If his group had downtime, he decided how his TMs would fill it, such as with cleaning or training.  (Munoz Dep., pp. 110, 112-13).

326.   Munoz completed shift logs everyday and made notes on safety incidents, build numbers, production schedules, parts shortages, general attendance and anything else he felt was important for the GL on the next shift to know. (Munoz Dep., pp. 114-15).

327.   His GL counterpart on the previous shift would leave him a log and Munoz would share some of that information with the group.  (Munoz Dep., p. 115).

328.   Munoz served as a liaison between the Body Shop and representatives of suppliers and discussed with them items such as whether MBUSI or the supplier would be charged for a damaged part, inspections by the suppliers of parts and counts on parts.  (Munoz Dep., pp. 116-18).

329.   If suppliers needed to inspect parts, Munoz would instruct the TMs to pull those parts.  (Munoz Dep., p. 119).

330.   Munoz annually evaluated the performance of TMs and TLs in his group.  (Munoz Dep., p. 121; Munoz RFA #6).

331.   He recorded on the evaluation form how each TM measured up to the performance criteria based on his observations, and he rated them as satisfactory or non-satisfactory.  (Munoz Dep., pp. 121-22).

332.   He also recorded development steps that he felt would help the TM. (Munoz Dep., p. 122).

333.   He also rated the TM as ready or not ready for promotion and could write comments about his rating.  (Munoz Dep., pp. 122-23; Munoz RFA #7).

334.   His rating was considered and normally followed in determining whether the TM was promoted.  (Munoz Dep., p. 123; Munoz RFA #8; Jones Decl. ¶¶ 31-32).

335.   If he rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

336.   If Munoz knew a TM or TL wanted to advance he provided them information and give them opportunities to develop.  (Munoz Dep., pp. 123-25).

337.   For example, he encouraged them to attend Pre-Team Leader Academy and gave TLs opportunities to fill in for him.  (Munoz Dep., p. 124).

338.   TMs went to Munoz with questions about policies and procedures and he answered them or if he could not he would obtain information for them or connect them with the right department.  (Munoz Dep., p. 129).

339.   He handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in a TM issue or conflict.  (Munoz RFA #18).

340.   When a TM in his group filed a concerns resolution, Munoz spoke with the TM about it, and if the TM was not satisfied with his response, Munoz escalated it to the AM.  (Munoz Dep., pp. 138-39).

341.   Munoz initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Munoz RFA #16).

342.   If Munoz or a TM had an idea for an improvement, he would review it with the TLs, get feedback from the TMs, and discuss it with the AM.  (Munoz Dep., pp. 139-40).

343.   If the idea was approved, he would share it with the other shift. (Munoz pp. 139-40).

344.   Munoz showed and supported top performance in his group.  (Munoz RFA #29).

345.   He shared his knowledge and experience with the group.  (Munoz RFA #30).

346.   In 2006, 2007 and 2008, Munoz was evaluated on various leadership criteria and competencies and was rated as successful, with which he agreed. Munoz Dep., pp. 133-35, Munoz Dep. Exs. 8-10).

## I.     KELLY PITMAN - 2007

347.   Kelly Pitman ("Pitman") began employment at MBUSI in 1997. (Pitman Dep., pp. 14, 17, 20).[18]

348.   On September 6, 2004, Pitman was promoted to GL of Door Line, Plant 2.  (Pitman Dep., pp. 20-21, 23-24; Pitman Dep. Ex. 1).

349.   In January, 2005, Pitman became GL for Assembly, Plant 2, Final 4. (Pitman Dep., p. 25; Banta Decl. ¶ 6).[19]

350.   On September 1, 2006, Pitman became Acting AM for Assembly, Plant 2.   (Pitman Dep., p. 124; Banta Decl. ¶ 7; Banta Decl. Ex. B (LEAD Evaluation 2007, p. 2)).

351.   On March 1, 2007, Pitman was promoted to AM, Assembly, Plant 2. (Pitman Dep., p. 29; Banta Decl. ¶ 8; Banta Decl. Ex. C (Transaction Notice)).

352.   In September, 2007, Pitman transferred to AM, Supplier Quality Engineering, where he worked until he resigned from employment with MBUSI on March 21, 2008.  (Pitman Dep., pp. 14, 30; Banta Decl. ¶¶ 9-10; Banta Decl. Ex. D (Resignation Letter)).

---

[18]     The Deposition of Kelly Pitman and exhibits to the deposition are attached as Ex. 39 to MBUSI's Evidentiary Submission (Volume 4).

[19]     The Declaration of Valerie Banta is attached as Ex. 25 to MBUSI's Evidentiary Submission (Volume 2).

353.   In 2007, MBUSI paid Pitman over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 8; Pitman RFA #41).[20]

354.   For the year 2007, Pitman was either an AM or an Acting AM and thus performed AM duties instead of GL duties.  (Pitman Dep., pp. 29, 124; Banta Decl. ¶¶ 7-9; Banta Decl. Exs. B, C).

355. As an AM, Pitman considered himself to be a member of management.  (Pitman Dep., p. 33).

---

[20]   Pitman Responses to Requests for Admission are attached as Ex. 40 to MBUSI's Evidentiary Submission (Volume 4).

## J.     DANNY BANKSTON - 2009

356.   Danny Bankston ("Bankston") began employment at MBUSI on May 6, 1996.  (Bankston Dep., p. 12).[21]

357.   In September, 2003, Bankston was promoted to GL for the Quality Department.  (Bankston Dep., pp. 42, 92).

358.   He first was a GL for Quality - Audit; then he spent some time as a GL in Germany; and then he helped prepare for the launch of a new vehicle at the Vance plant.  (Bankston Dep., pp. 23-24, 69, 92, 96-97).

359.   In January, 2006, he returned to his GL duties in Quality - Audit. (Bankston Dep., pp. 23-24, 106).

360.   In March or April, 2007, he transferred to a GL position in Quality - Body.  (Bankston Dep., pp. 23-24, 85, 108-09).

361.   In July 2008, his title changed to GL for Quality - Audit Body & Paint, and he worked in that position until he left MBUSI on December 31, 2009. (Bankston Dep., pp. 17, 85, 108-09, 113; Bankston Dep. Ex. 3).

362.   In 2009 (Quality - Audit Body & Paint), MBUSI paid Bankston over $100,000.00 in compensation, including at least $455.00 per week in salary. (Compensation Decl. ¶ 9; Bankston RFA #41).[22]

---

[21]     The Deposition of Danny Bankston and exhibits to the deposition are attached as Ex. 41 to MBUSI's Evidentiary Submission (Volume 4).

363.   When he was a GL in Quality - Audit Body & Paint, he had approximately 7 TMs in his group and some of them worked in the Body Shop and some of them worked in the Paint Shop.  (Bankston Dep., pp. 109-10).

364.   A GL position is different than a general laborer position.  (Bankston Dep., pp. 19-20).

365.   Bankston's GL duties differed from those performed by the TMs in his group.  (Bankston RFA #34).

366.   As a GL, he supervised the TLs and TMs in his group.  (Bankston RFA #1).

367.   When he was a TM he considered his GL to be his supervisor. (Bankston Dep., pp. 40, 45).

368.   In his job as a GL, a Manager or AM was not always present in his group, and he could and did lead his group independently of his Manager or AM. (Bankston RFA #33).

369.   He covered for the AM when she was on vacation.  (Bankston Dep., p. 186).

370.   In Quality - Body & Paint, Bankston would travel between Body, Paint 1 and Paint 2, where his TMs worked, observe their performance and make

---

[22]      Bankston Responses to Requests for Admission are attached as Ex. 42 to MBUSI's Evidentiary Submission (Volume 4).

sure the TMs were doing what they were supposed to be doing.  (Bankston Dep., pp. 164-65, 173-74).

371.   Bankston would check the SMPs once a day and check each TM at each location.  (Bankston Dep., p. 162).

372.   He described his day after the line starting running until the end of the shift as follows:  He would spend the first hour on line checking quality; then he would get ready for and attend a Body Shop meeting; then he would go to Weld Destruct where he had TMs and make sure they were doing well; then he would go to Paint 1 and check on or help his TM there (if he helped, that took about 15 minutes); then he would go back by Weld Destruct and help them bust welds for an hour and a half; then he would go to lunch; then he would check on his TM in Paint 2; then he would check with the Paint Quality Control GL; then he would go to Final Line in Paint Shop and check on what issues the TMs had there; then he would take his break; then he would go to Body Shop and check on TMs there; and then he would check cars on line for the last hour.  (Bankston Dep., pp. 173-77).

373.   Bankston testified that he was only required to check cars the first and last hours of the day, and that he was told to check cars when he was not performing his other GL duties.  (Bankston Dep., pp. 151, 165-66).

374.   Bankston checked cars to see if his TMs had missed any issues. (Bankston Dep., pp. 162-66, 169).

375.   If Bankston caught something his TM missed, he would show it to the TM.  (Bankston Dep., p. 163).

376.   He would tell the TM to try to look out for the issue and make sure to not miss it in the future.  (Bankston Dep., p. 163).

377.   Bankston was responsible for checking TMs to be sure they were doing what the policy said they should do, and he addressed any quality issues that arose during the course of his shift.  (Bankston Dep., p. 160).

378.   If a quality issue was found, he sometimes worked with other GLs to try to determine what was causing the issue.  (Bankston Dep., p. 161).

379.   Bankston directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Bankston RFA #5).

380.   He led his group in meeting company standards and used leadership skills in his GL position.  (Bankston RFA ##25, 26).

381.   He shared his knowledge and experience with his group.  (Bankston RFA #30).

382.   When Bankston arrived at work each shift, he checked logs by other GLs to see what issues there had been on the prior shift, and he printed out any safety sheets or HR toolboxes to share with his group.  (Bankston Dep., p. 153).

383.   He would meet and greet his TMs when they arrived at work and record who was in attendance.  (Bankston Dep., p. 153).

384.   He also checked his phone messages to see if any TMs called out of work.  (Bankston Dep., p. 153).

385.   Bankston conducted a start-up or communication meeting with his group every day.  (Bankston Dep., pp. 167-68).

386.   He informed them of any safety or HR issues and covered any issues from the previous shift.  (Bankston Dep., pp. 179-80).

387.   In Quality-Body & Paint, prior to his start-up meeting with his group, Bankston attended a start-up meeting with all of the Body Shop GLs, AMs, Manager and Engineers to discuss the GLs' leave-over logs from the previous shift. (Bankston Dep., p. 167).

388.   In that meeting, the GLs had an opportunity to discuss any issues they had in their groups.  (Bankston Dep., pp. 167-68).

389.   Bankston then made the TMs in his group aware of some of that information when he met with them in their start-up meeting.  (Bankston Dep., pp. 167-68).

390.   For example, he would tell them there was a dent in a part from a supplier and to be sure they looked for it.  (Bankston Dep., p. 167).

391.   In Quality-Body & Paint, Bankston attended a Body Shop meeting every morning where the AM of each area (such as CMM, Welding and Quality) reported on their area because Bankston's AM delegated that task to him. (Bankston Dep., pp. 170-71).

392.   He facilitated the meeting, and he also reported for the Quality area when it was the time for that area to give a report.  (Bankston Dep., pp. 171-73).

393.   At the end of each shift, Bankston completed a carry-over log which contained information such as attendance, issues that came up during the day, quality, the daily audit and items for the GL on the next shift to monitor. (Bankston Dep., pp. 170, 181-83; Bankston Dep. Ex. 4).

394.   GLs oversaw training of TMs to be sure the TMs had been properly trained.  (Bankston Dep., p. 82).

395.   Bankston reviewed the TM or TL's performance to determine what level they were trained to in the Circle of Skills training plan, and he was responsible for signing off on the Circle of Skills form quarterly.  (Bankston Dep., pp. 83-84; Bankston Dep. Ex. 2).

396.   When he signed off on the form, he judged whether the TMs or TLs could perform the function for each process without assistance.  (Bankston Dep., p. 85).

397.   Bankston directed training and retraining in skills for TMs when he deemed appropriate.  (Bankston RFA #19).

398.   Bankston managed vacation scheduling, timekeeping and attendance tracking for his TLs and TMs.  (Bankston Dep., pp. 153-55; Bankston RFA #4).

399.   He marked attendance occurrences for TMs according to the attendance policy.  (Bankston Dep., p. 154).

400.   If a TM had too many occurrences, Bankston let HR know and wrote a discipline form.  (Bankston Dep., pp. 154-55).

401.   He informed the TLs which TMs would not be at work, and the TLs adjusted manpower to make sure all stations were covered.  (Bankson Dep., p. 154).

402.   Bankston moved TMs from team to team to cover manpower problems.  (Bankston Dep., p. 154).

403.   Bankston was responsible for approving vacation for his TMs according to the vacation policy.  (Bankston Dep., p. 155).

404.   He also approved emergency vacation for TMs who brought the correct documentation.  (Bankston Dep., p. 157).

405.   When a TM had to leave a shift early, he adjusted manpower or made the decision to help them finish their processes early.  (Bankston Dep., p. 158).

406.   Bankston only had to fill in for a TM if the TL was already filling in for another TM.  (Bankston Dep., pp. 158-59).

407.   Even if he filled in, he still had to do all of his GL job.  (Bankston Dep., p. 159).

408.   Bankston annually evaluated his TMs and TLs and rated them as satisfactory or not satisfactory in various performance categories.  (Bankston Dep., pp. 56-59; Bankston RFA #6).

409.   He provided his opinion as to whether the TM was ready for promotion to the next level, and he indicated the determination on the evaluation.  (Bankston Dep., pp. 58-59; Bankston RFA #7).

410.   Bankston's AM and HR reviewed the evaluation before Bankston presented it to the TM, and the AM or HR asked him to change something on an evaluation only once or twice.  (Bankston Dep., pp. 58-59).

411.   If Bankston assessed a TM as not ready for promotion, the TM was not eligible for promotion.  (Bankston Dep., pp. 60-61, 72).

412.   If he rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

413.   He showed and supported top performance in his group.  (Bankston RFA #29).

414.   Bankston ensured that the TMs in his group followed company policies and work rules and that these policies and rules were enforced.  (Bankston RFA #14).

415.   Bankston counseled TMs on performance, quality of work and conduct.  (Bankston RFA #9).

416.   Bankston had the authority to initiate a CPR if he felt that was necessary.  (Bankston RFA #10).

417.   If there was a reason to take a discipline step, he drafted a discipline and sought approval from HR and the AM, including for termination.  (Bankston Dep., pp. 204-07).

418.   He called HR and sought guidance if the discipline related to a conduct issue.  (Bankston Dep., pp. 205-06).

419.   He initiated, facilitated and monitored problem solving in his group. (Bankston RFA #12).

420.   He reviewed SMPs that his TLs drafted and made sure they drafted revisions to SMPs where appropriate.  (Bankston Dep., pp. 185-86).

421.   He handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in a TM issue or conflict. (Bankston RFA #).

422.   Bankston ensured that his group was working safely and he monitored the environment for safety hazards.  (Bankston RFA #17).

423.   He walked by Weld Destruct when his TMs were not working and checked to make sure they were wearing their safety equipment.  (Bankston Dep., p. 180).

424.   In the event of severe weather or fire, Bankston ensured that the TMs that were with him went to the designated safety area.  (Bankston Dep., pp. 87-89).

425.   He ensured that production and quality goals were met in his group. (Bankston RFA ##13 & 22).

426.   When his TMs did not have weld destruct or other duties to do, he made a plan for them to check cars on line.   (Bankston Dep., pp. 183-184; Bankston Dep. Ex. 5).

427.   He used his best judgment in performing all of his GL job duties. (Bankston RFA #23).

428.   He fulfilled all of the roles and responsibilities of his GL position. (Bankston Dep., pp. 198-99; Bankston Dep. Ex. 9; Bankston RFA #24).

429.   Bankston agreed that the purpose of the GL position was "to direct Team Leaders and other Team Members in the execution of the teams' responsibilities.  Responsible for the teams' achieving the Company's objectives for

safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Bankston Dep., pp. 200-01).

430.   Bankston described the direction he gave his group as follows:  "it's like being a music director, you follow the sheet music to direct the symphony - - to direct an orchestra.  You're not just up there just moving your arms.  They can't play or follow unless you have something that you're reading and directing.  And when you direct team leaders and other team members, you're directing them in what the company has laid out for them to follow." (Bankston Dep., pp. 200-01).

431.   Bankston agreed that the essential functions listed in the GL job description were the actual functions of his job except he did not plan activities because of the production schedule. (Bankston Dep., pp. 201-02, 207).

432.   Unlike TMs, Bankston was evaluated not just on how he performed but on how his group performed. (Bankston Dep., pp. 193-94).

433.   On all of his evaluations, he was rated as satisfactory. (Bankston Dep., p. 197).

434.   Bankston admits that he "oversaw" his group to see that policies were followed, but he does not believe he was management because he did not have the "final say" on things such as hiring and firing. (Bankston Dep., pp. 190-92).

### K.    MARIO COHEN - 2009

435.    Mario Cohen ("Cohen") began employment at MBUSI on June 2, 1997.  (Cohen Dep., p. 45).[23]

436.    In 1998, he was promoted to TL.  (Cohen Dep., pp. 51-52).

437.    Later in 1998, Cohen was promoted to GL in the Assembly Shop. (Cohen Dep., pp. 42, 70).

438.    He received a significant increase in his pay when he was promoted to GL because he took on new responsibilities.  (Cohen Dep., p. 162).

439.    In approximately 2005, Cohen became GL of Trim 1 in Assembly. (Cohen Dep., pp. 42, 78).

440.    In that position, Cohen had 4 teams and TLs, and about 6 TMs were on each team.  (Cohen Dep., p. 79).

441.    In 2009, MBUSI paid Cohen over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 10; Cohen RFA #41).[24]

442.    Cohen's GL duties differed from those performed by the TMs in his group.  (Cohen RFA #34).

443.    As a TL, Cohen reported to a GL.  (Cohen Dep., pp. 50-51).

---

[23]    The Deposition of Mario Cohen and exhibits to the deposition are attached as Ex. 43 to MBUSI's Evidentiary Submission (Volume 4).

[24]    Cohen Responses to Request for Admission are attached as Ex. 44 to MBUSI's Evidentiary Submission (Volume 4),

444.   As a TL, he handled the job rotation schedule, and if he could not resolve problems that his TMs had with the schedule, he would call the GL. (Cohen Dep., pp. 63-64).

445.   As a GL, Cohen could approve changes in the rotation schedule. (Cohen Dep., p. 77).

446.   As a TL, he was trained in the Circle of Skills to work on the stations in his team independently.  (Cohen Dep., pp. 57-58).

447.   As a GL, he was not trained to work on all the stations in his group. (Cohen Dep., p. 58).

448.   In 2002, when Cohen was a GL, he described himself as a "manager." (Cohen Dep., pp. 115-16; Cohen Dep. Ex. 87).

449.   As a GL, Cohen made sure the TMs were doing their job.  (Cohen Dep., p. 104).

450.   He gave TLs feedback and let them know when they did a good job. (Cohen Dep., pp. 109-10).

451.   He let TLs know if they did something inconsistent with the company policy.  (Cohen Dep., p. 109).

452.   He let TLs know if there was something they needed to improve upon. (Cohen Depo., p. 110).

453.   He initiated conversations with TMs about their performance.  (Cohen Dep., p. 135).

454.   He initiated CPRs for TMs who did not follow company policy or attendance guidelines.  (Cohen Dep., p. 138).

455.   Cohen tried to lead and teach according to MBUSI policy.  (Cohen Dep., p. 111).

456.   Cohen had pre-shift meetings with the AMs and GLs and sometimes TLs about information they needed to relay to their groups.  (Cohen Dep., p. 141).

