# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **JEFF HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **vs.** | ) | **7:08-cv-00536-LSC** |
| | ) | |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

| | | |
|---|---|---|
| **GRALYN LAWSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **7:09-cv-01157-TMP** |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## DEFENDANT MERCEDES-BENZ U.S. INTERNATIONAL, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT AS TO PLAINTIFFS WHO ARE EXEMPT UNDER THE EXECUTIVE EXEMPTION BECAUSE THEY ADMIT THEIR PRIMARY DUTY IS MANAGEMENT AND THEY PERFORM SOME NON-EXEMPT WORK BUT THAT WORK IS DIRECTLY RELATED TO THEIR EXEMPT DUTIES

---

Respectfully submitted:

Michael L. Lucas (LUC004)
Ashley H. Hattaway (HAT007)
BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama 35203
(205) 251-3000

October 24, 2011

Attorneys for Defendant
Mercedes-Benz U.S. International,
Inc. (MBUSI)

## **TABLE OF CONTENTS**

Page

I.     SUMMARY OF THE ARGUMENT ................................................................2

II.    STATEMENT OF FACTS .............................................................................3

     A.    Steven Campbell.........................................................................3

     B.    Timothy Crawford ....................................................................16

     C.    Michael Crowley .....................................................................29

     D.    Robert Fisher ...........................................................................39

     E.    Floyd Franklin ........................................................................52

     F.    Derek Hendley.........................................................................61

     G.    James Karpinski ......................................................................73

     H.    Penny Kessler .........................................................................82

     I.    Gary Oglesby...........................................................................91

     J.    Kelly Pitman..........................................................................104

     K.    Frederick Rodgers .................................................................118

     L.    Timothy Swindle....................................................................128

     M.    Jassen Tidwell .......................................................................138

III.   ARGUMENT.............................................................................................147

     A.    Plaintiffs Are Employed By MBUSI In An Executive Capacity......147

          1.    Five Plaintiffs Admitted In Response To A Request For Admission That They Are Exempt Employees ......................148

2.      Plaintiffs Are Paid On A Salary Basis Above The Minimum Rate ........................................................149

3.      Plaintiffs' Primary Duty Is Management Of A Subdivision...............................................................149

        a.      The GLs Alleged Non-Exempt Work Is Actually Exempt Work Under The Law ......................................156

        b.      Management Is The Plaintiffs' Most Important Duty ............................................................................159

        c.      Concurrent Performance Of Exempt Work And Non-Exempt Work Does Not Disqualify The Plaintiffs From The Executive Exemption ...................163

        d.      Supervisors Do Not Have To Create The Policies Or Work Without Supervision To Be Exempt ............164

4.      Plaintiffs Customarily And Regularly Direct The Work Of Two Or More Employees ..................................170

5.      Plaintiffs' Recommendations Regarding Team Members' Status Are Given Particular Weight........................................171

B.      There Is No Just Reason To Delay Entering A Final Judgment ................173

IV.     CONCLUSION.............................................................................175

Certificate of Service ................................................................176

Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI") submits this Brief in Support of Its Motion for Final Summary Judgment As To Plaintiffs Who Are Exempt under the Executive Exemption Because They Admit Their Primary Duty Is Management And They Perform Some Non-Exempt Work But That Work Is Directly Related To Their Exempt Duties.[1]   Thirteen plaintiffs (**Steven Campbell, Timothy Crawford, Michael Crowley, Robert Fisher, Floyd Franklin, Derek Hendley, James Karpinski, Penny Kessler, Gary Oglesby, Kelly Pitman,**[2] **Frederick Rodgers, Timothy Swindle and Jassen Tidwell**) in the above-styled Lawson v. MBUSI case are exempt from Fair Labor Standards Act ("FLSA") overtime pay requirements under the executive exemption because they admit their primary duty is management and they perform some non-exempt work but that work is directly related to their exempt duties.

---

[1]     MBUSI filed a Motion To Drop All Plaintiffs From The Case Except Gralyn Lawson (Doc. # 37 (Lawson case)) because the plaintiffs were not properly joined in the Lawson case.   The Court indicated in a status conference that the Lawson plaintiffs were improperly joined, that it did not plan to drop any plaintiffs from the Lawson case as requested by MBUSI, but that it did plan to sever the plaintiffs' claims.   The Court later instructed MBUSI to file its summary judgment motions as to the plaintiffs' claims in this case.   On August 5, 2011, the Court entered an order finding the Motion to Drop moot and therefore denied the Motion.

[2]     Kelly Pitman is subject to MBUSI's previously filed Motion For Final Summary Judgment As To Plaintiffs Whose Claims Are Time Barred.   (Doc. # 50 (Lawson case)).   Pitman also is subject to MBUSI's previously filed Motion For Summary Judgment As To Plaintiffs Who Were Exempt Because They Were Highly Compensated for the year 2009.   (Doc. # 56 (Lawson case)).

## I.   <u>**SUMMARY OF THE ARGUMENT**</u>

MBUSI promoted these thirteen plaintiffs to GL and pays them more than TLs and TMs because it counts on them to manage the operations of their group. Like the other plaintiffs, these thirteen plaintiffs admit that their job, function, role and responsibility is to make sure that their TMs are following company processes and putting out good quality vehicles and to correct the situation when they are not. These thirteen plaintiffs allege that they also perform work they consider to be non-exempt during the day, but under the law this work is considered to be exempt work because it is directly and closely related to the performance of their management duties.   Moreover, even when plaintiffs perform any non-exempt work their most important job duty always remains the supervision of their group, and the law is clear that performing exempt and non-exempt work concurrently does not preclude the exemption.   Recognizing that the alleged non-exempt work they perform does not disqualify them for the executive exemption, plaintiffs primarily assert that they are not management because they answer to a higher authority and they enforce company policies rather than create them, but that argument has no merit under the law.   Furthermore, several of these plaintiffs have admitted they were properly classified under the FLSA so it really makes no difference what they say about their job duties now.

## II.    STATEMENT OF FACTS

### A.    STEVEN CAMPBELL

1.     Steven Campbell ("Campbell") began work as a TM at MBUSI on October 7, 1996.  (Campbell Dep., p. 11).[3]

2.     After six months as a Production TM, Campbell was promoted to TL and received a raise. (Campbell Dep., pp. 25, 29).

3.     Campbell was a TL in the Assembly Shop for approximately three and a half years, then he transferred to become a TM in Quality for about a year and a half until he returned as a TM in the Assembly Shop.  (Campbell Dep., pp. 37, 40-41).

4.     Campbell was then a TM on the Trim 1 Line for approximately one year before he was promoted to TL on Trim 1 Line, he was a TL on Trim 1 Line for approximately two years, and he was a TL on the Trim 0 Line until he officially assumed the position of GL on April 25, 2005 over the Final 3 West Line, B Shift. (Campbell Dep., pp. 41-42, 46-47, 49-50, 52, 62; Campbell Dep. Ex. 1).

5.     When Campbell was GL over the Final 3 West Line, he had three teams in his group, three TLs and approximately eighteen TMs in his group. (Campbell Dep., p. 64).

---

[3]     The Deposition of Steven Campbell and exhibits to the deposition are attached as Ex. 171 to MBUSI's Evidentiary Submission (Volume 14).

6.      After about two years, Campbell moved to the Trim 1 West Line as GL.  (Campbell Dep., p. 62).

7.      As GL on Trim 1 West Line, Campbell's group had four TLs, four teams, and about twenty-five TMs.  (Campbell Dep., pp. 66-67).

8.      After about a year as GL on Trim 1 West Line, Campbell moved to GL over the Trim 0 Line for approximately a year and then returned to the Trim 1 West Line as GL.  (Campbell Dep., p. 63).

9.      As GL on Trim 0 Line, Campbell's group had three TLs, three teams and approximately eighteen TMs.  (Campbell Dep., pp. 69-70).

10.     When Campbell returned to the Trim 1 West Line as GL, he had four teams, four TLs and approximately twenty-four TMs.  (Campbell Dep., p. 71).

11.     As a GL at MBUSI, Campbell earns at least $455.00 per week in salary.  (Campbell RFA #41).[4]

12.     Campbell supervises the TLs and TMs in his group.  (Campbell RFA #1).

13.     Campbell makes decisions about his group and carries out his plans for the group.  (Campbell RFA # 35).

---

[4]      Campbell Responses to Requests for Admission are attached as Ex. 172 to MBUSI's Evidentiary Submission (Volume 14).

14.    Campbell directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Campbell RFA #5).

15.    Campbell leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Campbell RFA ##25, 26 & 28).

16.    Campbell shares his knowledge and experience with his group. (Campbell RFA #30).

17.    Campbell shows and supports top performance in his group. (Campbell RFA #29).

18.    Campbell uses his best judgment in performing all of his GL job duties.  (Campbell RFA #23).

19.    Campbell fulfills all of the roles and responsibilities of his GL position.  (Campbell RFA #24).

20.    Campbell thinks strategically and establishes direction for his group. (Campbell RFA #27).

21.    As GL, Campbell works to accomplish the Company's goals and targets.  (Campbell Dep., p. 150).

22.     As GL, Campbell has his TMs and TLs follow their roles and responsibilities on the Roles and Responsibilities Card.  (Campbell Dep., p. 145; Campbell Dep. Ex. 16).

23.     As GL, Campbell states that his primary responsibilities are to monitor his TLs and TMs to make sure they are working within MBUSI standards. (Campbell Dep., pp. 167-68).

24.     As GL, Campbell looks everyday to recognize if they are doing that. (Campbell Dep., p. 167).

25.     As GL, Campbell monitors his TMs to see if they are performing correctly.  (Campbell Dep., p. 168).

26.     As GL, it is Campbell's job to make sure TMs are following the processes described in the job element sheets.  (Campbell Dep., p. 98).

27.     Campbell regularly provides his TMs feedback when a problem arises.  (Campbell Dep., pp. 120-21).

28.     As GL, Campbell spends time walking through his group and observing his TMs' performance.  (Campbell Dep., p. 106).

29.     When Campbell performs a walk through, if he observes something out of standard, he corrects his TM and gives feedback where needed. (Campbell Dep., p. 106).

30.     MBUSI regularly emphasizes to Campbell that he should watch for any out of standard conditions and that he should observe his TMs' overall performance.  (Campbell Dep., p. 106).

31.     As GL, Campbell works to try to prevent quality issues.  (Campbell Dep., p. 114).

32.     If one of Campbell's TMs builds a vehicle incorrectly, he holds them responsible.  (Campbell Dep., p. 113).

33.     Campbell initiates, facilitates and monitors problem solving in his group.  (Campbell RFA #12).

34.     Campbell ensures that production and quality goals are met in his group.  (Campbell RFA ##13 & 22).

35.     Campbell initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Campbell RFA #16).

36.     As GL, before Campbell's shift begins, he prints out SQDCM reports and checks his emails for safety reports, quality reports, toolbox memos, and communications from HR.  (Campbell Dep., p. 74).

37.     Campbell also will review the turnover log from the previous shift before his shift starts.  (Campbell Dep., pp. 74-75).

38.     As GL, Campbell is responsible for updating the SQDCM Board once a day.  (Campbell Dep., p. 81).

39.     It is important to update the SQDCM Board because it provides feedback information for the team.  (Campbell Dep., p. 81).

40.     Before the shift starts, Campbell checks the call-in Hot Line, checks voice mail for call-ins, checks his attendance calendar and documents any turnover on his regular vacation plan.  (Campbell Dep., pp. 73-74).

41.     In checking his attendance, Campbell needs to recognize if there is a manpower issue and if there is, he will communicate it to the AM in their start up meeting and update the Attendance Board.  (Campbell Dep., p. 75).

42.     If Campbell's group is within standard, he will move TMs around to handle manpower issues, but if his group is out of standard, he must discuss it with his AM.  (Campbell Dep., p. 75).

43.     As GL, Campbell leads a five minute start up meeting that occurs at 6:15 at the start of the shift.  (Campbell Dep., pp. 72-73).

44.     Campbell leads the startup meeting at which he communicates to the TMs the goals for the day.  (Campbell Dep., p. 36).

45.     During the start up meeting, Campbell covers the previous shift's results, any new memorandums, any Quality topics from the previous day, any safety topics from the previous day and SQDCM issues.  (Campbell Dep., p. 73).

46.     As GL, Campbell attends meetings called by the Managers and AMs, HR might schedule meetings and other departments would schedule meetings for him to attend.  (Campbell Dep., p. 78).

47.     As a GL, Campbell will have monthly meetings with HR where topics such as policy changes and production schedule changes are discussed.  (Campbell Dep., p. 58).

48.     As GL, Campbell tracks his top three scrap items to try to help maintain the budget.  (Campbell Dep., p. 139).

49.     As GL, Campbell spends most of his day performing on line quality checks, making repairs, moving parts, answering line pulls, and performing quality walk backs.  (Campbell Dep., p. 106).

50.     Generally a TL responds to a Line pull first, but if he cannot resolve the issue, he will call Campbell and Campbell tries to resolve the issue within his group before escalating it.  (Campbell Dep., pp. 110-11).

51.     If Campbell is working on the Line making repairs and a safety issues arises, he deals with it or escalates it.  (Campbell Dep., p. 107).

52.     Campbell can make the decision to make a repair himself or have one of his TLs do it.  (Campbell Dep., p. 108).

53.     If Campbell is making repairs, he retains his other GL responsibilities. (Campbell Dep., p. 109).

54.    As GL, at the close of the shift, Campbell prepares his turnover log. (Campbell Dep., p. 76).

55.    Campbell will also do any necessary repair activities, address any parts, topics, time and attendance issues and other administrative work.  (Campbell Dep., p. 77).

56.    Campbell handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Campbell RFA #18).

57.    Campbell ensures that company policies and work rules are enforced in his group.  (Campbell RFA #14).

58.    One of Campbell's responsibilities as GL is to identify if any of MBUSI's policies are being broken, if it is an issue he has been asked to correct he will, or if it is an issue he has been asked to escalate he will.  (Campbell Dep., pp. 94-95).

59.    As to certain issues, Campbell has been trained to immediately stop them and as to others, he has been trained to escalate.  (Campbell Dep., p. 95).

60.    There are situations that Campbell can handle and fix himself, and there are situations that he must escalate.  (Campbell Dep., p. 96).

61.    Campbell has counseled TMs on performance, quality of work and conduct.  (Campbell RFA #9).

62.    As GL, Campbell has counseled TMs for quality performance. (Campbell Dep., pp. 145-46).

63.    As GL, Campbell has counseled TMs for attendance violations. (Campbell Dep., p. 146).

64.    As GL, Campbell has counseled TMs to focus on their position. (Campbell Dep., p. 146).

65.    As GL, if Campbell determines a TM has reached a level to which a CPR would need to be issued, he will escalate the issue.  (Campbell Dep., pp. 147-48).

66.    Campbell also has the authority to initiate a CPR on a TM when he deems necessary.  (Campbell RFA #10).

67.    As GL, if Campbell can correct an issue short of a CPR, he will engage in verbal coaching first.  (Campbell Dep., p. 149).

68.    As GL, Campbell checks to make sure everyone is working as safely as possible, complying with policies and standards of MBUSI, and he monitors the environment for safety hazards.  (Campbell Dep., p. 115, Campbell RFA #17).

69.    If an injury occurs, Campbell fills out a problem solving sheet. (Campbell Dep., pp. 116-17).

70.    On the 5 Why sheet, Campbell will help develop the root cause of the problem and countermeasures.  (Campbell Dep., pp. 118-19).

71.     Campbell will communicate the countermeasures to his TMs. (Campbell Dep., p. 120).

72.     If a TM has work restrictions, Campbell makes sure they only work within those restrictions.  (Campbell Dep., pp. 137-38).

73.     As GL, one of Campbell's responsibilities is to make sure that his TMs are trained to do the job correctly.  (Campbell Dep., p. 120).

74.     Campbell directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Campbell RFA #19).

75.     As GL, Campbell must initial off on the Circle of Skills every quarter which reflects the TM's training status.  (Campbell Dep., p. 123).

76.     When a TM becomes a Level 3, Campbell must review and verify that the TM is at that level.  (Campbell Dep., pp. 123-24).

77.     Campbell can recommend that his TMs receive more training. (Campbell Dep., p. 124).

78.     Campbell evaluates the performance of TMs and TLs in his group. (Campbell RFA #6).

79.     As GL, Campbell fills out a performance evaluation on each TM once a year.  (Campbell Dep., pp. 141-42).

80.     Campbell assesses whether a TM's performance is satisfactory based on the criteria on the evaluation form.  (Campbell Dep., p. 144).

81.     If Campbell does not give a TM an overall satisfactory rating, the TM cannot be promoted.  (Campbell Dep., p. 142).

82.     If Campbell gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).[5]

83.     Campbell provides his opinion as to whether TMs and TLs in his group are ready for promotion and his opinion is given consideration and normally is followed in determining if the TL or TM will be promoted.  (Campbell Dep., pp. 142-44; Campbell RFA #7; Jones Decl. ¶¶ 31-32).

84.     Campbell manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Campbell RFA #4).

85.     Campbell manages attendance in his group and ensures that his group is properly staffed.  (Campbell RFA #3).

86.     As GL, Campbell keeps track of his team's vacation.  (Campbell Dep., p. 74).

87.     If a vacation request is within standard, Campbell as GL may approve it.  (Campbell Dep., pp. 136-37).

---

[5]     The First Declaration of Marcus Jones with exhibits to the declaration are attached as Ex. 30 to MBUSI's Evidentiary Submission (Volume 3).

88.     Campbell reviews the guidelines to see if the vacation request is within standard and if it is not within standard, he may deny it.  (Campbell Dep., p. 137).

89.     As GL, Campbell will move people within his Group daily. (Campbell Dep., p. 154).

90.     As a GL, Campbell has received such training as civil treatment, corporate policies and guidelines, ergonomics, group leader communication, human resource training, labor relations training, record management training, training on the role of the GL at MBUSI, and situational leadership training. (Campbell Dep., pp. 60-61; Campbell Dep. Ex. 2).

91.     Campbell attended Group Leader Self Sufficiency training which included topics relevant to the GL positions, including time and attendance, and legal issues.  (Campbell Dep., pp. 54-55).

92.     The Group Leader Self Sufficiency program lasted a period of eight weeks.  (Campbell Dep., p. 55).

93.     As a GL, Campbell was trained on his responsibilities for handling severe weather or evacuation situations.  (Campbell Dep., p. 58).

94.     As GL, Campbell is evaluated on leadership competency.  (Campbell Dep., p. 158).

95.    The MBUSI Group Leader job description contains a general description of the GL and their purpose.  (Campbell Dep., pp. 155-56; Campbell Dep. Ex. 18).

96.    The MBUSI Group Leader job description describes the essential functions of the GL position.  (Campbell Dep., pp. 156-57).

97.    As GL, Campbell tries to accomplish the roles and responsibilities listed in the Roles and Responsibilities Card.  (Campbell Dep., p. 152; Campbell Dep. Ex. 17).

98.    Campbell believes he is given a limited opportunity to manage his group because he cannot approve or disapprove overtime, he has a set of standards pursuant to which he can approve or disapprove vacation, he does not decide the build number for the day, or whether he can stop the production line over a certain period of time which is over a few minutes and he cannot decide whether to pass a quality defect without escalating.  (Campbell Dep., p. 151).

## B.      TIMOTHY CRAWFORD

99.    Timothy Crawford ("Crawford") began employment at MBUSI on July 8, 1996 as a TM in the Paint Department.  (Crawford Dep., pp. 14, 25).[6]

100.    Crawford then was promoted to TL in Assembly on the Trim 1 Line and he received a 5% pay raise.  (Crawford Dep., pp. 27-29).

101.    After three years as a TL on the Trim 1 Line, Crawford was promoted to GL for the Trim 1 Line from January 2002 to February 2004.  (Crawford Dep., pp. 31-32, 47).

102.    Crawford was next GL over the CDC tent from February 2004 until November 2004.  (Crawford Dep., p. 47).

103.    Crawford then became GL for the Trim 1 Line in Plant 2 from November 2004 through August 2008.  (Crawford Dep., p. 47).

104.    When Crawford was initially in Trim 1 Plant 2, he had thirty to thirty-five TLs in his group, including four teams.  (Crawford Dep., pp. 54-55).

105.    The Trim 1 Line is over the size of football field.  (Crawford Dep., p. 56).

106.    From August 2008 through July 2009, Crawford was mainly either off work or on light duty due to a foot injury.  (Crawford Dep., pp. 48-49).

---

[6]        The Deposition of Timothy Crawford and exhibits to the deposition are attached as Ex. 173 to MBUSI's Evidentiary Submission (Volume 14).

107.   During that time, from January to February 14, 2009, Crawford was GL for the Trim 1 West Line  which included a group of approximately thirty persons.  (Crawford Dep., pp. 49-50).

108.   During the January to February 2009 time period, MBUSI was reorganizing stations due to the number of TMs who had left the Company so Crawford was observing the performance of TMs, securing input from TMs about how to make the stations work better, and working on a station for up to 25% of the day to determine how to redo the station.  (Crawford Dep., pp. 51-53).

109.   In July 2009, Crawford became GL for the Trim 2 Line in Plant 2 until January of 2010.  (Crawford Dep., pp. 47-48, 53-54).

110.   When Crawford was GL over the Trim 2 group, his group had three teams, seventeen TMs and included an area 40 yards in length.  (Crawford Dep., pp. 57-58).

111.   In January 2010, Crawford returned as GL over the Trim 1 Line. (Crawford Dep., p. 54).

112.   As GL of the Trim 1 Line, Crawford's group had anywhere from thirty-nine to forty-four TMs and six teams.  (Crawford Dep., p. 58).

113.   As GL, Crawford has always received a base salary every week that he worked and he earned as least $455.00 per week in salary.  (Crawford Dep., p. 39; Crawford RFA #41).[7]

114.   In March, 2010, Crawford applied for an AM position at MBUSI in Operations in the Finance Department and described his daily job responsibilities as GL as entering payroll, observing work, feeding back information up line to his supervisor, working with other people in his core group, working with other GLs, working with the Process Engineer doing setups, dealing with issues, collecting data or information and providing feedback.  (Crawford Dep., pp. 18-19).

115.   Indeed, Crawford described his primary duties as group leader as follows:

> My job as group leader is to monitor the jobs of the TL and team leaders on the line and make sure they are in compliance with the standards and the policies that the Company has established.

(Crawford Dep., pp. 144-45).

116.   Crawford spends most of his time as GL performing these tasks because even when he is checking a car at the end of the Line, he is verifying that standards are being maintained or kept as he is when he is monitoring reports at his desk.  (Crawford Dep., p. 145).

---

[7]   Crawford Responses to Requests for Admission are attached as Ex. 174 to MBUSI's Evidentiary Submission (Volume 14).

117.   Crawford supervises the TLs and TMs in his group.  (Crawford RFA #1).

118.   A Manager or AM is not always present in Crawford's group, and he leads his group independently of his Manager or AM.  (Crawford RFA #33).

119.   Crawford gives work directions and assignments to the members of his group.  (Crawford RFA #2).

120.   Crawford directs his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Crawford RFA #5).

121.   Crawford leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Crawford RFA ##25, 26 & 28).

122.   Crawford shares his knowledge and experience with his group.  (Crawford RFA #30).

123.   Crawford shows and supports top performance in his group.  (Crawford RFA #29).

124.   Crawford uses his best judgment in performing all of his GL job duties.  (Crawford RFA #23).

125.   Crawford fulfills all of the roles and responsibilities of his GL position.  (Crawford RFA #24).

126.   As GL, Crawford received training on dealing with personalities, safety training and also attended Group Leader Academy which lasted two weeks. (Crawford Dep., p. 40).

127.   Crawford also participated in Group Leader Self Sufficiency training in which they went from department to department to determine who were their contacts and the different departmental functions.  (Crawford Dep., pp. 42-43).

128.   Every month or so Crawford will attend a lunch box training session with the Human Resource Department where they will discuss policies and procedures.  (Crawford Dep., pp. 44, 61).

