
FILED
2011 Nov-21  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **JEFF HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **vs.** | ) | **7:08-cv-00536-LSC** |
| | ) | |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

| | | |
|---|---|---|
| **GRALYN LAWSON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **7:09-cv-01157-LSC** |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## DEFENDANT MERCEDES-BENZ U.S. INTERNATIONAL, INC.'S BRIEF IN SUPPORT OF ITS MOTION FOR FINAL SUMMARY JUDGMENT AS TO PLAINTIFFS WHO ARE EXEMPT PURSUANT TO THE EXECUTIVE, ADMINISTRATIVE AND COMBINATION EXEMPTIONS

_____

1961921 v1

Respectfully submitted:

Michael L. Lucas (LUC004)
Ashley H. Hattaway (HAT007)
BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama 35203
(205) 251-3000

November 21, 2011

Attorneys for Defendant
Mercedes-Benz U.S. International,
Inc. (MBUSI)

# TABLE OF CONTENTS

Page

I.   STATEMENT OF FACTS ..................................................................3

    A.   Don Fillmore ........................................................................3

    B.   Michael Eugene Price ........................................................16

II.   ARGUMENT....................................................................................31

    A.   As GLs Fillmore And Price Have Been Exempt Executives..............32

        1.   Plaintiffs Are Paid On A Salary Basis Above The Minimum Rate ..........................................................................32

        2.   Plaintiffs' Primary Duty Is Management Of A Subdivision..................................................................................33

        3.   Plaintiffs Customarily And Regularly Direct The Work Of Two Or More Employees ....................................................39

        4.   Plaintiffs' Recommendations Regarding Team Members' Status Are Given Particular Weight..........................................39

B.   At Times, Fillmore And Price Have Performed Exempt Administrative Duties And Are Also Exempt Under The Administrative And Combination Exemptions ...............................41

C.   There Is No Just Reason To Delay Entering A Final Judgment ..................44

IV.   CONCLUSION................................................................................46

Certificate of Service ................................................................................48

1961921 v1

Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI") submits this Brief In Support Of Its Motion For Final Summary Judgment As To Plaintiffs Who Are Exempt Pursuant To The Executive, Administrative And Combination Exemptions.[1] Two plaintiffs (**Don Fillmore and Michael Eugene Price**) in the above-styled Lawson v. MBUSI case are exempt from Fair Labor Standards Act ("FLSA") overtime pay requirements pursuant to the executive, administrative and combination exemptions.  Fillmore and Price do not allege that as GLs they have ever had the primary duty of working on the line or checking quality.  They are like other plaintiffs in this case in that they readily admit that as a GL their primary duty has been to monitor their TMs and ensure they follow MBUSI policies and procedures.  However, they are unique in that for periods of time they have held jobs which required that they spend significant time performing administrative duties.

Fillmore admits that throughout his time as a GL his primary duty has been to ensure that his TMs are following the company rules, regulations and SMPs. However, since he has worked as a GL in the Audit area (2009 to present) he has

---

[1]    MBUSI filed a Motion To Drop All Plaintiffs From The Case Except Gralyn Lawson (Doc. # 37 (Lawson case)) because the plaintiffs were not properly joined in the Lawson case.  The Court indicated in a status conference that the Lawson plaintiffs were improperly joined, that it did not plan to drop any plaintiffs from the Lawson case as requested by MBUSI, but that it did plan to sever the plaintiffs' claims.  The Court later instructed MBUSI to file its summary judgment motions as to the plaintiffs' claims in this case.  On August 5, 2011, the Court entered an order finding the Motion to Drop moot and therefore denied the Motion.

also spent a significant amount of time preparing reports related to his group's activities in auditing cars which are used by MBUSI to address quality issues.

Price admits that for most of his time as a GL his primary responsibility has been to ensure that his TMs comply with company policies and standards. However, from June 2009 to the middle of 2010, Price worked as a GL on the 166 Project Team but instead of supervising he was in charge of reviewing equipment that was to be used in producing the new model to see if it was feasible for TMs to use and to provide input into other pre-production planning.

As GLs, Fillmore and Price have been exempt executives, but for periods of time they have performed administrative duties and at those times the administrative and combination exemptions have applied to them.  Because they have always been exempt, they should be dismissed from the case.

2

## I.   STATEMENT OF FACTS

### A.   DON FILLMORE

1.     Don Fillmore ("Fillmore") began employment at MBUSI in 1996 as a TM in Supplier Quality (SQO). (Fillmore Dep., pp. 15, 21).[2]

2.     Fillmore was promoted to TL in Supplier Quality around 1997 or 1998.  (Fillmore Dep., p. 24).

3.      In 1998 or 1999, Fillmore was promoted to GL and was assigned a Quality group in the Body Shop.  (Fillmore Dep., p. 24).

4.     Fillmore's group consisted of TMs who were quality inspectors or quality checkers.  (Fillmore Dep., p. 25).

5.     Fillmore was GL over his Quality group in the Body Shop, then his group included the Body and Paint Shop, and then he moved to a group in the Body and Paint Shop in Plant 2 when it opened.  (Fillmore Dep., p. 26).

6.     Plant 2 opened in 2004.  (Glass Dep., pp. 47-48).[3]

7.     Fillmore's group had one TL and one TM in each Plant for a total of four TMs. (Fillmore Dep., p. 61).

---

[2]      The Deposition of Don Fillmore and exhibits to the deposition are attached as Ex. 200 to MBUSI's Evidentiary Submission (Volume 17).

[3]      The Deposition of Kim Glass and exhibits to the deposition are attached as Ex. 118 to MBUSI's Evidentiary Submission (Volume 10).

8.     Around 2008, Fillmore moved to GL over Quality in the Assembly Area in Plant 1.  (Fillmore Dep., pp. 26-27).

9.     When Fillmore was in Assembly, Plant 1, his group had two TLs and nine TMs.  (Fillmore Dep., pp. 60-61).

10.    In 2009, Fillmore became GL for the Audit Area in Plant 1 for Quality.  (Fillmore Dep., p. 27).

11.    Fillmore has one TL and thirteen TMs in his group and they are disbursed throughout the Plant.  (Fillmore Dep., pp. 33, 51, 62).

12.    Fillmore has attended Group Leader Academy and had training regarding harassment, the Americans With Disabilities Act, civil treatment, communications, corporate policies and guidelines, group leader roles and responsibilities, HR benefits, labor relations, and numerous other training courses. (Fillmore Dep., pp. 101-02; Fillmore Dep. Ex. 1).

13.    As a GL at MBUSI, Fillmore earns at least $455.00 per week in salary.  (Fillmore RFA  #41).[4]

14.    Fillmore's duties differed from those performed by the TMs in his group.  (Fillmore RFA #34).

---

[4]     Fillmore Responses to Requests for Admission are attached as Ex. 201 to MBUSI's Evidentiary Submission (Volume 17).