457.   He then had morning meetings with his TMs and TLs where he relayed this information.  (Cohen Dep., p. 141).

458.   Cohen also went over SQDCM with his group.  (Cohen Dep,. pp. 124-25, 142).

459.   If TMs had questions, he tried to answer them or he called HR for them.  (Cohen Dep., p. 36).

460.   He met with TMs and HR about issues his TMs raised.  (Cohen Dep., pp. 143-44).

461.   TMs were supposed to follow Cohen's instructions, and if they did not, they could be disciplined.  (Cohen Dep., pp. 113-14).

462.   Cohen used sign in/sign out sheets to track which TMs worked on which vehicles.  (Cohen Dep., pp. 79-80).

463.   If Cohen or the Quality Department found something wrong with the vehicle, he gave the TM feedback about the defect.  (Cohen Dep., p. 81).

464.   He ensured that his group was working safely and he monitored the environment for safety hazards.  (Cohen RFA #17).

465.   He made sure TMs followed company policy on safety.  (Cohen Dep., p. 127).

466.   Cohen participated in finding root causes of TM injuries and developing countermeasures.  (Cohen Dep., pp. 155-56; Cohen Dep. Ex. 90).

467.   When a TM in his group was injured, Cohen was part of the investigation into the incident.  (Cohen Dep., p. 126).

468.   Cohen, the Medical Department, the Physical Therapist and the TM worked together to come up with a countermeasure to keep the injury from happening again.  (Cohen Dep., pp. 126-27).

469.   Cohen could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Cohen RFA #19).

470.   He reviewed Circle of Skills forms completed by TLs to see that the TMs had been trained.  (Cohen Dep., p. 82).

471.   He read the SMP and watched the TM perform the process to see if the TM followed it and did the process correctly.  (Cohen Dep., pp. 83-84).

472.   If the TM did not follow the SMP, the TM had to continue to train. (Cohen Dep., p. 85).

473.   In his position as GL, Cohen annually evaluated TMs and TLs who worked for him.  (Cohen Dep., pp. 117-18; Cohen Dep. Ex. 88).

474.   He gave them the only evaluation they received for the year.  (Cohen Dep., p. 119).

475.   It was made part of their personnel file.  (Cohen Dep., p. 119).

476.   The evaluations were based on Cohen's daily observations of the TMs as he walked through their area.  (Cohen Dep., pp. 117-18).

477.   On the evaluation, Cohen assessed whether the TM met the performance criteria and rated them as satisfactory or not satisfactory.  (Cohen Dep., pp. 119-20; Cohen Dep. Ex. 88).

478.   He also wrote on the evaluation items that the TM needed to develop. Cohen Dep., pp. 120-21; Cohen Dep. Ex. 88).

479.   He suggested to TMs what they needed to do to develop their skills and on the next evaluation he assessed whether they had developed the skills. (Cohen Dep., p. 121; Cohen Dep. Ex. 88).

480.   Cohen evaluated whether as the supervisor he believed the TM was ready for promotion or needed development.   (Cohen Dep., pp. 122-23; Cohen Dep. Ex. 88).

481.   He determined if the TM had followed all the steps and displayed all the skills needed for the next level.  (Cohen Dep., pp. 123-24; Cohen Dep. Ex. 88).

482.   A TM could not move to the next level if Cohen rated him as needing development.  (Cohen Dep., p. 124).

483.   Also, if Cohen rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

484.   He signed the evaluation as the TM's "supervisor."  (Cohen Dep., pp. 121-22).

485.   During the course of the year, when Cohen noted that a TM needed to improve something, he told the TM so the TM had an opportunity to correct it before receiving an evaluation.  (Cohen Dep., pp. 118-19).

486.   He talked to TMs to keep morale high in his group.  (Cohen Dep., pp. 136-37).

487.   He attempted to solve problems between TMs and their TLs.  (Cohen Dep., p. 137).

488.   He provided a response to concerns resolutions filed by TMs in his group.  (Cohen Dep., pp. 137-38).

489.   Cohen had some accountability when his group sent out a vehicle with a defect.  (Cohen Dep., pp. 129-30).

490.   If a problem was cased by one of the processes in his group, that was fed back to him, and he was responsible for making sure it did not continue to happen.  (Cohen Dep., p. 132).

491.   Cohen expected TMs to have quality in their work, and if they caused or could have prevented a vehicle from leaving the group with a defect, Cohen fed that back to the TMs to make sure they were doing what they were supposed to be doing.  (Cohen Dep., pp. 130, 147).

492.   If Cohen knew of a defect from another group, he fed it back to the other group.  (Cohen Dep., pp. 131-32).

493.   He made sure his group did not incur unnecessary costs.  (Cohen Dep., p. 133-34).

494.   Cohen tracked attendance of the TMs in his group.  (Cohen Dep., p. 136).

495.   He was responsible for the manpower in his group and making sure that all stations were covered.  (Cohen Dep., p. 138).

496.   When a temporary employee had an attendance problem, Cohen spoke to the temporary employee's supervisor and HR representative, and the employee did not return to his group.  (Cohen Dep., pp. 139-40).

497.   Cohen had a budget for overtime hours, and if he exceeded it, he had to provide an explanation to the AM.  (Cohen Dep., pp. 159-60; Cohen Dep. Ex. 91).

498.   He asked TMs to work overtime, and he entered overtime worked by TMs into the time system.  (Cohen Dep., pp. 155, 157-58).

499.   Cohen completed turnover logs where he recorded information for his group such as safety concerns, medical visits, quality issues, attendance, and pre and post shift items.  (Cohen Dep., pp. 144-56; Cohen Dep. Exs. 89 & 90).

500.   The turnover logs helped the GL on the next shift to prepare for the shift.  (Cohen Dep., p. 148).

501.   Cohen used the turnover logs prepared by the GL on the previous shift to prepare for his shift.  (Cohen Dep., p. 152).

502.   In his years as a GL, Cohen sanded an area on a car that was missed on only five to ten occasions.  (Cohen Dep., p. 140).

503.   He used his best judgment in performing all of his GL job duties. (Cohen RFA #23).

504.   He fulfilled all of the roles and responsibilities of his GL position. (Cohen Dep., pp. 160-62; Cohen Dep. Ex. 4;[25] Cohen RFA #24).

---

[25]    Several of the plaintiffs in the <u>Lawson</u> case were deposed in the <u>Hicks</u> case, and the parties agreed to use their depositions in the <u>Lawson</u> case.  In those <u>Hicks</u> depositions, all of the exhibits were marked the first time they were used and then were used throughout the

## L.    CLARENCE ALLEN OZIER - 2009

505.   Clarence "Allen" Ozier ("Ozier") began employment at MBUSI on June 2, 1997.  (Ozier Dep., p. 11).[26]

506.   He was promoted to TL in Assembly, Trim 2.  (Ozier Dep., pp. 21, 26).

507.   In July, 2005, Ozier was promoted to GL in Trim 5, Assembly, Plant 2, and he was GL over various Trim areas until he became GL of the Continuous Improvement ("CI") Team in Assembly in January, 2009.  (Ozier Dep., pp. 27-29, 34-36, 43; Banta Decl. ¶¶ 12-15).

508.   Ozier's employment with MBUSI ended in December, 2009.  (Ozier Dep., p. 12; Banta Decl. ¶ 16).

509.   In 2009 (CI Team), MBUSI paid Ozier over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 11; Ozier RFA #41).[27]

510.   As a TL, Ozier had different duties than a TM, and those duties included filling out job rotation schedules, reviewing SMPs to determine if they

---

depositions without being re-marked. For ease of reference by the Court, an exhibit referenced by a <u>Hicks</u> deponent is included with the exhibits of the deponent who referenced it.  So, for example, "Cohen Dep. Ex. 4" refers to Exhibit 4 to all of the <u>Hicks</u> depositions and is included with Cohen's deposition exhibits in the evidentiary submissions.

[26]    The Deposition of Clarence Allen Ozier and exhibits to the deposition are attached as Ex. 45 to MBUSI's Evidentiary Submission (Volume 4).

[27]    Ozier Response to Request for Admission are attached as Ex. 46 to MBUSI's Evidentiary Submission (Volume 4).

were up to date, handling torque verification sheets, maintaining the training plan for TMs and recommending trainers. (Ozier Dep., pp. 23-24).

511.  If Ozier reviewed an SMP that was not up to date, he would inform the GL to begin the process of updating the SMP. (Ozier Dep., p. 23).

512.  TLs answered line pulls by TMs and tried to resolve the problem that caused the line pull, but if they could not, they called the GL. (Ozier Dep., p. 21).

513.  As a TL, Ozier would try to resolve quality issues in his team, but if he could not resolve it before it left his team, he notified the GL. (Ozier Dep., p. 25).

514.  As a TL, Ozier had "very, very little" contact with AMs. (Ozier Dep., p. 27).

515.  As the GL of the CI Team, Ozier had approximately 8 TMs and 1 TL in his group, and they worked throughout the Assembly Shop in Plant 2. (Ozier Dep., pp. 42-43).

516.  The function of the CI Team was to reduce waste through time studies. (Ozier Dep., p. 42).

517.  On the CI Team, Ozier spent most of his time relaying information to TMs about what workshops they needed to do, walking around to see the workshops and participating in workshops. (Ozier Dep., p. 161).

518.   As the GL of the CI Team, Ozier reported to a Manager.  (Ozier Dep., p. 43).

519.   Once a week, Ozier attended a CI meeting along with TLs and other GLs over CI Teams and the head of MPS.  (Ozier Dep., p. 44).

520.   At the meetings, the attendees discussed manpower, reductions needed and when each CI Team would meet with the management team.  (Ozier Dep., p. 45).

521.   As GL of the CI Team, Ozier attended a start-up meeting every morning with the AMs of the Final Side in Assembly.  (Ozier Dep., p. 48).

522.   At the meeting, the attendees discussed the previous day's activities, what would happen through the shop, any recent safety issues, overall numbers, their goals, targets, manpower and anything in the turnover logs.  (Ozier Dep., pp. 48-49).

523.   Ozier then conducted a start-up meeting with his CI Team at the beginning of each shift and fed back that information to the TMs.  (Ozier Dep., p. 47).

524.   At the start up meeting with his CI Team, he also discussed the status of the projects the TMs were working on and what assistance they needed from him or others to make sure the group met its targets.  (Ozier Dep., p. 50).

525.   Before each shift in CI, he read e-mails from other GLs requesting workshops by the CI Team.  (Ozier Dep., pp. 58-59).

526.   He led his group in meeting company standards and used leadership skills in his GL position.  (Ozier RFA ##25, 26).

527.   If a TM was not performing a process correctly, Ozier reviewed the SMP with the TM and tried to assist them in being able to perform the process. (Ozier Dep., p. 88).

528.   He drafted development steps for TMs who had performance issues. (Ozier Dep., pp. 85, 90; Ozier Dep. Exs. 6 & 10).

529.   He fed back quality issues to TMs and worked with them on improving.  (Ozier Dep., p. 93; Ozier Dep. Ex. 10).

530.   He documented defects from his group and addressed that with TMs so the group would not have that defect again.  (Ozier Dep., pp. 144-45).

531.   He relayed to TLs information that was passed to him and made sure they understood it and did what they were supposed to do.  (Ozier Dep., pp. 113, 124).

532.   When Ozier saw TMs not doing what they were supposed to be doing, he reminded them of the procedures they were supposed to follow.  (Ozier Dep., p. 114).

533.   When a TM was away from the line when he should be working, Ozier reminded him to follow the policy.  (Ozier Dep., p. 114).

534.   When Ozier observed a TM not focusing on his job, he reviewed the SMP with the TM and made sure the TM was following it.  (Ozier Dep., p. 133).

535.   Other than the TL, he was the best person to make the TMs focus because he saw them more than anybody else.  (Ozier Dep., p. 150).

536.   He shared his knowledge and experience with his group.  (Ozier RFA #30).

537.   Ozier ensured that company policies and work rules were enforced in his group.  (Ozier RFA #14).

538.   Ozier reminded TMs that there were policies that needed to be followed.  (Ozier Dep., p. 115).

539.   When Ozier saw a TM not following a safety rule, he talked to the TM about following the SMP and the procedures.  (Ozier Dep., p. 129).

540.   When Ozier saw TMs engage in conduct which warranted discipline, he reported the conduct to the AM.  (Ozier Dep., pp. 137-38).

541.   He always addressed rule or policy violations by a TM.  (Ozier Dep., p. 138).

542.   When he thought further action was needed beyond what he did, he escalated it to the AM.  (Ozier Dep., pp. 146-47).

543.   Ozier managed vacation scheduling, timekeeping and attendance tracking for members of his group.  (Ozier Dep., pp. 129-30; Ozier RFA  #4).

544.   When a TM had a certain number of occurrences under the Attendance Policy, Ozier informed the AM and drafted a CPR.  (Ozier Dep., p. 129).

545.   When a TM received a certain number of CPRs for attendance, he was terminated.  (Ozier Dep., p. 135).

546.   Ozier managed manpower and line staffing within his group or had his TLs do that.  (Ozier Dep., p. 144).

547.   When Ozier's group was short of manpower, he and the TLs moved TMs among teams, and he informed the AM they were short and requested additional resources if needed.  (Ozier Dep., pp. 131-32).

548.   When a TM had medical restrictions, Ozier communicated that information to the TL so the TL would know where to place the TM in the rotation. (Ozier Dep., pp. 130-31).

549.   Ozier evaluated the performance of TMs and TLs in his group.  (Ozier Dep., pp. 71-84, 91-96, 104-05; Ozier Dep. Exs. 2, 4-5, 9-16; Ozier RFA  #6).

550.   On the evaluation form, he provided his opinion as to whether the TMs and TLs met the performance criteria and the roles and responsibilities of their position.  (Ozier Dep., pp. 72-75; Ozier Dep. Exs. 2-5, 9-16).

551.   If the TM or TL met the goals and were following procedures, Ozier rated them as satisfactory.  (Ozier Dep., pp. 74-75).

552.   He "would try to write what [he] had seen" in the evaluations.  (Ozier Dep., p. 78).

553.   He provided his opinion as to whether or not TMs and TLs were ready for promotion or needed development.  (Ozier Dep., pp. 79-80, 82-84, 91-96, 104-05; Ozier Dep. Exs. 2, 4-5, 9-16; Ozier RFA #7).

554.   Ozier's rating of a TM as ready or not ready for promotion was considered and normally followed in determining if the TM would be promoted.  (Ozier Dep. Exs. 2, 4-5, 9-16, at p. 2; Jones Decl. ¶¶ 31-32).

555.   If Ozier rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Ozier Dep., pp. 92; Jones Decl. ¶ 33).

556.   Ozier also evaluated temporary employees who worked at MBUSI, and they required more frequent evaluations.  (Ozier Dep., pp. 135-36).

557.   He handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in a TM issue or conflict.  (Ozier RFA #18).

558.   He tried to keep his group happy so they would work better.  (Ozier Dep., p. 146).

559.   When Ozier's group had issues with parts, equipment or machines, Ozier contacted Logistics, Engineering or Maintenance and led them to the areas in which the group had problems.  (Ozier Dep., pp. 151-52).

560.   He informed his AM on any activity that might cause downtime so the AM would know how it would affect other groups and could pass on the information.  (Ozier Dep., pp. 152-53).

561.   Where there were quality issues, Ozier along with the TL drafted a 5 Why problem solving form.  (Ozier Dep., p. 124).

562.   He also drafted a 5 Why form when TMs were injured.  (Ozier Dep., pp. 124-25, 145).

563.   He could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Ozier RFA #19).

564.   He reviewed and signed off on training plans and talked with the trainer to make sure the TM was progressing.  (Ozier Dep., pp. 121-22).

565.   Ozier was evaluated on how his group performed.  (Ozier Dep., p. 148).

566.   He used his best judgment in performing all of his GL job duties. (Ozier RFA #23).

## M.    GENE UPTON - 2009

567.    Gene Upton ("Upton") began employment at MBUSI in April, 1997. (Upton Dep., p. 13).[28]

568.    Upton was promoted to TL in Paint Repair in 2002.  (Upton Dep., pp. 30, 33-34, 49).

569.    He was promoted to GL of Paint Repair in Assembly, in 2005, and he remained in that position until his employment with MBUSI ended on December 31, 2009.  (Upton Dep., pp. 13, 54, 68; Banta Decl. ¶ 17).

570.    In 2009, MBUSI paid Upton over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 12; Upton RFA #41).[29]

571.    As a TL, Upton reported to his GL.  (Upton Dep., p. 46).

572.    As a TL, Upton worked on the line and also had additional responsibilities such as reporting area conditions to the GL, setting up, and making sure TMs had the tools they needed to do their job.  (Upton Dep., p. 36).

573.    He also assisted TMs who pulled the line and if he could not fix the problem which caused the line pull, he went to the GL.  (Upton Dep., pp. 37-38, 46).

---

[28]    The Deposition of Gene Upton and exhibits to the deposition are attached as Ex. 47 to MBUSI's Evidentiary Submission (Volume 5).

[29]    Upton Responses to Request for Admission are attached as Ex. 48 to MBUSI's Evidentiary Submission (Volume 5).

574.   The GL did not respond to line pulls because he was not standing on line.  (Upton Dep., pp. 37-38).

575.   As a TL, Upton sometimes filled in for TMs on his team or on other teams when the GL or AM called him and told him to fill in on another team. (Upton Dep., pp. 41-43).

576.   As a GL, Upton had three teams and averaged 22 TMs in his group. (Upton Dep., pp. 68-69).

577.   These three teams covered five areas in Paint Repair, including polish line, final inspection, spot repair, major repair and assembly repair.  (Upton Dep., pp. 69-70).

578.   Two of Upton's teams were offline and the other was online.  (Upton Dep., p. 120).

579.   The TMs in assembly repair were in the Assembly Shop which was half a mile away from the Paint Shop areas.  (Upton Dep., p. 70).

580.   A Manager or AM was not always present in his group, and he led his group independently of his Manager or AM.  (Upton RFA #33).

581.   He took control of situations in his area that arose when his AM was absent.  (Upton RFA #32).

582.   Upton supervised the TLs and TMs in his group and described himself to people outside of MBUSI as a supervisor.  (Upton Dep., p. 201; Upton RFA #1).

583.   His daily activities were to observe TMs, give them feedback, attend meetings, check quality, feedback issues his TMs found in the Assembly Shop to the Paint Shop or the other areas responsible, and get clean points for the Assembly Shop.  (Upton Dep., pp. 151-52).

584.   These tasks "pretty much took a lot of [his] day."  (Upton Dep., p. 152).

585.   He checked quality on line the first hour of every shift and then only when the quality numbers "were in the red" which was about two hours a day. (Upton Dep., pp. 151-53).

586.   Upton spent about 40 minutes walking the production line and when he did that he was observing the TMs.  (Upton Dep., pp. 121-22).