129.   Crawford initiates, facilitates and monitors problem solving in his group.  (Crawford RFA #12).

130.   Crawford ensures that production and quality goals are met in his group.  (Crawford RFA ##13 & 22).

131.   Crawford initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Crawford RFA #16).

132.   Throughout the day, Crawford observes his TMs and gives them feedback, correcting them and documenting their performance.  (Crawford Dep., pp. 134-36).

133.   Crawford observes his TMs and makes sure they are doing the processes in accordance with the SMPs and JESs and that the equipment and the parts are not being damaged.  (Crawford Dep., pp. 106-07).

134.   If Crawford notices a TM performing a process not according to the SMP, he will talk with them.  (Crawford Dep., pp. 82-83).

135.   Crawford will prepare feedback forms which he uses to address multiple quality issues with TMs and review it with them.  (Crawford Dep., pp. 123-24).

136.   While walking through his group during the day, Crawford checks to make sure his TMs have completed their 5S responsibilities.  (Crawford Dep., p. 81).

137.   As GL, Crawford also makes mutilation checks to make sure his TMs are not wearing anything that could mutilate the car.  (Crawford Dep., p. 81).

138.   Crawford spends about half the shift checking cars for quality to make sure his TMs are following the SMPs and to determine if any modifications are required. (Crawford Dep., pp. 84-85, 89).

139.   When standing at the end of the Line checking cars and when he is walking the Line, Crawford is trying to make sure his TMs are doing what they are supposed to be doing, that they are following the SMPs, he will feed back any

issues and he is checking to see that his TMs are productive and efficient in their job.  (Crawford Dep., pp. 89, 137-38).

140.   As GL, about once a month, Crawford may have to perform a repair after shift that may take him forty-five minutes to an hour and a half.  (Crawford Dep., p. 75).

141.   Crawford evaluates the performance of TMs and TLs in his group. (Crawford RFA #6).

142.   As GL, Crawford annually completes an evaluation form on TMs and TLs in his group.  (Crawford Dep., p. 107).

143.   Crawford describes the TM's performance with regard to certain performance criteria and evaluates their performance as satisfactory or not satisfactory.  (Crawford Dep., pp. 107-08).

144.   If Crawford gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

145.   Crawford provides his comments on any position development steps the TM or TL can take to improve their performance in their role.  (Crawford Dep., p. 108).

146.   Crawford will state whether the TM or TL needs development or is ready to advance and his opinion is given consideration and normally is followed

in determining if the TL or TM will be promoted.  (Crawford Dep., pp. 108-09; Crawford RFA #7; Jones Decl. ¶¶ 31-32).

147.   As GL, Crawford reviews the rotation schedules to ensure that there is a balance of TMs trained in each station.  (Crawford Dep., p. 101).

148.   Crawford will get with his TLs and let them adjust manpower if necessary if a TM leaves during the day.  (Crawford Dep., pp. 105-06).

149.   Crawford manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Crawford RFA #4).

150.   Crawford manages attendance in his group and ensured that his group is properly staffed.  (Crawford RFA #3).

151.   Crawford approves vacation based on the vacation guidelines. (Crawford Dep., p. 104).

152.   Crawford records attendance daily and keeps up with an attendance calendar and attendance occurrences.  (Crawford Dep., p. 103).

153.   When a TM has reached a certain occurrence level for attendance, Crawford drafts a CPR and submits it to his AM and Human Resources for approval.  (Crawford Dep., p. 103).

154.   After the CPR is approved, Crawford presents it to the TM with Human Resources present.  (Crawford Dep., p. 104).

155.   Crawford ensures that Company policies and work rules are enforced in his group.  (Crawford RFA #14).

156.   When Crawford observes a TL violating a standard of conduct, he addresses it.  (Crawford Dep., p. 119).

157.   If Crawford believes discipline is necessary for a TM, it is his responsibility to report that to the AM and Human Resources.  (Crawford Dep., pp. 121-22).

158.   Crawford has counseled TMs on performance, quality of work and conduct.  (Crawford RFA #9).

159.   Crawford also has the authority to initiate a CPR on a TM when he deems it necessary.  (Crawford RFA #10).

160.   Crawford handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Crawford RFA #18).

161.   Crawford drafts a 5 Why form if there is a quality issue that arises from his area that reaches CPA.  (Crawford Dep., pp. 99-100).

162.   Crawford will collect the data, come up with countermeasures and submit the form for approval.  (Crawford Dep., p. 100).

163.   Crawford will make sure that the TMs are complying with the countermeasures.  (Crawford Dep., pp. 100-01).

164.   Crawford ensures that his group is working safely and he monitors the environment for safety hazards.  (Crawford RFA #17).

165.   As GL, Crawford looks for any potential safety issues that may appear on the Line.  (Crawford Dep., p. 89).

166.   When Crawford finds a potential safety issue, he will discuss it with his TMs and TLs and contact whoever needs to be contacted to help resolve the issue.  (Crawford Dep., pp. 90-91).

167.   If there is a safety incident, Crawford will interview the TM, document what the TM said and then come up with countermeasures with the TM and TL and then submit a 5 Why form to his AM for approval.  (Crawford Dep., pp. 94-95).

168.   Crawford will communicate any countermeasures to his TMs. (Crawford Dep., p. 99).

169.   With respect to TMs who have restrictions, Crawford verifies the restrictions and makes sure that the stations in which Medical has approved for the TM to work are the only stations in which they work.  (Crawford Dep., pp. 104-05).

170.   Crawford directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Crawford RFA #19).

171.   Crawford observes the performance of TMs throughout the training process to make sure the training process is moving along appropriately. (Crawford Dep., p. 102).

172.   Crawford signs off on their training before a TM is given a Level 3 on the Circle of Skills.  (Crawford Dep., p. 102).

173.   Every quarter Crawford verifies the Circle of Skills form for TMs in his group.  (Crawford Dep., p. 102).

174.   Crawford can send a TM back for retraining if they are having trouble with the processes.  (Crawford Dep., pp. 102-03).

175.   Crawford consults with the other GL and his Planning and Process Engineer when revising SMPs and JESs.  (Crawford Dep., pp. 130-31).

176.   When Crawford comes in as GL, he makes a visual check of his Line to make sure all of the tools are in place according to the SMPs, reads the turnover log, reads his emails and anything else that may be on his desk that needs his attention, checks for call-in, checks for attendance issues that are out of standard, and checks for any communications he needs to make to his TMs.  (Crawford Dep., pp. 60, 67-68).

177.   As group leader, Crawford typically updates the SQDCM boards in the morning before his shift startup meeting.  (Crawford Dep., pp. 72-73).

178.   As GL, Crawford regularly attends the daily startup meeting before the shift with the AM and the GLs for the Trim side.  (Crawford Dep., p. 59).

179.   Crawford conducts the startup meeting for his group at the start of the shift each day.  (Crawford Dep., p. 62).

180.   At that meeting, Crawford communicates to his TMs information about safety, any feedback regarding quality issues, feedback about their numbers of cars delivered, their FTC, how many line stops they had and how long the line was down and any toolbox information.  (Crawford Dep., pp. 62-63).

181.   The first hour of the shift, Crawford goes down the Line and checks TMs, greets TMs and looks at processes.  (Crawford Dep., p. 86).

182.   Crawford tries to promote team harmony to make sure everyone is getting along and being treated fairly in his group.  (Crawford Dep., p. 138).

183.   As GL, if Crawford has issues, he will contact the appropriate person including another GL, Maintenance or Engineering.  (Crawford Dep., p. 139-40).

184.   At the end of the shift, Crawford goes where his TMs are before they leave so they can raise any issues with him, he prepares his turnover log, does payroll, does evaluations if they need to be updated, does any paperwork that needs to be performed and makes sure everything is ready for the next shift.  (Crawford Dep., pp. 74-75).

185.   When Crawford was GL over the Trim 2 Line, they would have end of shift meetings with the AM and the GLs.  (Crawford Dep., p. 64).

186.   Crawford typically leaves within an hour after the shift is over after completing various other administrative duties.  (Crawford Dep., pp. 78-79).

## C.   MICHAEL CROWLEY

187.   Michael Crowley ("Crowley") **admitted in Response to a Request for Admission that he was properly classified under the FLSA as an exempt employee.**[8] (Crowley RFA #43).[9]

188.   Crowley began employment at MBUSI in 2002 as a TM in Plant 1 on the Trim 1 Line. (Crowley Dep., pp. 12, 17).[10]

189.   In 2004, when Plant 2 opened, Crowley moved to the Trim 1 Line in Plant 2.  (Crowley Dep., p. 17).

190.   Crowley worked on the Trim 1, Line Plant 2 for approximately two years, was promoted to TL and he received an increase in pay.  (Crowley Dep., pp. 17, 19).

191.   After about one year as a TL on the Trim 1 Line, Crowley moved to the Trim 6 Line in Plant 2.  (Crowley Dep., p. 17-18).

192.   Around April 28, 2008, Crowley was promoted to GL over the Trim 6 Line in Plant 2.  (Crowley Dep., p. 20).

---

[8]      Pursuant to Federal Rule of Civil Procedure 36, in response to a request for admission, a party must admit the matter or must specifically deny it or state in detail why the party cannot truthfully admit or deny it.  FED. R. CIV. P. 36(a)(4).  Some plaintiffs, like Crowley, did not expressly admit that they were properly classified under the FLSA as an exempt employee, but also did not deny it or state in detail why they could not admit or deny it.  By operation of Rule 36(a)(4), such responses are deemed to be admitted.

[9]      Crowley Responses to Requests for Admission are attached as Ex. 175 to MBUSI's Evidentiary Submission (Volume 14).

[10]      The Deposition of Michael Crowley and exhibits to the deposition are attached as Ex. 176 to MBUSI's Evidentiary Submission.

193.   As GL on the Trim 6 Line, Crowley's group had three TLs and around twenty TMs.  (Crowley Dep., p. 21).

194.   In the summer of 2010, Crowley moved to GL for the Trim 3 Line in Plant 2.  (Crowley Dep., p. 18).

195.   Crowley's group on the Trim 3 Line includes three TLs and eighteen TMs.  (Crowley Dep., pp. 21-22).

196.   Crowley performed the same GL job duties on the Trim 3 and Trim 6 Lines.  (Crowley Dep., pp. 83-85).

197.   As a GL at MBUSI, Crowley earns at least $455.00 per week in salary.  (Crowley RFA #41).

198.   Crowley supervises the TLs and TMs in his group.  (Crowley RFA #1).

199.   As GL, Crowley oversees the operations of his group.  (Crowley Dep., p. 24).

200.   A Manager or AM is not always present in his group, and Crowley leads his group independently of his Manager or AM.  (Crowley RFA #33).

201.   Crowley gives work directions and assignments to the members of his group.  (Crowley RFA #2).

202.   Crowley makes decisions about his group and carries out his plans for the group.  (Crowley RFA # 35).

203.   Crowley directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Crowley RFA #5).

204.   Crowley leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Crowley RFA ##25, 26 & 28).

205.   Crowley shares his knowledge and experience with his group. (Crowley RFA #30).

206.   His duties differ from those performed by the TMs in his group. (Crowley RFA #34).

207.   Crowley initiates, facilitates and monitors problem solving in his group.  (Crowley RFA #12).

208.   As GL, Crowley initiates problem solving.  (Crowley Dep., p. 120).

209.   Crowley ensures that production and quality goals are met in his group.  (Crowley RFA ##13 & 22).

210.   Crowley is held accountable for his group meeting the FTC goal for the day.  (Crowley Dep., p. 88).

211.   Crowley initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Crowley RFA #16).

212.   As GL, Crowley initiates improvement in his group.  (Crowley Dep., p. 47).

213.   Crowley shows and supports top performance in his group.  (Crowley RFA #29).

214.   Crowley uses his best judgment in performing all of his GL job duties. (Crowley RFA #23).

215.   Crowley fulfills all of the roles and responsibilities of his GL position. (Crowley RFA #24).

216.   Crowley agrees that leadership skills are important for a GL. (Crowley Dep., p. 45).

217.   Crowley agrees that communication skills are important for a GL and as a GL, Crowley spends a lot of time communicating with his TMs in his group. (Crowley Dep., p. 46).

218.   If there is a change in the process, Crowley communicates that to his group and makes sure the group is following the new process.  (Crowley Dep., pp. 46-47).

219.   Crowley's primary duty as a GL is to observe his TMs to make sure they are following the SMPs and JESs to build a quality vehicle.  (Crowley Dep., pp. 140-42).

220.   Crowley does make sure that his TMs are following the SMPs and JESs.  (Crowley Dep., pp. 26-27, 133).

221.   As GL, Crowley makes sure that the TMs in his group are following MBUSI's standards when they build the vehicle.  (Crowley Dep., p. 27).

222.   As GL, Crowley becomes aware of quality issues because the people assigned to check quality at the end of the Line will pull the Line.  (Crowley Dep., pp. 28-29).

223.   Crowley will go to the Line pull, determine what is the problem, and how to address the problem.  (Crowley Dep., p. 29).

224.   When Crowley responds to a Line pull, it includes assessing the defect, feeding information back to the TM and containing the problem and this takes about fifty percent of his day.  (Crowley Dep., p. 49).

225.   If Crowley determines that a TM caused a quality defect, he will feed it back to the TM.  (Crowley Dep., p. 36).

226.   Crowley does this so the TM hopefully will not make the mistake again.  (Crowley Dep., p. 36).

227.   Crowley also will contain the problem by walking the issue back and determining with which vehicle the defect began and where it ended.  (Crowley Dep., pp. 36-37).

228.   In determining the root cause of a quality issue, Crowley will gather data to help figure out the root cause and he will have input into developing a countermeasure.  (Crowley Dep., pp. 79-80).

229.   Crowley will observe his group to make sure they are performing the countermeasure.  (Crowley Dep., pp. 80-81).

230.   Crowley keeps a TM quality file on each TM and tracks their quality defects.  (Crowley Dep., pp. 37-38).

231.   If a TM has too many quality defects, Crowley initiates a CPR and it must be approved by his AM and HR.  (Crowley Dep., p. 38).

232.   After the CPR has been approved, Crowley sits down and goes over it with the TM.  (Crowley Dep., pp. 38-39).

233.   Crowley handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Crowley RFA #18).

234.   When TMs bring issues to Crowley's attention, he tries to resolve them or escalates them to the appropriate person.  (Crowley Dep., pp. 51-53).

235.   Crowley ensures that company policies and work rules are enforced in his group.  (Crowley RFA #14).

236.   Crowley counsels TMs on performance, quality of work and conduct. (Crowley RFA #9).

237.   Crowley has the authority to initiate a CPR on a TM when he deems necessary.  (Crowley RFA #10).

238.   Crowley directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Crowley RFA #19).

239.   Crowley will review and sign off on a training log.  (Crowley Dep., p. 169; Crowley Dep. Ex. 23).

240.   Crowley tracks SQDCM every day.  (Crowley Dep., p. 76).

241.   Crowley ensures that his group is working safely and he monitors the environment for safety hazards.  (Crowley RFA #17).

242.   Crowley makes sure that the TMs in his group are wearing their PPE. (Crowley Dep., p. 85).

243.   Crowley manages attendance in his group and ensures that his group is properly staffed.  (Crowley RFA #3).

244.   Crowley manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Crowley RFA #4).

245.   Crowley is responsible for submitting time for the TMs in his group. (Crowley Dep., p. 70).

246.   Crowley will keep up with a TMs' attendance is they are out on vacation or sickness or if they are late.  (Crowley Dep., pp. 71-72).

247.   Crowley keeps an attendance file on each TM in his group.  (Crowley Dep., p. 73).

248.   If a TM has too many absences, Crowley initiates a CPR and sends it to upper management and HR for approval, and upon approval he sits down with the TM with the CPR.  (Crowley Dep., p. 74).

249.   As GL, Crowley has to make sure he has enough manpower in order to cross train TMs.  (Crowley Dep., p. 166).

250.   Crowley evaluates the performance of TMs and TLs in his group. (Crowley RFA #6).

251.   On a performance evaluation, Crowley puts in how the TM measures up against the criteria based on his observations and rates the TM as satisfactory or not satisfactory.  (Crowley Dep., pp. 159-60).

252.   Crowley puts comments in the current position development steps about things that he would like them to do.  (Crowley Dep., p. 160).

253.   On the performance evaluation, Crowley rates whether the TM or TL is ready for promotion to the next level and his opinion is given consideration and normally is followed in determining if the TM or TL will be promoted.  (Crowley Dep., p. 161; Crowley RFA #7; Jones Decl. ¶¶ 31-32).

254.   A TM must have an overall satisfactory evaluation in order to progress to the next level.  (Crowley Dep., pp. 161-62).

255.   If Crowley gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

256.   Before his shift, Crowley reads his shift logs to learn what went on during the previous shift.  (Crowley Dep., p. 64).

257.   A normal part of Crowley's pre-shift routine is to check 5S on his Line.  (Crowley Dep., p. 96).

258.   Crowley also updates the group's performance board pre-shift, updates the attendance calendar, checks the number of vehicles in the buffer, and updates the shop attendance board.  (Crowley Dep., pp. 96-97).

259.   Crowley spends about forty-five minutes before his shift and after his shift and twenty-five minutes during his shift completing shift logs and complying information for shift logs.  (Crowley Dep., pp. 65-66).

260.   Crowley attends a pre-shift start up meeting with the AM and GLs for about ten to fifteen minutes at which they get direction for the day.  (Crowley Dep., pp. 66-67).

261.   Crowley has a start up meeting with his group that he leads at which he addresses issues of quality or parts or other problems they may run into during the day.  (Crowley Dep., pp. 67-68).

262.   After his shift, Crowley will complete the shift log for the next GL. (Crowley Dep., pp. 64-65).

263.   Fifty percent of Crowley's day is spent responding to Line pulls by the TMs in his group.  (Crowley Dep., p. 33).

264.   Ten percent of Crowley's day is spent responding to radio calls and radios are carried by Engineering, Maintenance, AMs, Managers and GLs. (Crowley Dep., p. 32).

265.   Crowley spends about five percent of his day looking for improvements, initiating improvements or following up on improvements. (Crowley Dep., p. 48).

266.   Crowley spends about five percent of his day talking to other GLs or engineers or Maintenance.  (Crowley Dep., pp. 69-70).

267.   Crowley spends about five percent of his day dealing with problems or issues that TMs bring to his attention.  (Crowley Dep., p. 57).

268.   Crowley spends about one percent of his day working on improvement ideas.  (Crowley Dep., p. 62).

269.   Crowley spends about one percent of his day tracking attendance and vacation.  (Crowley Dep., p. 76).

270.   As GL, Crowley may do repair work on a defect on a vehicle or escalate it, but he does not do this everyday.  (Crowley Dep., pp. 175-76).

**D.    ROBERT FISHER**

271.   Robert Fisher ("Fisher") began employment at MBUSI in October, 1996 as a TM on the Engine Chassis Line in the Assembly Shop.  (Fisher Dep., pp. 18, 28).[11]

272.   In early 1997, Fisher was promoted to TL on the Engine Chassis Line and around 2005, he moved to Plant 2 as a TL on the Engine Line.  (Fisher Dep., pp. 29, 32).

273.   In October, 2006, Fisher was promoted to GL for the Engine Line in Plant 2.  (Fisher Dep., pp. 33, 45; Fisher Dep. Ex. 1).

274.   As GL over the Engine Line, Fisher's group had approximately twenty TMs, four TLs and four teams.  (Fisher Dep., p. 56).

275.   In late February or early March, 2007, Fisher moved to GL over the Final 2 Line on A Shift.  (Fisher Dep., p. 55).

276.   When Fisher moved to the Final 2 Line on A Shift, his group had twenty to twenty-five TMs, four TLs, and four teams.  (Fisher Dep., p. 58).

277.   After approximately six months on that Line, Fisher moved to the Final 4 Line in Plant 2.  (Fisher Dep., pp. 55-56).

---

[11]    The Deposition of Robert Fisher and exhibits to the deposition are attached as Ex. 177 to MBUSI's Evidentiary Submission (Volume 14).

278.   On the Final 4 Line, Fisher's group originally had thirty TMs but repair has been separated out of his group and now he has approximately twenty-two TMs and three TLs.  (Fisher Dep., p. 59).

279.   As GL at MBUSI, Fisher earned at least $455.00 per week in salary.  (Fisher RFA #41).[12]

280.   Fisher attended Group Leader Academy which involved leadership development and involved a couple of hours of classes a day for approximately a week.  (Fisher Dep., p. 52).

281.   Fisher supervises the TLs and TMs in his group.  (Fisher RFA #1).

282.   A Manager or AM is not always present in his group, and Fisher leads his group independently of his Manager or AM.  (Fisher RFA #33).

283.   Fisher gives work directions and assignments to the members of his group.  (Fisher RFA #2).

284.   Fisher directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Fisher RFA #5).

285.   Fisher leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Fisher RFA ##25, 26 & 28).

------

[12]   Fisher Responses to Requests for Admission are attached as Ex. 178 to MBUSI's Evidentiary Submission (Volume 14).

286.   Fisher shares his knowledge and experience with his group.  (Fisher RFA #30).

287.   Fisher uses his best judgment in performing all of his GL job duties. (Fisher RFA #23).

288.   Fisher fulfills all of the roles and responsibilities of his GL position. (Fisher RFA #24).

289.   Fisher agrees that the essential functions listed on the MBUSI group leader job description are the essential functions of the position except while he can coordinate proper manning levels within his group, he cannot get TMs from other groups on his own.  (Fisher Dep., pp. 124-26; Fisher Dep. Ex. 4).

290.   Fisher is responsible for making sure everyone in his group is doing what they should to promote quality product.  (Fisher Dep., p. 122).

291.   Fisher is responsible for making sure the TMs in his group are productive.  (Fisher Dep., p. 123).

292.   Fisher is responsible for making sure that his group is not unnecessarily wasteful and that his TMs perform housekeeping and 5S duties in their areas.  (Fisher Dep., p. 123).

293.   Fisher is responsible for making sure his TMs are working efficiently and that new TMs are being trained.  (Fisher Dep., p. 123).

294.   Fisher is told that he is supposed to lead his group as GL and he tries to motivate people to do their job and get along.  (Fisher Dep., p. 124).

295.   As GL, Fisher is evaluated based on leadership competencies.  (Fisher Dep., p. 180).

296.   Fisher initiates, facilitates and monitors problem solving in his group. (Fisher RFA #12).

297.   Fisher ensures that production and quality goals are met in his group. (Fisher RFA ##13 & 22).

298.   Fisher initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Fisher RFA #16).

299.   As GL, Fisher communicates to the TMs direction regarding work rules, standards of conduct, and direction from Mangers, AMs and Vice Presidents. (Fisher Dep., p. 152).

300.   As GL, Fisher is supposed to follow up and analyze the results regarding his communication of such direction.  (Fisher Dep., p. 152).

301.   Fisher has been told that his responsibility as GL is to observe his TLs' and TMs' performance to ensure they are complying with their responsibilities.  (Fisher Dep., p. 120).

302.   Fisher's job is to observe his TMs and correct them if they are not following the SMPs.  (Fisher Dep., pp. 104-05).

303.   As GL, Fisher watches and observes the performance of his TMs to determine if they are following the SMPs and JESs and following MBUSI's standards of conduct, and providing sufficient attention to their jobs.  (Fisher Dep., pp. 101-02).

304.   If a TM is not doing so, Fisher will talk to them and tell them to comply.  (Fisher Dep., p. 102).

305.   Fisher gives his TMs feedback regarding their performance.  (Fisher Dep., pp. 114-15).

306.   Fisher coaches his TMs regarding their performance.  (Fisher Dep., p. 115).

307.   Fisher evaluates the performance of TMs and TLs in his group. (Fisher RFA #6).

308.   Fisher completes a performance evaluation each year for each TM and TL in his group.  (Fisher Dep., p. 127).

309.   Fisher evaluates his TMs and TLs as satisfactory or not satisfactory. (Fisher Dep., p. 127).

310.   If Fisher gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

311.   Based on his observations, Fisher states whether a TM or TL is ready for promotion and Fisher's recommendation is given consideration and normally is followed in determining if the TM or TL will be promoted.  (Fisher Dep., pp. 127-28, Fisher RFA #7: Jones Decl. ¶¶ 31-32).