15.     A Manager or AM is not always present in Fillmore's group, and he leads his group independently of his Manager or AM based on Company guidelines.  (Fillmore RFA #33).

16.     Fillmore leads his group in meeting company standards and he uses leadership skills in his GL position.  (Fillmore RFA ##25, 26).

17.     Fillmore shares his knowledge and experience with his group.  (Fillmore RFA #30).

18.     Fillmore ensures that production and quality goals are met in his group.  (Fillmore RFA ##13 & 22).

19.     Fillmore initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Fillmore RFA #16).

20.     Fillmore works with other GLs and the CI Team to make continuous improvements in the processes.  (Fillmore Dep., p. 167).

21.     As GL, Fillmore makes sure that his TMs stay focused on and aware about following the processes and standard procedures.  (Fillmore Dep., p. 175).

22.     Fillmore shows and supports top performance in his group.  (Fillmore RFA #29).

23.     Fillmore uses his best judgment in performing all of his GL job duties.  (Fillmore RFA #23).

24.     Fillmore fulfills all of the roles and responsibilities of his GL position. (Fillmore RFA #24).

25.     Fillmore's primary duty as a GL is to follow the rules and guidelines and to give the TMs in his group feedback so that they can follow the rules, guidelines and SMPs.  (Fillmore Dep., pp. 50-51).

26.     As GL, Fillmore is focused on making sure the TMs follow the SMPs, take the required training, and do what is asked of them.  (Fillmore Dep., pp. 181-82).

27.     If Fillmore observes a TM not complying with a SMP, he provides feedback.  (Fillmore Dep., p. 128).

28.     Providing feedback to TMs makes for better quality.  (Fillmore Dep., p. 129).

29.     In all of the areas in which Fillmore has been GL, the basic principle is the same with respect to keeping up with training, following policies, procedures and SMPs, and monitoring TMs.  (Fillmore Dep., pp. 190-91).

30.     These are some of Fillmore's primary duties in all of the areas in which he has been GL.  (Fillmore Dep., p. 191).

31.     The main part of Fillmore's primary duty is to ensure that the TMs are in their work stations following the rules, regulations and the SMPs.  (Fillmore Dep., p. 191).

6

32.     Fillmore constantly observes and monitors his TMs and gives them feedback on the spot and this is one of his primary duties as a GL.  (Fillmore Dep., pp. 183-84).

33.     As GL, Fillmore observes the TMs while they are performing processes, and if they deviate from the SMPs, he provides feedback.  (Fillmore Dep., pp. 41-42, 44).

34.     Fillmore described his process as follows:

> We don't call the plays, we just - once that playbook is put in place, its like at Alabama, you know, Nick Saban, he has a playbook and each player, they have to follow that play.  They can't deviate because its there for a reason.  By design, it's to get a desired outcome, which is to make everybody successful.
>
> So from my side, I try to tell them look, this is the playbook, we have got to follow it.  I didn't invent it, I didn't make it, but we have got to execute it.  And if we do these things, we should be successful, because that's why Mercedes put them in place, that's why upper management put them in place.
>
> So, yes, we follow the playbook, that's what we do.  So I guess you could say me and my team are players on this team.

(Fillmore Dep., p. 42).

35.     It is Fillmore's job to check, monitor and observe that his group is following the guidelines.  (Fillmore Dep., p. 45).

7

36.     Fillmore handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.  (Fillmore RFA #18).

37.     Fillmore ensures that company policies and work rules are enforced in his group.  (Fillmore RFA #14).

38.     If Fillmore observes a TM with performance problems, he will observe them to try to determine the basis of the problem and then provide them feedback.  (Fillmore Dep., pp. 55-56).

39.     Fillmore has counseled TMs on performance, quality of work and conduct.  (Fillmore RFA #9).

40.     If a TM has an attendance or performance problem that Fillmore believes justifies a CPR, he will go to his AM or Manager, explain the situation to him and get approval to write up a CPR.  (Fillmore Dep., pp. 56-58).

41.     Fillmore tries to complete a performance evaluation every year for a TM.  (Fillmore Dep., p. 183).

42.     When completing a performance evaluation, Fillmore puts his comments about the TM next to the performance criteria and based on his observations, rates them as satisfactory or not satisfactory.  (Fillmore Dep., pp. 176-77).

43.     If Fillmore gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33).[5]

44.     In a performance evaluation, Fillmore provides feedback on how the TM can improve.  (Fillmore Dep., pp. 177-78).

45.     On the performance evaluation, Fillmore will include information regarding steps the TM can take to continue to improve and develop in their position.  (Fillmore Dep., pp. 178-79).

46.     Fillmore gives his TMs his opinion on what they need to do to get promoted to TL.  (Fillmore Dep., pp. 54-55).

47.     Fillmore will evaluate whether the TM is ready to be considered for promotion or needs development.  (Fillmore Dep., p. 179).

48.     Fillmore provides his opinion as to whether TMs and TLs in his group are ready for promotion and his opinion is given consideration and normally is followed in determining if the TL or TM will be promoted.  (Fillmore RFA #7; Jones Decl. ¶¶ 31-32).

49.     Fillmore can direct training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Fillmore RFA #19).

---

[5]     The First Declaration of Marcus Jones and exhibits to the declaration are attached as Ex. 30 to MBUSI's Evidentiary Submission (Volume 3).

50.     Fillmore is notified of the training that the TMs in his group need, he tells his TMs the training they need, and ensures that they get the training. (Fillmore Dep., p. 52).

51.     When Fillmore observes and monitors the training plans he provides feedback if necessary.  (Fillmore Dep., pp. 40-41).

52.     As GL, Fillmore makes sure that MBUSI's four-step training process is administered to the TMs in his group.  (Fillmore Dep., p. 33).

53.     As GL, Fillmore makes sure that his TMs follow the guidelines of the four-step training procedure.  (Fillmore Dep., pp. 33-34).

54.     If training does not progress according to policy, then Fillmore gives feedback.  (Fillmore Dep., p. 34).

55.     As long as his TMs follow the MBUSI policies and procedures regarding training, and Fillmore observes that they are doing so, he is okay with their rotation schedules.  (Fillmore Dep., p. 34).

56.     At the end of each week, Fillmore reviews the training plans to make sure that policies and procedures have been followed.  (Fillmore Dep., pp. 35-36).

57.     Fillmore is not a Level 3 on the Circle of Skills in any process his group performs.  (Fillmore Dep., p. 39).

58.    As GL, Fillmore monitors the Circle of Skills forms, signs off on them each quarter, and makes sure that policies and procedures have been followed. (Fillmore Dep., p. 40).

59.    When a SMP is revised, Fillmore provides that information to his TMs and he monitors and observes them to make sure they are meeting the new SMP.  (Fillmore Dep., p. 76).

60.    Fillmore ensures that his group is working safely and he monitors the environment for safety hazards.  (Fillmore RFA #17).