587.   When he observed TMs, he looked to see if they were following SMPs.  (Upton Dep., p. 122).

588.   He gave them feedback so that they would do a better job and eliminate mistakes.  (Upton Dep., p. 125).

589.   When his TLs or TMs had problems, they called him on his radio and he would go to their area.  (Upton Dep., pp. 126-27, 131).

590.   They called him 25 to 30 times a day.  (Upton Dep., p. 143).

591.   When there were problems, he first tried to resolve them within his group.  (Upton Dep., p. 135).

592.   He tried to make sure the TL or TM was following the SMP.  (Upton Dep., p. 135).

593.   He instructed TMs on what to do differently so they would not have the problem again.  (Upton Dep., p. 143).

594.   If the problem was within his realm, he could make the decision to fix it himself, have a TM fix it or contact Maintenance or Engineering or another GL.  (Upton Dep., pp. 134-35).

595.   Upton felt that his function was to communicate information between upper management and TMs.  (Upton Dep., p. 218).

596.   He attended a start-up meeting with his AM at the beginning of each shift.  (Upton Dep., p. 71).

597.   He then met with the TMs in the Paint Shop and communicated to them items such as problems from the previous shift, quality, safety, HR issues and SQDCM.  (Upton Dep., pp. 71-73).

598.   To prepare for his meetings with his TMs he read leave-over logs from the previous shift, read e-mails from HR and other areas, and gathered information from his AM.  (Upton Dep., pp. 72-73).

599.   He then communicated the same information to his TMs in the Assembly Shop by telephone.  (Upton Dep., pp. 71-72).

600.   Upton also met with the Managers, the AMs and the Engineers in another meeting during the shift to go over downtime information and quality and production numbers.  (Upton Dep., p. 74).

601.   After that meeting, Upton would call his TLs and let them know how many cars they were going to build and how much overtime they would have that day.  (Upton Dep., pp. 74-75).

602.   He called his AM throughout the shift to inform him of any downtime (which was 25 to 100 times a day) to help in planning overtime.  (Upton Dep., p. 140).

603.   Upton did not necessarily involve the AM in the problem that caused downtime but just notified him of the problem.  (Upton Dep., pp. 141-42).

604.   At the end of the shift, Upton gathered all the production and quality numbers and completed a shift log for the GL on the next shift.  (Upton Dep., p. 78; Upton Dep. Exs. 2-8).

605.   The shift log had important information about how his shift ran, such as quality and production for his group for the day and problems his group had during the day.  (Upton Dep., pp. 85-88; Upton Dep. Exs. 2-8).

606.   He included SQDCM information on the shift log and prepared a monthly SQDCM chart that he posted.  (Upton Dep., pp. 78-79, 82; Upton Dep. Ex. 1).

607.   SQDCM was important information that he communicated to his TMs, and if he did not do it, he did not do his job.  (Upton Dep., p. 84).

608.   He communicated with the GL on the other shift to create the SQDCM charts.  (Upton Dep., pp. 116-17; Upton Dep. Ex. 8).

609.   He gave work directions and assignments to the members of his group.  (Upton RFA #2).

610.   He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Upton RFA #5).

611.   He instructed his TLs in start-up and shutdown procedures.  (Upton Dep., p. 107).

612.   He delegated the task of seeing if the work areas were ready for the start of the shift to his TLs.  (Upton Dep., p. 78).

613.   When he had issues caused by missed processes, he reminded his TMs to follow processes and communicated with the GL on the other shift to remind his TMs as well.  (Upton Dep., pp. 111-13; Upton Dep. Ex. 6).

614.   He led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Upton RFA ##25, 26 & 28).

615.   He shared his knowledge and experience with his group.  (Upton RFA #30).

616.   He communicated with other GLs on issues that affected his or their group.  (Upton Dep., pp. 103-06; Upton Dep. Exs. 2 & 3).

617.   Other groups communicated problems to him that affected his group, and he instructed his TMs on watching for those problems.  (Upton Dep., p. 106).

618.   He worked with other GLs to develop countermeasures for issues that affected their groups.  (Upton Dep., pp. 107-08; Upton Dep. Ex. 4).

619.   He worked with another GL to put together a tracking sheet for fuel lids in assembly.  (Upton Dep., pp. 101-02; Upton Dep. Ex. 2).

620.   He put together a flip chart of areas of a trial that would affect his group and created some procedures to follow.  (Upton Dep., pp. 102-03; Upton Dep. Ex. 2).

621.   He signed off on revisions to SMPs if he agreed with them, and if he did not, he suggested changes.  (Upton Dep., pp. 136-38; Upton Dep. Ex. 9).

622.   Upton managed attendance in his group and ensured that his group was properly staffed.  (Upton RFA #3).

623.   Upton managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Upton Dep., p. 174; Upton RFA #4).

624.   Every day, he checked attendance, checked to see if any TMs were on vacation and checked to see if any TMs had called in.  (Upton Dep., pp. 75-76).

625.   He discussed manpower needs with his TLs and TMs.  (Upton Dep., p. 76).

626.   He moved TMs from team to team to adjust the manpower in his group.  (Upton Dep., p. 154).

627.   He called his AM if he needed more TMs.  (Upton Dep., p. 129).

628.   He determined how to classify TM absences based on MBUSI policies.  (Upton Dep., p. 174).

629.   He approved or denied vacation and emergency vacation requests based on policies and procedures.  (Upton Dep., pp. 176-78; Upton Dep. Ex. 13).

630.   He approved the time frame for TM elective short term disability leaves of absence.  (Upton Dep., pp. 180-81; Upton Dep. Ex. 14).

631.   He entered his TMs' time in to the time system.  (Upton Dep., p. 121).

632.   He annually evaluated the performance of his TMs and TLs in his group.  (Upton Dep., pp. 31, 80, 183-91; Upton Dep. Exs. 15-17; Upton RFA #6).

633.   He assessed whether the TM's performance was satisfactory or unsatisfactory based on the performance criteria.  (Upton Dep., pp. 184-85; Upton Dep. Exs. 15-17).

634.   He also provided the TM with development steps for the TM's current position and to advance to the next level.  (Upton Dep., pp. 186-88; Upton Dep. Exs. 15-17).

635.   He provided his opinion as to whether or not the TM was ready for promotion "by [his] observation as a supervisor."  (Upton Dep., pp. 186-87; Upton Dep. Ex. 15, p. 2; Upton RFA #7).

636.   Upton's rating of a TM as ready or not ready for promotion was considered and normally followed in determining if the TM would be promoted. (Jones Decl. ¶¶ 31-32).

637.   If Upton rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Upton Dep., p. 185; Jones Decl. ¶ 33).

638.   Upton ensured that company policies and work rules were enforced in his group.  (Upton RFA #14).

639.   Upton counseled TMs on performance, quality of work and conduct. (Upton RFA #9).

640.   He had "stern talks" with his TMs to make sure they did not repeat mistakes.  (Upton Dep., pp. 113-14: Upton Dep. Ex. 7).

641.   If he observed TMs doing something incorrectly, he told them and he followed-up to make sure they did it correctly.  (Upton Dep., pp. 115-16).

642.   If TMs had a problem, he tried to help them fix it and worked with the TL to help them fix it.  (Upton Dep., p. 116).

643.   He had the authority to initiate a CPR on a TM when he deemed necessary.  (Upton RFA #10).

644.   He initiated, facilitated and monitored problem solving in his group. (Upton RFA #12).

645.   When a TM had a problem with a missed process, Upton helped develop an added step to an SMP to solve the problem.  (Upton Dep., pp. 148-49).

646.   He ensured that production and quality goals were met in his group. (Upton RFA ##13 & 22).

647.   He was held accountable for quality issues in his group.  (Upton Dep., p. 143).

648.   When a quality issue from another group affected his group, he fed it back to the other GL.  (Upton Dep., p. 144).

649.   When there was a problem from his group that was noticed by another group, that GL contacted him.  (Upton Dep., p. 144).

650.   Upton determined which member of his group was responsible for the problem, and he gave feedback to the TM to make sure the problem was fixed. (Upton Dep., pp. 144-45).

651.   He also informed the TMs in his group of the problem and showed them how to fix it.  (Upton Dep., pp. 145-46).

652.   It was bad for him as a GL if TMs continued to have quality issues. (Upton Dep., p. 147).

653.   He was accountable for controlling costs such as scrap and overtime and for money spent in his group.  (Upton Dep., pp. 182-83).

654.   He tried to make sure that his TMs worked as efficiently and productively as possible.  (Upton Dep., p. 182).

655.   He initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Upton RFA #16).

656.   TMs brought work problems they had to his attention and he made suggestions to solve their problems and also passed on his suggestions to the GL on the other shift so that his TMs would not have the same problem.  (Upton Dep., p. 111; Upton Dep. Ex. 5).

657.   He ensured that his group was working safely and he monitored the environment for safety hazards.  (Upton RFA #17).

658.   He reported safety issues in his group.  (Upton Dep., pp. 155-56).

659.   He made sure TMs complied with PPE requirements.  (Upton Dep., p. 156).

660.   If a TM habitually did not comply with safety requirements, he would pass that information on to the AM and Safety Department and counsel the TM. (Upton Dep., pp. 156-57).

661.   He made sure TMs worked within their work restrictions.   (Upton Dep., p. 176).

662.   He was responsible for accounting for all TMs in the event of a severe weather incident.  (Upton Dep., p. 65).

663.   He completed 5 Why forms when there was an injury in his group. (Upton Dep., p. 158: Upton Dep. Ex. 11).

664.   He also completed 5 Why forms for quality issues.  (Upton Dep., p. 162).

665.   He worked with his AM to develop countermeasures to include in the 5 Why forms.  (Upton Dep., pp. 163-64).

666.   He also instructed the TM who caused the problem on how to solve it. (Upton Dep., p. 165).

667.   He also reviewed the problem with the other TMs and took whatever steps were needed to contain the problem.  (Upton Dep., p. 165).

668.   He handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in a TM issue or conflict.  (Upton RFA #18).

669.   He attended monthly meetings where HR covered various HR topics with the GLs.  (Upton Dep., pp. 65-66).

670.   He was trained that as a GL he needed to take immediate action on TM legal issues, and knew the company could be sued if he did not do so.  (Upton Dep., p. 61).

671.   He was held accountable for the morale of his group, and he wanted to keep the morale of his group high.  (Upton Dep., pp. 114-15).

672.   He could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Upton RFA #19).

673.   He ensured that his TMs were trained.  (Upton Dep., pp. 166-67).

674.   Upton signed the Circle of Skills training documents every quarter. (Upton Dep., pp. 168-69; Upton Dep. Ex. 12).

675.   He reviewed the TM's training logs and talked with the TL before allowing the TM to work at Level 3 on the Circle of Skills.  (Upton Dep., pp. 170-71).

676.   He made sure that TMs did not work above their training level. (Upton Dep., p. 170).

677.   He administered classroom training to TMs on HR and safety topics. (Upton Dep., p. 66).

678.   He showed and supported top performance in his group.  (Upton RFA #29).

679.   Upton was evaluated differently than his TMs because he was evaluated on leadership competencies.  (Upton Dep., pp. 205-06, 208).

680.   For example, he was evaluated on his ability to execute decisions and deliver results; his ability to demonstrate accountability and credibility; and his ability to drive innovation and lead change.  (Upton Dep., p. 208).

681.   He used his best judgment in performing all of his GL job duties. (Upton RFA #23).

682.   He fulfilled all of the roles and responsibilities of his GL position. (Upton RFA #24).

## N.      THOMAS DANIELS - 2010

683.    Thomas Daniels ("Daniels") **admitted in Response to a Request for Admission that he was properly classified under the FLSA as an exempt employee.** (Daniels RFA #43).[30]

684.    He admitted that he supervised the TLs and TMs in his group, and he admitted to spending more of his time at work supervising and managing his group than performing any other duties.  (Daniels RFA ##1 & 39).

685.    Daniels began employment at MBUSI in 1996.   (Daniels Dep., p. 14).[31]

686.    He was promoted to TL in 1996.  (Daniels Dep., p. 22).

687.    He was promoted to GL, Paint 1 in 1997.  (Daniels Dep., pp. 24-25; Banta Decl. ¶ 18).

688.    Daniels was a GL in Paint 1 or 2 except in 2005 and 2010 when he worked as a GL in the Assembly Shop as part of the GL Self-Sufficiency program. (Daniels Dep., pp. 36-37).

689.    In 2010, MBUSI paid Daniels over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 13; Daniels RFA #41).

---

[30]      Daniels Responses to Request for Admission are attached as Ex. 49 to MBUSI's Evidentiary Submission (Volume 5).

[31]      The Deposition of Thomas Daniels and exhibits to the deposition are attached as Exhibit 50 to MBUSI's Evidentiary Submission (Volume 5).

690.   As a GL, Daniels had between 28 and 42 TMs and TLs in his group at one time.  (Daniels Dep., pp. 37-39).

691.   A Manager or AM was not always present in his group, and he led his group independently of his Manager or AM.  (Daniels RFA #33).

692.   He did not have much interaction with his Manager and saw him about once a week on day shift and not at all on night shift.  (Daniels Dep., pp. 40-41).

693.   He took control of situations in his area that arose when his AM was absent, and he filled in for his AM.  (Daniels Dep., p. 117; Daniels RFA #32).

694.   As a GL, Daniels supervised the TLs and TMs in his group, and he was the leader of his group.  (Daniels Dep., pp. 122-23; Daniels RFA #1).

695.   His primary duty as a GL was to monitor the function of the group. (Daniels p. 63).

696.   He spent about 6 1/2 hours of an 8 hour day monitoring the function of his group, including responding to quality issues; observing SQDCM issues; making sure his TMs had on the proper PPE and that they were not in awkward ergonomic situations; making sure the TMs had the proper tools and parts; and making sure the TMs had a good attitude and were focused on the process. (Daniels Dep., pp. 65-67).

697.   When he saw an abnormality while monitoring his group, he usually addressed it with the TL first.  (Daniels Dep., p. 67).

698.   When he saw a TM acting up or talking, he took care of that himself because the TMs needed to be focused.  (Daniels Dep., p. 68).

699.   He gave work directions and assignments to the members of his group.  (Daniels RFA #2).

700.   He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Daniels RFA #5).

701.   Daniels' other duties included moving TMs to adjust manpower; observing the area for safety-related conditions; evaluating safety incidents; monitoring TMs' performance and moods; making sure everyone was focusing on their job; monitoring quality; feeding forward and feeding back quality issues to GLs and TLs; entering time and attendance into the PeopleSoft database on a weekly basis; evaluating TMs; maintaining trend charts for the group's quality issues; filling out problem solving forms on quality issues; maintaining end of shift reports; reading shift reports from the previous shift; distributing that information; posting the information on the team board in the team center; meeting with the AM prior to the shift to obtain information to be passed on to his TMs; and conducting a pre-shift meeting with the group.  (Daniels Dep., pp. 41-42, 63-64).

702.   Daniels did not do these activities as a TL.  (Daniels Dep., p. 42).

703.   In Assembly, Daniels did not know any of the processes and did not work any of the processes.  (Daniels Dep., pp. 74-75).

704.   In Paint, he worked a process for about one hour a week so TMs could take breaks.  (Daniels Dep., pp. 74-75).

705.   A GL did not need to be a level three in the Circle of Skills in each process in his group because it was not expected that a GL would fill in on a process.  (Daniels Dep., p. 76).

706.   After the line started, Daniels walked the line observing everyone, making sure the equipment was functional and greeting TMs.  (Daniels Dep., p. 64).

707.   Daniels then checked quality at the end of the line during the first hour of the shift.  (Daniels Dep., p. 64).

708.   When he was checking quality, he was still responsible for the TLs and TMs in his group.  (Daniels Dep., p. 77).

709.   If he found a quality issue, he could decide if he would repair it or have someone in his group repair it.  (Daniels Dep., pp. 137-38).

710.   Daniels left the line while checking quality to handle other issues, depending on the severity of the issue.  (Daniels Dep., pp. 64-65).

711.   If Daniels saw a line pull in his group, he monitored it to see if the TL responded as he should, and if he did not see anyone respond, he called a TL on the radio.  (Daniels Dep., p. 70).

712.   He only responded to line pulls if a TL was not available.  (Daniels Dep., p. 70).

713.   He strategically placed TLs to maximize efficiency in regards to line pulls.  (Daniels Dep., p. 71).

714.   He managed manpower by shifting TMs among stations based on skill sets, ergonomic conditions and availabilities.  (Daniels Dep., pp. 73, 89).

715.   He monitored TM training, and he signed off on training levels each week.  (Daniels Dep., pp. 73-74; Daniels Dep. Ex. 5).

716.   For a TM to be designated level three in the Circle of Skills Daniels had to verify that the TM was a level three.  (Daniels Dep., pp. 74, 109-10).

717.   To verify the training level, Daniels observed the TM work the process.  (Daniels Dep., p. 74).

718.   He led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Daniels RFA ##25, 26 & 28).

719.   A GL had to use his skills to influence people to follow the process and procedures.  (Daniels Dep., pp. 32-33).

720.   A GL had to be a motivator, deal with people and gain trust with people.  (Daniels Dep., p. 33).

721.   He met with TMs on a one-to-one basis and let them know how much he appreciated them.  (Daniels Dep., p. 69).

722.   He monitored the assignment of projects by TLs to TMs to make sure the workload was distributed fairly.  (Daniels Dep., pp. 102-03).

723.   He made sure each TM got equal opportunities to do "easy" jobs. (Daniels Dep., p. 103).

724.   He shared his knowledge and experience with his group.   (Daniels RFA #30).

725.   Daniels ensured that company policies and work rules were enforced in his group.  (Daniels RFA #14).

726.   Daniels maintained a file on each TM and TL in his group where he kept information on attendance issues, quality issues, and records of discussions he had with TMs and TLs on performance or attendance.  (Daniels Dep., p. 43).

727.   Daniels managed attendance in his group according to plan.  (Daniels Dep., p. 91; Daniels RFA #3).

728.   Daniels managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Daniels RFA #4).

729.   On a daily basis, he looked at TM time, and if anyone had over the approved time he recorded and addressed that.  (Daniels Dep., p. 44).

730.   He checked the accuracy of a TM's reported time by comparing it to the time that the line ran.  (Daniels Dep., p. 44).

731.   He entered the TMs' time into a database so they could be paid. (Daniels Dep., p. 45).

732.   He approved time for temporary TMs.  (Daniels Dep., p. 77).

733.   He tracked vacation and emergency vacation, reviewed requests against the standard and made sure his group stayed in standard, approved requests that were within standard, and sought approval from the Manager or HR if they were out of standard.  (Daniels Dep., pp. 45-46).

734.   When a TM called in and said he was going to be absent or late, Daniels treated each incident on its own merit.  (Daniels Dep., p. 46).

735.   He assessed what his manpower situation was and if the group was in standard or not, and if they were not in standard but the TM had a viable reason for the absence or tardy, he would escalate the matter.  (Daniels Dep., pp. 46-47).

736.   He checked the call-in hotline prior to each shift which let him know about his manpower situation.  (Daniels Dep., p. 47).

737.   He approved the time period for elective short term disability requests.  (Daniels Dep., pp. 92-94: Daniels Dep. Ex. 2).

738.   When a TM received a certain number of occurrences under the Attendance Policy, Daniels drafted a CPR and got it approved.  (Daniels Dep., p. 48).