312.   Fisher does not know of any TMs or TLs who have been promoted who are not appraised as ready for promotion.  (Fisher Dep., p. 133).

313.   Fisher ensures that company policies and work rules are enforced in his group.  (Fisher RFA #14).

314.   Fisher counsels TMs on performance, quality of work and conduct. (Fisher RFA #9).

315.   Fisher has the authority to initiate a CPR on a TM when he deems necessary.  (Fisher RFA #10).

316.   When a TM missed a process, Fisher made the decision to write it up as TM feedback rather than escalate it as a CPR.  (Fisher Dep., p. 135).

317.   When a TM incorrectly installed roof labels, Fisher restricted the TM from that station until he could be retrained.  (Fisher Dep., p. 74).

318.   Fisher initiates CPRs when appropriate under MBUSI's policies and rules.  (Fisher Dep., p. 111).

319.   Fisher handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict. (Fisher RFA #18).

320.   Fisher manages attendance in his group and ensures that his group is properly staffed.  (Fisher RFA #3).

321.   Fisher manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Fisher RFA #4).

322.   As GL, Fisher keeps track of TMs' attendance.  (Fisher Dep., pp. 78, 107).

323.   Fisher is responsible for moving TMs from station to station within his group.  (Fisher Dep., p. 107).

324.   Fisher will coordinate with HR regarding leave and other HR issues involving his TMs.  (Fisher Dep., pp. 155-56).

325.   Fisher keeps an attendance calendar on each TM and uses the attendance guidelines to determine whether an absence would constitute an occurrence under the Attendance Policy.  (Fisher Dep., pp. 78-79).

326.   If a TM violates the Attendance Policy, Fisher initiates a CPR, fills in the information on the CPR form and submits it to HR.  (Fisher Dep., pp. 79-80).

327.   As GL, Fisher approves requests for vacations from his TMs.  (Fisher Dep., p. 79).

328.   If a TM requests emergency vacation that is outside the standard, Fisher escalates it to his AM.  (Fisher Dep., p. 81).

329.   When a TM leaves during the day, Fisher will adjust his manpower within his group to cover all of the stations.  (Fisher Dep., p. 84).

330.   Fisher shows and supports top performance in his group.  (Fisher RFA #29).

331.   Fisher directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Fisher RFA #19).

332.   Fisher communicates cascade training down to the TMs.  (Fisher Dep., pp. 115-16).

333.   Fisher makes sure that the four step training plan is followed.  (Fisher Dep., pp. 116-17).

334.   Fisher updates the Circle of Skills every quarter.  (Fisher Dep., p. 112).

335.   Fisher attempts to get the TMs in his group trained to Level 3.  (Fisher Dep., p. 113).

336.   Fisher tries to have enough TMs at Level 4s in his group so they can train new TMs who come into his group.  (Fisher Dep., p. 113).

337.   Fisher ensures that his group is working safely and he monitors the environment for safety hazards.  (Fisher RFA #17).

338.   Fisher is responsible for making sure his TMs comply with safety guidelines.  (Fisher Dep., p. 122).

339.   As GL, in the event of severe weather, Fisher's group has an assigned shelter and he has to take a head count to make sure all of his TMs are there. (Fisher Dep., p. 55).

340.   A 5 Why form is a form they use to try to identify the root cause of a problem or issue.  (Fisher Dep., p. 139).

341.   If there is a safety issue or injury, the GL will draft the form along with Safety.  (Fisher Dep., pp. 139-40).

342.   The purpose of the form is to identify the cause and a countermeasure so it does not happen again.  (Fisher Dep., p. 140).

343.   After Fisher drafts the form, he submits it to his AM for approval and once the countermeasure has been approved, he feeds back that information to his TMs to ensure they comply with it.  (Fisher Dep., pp. 140-41).

344.   As GL, Fisher will observe whether his TMs are complying with the countermeasure.  (Fisher Dep., p. 144).

345.   When Fisher gets to work, he checks his email, prints out his turnover log, prints out the daily safety hot sheet to see if any safety issues are listed on it, checks his area to make sure it is ready for start up and that they have no parts issues.  (Fisher Dep., p. 70).

346.   Fisher also updates the SQDCM Board every day before the shift begins.  (Fisher Dep., pp. 70-71).

347.   As a GL, Fisher attends a pre-shift meeting at which the AMs attend as well as the rest of the GLs on the Final Side.  (Fisher Dep., p. 63).

348.   At that meeting, they discuss the issues their shift had and any issues they know of that may be coming up.  (Fisher Dep., p. 64).

349.   The GLs provide input regarding any issues that occurred the previous day or shift and any issues they expected.  (Fisher Dep., p. 64).

350.   Fisher has a start up meeting with his group at the beginning of the shift at which he discusses any safety, quality and deliverance issues and SQDCM issues.  (Fisher Dep., p. 65).

351.   As GL, Fisher regularly checks the Production Board during the day and checks 5 S to make sure his TMs are cleaning up their area.  (Fisher Dep., pp. 74-75).

352.   As GL, Fisher walks up and down the Line and observes his TMs performing their job and whether they are following the SMPs.  (Fisher Dep., p. 84).

353.   As GL, Fisher will talk with the TM to get him to comply with the procedures and if necessary, he escalates.  (Fisher Dep., pp. 85-87).

354.   As GL, Fisher is responsible for making sure his group performs the work like it is supposed to do.  (Fisher Dep., p. 87).

355.   If his group does not perform their work correctly, Fisher is held accountable.  (Fisher Dep., p. 87).

356.   Fisher spends time keeping the Line moving which involves checking up on different parts of the Line and if there is a delay, he determines why there is a delay, addresses the delay as necessary and if he needs to escalate or get support he does.  (Fisher Dep., pp. 166-67).

357.   Fisher also walks the Line and checks the quality of the vehicles, including the paperwork to see if there are any open issues.  (Fisher Dep., pp. 91-92).

358.   Fisher will review the paperwork before the vehicle gets to the end of the Line to determine if there are any issues with the vehicle that need to be addressed.  (Fisher Dep., p. 92).

359.   Fisher checks the paperwork on just about every vehicle to make sure there is no quality defects that are unrepaired.  (Fisher Dep., p. 159).

360.   If there are unrepaired defects, Fisher determines if he needs to call any other TMs or TLs from other Lines to come and repair the vehicle before it is sent off as a bad vehicle.  (Fisher Dep., pp. 92-93).

361.   Fisher has a TM who performs this job so there is no need for Fisher to do it unless the TM gets behind and Fisher will help him out.  (Fisher Dep., pp. 93-94).

362.   Some days the TM will never get behind and some days he may stay behind.  (Fisher Dep., p. 94).

363.   When Fisher is spending time checking vehicles, he is still observing and seeing that his TMs are following the SMPs.  (Fisher Dep., pp. 161-62).

364.   There may be two repairs a day that Fisher will perform that are listed on the paperwork.  (Fisher Dep., p. 95).

365.   Fisher will normally spend maybe five minutes making these repairs.  (Fisher Dep., p. 97).

366.   Even if Fisher is doing a repair, he is still responsible for the output of his TMs in his group.  (Fisher Dep., p. 97).

367.   Fisher also will work on a vehicle four or five times a day either out of necessity or just to help out.  (Fisher Dep., pp. 89, 158-59).

368.   When Fisher does so, it takes him only about ten to fifteen minutes.  (Fisher Dep., p. 90).

369.   As GL, Fisher occasionally will attend a post-shift meeting with other GLs and AMs to discuss issues they may have had during the shift.  (Fisher Dep., p. 68).

370.   As GL, on the Final 4 Line, Fisher had to run a couple of reports after the end of the shift that he did not have to do on the other Lines.  (Fisher Dep., p. 77).

371.  The only reason Fisher believes he does not manage is because he follows the policies and guidelines and does not create them himself.  (Fisher Dep., p. 103).

### E.   FLOYD FRANKLIN

372.   Floyd Franklin ("Franklin') **admitted in Response to a Request for Admission that he was properly classified under the FLSA as an exempt employee.**[13]  (Franklin RFA #43).[14]

373.   Franklin began employment at MBUSI in 1996 as a TM in the Assembly Shop on the Engine Line.  (Franklin Dep., p. 22).[15]

374.   Within three months, Franklin was promoted to TL on the Engine Line and received a raise.  (Franklin Dep., pp. 23, 31-32).

375.   In 2000, Franklin was promoted to GL over the Chassis Line and he again received a raise.  (Franklin Dep., pp. 37-38, 48-49).

376.   Franklin had four TLs in his group as well as TMs on the Chassis Line. (Franklin Dep., p. 49).

377.   Franklin attended Group Leader Academy in which he was taught skills he needed to be a GL.  (Franklin Dep., pp. 102-03).

378.   Franklin then moved from Chassis Line GL to GL over the End of Final Line.  (Franklin Dep., p. 49).

---

[13]     As mentioned above in footnote no. 8, some plaintiffs, like Crowley and Franklin, did not expressly admit that they were properly classified under the FLSA as an exempt employee, but also did not deny it or state in detail why they could not admit or deny it.  By operation of Rule 36(a)(4), such responses are deemed to be admitted.

[14]     Franklin Responses to Requests for Admission are attached as Ex. 179 to MBUSI's Evidentiary Submission (Volume 14).

[15]     The Deposition of Floyd Franklin and exhibits to the deposition are attached as Ex. 180 to MBUSI's Evidentiary Submission (Volume 14).

379.   Franklin went through the Group Leader Self Sufficiency training which involved a more indepth look at the GL's role as far as using other departments such as EBS and Engineering to help find solutions to problems. (Franklin Dep., pp. 68-69).

380.   The Group Leader Self Sufficiency training lasted six weeks. (Franklin Dep., p. 69).

381.   Franklin then was a GL in the Self Sufficiency Program and he filled in for various other GLs that were going into training for six weeks at a time. (Franklin Dep., pp. 50, 68).

382.   Franklin then moved to Plant 2 for the Pilot Team and was Manpower Coordinator for bringing all of the TMs into Plant 2.  (Franklin Dep., p. 51).

383.   After Plant 2 opened, Franklin was GL on the Final 4 Line.  (Franklin Dep., p. 52).

384.   After about a year on the Final 4 Line, Franklin moved to GL over the Door Line.  (Franklin Dep., pp. 52-53).

385.   On the Door Line, Franklin had six TLs and at least thirty TMs. (Franklin Dep., p. 53).

386.   After about a year on the Door Line, Franklin moved to Final 3 Line where he is currently employed.  (Franklin Dep., p. 53).

387.   On the Final 3 Line, Franklin has approximately thirty TMs and five TLs.  (Franklin Dep., p. 55).

388.   As a GL at MBUSI, Franklin earns at least $455.00 per week in salary.  (Franklin RFA #41).

389.   Franklin supervises the TLs and TMs in his group.  (Franklin RFA #1).

390.   Franklin gives work directions and assignments to the members of his group.  (Franklin RFA #2).

391.   Franklin directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Franklin RFA #5).

392.   Franklin leads his group in meeting company standards; he leads change in his group upon approval at the AM level; and he uses leadership skills in his GL position.  (Franklin RFA ##25, 26 & 28).

393.   Franklin shares his knowledge and experience with his group. (Franklin RFA #30).

394.   Franklin initiates, facilitates and monitors problem solving in his group.  (Franklin RFA #12).

395.   Franklin ensures that production and quality goals are met in his group.  (Franklin RFA ##13 & 22).

396.   Franklin initiates continuous improvement activities in his group. (Franklin RFA #16).

397.   Franklin shows and supports top performance in his group.  (Franklin RFA #29).

398.   Franklin uses his best judgment in performing all of his GL job duties. (Franklin RFA #23).

399.   Franklin fulfills all of the roles and responsibilities of his GL position. (Franklin RFA #24).

400.   When Franklin arrives for his shift, he checks his email, updates the SQDCM Board, checks all of his sheets off the computer, checks his voice mail call-ins to see if any TMs will be out, and updates his Attendance Board.  (Franklin Dep., pp. 77-78).

401.   At six, Franklin attends a start up meeting for GLs and AMs. (Franklin Dep., p. 82).

402.   Franklin then has a 6:15 start up meeting with his group that lasts about five minutes.  (Franklin Dep., p. 91).

403.   During this meeting, Franklin covers the SQDCM topics.  (Franklin Dep., p. 93).

404.   At the start of production, Franklin walks his Line.  (Franklin Dep., pp. 147-48; Franklin Dep. Ex. 2).[16]

405.   GLs attend lunch box meetings with HR once a month to discuss policy issues and changes.  (Franklin Dep., p. 93).

406.   As GL on the Final 3 Line, Franklin's job is to keep the Line moving and keep good vehicles coming off the Line.  (Franklin Dep., p. 64).

407.   Franklin agrees that he works hard to lead his group to achieve the Line goals.  (Franklin Dep., p. 108).

408.   As GL, Franklin has good documentation skills and tracks defects, issues leaving the Line, scrap, DMT parts, and he tracks these items so he can give feedback to the appropriate group.  (Franklin Dep., p. 118).

409.   Franklin believes the most important quality as a GL is to get the team's morale up and being able to keep them motivated without pushing them. (Franklin Dep., p. 119).

410.   Franklin believes he is a motivating force for his group.  (Franklin Dep., p. 119).

---

[16]       Several of the plaintiffs in the <u>Lawson</u> case were deposed in the <u>Hicks</u> case, and the parties agreed to use their depositions in the <u>Lawson</u> case.  In those <u>Hicks</u> depositions, all of the exhibits were marked the first time they were used and then were used throughout the depositions without being re-marked.  For ease of reference by the Court, an exhibit referenced by a <u>Hicks</u> deponent is included with the exhibits of the deponent who referenced it.  So, for example, "Franklin Dep. Ex. 2" refers to Exhibit 2 to all of the <u>Hicks</u> depositions and is included with Franklin's deposition exhibits in the evidentiary submissions.

411.   A GL is constantly interacting with other people.  (Franklin Dep., p. 120).

412.   In order to ensure the quality of the vehicle coming off his Line, Franklin checks vehicles and will make the decision to make a repair and feed back any defect to try to close the quality loop.  (Franklin Dep., pp. 70-71).

413.   If a TM improperly performs a process, Franklin will feed it back to the TM.  (Franklin Dep., pp. 73-74).

414.   If defects come off his Line, Franklin's responsibility is to take that information back to his TMs and feed them that information as soon as possible so they can keep other similar defects from coming out of the group. (Franklin Dep., pp. 64-65).

415.   When Franklin checks quality on the vehicles, he positions himself where he can look at the vehicle and see all of the components that were put on and check for any visual defects, as well as fit and finish.  (Franklin Dep., pp. 142-43).

416.   If Franklin finds a defect, he repairs it, walks it back and feeds it back to the TM.  (Franklin Dep., p. 143).

417.   As GL, Franklin will fill out a 5 Why sheet which is a systematic way to try to find the root cause of a defect and a countermeasure.  (Franklin Dep., pp. 152-53).

418.   Franklin follows up on any countermeasures to make sure they are being performed.  (Franklin Dep., pp. 156-57).

419.   Franklin evaluates the performance of TMs and TLs in his group. (Franklin RFA #6).

420.   Franklin fills out performance evaluations for the TMs in his group on a yearly basis.  (Franklin Dep., p. 129).

421.   Franklin fills out these evaluations based on his observations of his TMs performing their job. (Franklin Dep., pp. 129-30).

422.   Franklin provides his opinion as to whether or not TMs and TLs in his group are ready for promotion and Franklin's opinion is given consideration and normally is followed in determining if the TM or TL will be promoted.  (Franklin RFA #7; Jones Decl. ¶¶ 31-32).

423.   On the evaluation, Franklin will note whether the TM needs development or is ready for the next level.  (Franklin Dep., p. 133).

424.   If Franklin gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

425.   Franklin will review the evaluation with the TM.  (Franklin Dep., p. 130).

426.   Franklin directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Franklin RFA #19).

427.   As GL, Franklin signs off on SMPs as they all have to make sure that they agree that the standard method and procedure is good for the process. (Franklin Dep., p. 88).

428.   Franklin manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Franklin RFA #4).

429.   Franklin ensures that his group is working safely and he monitors the environment for safety hazards.  (Franklin RFA #17).

430.   Part of the GL's duties is to fill out safety cards on a daily basis to identify any safety concerns.  (Franklin Dep., p. 123).

431.   If a TM is not wearing appropriate PPE, Franklin will get it for them and give it to them.  (Franklin Dep., pp. 74-75).

432.   Franklin ensures that company policies and work rules are enforced in his group.  (Franklin RFA #14).

433.   Franklin handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Franklin RFA #18).

434.   Franklin counsels TMs on performance, quality of work and conduct. (Franklin RFA #9).

435.   Franklin has the authority to initiate a CPR on a TM when he deems necessary.  (Franklin RFA #10).

436.   As GL, Franklin has filled out CPRs and sent them to HR for approval.  (Franklin Dep., p. 140).

437.   Franklin will then discuss the CPR with the TM or TL with HR present.  (Franklin Dep., p. 141).

## F.     DEREK HENDLEY

438.   Derek Hendley ("Hendley") was originally employed as a TM in the Body Shop.  (Hendley Dep., pp. 20-21).[17]

439.   Subsequently, Hendley was promoted to TL in the Body Shop and he received a five percent pay raise.  (Hendley Dep., pp. 25-27).

440.   Hendley became a GL for the Body Pilot Team on October 27, 2003. (Hendley Dep., pp. 43-45; Hendley Dep. Exs. 1, 2).

441.   In 2005, Hendley became GL for the Z-1 Group on the R Class side of the Body Shop.  (Hendley Dep., pp. 53-54).

442.   As GL over the Z-1 Group, Hendley had three teams and fifteen to eighteen TMs in his group.  (Hendley Dep., pp. 56-57).

443.   After about two to two and a half years, Hendley became GL for the Z-2 Group on the M Class side of the Body Shop.  (Hendley Dep., p. 54).

444.   The Z-2 area covers about a third of the Body Shop for the M Class side.  (Hendley Dep., p. 59).

445.   When Hendley was GL over the Z-2 Group on the M Class side of the Body Shop, he had three teams, fifteen to twenty TMs and three TLs.  (Hendley Dep., pp. 58-59).

---

[17]     The Deposition of Derek Hendley and exhibits to the deposition are attached as Ex. 181 to MBUSI's Evidentiary Submission (Volume 14).

446.   In April, 2009, Hendley moved to GL for the Z-3.2 Group on the M Class side of the Body Shop.  (Hendley Dep., pp. 54-55).

447.   The Z-3.2 area on the M Class side of the Body Shop is one straight line, around two hundred feet long, and consists of twelve stations.  (Hendley Dep., p. 60).

448.   As GL on the Z-3.2 Group, Hendley has eighteen to twenty TMs and four TLs.  (Hendley Dep., p. 61).

449.   After being promoted to GL, Hendley attended Group Leader Academy for approximately one week during which he was trained on the time keeping system, how to do evaluations, and leadership training.  (Hendley Dep., pp. 47-48).

450.   As a GL at MBUSI, Hendley earns at least $455.00 per week in salary.  (Hendley RFA #41).[18]

451.   Hendley supervises the TLs and TMs in his group and he is effectively the supervisor of the group of which he is the GL.  (Hendley Dep., p. 92; Hendley RFA #1).

452.   MBUSI regularly tells Hendley he is supposed to manage his group. (Hendley Dep., pp. 91-92).

---

[18]   Hendley Responses to Requests for Admission are attached as Ex. 182 to MBUSI's Evidentiary Submission (Volume 14).

453.   A Manager or AM is not always present in Hendley's group, and he leads his group independently of his Manager or AM.  (Hendley RFA #33).

454.   As GL, Hendley is evaluated on leadership competency.  (Hendley Dep., p. 128).

455.   Hendley agrees that the roles and responsibilities of the GL position are what MBUSI wants the GLs to do.  (Hendley Dep., pp. 124-25; Hendley Dep. Ex. 13).

456.   As GL, Hendley attempts to perform those roles and responsibilities. (Hendley Dep., p. 125).

457.   Hendley gives work directions and assignments to the members of his group.  (Hendley RFA #2).

458.   Hendley directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Hendley RFA #5).

459.   Hendley leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Hendley RFA ##25, 26 & 28).

460.   Hendley agrees that he does a good job of challenging his group to perform at a high level.  (Hendley Dep., pp. 128-29).

461.   Hendley shares his knowledge and experience with his group. (Hendley RFA #30).

462.   Hendley shows and supports top performance in his group.  (Hendley RFA #29).

463.   As GL, Hendley tries to make sure his team has good morale. (Hendley Dep., pp. 135-36).

464.   As GL, Hendley had hourly goals to achieve on production and he tries to meet those goals.  (Hendley Dep., p. 132).

465.   As GL, Hendley tries to minimize costs.  (Hendley Dep., p. 133).

466.   Hendley initiates, facilitates and monitors problem solving in his group.  (Hendley RFA #12).

467.   Hendley ensures that production and quality goals are met in his group.  (Hendley RFA ##13 & 22).

468.   Hendley initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Hendley RFA #16).

469.   Hendley uses his best judgment in performing all of his GL job duties. (Hendley RFA #23).

470.   Hendley fulfills all of the roles and responsibilities of his GL position. (Hendley RFA #24).

471.   Hendley's primary duty as GL is to make general observations throughout the day of his TMs, including their work habits and their quality, to help his TMs get where they need to be through verbal communication, to make sure his TMs are following the SMPs, and to make sure his TMs are following whatever standards are in place.  (Hendley Dep., pp. 140-41).

472.   As GL, Hendley is held accountable for the quality that comes out of his group.  (Hendley Dep., p. 131).

473.   As GL, Hendley observes his TMs to make sure they are running as an efficient team.  (Hendley Dep., p. 133).

474.   Hendley is supposed to walk throughout his area and make sure the TMs in his group are doing what they are supposed to do throughout the day. (Hendley Dep., p. 92).

475.   As GL, Hendley walks the Line, checks the quality of the TMs who are building the vehicle and makes general observations of the TMs.  (Hendley Dep., p. 79).

476.   As GL, if Hendley observes a TM violating MBUSI standards, he addresses it with the TM and counsels them to try to get them to improve their conduct.  (Hendley Dep., p. 82).

477.   If Hendley observes a TM not following an SMP, he will address the issue with them.  (Hendley Dep., pp. 87-88).

478.   During the course of the day, Hendley is normally called once to look at a vehicle on another Line because of a condition in which the vehicle left his Line.  (Hendley Dep., p. 98).

479.   Hendley will feedback information from that condition to his TMs to make sure it does not happen again.  (Hendley Dep., pp. 98-99).

480.   When a quality defect leaves his group, Hendley will draft a 5 Why report and frequently will consult Engineering on determining a good course of action to correct the problem. (Hendley Dep., p. 112).

481.   After the report is reviewed and approved by the AM, Hendley will instruct his TMs as to how to comply.  (Hendley Dep., pp. 112-13).

482.   Hendley counsels TMs on performance, quality of work and conduct. (Hendley RFA #9).

483.   Hendley has the authority to initiate a CPR on a TM when he deems necessary.  (Hendley RFA #10).

484.   Hendley ensures that company policies and work rules are enforced in his group.  (Hendley RFA #14).

485.   Hendley handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Hendley RFA #18).

486.   Hendley addresses standards of conduct violations in his group. (Hendley Dep., p. 86).

487.   If a TM continues to violate a standard of conduct after Hendley talks with the TM, he will initiate a CPR.  (Hendley Dep., pp. 84-85).

488.   There have been instances where Hendley has initiated a CPR. (Hendley Dep., p. 88).

489.   For example, Hendley initiated a CPR for Denita Washington after he observed her multiple times using a cell phone on the Line.  (Hendley Dep., pp. 89-91; Hendley Dep. Ex. 5).

490.   Hendley ensures that his group is working safely and he monitors the environment for safety hazards.  (Hendley RFA #17).

491.   Part of Hendley's job as a GL is to make sure that his TMs are following the safety policies.  (Hendley Dep., pp. 83-84).

492.   If there is an injury to a TM, Hendley will draft a 5 Why sheet and submit it to his AM for approval.  (Hendley Dep., pp. 115-16).