61.    When there is an injury, Fillmore will complete a problem solving sheet, look at what happened and try to improve the process so an accident does not happen again.  (Fillmore Dep., pp. 164-65).

62.    As GL, Fillmore reports the time and attendance of his group. (Fillmore Dep., p. 140).

63.    Fillmore will communicate with Payroll if there are issues with a TM's pay.  (Fillmore Dep., pp. 143-44).

64.    If there are discrepancies with respect to a TM's time, Fillmore confronts the TM.  (Fillmore Dep., p. 141).

65.    Fillmore works hard to follow the vacation policies for his group. (Fillmore Dep., p. 142).

11

66.     In the Audit Area, Fillmore's group is auditing vehicles that have been completed or that are in the process of being built.  (Fillmore Dep., p. 27).

67.     Fillmore's group conducts product audits (PA).  (Fillmore Dep., p. 28).

68.     When Fillmore comes to work, he will look at his turnover report, he will look at his emails, he will check his audit messages, he will pull down any toolbox information, he will review any safety information and then he will provide the information to TMs in his group.  (Fillmore Dep., pp. 88-89).

69.     Fillmore has a meeting with his group each morning at which he disseminates information that is pertinent to the Company, including toolboxes. (Fillmore Dep., p. 29).

70.     At the end of the day, Fillmore walks through his area, he makes sure everything is cleaned up, he inputs data into the turnover log, he prepares any reports that his Manager tells him he needs to put together and makes sure everything is taken care of.  (Fillmore Dep., p. 94).

71.     Fillmore may attend HR meetings where they discuss new procedures, integrated management system (IMS) meetings where they discuss new ways to handle matters relating to the production system, and product audit meetings where they provide feedback to other people in the production process on what Quality has found.  (Fillmore Dep., pp. 98-99).

12

72.     As GL, Fillmore will look at issues that the TMs in his group find and make sure they are following the vehicle inspection standard (VISs) in determining whether the issue can pass or not.  (Fillmore Dep., pp. 94-95).

73.     As GL, Fillmore will encourage his TMs to move vehicles out of the area once they are completed because they have limited space.  (Fillmore Dep., pp. 95-97).

74.     Fillmore will complete a shift log which reflects issues from the day that he communicates to the GL and AM on the other shift.  (Fillmore Dep., p. 148).

75.     As GL, Fillmore will complete problem solving sheets.  (Fillmore Dep., pp. 155-61; Fillmore Dep. Ex. 11).

76.     By using the problem solving sheet, Fillmore will determine a root cause, develop a countermeasure and communicate it to his TMs and then he monitors to ensure that the TMs comply with the countermeasure.  (Fillmore Dep., pp. 159-60).

77.     Fillmore takes photographs of issues they discover and post those issues so Production can see them.  (Fillmore Dep., pp. 108-09).

78.     As GL, Fillmore has to approve stacks of paper, make sure all of the paperwork is there, take information from the paperwork and put it into secondary sheets and then file the reports.  (Fillmore Dep., p. 84).

13

79.     Fillmore reviews the data and takes that information and puts it into a report so it can be used for the morning meeting.  (Fillmore Dep., p. 85).

80.     Fillmore will observe incorrect items in the reports and when he does so, he will get with the TL and take care of it.  (Fillmore Dep., p. 86).

81.     Fillmore spends about six hours of his day in the Audit Area preparing reports, entering data into the computer, disseminating information, looking at issues, moving vehicles and participating in meetings.  (Fillmore Dep., p. 63).

82.     Fillmore prepares reports of the information his group has collected and disseminates it outside his group.  (Fillmore Dep., p. 64).

83.     Fillmore will prepare agendas which include the issues they have found and send it out to everyone in the organization.  (Fillmore Dep., pp. 64-65).

84.     Fillmore prepared a document which reflected the current feedback process on water leaks and a proposed improved process.  (Fillmore Dep., pp. 186-87; Fillmore Dep. Ex. 21).

85.     Fillmore prepared documentation which showed his group what were the rules regarding early outs.  (Fillmore Dep., pp. 187-88; Fillmore Dep. Ex. 22).

86.     The data that Fillmore prepares includes summary sheets for the CPA process, a summary sheet for the PA process, and basically he collects information showing the date, the line that the investigation believes was the cause of the issue,

to whom the issue was assigned, a 5 Why analysis, and validation sheets. (Fillmore Dep., pp. 77-78).

87.    As GL, Fillmore will complete an Excel chart which will show Production how they are doing on shipping good quality vehicles.  (Fillmore Dep., p. 82).

88.    It takes Fillmore an hour to an hour and a half to run this report. (Fillmore Dep., p. 83).

89.    Fillmore has had to work on the Line during lunch periods and when people were out when he was a GL in the Paint Shop, particularly in Plant 1 because it is such an old shop.  (Fillmore Dep., pp. 192-93).

90.    When Fillmore had to work on the Line in the Paint Shop, it would not be for the whole day, but at lunch and different times throughout the day, and it would be no more than three or four hours in a day.  (Fillmore Dep., pp. 194-95).

91.    Fillmore was always paid for all of the non-production Fridays in 2008.  (Fillmore Dep., pp. 114-16).

**B.      MICHAEL EUGENE PRICE**

92.      Price began employment with MBUSI in October, 1996, as a TM in the Body Shop on the Final Line.  (Price Dep., pp. 14, 26-28).[6]

93.      In the Spring of 1997, Price was promoted to TL and received a five percent raise.  (Price Dep., pp. 29-30).

94.      Price was promoted to GL on a Project Team in November, 2003. (Price Dep., pp. 38, 53-54).

95.      As a GL at MBUSI, Price earns at least $455.00 per week in salary. (Price RFA  #41).[7]

96.      After the Project Team assignment ended, Price was GL for the Z-2 251 Line in the Body Shop from 2004 through 2006.  (Price Dep., pp. 55, 59-61).

97.      As GL on the Z-2 Line, Price's group had four teams and at least twenty TMs on his group.  (Price Dep., p. 62).

98.      The Z-2 Line covered about half of the 251 side of the Body Shop. (Price Dep., p. 63).

99.      In 2007, Price moved to a GL position over the Z-3 Line.  (Price Dep., pp. 60-61).

---

[6]      The Deposition of Michael Eugene Price and exhibits to the deposition are attached as Ex. 202 to MBUSI's Evidentiary Submission (Volume 17).

[7]      Price Responses to Requests for Admission are attached as Ex. 203 to MBUSI's Evidentiary Submission (Volume 17).

100.   As GL over the Z-3 Line, Price's group had two TLs and at least thirty TMs.  (Price Dep., p. 65).

101.   The Z-3 Line is 175 to 250 feet long.  (Price Dep., p.  66).

102.   In 2008, Price became GL for the Dent Doctor Group.  (Price Dep., pp. 60-61).

103.   The Dent Doctor group had approximately twenty-five to thirty TMs and four teams with teams in Assembly 1 and in Assembly 2.  (Price Dep., pp. 66-67).