739.   Daniels, HR and sometimes the AM met with the TM and explained why the TM was receiving a CPR.  (Daniels Dep., pp. 48-49).

740.   He annually evaluated the performance of TMs and TLs in his group. (Daniels Dep., p. 51; Daniels RFA #6).

741.   He judged the TM against the performance criteria and determined if the TM's performance was satisfactory or not satisfactory.  (Daniels Dep., p. 52).

742.   He provided his opinion as to whether the TMs and TLs were ready for promotion.  (Daniels Dep., p. 52; Daniels RFA #7).

743.   Daniels' rating of a TM as ready or not ready for promotion was considered and normally followed in determining if the TM would be promoted. (Jones Decl. ¶¶ 31-32).

744.   If Daniels gave a TM a non-satisfactory rating in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

745.   Daniels does not know of any TM or TL in his group that moved to the next level without him marking on the evaluation that the TM was ready for promotion.  (Daniels Dep., p. 54).

746.   Daniels reviewed the performance evaluation with the TM and gave him specific suggestions to work on during the year.  (Daniels Dep., p. 54).

747.   Daniels counseled TMs on performance, quality of work and conduct. (Daniels RFA #9).

748.   If a TM was not performing to standard, he expected the TL to escalate that to him, and he discussed the issue with the TM.  (Daniels Dep., pp. 115-16).

749.   He tracked quality defects by TMs and discussed them with the TMs. (Daniels Dep., p. 49).

750.   He used his tracking forms to determine if a CPR was warranted. (Daniels Dep., p. 49).

751.   He had the authority to initiate a CPR on a TM when he deemed necessary.  (Daniels RFA #10).

752.   When Daniels saw that a TM was struggling with something, he talked with the TM to see what he could do to give the TM what the TM needed. (Daniels Dep., p. 50).

753.   He tried to determine if the TM was not trained well enough in the process or if there were personality conflicts or something else that he could smooth over.  (Daniels Dep., p. 50).

754.   Not every issue had to go to HR.  (Daniels Dep., p. 50).

755.   He handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in a TM issue or conflict.  (Daniels Dep., p. 50; Daniels RFA #18).

756.   He initiated, facilitated and monitored problem solving in his group. (Daniels RFA #12).

757.   On trend charts, Daniels tracked specific defects on a daily basis over a period of a month to see if they made any improvements, and if they did not improve, he participated in changing the countermeasure to get the trend charts going in the right direction.  (Daniels Dep., pp. 54-55).

758.   He completed problem solving forms for safety and quality issues, scrap, equipment failures, and bottlenecks in the process.  (Daniels Dep., pp. 55-56, 110-11, 114; Daniels Dep. Exs. 6-7).

759.   The form helped him investigate the problem, determine the root cause of the problem and develop a countermeasure.  (Daniels Dep., pp. 56, 111-15).

760.   Countermeasures included monitoring and talking with the TM that caused the problem.  (Daniels Dep., pp. 112, 114-15).

761.   He had the TL check cars for repeat issues.  (Daniels Dep., p. 113).

762.   He made sure this his group used the countermeasures.  (Daniels Dep., p. 56)

763.   He ensured that production and quality goals were met in his group. (Daniels RFA ##13 & 22).

764.   He ultimately got the blame for quality issues that came out of his group.  (Daniels Dep., p. 69).

765.   When another shop called him about quality defects from his shop, he decided if he or the TL would go to the shop to view the issue.  (Daniels Dep., pp. 97-98).

766.   He talked with GLs and TMs from other areas to determine how long the defect had been occurring so that he could see if a particular TM was having a performance issue.  (Daniels Dep., pp. 107-08).

767.   If a TM was responsible for a quality issue, he made sure the TM understood the issue and what was expected of him, followed up with training if needed and observed the TM so that the issue would be corrected.  (Daniels Dep., pp. 99-100).

768.   He controlled the inventory in the shop by maintaining the correct number of cars in the buffers.  (Daniels Dep., p. 117).

769.   One of his duties was to meet the daily targets for his group.  (Daniels Dep., p. 123).

770.   He challenged his TLs to look at their areas and make adjustments to keep focused on delivery targets.  (Daniels Dep., p. 125).

771.   He challenged his TLs to consistently maintain their process standards.  (Daniels Dep., p. 128).

772.   He completed daily shift logs which included items such as safety incidents, near misses, quality defects, line efficiency downtime, production numbers, scrap material or parts and attendance.  (Daniels Dep., pp. 56-57, 94-95; Daniels Dep. Exs. 3-4).

773.   The purpose of the logs was to let the AM and Manager know what was going on in his group.  (Daniels Dep., p. 96).

774.   He also included any information that that might be pertinent to the next GL and help the GL have a good run.  (Daniels Dep., pp. 57-58).

775.   He shared SQDCM information with his group in daily start-up meetings and on a board in the team center that he maintained daily.  (Daniels Dep., pp. 58-59).

776.   Before the start-up meeting with his group, Daniels met with the other GLs and AMs and they discussed leave-over information from the previous shift, problems they might encounter in the upcoming shift, quality defects and manpower.  (Daniels Dep., p. 61).

777.   He also communicated with Engineers or other GLs across the shop to give them a heads-up on issues that might be coming their way.  (Daniels Dep., p. 78).

778.   He initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Daniels Dep., p. 92; Daniels RFA #16).

779.   He had to be aware of and approve all changes to SMPs.  (Daniels Dep., pp. 136-37).

780.   He ensured that his group was working safely and he monitored the environment for safety hazards.  (Daniels RFA #17).

781.   He performed daily safety audits of his areas and looked at ergonomics, safety standards and cleanliness.  (Daniels Dep., p. 120).

782.   He showed and supported top performance in his group.  (Daniels RFA #29).

783.   He was evaluated on leadership competencies and was rated as excellent.  (Daniels Dep., pp. 116-28; Daniels Dep. Exs. 7&8).

784.   In 2010, Daniels' supervisor stated on his evaluation that "Tom is a good leader with consistent, firm and fair treatment of all T/M's and gives both verbal and written feedback when appropriate."  (Daniels Dep., p. 128; Daniels Dep. Ex. 8).

785.   He used his best judgment in performing all of his GL job duties. (Daniels RFA #23).

786.   He fulfilled all of the roles and responsibilities of his GL position. (Daniels RFA #24).

787.   Daniels disagreed that he "managed" for the following reason:   "I manage what I am given the latitude to manage, but I don't have total control over it all."  (Daniels Dep., p. 85).

### O.   PHILLIP COOPER - 2010

788.   Phillip Cooper ("Cooper") began employment at MBUSI in 1996. (Cooper Dep., p. 25).[32]

789.   Cooper was promoted to GL in 2002.  (Cooper Dep., pp. 39-40).

790.   In 2005, Cooper became GL over Quality Operations, Paint and Body, Plant 1.  (Cooper Dep., p. 43).

791.   In 2007, Cooper "took over" Quality Operations, Paint and Body, Plant 2 as well.  (Cooper Dep., p. 44).

792.   In 2010, Cooper also added Audit, Paint and Body and Weld Destruct to his group.  (Cooper Dep., p. 44).

793.   In 2010, MBUSI paid Cooper over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 14; Cooper RFA #41).[33]

794.   As a GL of Quality, Body and Paint, Cooper had between 3 and 13 TMs and TLs in his group at one time.  (Cooper Dep., p. 65).

795.   The Paint and Body Shops were adjacent to each other and were about 10,000 square feet each.  (Cooper Dep., pp. 46, 69).

---

[32]   The Deposition of Phillip Cooper and exhibits to the deposition are attached as Ex. 51 to MBUSI's Evidentiary Submission (Volume 5).

[33]   Cooper Responses to Request for Admission are attached as Ex. 52 to MBUSI's Evidentiary Submission (Volume 5).

796.   As a GL, he supervised the TLs and TMs in his group, and he was accountable for the performance of the TLs and TMs in his group.  (Cooper Dep., pp. 69, 155; Cooper RFA #1).

797.   His TMs in Body checked for correct build specs and rubbed cars for dents; his TMs in Paint inspected the final paint product on cars to make sure it met VIS standards; his TMs in Audit audited car bodies off line to make sure they met VIS standards; and his TMs in Weld Destruct destroyed and inspected welds. (Cooper Dep., p. 68).

798.   TLs in his group filled in for TMs on vacations days and breaks, trained new TMs on the jobs, made the work rotation schedules and answered line calls.  (Cooper Dep., pp. 47-48).

799.   TLs escalated all quality issues to him or the AM.  (Cooper Dep., p. 48).

800.   As a GL, Cooper's job duties were different that TMs and TLs. (Cooper Dep., p. 165).

801.   Unlike TMs and TLs, he was responsible and accountable for the entire group; he had greater authority than TMs and TLs; and he had more responsibility for directing the work than they did.  (Cooper Dep., p. 166).

802.   In 2010, Cooper's primary function was to oversee the overall function of his group.  (Cooper Dep., p. 174).

803.   A Manager or AM was not always present in his group, and he led his group independently of a Manager or AM.  (Cooper RFA #33).

804.   His AM was over all of Quality, Body and Paint which included two to four groups.  (Cooper Dep., pp. 66-67).

805.   The AM walked the line two hours a day and spent the rest of the day in meetings.  (Cooper Dep., pp. 105-06).

806.   As a GL, Cooper rotated shifts, and the AM was not present during night shift.  (Cooper Dep., pp. 56-57).

807.   There was not a Manager over Cooper.  (Cooper Dep., p. 106).

808.   The AM reported to a VP, but Cooper does not know what he did and he never saw the VP on the production floor.  (Cooper Dep., pp. 106-07).

809.   Cooper gave work directions and assignments to the members of his group, and he oversaw their work.  (Cooper Dep., pp. 151, 172; Cooper RFA #2).

810.   He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Cooper Dep., pp. 169-72; Cooper RFA #5).

811.   He led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Cooper RFA ##25, 26 & 28).

812.   If his group did not perform well and his TMs did not do what they were supposed to do, then that affected his job.  (Cooper Dep., p. 152).

813.   He shared his knowledge and experience with his group.   (Cooper RFA #30).

814.   Prior to each shift, Cooper read the daily safety sheet, prepared for his daily meeting with his group and prepared any reports for the AM, such as on any SQDCM issues or any issues reflected on the previous shift log.  (Cooper Dep., pp. 98-99).

815.   He posted any e-mails or memos that he planned to cover in his daily meeting with his group and he completed the SQDCM board.  (Cooper Dep., pp. 97, 99).

816.   The SQDCM board included how many days since a lost time incident, how many incidents the previous day, quality issues, anything out of standard the group needed to keep an eye on, how much downtime they had on the line, how many cars were built on the previous shifts and the TM rotation schedule.  (Cooper Dep., p. 97).

817.   He completed summaries on the SQDCM information at the end of each month for the AM.  (Cooper Dep., pp. 97-98).

818.   At the start of every shift, Cooper conducted a meeting with his group to communicate safety issues and toolboxes, to communicate to the TMs the build

numbers or build time and to discuss quality issues from the previous shift and how they had been addressed.  (Cooper Dep., pp. 92-93).

819.   Every day, Cooper met with the AM and the Engineer for his group to discuss quality issues (previous and forseeable), plans that the AM wanted implemented during the day and other important issues.  (Cooper Dep., pp. 94-95).

820.   Every morning during day shift Cooper attended a meeting in the Body Shop with the AMs, a Manager, Engineers and sometimes other GLs, and they discussed process, supplier, welding, measurement and quality issues. (Cooper Dep., pp. 89-91, 94).

821.   Once a week, Cooper attended a quality meeting in the Paint Shop with the Paint Manager, AMs, Engineers and some GLs, and they discussed the quality indicators for the week.  (Cooper Dep., pp. 91-92).

822.   Once a week, Cooper attended a soapy water test meeting with Engineers from the responsible departments, GLs from the responsible lines and the AM to discuss quality issues and give the line and the Engineers feedback. (Cooper Dep., pp. 96-97).

823.   Cooper spent most of his time walking the Paint and Body Shop areas to ensure that all TMs were in their place and that they were performing their jobs; addressing any issues the TMs brought to his attention; and answering questions on quality issues.  (Cooper Dep., pp. 99-100, 104).

824.   When a TM was not doing his job, Cooper addressed it with the TM or his TL.  (Cooper Dep., p. 100).

825.   Cooper worked on line when there was a quality issue, for TMs during lunch or breaks or when there was a manpower issue that could not be addressed by a TL.  (Cooper Dep., pp. 97, 101).

826.   During 2010, Cooper worked on line every week but not every day and only for a half day or less like for a break.  (Cooper Dep., pp. 103, 174).

827.   When Cooper was on line he was still accountable for his group and was still responsible for ensuring that the TMs got their job done correctly, and if there was a problem with his group's performance they came to him.  (Cooper Dep., p. 102).

828.   When one of Cooper's TMs found a quality issue, he notified his TL who notified Cooper.  (Cooper Dep., pp. 48, 77-78).

829.   The TL then fed back the information to the line.  (Cooper Dep. p. 70, 78).

830.   Cooper addressed the quality issue with production TMs, TLs, GLs, AMs and Managers depending on what he thought was appropriate.  (Cooper Dep., p. 105).

831.   For certain quality issues, production GLs, TLs and Engineers had to complete problem solving forms.  (Cooper Dep., p. 71).

832.   Cooper tracked those forms to make sure they were turned in in a timely manner and to inform his AM and the AMs in production of the countermeasures.  (Cooper Dep., p. 72).

833.   Cooper reviewed the countermeasures to make sure that they met the VIS standards.  (Cooper Dep., pp. 72-73).

834.   His group then checked to make sure production was following the countermeasures.  (Cooper Dep., pp. 73-74).

835.   When one of Cooper's TMs missed a quality issue, Cooper completed a problem solving sheet to make sure that it would not happen again.  (Cooper Dep., pp. 74-75, 146; Cooper Dep. Exs. 2, 13).

836.   In completing a problem solving sheet, Cooper talked to the TMs and TLs and then put together the best procedure to stop the issue from reoccurring. (Cooper Dep., pp. 75-76).

837.   Cooper then observed the performance of the TMs to make sure they followed what he put together.  (Cooper Dep., p. 76).

838.   He also observed to make sure that what he put together corrected the problem.  (Cooper Dep., p. 76).

839.   Cooper ensured that the company policies and work rules were enforced in his group.  (Cooper RFA #14).

840.   He reviewed and signed off on a packet for the TMs in his group that provided them with safety information, shop specific rules, procedure and an outline for training.  (Cooper Dep., pp. 125-26; Cooper Dep. Ex. 7).

841.   On the Body Paint Process Audit page, he was responsible for signing to ensure that each TM was performing each of the functions in a good manner before they could progress.  (Cooper Dep., p. 127; Cooper Dep. Ex. 7, p. 9).

842.   He was responsible for ensuring that any conduct issues with TMs were addressed.  (Cooper Dep., p. 107).

843.   He determined when he could address the issue and when to involve HR.  (Cooper Dep., p. 107).

844.   Cooper managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Cooper Dep., p. 111; Cooper RFA #4).

845.   He entered their time and attendance into the system.  (Cooper Dep., p. 111).

846.   He kept an attendance calendar on each TM which contained their time missed and whether it was excused or unexcused.  (Cooper Dep., p. 111).

847.   He approved vacation and emergency vacation requests according to guidelines.  (Cooper Dep., pp. 111-13).

848.  He kept track of TM occurrences under the Attendance Policy and explained and applied the Attendance Policy to the TMs along with HR.  (Cooper Dep., p. 112).

849.  When TMs reached a certain number of occurrences he reported that to HR and prepared a write-up for attendance issues.  (Cooper Dep., p. 112).

850.  Cooper along with the AM and sometimes Safety and HR determined how TMs could meet any restrictions, and he ensured that the TM worked in accordance with the restrictions.  (Cooper Dep., p. 113).

851.  He sent TMs who requested FMLA leave to the Medical Department. (Cooper Dep., p. 113).

852.  At the beginning of each shift, Cooper and his TLs discussed where to make manpower adjustments.  (Cooper Dep., pp. 107-08).

853.  Sometimes he had to adjust manpower during the shift.  (Cooper Dep., p. 114).

854.  It was Cooper's responsibility to ensure that he had sufficient manpower in his different areas.  (Cooper Dep., p. 114).

855.  Cooper reviewed job rotation schedules which TLs completed on a monthly basis.  (Cooper Dep., p. 127).

856.  He evaluated his TMs and TLs in his group on an annual basis. (Cooper Dep., p. 123; Cooper Dep. Exs. 1 & 6; Cooper RFA #6).

857.    He provided his opinion as to whether the TMs and TLs were ready for promotion.  (Cooper Dep. Ex. 1, p. 2; Cooper RFA #7).

858.    Cooper's opinion as to whether the TM or TL was ready for promotion was considered and normally followed in determining if the TM or TL was promoted.  (Cooper Dep., pp. 36-37, 55; Cooper Dep. Ex. 1, p. 2; Jones Decl. ¶¶ 31-32).

859.  If Cooper rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

860.    Cooper counseled TMs on performance, quality of work and conduct. (Cooper RFA #9).

861.    Cooper compiled a TM score card every week that recorded the amount of defects that each TM missed or misjudged.  (Cooper Dep., pp. 127-28; Cooper Dep. Ex. 8).

862.    Cooper addressed problems reflected on the score card with TMs when they happened.  (Cooper Dep., pp. 128-29).

863.    When TMs had conflicts, he counseled them or if he determined it was appropriate he involved HR.  (Cooper Dep., pp. 134-35).

864.    When TMs violated policy he filled out a CPR for approval by HR and the AM.  (Cooper Dep., pp. 135-37, 173).

865.   If the TM did not improve, he could issue a second reprimand with HR approval.  (Cooper Dep., p. 136).

866.   If the TM still did not improve and termination was warranted, it was his responsibility to point that out to HR.  (Cooper Dep., pp. 136-37).

867.   If Cooper did not direct disciplinary issues to HR, then HR would not know about them.  (Cooper Dep., p. 152).

868.   Cooper and HR delivered CPRs to the TMs.  (Cooper Dep., p. 137).

869.   Cooper also verbally counseled TMs and if they failed to heed his counseling, they would be disciplined.  (Cooper Dep., p. 138).

870.   He initiated, facilitated and monitored problem solving in his group. (Cooper RFA #12).

871.   He took steps to ensure that his group met its production goals. (Cooper Dep., p. 170; Cooper RFA #22).

872.   He initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Cooper Dep., p. 153; Cooper RFA #16).

873.   He checked certain areas to determine if SMPs needed to be revised. (Cooper Dep., p. 143).

874.   He drafted revisions to SMPs or if his TLs did them, he reviewed them to make sure they were correct.  (Cooper Dep., pp. 141-42).

875.   In 2010, for the ramp up of the new Body Shop, he had his TMs tear down parts daily to see if they met standards, and he provided feedback from those tear downs.  (Cooper Dep., pp. 139-40).

876.   He tracked how much money his group spent according to the budget. (Cooper Dep., pp. 143-44).

877.   He monitored an annual plan and gave feedback to production on ways to get quality in line.  (Cooper Dep., pp. 154-55).

878.   He ensured that his group was working safely and he monitored the environment for safety hazards.  (Cooper RFA #17).