493.   When Hendley has a TM with medical restrictions he finds an area in which the TM can work that is suitable for the TM within their restrictions. (Hendley Dep., pp. 106-07).

494.   As GL, in the event of severe weather, Hendley is responsible for making sure his TMs get to a shelter in a specific area.  (Hendley Dep., pp. 51-52).

495.   Hendley directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Hendley RFA #19).

496.   Hendley will assess a TM to make sure they are trained at a Level 3. (Hendley Dep., pp. 108-09).

497.   Hendley will sign off on the level of training on the Circle of Skills. (Hendley Dep., p. 109).

498.   Hendley signs off on the Circle of Skills every quarter.   (Hendley Dep., p. 110).

499.   Hendley does not let TMs work on a process by themselves for which they are not properly trained.  (Hendley Dep., pp. 134-35).

500.   Hendley evaluates the performance of TMs and TLs in his group. (Hendley RFA #6).

501.   Hendley completes a performance evaluation on his TMs every year. (Hendley Dep., pp. 99-100).

502.   Hendley describes how the TM performs in comparison to the performance criteria.  (Hendley Dep., p. 100).

503.   Hendley rates the TMs' performance as satisfactory or not satisfactory. (Hendley Dep., pp. 100-01).

504.   If Hendley gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

505.   Hendley will include any steps that the TM can do to improve their skills in their position.  (Hendley Dep., p. 101).

506.   Hendley provides his opinion as to whether TMs and TLs in his group are ready for promotion and his opinion is given consideration and normally is followed in determining if the TM or TL will be promoted.  (Hendley Dep., pp. 101-102; Hendley RFA #7; Jones Decl. ¶¶ 31-32).

507.   Hendley has never had a TM or TL in his group who has been promoted without him assessing that they are ready for promotion.  (Hendley Dep., p. 102).

508.   Hendley manages attendance in his group and ensures that his group is properly staffed.  (Hendley RFA #3).

509.   Hendley manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Hendley RFA #4).

510.   Hendley is responsible for tracking attendance on his TMs, approves vacation based on policy, and tracks occurrences when TMs are in violation of the attendance policy.  (Hendley Dep., pp. 105-06).

511.   When a TM reaches a level in which they are to receive a CPR for attendance occurrences, Hendley will initiate a CPR.  (Hendley Dep., p. 106).

512.   Hendley can move TMs within his group.  (Hendley Dep., p. 108).

513.   Before Hendley attends the pre-shift start up meeting, he reads the shift log, checks his phone for messages from TMs, reads other reports and updates the SQDCM Board with information that has been sent out such as safety and production numbers.  (Hendley Dep., pp. 66-67).

514.   As GL on the Z-1 Group, Hendley would attend the pre-shift start up meeting which was conducted by an AM and the GLs would be present.  (Hendley Dep., pp. 63-64).

515.   As GL on the Z-1 Group, Hendley would conduct a start up meeting at the beginning of his shift at which he would cover safety related items, quality feedback concerns and daily production information.  (Hendley Dep., pp. 62-63).

516.   As GL, Hendley attends monthly lunch box meetings with HR and they discuss HR related policy issues.  (Hendley Dep., pp. 71-72).

517.   As GL, Hendley sometimes attends a flip chart meeting and that meeting may include Maintenance, Engineers, VPs, Managers and AMs.  (Hendley Dep., p. 65).

518.   Hendley is responsible as GL to try to limit his expenditures to meet budget.  (Hendley Dep., p. 122).

519.   As GL, Hendley normally stays twenty to twenty-five minutes after his shift ends during which time he completes his shift log, puts any information from his shift on the SQDCM Board and inputs his payroll and initiates evaluations if they are coming due.  (Hendley Dep., p. 74).

520.   Hendley updates the SQDCM Board at the end of his shift.  (Hendley Dep., pp. 95-96).

521.   Hendley includes safety, quality, delivery, costs and morale issues on his shift logs.  (Hendley Dep., p. 78).

522.   As GL for the Z-2 and Z-3.2 Groups, Hendley would perform the same pre-shift activities, attend the same pre-shift start up meeting and conduct his start up meeting  as he did when he was the Z-1 GL.  (Hendley Dep., pp. 69-71).

523.   When Hendley was GL in Z-2 he might have to work on the Line at breaks and lunch, he never had to work on the Line when he was GL in Z-1, and since he has been GL in the Z-3.2 Line, he only has had to move vehicles two or three times at break over four or five months.  (Hendley Dep., pp. 137-38).

524.   Hendley goes to the end of the Line every hour or two to conduct his quality checks on vehicles and he normally looks at seven or eight vehicles and a vehicle moves through that area in about eighty-seven seconds.  (Hendley Dep., p. 96).

525.   Hendley also spends time at the end of the Line because it is the best place for him to observe and make sure everything is working correctly.  (Hendley Dep., p. 97).

526.   The time that Hendley is at the end of the Line includes the time when he is just observing the general area to make sure things are functioning correctly. (Hendley Dep., p. 99).

## G.   JAMES KARPINSKI

527.   James Karpinski ("Karpinski") began employment at MBUSI in 1997 as a TM in the Assembly Shop on the Final Line.  (Karpinski Dep., pp. 12, 17).[19]

528.   After about two years, in 1999, Karpinski was promoted to TL and received a 5% raise.  (Karpinski Dep., p. 19).

529.   Karpinski was a TL for about a year and a half on the Assembly Final Line as well as the Chassis Line.  (Karpinski Dep., p. 20).

530.   Karpinski then was promoted to GL on February 17, 2003 and received a raise.  (Karpinski Dep., pp. 26-28; Karpinski Dep. Ex. 1).

531.   Before Karpinski was promoted to GL, he spent a week in pre group leader training.  (Karpinski Dep., p. 28).

532.   As GL, Karpinski has been through the Group Leader Self Sufficiency Program which takes you to different areas of the Company where you get to know other people in different areas with whom you may come in contact.  (Karpinski Dep., p. 29).

533.   The Group Leader Self Sufficiency Program lasted four weeks.  (Karpinski Dep., pp. 29-30).

534.   As GL, Karpinski has received training in civil treatment, leadership skills and communications.  (Karpinski Dep., p. 32).

---

[19]     The Deposition of James Karpinski and exhibits to the deposition are attached as Ex. 183 to MBUSI's Evidentiary Submission (Volume 15).

535.   As GL at MBUSI, Karpinski earns at least $455.00 per week in salary. (Karpinski RFA #41).[20]

536.   When Karpinski was promoted to GL, he was GL over the West Side of the Chassis Line.  (Karpinski Dep., p. 33).

537.   Karpinski also has been GL for the 251 Pilot Team, Final 3 Line in the Assembly 2 Shop, Final 2 Line in the Assembly 2 Shop, WSA Group in the Assembly 2 Shop, and Engine and Chassis Line in the Assembly 2 Shop. (Karpinski Dep., pp. 33-34).

538.   As GL, Karpinski's groups normally had four to five teams, with each team having its own TL and each team having about six TMs.  (Karpinski Dep., pp. 34-35).

539.   Karpinski supervises the TLs and TMs in his group.  (Karpinski RFA #1).

540.   Karpinski gives work directions and assignments to the members of his group.  (Karpinski RFA #2).

541.   Karpinski directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Karpinski RFA #5).

---

[20]   Karpinski Responses to Requests for Admission are attached as Ex. 184 to MBUSI's Evidentiary Submission (Volume 15).

542.   Karpinski leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Karpinski RFA ##25, 26 & 28).

543.   Karpinski shares his knowledge and experience with his group. (Karpinski RFA #30).

544.   Karpinski's duties differed from those performed by the TMs in his group.  (Karpinski RFA #34).

545.   Karpinski initiates, facilitates and monitors problem solving in his group.  (Karpinski RFA #12).

546.   Karpinski ensures that production and quality goals are met in his group.  (Karpinski RFA ##13 & 22).

547.   Karpinski initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Karpinski RFA #16).

548.   Karpinski shows and supports top performance in his group. (Karpinski RFA #29).

549.   Karpinski uses his best judgment in performing all of his GL job duties.  (Karpinski RFA #23).

550.   The Roles and Responsibilities Card contains an accurate description of the role of a GL.  (Karpinski Dep., p. 78; Karpinski Dep. Ex. 2).

551.   Karpinski fulfills all of the roles and responsibilities of his GL position.  (Karpinski RFA #24).

552.   When Karpinski first arrives at work, he checks his email, reads his turnover sheet, checks his call ins, and reviews any reports that he needs for the day.  (Karpinski Dep., pp. 48-49, 51).

553.   Karpinski is responsible for updating the SQDCM Board.  (Karpinski Dep., p. 53).

554.   At six, he has a GL meeting with the AM at which they discuss any pertinent information they need and any direction they need for the day's build and attendance issues.  (Karpinski Dep., p. 50).

555.   Karpinski leads a 6:15 start up meeting with his group at which they cover SQDCM.  (Karpinski Dep., pp. 52-53).

556.   Once the Line starts moving at 6:20, Karpinski reviews his turnover log and checks out any abnormalities that were left and then answers Line calls.  (Karpinski Dep., p. 55).

557.   Karpinski's primary duty as a GL is to keep the Production Line moving.  (Karpinski Dep., p. 37).

558.   Karpinski spends a hundred percent of his day walking his area.  (Karpinski Dep., p. 60).

559.   When Karpinski is walking his area, he is checking for parts that are out, doing 5S, answering TMs' questions, making sure TMs are wearing the appropriate PPE, making sure that TMs are not in an awkward ergonomic situations, talking to his TMs, and making sure his TMs are focused on their job. (Karpinski Dep., pp. 60-61).

560.   Karpinski does not work a station on the Line.   (Karpinski Dep., pp. 62-63).

561.   Karpinski estimates that he spends fifty percent of the shift making repairs as a result of answering Line calls. (Karpinski Dep., p. 63).

562.   Even when Karpinski is doing repairs, he still is available to do his other duties as a GL.   (Karpinski Dep., p. 77).

563.   As GL, Karpinski verifies that his TMs are following the SMPs. (Karpinski Dep., p. 65).

564.   One of Karpinski's duties as GL is to look for ways to improve the work environment for efficiency of the processes in his group.   (Karpinski Dep., p. 104).

565.   Problem solving ability is an important skill to have as a GL. (Karpinski Dep., p. 105).

566.   Karpinski's TLs will submit to him a TL check sheet which contains information regarding a TM's performance on a daily basis.  (Karpinski Dep., pp. 41-42).

567.   As GL, Karpinski will use problem solving sheets which help him to identify the root cause of a problem and develop a countermeasure.  (Karpinski Dep., p. 43).

568.   Karpinski will follow up and make sure the countermeasure is understood and used by the TMs in his group.  (Karpinski Dep., pp. 43-44).

569.   As GL, Karpinski prepares a daily turnover log.  (Karpinski Dep., p. 47).

570.   At the end of the shift, Karpinski completes his turnover log and his report for wrong and missing.  (Karpinski Dep., p. 70).

571.   Karpinski ensures that his group is working safely and he monitors the environment for safety hazards.  (Karpinski RFA #17).

572.   If a TM is injured, Karpinski will report the injury to his AM and either he or the AM will walk the TM to Medical and then he will complete a problem solving sheet to figure out the root cause of the injury and implement any countermeasures.  (Karpinski Dep., p. 74).

573.   As GL, Karpinski is required to check the Circle of Skills and make sure they are up to date.  (Karpinski Dep., p. 114).

574.   As GL, Karpinski watches TMs perform a process and if they complete the process according to the SMP, he will move them to Level 3 and sign off on the Circle of Skills form.  (Karpinski Dep., pp. 67-68).

575.   Karpinski directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Karpinski RFA #19).

576.   If a TM is underperforming, Karpinski can take them down to a Level 2 on the Circle of Skills.  (Karpinski Dep., p. 114).

577.   As GL, Karpinski signs off on any revision or modification to a SMP. (Karpinski Dep., p. 66).

578.   As GL, Karpinski must sign off on any changes or modifications to a JES.  (Karpinski Dep., p. 67).

579.   Karpinski completes an annual evaluation of TMs and TLs. (Karpinski Dep., p. 46).

580.   Karpinski evaluates the TM or TL based on the criteria on the evaluation form and based on his observations of the TM's or TL's day to day work habits.  (Karpinski Dep., p. 46).

581.   Karpinski evaluates the performance of TMs and TLs in his group with the approval from his AM and HR.  (Karpinski RFA #6).

582.   Karpinski provides his opinion as to whether or not TMs and TLs in his group are ready for promotion and Karpinski's opinion is given consideration

and normally is followed in determining if the TM or TL will be promoted. (Karpinski RFA #7; Jones Decl. ¶¶ 31-32).

583.   Karpinski will evaluate a TM or TL as ready for the next level or needs development based on the criteria of the Roles and Responsibilities Card and his observations he has made throughout the year of that TM or TL.  (Karpinski Dep., pp. 82-83).

584.   If Karpinski gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

585.   Karpinski manages attendance in his group and ensures that his group is properly staffed with the assistance of his AM.  (Karpinski RFA #3).

586.   Karpinski manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Karpinski RFA #4).

587.   As GL, Karpinski enters time and attendance, he calls in hourly numbers to his AM, and he may have to go to the Off Line area to answer any Quality issues.  (Karpinski Dep., pp. 37-38).

588.   As GL, if a TM requests a vacation day, Karpinski checks the vacation board to let them know if they can have the day.  (Karpinski Dep., p. 40).

589.   If a TM's request for vacation is when the team is in standard, Karpinski will approve the request.  (Karpinski Dep., p. 40).

590.   With respect to short term disability requests, Karpinski reviews his attendance calendar to see if there are any abnormalities and if not, he will sign off on the STD request by the TM.  (Karpinski Dep., p. 95).

591.   Within his group, Karpinski can shift manpower throughout the day if needed.  (Karpinski Dep., pp. 102-03).

592.   Karpinski ensures that company policies and work rules are enforced in his group.  (Karpinski RFA #14).

593.   Karpinski handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Karpinski RFA #18).

594.   Karpinski counsels TMs on performance, quality of work and conduct.  (Karpinski RFA #9).

595.   One of Karpinski's responsibilities as a GL is to draft corrective performance reviews for TMs.    (Karpinski Dep., p. 93).

596.   Karpinski will sit down with the TM and issue the corrective action along with HR.  (Karpinski Dep., p. 93).

597.   Karpinski has the authority to initiate a CPR on a TM when he deems necessary.  (Karpinski RFA #10).

### H.   PENNY KESSLER

598.   Penny Kessler ("Kessler") **admitted in Response to a Request for Admission that she was properly classified under the FLSA as an exempt employee.**[21]   (Kessler RFA #43).[22]

599.   Kessler began employment at MBUSI on February 5, 1996 as a Body Shop TM.   (Kessler Dep., p. 20).[23]

600.   After six or eight months as a TM, Kessler became a TL.   (Kessler Dep., p. 20).

601.   Kessler was promoted to GL on June 6, 1997 and she made more money as a GL than as a TL.   (Kessler Dep., pp. 24-25, 30).

602.   Kessler was GL in the Z-2 area in which she had three teams, three TLs and about twenty-five TMs.   (Kessler Dep., pp. 50-51).

603.   Kessler was next GL for approximately two years for the 3.2 and Z-2 Lines.   (Kessler Dep., pp. 41-43).

604.   Kessler had three teams, three TLs, and around twenty-five TMs in that group.   (Kessler Dep., p. 42).

---

[21]      As mentioned above in footnote no. 8, some plaintiffs, like Crowley and Kessler, did not expressly admit that they were properly classified under the FLSA as an exempt employee, but also did not deny it or state in detail why they could not admit or deny it.  By operation of Rule 36(a)(4), such responses are deemed to be admitted.

[22]      Kessler Responses to Requests for Admission are attached as Ex. 185 to MBUSI's Evidentiary Submission (Volume 15).

[23]      The Deposition of Penny Kessler and exhibits to the deposition are attached as Ex. 186 to MBUSI's Evidentiary Submission (Volume 15)

605.   Kessler was then GL for the 3.3 Line group which included Metal Finishing and Paint Shop Dent Doctors who are in Paint Shop 1 and Paint Shop 2. (Kessler Dep., pp. 31, 37).

606.   Kessler's group consisted of three TLs and sixteen TMs, including four TMs with a TL in Paint 1, four TMs with a TL in Paint 2, and eight TMs including a TL in Metal Finishing.  (Kessler Dep., pp. 37-38).

607.   Kessler attended Group Leader Academy which was every day for a month and included training on payroll, use of the payroll system, safety classes, team relations, and team building.  (Kessler Dep., pp. 54-55).

608.   Kessler resigned her employment at MBUSI in May, 2009.  (Kessler Resignation).[24]

609.   As a GL at MBUSI, Kessler earned at least $455.00 per week in salary.  (Kessler RFA #41).

610.   Kessler used her best judgment in performing all of her GL job duties. (Kessler RFA #23).

611.   Kessler fulfilled all of the roles and responsibilities of her GL position.  (Kessler RFA #24).

612.   As GL, Kessler was responsible for her group making the customer happy which was the next group down the Line.  (Kessler Dep., pp. 193-94).

---

[24]     Penny Kessler Resignation Letter is attached as Ex. 187 to MBUSI's Evidentiary Submission (Volume 15).

613.    Kessler tried to make sure her group did their tasks in a way that the customer or the next group down the Line was satisfied.  (Kessler Dep., p. 194).

614.    As GL, Kessler made sure that her TMs followed the SMPs to ensure quality.  (Kessler Dep., p. 114).

615.    As GL, Kessler observed the TMs and TLs performing their jobs. (Kessler Dep., pp. 110, 112).

616.    Kessler believes that she created enthusiasm in her group.  (Kessler Dep., pp. 211-12).

617.    Kessler agreed that she was responsible for improving her group. (Kessler Dep., p. 214).

618.    Kessler believed that she did what was necessary to improve the area in which her group worked.  (Kessler Dep., p. 214).

619.    Kessler coached her TLs in their responsibilities.  (Kessler Dep., p. 217).

620.    It was Kessler's responsibility to make sure her group was properly trained.  (Kessler Dep., p. 209).

621.    Kessler was responsible for making sure that her group started on time and left on time.  (Kessler Dep., p. 213).

622.    Kessler agrees with her 2007 performance appraisal that she led her group to achieve satisfactory SQDCM goals.  (Kessler Dep., p. 200).

623.   As GL, Kessler was responsible for following the Company's objectives which included that a GL manage their Line.  (Kessler Dep., p. 116).

624.   The GL Roles and Responsibilities Card accurately describes the roles and responsibilities of a GL except Kessler did not develop and implement an annual plan, overall continuous improvement was handled by a separate team, Kessler had limits on what she could do on managing attendance, and there was limited training that Kessler could provide for her TMs.  (Kessler Dep., pp. 120-22).

625.   Kessler led her group in meeting company standards; and she used leadership skills in her GL position.  (Kessler RFA ##25 & 26).

626.   Kessler ensured that company policies and work rules were enforced in her group.  (Kessler RFA #14).

627.   Kessler believes she did a good job of directing TMs as to Company policies and procedures.  (Kessler Dep., p. 207).

628.   One of Kessler's strengths as a GL was working with her team and she had fewer problems with HR than most GLs.  (Kessler Dep., p. 59).

629.   As GL, Kessler would get her TMs to talk and work out disagreements.  (Kessler Dep., p. 61).

630.   Kessler made the decision to contact HR if necessary.  (Kessler Dep., p. 62).

631.   As GL, Kessler issued discipline to a TM who failed to perform a part of his process for almost four hours.  (Kessler Dep., p. 248).

632.   Kessler completed a performance evaluation on each TM in her group annually.  (Kessler Dep., p. 76).

633.   On the performance evaluations, Kessler checked needs development or ready for promotion to the next level and Kessler's opinion was given consideration and normally was followed in determining if the TL or TM was promoted.  (Kessler Dep., p. 187; Jones Decl. ¶¶ 31-32).

634.   If Kessler gave a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL was not eligible for promotion.  (Jones Decl. ¶ 33).

635.   As GL, Kessler had to know how the attendance policy worked and who to go to in order to get various approvals.  (Kessler Dep., p. 207).

636.   As GL, Kessler maintained the attendance calendar for her group.  (Kessler Dep., p. 181).

637.   As GL, Kessler kept up with her TMs' attendance.  (Kessler Dep., p. 71).

638.   Kessler kept track of occurrences under the attendance policy for TMs in her group.  (Kessler Dep., p. 72).

639.   If the TM had too many occurrences, Kessler would write the CPR and forward it for approval.  (Kessler Dep., p. 73).

640.   Kessler checked the call-ins to see who was not going to show up. (Kessler Dep., p. 181).

641.   Kessler kept track of hours worked and vacation for her TMs. (Kessler Dep., p. 56).

642.   Kessler made the decision to approve TMs' vacation requests so long as they were in standard.  (Kessler Dep., p. 122).

643.   As GL, Kessler looked over the hours TMs put down that they worked and made sure it matched what they had done before she inputted their time into the system.  (Kessler Dep., pp. 149-50).

644.   Kessler ensured that her group was working safely and she monitored the environment for safety hazards.  (Kessler RFA #17).

645.   As GL, Kessler was required to look for safety related issues. (Kessler Dep., p. 57).

646.   As GL, Kessler made safety observations on a weekly basis.  (Kessler Dep., p. 153).

647.   As GL, Kessler filled out a safety card every week.  (Kessler Dep., pp. 57-58).

648. As GL, Kessler completed problem solving sheets. (Kessler Dep., p. 166).

649. Normally the TL wrote up an SMP, Kessler reviewed it and then recommended it up the Line. (Kessler Dep., pp. 90-91).

650. If there was an issue with the rotation schedule, Kessler reviewed it. (Kessler Dep., p. 68).

651. As GL, Kessler checked her call-in line in the morning to determine who would be absent from work. (Kessler Dep., p. 86).

652. Kessler complied with the pre-shift requirements, including being present in her Team Room, updating the attendance board, checking call ins and attending the start up meeting. (Kessler Dep., p. 93; Kessler Dep. Ex. 2).

653. Kessler discussed manpower needs at the meeting with the AM and other GLs before the shift started. (Kessler Dep., p. 87).

654. As GL, Kessler had a five minute communication meeting based upon SQDCM with her group where she communicated such information to her TMs and TLs. (Kessler Dep., pp. 94-95).

655. After the Line started at 6:20, Kessler went around and made sure that all the boards were updated, including the feedback board and the production board and the attendance board, that everything was set, she made sure her TMs had their tally sheets and then she checked vehicles. (Kessler Dep., pp. 108-09, 234-35).

656.   Kessler checked on the vehicles in her group at the end of the Line and if she found a defect, she almost always had a TM come forward to look at the issue and repair it, but if she was short handed, she repaired it and then verbally fed it back.  (Kessler Dep., pp. 238-40).

657.   When Kessler checked vehicles, she immediately fed back any issue to a TM to try to keep the problem from happening again.  (Kessler Dep., p. 98).

658.   Kessler updated the board at nine o'clock and had a nine o'clock meeting.  (Kessler Dep., pp. 240-41).

659.   During the third rotation after lunch, Kessler went over to the E-coat deck to check vehicles, talked to her TMs and saw if they needed any help and then she went to Paint 1 Dent Doctors and did the same thing.  (Kessler Dep., pp. 242-43).

660.   During the fourth rotation, Kessler loaded any vehicles that were left off the Line back on the Line and then checked vehicles until the end of the day.  (Kessler Dep., p. 243).

661.   At the end of the day, Kessler walked the Line and made sure that everyone had put everything away, all the paperwork had been filled out, made sure there were no messes, and then she did her shift log.  (Kessler Dep., p. 244).

662.   At the end of the shift, Kessler normally was in the Team Center where she observed her TMs and she completed the daily turnover log.  (Kessler Dep., pp. 102-03).