104.   After being GL over the Dent Doctor Group, in June, 2009, Price was assigned as GL for the 166 Project on which he currently works.  (Price Dep., p. 61).

105.   Until the middle of 2010, while Price was working as GL on the 166 Project Team, he did not have any TMs in his group, he had a desk and an office, and he was in charge of making sure that all aspects of the Production side were looked at with respect to the new vehicle.  (Price Dep., pp. 72, 77).

106.   Price worked with Engineering and Maintenance to buy off on the equipment which was being designed to use in the production of the new vehicle.  (Price Dep., pp. 73-74).

107.   Price looked at the equipment from a production standpoint to determine if it would be feasible for TMs to use it.  (Price Dep., p. 75).

17

108.   Price reviewed the designs and the equipment.  (Price Dep., pp. 75, 77).

109.   Price reviewed the production aspect of the planning and offered any input he had.  (Price Dep., pp. 77-78).

110.   Price also reviewed manpower numbers to determine how many TMs it would take to run the Shop.  (Price Dep., pp. 75-76).

111.   In the Summer of 2010, Price took a group of nine TMs to Germany for eight weeks to work on learning how to build the vehicle by hand, he would track issues and observe what was going on.  (Price Dep., pp. 70-71, 79-80).

112.   Price informs his TMs in the morning what is their schedule, what the plan is for the day, he observes their work and any issues that arises on the vehicle, if the TMs are doing something incorrect, he stops them and informs them of the SMP, and he tracks attendance.  (Price Dep., pp. 80-82).

113.   Price's group of nine TMs that work on the 166 Project, work with him in Germany for eight weeks, Price returns to Vance for one week, and then Price takes a new group of nine TMs to Germany to learn to build the vehicle. (Price Dep., pp. 70-71).

114.   After becoming GL, Price attended Group Leader Academy.  (Price Dep., p. 46).

18

115.   As GL, Price attended LSI training which involved training as to what MBUSI expected from their GLs.  (Price Dep., p. 48).

116.   As GL, Price has received training in prevention of harassment, ADA, civil treatment, corporate policies and guidelines, HR training, labor relations training, and work hardening awareness among other training.  (Price Dep., pp. 52-53; Price Dep. Ex. 2).

117.   Price supervises the TLs and TMs in his group.  (Price RFA #1).

118.   A Manager or AM is not always present in Price's group, and he leads his group independently of his Manager or AM.  (Price RFA #33).

119.   Price gives work directions and assignments to the members of his group.  (Price RFA #2).

120.   Price directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony.  (Price RFA #5).

121.   Price leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL position.  (Price RFA ##25, 26 & 28).

122.   Price shares his knowledge and experience with his group.  (Price RFA #30).

19

123.   Price initiates, facilitates and monitors problem solving in his group. (Price RFA #12).

124.   Price ensures that production and quality goals are met in his group. (Price RFA ##13 & 22).

125.   Price initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Price RFA #16).

126.   Price shows and supports top performance in his group.  (Price RFA #29).

127.   Price uses his best judgment in performing all of his GL job duties. (Price RFA #23).

128.   Price fulfills all of the roles and responsibilities of his GL position. (Price RFA #24).

129.   Price tries to make sure that his group works effectively and efficiently to minimize TM overtime.  (Price Dep., p. 139).

130.   Price is held accountable for the quality that comes out of his group. (Price Dep., p. 115).

131.   Price's team responds well to his direction.  (Price Dep., p. 170).

132.   Price responds quickly when crisis situations arise and provides suggestions for workable countermeasures to problems.  (Price Dep., p. 170).

133.   The GL Roles and Responsibilities Card contains the roles and responsibilities for the GL as defined by the Company.  (Price Dep., p. 156).

134.   Price has fulfilled the GL roles and responsibilities except he does not believe he manages because he has to follow policies, he does not develop an annual plan, and problem solving is usually initiated by the AM.  (Price Dep., pp. 156-63).

135.   As GL, Price follows the guidelines set forth in the training for GLs on their roles and responsibilities as closely as possible.  (Price Dep., p. 166; Price Dep. Ex. 14).

136.   The GL job description contains the general purpose of Price's GL position.  (Price Dep., p. 167; Price Dep. Ex. 15).

137.   The essential functions listed for the GL position are functions performed by Price as GL.  (Price Dep., p. 168; Price Dep. Ex. 15).

138.   As GL, Price is evaluated based on his leadership competencies. (Price Dep., pp. 168-69).

139.   As GL, Price observes his TMs and TLs to ensure that they are complying with MBUSI's policies, standards and rules.  (Price Dep., pp. 158-59).

140.   When Price observes the TMs and TLs, if he sees that they are not complying with the standards he informs them as to what is the policy so that they

will comply and if they do not, he will escalates to his AM.  (Price Dep., pp. 159-60).

141.   Other than when Price has been a GL on the Project Team, his primary responsibility has been to observe the work of his TMs and ensure they are complying with Company policies, standards and standards of conduct.  (Price Dep., pp. 175-76).

142.   Price ensures that company policies and work rules are enforced in his group.  (Price RFA #14).

143.   As GL, Price is accountable for making sure that his TMs and TLs are following Company policies and standards of conduct.  (Price Dep., p. 118).

144.   Price handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict. (Price RFA #18).

145.   Price counsels TMs on performance, quality of work and conduct. (Price RFA #9).

146.   If Price is aware of a performance issue, then it is his job as GL to counsel the TM on the proper procedure and SMP and what the TM needs to be doing.  (Price Dep., p. 146).

147.   If there is an HR issue that Price cannot resolve himself, he escalates it to his AM.  (Price Dep., p. 121).

22

148.   If Price observes TMs violating HR policies, he escalates that information to his AM.  (Price Dep., p. 145).

149.   If a TM has not improved their performance after Price has counseled them, he will escalate the issue to his AM.  (Price Dep., p. 146).

150.   Price has the authority to initiate a CPR on a TM when he deems necessary.  (Price RFA #10).

151.   It is Price's responsibility to write the CPR and forward it his AM for his approval.  (Price Dep., p. 147).

152.   Price has drafted a CPR.  (Price Dep., p. 147).

153.   Price ensures that his group is working safely and he monitors the environment for safety hazards.  (Price RFA #17).

154.   As GL, Price is accountable for ensuring his TMs comply with safety policies and rules.  (Price Dep., pp. 118-19).

155.   If there is an injury, Price conducts a walk back with Safety and he fills out a 5 Why form to determine the reason for the injury and develop countermeasures to prevent the injury from occurring again.  (Price Dep., pp. 122-23).