879.   He ensured that TMs in his group followed MBUSI safety policies. (Cooper Dep., p. 87).

880.   He ensured that TMs in his group wore the correct PPE.  (Cooper Dep., p. 87).

881.   He implemented safety training for the TMs in his group.  (Cooper Dep., p. 87).

882.   He was responsible for accounting for all TMs in his group in a severe weather event and for making sure they were in a safe place.  (Cooper Dep., pp. 86-87).

883.   He reported unsafe conditions to get them fixed.  (Cooper Dep., p. 87).

884.   Cooper and a safety representative investigated injuries to TMs in his group and developed an immediate plan to address the condition that caused the injury.  (Cooper Dep., pp. 87-88).

885.   He also suggested long term measures to address safety issues. (Cooper Dep., p. 88).

886.   He ensured that safety issues caused by maintenance problems were fixed.  (Cooper Dep., p. 88).

887.   He drafted problem solving sheets when there was an injury.  (Cooper Dep., pp. 88-89).

888.   He could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Cooper RFA #19).

889.   He maintained Circle of Skills training sheets for TMs in his group. (Cooper Dep., pp. 119-20).

890.   He tried to get each TM to Level 4 in the Circle of Skills training for each process in his group, and he developed training plans for that purpose. (Cooper Dep., pp. 122-23).

891.   He determined on which day the TM would train on a particular process.  (Cooper Dep., p. 123).

892.   He drafted a training lesson for Paint Repair Confirmation Procedure along with one of his TLs and explained to TMs and TLs that they needed to follow it.  (Cooper Dep., pp. 133-34).

893.   He ensured that his TMs followed it or he addressed it with them if they did not.  (Cooper Dep., p. 134).

894.   At the end of each shift, Cooper ensured that everyone had left the area, that the lines were shut down properly, that the shift log was complete and that time and attendance was entered.  (Cooper Dep., pp. 129-30).

895.   He completed daily shift logs with SQDCM information to inform his GL counterpart on the other shift of what happened on his shift so that the counterpart could take appropriate action on his shift, to inform the AM of the issues on his shift and what action he took so the AM could plan actions for the next shift and to inform Engineers so they could look at their issues.  (Cooper Dep., pp. 145-47; Cooper Dep. Exs. 15-17).

896.   He showed and supported top performance in his group.  (Cooper RFA #29).

897.   He was evaluated on leadership competencies.   (Cooper Dep., pp. 158-59; Cooper Dep. Ex. 19).

898.   In 2010, he showed excellent judgment in applying company standards.  (Cooper Dep., p. 159).

899.   He fulfilled all of the roles and responsibilities of his GL position. (Cooper RFA #24).

## P.     SUSAN POPE - 2010

900.  Susan Pope ("Pope") **admitted in Response to a Request for Admission that she was properly classified under the FLSA as an exempt employee.** (Pope Dep. Ex. 1, #43).[34]

901.  On March 3, 1997, Pope began employment at MBUSI.  (Pope Dep., p. 16).

902.  On January 17, 2005, Pope was promoted to GL.  (Pope Dep., p. 44; Pope Dep. Ex. 2).

903.  In May 2008, Pope became "in charge of" Body and Paint Quality Control, which are on-line areas, and thereafter also PA and Weld Destruct, which are off-line areas.  (Pope Dep., p. 62).

904.  Pope had approximately 11 TMs and 3 TLs in her group, and they were spread throughout the Body and Paint Shops.  (Pope Dep., pp. 63-65).

905.  In 2010, MBUSI paid Pope over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 15; Pope Dep. Ex. 1,  #41).

906.  Pope's primary duty as a GL was to verify that the members of her group followed through with the roles, standards and practices in their inspections. (Pope Dep., p. 147).

---

[34]     The Deposition of Susan Pope and exhibits to the deposition are attached as Ex. 53 to MBUSI's Evidentiary Submission (Volume 5).

907.   She supervised the TLs and TMs in her group.  (Pope Dep. Ex. 1, #1).

908.   A Manager or AM was not always present in her group, and she led her group independently of her Manager or AM.  (Pope Dep. Ex. 1, #33).

909.   Since May, 2008, Pope's AM only worked on the day shift, but Pope rotated shifts with her group.  (Pope Dep., p. 71).

910.   She took control of situations in her area that arose when her AM was absent.  (Pope Dep. Ex. 1, #32).

911.   As a GL, she was never supposed to have TMs working without someone to answer to so she stayed with them or turned them over to someone else.  (Pope Dep., p. 95).

912.   She gave work directions and assignments to the members of her group.  (Pope Dep. Ex. 1, #2).

913.   She made decisions about her group and carried out her plans for the group.  (Pope Dep. Ex. 1, # 35).

914.   She directed her group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Pope Dep. Ex. 1, #5).

915.   She led her group in meeting company standards; she led change in her group; and she used leadership skills in her GL position.  (Pope Dep. Ex. 1, ##25, 26 & 28).

916.    She shared her knowledge and experience with her group.  (Pope Dep. Ex. 1, #30).

917.    Her duties differed from those performed by the TMs in her group. (Pope Dep. Ex. 1, #34).

918.    Since May, 2008, she spent her time attending meetings, completing reports and verifying that her TMs were inspecting to the standardized policy. (Pope Dep., p. 106).

919.    She looked at a car before her TM inspected it to see if the TM spotted what she did.  (Pope Dep., p. 107).

920.    If the TMs did something incorrectly, she instructed the TLs on what was wrong and asked them to watch the TMs.  (Pope Dep., p. 107).

921.    She also addressed quality issues when TLs called her about them. (Pope Dep., p. 108).

922.    She went to look at the issue herself so she could give an opinion on the issue and what needed to be done and decide if they should call the AM so he would be familiar with the issue.  (Pope Dep., p. 108).

923.    Every day when Pope arrived at work, she checked in on Weld Destruct, went to the Body Shop and checked Lotus notes to get any information she needed, checked TM call-ins, checked the calendar to see who was scheduled off to know what the manpower would be and what TM she would ask to move,

put in order what she wanted to talk about in meetings, said hello to TMs and got them started on any immediate projects.  (Pope Dep., pp. 89-92).

924.   At the beginning of every shift, Pope updated the SQDCM board with information from the shift log and the safety report.  (Pope Dep., p. 102).

925.   She also discussed SQDCM information with her group at the daily start-up meeting.  (Pope Dep., pp. 102-03).

926.   She completed shift logs every day which included information such as safety issues, PA issues, CPA issues, overtime, attendance, what happened on the shift, what issues they saw in her group, and what the top issues were out of the MRS.  (Pope Dep., pp. 103-04; Pope Dep. Ex. 8).

927.   Every day, Pope attended the Body Shop meeting to learn what the quality issues were so she could tell that to her TMs and to talk about quality issues her group found and any safety issues from her area.  (Pope Dep., pp. 77-78, 92).

928.   She also went to the Paint Shop meetings every day until she started having a TL go for her.  (Pope Dep., p. 78).

929.   She met with her AM and Engineer daily to discuss what was happening in the department and manpower.  (Pope Dep., pp. 78-79).

930.   She attended weekly soapy water meetings with her GL counterpart in Paint and Engineers.  (Pope Dep., p. 80).

931.   She attended monthly surface review meetings with the Manager from the Paint Shop, her AM, the BASF representative and the Engineers from Paint Shop, and they discussed how they were doing on the paint and whether they needed to make any changes in the paint.  (Pope Dep., p. 81).

932.   She went to the 166 meetings with the Pilot TMs and the 166 TMs, and they discussed the status of the 166 project from a quality standpoint.  (Pope Dep., p. 82).

933.   She had a TM working on the 166 project, and he reported to her any quality issues that came from the project which she reported to the AM.  (Pope Dep., pp. 85-86).

934.   Pope got that TM the resources he needed to learn.  (Pope Dep., pp. 85-86).

935.   Her TMs in Weld Destruct took apart and inspected parts for the 166 on a daily basis.  (Pope Dep., pp. 86-87).

936.   She attended the daily VIN scribe meetings with the Engineer, the TMs from Paint that were involved in the VIN scribe and the robot automation representatives, and they discussed the quality of the VIN inscription on the vehicle.  (Pope Dep., p. 83).

937.   When on day shift, she also led a Body Shop meeting for the Engineers, the Body Shop Manager and sometimes the management team, and they

discussed the top 5 quality issues from the day before and a topic for each day. (Pope Dep., p. 84).

938.   Pope ensured that company policies and work rules were enforced in her group.  (Pope Dep. Ex. 1, #14).

939.   If a TM violated a standard of conduct that justified discipline, she notified her AM and HR.  (Pope Dep., p. 123).

940.   She got their opinion on the standard practice for MBUSI before she talked to the TM so that discipline would be consistent.  (Pope Dep., p. 123).

941.   Pope managed attendance in her group and ensured that her group was properly staffed.  (Pope Dep. Ex. 1, #3).

942.   If a TM left during the shift, she moved TMs and TLs throughout the group to cover the work.  (Pope Dep., p. 126).

943.   Pope managed vacation scheduling, timekeeping and attendance tracking for members in her group.  (Pope Dep. Ex. 1, #4).

944.   Her TMs filled out a tracking sheet so she knew what hours they were present.  (Pope Dep., p. 120).

945.   She kept a calendar for each TM where she coded vacation or emergency vacation and marked other absences.  (Pope Dep., pp. 120-21).

946.   She tracked occurrences on the back of the calendar.  (Pope Dep., p. 121).

947.   Once a TM reached a certain occurrence level, Pope drafted a CPR which she sent to her AM and HR for approval.  (Pope Dep., p. 122).

948.   Pope and her AM meet with the TM and issued the CPR.  (Pope Dep., p. 122).

949.   She evaluated the performance of TMs and TLs in her group.  (Pope Dep., p. 127; Pope Dep. Ex. 1, #6 & Exs. 10, 12, 13).

950.   She recorded how the TM performed with regard to the performance criteria.  (Pope Dep., p. 128).

951.   She evaluated whether the TM's performance was satisfactory or non-satisfactory.  (Pope Dep., p. 128).

952.   She included any steps that she felt would help the TM develop in his position.  (Pope Dep., p. 129).

953.   She provided her opinion as to whether TMs and TLs in her group were ready for promotion based on her observation of their performance.  (Pope Dep., pp. 129, 135; Pope Dep., Ex. 1, #7).

954.   In evaluating whether a TM or TL was ready for promotion she observed whether they followed the roles and responsibilities in their daily activities, and if they had a chance to fill in at the next level she watched to see if they were able to handle the extra duties.  (Pope Dep., p. 130; Pope Dep. Ex. 11).

955.   If Pope did not rate a TL or TM as ready for promotion, the TM or TL would not be considered for promotion.  (Pope Dep., pp. 33-34, 133).

956.   If Pope rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

957.   Pope counseled TMs on performance, quality of work and conduct. (Pope Dep. Ex. 1, #9).

958.   She sat down with them and let them know they were not doing their job correctly and not following the policies and practices of MBUSI.  (Pope Dep., pp. 117-18).

959.   No TM failed to adhere to her counseling.  (Pope Dep., p. 118).

960.   She made notes of counseling sessions with TMs.  (Pope Dep., pp. 136-38; Pope Dep. Ex. 14).

961.   She also had the authority to initiate a CPR on a TM if she deemed necessary.  (Pope Dep. Ex. 1, #10).

962.   She initiated, facilitated and monitored problem solving in her group. (Pope Dep. Ex. 1, #12).

963.   She ensured that production and quality goals were met in her group. (Pope Dep. Ex. 1, #13 & #22).

964.   When she learned that there was a quality issue out of her group she went to see the issue and then she watched the TM to verify that he was completing his SMP.  (Pope Dep., p. 113).

965.   She then checked reports to see if there were any abnormal conditions in the shop that caused the TM to miss the issue.  (Pope Dep., pp. 113-14).

966.   She then drafted a 5 Why problem solving form and left it for her AM for approval.  (Pope Dep., p. 114; Pope Dep. Ex. 9).

967.   She instructed the TMs or TLs in the countermeasures and observed their performance to make sure they were following the countermeasures.  (Pope Dep., p. 115).

968.   She reviewed 5 Why forms from her GL counterpart and instructed her group in what those 5 Why forms provided.  (Pope Dep., p. 116).

969.   She initiated continuous improvement activities in her group and led the implementation of initiatives in her group.  (Pope Dep. Ex. 1, #16).

970.   She ensured that her group was working safely and she monitored the environment for safety hazards.  (Pope Dep. Ex. 1, #17).

971.   She did walkthroughs of her area to verify that no TMs were doing anything unsafe, and she called Maintenance and Engineering to make changes when needed.  (Pope Dep., pp. 116-17).

972.   She also watched for safety issues when performing her other duties. (Pope Dep., p. 117).

973.   If she saw somebody doing something unsafe she stopped them, and if she saw someone without PPE she told them to put in on.  (Pope Dep., p. 117).

974.   She addressed all safety issues in the pre-shift meeting with her TMs and explained to them why the issue applied to them and why they needed to be careful.  (Pope Dep., p. 118).

975.   When there was an injury in her group, she met with the TM and the TL and discussed what happened and if it was the TM's fault or something on line. (Pope Dep. p. 111).

976.   She also discussed with the TM and TL what kind of measures could be put in place to keep injury from happening again.  (Pope Dep., p. 112).

977.   Pope had the TM and TL draft a 5 Why problem solving form that she reviewed and changed and sent to AM for approval.  (Pope Dep., p. 112).

978.   When a TM had restrictions she made sure the TM only worked in the appropriate stations.  (Pope Dep., p. 125).

979.   She handled TM issues and conflicts in her group and decided when to involve higher management or Team Relations in a TM issue or conflict.  (Pope Dep. Ex. 1, #18).

980.   She could direct training and retraining in skills for TMs in her group, and she did so if she deemed appropriate.  (Pope Dep. Ex. 1, #19).

981.   She had the TLs develop a training plan for each TM.  (Pope Dep., p. 120).

982.   She read through the training plans for each TM so she could see what they did each week, and she signed off on those.  (Pope Dep., p. 119).

983.   She had TLs or TMs train new TMs in every station in the team. (Pope Dep., p. 119).

984.   She observed the performance of the TM and made sure he was capable before he moved to Level 3 or 4 of the Circle of Skills.  (Pope Dep., pp. 119-20).

985.   She signed off on the Circle of Skills for each TL and TM each quarter.  (Pope Dep., p. 120).

986.   She showed and supported top performance in her group.  (Pope Dep. Ex. 1, #29).

987.   She used her best judgment in performing all of her GL job duties. (Pope Dep. Ex. 1, #23).

988.   She fulfilled all of the roles and responsibilities of her GL position. (Pope Dep., pp. 139-40; Pope Dep. Ex. 1, #24 & Ex. 16).

989.   The job description for GL contained those items that Pope observed and tried to make sure occurred within her group.  (Pope Dep., pp. 140-43; Pope Dep. Ex. 17).

990.   Every year as a GL Pope was evaluated on leadership criteria.  (Pope Dep., p. 144; Pope Dep. Ex. 18).

991.   In 2010, Pope was rated as successful on her evaluation.  (Pope Dep. Ex. 18).

992.   In 2010, Pope's supervisor wrote that she "effectively manages her Team Members," and Pope agreed with that comment.  (Pope Dep., p. 144; Pope Dep. Ex. 18).

## Q.    TIMOTHY LEE - 2010

993.    Timothy Lee ("Lee") began employment at MBUSI in 1997.   (Lee Dep., pp. 19, 28).[35]

994.    Lee was promoted to TL in 1999.   (Lee Dep., p. 21).

995.    Lee was promoted to GL in Assembly on October 23, 2000.   (Lee Dep., pp. 30-31, 35).

996.    In January, 2009, Lee became GL of Assembly, Plant 2, Repair, and his group was an off-line repair group.   (Lee Dep., pp. 37, 65; Banta Decl. ¶ 30).

997.    In Repair, Lee had 24 TMs and 4 TLs in his group.   (Lee Dep., pp. 38-39).

998.    In 2010, MBUSI paid Lee over $100,000.00 in compensation, including at least $455.00 per week in salary.   (Compensation Decl. ¶ 16; Lee RFA #41).[36]

999.    As a TL, Lee filled in for TMs on line, checked tools, did the job rotation schedule and trained TMs.   (Lee Dep., p. 23).

1000. As a TL, Lee got his direction from his GL.   (Lee Dep., p. 24).

1001. As a TL, he could not sign off on a TM reaching a certain level of training, and the GL had to do that.   (Lee Dep., p. 25).

---

[35]    The Deposition of Timothy Lee and exhibits to the deposition are attached as Ex. 54 to MBUSI's Evidentiary Submission (Volume 5).

[36]    Lee Responses to Request for Admission are attached as Ex. 55 to MBUSI's Evidentiary Submission (Volume 5).

1002. As the GL, he supervised the TLs and TMs in his group.  (Lee RFA #1).

1003. A Manager or AM was not always present in his group, and he led his group independently of his Manager or AM.  (Lee RFA #33).

1004. Lee rotated shifts with his group but his manager did not so he did not have regular interaction with his manager when on the night shift.  (Lee Dep., pp. 40-41).

1005. TLs were responsible the TMs on their team; GLs were responsible for the TMs in their group; and AMs were responsible for the entire shop.  (Lee Dep., pp. 172-73).

1006. He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Lee RFA #5).

1007. If a TM or TL refused to follow his direction it was considered insubordination.  (Lee Dep., p. 128).

1008. A TL in his group received a CPR because he failed to follow Lee's instruction to not have confrontations with TMs.  (Lee Dep., pp. 128-29).

1009. He led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Lee RFA ##25, 26 & 28).

1010. He made decisions about his group and carried out his plans for the group. (Lee RFA # 35).

1011. He shared his knowledge and experience with his group. (Lee RFA #30).

1012. As a GL in the off-line repair area, Lee spent the day checking four or five different areas. (Lee Dep., p. 80).

1013. He checked TMs to make sure they were doing what they were supposed to be doing. (Lee Dep., p. 80).

1014. He also checked the repair tickets and the repairs that the TMs made. (Lee Dep., p. 80).

1015. He also checked the shower cars to make sure the TMs at the shower were doing what they were supposed to be doing. (Lee Dep., p. 80).

1016. Throughout the day, Lee observed TMs' performance to make sure they were following SMPs. (Lee Dep., pp. 139-40).

1017. He walked the areas looking for abnormal conditions, safety and cleanliness. (Lee Dep., pp. 133-34).

1018. He checked TMs daily to make sure they were not wearing items that could scratch the cars. (Lee Dep., p. 138).

1019. He instructed TLs to make sure the TMs had the proper tools, and he made sure the TLs took tools to be calibrated. (Lee Dep., pp. 139, 146-47).

1020. He checked the scrap tables to ensure they were clean.  (Lee Dep., p. 140).

1021. Lee made repairs when he was short on manpower.  (Lee Dep., pp. 80-81).

1022. Lee attended a start-up meeting with his AMs and GLs every day, and they discussed safety issues, manpower, daily targets, electrical, mutilation and certain things the AM wanted them to do.  (Lee Dep., pp. 53-54, 56).

1023. Prior to the meeting the GLs recorded attendance on a board in their team centers, and then they put their manpower needs on another board with a diagram of the whole shop, and this is how the AM learned of the manpower needs in the shop.  (Lee Dep., p. 55).

1024. The AM would not know of the manpower needs without the GLs tracking manpower issues for each group.  (Lee Dep., pp. 55-56, 114).