663.   Kessler cannot remember the last time she had to actually work a station.  (Kessler Dep., p. 196).

## I.   GARY OGLESBY

664.   Gary Oglesby ("Oglesby") began employment at MBUSI on July 8, 1996 as a TM in Quality.  (Oglesby Dep., pp. 12, 24).[25]

665.   In 1998, Oglesby was promoted to TL in Quality and received a pay raise.  (Oglesby Dep., pp. 25, 28-29).

666.   As a TL, if a TM's performance was unsatisfactory, Oglesby turned it over to this GL to correct and instruct the TM.  (Oglesby Dep., p. 31).

667.   Oglesby was promoted to GL in Quality on October 23, 2000. (Oglesby Dep., pp. 37-38; Oglesby Dep. Ex. 1).

668.   As a GL at MBUSI, Oglesby earns at least $455.00 per week in salary.  (Oglesby RFA #41).[26]

669.   Oglesby attended Group Leader Academy which lasted a week and included leadership training.  (Oglesby Dep., pp. 41-43).

670.   Oglesby also participated in the Group Leader Self Sufficiency Program.  (Oglesby Dep., pp. 44-45).

671.   As GL, Oglesby attends monthly lunch box meetings with HR at which various Company policies and standards are covered.  (Oglesby Dep., p. 49, 67).

---

[25]      The Deposition of Gary Oglesby and exhibits to the deposition are attached as Ex. 188 to MBUSI's Evidentiary Submission (Volume 15).

[26]      Oglesby Responses to Requests for Admission are attached as Ex. 189 to MBUSI's Evidentiary Submission (Volume 15).

672.   Oglesby needed to have knowledge of these policies so he can enforce them with his TMs.  (Oglesby Dep., p. 49).

673.   Initially, Oglesby was GL for Receiving and Inspection for about a year to a year and a half and then he moved to GL over the End of Line Group. (Oglesby Dep., pp. 52-53).

674.   When Oglesby was a GL for the Receiving and Inspection Group, he had three teams, three TLs and twelve TMs.  (Oglesby Dep., pp. 54-55).

675.   Oglesby's group in Receiving and Inspection was spread out throughout the entire facility.  (Oglesby Dep., p. 56).

676.   On the Quality End of Line Group, Oglesby's group has three teams, three TLs, and twenty-four TMs.  (Oglesby Dep., p. 58).

677.   Oglesby's Receiving and Inspection group covers an area that is at least a couple of football fields in size.  (Oglesby Dep., p. 59).

678.   During his time as a GL, Oglesby spent a year and a half in Germany as GL for the Null Series.  (Oglesby Dep., p. 54).

679.   Oglesby supervises the TLs and TMs in his group.   (Oglesby RFA #1).

680.   A Manager or AM is not always present in Oglesby's group, and he leads his group independently of his Manager or AM.  (Oglesby RFA #33).

681.   Oglesby leads his group and is evaluated based on leadership competencies.  (Oglesby Dep., pp. 143, 151-52).

682.   Oglesby is responsible for accomplishing MBUSI's goals and targets. (Oglesby Dep., p. 147).

683.   Oglesby takes control of situations in his area that arise with his AM is absent.  (Oglesby RFA #32).

684.   Oglesby gives work directions and assignments to the members of his group.  (Oglesby RFA #2).

685.   Oglesby makes decisions about his group and carries out his plans for the group.  (Oglesby RFA #35).

686.   Oglesby directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Oglesby RFA #5).

687.   Oglesby leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Oglesby RFA ##25, 26 & 28).

688.   Oglesby shares his knowledge and experience with his group. (Oglesby RFA #30).

689.   Oglesby's duties differed from those performed by the TMs in his group.  (Oglesby RFA #34).

690.   One of Oglesby's responsibilities as a GL is to help the morale of the group.  (Oglesby Dep., p. 73).

691.   Oglesby initiates, facilitates and monitors problem solving in his group.  (Oglesby RFA #12).

692.   Problem solving is an important skill for advancement to the GL position.  (Oglesby Dep., p. 139).

693.   Oglesby ensures that production and quality goals are met in his group.  (Oglesby RFA ##13 & 22).

694.   Oglesby initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Oglesby RFA #16).

695.   Oglesby shows and supports top performance in his group.  (Oglesby RFA #29).

696.   Oglesby uses his best judgment in performing all of his GL job duties.  (Oglesby RFA #23).

697.   Oglesby fulfills all of the roles and responsibilities of his GL position.  (Oglesby RFA #24).

698.   Oglesby tries to accomplish all of the roles and responsibilities of a GL.  (Oglesby Dep., pp. 147-48).

699.   Oglesby agrees that the GL job description's purpose is the purpose of the GL position with the exception of costs and he tries to accomplish that purpose. (Oglesby Dep., p. 149; Oglesby Dep. Ex. 22).

700.   The GL job description states the purpose of the GL position as follows:

> To direct Team Leaders and other Team Members in the execution of the teams' responsibilities.  Responsible for the teams' achieving the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training, and team harmony.

(Oglesby Dep. Ex. 22).

701.   Oglesby agrees that the GL job description contains the essential functions of the GL position and he tries to accomplish those functions.  (Oglesby Dep., pp. 149-50; Oglesby Dep. Ex. 22).

702.   The GL job description states the essential function of the GL position as follows:

> To establish a positive role model for all Team Members while assuring high standards of personal integrity and responsibility of Team Leaders.

> To maintain familiarity with all job duties and skill levels of the Team Leaders and Team Members in the area of responsibility and monitors events for problems which may affect team performance.

> To conduct the routine performance assessment of Team Leaders and participate in the process of Team Member performance assessments.

To coordinate proper manning levels and allocation of Team Members in response to production demands, training completion, and compliance with MBUSI attendance and vacation policies.

To coordinate planning, creation, and maintenance of clean and orderly team areas, with appropriate visual controls and operating rules, in order to assure the safety, health, and productivity of Team Leader and Team Members.

To support and cooperate with other groups while acting as primary communication link to Team Leaders for inter-team and inter-group issues and information.

To monitor and plan activities according to production schedules while assuring that teams maintain tooling, equipment, machines, parts, materials, supplies, and training flexibility in the area to support the achievement of production requirements while attaining the highest possible production quality.

To act as a technical problem solving resource in the assigned area by determining the root cause and countermeasure required, especially in the case of line-stop problems or other production interruptions.

To monitor the condition of team product to ensure the quality passed from the area meets all specifications and standards.

To ensure compliance with all company rules, policies, and practices, and takes appropriate corrective action when warranted, in accordance with the term[s] of the Team Member Handbook.

To collect, record, and analyze information while maintaining documentation regarding the activities in the assigned area as defined by MBUSI policy, procedure, or practice.

(Oglesby Dep. Ex. 22).

703.   Before his shift starts, Oglesby will check his emails, that may include any kind of information about safety accidents, conditions, part shortages and in what direction they are going for the day.  (Oglesby Dep., p. 66).

704.   Oglesby will communicate such information to his TMs.   (Oglesby Dep., p. 66).

705.   Before the shift starts, Oglesby also reads the turnover logs from the other departments, memos coming out of HR, attends a start up meeting and lets his AM know about his manpower.  (Oglesby Dep., p. 63).

706.   As GL, Oglesby is responsible for all SQDCM areas for his group. (Oglesby Dep., pp. 77-78).

707.   In the morning, Oglesby updates the SQDCM Board so that his TMs will have the most current information so they will know what is going on. (Oglesby Dep., p. 77).

708.   Oglesby then conducts a shift start up meeting and goes over information his teams needs to know, including HR issues.  (Oglesby Dep., pp. 64-65).

709.   As GL, Oglesby tries to make sure his TMs are working efficiently and productively so overtime is minimized.  (Oglesby Dep., p. 131).

710.   Oglesby spends most of his day walking his group and checking quality.  (Oglesby Dep., p. 91).

711.   Oglesby's TLs work a lot closer with the TMs than he does.  (Oglesby Dep., p. 73).

712.   When Oglesby walks his group, he observes his TMs' performance, helps any TMs that are having problems and gives feedback to his TMs.  (Oglesby Dep., pp. 91-92).

713.   When Oglesby checks vehicles, he maintains his other GL responsibilities.  (Oglesby Dep., p. 92).

714.   Oglesby spends about half his time walking his group and observing their performance and the other half checking vehicles.  (Oglesby Dep., p. 94).

715.   As GL, Oglesby is contacted forty to fifty times a day by other GLs so they can work together to resolve a problem.  (Oglesby Dep., pp. 99-100).

716.   Oglesby proposes countermeasures to his AM for approval and if they are approved, he instructs his TMs to perform the countermeasure and observes their compliance.  (Oglesby Dep., p. 101).

717.   Oglesby will communicate information to the other shift and his TMs so problems do not repeat themselves.  (Oglesby Dep., pp. 85-89).

718.   Oglesby does not complete a turnover log since they only run one shift, but when they ran two shifts, he did complete a turnover log.  (Oglesby Dep., p. 74).

719.   It is important to communicate the information to the other shift that he includes in the turnover log.  (Oglesby Dep., p. 75).

720.   Oglesby ensures that company policies and work rules are enforced in his group.  (Oglesby RFA #14).

721.   Oglesby handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Oglesby RFA #18).

722.   Oglesby tries to work out conflicts between TMs within his group. (Oglesby Dep., p. 142).

723.   Oglesby strives to make sure that his TLs and TMs fulfills the roles and responsibilities for their position set out on the Roles and Responsibilities Card.  (Oglesby Dep., pp. 140-41).

724.   Oglesby counsels TMs on performance, quality of work and conduct. (Oglesby RFA #9).

725.   As GL, Oglesby verbally corrects TMs' behavior if necessary. (Oglesby Dep., p. 141).

726.   Oglesby has the authority to initiate a CPR on a TM when he deems necessary.  (Oglesby RFA #10).

727.   Oglesby decides what conduct to bring to his AM's attention for the issuance of a CPR.  (Oglesby Dep., p. 142).

728.   Oglesby directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Oglesby RFA #19).

729.   As GL, Oglesby is responsible for making sure all TMs in his group have the proper training.  (Oglesby Dep., p. 120).

730.   Oglesby wants his TMs trained on as many processes as possible so he can rotate them around.  (Oglesby Dep., pp. 120-21).

731.   As GL, Oglesby will consult with his TMs about training plans that are developed for each TM.  (Oglesby Dep., p. 123).

732.   As GL, Oglesby will sign off on a TM's daily training plan after observing to make sure they are performing as indicated.  (Oglesby Dep., p. 125).

733.   As GL, if a TM has a quality or performance problem, Oglesby can send them back for additional training.  (Oglesby Dep., p. 124).

734.   As GL, Oglesby verifies that his TMs are at the level represented on the Circle of Skills.  (Oglesby Dep., pp. 122-23).

735.   Oglesby will observe the TL performing the process to make sure they are at their level indicated.  (Oglesby Dep., pp. 122-23).

736.   As GL, Oglesby reviews the performance of each TM to ensure the accuracy of the Circle of Skills document before signing off on it.  (Oglesby Dep., p. 124).

737.   If a quality issues leaves his group and is found by Audit, then he completes a 5 why form.  (Oglesby Dep., p. 108).

738.   It is important to provide TMs feedback so problems do not reoccur. (Oglesby Dep., p. 115).

739.   Oglesby evaluates the performance of TMs and TLs in his group. (Oglesby RFA #6).

740.   Oglesby prepares performance evaluations for TM and TLs in his group once a year.  (Oglesby Dep., p. 132).

741.   On the performance evaluation, Oglesby bases his satisfactory or not satisfactory rating on his observations of the TM's work performance.  (Oglesby Dep., pp. 133-34).

742.   If Oglesby gives a TM or TL a not satisfactory in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

743.   Under the current position development steps, Oglesby includes suggestions for the TM's development.  (Oglesby Dep., p. 134).

744.   Oglesby rates whether a TM needs development or is ready for the next level.  (Oglesby Dep., pp. 134-35; Oglesby RFA #7).

745.   If Oglesby checked that the TM needs development, the TM would not be considered for promotion.  (Oglesby Dep., p. 135).

746.    Oglesby's recommendation as to whether a TL or TM is ready for promotion is given consideration and normally is followed in determining if the TL or TM will be promoted.  (Jones Decl. ¶¶ 31-32).

747.    Oglesby manages attendance in his group and ensures that his group is properly staffed.  (Oglesby RFA #3).

748.    Oglesby manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Oglesby RFA #4).

749.    As GL, Oglesby keeps track of the attendance of his group and enters time for his TMs.  (Oglesby Dep., p. 65).

750.    Oglesby usually enters times for his TMs and TLs after the shift ends. (Oglesby Dep., p. 76).

751.    As GL, Oglesby determines how to classify an absence based on MBUSI's policy.  (Oglesby Dep., pp. 125-26).

752.    Oglesby approves vacation based on MBUSI's policy.  (Oglesby Dep., p. 126).

753.    As GL, Oglesby can move TMs around between teams in his group. (Oglesby Dep., p. 63).

754.    Oglesby ensures that his group is working safely and he monitors the environment for safety hazards.  (Oglesby RFA #17).

755.   Oglesby sees to it that his TMs comply with MBUSI safety policies and procedures. (Oglesby Dep., p. 103).

756.   If a TM violates a safety policy, Oglesby will first counsel the TM, then document it, and if it continues, escalate the issue to his AM and the AM will determine whether a CPR is necessary.  (Oglesby Dep., pp. 103-04).

757.   As GL, Oglesby will complete a Stop Audit card to highlight a safety issue.  (Oglesby Dep., pp. 83-84).

758.   As GL, Oglesby accounts for his TMs in the event of a severe weather incident or evaluation.  (Oglesby Dep., p. 48).

759.   If there is an injury, Oglesby calls Safety, he stays with the TM until Medical gets involved and then he prepares a report regarding the injury.  (Oglesby Dep., pp. 104-05).

760.   In the report, they will document the injury and develop a countermeasure.  (Oglesby Dep., pp. 105-06).

761.   As GL, Oglesby makes sure that TMs work within restrictions provided by Medical.  (Oglesby Dep., p. 127).

762.   The only reasons why Oglesby does not believe he manages his group are because he does not set quality standards and in many instances, he must consult with his AM on decisions.  (Oglesby Dep., pp. 145-46).

### J.   KELLY PITMAN

763.   Kelly Pitman ("Pitman") began employment at MBUSI in 1997. (Pitman Dep., pp. 14, 17, 20).[27]

764.   On September 6, 2004, Pitman was promoted to GL of Door Line, Plant 2.  (Pitman Dep., pp. 20-21, 23-24; Pitman Dep. Ex. 1).

765.   In January, 2005, Pitman became GL for Assembly, Plant 2, Final 4. (Pitman Dep., p. 25; Banta Decl. ¶ 6).[28]

766.   On September 1, 2006, Pitman became Acting AM for Assembly, Plant 2.   (Pitman Dep., p. 124; Banta Decl. ¶ 7; Banta Decl. Ex. B (LEAD Evaluation 2007, p. 2)).

767.   On March 1, 2007, Pitman was promoted to AM, Assembly, Plant 2. (Pitman Dep., p. 29; Banta Decl. ¶ 8; Banta Decl. Ex. C (Transaction Notice)).

768.   In September, 2007, Pitman transferred to AM, Supplier Quality Engineering, where he worked until he resigned from employment with MBUSI on March 21, 2008.  (Pitman Dep., pp. 14, 30; Banta Decl. ¶¶ 9-10; Banta Decl. Ex. D (Resignation Letter)).

---

[27]     The Deposition of Kelly Pitman and exhibits to the deposition are attached as Ex. 39 to MBUSI's Evidentiary Submission (Volume 4).

[28]     The Declaration of Valerie Banta is attached as Ex. 25 to MBUSI's Evidentiary Submission (Volume 2).

769.   As a GL, Pitman earned at least $455.00 per week in salary.  (Pitman RFA #41).[29]

770.   As the GL for Final Line, Pitman had approximately 14 to 16 TMs and TLs in his group.  (Pitman Dep., pp. 26-27).

771.   As a GL, Pitman supervised the TMs and TLs in his group.  (Pitman RFA #1).

772.   When he worked at MBUSI and someone asked him what he did, he probably referred to himself as a supervisor.  (Pitman Dep., p. 117).

773.   A Manager or AM was not always present in his group, and he led his group independently of his Manager or AM.   (Pitman Dep., pp. 27-28; Pitman RFA #33).

774.   He took control of situations in his area that arose when the AM was absent.  (Pitman RFA #32).

775.   He gave work directions and assignments to the members of his group.  (Pitman RFA #2).

776.   He directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Pitman RFA #5).

---

[29]     Pitman Responses to Requests for Admission are attached as Ex. 40 to MBUSI's Evidentiary Submission (Volume 4).

777.   As a GL, he performed duties that differed from those performed by the TMs in his group.  (Pitman Dep., p. 134; Pitman RFA #34).

778.   He was not assigned to a station.  (Pitman Dep., p. 94).

779.   Not everyone could walk up and down the line, but GLs could. (Pitman Dep., p. 95).

780.   Pitman testified that his primary duties as a GL were to observe TMs and inspect the vehicles.  (Pitman Dep., p. 28).

781.   Pitman testified that he spent the first hour of production inspecting the quality of vehicles, spent the second hour of production walking the line and talking with his TMs, and spent the majority of the rest of the day inspecting the quality of vehicles and responding to line calls by TMs.  (Pitman Dep., pp. 34-35, 58-60).

782.   Pitman testified that he spent at least 75% of the day inspecting quality and feeding back quality issues to the TMs.  (Pitman Dep., pp. 59, 72-73).

783.   MBUSI held him responsible for the operation of his group at all times including when he was checking quality.  (Pitman Dep., p. 130).

784.   Pitman observed TMs while he inspected quality.  (Pitman Dep., p. 63).

785.   He was not stationed in one particular spot 75% of the day while checking quality, and he might check it at the end of his area or somewhere else. (Pitman Dep., p. 73).

786.   Inspecting quality allowed him to know if there was a quality issue and that he needed to observe the TMs.  (Pitman Dep., pp. 63-64).

787.   When he found a quality issue, he investigated the issue to find out if the problem was with a part or with a TM's performance.  (Pitman Dep., pp. 63-64, 72).

788.   To investigate the issue, he observed the TMs perform at their stations and asked the TMs questions.  (Pitman Dep., pp. 64, 71-72).

789.   If Pitman found by observing that the problem was with a part then he would escalate the issue to Supplier Quality, and if the problem was because of a TM's performance, he would feed that back to the TM.  (Pitman Dep., pp. 64-65, 69).

790.   Part of Pitman's observation of his TMs was to see if they were following the process.  (Pitman Dep., p. 70).

791.   When he observed them, he had the SMPs and JESs in front of him and would watch the TMs to see that they followed the SMPs and JESs step by step.  (Pitman Dep., pp. 70-71, 78).

792.   If they did not follow the process, he would inform them of that. (Pitman Dep., p. 71).

793.   Pitman documented when TMs did not follow processes, and if they continued to not follow the processes, he would consult with the AM about the next step.  (Pitman Dep., pp. 75, 79).

794.   The AM would tell him to call HR and to start a CPR.  (Pitman Dep., p. 75).

795.   As part of his observation of TMs, Pitman made sure TMs were following directions and standards that he communicated to them.  (Pitman Dep., p. 68).

796.   He was responsible for observing TMs and making sure they followed the standards in the shop.  (Pitman Dep., p. 74).

797.   If the TMs did not follow the standards, he would address it with the TMs, tell them what the standards were, and tell them that the company expected them to follow the SMP exactly.  (Pitman Dep., p. 74).

798.   If they did not follow the standard, they were in violation of the policies and procedures of MBUSI.  (Pitman Dep., p. 74).

799.   Pitman counseled TMs and TLs on performance, quality of work and conduct.  (Pitman RFA #9).

800.   He ensured that company policies and work rules were enforced in his group.  (Pitman Dep., p. 131; Pitman RFA #14).

801.   When Pitman observed TMs and informed them that they were not following SMPs, the natural result was that he ensured company policies were followed.  (Pitman Dep., p. 78).

802.   When Pitman walked up and down the line and observed his TMs, he made sure they were doing well.  (Pitman Dep., p. 95).

803.   When there was downtime, he informed the TMs as to what needed to be done.  (Pitman Dep., p. 135).

804.   He observed them to make sure they did what they were supposed to do during downtime, and if they did not do what they were supposed to do, he would address it.  (Pitman Dep., pp. 135-36).

805.   Pitman ensured that his group worked safely, and he monitored the environment for safety hazards.  (Pitman RFA #17).

806.   When he was observing his TMs, he would check to make sure they were wearing the appropriate PPE and were not in awkward ergonomic situations. (Pitman Dep., pp. 92-94).

807.   When he had a TM injured on the job, he took them to the Medical Department.  (Pitman Dep., p. 65).

808.   He and the AM would investigate the incident to find out what happened and to prevent it from happing again.  (Pitman Dep., p. 66).

809.   They would ask the TM what happened.  (Pitman Dep., p. 65).

810.   He would go to the site of the occurrence and review with the TM and the witnesses what happened.  (Pitman Dep., pp. 65-66).

811.   He would work with Process Engineering to find a solution for how to prevent the occurrence from happening again.  (Pitman Dep., p. 66).

812.   If there needed to be a change in process, several people, including Pitman, Engineering, Safety and Managers would be involved.  (Pitman Dep., pp. 66-67).

813.   As a countermeasure to the incident happening again, Pitman shared with the group what happened and what had been done to prevent its reoccurrence. (Pitman Dep., pp. 67-68).

814.   Every day, Pitman read the daily turnover log from the prior shift and prepared his own turnover log for his group.  (Pitman Dep., pp. 34-37).

815.   On the turnover log, the GLs reported on SQDCM, including safety issues, quality issues, parts issues, whether they met their production numbers for the day, overtime worked, scrap incurred and attendance for the group.  (Pitman Dep., pp. 36, 41).

816.   Every day, Pitman checked the quality issues that came from his group the day before.  (Pitman Dep., pp. 34, 36-37).

817.   For the major quality issues, Pitman tried to determine the cause of the issue by observing the TMs to see if they were following the SMP and if they were not, he informed them they needed to follow the SMP.  (Pitman Dep., pp. 39-40).

818.   "[Pitman's] job was to ensure that the team member was following the SMP, JES."  (Pitman Dep., p. 40).

819.   Following the SMP ensured quality.  (Pitman Dep., p. 41).

820.   If the quality issue was not caused by the TM, Pitman involved the appropriate persons outside of his group, such as Process Engineering or Supplier Quality.  (Pitman Dep., p. 40).

821.   In investigating quality issues, Pitman used the four-Ms:   man, material, machine, method.  (Pitman Dep., p. 40).

822.   Pitman ensured that quality and production goals were met in his group.  (Pitman RFA ##13 & 22).

823.   Pitman also reported SQDCM on a board in the team center to communicate to the TMs in his group the SQDCM issues.  (Pitman Dep., pp. 41-42).

824.   Pitman annually evaluated the performance of TMs and TLs in his group.  (Pitman Dep., p. 42; Pitman RFA #6).

825.   Pitman evaluated whether TMs met SMPs and also certain measurements based on his observation of the TMs.  (Pitman Dep., pp. 42-43).

826.   If Pitman rated a TM or TL as not satisfactory in any area of the evaluation other than attendance, the TM or TL was not eligible for promotion.  (Jones Decl. ¶ 33).

827.   Pitman provided an opinion as to whether TMs and TLs in his group were ready for promotion and that opinion is a factor in the decision as to whether the TM or TL will be promoted.  (Pitman Dep., pp. 43-44; Pitman RFA ##8 & 9).

828.   Pitman's opinion as to whether TMs and TLs in his group were ready for promotion was given consideration and normally was followed.  (Jones Decl. ¶¶ 31-32).

829.   Pitman does not recall any TM or TL being promoted without him recommending the TM or TL for the next level.  (Pitman Dep., p. 44).

830.   Pitman showed and supported top performance in his group.  (Pitman Dep., p. 123; Pitman RFA #29).

831.   It was important to him to develop the TMs in his group because it helped the company.  (Pitman Dep., p. 117).

832.   Pitman managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Pitman Dep., pp. 44-45; Pitman RFA #4).

833.   Pitman inputted time into the system for his group, and he signed off on time sheets for temporary employees to confirm the employees worked the time that was recorded.  (Pitman Dep., p. 85).