156.   As GL, Price will inform his TMs of what happened, what they need to do to prevent an accident from happening again, and then he will follow up to

make sure that they do what is needed to prevent another accident.  (Price Dep., pp. 126-27).

157.   As GL, if a TM has medical restrictions, Price gets Medical to clear the stations in which the TM can work and then he makes sure that those stations are the only stations in which the TM works.  (Price Dep., pp. 136-37).

158.   As GL, Price will attend a monthly meeting with HR when he is available.  (Price Dep., pp. 49-50).

159.   HR policies and procedures are discussed at these meetings.  (Price Dep., p. 51).

160.   As GL, Price must make sure that all of his TMs follow procedure. (Price Dep., p. 51).

161.   Price manages attendance in his group and ensures that his group is properly staffed.  (Price RFA #3).

162.   As GL, Price is responsible for the attendance calendar and tracking attendance for his TMs and TLs.  (Price Dep., p. 134).

163.   Price manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Price RFA #4).

164.   As GL, Price approves vacation or emergency vacation based on the policy.  (Price Dep., p. 136).

1961921 v1

165.   Price evaluates the performance of TMs and TLs in his group.  (Price RFA #6).

166.   When completing a performance evaluation, Price will describe the TM's performance with respect to the performance criteria.  (Price Dep., p. 140).

167.   Price will evaluate the TM as satisfactory or not satisfactory.  (Price Dep., p. 140).

168.   If Price gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion.  (Jones Decl. ¶ 33).

169.   Price will describe any steps that a TM can take to further develop in their position.  (Price Dep., p. 140).

170.   Price will then appraise whether the TM or TL is ready for promotion to the next level and his opinion is given consideration and normally is followed in determining if the TM or TL will be promoted.  (Price Dep., p. 141; Price RFA #7; Jones Decl. ¶¶ 31-32).

171.   Price will refer to the Roles and Responsibilities Card to determine whether a TM or TL is ready to be promoted to the next level.  (Price Dep., pp. 141-42).

172.   Price directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.  (Price RFA #19).

173.   As GL, Price develops training plans for his TMs with the assistance of his TLs.  (Price Dep., p. 129).

174.   As GL, Price tries to get as many of his TMs trained in different stations as possible.  (Price Dep., pp. 127-28).

175.   Before a TM may be moved to Level 3, Price must observe a TM's performance to ensure they are capable of performing the process on their own. (Price Dep., p. 128).

176.   As GL, Price signs off on the Circle of Skills which reflects the level that each TL or TM has reached on a station each quarter.  (Price Dep., pp. 128-29).

177.   As GL, Price will draft revisions or have TLs draft revisions to SMPs. (Price Dep., p. 155).

178.   If a TL drafted a revised SMP, Price will review it, make sure the other shift's GL signs off on it and then sends it to the AM for approval.  (Price Dep., pp. 155-56).

179.   If there is a quality issue and his AM instructs him to do so, Price will prepare a 5 why form for that issue.  (Price Dep., pp. 123-24).

180.   When Price was GL over the Z-2 Line, he would come in to work in the morning and check issues from the night before from the shift log.  (Price Dep., pp. 87-88).

181.   Price would check his emails, check for call-ins and complete any evaluations or paperwork that he was required to do pre-shift.  (Price Dep., pp. 89-90).

182.   As GL for the Z-2 Group, Price would attend a morning meeting with the Manager, AM and all of the GLs where the plan for the day and the issues from the prior shift would be discussed.  (Price Dep., pp. 82-83).

183.   That meeting usually last fifteen to twenty minutes.  (Price Dep., p. 84).

184.   From 6:15 to 6:20, Price would conduct a five minute communication meeting with his group at which they would discuss the issues from the day before and the plan for the day.  (Price Dep., pp. 84-85).

185.   Price would stay after the shift from five minutes to a couple of hours depending on what was going on.  (Price Dep., p. 91).

186.   After the shift, Price would finish his shift log, work on any evaluations, conduct any walk backs for quality issues that happened and check on any equipment issues.  (Price Dep., p. 91).

187.   Price would include SQDCM information on the shift logs.  (Price Dep., p. 94).

188.   Price would update the SQDCM Board whenever necessary.  (Price Dep., p. 93).

27

189.   Price would perform the same pre and post shift activities as GL for the Z-3.2 Line and the Dent Doctor Group.  (Price Dep., pp. 86, 90, 109).

190.   When Price was GL for the Dent Doctor Group, he would stay from a few minutes to a few hours depending on what was going on and complete his paperwork, conduct quality walk backs and feedback issues to other groups.  (Price Dep., pp. 94-95).

191.   As GL, Price was instructed to walk throughout his group and observe the performance of his TMs and TLs throughout the day.  (Price Dep., p. 101).

192.   Price would do this throughout the day as GL in the various groups in which he has been GL.  (Price Dep., p. 101).

193.   As GL in Z-2 and Z-3.2 Lines, Price would spend most of his time walking throughout the different areas and observing the TMs' performance and addressing any issues that arose.  (Price Dep., p. 102).

194.   Price was told not to be in the team room during the shift, to be on the Line and to be in the last station checking quality coming off the Line.   (Price Dep., pp. 110-14).

195.   As GL, Price's TLs would contact him by radio to alert him to issues and he would decide whether he could handle it by radio or needed to go see the issue in person.  (Price Dep., pp. 104-05).

28

196.   On some quality issues, Price would need to see the issue so he could understand what was the issue.  (Price Dep., p. 105).

197.   When Price would see the issue, he would see what needed to be done, where the issue needed to be fed back and determine whether it needed to be escalated based upon how major or minor it was.  (Price Dep., p. 105).

198.   When looking at the issue, some could be repaired right there, some would have to have follow up, and some might need to be escalated immediately as they might need to shut down.  (Price Dep., pp. 105-06).

199.   Price would contact Maintenance or Engineering if necessary.  (Price Dep., p. 106).

200.   If Price believed the issue was coming from another group, he would contact that GL so he could look at it.  (Price Dep., p. 106).

201.   As Dent Doctor GL, Price also spent most of his time walking throughout the different areas and observing the performance of his TMs.  (Price Dep., p. 132).

202.   As GL over the Dent Doctor Group, Price would also walk back issues, determine whether issues were Body Shop issues and whether they needed to be escalated.  (Price Dep., pp. 132-33).

203.   If Price's Dent Doctor Group could not address the issue, he would contact whoever needed to be contacted, including Engineering.  (Price Dep., p. 133).

## II.  ARGUMENT

In a FLSA exemption case, how an employee spends his time is a question of fact for a jury, but whether the employee's particular activities make him exempt is a question of law for the Court.  See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).  When the material facts are not genuinely in dispute, summary judgment is appropriate.  See Gregory v. First Title of Am., Inc., 555 F.3d 1300, 1301 (11th Cir. 2009) (affirming summary judgment).  For the purpose of this motion, MBUSI relies solely on plaintiffs' own description of their duties.  Thus, there is no need for a jury to determine their duties; rather, the only issue is whether those duties, as described by plaintiffs, make them exempt.