1025. After the start-up meeting with the AMs and GLs, Lee conducted a meeting with his group and provided information to the group.  (Lee Dep., p. 58).

1026. He also made himself available to the TMs before the start of shift if they wanted to talk with him.  (Lee Dep., p. 197).

1027. Lee updated the SQDCM board on a daily basis with the build target information and the quality charts.  (Lee Dep., p. 62).

1028. He discussed SQDCM issues with his group at the pre-shift meeting which included safety issues, the build target, scrap and keeping TMs focused. (Lee Dep., pp. 62-64).

1029. Focus is important in Lee's area because they do more strenuous and dangerous work.  (Lee Dep., pp. 64-65).

1030. As a GL, Lee observed and addressed SQDCM throughout the day. (Lee Dep., p. 65).

1031. Lee communicated toolbox information such as on HR policies to his group by posting it.  (Lee Dep., pp. 96-97).

1032. He attended meetings with HR about HR topics and policy changes. (Lee Dep., pp. 196-97).

1033. HR let the GLs know about changes before informing TMs in case the TMs had questions.  (Lee Dep., p. 197).

1034. Lee attended retrofit meetings with the supplier, the AM and other GLs.  (Lee Dep., p. 200).

1035. Throughout the day, Lee took notes of items he wanted to leave over for his GL counterpart, such as a part not fitting right or issues at the shower.  (Lee Dep., pp. 81-82).

1036. He completed turnover logs for his GL counterpart on the next shift so that the GL would know of any changed conditions or open issues, and his GL counterpart did the same for him.  (Lee Dep., pp. 52-53, 131; Lee Dep. Ex. 5).

1037. Lee attended an end of the shift meeting with the GLs and the AMs, and they discussed end of the line details that the AMs had not been informed of during the day.  (Lee Dep., p. 82).

1038. Lee ensured that company policies and work rules were enforced in his group.  (Lee RFA #14).

1039. Lee managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Lee Dep., p. 82; Lee RFA #4).

1040. He documented time and attendance for all TMs and TLs in his group. (Lee Dep., p. 47).

1041. He checked to see what TMs called off work, and he checked the calendar to see who was on vacation each day.  (Lee Dep., pp. 47, 114).

1042. When a TM put in a vacation request he recorded it on the calendar. (Lee Dep., p. 47).

1043. He was responsible for approving a TM or TL's vacation request. (Lee Dep., p. 48).

1044. When a TM had an unexcused absence, Lee informed HR, and after HR determined if an occurrence was due, Lee issued the occurrence to the TM by documenting it on the attendance board.  (Lee Dep., p. 61).

1045. He approved the time for the TMs and TLs that was submitted to payroll.  (Lee Dep., p. 83).

1046. He approved time for temporary employees who worked in his area. (Lee Dep., p. 83).

1047. He taught other GLs how to enter time into the payroll system.  (Lee Dep., p. 100).

1048. Once his group was staffed, Lee managed it throughout the day.  (Lee Dep., pp. 115-16).

1049. He evaluated the performance of TMs and TLs in his group on an annual basis.  (Lee Dep., pp. 50-51, 111; Lee RFA #6).

1050. He rated them as satisfactory or not satisfactory in various performance areas.  (Lee Dep., p. 50).

1051. He provided his opinion as to whether TMs and TLs were ready for promotion.  (Lee Dep. pp. 51, 111; Lee RFA #7).

1052. Lee's opinion as to whether the TM or TL was ready for promotion was considered and normally followed in determining whether the TM or TL would be promoted.  (Jones Decl. ¶¶ 31-32).

1053. If Lee gave the TM a not satisfactory rating in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

1054. Lee is not aware of any TM that was promoted to the next level without him marking that the TM was ready to move to the next level.  (Lee Dep., p. 111).

1055. Lee counseled TMs on performance, quality of work and conduct. (Lee RFA #9).

1056. He held his TMs accountable for quality defects.  (Lee Dep., p. 183).

1057. He gave feedback to TMs in his group.  (Lee Dep., p. 112).

1058. If he saw a TM displaying subpar performance he addressed that issue with the TM and made suggestions for change.  (Lee Dep., p. 184).

1059. When his TMs were responsible for a defect, Lee told them they had a defect and reported it to his AM.  (Lee Dep., p. 43).

1060. Lee kept a daily log on TMs that made errors on a form that he created.  (Lee Dep., pp. 44, 49).

1061. He kept quality information on each TM in a TM file.  (Lee Dep., p. 44).

1062. When a TM made a certain number of errors he reported that to the AM.  (Lee Dep., p. 44).

1063. The AM did not track quality defects for TMs but relied on the files kept by Lee.  (Lee Dep., pp. 46-47).

1064. Lee had a sit-down conversation with a TM about comments the TM made to another TM, and in that conversation he made the TM aware of the company's expectations for his behavior and of the company's no retaliation policy.  (Lee Dep., pp. 117-20; Lee Dep. Ex. 3).

1065. He also drafted and issued the TM a written counseling and was responsible for keeping it in the TM's file.  (Lee Dep., pp. 118-21; Lee Dep. Ex. 3).

1066. He also sat down with a TM who violated the cell phone policy, told the TM that any further violations would result in a CPR and issued him a written counseling which he kept in the TM's file.  (Lee Dep., pp. 124-26; Lee Dep. Ex. 4).

1067. He notified his AM of possible policy violations by TMs.  (Lee Dep., pp. 123-24).

1068. Lee had the authority to initiate a CPR on a TM when he deemed necessary.  (Lee Dep., p. 48; Lee RFA #10).

1069. He initiated a CPR when a TM had a quality issue.  (Lee Dep., p. 48).

1070. He and HR administered the CPR to the TM, and he explained to the TM why he was receiving a CPR.  (Lee Dep., p. 49).

1071. Lee kept files on TMs which contained discipline forms, quality forms, vacation request forms and medical documentation.  (Lee Dep., pp. 126-27).

1072. The purpose of the files was to track the TM's performance and attendance throughout the year.  (Lee Dep., p. 127).

1073. Lee initiated, facilitated and monitored problem solving in his group. (Lee RFA #12).

1074. During new model trials, he made suggestions to the Engineer about items that needed to be changed.  (Lee Dep., p. 198).

1075. During new model launches, he met with Engineers and Supply Representatives throughout the day.  (Lee Dep., p. 198).

1076. He thought strategically and established direction for his group.  (Lee RFA #27).

1077. He ensured that production and quality goals were met in his group. (Lee RFA ##13 & 22).

1078. He checked the MRS system hourly to learn if there were any quality defects from his group.  (Lee Dep., p. 134; Lee Dep. Ex. 5).

1079. When he learned of a quality defect from his group, he had a TL walk the defect to the process and check cars to contain the defect and report back to him.  (Lee Dep., pp. 137-38).

1080. Lee fed back the defect to the TM who was responsible.  (Lee Dep., pp. 135-36).

1081. He let the TM know what the process was and asked the TM what happened.  (Lee Dep., p. 136).

1082. He also completed a problem solving sheet when there was a defect in his group and he determined the root cause of the defect and worked with the TM to develop a countermeasure.  (Lee Dep., pp. 156-58; Lee Dep. Ex. 8).

1083. If a TM came up with a countermeasure he did not agree with he did not use it.  (Lee Dep., p. 159).

1084. Lee communicated the countermeasure and how it should be implemented to the rest of the group, and he checked to make sure the countermeasure was being implemented and maintained.  (Lee Dep., p. 160).

1085. He initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Lee RFA #16).

1086. He ensured that his group was working safely and he monitored the environment for safety hazards.  (Lee RFA #17).

1087. It was important to him as GL to make sure all of the TMs in his group were safe.  (Lee Dep., p. 142).

1088. Every day he checked for safety and documented any issues he found on a STOP Audit Card.  (Lee Dep., p. 140-41).

1089. If he saw any safety issues, he stopped and corrected them and then tried to find long term countermeasures to keep them from happening again.  (Lee Dep., p. 142).

1090. He participated with his AM, Safety and HR in drafting problem solving sheets for TM injuries, and they would come up with a root cause of the injury and a countermeasure.  (Lee Dep., pp. 160-61).

1091. He would make sure the countermeasure was implemented.   (Lee Dep., p. 162).

1092. He was the safety representative for the Final side of the Assembly 2 Shop, and he did safety walkthroughs where he looked at a lot of safety topics and ergonomic issues.   (Lee Dep., pp. 69, 162).

1093. He was the leader of the Safety Committee for five years, and in that role he facilitated monthly safety meetings with the Safety Committee which included TM representatives from each line, AMs, the Manager and the Safety Department.  (Lee Dep., pp. 163-64, 173).

1094. As the leader he presented audit findings, fixes and lessons learned to the committee.  (Lee Dep. p. 169).

1095. He drafted the agenda and the minutes for the committee meetings. (Lee Dep., p. 169; Lee Dep. Ex. 9).

1096. In the Safety Committee meetings they discussed how to resolve safety issues and developed countermeasures.  (Lee Dep., pp. 165, 172).

1097. The GLs were responsible for implementing the countermeasures decided on by the Safety Committee.  (Lee Dep., pp. 169-72).

1098. He could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Lee RFA #19).

1099. He signed off on training plans which his TLs developed for his TMs, and a TM could not be recognized as having a certain level of training unless he signed off.  (Lee Dep., pp. 109-10, 152; Lee Dep. Ex. 6).

1100. Before he signed off on a plan he observed the TM perform the process to make sure the TM was at the appropriate training level.  (Lee Dep., p. 152).

1101. He showed and supported top performance in his group.  (Lee Dep., p. 181; Lee RFA #29).

1102. It was important to him for his TMs to perform at a very high level. (Lee Dep., p. 185).

1103. He used his best judgment in performing all of his GL job duties. (Lee RFA #23).

1104. He fulfilled all of the roles and responsibilities of his GL position. (Lee RFA #24).

1105. For example, he managed the group as an operational unit and was responsible for accomplishing the company's goals and targets; monitored key measurables while managing the group as a business unit of the company; ensured quality goals for the group were met; confirmed that the TMs used the systems correctly; kept TMs informed; created enthusiasm in the group; maintained a high morale in the group; and ensured that company policies and work rules were enforced.  (Lee Dep., pp. 104, 107-09; Lee Dep. Ex. 2).

1106. Lee was evaluated on various leadership behaviors and received excellent ratings.  (Lee Dep., pp. 174-93; Lee Dep. Exs. 10-14).

1107. In 2010, Lee's supervisor stated that Lee "is very effective group leader that has a broad base of knowledge of the M-Class and R-Class.  This is shown through his day to day problem solving activities and the many times he has led numerous retrofit activities," and Lee agreed with that statement.  (Lee Dep., p. 190; Lee Dep. Ex. 14).

1108. Lee's supervisor also stated that "Tim has filled in as [an AM] on numerous occasions and was able to maintain and often times exceed daily targets."  (Lee Dep., p. 191; Lee Dep. Ex. 14).

1109. Lee's supervisor further stated that "overall Tim was very effective in running area," and Lee agreed.  (Lee Dep., pp. 192-93).

R.    **MARCUS GARTH - 2010**

1110. Marcus Garth ("Garth") began employment at MBUSI on July 7, 1997. (Garth Dep., p. 13).[37]

1111. In approximately 2001, Garth was promoted to TL. (Garth Dep., p. 20).

1112. In September, 2003, Garth was promoted to GL of the Chassis line which was the line he worked on as a TM and TL. (Garth Dep., pp. 26, 30-31: Garth Dep. Ex. 1).

1113. In 2008, Garth became the GL over Off-line Repair, Assembly, Plant 2. (Garth Dep., pp. 40, 46-47).

1114. In 2010, MBUSI paid Garth over $100,000.00 in compensation, including at least $455.00 per week in salary. (Compensation Decl. ¶ 17; Garth RFA #41).[38]

1115. As a TL, his GL was his supervisor, and he interacted with the GL throughout the whole day. (Garth Dep., pp. 18-20, 27).

1116. As a TL, Garth answered line pulls by TMs, and if the problem was serious he consulted with the GL which was about ten times a day. (Garth Dep., pp. 23-24).

---

[37]     The Deposition of Marcus Garth and exhibits to the deposition are attached as Ex. 56 to MBUSI's Evidentiary Submission (Volume 5).

[38]     Garth Responses to Request for Admission are attached as Ex. 57 to MBUSI's Evidentiary Submission (Volume 5).

1117. He also consulted with his GL on the development of TMs through training.  (Garth Dep., p. 25).

1118. The GL directed him to do certain projects.  (Garth Dep., pp. 27-28).

1119. As a TL, he did not have much interaction with the AM.  (Garth Dep., pp. 28-29).

1120. As a GL, Garth's duties differed from those performed by the TMs in his group.  (Garth RFA #34).

1121. His primary function as a GL was to oversee the performance of the TMs in his group and make sure they were doing what they were supposed to be doing.  (Garth Dep., p. 106).

1122. As a GL, he managed his line as an operational unit and was responsible to accomplish the company's goals and targets.  (Garth Dep. p. 93-94; Garth Dep. Ex. 8).

1123. As a GL, he supervised the TLs and TMs in his group and referred to himself as a supervisor.  (Garth Dep., pp. 100-01; Garth RFA #1).

1124. He agreed that the purpose of the GL position was to direct TLs and TMs in the execution of the teams' responsibilities.  (Garth Dep., pp. 101-02; Garth Dep. Ex. 10).

1125. He also agreed that the essential functions of the GL position were listed on the GL job description.  (Garth Dep., p. 102; Garth Dep. Ex. 10).

1126. He was responsible for the performance of his TMs and for his area. (Garth Dep., p. 95).

1127. He thought strategically and established direction for his group. (Garth RFA #27).

1128. As a GL in Repair, he had between 24 and 32 TMs in his group. (Garth Dep., p. 47).

1129. His group made repairs on "bad cars" that came off the end of the line. (Garth Dep., p. 48).

1130. Some TMs did general repair; some TMs did heavy repairs; some TMs installed options; some TMs worked on shower leaks; and some TMs drove the cars from shower to shipping and also ran tests on the ship line.  (Garth Dep., p. 54).

1131. A Manager or AM was not always present in his group, and he led his group independently of his Manager or AM.  (Garth RFA #33).

1132. His AM was over three groups.  (Garth Dep., p. 48).

1133. He took control of situations in his area that arose when his AM was absent.  (Garth RFA #32).

1134. Garth's function in Repair was to observe the TMs and make sure they were following the SMPs and JESs.  (Garth Dep., pp. 48, 59).

1135. He was supposed to spend his time walking the area and observing the performance of the TMs if he was not addressing an issue or was in a meeting. (Garth Dep., p. 63).

1136. As a GL, Garth worked on-line only when his manpower was "way out of standard," which happened five or six times while he was a GL in the Repair area for two years.  (Garth Dep., p. 103).

1137. While on-line, he was still responsible for overseeing the performance of his group, ensuring that he addressed any problems that occurred in other areas of his group and addressing any issues that arose for TMs.  (Garth Dep., p. 104).

1138. He gave work directions and assignments to the members of his group.  (Garth RFA #2).

1139. He made decisions about his group and carried out his plans for the group.  (Garth RFA # 35).

1140. He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Garth RFA #5).

1141. He led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Garth RFA ##25, 26 & 28).

1142. He shared his knowledge and experience with his group.  (Garth RFA #30).

1143. Garth had daily pre-shift meetings with GLs and AMs on the Final side of Assembly, and they discussed the turnover logs from the previous shifts, major issues or concerns that might cause down time and whether any of Garth's TMs could assist on-line TMs with repairs.  (Garth Dep., pp. 50-51).

1144. He and the other GLs used turnover or shift logs to communicate issues about their shifts to each other.  (Garth Dep., pp. 52, 89-90, 93; Garth Dep. Ex. 7).

1145. He then led daily pre-shift meetings with his group where they discussed toolboxes, any issues raised by his GL counterpart on the other shift that needed to be shared with the group, issues from the prior shift and any safety concerns.  (Garth Dep., p. 52).

1146. He developed the agenda for the meeting.  (Garth Dep., p. 52).

1147. At the beginning of the shift, Garth read his e-mails and his GL counterpart's turnover logs to see what issues the GL had and checked his areas to know what issues to feed to his group at the pre-shift meeting.  (Garth Dep., p. 53).

1148. He could then tell his TMs what issues they were facing and what they needed to do.  (Garth Dep., p. 53).

1149. Post-shift, he made sure his TMs did 5s (cleaning) in the area and that they properly tagged scrap.  (Garth Dep., pp. 90, 92).

1150. Garth attended retro meetings to decide how to handle replacement of parts on cars.  (Garth Dep., p. 49).

1151. Sometimes Garth's AM called meetings to get feedback or discuss quality issues.  (Garth Dep., pp. 52-53).

1152. Garth ensured that company policies and work rules were enforced in his group.  (Garth RFA #14).

1153. Garth managed attendance in his group and ensured that his group was properly staffed.  (Garth RFA #3).

1154. He was responsible for adjusting manpower in his group to meet the functions performed by his group and escalated to his AM only if he needed TMs from other areas.  (Garth Dep., pp. 98-99).

1155. Sometimes he assigned TMs from one area to another area because of a heavy workload in the area.  (Garth Dep., pp. 54, 99).

1156. He also adjusted manpower due to TM absences and when TMs had to leave early.  (Garth Dep., pp. 64, 67-68).

1157. He decided which TMs would work overtime according to volunteers and seniority.  (Garth Dep., p. 69).

1158. Garth managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Garth RFA #4).

1159. He controlled the attendance on a day-to-day basis.  (Garth Dep., p. 99).

1160. He entered TMs' time.  (Garth Dep., p. 63).

1161. He maintained the attendance calendar.  (Garth Dep., p. 63).

1162. He approved vacation and emergency vacation requests and explained the vacation policy to TMs.  (Garth Dep., pp. 66-67).

1163. He checked for call-ins by TMs.  (Garth Dep., p. 63).

1164. He kept track of occurrences for TMs and counseled them regarding whether a particular absence was an occurrence under the policy.  (Garth Dep., p. 64).

1165. When a TM reached a certain occurrence level, he drafted a CPR. (Garth Dep., pp. 64, 99).

1166. He evaluated the performance of TMs and TLs in his group annually. (Garth Dep., p. 77; Garth RFA #6).

1167. In the evaluations, he described the TM's performance with regard to particular performance criteria and judged them as satisfactory or non-satisfactory. (Garth Dep., pp. 77-78; Garth Dep. Ex. 4).

1168. He based his evaluation of the TM's performance on his observation of their performance, and he took into account whether he had counseled the TM on an issue.  (Garth Dep., p. 79).

1169. He provided his opinion as to whether or not TMs and TLs in his group were ready for promotion.  (Garth Dep. pp. 78-80; Garth Dep. Ex. 5; Garth RFA #7).

1170. In evaluating whether a TL was ready for promotion to GL, Garth considered the TL's initiative, leadership capability, communication with TMs, production of the TL's area, how the TL addressed problems in the area and how the TL supervised the group when filling in for him.  (Garth Dep., pp. 81-82).

1171. A TM could not be promoted unless Garth checked off that the TM was ready for promotion.  (Garth Dep., pp., 21, 29).

1172. If Garth rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

1173. He evaluated temporary TMs on their SMPs and JESs and their work performance, and when he had a temporary TM that was not performing he notified his AM.  (Garth Dep., pp. 65-66).