834.   He documented TMs that did not show up to work and informed managers and HR when TMs abused the MBUSI system or policies.   (Pitman Dep., pp. 44-45).

835.   TMs submitted vacation requests to Pitman, and he approved them according to MBUSI policy.  (Pitman Dep., p. 45).

836.   When a TM had a certain number of absences or tardies, the TM would receive occurrences under the attendance policy.  (Pitman Dep., p. 46).

837.   Pitman tracked those occurrences, and when the TM had a certain number of occurrences, Pitman would initiate a CPR.  (Pitman Dep., pp. 45-47).

838.   As a GL, Pitman had the authority to initiate a CPR on a TM when he deemed necessary.  (Pitman RFA #10).

839.   Pitman presented the CPR to the TM with the AM and HR present. (Pitman Dep., pp. 47-48).

840.   Pitman kept individual files for the TMs in his group with items such as attendance, occurrences, doctor excuses, medical information, disciplinary actions and performance related issues.  (Pitman Dep., p. 128).

841.   Pitman managed attendance in his group and ensured that his group was properly staffed.  (Pitman RFA #3).

842.   He used the board on which he tracked attendance and the attendance policies to help him determine if he would be short on manpower.  (Pitman Dep., pp. 51-52).

843.   Every day, Pitman checked to see if any TMs in his group called off of work and compared it to the attendance board to know if there were any unexpected absences or tardies in his group.  (Pitman Dep., pp. 34, 52).

844.   Pitman could shift manpower around his group (i.e., TMs from team to team) as long as the TMs were trained at the proper level in the Circle of Skills training plan.  (Pitman Dep., pp. 82-84).

845.   Every morning, Pitman met with the GLs and AMs to discuss manpower, quality issues, the focus of the day (meaning where trends were going and how they needed to resolve them) and what actions they were to take during the shift to achieve what MBUSI wanted to be achieved.  (Pitman Dep., pp. 34, 53-56).

846.   The GLs including Pitman would provide information about the manpower in each of their groups to the AMs so that the AMs could move TMs among groups if needed.  (Pitman Dep., pp. 54-55).

847.   Pitman would take the information from the meeting with the AMs and GLs and relay it to his group in a daily start-up meeting.  (Pitman Dep., pp. 34, 56).

848.   After Pitman communicated the direction for the day to his group, he would observe his TMs to ensure they were following the direction.  (Pitman Dep., p. 56).

849.   If a TM was not performing correctly, he would provide feedback to the TM.  (Pitman Dep., p. 56).

850.   Pitman also discussed SQDCM with his group in the daily start-up meeting that he conducted.  (Pitman Dep., p. 57).

851.   Pitman initiated, facilitated and monitored problem solving in his group.  (Pitman RFA #12).

852.   Pitman initiated continuous improvement activities in his group and led the implementation of initiatives in his group.   (Pitman Dep., pp. 116-17; Pitman RFA #16).

853.   He shared his knowledge and experience with the group.  (Pitman Dep., p. 123; Pitman RFA #30).

854.   Pitman could write or revise SMPs and JESs.  (Pitman Dep., p. 79).

855.   If he felt a process needed to be changed, he called the Process Engineers because they knew the impact of the change.  (Pitman Dep., p. 80).

856.   No process change was made in Pitman's group unless Pitman signed off on it.  (Pitman Dep., p. 81).

857.   Pitman testified that the only time he worked a process on the line was if there was a trial on a new process or he would have to fill in because there was a manpower issue and no TMs or TLs were available.  (Pitman Dep., pp. 88-92).

858.   Pitman stated that GLs performed trials on new processes to see if the process was capable of being done in a certain amount of time "because if the group leader can do it, it's doable because group leaders don't do it every day -- every process every day."  (Pitman Dep., p. 90).

859.   Pitman does not know and cannot estimate how often he performed a process.  (Pitman Dep., pp. 88, 92).

860.   As a GL, Pitman could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Pitman RFA #19).

861.   For a TM in Pitman's group to be able to work alone, Pitman had to verify based on his observation that the TM met all the criteria in the Circle of Skills four step training plan.  (Pitman Dep., p. 82).

862.   Pitman handled employee issues and conflicts in his group and decided when to involve higher management or Team Relations in an employee issue or conflict.  (Pitman Dep., pp. 131-33; Pitman RFA #18).

863.   He led his group in meeting company standards; he led change in his group; and he used leadership skills in his job.  (Pitman RFA #25).

864.   He thought strategically and established direction for his group. (Pitman RFA #27).

865.   He made decisions about his group and carried out plans for his group.  (Pitman Dep., pp. 115-16; Pitman RFA #35).

866.   Pitman fulfilled all of the roles and responsibilities of his position as a GL, and he used his best judgment in performing all his GL job duties.  (Pitman RFA ##23 & 24).

867.   The reason Pitman believes he was not a management employee at MBUSI is because he applied company policy.  (Pitman Dep., p. 101).

## K.   FREDERICK RODGERS

868.   Frederick Rodgers ("Rodgers") **admitted in Response to a Request for Admission that he was properly classified under the FLSA as an exempt employee.**[30]  (Rodgers RFA #43).[31]

869.   Rodgers began employment at MBUSI in March, 1997 as a TM in Assembly.  (Rodgers Dep., p. 13).[32]

870.   Around 1999, Rodgers was promoted to TL.  (Rodgers Dep., p. 17).

871.   On February 4, 2008, Rodgers was promoted to GL for the Final 3 Line and his group included three TLs and seventeen TMs.  (Rodgers Dep., pp. 18, 51; Rodgers Dep. Ex. 5).

872.   Rodgers was GL on Final 3 Assembly for three years, was on the Pilot Team for eighteen months, returned to Final 3 as GL for two years, and has been GL for Final 2 Line since 2009.  (Rodgers Dep., pp. 15-16).

873.   On the Final 2 Line, Rodgers' group has thirty-one TMs and five TLs and on the Final 3 Line, Rodgers' group had three TLs and seventeen TMs. (Rodgers Dep., p. 18).

---

[30]      As mentioned above in footnote no. 8, some plaintiffs, like Crowley and Rodgers, did not expressly admit that they were properly classified under the FLSA as an exempt employee, but also did not deny it or state in detail why they could not admit or deny it.  By operation of Rule 36(a)(4), such responses are deemed to be admitted.

[31]      Rodgers Responses to Requests for Admission are attached as Ex. 190 to MBUSI's Evidentiary Submission (Volume 15).

[32]      The Deposition of Frederick Rodgers and exhibits to the deposition are attached as Ex. 191 to MBUSI's Evidentiary Submission (Volume 15).

874.   Rodgers attended Group Leader Academy.  (Rodgers Dep., p. 20).

875.   Rodgers attended the Group Leader Self Sufficiency Program in which they were taught about the MPS system, how MBUSI works, and various processes.  (Rodgers Dep., p. 189).

876.   Rodgers also had training regarding civil treatment, communication skills and leadership skills.  (Rodgers Dep., pp. 190-91).

877.   Rodgers earns at least $455.00 per week salary.  (Rodgers RFA #41).

878.   Rodgers' response to MBUSI's requests for admissions which states that information is in the possession of defendant's attorneys refers to his declaration.  (Rodgers Dep., pp. 47-48).

879.   Rodgers' declaration was truthful at the time he gave it.  (Rodgers Dep., p. 39; Rodgers Dep. Ex. 3).

880.   Rodgers' primary duty as GL is supervision and management of his group.  (Rodgers Dep. Ex. 3, ¶ 5).

881.   The supervision and management of Rodgers' group is his most time consuming and important job duty.  (Rodgers Dep. Ex. 3, ¶ 5).

882.   At all times, Rodgers remains responsible for the operations of his group.  (Rodgers Dep. Ex. 3, ¶ 8).

883.   Rodgers spends more of his time supervising and managing his group than performing any other duties.  (Rodgers RFA #39).

884.   Rodgers thinks strategically and establishes direction for his group. (Rodgers RFA #27).

885.   Rodgers leads change in his group.  (Rodgers RFA #28).

886.   Rodgers shows and supports top performance in his group.  (Rodgers RFA #29).

887.   Rodgers takes control of situations in his area that arise when his AM is absence.  (Rodgers RFA #32).

888.   Rodgers leads his group independently of his Manager and AM. (Rodgers RFA #33).

889.   Rodgers performs duties that differ from those performed by the TMs in his group.  (Rodgers RFA #34).

890.   Rodgers makes decisions about his group and carries out plans for his group.  (Rodgers RFA #35).

891.   Rodgers' management duties also include vacation scheduling, time keeping and recording, keeping track of attendance and other such personnel duties for his group.  (Rodgers Dep. Ex. 3, ¶ 13).

892.   As GL, Rodgers updates attendance calendars on TMs.   (Rodgers Dep., p. 27).

893.   As GL, Rodgers keeps up with vacation scheduling and makes sure the schedule meets the Company policy.  (Rodgers Dep., p. 29).

894.   Rodgers keeps track of whether a TM receives an occurrence under the attendance policy.  (Rodgers Dep., p. 107).

895.   Rodgers uses judgment and discretion to resolve quality problems and decide what countermeasures should be implemented.  (Rodgers Dep. Ex. 3, ¶ 14).

896.   Rodgers makes sure that his TMs are following the SMPs.  (Rodgers Dep., p. 66).

897.   Rodgers is responsible for the performance of his group.  (Rodgers Dep., p. 69).

898.   When Rodgers is notified of a quality defect, he will trace it back to the TM involved and try to correct it with that TM.  (Rodgers Dep., pp. 113-14).

899.   Rodgers keeps a quality tracking sheet for each one of his TMs and he will learn of a quality defect from Quality, find out which TM is involved, talk with the TM, and document the defect on the sheet.  (Rodgers Dep., pp. 116-17).

900.   If a TM has continuing quality defects, Rodgers will write up a CPR. (Rodgers Dep., p. 119).

901.   During the day, Rodgers observes the TMs in his group.  (Rodgers Dep., p. 93).

902.   Rodgers observes his TMs to make sure they are following the SMPs. (Rodgers Dep., pp. 160-61).

903.   Rodgers communicates with other GLs and AMs to coordinate production and to collaborate as to how to address production issues and improve production.  (Rodgers Dep. Ex. 3, ¶ 18).

904.   Rodgers manages his group with infrequent instruction and direction by his AM or Manager unless there is a problem and he needs additional assistance.  (Rodgers Dep. Ex. 3, ¶ 19).

905.   Rodgers supervises the TLs and TMs in his group.   (Rodgers RFA #1).

906.   Rodgers gives work directions and assignments to members of his group.  (Rodgers RFA #2).

907.   Rodgers manages attendance in his group and ensures that his group is properly staffed.  (Rodgers RFA #3).

908.   Rodgers manages vacation scheduling, time keeping and attendance tracking for the members of his group.  (Rodgers RFA #4).

909.   Rodgers directs his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency training and team harmony.  (Rodgers RFA #5).

910.   Rodgers evaluates the performance of his TMs and TLs in his group, provides an opinion as to whether they are ready for promotion, and his opinion is one factor considered in promotion decisions.  (Rodgers RFA ##6, 7, 8).

911.  Rodgers prepares performance evaluations for TMs in his group. (Rodgers Dep., pp. 124-25).

912.  Rodgers evaluates how the TM measures up against the performance criteria and whether they are satisfactory or not satisfactory in each category. (Rodgers Dep., pp. 125-26).

913.  If Rodgers gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).

914.  A TM must receive a satisfactory evaluation to be eligible for promotion.  (Rodgers Dep., pp. 128-29).

915.  Rodgers' opinion as to whether TMS and TLs in his group are ready for promotion is given consideration and normally is followed in determining if the TL or TM will be promoted.  (Jones Decl. ¶¶ 31-32).

916.  Rodgers counsels TMs and TLs on performance, quality of work and conduct when appropriate.  (Rodgers RFA #9).

917.  Rodgers counsels his TMs on their performance and decides whether to use verbal counseling, documentation of a repetitive problem or a correction performance review.  (Rodgers Dep. Ex. 3, ¶ 7).

918.  Rodgers has authority to initiate a corrective performance review when he deems necessary.  (Rodgers RFA #10).

919.   Rodgers is responsible for the operation of his group at all times while on duty.  (Rodgers RFA #11).

920.   Rodgers initiates, facilitate and monitors problem solving in his group.  (Rodgers RFA #12).

921.   Rodgers ensures that Company policies and work rules are enforced in his group.  (Rodgers RFA #14).

922.   Rodgers ensures the development of TMs in his group through performance evaluations, training, feedback and coaching.  (Rodgers RFA #15).

923.   Rodgers will make notes about ways a TM can further develop their skills.  (Rodgers Dep., p. 126).

924.   As GL, Rodgers reviews the training plan to make sure it is correct. (Rodgers Dep., pp. 29-30).

925.   As GL, Rodgers makes sure enough TLs are trained in enough stations in his group so that all of the stations can be covered.  (Rodgers Dep., p. 30).

926.   Rodgers initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Rodgers RFA #16).

927.   Rodgers ensures that his group works safely and monitors the environment for safety hazards.  (Rodgers RFA #17).

928.   As GL, Rodgers makes sure that TMs with restrictions work within those restrictions.  (Rodgers Dep., pp. 105-06).

929.   When there is an injury in Rodgers' group, he completes an MPS sheet, finds out what was the root cause of the injury and develops a countermeasure along with Safety and other management personnel.  (Rodgers Dep., pp. 77-78).

930.   Rodgers handles employee issues and conflicts in his group and decides when to involve higher management or MBUSI Team Relations Department.  (Rodgers RFA #18).

931.   Rodgers can direct training and retraining in skills for TMs in his group and does so if he deems appropriate.  (Rodgers RFA #19).

932.   Rodgers is responsible for keeping his group enthusiastic, motivated and focused.  (Rodgers RFA #20).

933.   Rodgers takes steps to be sure that his group meets its production goals.  (Rodgers RFA #22).

934.   Rodgers uses his best judgment in performing all of his duties as GL. (Rodgers RFA #23).

935.   Rodgers fulfills all the roles and responsibilities of his position as GL at MBUSI.  (Rodgers RFA #24).

936.   As GL, Rodgers is the leader of his group and uses leadership skills in his job.  (Rodgers RFA #25).

937.   Rodgers leads his group in meeting Company standards.   (Rodgers RFA #26).

938.   Rodgers checks the plantwide call-in number.  (Rodgers Dep., p. 28).

939.   At the start of the shift, Rodgers goes to a GLs' meeting with the Managers and AMs and they go over the issues from the prior day, the issues they expect to face during the day and how those should be handled.  (Rodgers Dep., pp. 89-90).

940.   Rodgers then goes back to the Team Center, leads a meeting with the TMs in his group and passes on that information.  (Rodgers Dep., pp. 27-28, 91).

941.   Rodgers will attend lunch box meetings for GLs where they will discuss Company policies.  (Rodgers Dep., pp. 97-98).

942.   Rodgers is not normally assigned to work a station as GL.  (Rodgers Dep., p. 75).

943.   Rodgers has never requested authorization for overtime and been denied such paid.  (Rodgers RFA #42).

944.   Since Mr. Taylor left MBUSI, Rodgers has been paid for any overtime that he worked.  (Rodgers Dep., p. 54).

945.   Rodgers agrees with his 2009 performance evaluation which states in part: "[Rodgers] has been able to adapt and manage a highly demanding area with little or no supervision."  (Rodgers Dep., p. 55; Rodgers Dep. Ex. 7).

### L.     TIMOTHY SWINDLE

946.   Timothy Swindle ("Swindle") **admitted in Response to a Request for Admission that he was properly classified under the FLSA as an exempt employee.**  (Swindle RFA #43).[33]

947.   Swindle began employment at MBUSI as a TM in Assembly on the Final Line in July, 1997.  (Swindle Dep., pp. 12, 21).[34]

948.   Swindle was a TM in Assembly on the Final Line for two years. (Swindle Dep., p. 24).

949.   Swindle was promoted to a TL position on the Final Line. and he received a pay raise when he became a TL.  (Swindle Dep., pp. 27-28).

950.   Swindle was next TL on the Project Team for approximately four years.  (Swindle Dep., p. 36).

951.   Swindle was promoted to GL on the Final 2 Line in Plant 2 in March, 2004.  (Swindle Dep., pp. 41-42, 53).

952.   As GL for the Final 2 Line, Swindle had four or five teams in his group, four or five TLs and twenty to twenty-five TMs.  (Swindle Dep., p. 55).

---

[33]     Swindle Responses to Requests for Admission are attached as Ex. 192 to MBUSI's Evidentiary Submission (Volume 15).

[34]     The Deposition of Timothy Swindle and exhibits to the deposition are attached as Ex. 193 to MBUSI's Evidentiary Submission (Volume 15).

953.   After about a year and a half as GL over the Final 2 Line, Swindle moved to GL over the Final 3 Line for approximately a year.  (Swindle Dep., p. 53).

954.   Swindle was moved from the Final 2 Line to the Final 3 Line in 2005 due to his organizational and problem solving skills and immediately showed positive results.  (Swindle Dep., p. 130; Swindle Dep. Ex. 6).

955.   As GL over Final 3 Line, Swindle had four or five teams, four or five TLs and twenty-six to thirty TMs in his group.  (Swindle Dep., p. 58).

956.   Swindle next was GL over the Door Line for about six months and his group had seven or eight teams, seven or eight TLs and forty to fifty TMs.  (Swindle Dep., pp. 53, 62).

957.   Swindle then was GL for Engine 1 Line, Plant 1 and his group had four to five teams, four to five TLs and fifteen to twenty-five TMs.  (Swindle Dep., pp. 54-55, 64).

958.   Swindle next was GL on the Final 1 Line for Plant 1 for approximately six months before he resigned his employment with MBUSI in January, 2008.  (Swindle Dep., pp. 15, 54).

959.   As GL for Final 1 Line, Plant 1, Swindle's group had four to five teams, four to five TLs and twenty-five to thirty TMs.  (Swindle Dep., p. 66).

960.   Swindle attended Group Leader Academy which lasted one or two weeks and he participated in the Group Leader Self Sufficiency Program. (Swindle Dep., pp. 46-48).

961.   As a GL at MBUSI, Swindle earned at least $455.00 per week in salary.  (Swindle RFA #41).

962.   Swindle supervised the TLs and TMs in his group.   (Swindle RFA #1).

963.   As GL, Swindle managed his group and complied with the roles and responsibilities set out on the Roles and Responsibilities Card except that he did not complete an annual plan.  (Swindle Dep., pp. 121-23).

964.   As GL, Swindle performed the duties set out on the essential functions of the GL's job description.  (Swindle Dep., p. 126; Swindle Dep. Ex. 4).

965.   Swindle admitted to spending more of his time at work supervising and managing his group than performing any other duties.  (Swindle RFA #39).

966.   Swindle's duties and responsibilities as a GL were different than those he had as a TM and TL.  (Swindle Dep., p. 49).

967.   As GL, Swindle would try to make sure his TMs were working as efficiently as possible.  (Swindle Dep., pp. 110-11).

968.   As GL, Swindle directed and tried to lead his group to achieve their SQDCM goals.  (Swindle Dep., p. 79; Swindle RFA #5).

969.   Swindle directed his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Swindle RFA #5).

970.   As GL, Swindle would respond to issues or problems that arose on the Line.  (Swindle Dep., p. 86).

971.   Swindle would attempt to solve problems within his group before going outside the group for help.  (Swindle Dep., pp. 88-89).

972.   As GL, if Swindle could not solve a problem himself within his own group, he would seek the assistance of his AM.  (Swindle Dep., p. 89).

973.   Swindle led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position.  (Swindle RFA ##25, 26 & 28).

974.   A Manager or AM was not always present in Swindle's group, and he led his group independently of his Manager or AM.  (Swindle RFA #33).

975.   Swindle took control of situations in his area that arose when his AM was absent.  (Swindle RFA #32).

976.   Swindle gave work directions and assignments to the members of his group.  (Swindle RFA #2).

977.   Swindle made decisions about his group and carried out his plans for the group.  (Swindle RFA # 35).

978.   Swindle shared his knowledge and experience with his group. (Swindle RFA #30).

979.   Swindle's duties differed from those performed by the TMs in his group.  (Swindle RFA #34).

980.   Swindle ensured that company policies and work rules were enforced in his group.  (Swindle RFA #14).

981.   Swindle handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in an employee issue or conflict.  (Swindle RFA #18).

982.   Swindle counseled TMs on performance, quality of work and conduct. (Swindle RFA #9).

983.   Swindle had the authority to initiate a CPR on a TM when he deemed necessary.  (Swindle RFA #10).

984.   Swindle managed attendance in his group and ensured that his group was properly staffed.  (Swindle RFA #3).

985.   Swindle managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Swindle RFA #4).

986.   As GL, Swindle tracked attendance for his TMs on a daily basis, determined if the absence was excused and initiated a CRP if it was necessary. (Swindle Dep., pp. 101-03).

987.   As GL, Swindle could approve vacation and emergency vacation requests for his TMs.  (Swindle Dep., p. 103).

988.   As GL, Swindle could adjust manpower within his own group. (Swindle Dep., p. 105).

989.   Swindle evaluated the performance of TMs and TLs in his group. (Swindle RFA #6).

990.   As GL, Swindle prepared performance evaluations for his TMs and TLs on an annual basis.  (Swindle Dep., p. 111).

991.   Swindle would rate his TMs and TLs as satisfactory or not satisfactory based on the performance criteria, list development skills, and state whether they needed development or were ready for the next level.  (Swindle Dep., pp. 111-15).

992.   If Swindle gave a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL was not eligible for promotion. (Jones Decl. ¶ 33).

993.   Swindle provided his opinion as to whether TMs and TLs in his group were ready for promotion and Swindle's opinion was given consideration and normally was followed in determining if the TL or TM was promoted.  (  (Swindle RFA #7; Jones Decl. ¶¶ 31-32).

994.   Swindle initiated, facilitated and monitored problem solving in his group.  (Swindle RFA #12).

995.   Swindle ensured that production and quality goals were met in his group.  (Swindle RFA ##13 & 22).

996.   If Swindle observed a TM incorrectly performing his job, he would correct them.  (Swindle Dep., p. 83).

997.   If there was a quality issue from his Line, Swindle would work to determine the root cause of the issue, determine a countermeasure and make sure the countermeasure was followed.  (Swindle Dep., pp. 98-99).

998.   As GL, when Swindle was checking quality, he maintained his other responsibilities.  (Swindle Dep., p. 90).

999.   Swindle initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Swindle RFA #16).

1000. Swindle ensured that his group was working safely and he monitored the environment for safety hazards.  (Swindle RFA #17).

1001. As GL, Swindle would work to ensure that his TMs complied with safety policies, corrected them if he noticed them not complying with safety standards and if there was a continual problem, he would initiate a CPR.  (Swindle Dep., pp. 92-93).

1002. As GL, if there was an accident, Swindle would work to develop a countermeasure and made sure the countermeasure was followed by his TMs. (Swindle Dep., p. 96).

1003. As GL, in the event of severe weather incentive or evaluation situation, Swindle was required to make sure his TMs were where they were supposed to be and take a head count.  (Swindle Dep., p. 51).

1004. Swindle directed training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Swindle RFA #19).

1005. As GL, Swindle would make sure that his TMs got the process training they needed to do their job.  (Swindle Dep., p. 100).

1006. As GL, Swindle would sign off on the Circle of Skills documents for his TMs and make sure they were capable of operating at the level indicated. (Swindle Dep., p. 101).

1007. As GL, Swindle developed training plans for his TMs and could send them back to have more training if necessary.  (Swindle Dep., p. 101).

1008. Swindle showed and supported top performance in his group. (Swindle RFA #29).

1009. Swindle used his best judgment in performing all of his GL job duties. (Swindle RFA #23).

1010. Swindle fulfilled all of the roles and responsibilities of his GL position.  (Swindle RFA #24).

1011. Before his shift started, Swindle would review the shift log for any issues that he would face, check emails, check call-ins to see if anyone had called in, update his attendance calendar, check the Line for proper stocking of parts, and do a safety walk through.  (Swindle Dep., pp. 73, 75-76).