As GLs, Fillmore and Price have supervised their groups of TMs and have been exempt under the executive exemption.  Since Fillmore has been in the Audit area he also performs exempt administrative duties and therefore additionally qualifies for the administrative exemption.  For a period of time while on the 166 Project Team, Price did not supervise TMs but instead worked on pre-production planning for a new model, which qualified him for the administrative exemption.  To the extent Fillmore and Price perform both exempt executive and exempt administrative duties during the same period they are exempt under the combination exemption as well.

## A.    As GLs Fillmore And Price Have Been Exempt Executives.

As GLs Fillmore and Price have met all the requirements of an exempt executive which include:  (1) they are compensated on a salary basis at a rate of not less than $455 per week; (2) their primary duty is management of a customarily recognized department or subdivision of an enterprise; (3) they customarily and regularly direct the work of two or more other employees; and (4) their suggestions or recommendations as to the advancement, promotion, firing, discipline and other change of status of TMs and TLs are given particular weight.  29 C.F.R. § 541.100. One exception to this is when from June 2009 to the middle of 2010 Price worked on pre-production planning and did not supervise TMs.

### 1.    Plaintiffs Are Paid On A Salary Basis Above The Minimum Rate.

An employee is paid on a salary basis if he regularly receives each pay period a predetermined amount which is not subject to reduction because of variations in the quality or quantity of work performed.  29 C.F.R. § 541.602. Since becoming GLs Fillmore and Price have received a predetermined weekly salary, which always has exceeded $455.00, no matter if they worked all week and no matter the quality of their work.  (Fillmore RFA #41; Price RFA # 41).  Thus, there is no dispute that the plaintiffs were paid on a salary basis above the minimum rate.

32

### 2.    Plaintiffs' Primary Duty Is Management Of A Subdivision.

Fillmore and Price have managed groups which are customarily recognized subdivisions of MBUSI.  "The phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function."  29 C.F.R. § 541.103(a).  Throughout his time as a GL, Fillmore has supervised a group of TMs and TLs in Quality and then in Audit in particular areas of the facility.  (Fillmore Dep., pp. 24, 26-27, 191).  As a GL, Price likewise has supervised a group of TMs and TLs in certain areas including the Z-2 Line, the Z-3 Line, the Dent Doctor Group and the Project Team.  (Price Dep., pp. 55, 59-63, 65-66, 70-71; Price RFA #1, 2 and 5).  There was a brief period from June 2009 to the middle of 2010 that Price did not supervise TMs.  (Price Dep., pp. 61, 72, 77).  The groups assigned to the plaintiffs clearly meet the description of a customarily recognized subdivision.

Fillmore and Price have had as their primary duty the management of their groups (except briefly when Price did not manage TMs.).  An employee's primary duty is the "principal, main, major or most important duty" that he performs.  29 C.F.R. § 541.700(a); see also DePew v. ShopKo Stores, Inc., No. 03-0539, 2006 WL 1663272 (D. Idaho May 30, 2006) (finding that the plaintiffs' duties of directing, training, motivating and leading their department were more important

than any other duties).  In determining the plaintiffs' primary duty the focus is on "the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  Some factors to consider when determining the primary duty of an employee include the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  29 C.F.R. § 541.700(a).

While not determinative, "[t]he amount of time spent performing work can be a useful guide in determining whether exempt work is the primary duty of the employee.  Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.  Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion."  29 C.F.R. § 541.700(b).

There is no question that while a GL Fillmore's primary duty has been management and that he has spent well over 50 percent of his time performing exempt executive duties.  He testified that his primary duty in all areas in which he

34

has been a GL has been to monitor TMs; make sure that TMs follow the rules, the regulations and the SMPs; and also to give the TMs feedback when they do not. (Fillmore Dep. pp. 50-51, 128, 190-91).   He also ensures they take the required training and do what is asked of them.   (Fillmore Dep., pp. 181-82).   Fillmore testified that he <u>constantly</u> observes and monitors his TMs and gives them feedback.   (Fillmore Dep., pp. 183-84).   If his TMs deviate from the SMPs, he provides feedback.   (Fillmore Dep., pp. 41-42, 44).   It is Fillmore's "job" to check, monitor and observe that his group is following guidelines.   (Fillmore Dep., p. 45).

For most of his time as a GL, Price likewise has had management as his primary duty and he has spent the majority of his time performing exempt executive duties.   Except for a period of time when he had no TMs on the 166 Project Team, his primary responsibility has been to observe the work of the TMs and ensure they are complying with the company policies and standards, and he did this throughout most of his day.   (Price Dep., pp. 101-02, 132, 158-59, 175-76). When as GL of the 166 Project Team Price takes groups of TMs to Germany, he observes those TMs and tracks issues.   (Price Dep., pp. 70-71, 79-80).   Price informs his TMs in the morning what is their schedule and what the plan is for the day; he observes their work and any issues that arises on the vehicle; if the TMs are doing something incorrect, he stops them and informs them of the SMP; and he tracks attendance.   (Price Dep., pp. 80-82).   Only from June 2009 to the middle of

2010 when he had no TMs did Price not manage.  The rest of the time as GL he has supervised his group, given directions and assignments to the members of his group and directed the group in meeting the company's objectives.  (Price RFA ##1, 2, 5)

Fillmore and Price further admit that they perform many of the duties recognized by the Department of Labor as management duties.   29 C.F.R. § 541.102.  They ensure that company policies and work rules are enforced in their group.  (Fillmore RFA #14; Price RFA #14).  They counsel TMs on performance, quality of work and conduct.  (Fillmore RFA #9; Price #9).  They direct training and retraining in skills for TMs.  (Fillmore RFA #19; Price RFA #19).  They handle TM issues and conflicts and decide when to involve higher management or HR.  (Fillmore RFA #18; Price RFA #18).  They ensure that production and quality goals are met in their groups.  (Fillmore RFA ##13, 22; Price ##13, 22).  They initiate continuous improvement activities in their group and lead the implementation of initiatives in their group.  (Fillmore RFA #16; Price RFA #16).  They make sure their groups are working safely.  (Fillmore RFA #17; Price RFA #17).   They fulfill all of the roles and responsibilities of their GL position.  (Fillmore RFA #24; Price #24).  These admissions establish their primary role as a supervisor as a matter of law.  Jacobs v. Elect. Data Sys. Corp., No. 2:05CV925, 2006 WL 3742202, at *3 (M.D. Ala. Dec. 18, 2006).