1174. Garth counseled TMs on performance, quality of work and conduct. (Garth RFA #9).

1175. When a TM was not following the SMPs or JESs, Garth corrected the TM and documented it or if the issue was severe or repeat he wrote a CPR.  (Garth Dep., pp. 59-60).

1176. He had the authority to initiate a CPR on a TM when he deemed necessary.  (Garth Dep., p. 60; Garth RFA #10).

1177. He participated in the meeting where the CPR was presented to the TM.  (Garth Dep., p. 60).

1178. When Garth counseled the TM and the TM did not improve, Garth wrote a higher level of discipline.  (Garth Dep., p. 61).

1179. Garth also wrote out discipline for TMs for conduct issues.  (Garth Dep., p. 61).

1180. He counseled TMs to try to improve their conduct.  (Garth Dep., p. 62).

1181. When he observed TMs talking to each other instead of paying attention to their job, he corrected them.  (Garth Dep., p. 62).

1182. Garth was responsible for preparing the area for strip-outs, and he directed TMs to do what was needed to prepare the line for strip-outs.  (Garth Dep. p. 83).

1183. He directed TMs in what to do during downtime, such as cleaning and training.  (Garth Dep., p. 62).

1184. He tried to resolve conflicts between TMs in his group.  (Garth Dep., p. 61).

1185. He tried to make sure that TLs rotated TMs through jobs appropriately and fairly.  (Garth Dep., p. 70).

1186. When TMs complained that the rotation was not fair, he talked to the TL about the rotation and talked to the TM about their concern and tried to address it.  (Garth Dep., pp. 70-71).

1187. TMs came to him with concerns about once a month and he did his best to address them.  (Garth Dep., p. 71).

1188. He initiated, facilitated and monitored problem solving in his group. (Garth RFA #12).

1189. He drafted revisions to SMPs and JESs, and if his TMs had suggestions of revisions, he evaluated those and determined whether to recommend a change.  (Garth Dep., pp. 87-88).

1190. He reviewed new model car processes and brought up any concerns he had about those to the Engineers or Pilot Team working on the new model. (Garth Dep., p. 84).

1191. He ensured that production and quality goals were met in his group. (Garth ##13 & 22).

1192. TMs brought quality issues to his attention, and Garth assessed what needed to be done about the issue.  (Garth Dep., pp. 56-57).

1193. If the defect was caused by another group, Garth contacted that group and gave them feedback.  (Garth Dep., p. 57).

1194. Sometimes Garth would ask TMs from other areas to help get the issue fixed.  (Garth Dep., p. 58).

1195. If he expected the issue to involve a considerable amount of downtime or a lot of defects on a lot of cars, he let his AM know about the issue.  (Garth Dep., pp. 58-59).

1196. He tried to adhere to the budget for his group by communicating to TMs not to damage parts, and when parts came damaged to his group he fed them back to the appropriate group.  (Garth Dep., pp. 88-89).

1197. He initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Garth RFA #16).

1198. He ensured that his group was working safely and he monitored the environment for safety hazards.  (Garth RFA #17).

1199. He was responsible for ensuring that the safety procedures were followed in his group.  (Garth Dep., p. 74).

1200. When he saw a TM not wearing PPE he corrected the TM, and if the TM continued not to do it, he wrote the TM up.  (Garth Dep., p. 74).

1201. When he noticed anything unsafe in the group, he tried to address it as soon as possible.  (Garth Dep., pp. 74-75).

1202. He discussed safety topics at the pre-shift meeting.  (Garth Dep., p. 73).

1203. When TMs had safety concerns they let him know about it.  (Garth Dep., p. 74).

1204. When he had TMs with medical restrictions he was responsible for making sure that they worked within their restrictions.  (Garth Dep., p. 67).

1205. In the event of severe weather, he was responsible for gathering his TMs and taking them to a sheltered area.  (Garth Dep., p. 37).

1206. He investigated injuries in his group and completed a safety STOP card.  (Garth Dep., p. 75).

1207. He worked with the Safety Department to develop countermeasures to safety issues.  (Garth Dep., p. 75).

1208. He completed 5 Why problem solving forms for safety and quality issues to determine the cause of the issue and to resolve it.  (Garth Dep., pp. 75-76; Garth Dep. Ex. 3).

1209. He implemented the steps taken as part of the 5 Why problem solving and also instructed his TMs on any changes made.  (Garth Dep., p. 76).

1210. He could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Garth RFA #19).

1211. He had TLs work with TMs to make sure the TMs were following the SMPs and JESs.  (Garth Dep., p. 71).

1212. When he observed that a TM needed more training or training in something different, he made that happen.  (Garth Dep., p. 72).

1213. Garth maintained Circle of Skills documents showing the skill level of each TM.  (Garth Dep., p. 72).

1214. He tried to get the TMs trained in as many areas as possible.  (Garth Dep., p. 72).

1215. He observed the TMs in the different areas to determine whether they could move to a different training level.  (Garth Dep., p. 73).

1216. He determined who would do the training for each TM.  (Garth Dep., p. 73).

1217. He monitored the annual plan and took actions to ensure the successful achievement of the plan.  (Garth Dep., p. 98).

1218. He showed and supported top performance in his group.  (Garth RFA #29).

1219. He used his best judgment in performing all of his GL job duties. (Garth RFA #23).

1220. He fulfilled all of the roles and responsibilities of his GL position. (Garth RFA #24).

1221. The only reason that Garth believes he was not management is because he did not have the "final say so."  (Garth Dep., p. 97).

### S.   MARIANNE MAGNER - 2010

1222. Marianne Magner ("Magner") began employment at MBUSI in 1997. (Magner Dep., pp. 14-15).[39]

1223. In February, 2005, Magner was promoted to GL of Supplier Quality Operations ("SQO") where she worked the entire time as a GL.  (Magner Dep., pp. 26, 28, 38; Magner Dep. Ex. 1).

1224. As a TM, Magner's supervisor was her GL.  (Magner Dep., p. 22).

1225. As a GL, Magner had nine to twelve TMs and three TLs in her group. (Magner Dep., p. 38).

1226. In 2010, MBUSI paid Magner over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 18; Magner RFA  #41).[40]

1227. When Magner became GL she understood that the purpose and objective of her new position was to supervise the activities of the SQO group. (Magner Dep., p. 29).

1228. She supervised the TLs and TMs in her group.  (Magner RFA #1).

1229. Her TMs were located in Assembly 1, Assembly 2, Body and Paint. (Magner Dep., p. 62).

---

[39]     The Deposition of Marianne Magner and exhibits to the deposition are attached as Ex. 58 to MBUSI's Evidentiary Submission (Volume 5).

[40]     Magner Responses to Request for Admission are attached as Ex. 59 to MBUSI's Evidentiary Submission (Volume 5).

1230. The SQO group answered line calls - which were calls from the line about problems with parts - and recorded information about the problem.  (Magner Dep., p. 51).

1231. The TMs and TLs in Magner's group were assigned to answer line calls in certain shops.  (Magner Dep., pp. 63, 113-14).

1232. As a GL, Magner was not assigned to a shop but roamed all the shops. (Magner Dep., pp. 63-64, 113-14).

1233. Magner covered line calls for TMs when the group was short on manpower.  (Magner Dep., pp. 68-69).

1234. When she answered line calls, Magner tried to solve problems such as finding out which of two look alike parts was the correct part.  (Magner Dep., p. 69).

1235. When she covered line calls, she still had to be available to handle other issues that arose in her area.  (Magner Dep., p. 167).

1236. If a more pressing issue arose, she finished her line call and went to address that issue.  (Magner Dep., p. 167).

1237. For example, if a TM was injured she checked on them.   (Magner Dep., p. 168).

1238. She was always available to her TMs by radio.  (Magner Dep., p. 168-70).

1239. TMs would call her if they did not know how to answer a particular line call.  (Magner Dep., pp. 70-71, 114).

1240. The SQO group also performed yard sorts - which were checking cars for problems with parts.  (Magner Dep., p. 56).

1241. The TMs reported the results of the yard sorts to Magner.  (Magner Dep., p. 149).

1242. SQO TMs in the Paint Shop performed chemical analyses which is something that Magner did not know how to do.  (Magner Dep., p. 120).

1243. A Manager or AM was not always present in her group, and she led her group independently of her Manager or AM.  (Magner RFA #33).

1244. As a GL, she did not have much interaction with her Manager, and he did not rotate shifts with her group like she did.  (Magner Dep., p. 40).

1245. She took control of situations in her area that arose when her AM was absent.  (Magner RFA #32).

1246. She gave work directions and assignments to the members of her group.  (Magner RFA #2).

1247. She made decisions about her group and carried out her plans for the group.  (Magner RFA # 35).

1248. She directed her group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Magner RFA #5).

1249. She led her group in meeting company standards; she led change in her group; and she used leadership skills in her GL position.  (Magner RFA ##25, 26 & 28).

1250. She shared her knowledge and experience with her group.  (Magner RFA #30).

1251. Magner talked to her TMs every day, and when she was not busy she visited the TMs in the various shops to see how they were doing.  (Magner Dep., pp. 123-24).

1252. Before each shift, Magner compiled all of the information from the previous shift such as what yard sorts needed to be done so that she would know what her group needed to start with on the shift.  (Magner Dep., p. 53).

1253. She also checked her e-mails to obtain information from Engineering, find out what happened on the previous shift, obtain information from TMs, obtain notices from HR and find out about all team meetings.  (Magner Dep., p. 54).

1254. She conducted a meeting for her group at the beginning of each shift and discussed information from HR, information on yard sorts, and issues that TMs wanted to discuss.  (Magner Dep., p. 56).

1255. She also discussed SQDCM with her group. (Magner Dep., pp. 56-57).

1256. After the pre-shift meeting, Magner spoke with the AM by phone to discuss any issues from the previous shift or questions he had. (Magner Dep., p. 74).

1257. During the day, Magner's AM called her to tell her that members of her group were needed in various places, such as at a supplier, performing yard sorts or checking an issue on line, and Magner would decide which TM to send. (Magner Dep., pp. 60-61).

1258. Supplier representatives called Magner when they wanted to let the group know about an issue with a part and she would communicate the issue to the group. (Magner Dep., p. 72).

1259. She was responsible for working with the in-house supplier representatives. (Magner Dep., p. 98).

1260. Magner attended retrofit meetings with Engineers, her AM, the Quality AM and persons from Repair to discuss changing parts on cars due to a supplier issue. (Magner Dep., pp. 73-74).

1261. Magner also attended monthly GL meetings. (Magner Dep., p. 75).

1262. Magner ensured that company policies and work rules were enforced in her group. (Magner RFA #14).

1263. Magner managed attendance in her group and ensured that her group was properly staffed.  (Magner RFA #3).

1264. She balanced out the workload for TMs so they would not get overloaded when there were manpower issues.  (Magner Dep., p. 164).

1265. Magner managed vacation scheduling, timekeeping and attendance tracking for members in her group.  (Magner RFA #4).

1266. She entered time for her group so that they would be paid.  (Magner Dep., p. 35).

1267. She maintained an attendance board and entered TMs' absences and tardies into a computer.  (Magner Dep., pp. 42-43).

1268. She kept up with vacation requests and approved vacation requests that were in standard.  (Magner Dep., p. 44).

1269. She checked call-ins by TMs letting her know they would be late and used that information to shift around manpower.  (Magner Dep., p. 45).

1270. She and an HR representative issued attendance occurrences to TMs who had a certain number of absences and tardies.  (Magner Dep., p. 43).

1271. She approved the time period for TM elective short-term disability requests.  (Magner Dep., pp. 105-08; Magner Dep. Ex. 4).

1272. She approved TM rotation schedules.  (Magner Dep., p. 139).

1273. She discussed with the TLs changes to the TM rotation schedule because of manpower issues.  (Magner Dep., pp. 108-09).

1274. She evaluated the performance of TMs and TLs in her group annually.  (Magner Dep., p. 46; Magner RFA #6).

1275. She recommended whether TMs and TLs in her group were ready for promotion.  (Magner Dep., p. 100; Magner RFA #7).

1276. Magner's TMs and TLs could not be promoted unless she marked them as ready for the next level.  (Magner Dep., pp. 100-01).

1277. If Magner rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion.  (Jones Decl. ¶ 33).

1278. She reviewed the evaluation with the TM.  (Magner Dep., p. 47).

1279. Magner counseled TMs on performance, quality of work and conduct.  (Magner RFA #9).

1280. For example, when a TM came to work without her steel-toed shoes Magner informed the group that was improper.  (Magner Dep., pp. 142-44).

1281. She also had the authority to initiate a CPR on a TM if she deemed necessary.  (Magner RFA #10).

1282. She drafted CPRs for TMs with the help of HR.  (Magner Dep., p. 144).

1283. She sat down with the TMs, reviewed the CPR with them and explained company policy.  (Magner Dep., pp. 144-45).

1284. She could issue discipline as a GL, which was something she could not do as a TL.  (Magner Dep., pp. 43-44).

1285. She was responsible for the behavior of her TMs.  (Magner Dep., p. 137).

1286. She also counseled supplier representatives about rules, such as not having food on the line and paying attention to cars leaving the line.  (Magner Dep., pp. 134-37).

1287. She initiated, facilitated and monitored problem solving in her group. (Magner RFA #12).

1288. She completed problem solving forms for incidents such as a pallet falling apart and a TL having a forklift accident.  (Magner Dep., pp. 109-13; Magner Dep. Ex. 5).

1289. Magner worked with the TM involved to determine what happened, and Magner and the AM determined the root cause and developed a countermeasure.  (Magner Dep., pp. 110-11).

1290. She discussed the countermeasure with her group.  (Magner Dep., pp. 111-12).

1291. She ensured that production and quality goals were met in her group. (Magner RFA ##13 & 22).

1292. She reported on scrap daily so that the company would know what problem parts were costing the most money.  (Magner Dep., p. 48).

1293. The SQO group completed a SQO turnover log, and Magner reviewed it.  (Magner Dep., pp. 50, 119; Magner Dep. Ex. 7).

1294. Magner printed out the SQO turnover report for the previous shift and discussed it with her group at the beginning of the shift.  (Magner Dep., p. 52).

1295. Magner and her TLs completed the paperwork to unblock cars that were checked by her group.  (Magner Dep., p. 85).

1296. TLs wrote and modified SMPs, and Magner signed off on them. (Magner Dep., pp. 97-98).

1297. She initiated continuous improvement activities in her group and led the implementation of initiatives in her group.  (Magner RFA #16).

1298. She ensured that her group was working safely and she monitored the environment for safety hazards.  (Magner RFA #17).

1299. She made sure her TMs wore the correct PPE and followed the company policy on PPE.  (Magner Dep., pp. 90-91).

1300. When a TM was unfocused or clowning on the job, it was Magner's responsibility to talk to the TM.  (Magner Dep., pp. 93-94).

1301. She handled TM issues and conflicts in her group and decided when to involve higher management or Team Relations in a TM issue or conflict. (Magner RFA #18).

1302. TMs went to her with issues about HR policies and practices. (Magner Dep., p. 34).

1303. She could direct training and retraining in skills for TMs in her group, and she did so if she deemed appropriate. (Magner RFA #19).

1304. She signed off on Circle of Skills training for TMs quarterly. (Magner Dep., pp. 85-86, 114-16; Magner Dep. Ex. 6).

1305. She observed the TMs before she verified that the TMs had been trained. (Magner Dep., p. 86).

1306. If she determined that the TM had not been trained to the next level, she did not sign off on the Circle of Skills training, and she suggested the TM needed additional training. (Magner Dep., pp. 129, 132-33).

1307. She instructed TMs to do their HR training. (Magner Dep., pp. 96-97, 159).

1308. It was important to her to develop her TMs. (Magner Dep., pp. 160-61).

1309. She understood her TMs' individual strengths and weaknesses and used that knowledge to get the most out of her team. (Magner Dep., p. 161).

1310. She showed and supported top performance in her group, and she was accountable for her TMs' performance.  (Magner Dep., p. 155; Magner RFA #29).

1311. She used her best judgment in performing all of her GL job duties. (Magner RFA #23).

1312. She fulfilled all of the roles and responsibilities of her GL position. (Magner RFA #24).

1313. For example, she managed the group as an operational unit and was responsible for accomplishing the company's goals and targets; monitored key measurables while managing the group as a business unit of the company; ensured quality goals for the group were met; confirmed that the TMs used the systems correctly; kept TMs informed; created enthusiasm in the group; maintained a high morale in the group; and ensured that company policies and work rules were enforced.  (Magner Dep., pp. 101, 103-04; Magner Dep. Ex. 3).

1314. As a GL, Magner was evaluated on leadership behaviors.  (Magner Dep., pp. 145-46, 149-50, 156, 161-62; Magner Dep. Exs. 11-15).

1315. In 2009, she was rated as "Excellent" in her performance, and her supervisor stated that she did "a good job of managing her team and developing them to support each other."  (Magner Dep. Ex. 14).

1316. In 2010, she was rated as "Excellent" in her performance, and her supervisor stated that she "manages her tasks and team well" and "has done an

excellent job of managing the workload of her team members."  (Magner Dep. Ex.

15).

### T.    CATHY WILLIAMS - 2008

1317. Cathy Williams ("Williams) began employment with MBUSI on March 3, 1997.  (Williams Dep., p. 12).[41]

1318. Williams was promoted to GL of the Project Team in Paint 2 in November, 2004.  (Williams Dep., pp. 27, 29-30; Williams Dep. Ex. 1).

1319. In 2007, she became GL over Phosphate, E-coat, Sand, Primer and Prime Sand, and she held that position until her employment at MBUSI ended on January 9, 2009.  (Williams Dep., pp. 12, 38).

1320. In 2008, MBUSI paid Williams over $100,000.00 in compensation, including at least $455.00 per week in salary.  (Compensation Decl. ¶ 19; Williams RFA #41).[42]

1321. When Williams was a TM and had issues performing her job, she went to her GL or TL.  (Williams Dep., p. 18).

1322. Her only interaction with the AM was that he greeted her daily. (Williams Dep., p. 18).

1323. As a TL, when she had an issue within her team she could not resolve, she called her GL.  (Williams Dep., p. 23).

---

[41]    The Deposition of Cathy Williams and exhibits to the deposition are attached as Ex. 60 to MBUSI's Evidentiary Submission (Volume 5).

[42]    Williams Responses to Request for Admission are attached as Ex. 61 to MBUSI's Evidentiary Submission (Volume 5).

1324. As a TL, her only additional interaction with the AM was when she filled in as GL or if she could not find a GL.  (Williams Dep., pp. 26-27).

1325. Williams agreed that the purpose of a GL was to direct TLs and TMs in the execution of the teams' responsibilities.  (Williams Dep., p. 85; William Dep. Ex. 4).

1326. She agreed that as a GL she had all of the essential functions listed on the GL job description.  (Williams Dep., p. 86; Williams Dep. Ex. 4).

1327. As a GL, her primary duty was to oversee the performance of her TMs and TLs to make sure they were performing in accordance with MBUSI standards and policies.  (Williams Dep., p. 90).

1328. Williams supervised the TLs and TMs in her group.  (Williams RFA #1).

1329. In Phospate, E-coat, Sand, Primer and Prime Sand, she had approximately 25 TMs and 3 TLs.  (Williams Dep., p. 42).

1330. Her area covered two-thirds of the second floor and almost the entire length of the Paint Shop on the first floor.  (Williams Dep., p. 43).