1012. As GL, Swindle would daily update the SQDCM Board which was a visual aide to TMs so they could see what were the issues.  (Swindle Dep., pp. 74-75).

1013. As GL, Swindle had a meeting which would normally last fifteen to thirty minutes before his shift started where he was given information to pass along to his group in the morning meeting.  (Swindle Dep., pp. 68, 70).

1014. Swindle would then have a meeting with his group that he conducted in which he would convey information such as production numbers, quality numbers and safety numbers.  (Swindle Dep., pp. 70-71).

1015. As GL, Swindle attended lunch box meetings with HR where HR related subjects were covered.  (Swindle Dep., pp. 51, 69).

1016. During the course of his days as GL, Swindle would walk through his group and observes his TMs' job performance.  (Swindle Dep., p. 82).

1017. After his shift, Swindle would prepare a shift log.  (Swindle Dep., p. 77).

## M.    JASSEN TIDWELL

1018. Jassen Tidwell ("Tidwell") began employment at MBUSI on March 4, 1996 as a TM in the Paint Repair Group in Plant 1.  (Tidwell Dep., pp. 17-19).[35]

1019. Tidwell was promoted to TL in Paint Repair in 1998 and received a raise.  (Tidwell Dep., pp. 20, 33).

1020. Tidwell was promoted to GL in Paint on March 13, 2006.  (Tidwell Dep., pp. 47-48).

1021. Tidwell went through Group Leader Academy and received training about communication, HR policies, leadership, and problem solving.   (Tidwell Dep., pp. 49, 51-52).

1022. When Tidwell became GL, he had the Top Coat area which included Top Coat, Polish and Repair areas.  (Tidwell Dep., pp. 62-63).

1023. In Tidwell's group, Paint Repair TMs were off line and Top Coat and Polish TMs were on line.  (Tidwell Dep., p. 63).

1024. In Tidwell's group, the Top Coat Line included four TMs, including two TLs, the Polish Line included six TMs, including one TL, and Paint Repair had four TMs and a TL.  (Tidwell Dep., pp. 62-64).

1025. Tidwell's group covered an area at least two football fields in size. (Tidwell Dep., p. 65).

---

[35]    The Deposition of Jassen Tidwell and exhibits to the deposition are attached as Ex. 194 to MBUSI's Evidentiary Submission (Volume 15).

1026. Tidwell was demoted to TM in Assembly on March 14, 2008. (Tidwell Dep., p. 148).

1027. Tidwell took a voluntary buy-out and left MBUSI around December 16, 2008. (Tidwell Dep., pp. 12, 148-49).

1028. As a GL at MBUSI, Tidwell earned at least $455.00 per week in salary. (Tidwell RFA #41).[36]

1029. Tidwell supervised the TLs and TMs in his group. (Tidwell RFA #1).

1030. A Manager or AM was not always present in his group, and Tidwell led his group independently of his Manager or AM. (Tidwell RFA #33).

1031. Tidwell gave work directions and assignments to the members of his group. (Tidwell RFA #2).

1032. Tidwell directed his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony. (Tidwell RFA #5).

1033. Tidwell led his group in meeting company standards; he led change in his group; and he used leadership skills in his GL position. (Tidwell RFA ##25, 26 & 28).

1034. Tidwell shared his knowledge and experience with his group. (Tidwell RFA #30).

---

[36]   Tidwell Responses to Requests for Admission are attached as Ex. 195 to MBUSI's Evidentiary Submission (Volume 15).

1035. Tidwell initiated continuous improvement activities in his group and led the implementation of initiatives in his group.  (Tidwell RFA #16).

1036. Tidwell initiated, facilitated and monitored problem solving in his group.  (Tidwell RFA #12).

1037. Tidwell showed and supported top performance in his group. (Tidwell RFA #29).

1038. Tidwell used his best judgment in performing all of his GL job duties. (Tidwell RFA #23).

1039. Tidwell fulfilled all of the roles and responsibilities of his GL position.  (Tidwell RFA #24).

1040. Tidwell's primary duties as a GL in Paint Repair were meeting production targets, safety and quality.  (Tidwell Dep., p. 54).

1041. Tidwell's primary duties as a GL to meet production targets were to review the processes and spot check the TMs to make sure they were following the SMPs.  (Tidwell Dep., p. 85).

1042. As GL, to meet production targets, Tidwell would review the processes, watch the spot check at the end of the Line, and make sure the TMs were following the SMPs.  (Tidwell Dep., p. 54).

1043. As GL, Tidwell would move around to watch his different TMs. (Tidwell Dep., p. 65).

1044. If a TM was not following a SMP, Tidwell would talk with them and if there were reoccurrences, he would escalate it to the AM's attention. (Tidwell Dep., pp. 57-58).

1045. As GL, Tidwell encouraged his TMs to do the best job they could do. (Tidwell Dep., p. 60).

1046. As GL, Tidwell would let his TMs know if they were doing a good job. (Tidwell Dep., pp. 60-61).

1047. Another primary duty Tidwell had was safety.  (Tidwell Dep., pp. 85-86).

1048. Tidwell ensured that his group was working safely and he monitored the environment for safety hazards.  (Tidwell RFA #17).

1049. With respect to safety, Tidwell would discuss safety in the morning meetings, notify TMs of any safety instances and bring safety issues to their attention.  (Tidwell Dep., p. 86).

1050. When Tidwell observed his group, he would make sure they were working safely and wearing the appropriate PPE.  (Tidwell Dep., p. 86).

1051. If a TM or TL brought a safety issue to his attention, Tidwell would view it and then determine what needed to be done.  (Tidwell Dep., p. 97).

1052. As GL, Tidwell would do a daily safety check.  (Tidwell Dep., p. 98).

1053. As GL, one of Tidwell's primary duties was quality and he would watch his TMs and make sure they were following the SMPs to ensure quality. (Tidwell Dep., pp. 99-100).

1054. Tidwell ensured that production and quality goals were met in his group.  (Tidwell RFA ##13 & 22).

1055. If there were quality issues, Tidwell would do verbal counseling, but if there were reoccurring problems for which further correction was needed, he would escalate it to his AM.  (Tidwell Dep., p. 100).

1056. With respect to his duties regarding quality, Tidwell would observe his TMs and if they were not having good quality he would talk with them on the Line, and then sometimes he and the AM would have "sit-downs" with them and if necessary give them a CPR.  (Tidwell Dep., p. 109).

1057. Additionally, as GL, Tidwell would do spot checks to make sure his TMs were not having quality issues.  (Tidwell Dep., p. 110).

1058. As GL, Tidwell presented continuous improvement ideas, but he could not do it by himself.  (Tidwell Dep., pp. 157-58).

1059. As GL, Tidwell could present his ideas about problem solving, but he had to work with others to make it happen.  (Tidwell Dep., pp. 158-59).

1060. As GL, Tidwell would have ideas for improvement in his group and bring them to the attention of the AM and Engineering.  (Tidwell Dep., pp. 111-12).

1061. If an SMP was changed, Tidwell would notify the TMs in a morning meeting and then he, the Engineer and the TLs would work with the TMs until they were comfortable with the change.  (Tidwell Dep., p. 84).

1062. As GL, Tidwell would complete turnover logs. (Tidwell Dep., p. 114).

1063. As GL, Tidwell would review the prior shift's turnover log and inform his group in the morning meeting of any issues.  (Tidwell Dep., pp. 115-16).

1064. Tidwell could direct training and retraining in skills for TMs in his group, and he did so if he deemed appropriate.  (Tidwell RFA #19).

1065. Tidwell evaluated the performance of TMs and TLs in his group. (Tidwell RFA #6).

1066. When filling out a performance evaluation for a TM, Tidwell would put his comments on the form, review it with his AM, and then they would decide together on the rating of satisfactory and not satisfactory.  (Tidwell Dep., pp. 119-20).

1067. If Tidwell gave a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL was not eligible for promotion. (Jones Decl. ¶ 33).

1068. Tidwell would also include comments on the form regarding development steps the TM could take.  (Tidwell Dep., p. 120).

1069. Tidwell provided his opinion as to whether or not TMs and TLs in his group were ready for promotion.  (Tidwell RFA #7).

1070. On the evaluation form Tidwell would mark whether a TM was ready for the next level and include his comments.  (Tidwell Dep., pp. 121-22).

1071. Tidwell's recommendation as to whether a TL or TM was ready for promotion was given consideration and normally was followed in determining if the TL or TM was promoted.  (Jones Decl. ¶¶ 31-32).

1072. Tidwell managed attendance in his group and ensured that his group was properly staffed.  (Tidwell RFA #3).

1073. Tidwell managed vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Tidwell RFA #4).

1074. As GL, Tidwell would keep an attendance calendar for each TM. (Tidwell Dep., p. 103).

1075. On the attendance calendar, Tidwell would keep up with whether the absence was excused or unexcused and the number of occurrences.  (Tidwell Dep., pp. 103-04).

1076. On attendance issues, Tidwell would have HR do a spot check on the gate records to make sure that the TM had not been present on the dates he had

them marked out with occurrences, he would get with his AM and then they would issue a CPR to the TM.  (Tidwell Dep., pp. 106-08).

1077. Tidwell ensured that company policies and work rules were enforced in his group.  (Tidwell RFA #14).

1078. Tidwell handled TM issues and conflicts in his group and decided when to involve higher management or Team Relations in an employee issue or conflict.  (Tidwell RFA #18).

1079. Tidwell counseled TMs on performance, quality of work and conduct. (Tidwell RFA #9).

1080. Tidwell also had the authority to initiate a CPR on a TM when he deemed necessary.  (Tidwell RFA #10).

1081. Eighty percent of the TMs in Tidwell's group received CPRs that were based on input from him.  (Tidwell Dep., p. 145).

1082. As GL, probably about three out of five days a week, there would be an occasion when Tidwell would have to take on the responsibility of a TL due to manpower issues.  (Tidwell Dep., p. 68).

1083. Once a week, Tidwell might have had to actually work a station for a rotation or up to half a day.  (Tidwell Dep., p. 71).

1084. This would usually be an emergency situation.  (Tidwell Dep., p. 71).

1085. Even when Tidwell would have to fill in for a TM or for a TL, he would maintain his GL duties.  (Tidwell Dep., p. 172).

## III.   <u>ARGUMENT</u>

In a FLSA exemption case, how an employee spends his time is a question of fact for a jury, but whether the employee's particular activities make him exempt is a question of law for the Court.  See <u>Icicle Seafoods, Inc. v. Worthington</u>, 475 U.S. 709, 714 (1986).  When the material facts are not genuinely in dispute, summary judgment is appropriate.  See <u>Gregory v. First Title of Am., Inc.</u>, 555 F.3d 1300, 1301 (11th Cir. 2009) (affirming summary judgment).  For the purpose of this motion, MBUSI relies solely on plaintiffs' own description of their duties. Thus, there is no need for a jury to determine their duties; rather, the only issue is whether those duties, as described by plaintiffs, make them exempt.

### A.   **Plaintiffs Are Employed By MBUSI In An Executive Capacity.**

An individual is employed in a bona fide executive capacity and thus exempt from overtime pay requirements if (1) he is compensated on a salary basis at a rate of not less than $455 per week; (2) his primary duty is management of the enterprise or a customarily recognized department or subdivision thereof; (3) he customarily and regularly directs the work of two or more other employees; and (4) he has the authority to hire or fire other employees or his suggestions or recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.   29 C.F.R.

§ 541.100.  It is undisputed that MBUSI designed the GL job to be exempt, and plaintiffs' testimony proves they are exempt under the executive exemption.

### 1. Five Plaintiffs Admitted In Response To A Request For Admission That They Are Exempt Employees.

Plaintiffs Michael Crowley, Floyd Franklin, Timothy Swindle, Fred Rodgers and Penny Kessler all underlined(admitted in response to a request for admission that they were properly classified as exempt employees under the FLSA).  Therefore, it makes no difference what these plaintiffs may say about their job duties now.  As Judge Thompson in the U.S. District Court for the Middle District of Alabama found in the case Jacobs v. Elect. Data Sys. Corp., No. 2:05CV925, 2006 WL 3742202, at *3 (M.D. Ala. Dec. 18, 2006), Rule 36 admissions are conclusive as to the matters admitted and cannot be overcome at the summary judgment stage by other evidence.  It does not matter if the admissions are express or by default, they conclusively resolve the matter admitted.  Id.  If this case were to proceed to trial, the plaintiffs should not be permitted to introduce evidence to rebut the admissions they already made during the discovery phase of the litigation.  Id.  (citing Williams v. City of Dothan, Ala., 818 F.2d 755, 762 (11th Cir. 1987)).  Plaintiffs Crowley, Franklin, Swindle, Rodgers and Kessler all admitted they were properly classified under the FLSA, and that admission precludes recovery under the FLSA.  Jacobs, 2006 WL 3742202, at *3.  Thus, there is no genuine issue of material fact as to their claims, and MBUSI is entitled to summary judgment.  Id.; see also

American Auto. Assoc. v. AAA Legal Clinic of Jefferson Crooke, P.C., 930 F.2d 1117, 1120 (5th Cir. 1991) (holding that an admission cannot be rebutted by contrary testimony or ignored by the district court); Williams, 818 F.2d at 762 (holding that the court was not free to reject the party's admission) .

### 2. Plaintiffs Are Paid On A Salary Basis Above The Minimum Rate.

An employee is paid on a salary basis if he regularly receives each pay period a predetermined amount which is not subject to reduction because of variations in the quality or quantity of work performed.  29 C.F.R. § 541.602. Since becoming GLs the plaintiffs have received a predetermined weekly salary, which always has exceeded $455.00, no matter if they worked all week and no matter the quality of their work.[37]  Thus, there is no dispute that the plaintiffs were paid on a salary basis above the minimum rate.

### 3. Plaintiffs' Primary Duty Is Management Of A Subdivision.

The plaintiffs admit that they "supervise," "direct," "instruct," or "are responsible for," a group of TMs and TLs in particular areas of the facility.  "The phrase 'a customarily recognized department or subdivision' is intended to

---

[37]     Beginning around September 2008, MBUSI had some non-production Fridays on which most non-exempt employees did not work and did not get paid, but as GLs, the plaintiffs worked or took a paid vacation day, and later took a paid vacation day or used the Friday bank. Under all scenarios, no deductions were made from the plaintiffs' pay.  This Court has ruled already that MBUSI's policy of requiring GLs to use a vacation day or bank unworked Friday hours does not affect the salary basis.  (Hicks v. MBUSI, 7:08-CV-0536-LSC, Memorandum of Opinion, pp. 6-9).

distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function."  29 C.F.R. § 541.103(a).  The groups assigned to the plaintiffs meet the description of a customarily recognized subdivision.

A plaintiff's primary duty is the "principal, main, major or most important duty" that he or she performs.  29 C.F.R. § 541.700(a); see also DePew v. ShopKo Stores, Inc., No. 03-0539, 2006 WL 1663272 (D. Idaho May 30, 2006) (finding that the plaintiffs' duties of directing, training, motivating and leading their department were more important than any other duties).  In determining the plaintiffs' primary duty the focus is on "the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  Some factors to consider when determining the primary duty of an employee include the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.   29 C.F.R. § 541.700(a).

While not determinative, "[t]he amount of time spent performing work can be a useful guide in determining whether exempt work is the primary duty of the employee.  Thus, employees who spend more than 50 percent of their time

performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." 29 C.F.R. § 541.700(b).

The Court should find that the thirteen plaintiffs listed above meet the definition of exempt executive employees because they admitted as much. They admit they supervise the TMs and TLs in their group. (Campbell RFA #1; Crawford RFA #1; Crowley RFA #1; Fisher RFA #1; Franklin RFA #1; Hendley RFA #1; Karpinski RFA #1; Kessler Dep., pp. 110, 112, 114; Oglesby RFA #1; Pitman RFA #1; Rodgers RFA #1; Rodgers Dep. Ex. 3, ¶ 5; Swindle RFA #1; Tidwell RFA #1). They admit they give work directions and assignments to the members of their group. (Crawford RFA #2; Crowley RFA #2; Fisher RFA #2; Franklin RFA #2; Hendley RFA #2; Karpinski RFA #2; Kessler Dep., p. 207; Oglesby RFA; #2 Pitman RFA #2; Campbell RFA #5; Rodgers RFA #2; Swindle RFA #2; Tidwell RFA #2). They admit they direct their group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony. (Campbell RFA #5; Crawford RFA #5; Crowley RFA #5; Fisher RFA #5; Franklin RFA #5;

Hendley RFA #5; Karpinski RFA #5; Kessler Dep., p. 207; Oglesby RFA #5; Pitman RFA #5; Rodgers RFA #5; Swindle RFA #5; Tidwell RFA #5).  They admit they fulfill all the roles and responsibilities of the GL position.  (Campbell RFA #24; Crawford RFA #24; Crowley RFA #24; Fisher RFA #24; Franklin RFA #24; Hendley RFA #24; Karpinski RFA #24; Kessler RFA #24; Oglesby Dep., pp. 147-48; Oglesby RFA #24; Pitman RFA #24; Rodgers RFA #24; Swindle RFA #24; Tidwell RFA #24).  These admissions establish their primary role as a supervisor as a matter of law.  Jacobs, 2006 WL 3742202, at *3.

They further admit that they perform many of the duties recognized by the Department of Labor as management duties, including overseeing the training of TMs, directing the work of TMs, maintaining production records for use in supervision and control, appraising TMs' productivity and efficiency for the purpose of recommending promotions or other changes in status, handling employee complaints and grievances, counseling and disciplining employees, planning work, determining techniques to be used, apportioning the work among TMs, controlling the flow and distribution of materials and supplies, providing for the safety of TMs, controlling the budget and monitoring or implementing legal compliance measures.  29 C.F.R. § 541.102.

These thirteen plaintiffs testified that they spend part of their day performing these management duties, including walking their area, observing and correcting

TMs' performance, making sure their TMs are following standards, providing feedback to TMs on quality issues, ensuring their TMs are working safely, handling problems in their group and observing the operations and condition of their group.  They also testified that they spend part of their day performing some work they consider to be non-exempt work.  For example, Pitman testified that his primary duties as a GL were to observe TMs and inspect the vehicles.  (Pitman Dep., p. 28).  Pitman observed TMs while he inspected quality.  (Pitman Dep., p. 63).  His job was to ensure that the TMs were following the SMPs and JESs. (Pitman Dep., p. 40).  Inspecting quality allowed him to know if there was a quality issue and that he needed to observe the TMs.  (Pitman Dep., pp. 63-64).

Karpinski testified that he spends a hundred percent of his day walking his area, checking for parts, doing 5S, answering TMs' questions, making sure TMs are wearing the appropriate PPE, making sure TMs are not in awkward ergonomic situations, talking to his TMs and making sure TMs are focused on their job. (Karpinski Dep., p. 60).  He does not work a station on a line, but he alleges he makes repairs during the shift.  (Karpinski Dep., p. 77).

Tidwell's primary duties included reviewing the processes, checking TMs to make sure they were following the processes, correcting TMs who did not follow the processes and ensuring his group was working safely.  (Tidwell Dep., pp. 54,

85-86, 99-100, 109-10).   At times, he also had to take on TL duties or work a station for a rotation to up to half a day.  (Tidwell Dep., pp., 68-71).

Campbell testified that his primary responsibility is to see that his TMs and TLs are working within standard.  (Campbell RFA #1; Campbell Dep., pp. 167-68).  It is his job to make sure the TMs are following the processes.  (Campbell Dep., p. 98).  He alleges he also performs on-line quality checks, makes repairs, moves parts, answers line pulls, and performs quality walk backs.  (Campbell Dep., p. 106).

Fisher is responsible for making sure his group is promoting quality and is productive, not unnecessarily wasteful, working efficiently and trained.  (Fisher RFA #1; Fisher Dep., pp., 122-23).  His job is to observe his TMs and correct them if they are not following the SMPs.  (Fisher Dep., pp. 101-02, 104-05).  He walks the line observing his TMs' job performance and also checking quality and paperwork on quality.  (Fisher Dep., pp. 84, 91-92, 161-62).  He may spend a few minutes making a repair or working on a vehicle to help out his group.  (Fisher Dep., pp. 95, 97, 89-90, 158-59).

Oglesby testified that the purpose of the GL position is to direct TLs and other TMs in the execution of the teams' responsibilities.  (Oglesby Dep., p. 149; Oglesby Dep. Ex. 22).  He spends most of his day walking his group and checking quality.  (Oglesby Dep., p. 91).  When he walks his group, he observes TM

performance, helps any TMs that are having problems, and gives feedback to his TMs.  (Oglesby Dep., pp. 91-92).  He spends about half his time observing TM performance and half his time checking quality.  (Oglesby Dep., p. 94).

Crawford testified that his job as a GL is to monitor the jobs of the TMs and TLs on the line and make sure they are in compliance with the standards and the policies that the Company has established.    (Crawford Dep., pp. 144-45).  Crawford spends most of his time as a GL performing these tasks because even when he is checking a car at the end of the line, he is verifying that standards are being maintained just as he is when he is monitoring reports at his desk.  (Crawford Dep., p. 145).  The other plaintiffs gave similar testimony.

The fact that these plaintiffs allege they perform non-exempt work for part of the day does not mean they are not exempt executives for several reasons.  One, the work they allegedly perform that they consider to be non-exempt work is actually considered exempt work under the law because it is directly and closely related to their exempt work.  Two, their primary duty is management because that is their most important duty and the reason MBUSI employs them and pays them as a GL.  Three, concurrent performance of exempt and non-exempt work does not disqualify GLs from the executive exemption because they meet the other requirements of the exemption.

### a.   The GLs' Alleged Non-Exempt Work Is Actually Exempt Work Under The Law.

The work that the plaintiffs characterize as non-exempt work is not really non-exempt work because work that is closely and directly related to the performance of the exempt work is also considered exempt work.  29 C.F.R. § 541.703.  "'[D]irectly and closely related' work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly.  Work 'directly and closely related' to the performance of exempt duties may also include recordkeeping; monitoring and adjusting machinery; taking notes; using the computer to create documents or presentations; opening the mail for the purpose of reading it and making decisions; and using a photocopier or fax machine."  29 C.F.R. § 541.703(a); See also Haas v. Behr Dayton Thermal Prods., LLC, No. 3:07cv139, 2008 U.S. Dist. LEXIS 122184, at *63-64 (S.D. Ohio Dec. 22, 2008) (holding that counting parts was part of the supervisory duty of managing production volumes).

In regards to quality checking, the regulations provide specifically that '[a] supervisor who spot checks and examines the work of subordinates to determine whether they are performing their duties properly, and whether the product is satisfactory, is performing work which is directly and closely related to managerial and supervisory functions, so long as the checking is distinguishable from the work

ordinarily performed by a nonexempt inspector." 29 C.F.R. § 541.703(b)(3).  The

plaintiffs who allegedly spend time checking quality do so to make sure their TMs

are performing quality work, and as they learn of quality defects, they feed those

back to the TMs.  (See, e.g., Pitman Dep., pp. 63-65, 69-72; Franklin Dep., pp. 64-

65, 70-71, 73-74, 143; Campbell Dep., p. 106; Oglesby Dep., pp. 91-92).

Generally, quality checking is done as these plaintiffs walk their areas also

observing the TMs and their performance and the overall operations of the area and

perform other management activities.  (See, e.g., Campbell Dep., pp. 106, 115,

168; Fisher Dep., pp. 84, 91-92; Pitman Dep., pp. 28, 63, 73, 94-95, 134; Oglesby

Dep., pp. 91-92; Crawford Dep., p. 145).  Likewise, GLs who make repairs do so

as they perform their other duties, including observing TMs and making sure they

are performing their jobs.  (See, e.g., Karpinski Dep., pp. 60-63, 65).  Unlike

Quality and Repair TMs, which are employed by MBUSI for a lesser pay rate than

the GLs, these plaintiffs are not tied to a specific spot with the sole purpose of

checking quality or making repairs.

Indeed, several courts have found that checking the quality of the

workmanship of subordinates is a factor which supports a determination that the

person doing the checking is an exempt executive.  For example, in Armitage v.