These management duties are critical to the operation of the groups and the whole Plant.  If the plaintiffs do not manage their groups, the quality of the product and the efficiency of the Plant is affected.  See Sappington v. Style-Line Furniture, No. 1:06CV249, 2007 WL 3355838, at *7 (N.D. Miss. Nov. 8, 2007) (finding line supervisors exempt because they oversaw quality and timeliness of production and upper management looked to them to have their lines produce the product on schedule).  Fillmore and Price are valuable to MBUSI because they observe their TMs, make sure the TMs are working correctly and safely, feed back quality mistakes to their group, counsel TMs and communicate to TMs and others in the Plant information essential to the operations.

Moreover, these plaintiffs also are relatively free from supervision.  A Manager or AM is not always present in their group, and they lead their groups independently of their Manager or AM.  (Fillmore #33; Price RFA #33).  They use their best judgment in performing their GL duties.  (Fillmore RFA #23; Price RFA #23).  Also, their salaries exceed that of TLs and TMs by approximately 10% and 15%, respectively.  (Jones Decl. ¶ 59).  Thus, all factors provided by the Department of Labor for determining primary duty compel the conclusion that as GLs Fillmore and Price have been exempt executives.

To the extent Fillmore and Price claim that they are not managers because they enforce rather than create company policy and they take direction from their

Assistant Manager, MBUSI has shown that argument to be meritless in its prior briefs.  See MBUSI Briefs (Lawson Docs. # 65, 73, 83) (citing Pollard, 2011 U.S. Dist. LEXIS 24199, at *21 ("[C]ourts uniformly reject arguments that an employee cannot be an exempt executive if he cannot make hiring or firing decisions or is subject to rigid supervision."); see also, Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982); Scott, 2011 U.S. Dist. LEXIS 32819, at *44; Burson v. Viking Forge Co., 661 F. Supp. 2d 794 (N.D. Ohio 2009); ; Haas v. Behr Dayton Thermal Prods., LLC, No. 3:07cv139, 2008 U.S. Dist. LEXIS 122184, at *61 (S.D. Ohio Dec., 22, 2008); Rainey v. McWane, Inc., 552 F. Supp. 2d 626, 631 (E.D. Tex. 2008); Pendlebury v. Starbucks Coffee Co., No. 04-80521, 2008 WL 763213, at *8 (S.D. Fla. Mar. 13, 2008); Mitchell v. Abercrombie & Fitch, Co., 428 F. Supp. 2d 725, 742-43 (S.D. Ohio 2006), aff'd, 225 Fed. Appx. 362 (6th Cir. 2007); Jackson v. Advance Auto Parts, Inc., 362 F. Supp. 2d 1323, 1335 (N.D. Ga. 2005) ("the fact that Plaintiffs had to adhere to certain guidelines or in certain instances obtain the Store Manager's approval does not diminish Plaintiffs' discretionary powers"); Beauchamp v. Flex-N-Gate LLC, 357 F. Supp. 2d 1010, 1017 (E.D. Mich. 2005) (stating that nothing in the applicable law "requires that a supervisor must have unfettered discretion in the performance of his management duties in order to be an 'executive'"); Kastor v. Sam's Wholesale Club, 131 F. Supp. 2d 862,

868 (N.D. Tex. 2001); Haines v. Southern Retailers, Inc., 939 F. Supp. 441, 450 (E.D. Va. 1996).

### 3.      Plaintiffs Customarily And Regularly Direct The Work Of Two Or More Employees.

Fillmore and Price have had two or more TMs in their groups except when Price was involved in pre-production on the Project Team from June, 2009 to the middle of 2010.  They direct the work of their group on a daily basis.  (Fillmore Dep., pp. 181-82; Price RFA ##2, 5).  Again, "[t]he mere fact that plaintiff also had a supervisor does not negate the fact that he was in charge of his shift."  Burson, 661 F. Supp. 2d at 804.  Plaintiffs clearly meet this third prong of the executive exemption test.

### 4.      Plaintiffs' Recommendations Regarding Team Members' Status Are Given Particular Weight.

Fillmore and Price meet the fourth prong of the exemption because their recommendations on promotion and discipline are given particular weight.  They both evaluate the performance of the TMs and TLs in their group.  (Fillmore Dep., pp. 176-79, 183; Price Dep., p.140; Price RFA #6).  If Fillmore or Price rates one of their TMs as not satisfactory in any area of the evaluation other than attendance, the TM is not eligible for promotion.  (Jones Decl. ¶ 33).  For those TMs who are eligible for promotion, Fillmore and Price rate them as ready or not ready for promotion,   and   their   recommendation   is   followed   absent   exceptional

39

circumstances.  (Fillmore Dep., p. 179; Fillmore RFA #7; Price Dep., p. 141; Price RFA #7; Jones Decl. ¶¶ 31-32).   Fillmore and Price also discipline TMs.  They counsel TMs on performance, quality of work and conduct and initiate CPRs when they believe necessary.  (Fillmore Dep., pp. 56-58; Fillmore RFA #9; Price Dep., pp. 146-47, Price RFA ##9, 10).  TMs who have an active CPR in their file are ineligible for promotion.  (Jones Decl. ¶¶ 31, 41).

To the extent Fillmore and Price argue that they do not affect the status of TMs because their promotion assessments and discipline must be reviewed by managers or human resources, MBUSI has shown that argument is wrong.  The DOL regulations explain that "particular weight" does not mean that the recommendation is final.  29 C.F.R. § 541.105; see also Burson, 661 F. Supp. 2d at 805 (finding that because the plaintiff's recommendations were "generally" followed and because he initiated discipline, his recommendations were given particular weight); Rainey, 552 F. Supp. 2d at 630 (finding that plaintiffs engaged in the managerial activity of discipline when they sent information to HR); Beauchamp, 357 F. Supp. 2d at 1016 (same).  Moreover, the plaintiffs have not presented any evidence that CPRs they drafted were overturned or that they have ever had a TM in their group be promoted that they rated as not ready for promotion.

A reasonable fact finder could not conclude that no particular weight was given to Fillmore's and Price's recommendations regarding promotion and discipline, and thus they are exempt under the fourth prong of the executive exemption test.

**B.     At Times, Fillmore And Price Have Performed Exempt Administrative Duties And Also Are Exempt Under The Administrative And Combination Exemptions.**

At times, Fillmore and Price also have met the requirements of the administrative exemption which include:  (1) they are compensated on a salary basis at a rate of not less than $455 per week; (2) their primary duty is the performance of office or non-manual work directly related to the management or general business operations of MBUSI; and (3) their primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  29 C.F.R. § 541.200.  As discussed above, there is no question that Fillmore and Price were paid on a salary basis above the minimum rate.

Since Fillmore has worked in the Audit area he has performed significant office work directly related to the business operations of MBUSI.  In the Audit area Fillmore prepares reports on quality issues that his TMs have found in vehicle audits.  (Fillmore Dep., pp. 63-65).  Fillmore sends this audit information to everyone in the organization.  (Fillmore Dep., pp. 64-65).  He completes summaries for the various audit processes and he includes the area of the plant

41

where his group believes the issue arose, which TM in his group was assigned the issue, a problem solving analysis and validation sheets.  (Fillmore Dep., pp. 77-78).  He also spends an hour to an hour and a half completing an Excel chart to show Production how they are doing on shipping good quality vehicles.  (Fillmore Dep., p. 82).  In other words, Fillmore reports on quality audit information to help Production address quality issues which is certainly work directly related to MBUSI's operations.