1331. A Manager or AM was not always present in her group, and she led her group independently of her Manager or AM.  (Williams RFA #33).

1332. She took control of situations in her area that arose when her AM was absent.  (Williams RFA #32).

1333. She gave work directions and assignments to the members of her group.  (Williams RFA #2).

1334. She made decisions about her group and carried out her plans for the group.  (Williams RFA # 35).

1335. She directed her group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Williams RFA #5).

1336. She led her group in meeting company standards; she led change in her group; and she used leadership skills in her GL position.  (Williams RFA ##25, 26 & 28).

1337. She shared her knowledge and experience with her group.  (Williams RFA #30).

1338. She conducted a daily start up meeting for her group.  (Williams Dep., p. 44).

1339. She had a daily meeting with GLs and AMs before the start-up meeting with her group, and they discussed the shift logs from previous shifts, HR toolbox information that they needed to convey to their groups, quality issues that they needed to make their group aware of, and the manpower situation for the day. (Williams Dep., pp. 45, 47).

1340. In this meeting the GLs could get TMs from other groups if they were low on manpower and the TMs were trained.  (Williams Dep., p. 46).

1341. Williams also had a daily meeting with the AMs, the Engineer, the AM of the Engineers and sometimes the Manager, for a daily update on E-coat Phospate.  (Williams Dep., p. 47).

1342. Every participant of that meeting had input in the meeting.  (Williams Dep., p. 48).

1343. She went to monthly programs with HR to discuss HR issues and policies.  (Williams Dep., pp. 36, 44).

1344. She was told to be available to TMs 30 minutes prior to and 30 minutes at the end of the shift.  (Williams Dep., p. 48).

1345. When she arrived for the shift, she would check call-ins to know her manpower for the day, check the attendance board to see which TMs were on vacation, read the shift logs from the prior shift, and open any e-mails.  (Williams Dep., p. 49).

1346. If any TMs had an issue they needed to speak to Williams about, they would come to her then.  (Williams Dep., p. 49).

1347. She updated the SQDCM board every morning with items such as accidents, percentage of First Time Capability (how many cars made it through her area without any line pulls) and attendance.  (Williams Dep., p. 50).

1348. Throughout the day, Williams walked through her group and observed the work of the TMs to make sure they were doing their jobs correctly. (Williams Dep., p. 53).

1349. Because her area was so large, she spent a lot of time checking on her TMs in different areas. (Williams Dep., p. 53).

1350. About two or three times a day, Williams' TLs would call her to come to their areas to address issues. (Williams Dep., p. 54).

1351. She would go find out what was the issue and if necessary escalate it to the AM. (Williams Dep., p. 54).

1352. If the issue involved another GL, she would call that GL to come observe the issue. (Williams Dep., p. 54).

1353. If the issue involved maintenance, she would contact the Maintenance Department, and if the issue involved engineering, she would contact the Engineering Department. (Williams Dep., p. 55).

1354. Approximately three times a day, another GL called her to address a quality issue that potentially arose from her group. (Williams Dep., p. 55).

1355. After she looked at the situation, she fed back the issue to the TM. (Williams Dep., p. 55).

1356. She would tell the TMs what needed to be done to make sure the issue did not happen again. (Williams Dep., pp. 55-56).

1357. She took TMs or TLs to the vehicle with the defect to point out what they had done incorrectly.  (Williams Dep., p. 56).

1358. Two or three times during the shift, she would fill in for TLs who needed a bathroom break and would answer line pulls by TMs with an issue or question.  (Williams Dep., p. 57).

1359. She also checked quality at the end of the areas so she could feed back quality issues to the operators.  (Williams Dep., p. 62).

1360. If an issue arose in her group while she was checking quality, she would go address the issue.  (Williams Dep., p. 64).

1361. She also continued to go from area to area and observe TMs to make sure they were doing their job correctly.  (Williams Dep., p. 64).

1362. While checking quality, she remained responsible for the performance of her TMs and TLs.  (Williams Dep., p. 91).

1363. After the shift, Williams completed her shift logs with information such as quality issues in her area, quality issues from other areas, equipment problems, the numbers of vehicles through her area, the FTC numbers and the attendance for her group.  (Williams Dep., pp. 50-53).

1364. The logs would tell the next GL what he or she needed to know for the next shift.  (Williams Dep., p. 53).

1365. She also talked with TMs about any issues they wanted to address, such as vacation requests, time and attendance.  (Williams Dep., pp. 51-52).

1366. Williams ensured that company policies and work rules were enforced in her group.  (Williams Dep., p. 81; William RFA #14).

1367. Williams managed attendance in her group and ensured that her group was properly staffed.  (Williams RFA #3).

1368. Williams managed vacation scheduling, timekeeping and attendance tracking for the members of her group.  (Williams Dep., p. 79; Williams RFA #4).

1369. She kept an attendance calendar on each TM, and if a TM was absent she coded the absence on the calendar according to the attendance policy. (Williams Dep., pp. 70-71).

1370. She wrote occurrences for the TM on the back of the calendar. (Williams Dep., p. 71).

1371. When the number of occurrences reached a certain level, she drafted a CPR for the TM and submitted it to the AM for approval.  (Williams Dep., p. 71).

1372. She approved vacation and emergency vacation requests based on the vacation policy.  (Williams Dep., pp. 71-72).

1373. When TMs left a shift unexpectedly, she moved TMs and TLs from one area to another area to cover the processes.  (Williams Dep., p. 72).

1374. She evaluated the performance of TMs and TLs in her group on an annual basis. (Williams Dep., pp. 73-74; Williams RFA #6).

1375. In the evaluation, she described the TMs performance in regard to the performance criteria. (Williams Dep., p. 74).

1376. She evaluated whether their performance was satisfactory or non-satisfactory. (Williams Dep., p. 74).

1377. If Williams rated a TM as not satisfactory in any area other than attendance, the TM was not eligible for promotion. (Jones Decl. ¶ 33).

1378. She included in the evaluation her ideas regarding steps TMs could take to develop in their position. (Williams Dep., p. 75).

1379. She appraised whether or not TMs and TLs in her group were ready for promotion, and she included the reasons why they were ready or not ready. (Williams Dep., p. 75; Williams RFA #7).

1380. Her appraisal of the TM was considered and normally followed in determining if the TM would be promoted. (Jones Decl ¶¶ 31-32).

1381. She never had a TM or TL that she appraised as not ready for promotion be promoted. (Williams Dep., p. 75).

1382. She used the roles and responsibilities for a TL and GL in appraising whether the TM or TL was ready for promotion. (Williams Dep., pp. 75-76; Williams Dep. Ex. 2).

1383. She involved the TMs and TLs in the roles and responsibilities for the next level to help prepare them for potential promotion. (Williams Dep., p. 76).

1384. She evaluated staffing company employees in their introductory period and that evaluation determined in part whether they were eligible for a position with MBUSI. (Williams Dep., p. 80).

1385. Williams counseled TMs on performance, quality of work and conduct. (Williams RFA #9).

1386. Williams made sure her TMs and TLs complied with MBUSI's standards of conduct. (Williams Dep., p. 76).

1387. When she saw a TM not focusing or away from their station she corrected them. (Williams Dep., p. 77).

1388. She would have discussions with TMs in an effort to improve their performance. (Williams Dep., pp. 77-78).

1389. When the TM did not comply with Williams' direction and did not improve, Williams informed the AM. (Williams Dep., pp. 77-78).

1390. She was responsible for reporting to HR or to the AM any instances of conduct by her TMs that warranted discipline. (Williams Dep., p. 79).

1391. She had the authority to initiate a CPR on a TM when she deemed necessary. (Williams Dep., p. 78; Williams RFA #10).

1392. If the AM or HR approved, Williams issued a CPR to the TM with HR present.  (Williams Dep., pp. 78-79).

1393. She initiated, facilitated and monitored problem solving in her group. (Williams RFA #12).

1394. She kept supplies such as filters and lab equipment within the budget set for her group.  (Williams Dep., p. 73).

1395. She also tried to minimize scrap so that the Paint Shop would stay within budget.  (Williams Dep., p. 72).

1396. She ensured that production and quality goals were met in her group. (Williams RFA ##13 & 22).

1397. She was evaluated on the performance of her group, including how well they did in their job and whether they caused or caught quality problems. (Williams Dep., pp. 65-66).

1398. She drafted 5 Why forms for quality issues that left her area, and as part of drafting the form, she analyzed the cause of the quality problem and developed countermeasures to prevent the issue from happening again.  (Williams Dep., p. 69).

1399. She provided the information regarding the countermeasure to her TMs and observed their work to make sure they were following the countermeasure.  (Williams Dep., p. 69).

1400. She initiated continuous improvement activities in her group and led the implementation of initiatives in her group.  (Williams RFA #16).

1401. She drafted revisions to SMPs and JESs.  (Williams Dep., p. 83).

1402. She ensured that her group was working safely and she monitored the environment for safety hazards.  (Williams RFA #17).

1403. She was responsible for the safety of her group.  (Williams Dep., p. 66).

1404. She corrected any TMs that did not comply with the safety rules. (Williams Dep., p. 66).

1405. When someone observed unsafe conditions in her group, they alerted her.  (Williams Dep., p. 66).

1406. She evaluated TMs on their observation of safety rules and policies. (Williams Dep., p. 67).

1407. When a TM was hurt, she alerted the AM, took the TM to the Medical Department and drafted a 5 Why form with the assistance of her AM.  (Williams Dep., pp. 67-68).

1408. In the 5 Why, she analyzed the cause of the problem and came up with a countermeasure.  (Williams Dep., p. 68).

1409. She informed the TMs of the countermeasure to keep the problem from occurring again.  (Williams Dep., pp. 68-69).

1410. She made sure that TMs with medical restrictions followed the restrictions. (Williams Dep., p. 72).

1411. She handled TM issues and conflicts in her group and decided when to involve higher management or Team Relations in a TM issue or conflict. (Williams RFA #18).

1412. She could direct training and retraining in skills for TMs in her group, and she did so if she deemed appropriate. (Williams RFA #19).

1413. She observed a TM's performance to make sure they could perform a process correctly before they could perform a process on their own. (Williams Dep., pp. 69-70).

1414. She maintained and signed off on Circle of Skills forms that showed which processes the TMs and TLs were certified to perform. (Williams Dep., p. 70).

1415. She tried to get as many TMs and TLs trained on as many processes as possible so that rotation was easier when TMs were absent. (Williams Dep., p. 70).

1416. She showed and supported top performance in her group. (Williams RFA #29).

1417. She used her best judgment in performing all of her GL job duties. (Williams RFA #23).

1418. She fulfilled all of the roles and responsibilities of her GL position. (Williams RFA #24).

1419. She thought strategically and established direction for her group. (Williams RFA #27).

1420. She was evaluated on leadership competencies and criteria.  (Williams Dep., p. 88; Williams Dep. Ex. 5).

1421. She does not believe she was a manager only because she had to get approval for some changes such as more manpower and changes in the material, machinery and methods.  (Williams Dep., pp. 84-85).

## III.   <u>ARGUMENT</u>

It is easy for the Court to determine that these sixteen plaintiffs were exempt for the years shown below because they were highly compensated employees in those years:

| | |
|---|---|
| Davis | 2006, 2007, 2008 |
| Little | 2006, 2007, 2008, 2010 |
| Skelton | 2006, 2007, 2008, 2010 |
| Munoz | 2006, 2007 |
| Pitman | 2007 |
| Bankston | 2009 |
| Cohen | 2009 |

| Ozier | 2009 |
|-------|------|
| Upton | 2009 |
| Daniels | 2010 |
| Cooper | 2010 |
| Pope | 2010 |
| Lee | 2010 |
| Garth | 2010 |
| Magner | 2010 |
| Williams | 2008 |

The Court does not have to determine the primary duty of these employees because for a highly compensated employee, the primary job duty analysis applicable to executive and administrative employees is streamlined. See Wood v. Kinetic Sys., Inc., No. 1:10-CV-001-CWD, 2011 U.S. Dist. LEXIS 42438, at *7 (D. Id. Apr. 19, 2011). The Department of Labor regulations provide that:

> An employee with total annual compensation of at least $100,000 is deemed exempt under section 13(a)(1) of the Act if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part.

29 C.F.R. § 541.601(a).

The regulation further provides as follows:

> (c) A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties. Thus, a highly compensated

employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee identified in subparts B, C or D of this part. An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100.

29 C.F.R. § 541.601(c).

There is no question that the plaintiffs were paid over $100,000.00 in compensation in the years specified, including at least $455.00 per week in salary. There is also no question that each of the plaintiffs customarily and regularly performed one or more of the exempt duties or responsibilities of an executive or administrative employee.  "'[C]ustomarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."  29 C.F.R. § 541.701.

The duties of an executive employee include (1) managing the enterprise or a customarily recognized department of subdivision thereof, (2) customarily and regularly directing the work of two or more other employees, and (3) having the authority to hire or fire other employees or suggesting and recommending the hiring, firing, advancement, promotion or any other change of status of other

employees when the suggestions and recommendations are given particular weight. 29 C.F.R. § 541.100(a)(2)-(4).   Management includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.  29 C.F.R. § 541.102; see also Coppage v. Bradshaw, 665 F. Supp. 2d 1361, 1369 (N.D. Ga. 2009) (finding that recruiting, training, motivating, disciplining, certifying and managing a team falls squarely within the requirement that an executive employee direct the work of two or more employees).

Administrative employees perform office or non-manual work directly related to the management or general business operations of the employer or the

employer's customers.  29 C.F.R. § 541.200.  Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities. 29 C.F.R. § 541.201.

The Court has to determine only that each plaintiff customarily and regularly performed one of the executive or administrative duties above.  As explained by the regulations, the primary duty analysis is not relevant to the Court's determination of whether a plaintiff qualifies for the highly compensated exemption.  In re RBC Dain Rauscher Overtime Litig., 703 F. Supp. 2d 910, 943 (D. Minn. 2010).  Thus, a Group Leader would qualify for the highly compensated exemption even if his primary duty was to perform non-exempt work as long as he also normally and recurrently performed at least one exempt duty.  Id.  Therefore, even if the Group Leader's exempt duties were ancillary to his non-exempt duties, he qualifies for the exemption if he customarily and regularly performs at least one exempt duty.  Id.  It also is not necessary to prove that an employee exercised discretion or independent judgment in the exercise of his administrative duties to

qualify for the highly compensated exemption.  See, e.g., Mamola v. Group Mfg. Servs., Inc., No. CV-08-1687-PHX-GMS, 2010 U.S. Dist. LEXIS 35433, at *34 (D. Ariz. Apr. 9, 2010).

It is undisputed that all of the plaintiffs discussed above customarily and regularly performed at least one duty of an exempt executive employee.  For example, all of the plaintiffs directed the work of two or more employees.  They also all evaluated their TMs and TLs on an annual basis, recommended promotion of TMs and TLs and their recommendations were given particular weight and indeed were usually determinative.  If they gave a TM or TL a "N" on an evaluation in any area other than attendance, the TM or TL could not be promoted. If they rated the TM or TL as not ready for promotion, the TM or TL was not promoted except in exceptional circumstances which none of these GLs experienced.  See 29 C.F.R. § 541.105 (stating that an employee's suggestions or recommendations may still have "particular weight" even if the employee does not have authority to make the ultimate decision as to the employee's change in status.).

The GLs also admitted they performed many other exempt executive employee duties on a daily basis, such as observing their TMs and TLs and ensuring they were performing to company standards; checking the quality of the TMs' work; conducting meetings for their group; counseling and disciplining their

TMs; making decisions on vacation, emergency vacation, short term disability and other absences of TMs; problem solving quality and safety issues that arose in their group; monitoring safety in their group and correcting unsafe acts; resolving conflicts among TMs; overseeing the training of TMs; communicating with other departments such as Engineering, Maintenance and HR about issues affecting their group; assessing and rearranging manpower; and developing their TMs and TLs.

These GLs also customarily and regularly performed at least one exempt administrative employee duty.  The all performed daily office or non-manual work directly related to the management or general business operations of MBUSI such as budgeting; auditing; quality control; safety and health; personnel management; human resources; labor relations; legal and regulatory compliance; and similar activities.

While these GLs admitted that their primary duty is management, there is no question that all of these GLs customarily and regularly performed one or more of the exempt duties or responsibilities of an executive or administrative employee, and that is all that matters.  It does not matter whether these GLs exercised independent judgment or discretion as long as they performed at least one exempt duty.

Some of these GLs claim they were not management because they had to follow company guidelines; they had to report to and take direction from their

supervisor; and they did not have the final say on some personnel decisions.  None of these arguments affect their exempt status including as a highly compensated employee.  See, e.g., Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982) ("[e]nsuring that company policies are carried out constitutes the 'very essence of supervisory work'") (citation omitted); Pendlebury v. Starbucks Coffee Co., No. 04-80521, 2008 WL 763213, at *8 (S.D. Fla. Mar. 13, 2008) ("The mere fact that managers are constrained by corporate policy and have their decisions reviewed by superiors does not diminish the primacy of their managerial responsibilities.); Rainey v. McWane, Inc., 552 F. Supp. 2d 626, 630-631 (E.D. Tex. 2008), aff'd, 314 Fed. Appx. 693 (5th Cir. 2009); Beauchamp v. Flex-N-Gate LLC, 357 F. Supp. 2d 1010 (E.D. Mich. 2005) (stating that nothing in the applicable law "requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be an 'executive.'"); Kastor v. Sam's Wholesale Club, 131 F. Supp. 2d 862, 868 (N.D. Tex. 2001) ("[T]hat an individual does not have final supervisory or discretionary authority does not take that person out of the realm of being a manager or supervisor…..").  The Court can easily determine from the evidence that these employees were paid over $100,000.00 in the relevant years and also customarily and regularly performed at least one exempt duty.  Thus, these highly compensated individuals were without question exempt for the years stated.

IV. **CONCLUSION**

For the reasons set forth herein, this Court should grant summary judgment in MBUSI's favor that dismisses the claims of **James Davis, Robert Little, Jimmy Skelton, Steven Munoz, Kelly Pitman, Danny Bankston, Mario Cohen, Clarence Ozier, Gene Upton, Thomas Daniels, Phillip Cooper, Susan Pope, Timothy Lee, Marcus Garth, Marianne Magner and Cathy Williams** for the years shown above.

<div style="margin-left:50%">

s/ Michael L. Lucas
Michael L. Lucas (LUC004)
Ashley H. Hattaway (HAT007)

Attorneys for Defendant
Mercedes-Benz U.S. International, Inc.

</div>

**OF COUNSEL:**

BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone: (205) 451-5204
Facsimile: (205) 458-5100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Defendant Mercedes-Benz U.S. International, Inc.'s Brief in Support of Its Motion for Summary Judgment on Claims of Plaintiffs Who Were Exempt Because They Were Highly Compensated has been electronically filed with the Clerk of the Court using the CM/ECF system on the following CM/ECF participants, on this the 12th day of September, 2011:

Thomas F. Campbell
D. Keiron McGowin
CAMPBELL LAW
1 Chase Corporate Drive
Suite 180
Birmingham, AL 35244

Mark R. Thierman
Joshua Buck
THIERMAN LAW FIRM, APC
7287 Lakeside Drive
Reno, Nevada  89511

s/ Michael L. Lucas
OF COUNSEL