Dolphin Plumbing & Mech., LLC, 510 F. Supp. 2d 763, 770-71 (M.D. Fla. 2007),

the Court found that the plaintiff performed on balance more management

functions than not and thus was an executive employee, and one of the management functions that it cited in support of its conclusion was that the plaintiff "verified the quality of the workmanship of Defendants' employees and piece workers."  Likewise, in <u>Wilbur v. Silgan Containers Corp.</u>, No. 2:06-cv-02181, 2008 WL 3863700 (E.D. Cal. Aug. 19, 2008), the Court found that the plaintiff performed managerial duties including quality responsibilities such as reviewing inspection reports, personally inspecting products and receiving verbal reports, and that the plaintiff was "plainly and unmistakably" exempt under the executive exemption.  Similarly, the Court in <u>Baudin v. Courtesy Litho Arts, Inc.</u>, 24 F. Supp. 2d 887, 892 (N.D. Ill. 1998), in finding that the plaintiff's primary duty was management and that he was an exempt employee, cited to evidence that plaintiff "used his light table to check over other employees' work in addition to doing his own stripping work," in support of its conclusion.  <u>See also</u> <u>Anderson v. Arvey Corp.</u>, 84 F. Supp. 55, 60 (E.D. Mich. 1949) (finding that the plaintiffs who determined "whether the work was being satisfactorily performed and generally checked the flow of work and its quality in their respective divisions" were exempt executives).

Because these plaintiffs check quality or perform other allegedly non-exempt work in conjunction with and for the purpose of evaluating and correcting TM performance, such work is actually exempt work.

### b.      Management Is The Plaintiffs' Most Important Duty.

As with the other plaintiffs in this case, these plaintiffs' primary duty is management because their most important duties are their management duties, even if they also allegedly perform non-exempt work.  As plaintiff Oglesby testified, the very purpose of the GL position is to direct TLs and other TMs in the execution of the teams' responsibilities.  (Oglesby Dep., p. 149; Oglesby Dep. Ex. 22).  As plaintiff Campbell testified, his primary responsibility is to see that his TMs and TLs are working within standard.  (Campbell RFA #1; Campbell Dep., pp. 167-68).  It is his job to make sure the TMs are following the processes. (Campbell Dep., p. 98).  It is Fisher's job to observe his TMs and correct them if they are not following the SMPs.  (Fisher Dep., pp. 101-02, 104-05).  Crawford's job is to monitor the jobs of the TMs and TLs on the line and make sure they are in compliance with the standards and the policies that the Company has established. (Crawford Dep., pp. 144-45).  Crowley's primary duty as a GL is to observe his TMs to make sure they are following the SMPs and JESs.  (Crowley Dep., pp. 140-42).  Hendley's primary duty as GL is to make general observations throughout the day on his TMs and their work habits and quality, to help them get where they need to be through verbal communication and to make sure they are following the SMPs and whatever standards are in place.  (Hendley Dep., pp. 140-41).

If the plaintiffs' most important job was to check quality or make repairs or work on the line, then there would be no reason to have the GL position and pay GLs more than TMs who could do the same job. The value of the GL is that they walk the lines, observe TMs, make sure the TMs are working correctly and safely, feed back quality mistakes to their group, counsel TMs and communicate to TMs and others in the Plant information essential to the operations. They also evaluate TMs, initiate discipline, problem solve, track attendance and other such duties and complete paperwork, such as CPRs, attendance and time forms, 5 Why forms, safety audit forms and quality forms, which are directly related to the supervision of their group.

These management duties are critical to the operation of the groups and the whole Plant. MBUSI relies upon the GLs to ensure that the TMs in their group are producing quality vehicles while keeping up with the pace of production. If TMs do not follow SMPs and processes are missed, the quality of the vehicle is impacted so MBUSI relies on the plaintiffs to train or ensure proper training of their TMs, monitor and evaluate them, communicate with them, ensure they are working to standard, and correct them when they are not. Moreover, it is critical to producing a quality vehicle that GLs constantly monitor and observe their TMs and feed back any issue or quality defect to ensure their TMs comply with the SMPs. MBUSI also relies on the plaintiffs to ensure that their lines are staffed and that

TMs are able to perform their assigned jobs.  MBUSI also relies on the plaintiffs to ensure that no defects originate from their group and to implement countermeasures for defects when they do occur.  If the plaintiffs do not manage their groups, the quality of the product and the efficiency of the Plant is affected. See Sappington v. Style-Line Furniture, No. 1:06CV249, 2007 WL 3355838, at *7 (N.D. Miss. Nov. 8, 2007) (finding line supervisors exempt because they oversaw quality and timeliness of production and upper management looked to them to have their lines produce the product on schedule).  Tellingly, the plaintiffs are evaluated on their leadership competencies and not on any allegedly non-exempt duties.  Jackson v. Advance Auto Parts, Inc., 362 F. Supp. 2d 1323, 1334 (N.D. Ga. 2005) (stating that the employee's primary duty is what he does that is of principal value to the employer). It is for these reasons that these plaintiffs are GLs and are paid more than TLs and TMs, and not because of the quality checks, repairs or filling-in they claim they do.

Some of these plaintiffs generally allege they spend about half of the production shift performing work they consider to be non-exempt (although such work actually is exempt work as shown in section A(3)(a)).  However, the DOL and the Courts have made clear that even if the plaintiffs spent most of their time performing non-exempt work, they are still non-exempt if the other factors support the conclusion that their primary duty is management.  29 C.F.R. § 541.700(b); See

also Jones v. Virginia Oil Co., 69 Fed. Appx. 633 (4th Cir. 2003) (holding manager of combination fast food and convenience store was properly classified as exempt despite allegations that he spent 75-80% of his time performing non-exempt work); Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1113-16 (9th Cir. 2001) (finding manager of recreational park exempt despite the claim that he spent 90% of his time performing non-exempt tasks); Debrecht v. Osceola County, 243 F. Supp. 2d 1364, 1370-72 (M.D. Fla. 2003) (finding battalion chiefs satisfied the primary duty test despite a claim that they spent 85% of their time performing non-exempt tasks); Kastor v. Sam's Wholesale Club, 131 F. Supp. 2d 862, 866-67 (N.D. Tex. 2001) (entering summary judgment against manager of bakery who claimed he spent 90% of his time performing non-managerial tasks).  Certainly, the time that the GLs in this case allegedly spend performing non-exempt work, which is much less than the employees in the cases cited above, does not create an issue of fact sufficient to defeat the exemption when the plaintiffs' own testimony demonstrates that their management duties are their important duties and the ones on which they are trained, evaluated and expected to perform.

Moreover, these plaintiffs also are relatively free from supervision.  Most have little interaction with the Managers.  (See, e.g., Karpinski Dep., pp. 35-36; Rodgers Dep. Ex. 3, ¶ 19).  They interact more with their AMs, but their interaction comes most commonly when they need to report an item to an AM or

seek the assistance of the AM because the AMs are overseeing more than one group. A Manager or AM is not always present in the plaintiffs' group, and they lead their group independently of a Manager or AM. (See, e.g., Crawford RFA #33, Crowley RFA #33, Fisher RFA #33, Hendley RFA #33, Oglesby RFA #33, Pitman RFA #33, Rodgers RFA #33, Swindle RFA #33, Tidwell RFA #33). The TMs and TLs interact most frequently with the GLs, and it is from the GLs that they take direction and seek guidance. (See, e.g., Karpinski Dep., pp. 23-24). Also, plaintiffs' salaries exceed that of TLs and TMs by approximately 10% and 15%, respectively. (Jones Decl. ¶ 59). Thus, all factors provided by the Department of Labor for determining primary duty compel the conclusion that the plaintiffs are exempt.

### c. Concurrent Performance Of Exempt And Non-Exempt Work Does Not Disqualify The Plaintiffs From The Executive Exemption.

The concurrent performance by GLs of management duties and duties they consider to be non-exempt does not disqualify them from the executive exemption when they meet the requirements of the exemption. 29 C.F.R. § 541.106. Generally, exempt employees decide when to perform non-exempt duties and remain responsible for the success or failure of the operations under their management. Id. That description fits these plaintiffs. The plaintiffs testified that when they perform allegedly non-exempt work, they retain their GL duties

including supervision of TMs, interrupt their alleged non-exempt work when needed to perform their GL duties, decide when to perform the so-called non-exempt work and retain responsibility for their groups at all times.  (See, e.g., Pitman Dep., p. 130; Campbell Dep., pp. 107-09; Franklin Dep., pp. 70-71; Karpinski Dep., p. 77; Fisher 92-93, 161-62; Oglesby Dep., pp. 92, 99-100; Tidwell Dep., p. 172; Swindle Dep., p. 90).  In that regard, they are like the assistant managers in a retail establishment, whom the Department of Labor says are exempt because they can supervise employees and serve customers at the same time and direct the work of other employees and stock shelves at the same time. 29 C.F.R. § 541.106(b); see also Pollard v. GPM Invs., LLC, No. 3:10.CV.115, 2011 U.S. Dist. LEXIS 24199, at *17-18 (E.D. Va. Mar. 10, 2011); and Scott v. SSP Am., Inc., No. 09-CV-4399, 2011 U.S. Dist. LEXIS 32819, at *26-27 (E.D.N.Y. Mar. 29, 2011) (manager who pitched in to help employees was exempt although she spent 90% of her time performing non-exempt work).  As discussed above, the GLs meet all of the requirements of the executive exemption and therefore the concurrent performance of alleged non-exempt duties with their exempt duties does not adversely affect their exemption.

### d.   Supervisors Do Not Have To Create The Policies Or Work Without Supervision To Be Exempt.

For the most part, these plaintiffs do not claim they were improperly classified because they perform non-exempt work; instead, they argue they are not

managers because they enforce rather than create company policy and they take direction from their Assistant Manager and do not have the final say. (Pitman Dep., p. 101; Campbell Dep., p. 151; Fisher Dep., p. 103; Oglesby Dep., pp. 145-46). That is an absurd argument. The executive exemption is not reserved for the very top person in the management hierarchy of a company, but is applicable to any employee whose primary duty is management. Even the President of a company takes direction from the Board of Directors. See, e.g., Pollard, 2011 U.S. Dist. LEXIS 24199, at *21 ("[C]ourts uniformly reject arguments that an employee cannot be an exempt executive if he cannot make hiring or firing decisions or is subject to rigid supervision.").

"[T]hat an individual does not have final supervisory or discretionary authority does not take that person out of the realm of being a manager or supervisor…." Kastor v. Sam's Wholesale Club, 131 F. Supp. 2d 862, 868 (N.D. Tex. 2001). As stated in Scott, "[a]lthough Plaintiff had to seek advance approval from the Operations and General Managers before taking certain actions, such as allowing employees to work overtime and suspending employees, 'there is often a hierarchy in any organization wherein supervisors have persons to whom they must report, and the fact that an individual does not have final supervisory authority does not take that person out of the realm of being a manager in an organization.'" Scott, 2011 U.S. Dist. LEXIS 32819, at *44 (citing Gellhaus v. Wal-Mart Stores,

Inc., 769 F. Supp. 2d 1071 (E.D. Tex. 2011) (footnote omitted); see also Beauchamp v. Flex-N-Gate LLC, 357 F. Supp. 2d 1010, 1017 (E.D. Mich. 2005) (stating that nothing in the applicable law "requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be an 'executive'"); Jackson, 362 F. Supp. 2d at 1335 ("the fact that Plaintiffs had to adhere to certain guidelines or in certain instances obtain the Store Manager's approval does not diminish Plaintiffs' discretionary powers").

Moreover, that a supervisor must follow and implement the policies of the company rather than create them does not make the supervisor non-exempt. "The mere fact that managers are constrained by corporate policy and have their decisions reviewed by superiors does not diminish the primacy of their managerial responsibilities." Pendlebury v. Starbucks Coffee Co., No. 04-80521, 2008 WL 763213, at *8 (S.D. Fla. Mar. 13, 2008). Rather, "[e]nsuring that company policies are carried out constitutes the 'very essence of supervisory work.'" Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982) (citation omitted).

In a case similar to the one at hand, the court rejected a claim by a shift supervisor that he was improperly classified as exempt. Burson v. Viking Forge Co., 661 F. Supp. 2d 794 (N.D. Ohio 2009). The shift supervisor testified that his primary duty was to "oversee the shift and make sure everything ran smoothly." Burson, 661 F. Supp. 2d at 799. Like the GLs at MBUSI, the shift supervisor was

responsible for the productivity of his shift and directing the work of the press operators.  Id.  He also ensured the safety of his employees, advised them of new safety policies and instructed them in safe operations.  Id.  He initiated disciplinary proceedings against employees and fielded employee complaints.  Id. at 800.  The shift supervisor also interviewed potential employees and their recommendations were followed "more often that not."  Id.  He also completed daily production records, performance appraisals of his employees and recommended wage increases.  Id.  He also determined who would work on each machine based on ability, and if a line went down he could move operators to  different machines or redirect them to a cleaning activity.  Id. at 803.  All requests for vacation went through the shift supervisor and he was responsible for adjusting work schedules when someone called in sick.  Id.  He was also responsible for getting volunteers to work overtime.  Id.  In other words, the court held, he was responsible for the daily functioning of his shift.  Id.

Despite these management duties, the shift supervisor argued that he was not an exempt employee because his decision making was severely limited by company policy and by his immediate superior.  Id. at 800.  He argued that safety training was dictated by company policy, performance appraisals were prepared from a standardized form, and he could not stray from the steps in the company's progressive discipline policy.  Id. at 801.  The court rejected this argument and

held that "[t]he fact that the training plaintiff was to provide his press operators and the discipline he was to administer was governed by existing company policies and the fact that, like many companies, Viking Forge used a standardized form for its performance appraisals, does not transform plaintiff's duties into ones that are not managerial in nature."  Id. (citing Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 507 (6th Cir. 2007); Rainey v. McWane, Inc., 552 F. Supp. 2d 626, 631 (E.D. Tex. 2008); and Mitchell v. Abercrombie & Fitch, Co., 428 F. Supp. 2d 725, 742-43 (S.D. Ohio 2006), aff'd, 225 Fed. Appx. 362 (6th Cir. 2007)).

The court also held that "[t]he fact that plaintiff had a manager who retained control over certain management decisions and dictated how other decisions were to be made did not undermine his authority to run his shift on a daily basis." Burson, 661 F. Supp. 2d at 802.  The court further stated that "[e]ven in situations where a supervisor, himself, is subjected to the close supervision of his superior, courts have routinely found that the supervisors responsible for the daily activities of their subordinates are vested with enough discretionary power and freedom from supervision to qualify for the executive exemption."  Id. at 802 (citing Mitchell, 428 F. Supp. 2d at 743; Thomas, 506 F.3d at 507; Kastor, 131 F. Supp. 2d at 868; and Haines v. Southern Retailers, Inc., 939 F. Supp. 441, 450 (E.D. Va. 1996)).

Courts also have rejected these same arguments in cases that were specific to the automotive manufacturing industry.  For example, in Haas, supervisors at an

engine facility previously owned by Daimler Chrysler sued the company when it quit paying them overtime payments and claimed that their managers were in charge of directing employees and that they were constrained by standard work instructions and the applicable collective bargaining agreement. Haas, 2008 U.S. Dist. LEXIS 122184, at *1-5, 58-59. The court rejected these arguments and stated that "accepting such an argument would make it virtually impossible for any employer involved in the mass production of goods to satisfy the regulations' 'management' criteria, in that most such employers have likely developed similar, stringent production standards, and are almost certainly constrained by union requirements." Id. at *61. See also Rainey, 552 F. Supp. 2d at 630 (finding that the responsibility for the initiation of the discipline process and for identifying the need for additional help to meet their production goals was indicative of managerial status, even though plaintiffs had to get permission); and Beauchamp, 357 F. Supp. 2d at 1017 (rejecting the argument that the plaintiff was not an exempt executive because he was constrained by automotive industry standards). As stated in Beauchamp, "it is not enough merely to propagate standards - - rather, supervision is necessary so long as a company must rely on human workers to carry out these standards." Id.

As plaintiff Danny Bankston explained well in his deposition, being a Group Leader is "like being a music director, you follow the sheet music to direct the

symphony - - to direct an orchestra.  You're not just up there just moving your arms.  They can't play or follow unless you have something that you're reading and directing.  And when you direct team leaders and other team members, you're directing them in what the company has laid out for them to follow."  (Bankston Dep., pp. 200-01).[38]  Or, as plaintiff Don Fillimore analogized to football, MBUSI has the playbook, and as a GL, he does not call the plays, but he does make sure that the TMs in his group are following the playbook so the whole team can be successful.  (Fillmore Dep., pp. 41-42).[39]  Although MBUSI provides the "sheet music" or the "playbook" (company policies and procedures ("SMPs")), the GLs are needed to direct their groups in those policies and procedures so that the group works together and with other groups to build a complete vehicle.

##### 4.   Plaintiffs Customarily And Regularly Direct The Work Of Two Or More Employees.

All of the plaintiffs have two or more TMs in their groups.  They admit that they direct the work of their group on a daily basis.  (See, e.g., Campbell RFA #5; Crawford RFA ##2, 5; Crowley RFA ##2, 5; Fisher RFA ##2, 5; Franklin RFA ##2, 5; Hendley RFA ##2, 5; Karpinski RFA ##2, 5; Oglesby RFA ##2, 5; Pitman RFA ##2, 5; Rodgers RFA ##2, 5; Swindle RFA ##2, 5; Tidwell RFA ##2, 5;

---

[38]    The Deposition of Danny Bankston is attached as Ex. 41 to MBUSI's Evidentiary Submission (Volume 4).

[39]    Excerpts of the Deposition of Don Fillmore are attached as Ex. 170 to MBUSI's Evidentiary Submission (Volume 13).

Kessler Dep., p. 207).  Again, "[t]he mere fact that plaintiff also had a supervisor does not negate the fact that he was in charge of his shift."  <u>Burson</u>, 661 F. Supp. 2d at 804.  Plaintiffs clearly meet this third prong of the executive exemption test.

### 5.     Plaintiffs' Recommendations Regarding Team Members' Status Are Given Particular Weight.

These plaintiffs meet the fourth prong of the exemption because their recommendations on promotion and discipline are given particular weight.  All of these plaintiffs evaluate their TMs and TLs on an annual basis, and the evaluation becomes a part of the individual's personnel file.  If a GL rates one of his TMs as not satisfactory in any area of the evaluation other than attendance, the TM is not eligible for promotion.  For those TMs who are eligible for promotion, the GL rates them as ready or not ready for promotion, and their recommendation is followed absent exceptional circumstances.  None of these plaintiffs have ever had a TM in their group be promoted that they rated as not ready for promotion.

Some plaintiffs argue that they do not affect the status of TMs because their promotion assessments must be reviewed by managers or human resources.  As explained by the regulations, "particular weight" does not mean that the recommendation is final:

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with

> which such suggestions and recommendations are made
> or requested; and the frequency with which the
> employee's suggestions and recommendations are relied
> upon.... An employee's suggestions and
> recommendations may still be deemed to have "particular
> weight" even if a higher level manager's recommendation
> has more importance and even if the employee does not
> have the authority to make the ultimate decision as to the
> employee's change in status.

29 C.F.R. § 541.105.  Plaintiffs' evaluations and recommendations of their TMs as

ready or not ready for promotion undisputedly carry particular weight regardless of

whether their recommendation is the ultimate decision.

Group Leaders also discipline TMs.  They counsel TMs informally and track

their quality defects.  They also have the authority to initiate CPRs for TMs and

they write the CPRs when TMs commit a violation of policy.  TMs who have an

active CPR in their file are ineligible for promotion.  CPRs must be approved by

managers and HR for consistency but that does not mean that the plaintiffs' input is

not given particular weight.  See Rainey, 552 F. Supp. 2d at 630 (finding that

plaintiffs engaged in the managerial activity of discipline when they sent

information to HR).  If the plaintiffs do not observe and record performance,

attendance and misconduct issues and then bring them to the attention of higher

management and HR, the issues may not be known by higher management and HR

and therefore go uncorrected.  As discussed above, the law does not require that

the plaintiffs have the final say in status decisions but only that their suggestions

and recommendations carry particular weight.  29 C.F.R. § 541.105; see also Beauchamp, 357 F. Supp. 2d at 1016 and Burson, 661 F. Supp. 2d at 805 (finding that because the plaintiff's recommendations were "generally" followed and because he initiated discipline, his recommendations were given particular weight). Moreover, none of the plaintiffs have presented any evidence that CPRs they drafted were overturned.

A reasonable fact finder could not conclude that no particular weight was given to plaintiffs' recommendations regarding promotion and discipline, and thus plaintiffs are exempt under the fourth prong of the executive exemption test.

### B.   There Is No Just Reason To Delay Entering A Final Judgment.

Although these plaintiffs are not part of a class and an order of summary judgment on their claims is a final order, to avoid any question, pursuant to Fed. R. Civ. P. 54(b), this Court should expressly determine that there is no just reason for delay and enter final summary judgment as to the claims of these eighteen plaintiffs.  Rule 54(b) states in relevant part as follows:  "when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  FED. R. CIV. P. 54(b).  Thus, for a proper Rule 54(b) certification, a district court must first determine that it is dealing with a final judgment:

> It must be a "judgment" in the sense that it is a decision upon a cognizable claim for relief, and it must be "final" in the sense that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action."

Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 7 (1980) (quoting Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436 (1956)).  The entry of summary judgment as to these eighteen plaintiffs in this case quite clearly is a final judgment as it disposes of all claims asserted by them.

Second, the court must determine that there is no just reason for delay. Curtiss-Wright Corp., 446 U.S at 8.  It is left to the "sound judicial discretion" of the district court to make this determination "in the interest of sound judicial administration."   Id.   In reaching this determination, the court should consider judicial administrative interest, the equities involved, and whether piecemill appeals will result.   Id.   In the present case, there is no just reason for delay because each of the individual plaintiffs' entire case is resolved by this summary judgment.  Moreover, each plaintiff has an individual case and even if summary judgment had been denied, their cases would not have been tried with cases of other plaintiffs.  Thus, there would not be an increase in cost if the plaintiffs decide to appeal these individual cases now, it will not multiply proceedings, and the failure to certify the judgment for appeal will only result in potential delay of an appeal and final resolution to the parties.  See Explosives Supply Co. v. Columbia

<u>Nitrogen Corp.</u>, 691 F.2d 486, 486-87 (11th Cir. 1982) ("the opinion of the lower court clearly shows the separability of the claims such that neither the same issues nor facts would be before the reviewing court more than once").

## IV.   <u>CONCLUSION</u>

Because all four prongs of the executive exemption test are met in regards to these thirteen plaintiffs (**Steven Campbell, Timothy Crawford, Michael Crowley, Robert Fisher, Floyd Franklin, Derek Hendley, James Karpinski, Penny Kessler, Gary Oglesby, Kelly Pitman, Frederick Rodgers, Timothy Swindle and Jassen Tidwell**), final summary judgment is due on their claims and their claims should be dismissed with prejudice with costs taxed to these plaintiffs.

<div style="margin-left:50%">

s/ Michael L. Lucas
Michael L. Lucas (LUC004)
Ashley H. Hattaway (HAT007)

Attorneys for Defendant
Mercedes-Benz U.S. International,
Inc.

</div>

**OF COUNSEL:**

BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone: (205) 451-5204
Facsimile: (205) 458-5100
mlucas@burr.com
ahattaw@burr.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Defendant Mercedes-Benz U.S. International, Inc.'s Brief in Support of Its Motion for Summary Judgment As To Plaintiffs Who Are Exempt Under The Executive Exemption Because They Admit Their Primary Duty Is Management And They Perform Some Non-Exempt Work But That Work Is Directly Related To Their Exempt Duties has been electronically filed with the Clerk of the Court using the CM/ECF system on the following CM/ECF participant, on this 24th day of October, 2011:

Thomas F. Campbell
D. Keiron McGowin
CAMPBELL LAW
1 Chase Corporate Drive
Suite 180
Birmingham, AL 35244

Mark R. Thierman
Joshua Buck
THIERMAN LAW FIRM, APC
7287 Lakeside Drive
Reno, Nevada  89511

s/ Michael L. Lucas
OF COUNSEL