Fillmore uses discretion and independent judgment in preparing these reports.  He has to sift through the information provided by his TMs to determine what should be included on the report.  (Fillmore Dep. p. 84).  He also has to ensure the information is correct and direct the TL to address it if it is not. (Fillmore Dep., pp. 85-86).   He also proposes improved quality feedback processes.  (Fillmore Dep., pp. 186-87; Fillmore Dep., Ex. 21).  He uses his discretion and independent judgment in a matter of great significance to MBUSI, which is quality, and Production relies upon his reports.

Price also performed significant office work directly related to the business operations of MBUSI when he worked on pre-production planning on the 166 Project Team.  Price worked in an office and was in charge of making sure that all aspects of the Production side were looked at with respect to the new vehicle. (Price Dep., pp. 72, 77).  He worked with Engineering and Maintenance to buy off

42

on the equipment which was being designed to use in the production of the new vehicle.  (Price Dep., pp. 73-74).  He looked at the equipment from a production standpoint to determine if it would be feasible for TMs to use it.  (Price Dep., p. 75).  He reviewed the designs and the equipment.  (Price Dep., pp. 75, 77).  He reviewed the production aspect of the planning and offered any input he had.  (Price Dep., pp. 77-78).  He also reviewed manpower numbers to determine how many TMs it would take to run the Shop.  (Price Dep., pp. 75-76).

Price's work in this job assignment certainly involved the use of discretion and independent judgment.  Indeed, his role was to provide his opinion on whether the designs and equipment could be used by TMs in production.  He also offered input on other aspects of producing the new vehicle.  He also had to determine how many TMs were needed to produce the vehicle.  Not only did Price exercise discretion and judgment but he did so on a matter of great significance - the production of a new vehicle.  Thus, since Fillmore has been a GL in the Audit area and when Price was involved in pre-production planning on the 166 Project Team, they qualified for the administrative exemption.

To the extent Fillmore and Price perform executive and administrative duties during the same period, they also qualify for the combination exemption.  The DOL regulations provide that "[e]mployees who perform a combination of exempt duties as set forth in the regulations in this part for executive, administrative,

professional, outside sales and computer employees may qualify for exemption." 29 C.F.R. § 541.708.  The regulation further provides as an example "an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption.  In other words, work that is exempt under one section of this part will not defeat the exemption under any other section."  29 C.F.R. § 541.708; <u>see also</u>, <u>Schmidt v. Eagle Waste & Recycling, Inc.</u>, 599 F.3d 626, 631-33 (7th Cir. 2010); <u>IntraComm, Inc. v. Bajaj</u>, 492 F.3d 285, 293-94 (4th Cir. 2007) (holding that the combination exemption allows the "blending" of exempt duties under different exemptions to meet the primary duty requirement).

When Fillmore and Price were not acting as managers, they were performing exempt administrative duties.  The regulations expressly provide that when they did so they did not lose their exempt status.  Because the law and facts clearly show that these two GLs have been exempt throughout their tenure as GLs, they must be dismissed from the case.

### C.     There Is No Just Reason To Delay Entering A Final Judgment.

Although these plaintiffs are not part of a class and an order of summary judgment on their claims is a final order, to avoid any question, pursuant to Fed. R. Civ. P. 54(b), this Court should expressly determine that there is no just reason for delay and enter final summary judgment as to the claims of these two plaintiffs.

44

Rule 54(b) states in relevant part as follows:  "when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."  FED. R. CIV. P. 54(b).  Thus, for a proper Rule 54(b) certification, a district court must first determine that it is dealing with a final judgment:

> It must be a "judgment" in the sense that it is a decision upon a cognizable claim for relief, and it must be "final" in the sense that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action."

Curtiss-Wright Corp. v. General Elec. Co., 446 U.S. 1, 7 (1980) (quoting Sears, Roebuck & Co. v. Mackey, 351 U.S. 427, 436 (1956)).  The entry of summary judgment as to these two plaintiffs in this case quite clearly is a final judgment as it disposes of all claims asserted by them.

Second, the court must determine that there is no just reason for delay. Curtiss-Wright Corp., 446 U.S at 8.  It is left to the "sound judicial discretion" of the district court to make this determination "in the interest of sound judicial administration."  Id.  In reaching this determination, the court should consider judicial administrative interest, the equities involved, and whether piecemill appeals will result.  Id.  In the present case, there is no just reason for delay because each of the individual plaintiffs' entire case is resolved by this summary judgment.  Moreover, each plaintiff has an individual case and even if summary

45

judgment had been denied, their cases would not have been tried with cases of other plaintiffs.  Thus, there would not be an increase in cost if the plaintiffs decide to appeal these individual cases now, it will not multiply proceedings, and the failure to certify the judgment for appeal will only result in potential delay of an appeal and final resolution to the parties.  See Explosives Supply Co. v. Columbia Nitrogen Corp., 691 F.2d 486, 486-87 (11th Cir. 1982) ("the opinion of the lower court clearly shows the separability of the claims such that neither the same issues nor facts would be before the reviewing court more than once").

## IV.   **CONCLUSION**

Because the requirements for the executive, administrative and combination exemptions are met in regards to these two plaintiffs (**Don Fillmore and Michael Eugene Price**), final summary judgment is due on their claims and their claims should be dismissed with prejudice with costs taxed to these plaintiffs.


                                        s/ Michael L. Lucas
                                        Michael L. Lucas (LUC004)
                                        Ashley H. Hattaway (HAT007)

                                        Attorneys for Defendant
                                        Mercedes-Benz U.S. International,
                                        Inc.

1961921 v1

**OF COUNSEL:**

BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama  35203
Telephone: (205) 451-5204
Facsimile: (205) 458-5100
mlucas@burr.com
ahattaw@burr.com

47

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Defendant Mercedes-Benz U.S. International, Inc.'s Brief in Support of Its Motion for Summary Judgment As To Plaintiffs Who Are Exempt Pursuant to the Executive, Administrative And Combination Exemptions has been electronically filed with the Clerk of the Court using the CM/ECF system on the following CM/ECF participant, on this 21st day of November, 2011:

Thomas F. Campbell
D. Keiron McGowin
CAMPBELL LAW
1 Chase Corporate Drive
Suite 180
Birmingham, AL 35244

Mark R. Thierman
Joshua Buck
THIERMAN LAW FIRM, APC
7287 Lakeside Drive
Reno, Nevada  89511

s/ Michael L. Lucas
OF COUNSEL

48

1961921 v1