FILED
2011 Dec-21  PM 07:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION**

| | | |
|---|---|---|
| **JEFF HICKS**, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff(s), | ) ) | **CV08-CO-00536-W** |
| vs. | ) ) ) | |
| **MERCEDES-BENZ U.S.** | ) ) | |
| **INTERNATIONAL, INC.**, an Alabama | ) ) | |
| Corporation, | ) | |
| Defendant. | | |

| | | |
|---|---|---|
| **GRAYLYN LAWSON, ET AL.**, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff(s), | ) ) | **CV09-CO-01157-W** |
| vs. | ) ) ) | |
| **MERCEDES-BENZ U.S.** | ) ) | |
| **INTERNATIONAL, INC.**, an Alabama | ) ) | |
| Corporation, | | |
| Defendant. | | |

**PLAINTIFFS' RESPONSE TO DEFENDANT MERCEDES-BENZ U.S.
INTERNATIONAL, INC.'S MOTION FOR FINAL SUMMARY JUDGMENT AS TO
"PLAINTIFFS WHO ARE EXEMPT PUSUANT TO THE EXECUTIVE,
ADMINISTRATIVE, AND COMBINATION EXEMPTIONS**

1

## TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

II.  DISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

    A.  **Genuine Issues Remain As To Whether Plaintiffs Are Exempt Under the Executive Exemption** . . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . . . . .  31

        1.  GLs Are Not Paid On a Salary Basis . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

        2.  Mercedes Cannot Meet Its Burden That GLs' Primary Duty Is Management Of A Customarily Recognized Department . . . . . . . . . . . .  39

            a.  *Plaintiffs' Primary Duty Is Not Management; Plaintiffs Are Non-Exempt "Working Foremen/Supervisors."* . . . . . . . . . . .  39

            b.  *Plaintiffs Do Not Manage A Customarily Recognized Department Or Subdivision* . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

        3.  Genuine Issues Remain As To GLs' Authority to Hire And Fire Or Whether GLs' Recommendations Are Given Particular Weight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

    B.  **Genuine Issues Remain As To Whether Plaintiffs Are Exempt Under The Administrative Exemption** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

        1.  Plaintiffs Duties Are Directly Related To The Day-To-Day Production of Mercedes Vehicles . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

        2.  Plaintiffs Do Not Exercise Any Discretion Or Have Independent Judgment With Respect To Matters of Independent Significance . . . . . .  50

    C.  **Genuine Issues Remain As To Whether Plaintiffs Are Exempt Under The Combination Exemption** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      INTRODUCTION**

Upon addressing Mercedes' instant motion for summary judgment (and after opposing the previous slew of summary judgment motions), Plaintiffs have come up with a fitting characterization of Mercedes' legal position that Group Leader ("GLs") are exempt from overtime under the Fair Labor Standards Act ("FLSA"):   Mercedes has taken on the role of Big Brother from George Orwell's classic 1984 and perfected the art of "doublespeak."

Here is just one example.  Mercedes publically represents that GLs are exempt under the managerial exemption because their primary duty is to "manage" Team Leaders ("TLs") and Team Members ("TMs"). Privately, however, Mercedes' upper management directs GLs to work the line and perform various tasks such as checking quality: "***I was told [by Vice President Phil Johnson] that they didn't pay me to have my ass in the chair [and that h]e wanted me in the last station checking quality coming off that line.***"[1] <u>See, e.g.</u>, Price Dep., pp. 110-14. Because

---

[1]
| | | |
|---|---|---|
| Q. | What do you mean you were usually on that line? |
| A. | That 95 percent of the day I was right on that line if not a hundred percent. So they could call me and just tell me what station they were in. |
| | . . . |
| Q. | Do you know why the company told you that? |
| A. | That is the direction we were given. |
| Q. | So they didn't give you a reason for that direction? |
| A. | ***I was told that they didn't pay me to have my ass in the chair was the quote from a vice president.*** |
| Q. | What vice president? |
| A. | Phil Johnson. |
| Q. | And he told you he wanted you walking up and down the line observing the work of your team members. Correct? |
| A. | He told me he wanted me on that line. |
| Q. | Which would be walking up and down the line observing the team members? |
| A. | ***He wanted me in the last station checking the quality coming off that line.*** |
| Q. | Did he tell you that? |
| A. | Yes, he did. |

it is difficult to argue that a GL is exempt under the FLSA if he or she works the line 95% to 100% of the time checking quality, Mercedes has used doublespeak to mischaracterize GLs actual duties.

This type of doublespeak is also prevalent in arguing that Plaintiffs are exempt because "they spend a significant time performing administrative duties." (Def's Mot., at 1.) To qualify for the administrative exemption under the FLSA, a GL's primary duty must include the "exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. "The exercise of discretion and independent judgment also **does not include clerical or secretarial work, recording or tabulating data**, or performing other mechanical, repetitive, recurrent or routine work. **An employee who simply tabulates data is not exempt, even if labeled as a "statistician.""** 29 C.F.R. §541.202(e). Manually entering information into a computer does not involve any discretion or independent judgment. It is robotical and tedious clerical work. But this is precisely the type of "administrative" work that Plaintiffs perform.[2]

---

Price Dep., pp. 111-12.

[2]   Q.   How much time of your day would you say is spent in the Audit area?
      A.   *I want to say as much as six hours. To break it down, I would say six hours*.
      Q.   What are you doing while you are in the Audit area?
      A.   *Reports, entering data into the computer, disseminating information, looking at issues, moving cars, involved in meetings. That would be it.*
      Q.   What sort of reports are you doing?
      A.   My team members, when they check vehicles, they have to input everything they do all; the issues, all the concerns. *We have to take that information and put them into a pre-set format, okay, like a reporting format.* So when they have issues, pictures have to be taken, then those pictures have to be put into formats, and then you have to put in some more information. Once you put in all of this information, then, of course, you have to sent this information out to the organization, and, you know, things of that nature.

Fillmore Dep., pp. 62-64.

<u>See, e.g.</u>, Fillmore Dep., pp. 62-78 ("All of this stuff, we are just plugging in those numbers."). Thus, Mercedes' contention that these two Plaintiffs are exempt under the combination exemption because they are similarly exempt under the administrative and managerial exemptions fails. At the very least, there is a triable issue as to whether Plaintiffs' exercise discretion and independent judgment in performing their office and clerical duties.

Moreover, for the same reasons that have been put forth in Plaintiffs' previous oppositions, there are triable issues as to whether GLs meet all the necessary factors to be considered exempt under the managerial exemption. Indeed, GLs earn less than non-exempt Team Leaders ("TLs") and non-exempt Team Members ("TMs"). <u>See</u> Costes Dep., pp. 81-82 (stating that TLs make more than GLs because of overtime)[3]; 29 C.F.R. § 541.700(a); <u>Morgan v. Family Dollar Stores</u>, 551 F.3d 1233, 1271 (11th Cir. 2008) (recognizing this as one factor that supports the conclusion that GLs' primary duty is not "management"). They have no independent discretion—they simply relay company edicts, are closely supervised by Assistant Managers ("AMs") and Mercedes upper management, and are directed to perform manual labor by their AMs. <u>See, e.g.</u>, <u>See, e.g.</u>, Price Dep., pp. 110-14 (testifying that he was directed by Mercedes' Vice President to stand at the end of his line and check quality); 29 C.F.R. § 541.700(a); 29 C.F.R. § 541.106(a)("[While] exempt executives make the decision regarding when to perform nonexempt duties . . . the nonexempt employee generally is directed by a supervisor to perform exempt work . . . ."); <u>Morgan</u>, 551 F.3d at 1270, n.57 (stating that "the frequency with which an employee exercises discretionary powers [remains in the] primary duty analysis"). Also, GLs do not have any authority to hire, fire, or promote employees and there are factual disputes as to the amount of weight Mercedes gives to GLs' recommendation. These

---

[3] The Deposition of Maury Costes and exhibits to the deposition are attached as Ex. 196 to MBUSI's Evidentiary Submission (Volume 16).

factors alone defeat Mercedes' motion for summary judgment because GLs were not engaged in the "management" of Mercedes.

Moreover, as a threshold matter, the "executive" and "administrative" exemptions are inapplicable because GLs were not paid a true salary. Mercedes' "non-production Friday" policy violated the salary basis by causing a diminution in GL salaries. See, e.g., Fillmore Dep., pp. 111-20 (testifying that he had to work off his work debt and that he was never paid out his work credit). All of these considerations raise triable issues of fact for a jury that GLs were misclassified as exempt employees. Therefore, as this Court ruled in Hicks v. Mercedes, 7:08-CV-0536-LSC, "Memorandum of Opinion," Mercedes' instant summary judgment motion must be denied. See also Morgan v. Family Dollar Stores, 551 F.3d 1233, 1271 (11th Cir. 2008) (recognizing that the primary duty determination is "necessarily fact-intensive").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## II.   **DISPUTED FACTS**

| **A.   DON FILLMORE** | |
|---|---|
| 1.      Don Fillmore ("Fillmore") began employment at MBUSI in 1996 as a TM in Supplier Quality (SQO). (Fillmore Dep., pp. 15, 21).[4] | Undisputed. |
| 2.      Fillmore was promoted to TL in Supplier Quality around 1997 or 1998.  (Fillmore Dep., p. 24). | Undisputed. |
| 3.      In 1998 or 1999, Fillmore was promoted to GL and was assigned a Quality group in the Body Shop.  (Fillmore Dep., p. 24). | Undisputed. |
| 4.      Fillmore's group consisted of TMs who were quality inspectors or quality checkers. (Fillmore Dep., p. 25). | Undisputed. |
| 5.      Fillmore was GL over his Quality group in the Body Shop, then his group included the Body and Paint Shop, and then he moved to a group in the Body and Paint Shop in Plant 2 when it opened.  (Fillmore Dep., p. 26). | Undisputed. |
| 6.      Plant 2 opened in 2004.  (Glass Dep., pp. 47-48).[5] | Undisputed. |
| 7.      Fillmore's group had one TL and one TM in each Plant for a total of four TMs. (Fillmore Dep., p. 61). | Disputed.  Objection:  misstates testimony.  The group was not Fillmore's group.  While in Paint Final, Fillmore worked alongside one TL and two TMs.  (Fillmore Dep., p. 61). |
| 8.      Around 2008, Fillmore moved to GL over Quality in the Assembly Area in Plant 1.  (Fillmore Dep., pp. 26-27). | Undisputed. |
| 9.      When Fillmore was in Assembly, Plant 1, his group had two TLs and nine TMs. (Fillmore Dep., pp. 60-61). | Undisputed. |
| 10.     In 2009, Fillmore became GL for the Audit Area in Plant 1 for Quality.  (Fillmore Dep., p. 27). | Undisputed. |

---

[4] The Deposition of Don Fillmore and exhibits to the deposition are attached as Ex. 200 to MBUSI's Evidentiary Submission (Volume 17).

[5] The Deposition of Kim Glass and exhibits to the deposition are attached as Ex. 118 to MBUSI's Evidentiary Submission (Volume 10).

| | |
|---|---|
| 11.     Fillmore has one TL and thirteen TMs in his group and they are disbursed throughout the Plant.  (Fillmore Dep., pp. 33, 51, 62). | Undisputed. |
| 12.     Fillmore has attended Group Leader Academy and had training regarding harassment, the Americans With Disabilities Act, civil treatment, communications, corporate policies and guidelines, group leader roles and responsibilities, HR benefits, labor relations, and numerous other training courses.    (Fillmore Dep., pp. 101-02; Fillmore Dep. Ex. 1). | Undisputed. |
| 13.     As a GL at MBUSI, Fillmore earns at least $455.00 per week in salary.  (Fillmore RFA  #41).[6] | Undisputed. |
| 14.     Fillmore's duties differed from those performed by the TMs in his group.  (Fillmore RFA #34). | Undisputed. |
| 15.     A Manager or AM is not always present in Fillmore's group, and he leads his group independently of his Manager or AM based on Company guidelines.  (Fillmore RFA #33). | Undisputed. |
| 16.     Fillmore leads his group in meeting company standards and he uses leadership skills in his GL position.   (Fillmore RFA ##25, 26). | Disputed.<br><br>As a GL, Fillmore is not held responsible if his team does not meet their quality goals.  (Fillmore Dep., p. 47).<br><br>Every MBUSI employee has a responsibility to ensure that policies, rules, regulations and SMPs are followed (Fillmore Dep., pp. 36-37). |
| 17.     Fillmore shares his knowledge and experience with his group.  (Fillmore RFA #30). | Undisputed. |
| 18.     Fillmore ensures that production and quality goals are met in his group.  (Fillmore RFA ##13 & 22). | Disputed.<br><br>As a GL, Fillmore is not held responsible if his |

---

[6] Fillmore Responses to Requests for Admission are attached as Ex. 201 to MBUSI's Evidentiary Submission (Volume 17).

| | team does not meet their quality goals. (Fillmore Dep., p. 47). |
|---|---|
| 19. Fillmore initiates continuous improvement activities in his group and leads the implementation of initiatives in his group. (Fillmore RFA #16). | Disputed.<br><br>There is a Continuous Improvement group at MBUSI that is responsible for continuous improvement. (Fillmore Dep., p. 167). |
| 20. Fillmore works with other GLs and the CI Team to make continuous improvements in the processes. (Fillmore Dep., p. 167). | Undisputed.<br><br>Fillmore testifies that he also gets feedback from the TLs and TMs for continuous improvement ideas. (Fillmore Dep. pp. 167-68). |
| 21. As GL, Fillmore makes sure that his TMs stay focused on and aware about following the processes and standard procedures. (Fillmore Dep., p. 175). | Undisputed. |
| 22. Fillmore shows and supports top performance in his group. (Fillmore RFA #29). | Objections: Vague, ambiguous, unintelligible. |
| 23. Fillmore uses his best judgment in performing all of his GL job duties. (Fillmore RFA #23). | Undisputed. |
| 24. Fillmore fulfills all of the roles and responsibilities of his GL position. (Fillmore RFA #24). | Undisputed. |
| 25. Fillmore's primary duty as a GL is to follow the rules and guidelines and to give the TMs in his group feedback so that they can follow the rules, guidelines and SMPs. (Fillmore Dep., pp. 50-51). | Undisputed. |
| 26. As GL, Fillmore is focused on making sure the TMs follow the SMPs, take the required training, and do what is asked of them. (Fillmore Dep., pp. 181-82). | Undisputed. |
| 27. If Fillmore observes a TM not complying with a SMP, he provides feedback. (Fillmore Dep., p. 128). | Undisputed. |
| 28. Providing feedback to TMs makes for better quality. (Fillmore Dep., p. 129). | Undisputed. |
| 29. In all of the areas in which Fillmore has been GL, the basic principle is the same with respect to keeping up with training, following policies, procedures and SMPs, and | Undisputed. |

| | |
|---|---|
| monitoring TMs.  (Fillmore Dep., pp. 190-91). | |
| 30.     These are some of Fillmore's primary duties in all of the areas in which he has been GL.  (Fillmore Dep., p. 191). | Undisputed. |
| 31.     The main part of Fillmore's primary duty is to ensure that the TMs are in their work stations following the rules, regulations and the SMPs.  (Fillmore Dep., p. 191). | Undisputed.<br><br>Every MBUSI employee has a responsibility to ensure that policies, rules, regulations and SMPs are followed (Fillmore Dep., pp. 36-37). |
| 32.     Fillmore constantly observes and monitors his TMs and gives them feedback on the spot and this is one of his primary duties as a GL.  (Fillmore Dep., pp. 183-84). | Undisputed. |
| 33.     As GL, Fillmore observes the TMs while they are performing processes, and if they deviate from the SMPs, he provides feedback.  (Fillmore Dep., pp. 41-42, 44). | Undisputed. |
| 34.     Fillmore described his process as follows:<br><br>        We don't call the plays, we just - once that playbook is put in place, its like at Alabama, you know, Nick Saban, he has a playbook and each player, they have to follow that play. They can't deviate because its there for a reason.  By design, it's to get a desired outcome, which is to make everybody successful.<br><br>        So from my side, I try to tell them look, this is the playbook, we have got to follow it.  I didn't invent it, I didn't make it, but we have got to execute it.  And if we do these things, we should be successful, because that's why Mercedes put them in place, that's why upper management put them in place.<br><br>        So, yes, we follow the | Undisputed. |

| | |
|---|---|
| playbook, that's what we do. So I guess you could say me and my team are players on this team. (Fillmore Dep., p. 42). | |
| 35.     It is Fillmore's job to check, monitor and observe that his group is following the guidelines. (Fillmore Dep., p. 45). | Undisputed. |
| 36.     Fillmore handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict.   (Fillmore RFA #18). | Undisputed. |
| 37.     Fillmore ensures that company policies and work rules are enforced in his group.  (Fillmore RFA #14). | Undisputed. |
| 38.     If Fillmore observes a TM with performance problems, he will observe them to try to determine the basis of the problem and then provide them feedback.  (Fillmore Dep., pp. 55-56). | Undisputed.<br><br>Fillmore and a TL will observe the TM to try to determine the basis of the problem and then provide feedback.  (Fillmore Dep., pp. 55-56). |
| 39.     Fillmore has counseled TMs on performance, quality of work and conduct. (Fillmore RFA #9). | Undisputed. |
| 40.     If a TM has an attendance or performance problem that Fillmore believes justifies a CPR, he will go to his AM or Manager, explain the situation to him and get approval to write up a CPR.  (Fillmore Dep., pp. 56-58). | Undisputed. |
| 41.     Fillmore tries to complete a performance evaluation every year for a TM. (Fillmore Dep., p. 183). | Undisputed. |
| 42.     When completing a performance evaluation, Fillmore puts his comments about the TM next to the performance criteria and based on his observations, rates them as satisfactory or not satisfactory.  (Fillmore Dep., pp. 176-77). | Undisputed. |
| 43.     If Fillmore gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion.  (Jones Decl. ¶ | Undisputed. |

| | |
|---|---|
| 33).[7] | |
| 44.   In a performance evaluation, Fillmore provides feedback on how the TM can improve.  (Fillmore Dep., pp. 177-78). | Undisputed. |
| 45.   On the performance evaluation, Fillmore will include information regarding steps the TM can take to continue to improve and develop in their position.  (Fillmore Dep., pp. 178-79). | Undisputed. |
| 46.   Fillmore gives his TMs his opinion on what they need to do to get promoted to TL.  (Fillmore Dep., pp. 54-55). | Undisputed. |
| 47.   Fillmore will evaluate whether the TM is ready to be considered for promotion or needs development.  (Fillmore Dep., p. 179). | Undisputed. |
| 48.   Fillmore provides his opinion as to whether TMs and TLs in his group are ready for promotion and his opinion is given consideration and normally is followed in determining if the TL or TM will be promoted. (Fillmore RFA #7; Jones Decl. ¶¶ 31-32). | Undisputed. |
| 49.   Fillmore can direct training and retraining in skills for TMs in his group, and he does so if he deems appropriate.   (Fillmore RFA #19). | Disputed.<br><br>As a GL, Fillmore cannot direct training.  Fillmore receives notification from the training center regarding the training that the TMs and TLs need to receive.  He only passes on this information to the members of the group.  (Fillmore Dep., pp. 51-52). |
| 50.   Fillmore is notified of the training that the TMs in his group need, he tells his TMs the training they need, and ensures that they get the training.  (Fillmore Dep., p. 52). | Undisputed. |
| 51.   When Fillmore observes and monitors the training plans he provides feedback if necessary.  (Fillmore Dep., pp. 40-41). | Undisputed. |
| 52.   As GL, Fillmore makes sure that MBUSI's   four-step   training   process   is | Undisputed. |

---

[7] The First Declaration of Marcus Jones and exhibits to the declaration are attached as Ex. 30 to MBUSI's Evidentiary Submission (Volume 3).

| | |
|---|---|
| administered to the TMs in his group. (Fillmore Dep., p. 33). | |
| 53. As GL, Fillmore makes sure that his TMs follow the guidelines of the four-step training procedure. (Fillmore Dep., pp. 33-34). | Undisputed. |
| 54. If training does not progress according to policy, then Fillmore gives feedback. (Fillmore Dep., p. 34). | Undisputed. |
| 55. As long as his TMs follow the MBUSI policies and procedures regarding training, and Fillmore observes that they are doing so, he is okay with their rotation schedules. (Fillmore Dep., p. 34). | Undisputed. |
| 56. At the end of each week, Fillmore reviews the training plans to make sure that policies and procedures have been followed. (Fillmore Dep., pp. 35-36). | Undisputed. |
| 57. Fillmore is not a Level 3 on the Circle of Skills in any process his group performs. (Fillmore Dep., p. 39). | Undisputed. Fillmore is new to the group, so has not yet been trained to a Level 3 on any process that his group performs. (Fillmore Dep., p. 39). |
| 58. As GL, Fillmore monitors the Circle of Skills forms, signs off on them each quarter, and makes sure that policies and procedures have been followed. (Fillmore Dep., p. 40). | Undisputed. |
| 59. When a SMP is revised, Fillmore provides that information to his TMs and he monitors and observes them to make sure they are meeting the new SMP. (Fillmore Dep., p. 76). | Undisputed. |
| 60. Fillmore ensures that his group is working safely and he monitors the environment for safety hazards. (Fillmore RFA #17). | Disputed. There is an entire Safety Department that ensures safety throughout MBUSI. (Fillmore Dep., pp. 90, 165). |
| 61. When there is an injury, Fillmore will complete a problem solving sheet, look at what happened and try to improve the process so an accident does not happen again. (Fillmore Dep., pp. 164-65). | Disputed. Objection: misstates testimony. Fillmore testifies that when an injury occurs, he has to initiate an investigation with safety. He and the safety team try to come up with a way to improve the process together. (Fillmore Dep., pp. 164-65). |

| | |
|---|---|
| 62.     As GL, Fillmore reports the time and attendance of his group.  (Fillmore Dep., p. 140). | Undisputed. |
| 63.     Fillmore will communicate with Payroll if there are issues with a TM's pay. (Fillmore Dep., pp. 143-44). | Undisputed. |
| 64.     If there are discrepancies with respect to a TM's time, Fillmore confronts the TM. (Fillmore Dep., p. 141). | I.Undisputed. |
| 65.     Fillmore works hard to follow the vacation policies for his group.  (Fillmore Dep., p. 142). | Undisputed. |
| 66.     In the Audit Area, Fillmore's group is auditing vehicles that have been completed or that are in the process of being built. (Fillmore Dep., p. 27). | Undisputed. |
| 67.     Fillmore's group conducts product audits (PA).  (Fillmore Dep., p. 28). | Undisputed. |
| 68.     When Fillmore comes to work, he will look at his turnover report, he will look at his emails, he will check his audit messages, he will pull down any toolbox information, he will review any safety information and then he will provide the information to TMs in his group.  (Fillmore Dep., pp. 88-89). | Undisputed. |
| 69.     Fillmore has a meeting with his group each morning at which he disseminates information that is pertinent to the Company, including toolboxes. (Fillmore Dep., p. 29). | Undisputed. |
| 70.     At the end of the day, Fillmore walks through his area, he makes sure everything is cleaned up, he inputs data into the turnover log, he prepares any reports that his Manager tells him he needs to put together and makes sure everything is taken care of. (Fillmore Dep., p. 94). | Disputed. Objection: misstates testimony.  Fillmore testifies that he does his walk-through and that he cleans up the area in terms of clearing it out. (Fillmore Dep., p. 94). |
| 71.     Fillmore may attend HR meetings where they discuss new procedures, integrated management system (IMS) meetings where they discuss new ways to handle matters relating to the production system, and product audit meetings where they provide feedback to other people in the production process on what | Undisputed.  Fillmore testifies that if his TL is unable to attend the meeting, then he will attend in the TL's place. (Fillmore Dep., p. 98). |

| Quality has found. (Fillmore Dep., pp. 98-99). | |
|---|---|
| 72.    As GL, Fillmore will look at issues that the TMs in his group find and make sure they are following the vehicle inspection standard (VIS) in determining whether the issue can pass or not. (Fillmore Dep., pp. 94-95). | Undisputed. |
| 73.    As GL, Fillmore will encourage his TMs to move vehicles out of the area once they are completed because they have limited space. (Fillmore Dep., pp. 95-97). | Undisputed.<br><br>As a GL, Fillmore also will move cars to keep the area from being over-crowded. (Fillmore Dep., p. 96). |
| 74.    Fillmore will complete a shift log which reflects issues from the day that he communicates to the GL and AM on the other shift. (Fillmore Dep., p. 148). | Undisputed. |
| 75.    As GL, Fillmore will complete problem solving sheets.   (Fillmore Dep., pp. 155-61; Fillmore Dep. Ex. 11). | Disputed. Objection: misstates testimony.<br><br>Fillmore testifies that he goes back and forth on the problem-solving sheets with his AM until the form is filled out to the AM's liking, because they AM has to report out on it and feel comfortable with the information contained in the form. (Fillmore Dep., p. 156-57). |
| 76.    By using the problem solving sheet, Fillmore will determine a root cause, develop a countermeasure and communicate it to his TMs and then he monitors to ensure that the TMs comply with the countermeasure. (Fillmore Dep., pp. 159-60). | Disputed. Objection: misstates testimony.<br><br>Fillmore testifies that he goes back and forth on the problem-solving sheets with his AM until the form is filled out to the AM's liking, because they AM has to report out on it and feel comfortable with the information contained in the form. (Fillmore Dep., p. 156-57). |
| 77.    Fillmore takes photographs of issues they discover and post those issues so Production can see them. (Fillmore Dep., pp. 108-09). | Undisputed.<br><br>Fillmore testifies that he was instructed by his boss to take pictures of every issue and then post all of the issues. (Fillmore Dep., pp. 108-09). |
| 78.    As GL, Fillmore has to approve stacks of paper, make sure all of the paperwork is there, take information from the paperwork and put it into secondary sheets and then file the reports. (Fillmore Dep., p. 84). | Disputed. Objection: misstates testimony.<br><br>Fillmore never testifies to approving the paperwork, he simply states that he has to make sure all of the paperwork is there. (Fillmore Dep., p. 84). |

| | |
|---|---|
| 79.     Fillmore reviews the data and takes that information and puts it into a report so it can be used for the morning meeting. (Fillmore Dep., p. 85). | Undisputed. |
| 80.     Fillmore will observe incorrect items in the reports and when he does so, he will get with the TL and take care of it. (Fillmore Dep., p. 86). | Disputed. Objection: misstates testimony.<br><br>Fillmore testifies that if he finds incorrect items in the report, he will bring it to the TL's attention and they both fix it together.  If something needs to be formatted within a report, Fillmore has to call the specialist who owns the report to fix it.  (Fillmore Dep., pp. 86-87). |
| 81.     Fillmore spends about six hours of his day in the Audit Area preparing reports, entering data into the computer, disseminating information, looking at issues, moving vehicles and participating in meetings.  (Fillmore Dep., p. 63). | Undisputed. |
| 82.     Fillmore prepares reports of the information his group has collected and disseminates it outside his group.    (Fillmore Dep., p. 64). | Undisputed. |
| 83.     Fillmore will prepare agendas which include the issues they have found and send it out to everyone in the organization. (Fillmore Dep., pp. 64-65). | Undisputed.<br><br>Fillmore does prepare the agendas, but management decides whether or not each item is actually an issue.  Fillmore's boss will then let him know what should and should not be included on the agenda.  (Fillmore Dep., pp. 64-65). |
| 84.     Fillmore prepared a document which reflected the current feedback process on water leaks and a proposed improved process. (Fillmore Dep., pp. 186-87; Fillmore Dep. Ex. 21). | Undisputed. |
| 85.     Fillmore prepared documentation which showed his group what were the rules regarding early outs.  (Fillmore Dep., pp. 187-88; Fillmore Dep. Ex. 22). | Disputed. Objection: misstates testimony.<br><br>Fillmore testified that he asked HR to provide him with the rules regarding early outs.  Fillmore took this information and put the information on a form. (Fillmore Dep., pp. 187-88). |
| 86.     The data that Fillmore prepares includes summary sheets for the CPA process, a summary sheet for the PA process, and | Undisputed. |

| | |
|---|---|
| basically he collects information showing the date, the line that the investigation believes was the cause of the issue, to whom the issue was assigned, a 5 Why analysis, and validation sheets. (Fillmore Dep., pp. 77-78). | |
| 87.     As GL, Fillmore will complete an Excel chart which will show Production how they are doing on shipping good quality vehicles. (Fillmore Dep., p. 82). | Undisputed.<br><br>Fillmore testifies that he takes information from a report and plugs it into an Excel spreadsheet.  This takes  him between forty-five minutes and two hours to complete each day.  (Fillmore Dep., pp. 82-84). |
| 88.     It takes Fillmore an hour to an hour and a half to run this report.   (Fillmore Dep., p. 83). | Disputed.<br><br>Fillmore testifies that he spends between forty-five minutes and two hours to complete the Excel spreadsheet.  (Fillmore Dep., p. 84). |
| 89.     Fillmore has had to work on the Line during lunch periods and when people were out when he was a GL in the Paint Shop, particularly in Plant 1 because it is such an old shop. (Fillmore Dep., pp. 192-93). | Undisputed.<br><br>Fillmore was directed by management when he should work on the line. Fillmore testifies that at time he was instructed to work on the line daily. (Fillmore Dep., pp. 192-93). |
| 90.     When Fillmore had to work on the Line in the Paint Shop, it would not be for the whole day, but at lunch and different times throughout the day, and it would be no more than three or four hours in a day.   (Fillmore Dep., pp. 194-95). | Disputed. Objection: misstates testimony.<br><br>Fillmore testifies that three to four hours per day was an average amount of time that he would work on the line. Fillmore was directed by management when he should work on the line.  This occurred both when Fillmore was working in Paint Final and in Body Final.  (Fillmore Dep., pp. 193-95). |
| 91.     Fillmore was always paid for all of the non-production Fridays in 2008. (Fillmore Dep., pp. 114-16). | Disputed. Objection: misstates testimony.<br><br>In order to be paid for non-production Fridays in 2008, Fillmore had to put the hours that he was paid for non-production Fridays into a bank for the following year.  Fillmore had to then work off the time the following year to make up for the non-production Fridays.   After Fillmore had paid back all of his "bank time," he still was not paid any overtime. (Fillmore Dep., pp. 114-118). |

| **B.   MICHAEL EUGENE PRICE** | |
|---|---|
| 92.   Price began employment with MBUSI in October, 1996, as a TM in the Body Shop on the Final Line. (Price Dep., pp. 14, 26-28).[8] | Undisputed. |
| 93.   In the Spring of 1997, Price was promoted to TL and received a five percent raise. (Price Dep., pp. 29-30). | Undisputed. |
| 94.   Price was promoted to GL on a Project Team in November, 2003.  (Price Dep., pp. 38, 53-54). | Undisputed. |
| 95.   As a GL at MBUSI, Price earns at least $455.00 per week in salary.   (Price RFA #41).[9] | Undisputed. |
| 96.   After the Project Team assignment ended, Price was GL for the Z-2 251 Line in the Body Shop from 2004 through 2006. (Price Dep., pp. 55, 59-61). | Undisputed. |
| 97.   As GL on the Z-2 Line, Price's group had four teams and at least twenty TMs on his group.  (Price Dep., p. 62). | Disputed. Objection:  misstates testimony. Price testifies that approximately twenty TMs were assigned in that area, not that the Z-2 Line was "his" group.  (Price Dep., p. 62). |
| 98.   The Z-2 Line covered about half of the 251 side of the Body Shop.  (Price Dep., p. 63). | Undisputed. |
| 99.   In 2007, Price moved to a GL position over the Z-3 Line.  (Price Dep., pp. 60-61). | Undisputed. |
| 100.   As GL over the Z-3 Line, Price's group had two TLs and at least thirty TMs. (Price Dep., p. 65). | Undisputed. |
| 101.   The Z-3 Line is 175 to 250 feet long. (Price Dep., p. 66). | Undisputed. |
| 102.   In 2008, Price became GL for the | Undisputed. |

[8] Price Responses to Requests for Admission are attached as Ex. 203 to MBUSI's Evidentiary Submission (Volume 17).

[9] Price Responses to Requests for Admission are attached as Ex. 203 to MBUSI's Evidentiary Submission (Volume 17).

| | |
|---|---|
| Dent Doctor Group.  (Price Dep., pp. 60-61). | |
| 103.     The Dent Doctor group had approximately twenty-five to thirty TMs and four teams with teams in Assembly 1 and in Assembly 2.  (Price Dep., pp. 66-67). | Undisputed. |
| 104.     After being GL over the Dent Doctor Group, in June, 2009, Price was assigned as GL for the 166 Project on which he currently works.  (Price Dep., p. 61). | Undisputed. |
| 105.     Until the middle of 2010, while Price was working as GL on the 166 Project Team, he did not have any TMs in his group, he had a desk and an office, and he was in charge of making sure that all aspects of the Production side were looked at with respect to the new vehicle.  (Price Dep., pp. 72, 77). | Undisputed. |
| 106.     Price worked with Engineering and Maintenance to buy off on the equipment which was being designed to use in the production of the new vehicle.  (Price Dep., pp. 73-74). | Undisputed. |
| 107.     Price looked at the equipment from a production standpoint to determine if it would be feasible for TMs to use it.  (Price Dep., p. 75). | Undisputed. |
| 108.     Price reviewed the designs and the equipment.  (Price Dep., pp. 75, 77). | Undisputed. |
| 109.     Price reviewed the production aspect of the planning and offered any input he had.  (Price Dep., pp. 77-78). | Undisputed. |
| 110.     Price also reviewed manpower numbers to determine how many TMs it would take to run the Shop.  (Price Dep., pp. 75-76). | Undisputed. |
| 111.     In the Summer of 2010, Price took a group of nine TMs to Germany for eight weeks to work on learning how to build the vehicle by hand, he would track issues and observe what was going on.  (Price Dep., pp. 70-71, 79-80). | Undisputed. |
| 112.     Price informs his TMs in the morning what is their schedule, what the plan is for the day, he observes their work and any issues that arises on the vehicle, if the TMs are | Undisputed. |

| | |
|---|---|
| doing something incorrect, he stops them and informs them of the SMP, and he tracks attendance. (Price Dep., pp. 80-82). | |
| 113.   Price's group of nine TMs that work on the 166 Project, work with him in Germany for eight weeks, Price returns to Vance for one week, and then Price takes a new group of nine TMs to Germany to learn to build the vehicle. (Price Dep., pp. 70-71). | Disputed.<br><br>Price seems to testify that there were no TMs in Germany prior to eight weeks before his deposition and that he had only been to Germany once since September 2009.  (Price Dep., pp. 70-72). |
| 114.   After becoming GL, Price attended Group Leader Academy.  (Price Dep., p. 46). | Undisputed. |
| 115.   As GL, Price attended LSI training which involved training as to what MBUSI expected from their GLs.  (Price Dep., p. 48). | Undisputed. |
| 116.   As GL, Price has received training in prevention of harassment, ADA, civil treatment, corporate policies and guidelines, HR training, labor relations training, and work hardening awareness among other training. (Price Dep., pp. 52-53; Price Dep. Ex. 2). | Undisputed. |
| 117.   Price supervises the TLs and TMs in his group. (Price RFA #1). | Disputed.<br><br>Price does not manage the group, he must ask permission for everything.  (Price Dep., pp. 157-58). |
| 118.   A Manager or AM is not always present in Price's group, and he leads his group independently of his Manager or AM.   (Price RFA #33). | Disputed.<br><br>Price does not manage the group, he must ask permission for everything.  (Price Dep., pp. 157-58). |
| 119.   Price gives work directions and assignments to the members of his group.  (Price RFA #2). | Undisputed. |
| 120.   Price directs his group in meeting the company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony. (Price RFA #5). | Undisputed. |
| 121.   Price leads his group in meeting company standards; he leads change in his group; and he uses leadership skills in his GL | Disputed.<br><br>Price testifies that he is must ask permission before |

| | |
|---|---|
| position.  (Price RFA ##25, 26 & 28). | doing anything.  (Price Dep., p. 58). |
| 122.    Price shares his knowledge and experience with his group.  (Price RFA #30). | Undisputed. |
| 123.    Price initiates, facilitates and monitors problem solving in his group.  (Price RFA #12). | Disputed.<br><br>Price does not initiate problem solving.  Problem solving is initiated by his AM.  (Price Dep., p. 162). |
| 124.    Price ensures that production and quality goals are met in his group.  (Price RFA ##13 & 22). | Disputed.<br><br>Price testifies that he cannot ensure that production and quality goals are met because he cannot be held responsible for the TMs and TLs performance.  (Price Dep., pp. 116-17). |
| 125.    Price initiates continuous improvement activities in his group and leads the implementation of initiatives in his group.  (Price RFA #16). | Disputed.<br><br>There is a continuous improvement group that works on continuous improvement throughout the group.  (Price Dep., p. 35). |
| 126.    Price shows and supports top performance in his group.  (Price RFA #29). | Objections:  Vague, ambiguous, unintelligible. |
| 127.    Price uses his best judgment in performing all of his GL job duties.  (Price RFA #23). | Undisputed. |
| 128.    Price fulfills all of the roles and responsibilities of his GL position.  (Price RFA #24). | Disputed.<br><br>As a GL, Price does not manage the line group as an operational unit and his is not responsible for accomplishing company goals and targets.  (Price Dep., p. 157).<br><br>As a GL, Price does not manage manpower or materials.  (Price Dep., p. 157).<br><br>As a GL, Price does not develop and implement an annual plan.  (Price Dep., p. 162).<br><br>As a GL, Price does not initiate problem solving.  (Price Dep., p. 162). |
| 129.    Price tries to make sure that his group works effectively and efficiently to minimize TM overtime. (Price Dep., p. 139). | Undisputed. |
| 130.    Price is held accountable for the quality that comes out of his group.  (Price Dep., | Undisputed. |

| | |
|---|---|
| p. 115). | Price is held accountable for the quality that comes out of his group because he was instructed by the vice president, Phil Johnson, to be at the end of the line checking quality.  (Price Dep., pp. 111-12). |
| 131.    Price's team responds well to his direction.  (Price Dep., p. 170). | Undisputed. |
| 132.    Price responds quickly when crisis situations arise and provides suggestions for workable countermeasures to problems. (Price Dep., p. 170). | Undisputed. |
| 133.    The    GL    Roles    and Responsibilities Card contains the roles and responsibilities for the GL as defined by the Company.  (Price Dep., p. 156). | Undisputed. |
| 134.    Price has fulfilled the GL roles and responsibilities except he does not believe he manages because he has to follow policies, he does not develop an annual plan, and problem solving is usually initiated by the AM.   (Price Dep., pp. 156-63). | Disputed.  Objection: misstates testimony.<br><br>As a GL, Price does not manage the line group as an operational unit and his is not responsible for accomplishing company goals and targets.  (Price Dep., p. 157).<br><br>As a GL, Price does not manage manpower or materials.  (Price Dep., p. 157).<br><br>As a GL, Price does not develop and implement an annual plan.  (Price Dep., p. 162).<br><br>As a GL, Price does not initiate problem solving. (Price Dep., p. 162). |
| 135.    As    GL,    Price    follows    the guidelines set forth in the training for GLs on their roles and responsibilities as closely as possible.  (Price Dep., p. 166; Price Dep. Ex. 14). | Undisputed. |
| 136.    The GL job description contains the general purpose of Price's GL position. (Price Dep., p. 167; Price Dep. Ex. 15). | Undisputed. |
| 137.    The essential functions listed for the GL position are functions performed by Price as GL.  (Price Dep., p. 168; Price Dep. Ex. 15). | Undisputed. |
| 138.    As GL, Price is evaluated based on his leadership competencies.  (Price Dep., pp. 168-69). | Undisputed. |

| | |
|---|---|
| 139. As GL, Price observes his TMs and TLs to complying with MBUSI's policies, standards and rules. (Price Dep., pp. 158-59). | Undisputed. |
| 140. When Price observes the TMs and TLs, if he sees that they are not complying with the standards he informs them as to what is the policy so that they will comply and if they do not, he will escalates to his AM. (Price Dep., pp. 159-60). | Undisputed. |
| 141. Other than when Price has been a GL on the Project Team, his primary responsibility has been to observe the work of his TMs and ensure they are complying with Company policies, standards and standards of conduct. (Price Dep., pp. 175-76). | Undisputed. |
| 142. Price ensures that company policies and work rules are enforced in his group. (Price RFA #14). | Undisputed. |
| 143. As GL, Price is accountable for making sure that his TMs and TLs are following Company policies and standards of conduct. (Price Dep., p. 118). | Undisputed. |
| 144. Price handles TM issues and conflicts in his group and decides when to involve higher management or Team Relations in an employee issue or conflict. (Price RFA #18). | Undisputed. |
| 145. Price counsels TMs on performance, quality of work and conduct. (Price RFA #9). | Disputed. Price testifies that he escalates before he counsels. (Price Dep., p. 160). |
| 146. If Price is aware of a performance issue, then it is his job as GL to counsel the TM on the proper procedure and SMP and what the TM needs to be doing. (Price Dep., p. 146). | Undisputed. |
| 147. If there is an HR issue that Price cannot resolve himself, he escalates it to his AM. (Price Dep., p. 121). | Undisputed. |
| 148. If Price observes TMs violating HR policies, he escalates that information to his AM. (Price Dep., p. 145). | Undisputed. |
| 149. If a TM has not improved their | Undisputed. |

| | |
|---|---|
| performance after Price has counseled them, he will escalate the issue to his AM.  (Price Dep., p. 146). | |
| 150.    Price has the authority to initiate a CPR on a TM when he deems necessary.  (Price RFA #10). | Disputed.<br><br>Price must get approval to initiate CPRs.  (Price Dep., p. 158). |
| 151.    It is Price's responsibility to write the CPR and forward it his AM for his approval.  (Price Dep., p. 147). | Undisputed. |
| 152.    Price has drafted a CPR.  (Price Dep., p. 147). | Undisputed. |
| 153.    Price ensures that his group is working safely and he monitors the environment for safety hazards.  (Price RFA #17). | Disputed.<br><br>There is a safety group that ensures the safety of all MBUSI employees.  (Price Dep., p. 163). |
| 154.    As GL, Price is accountable for ensuring his TMs comply with safety policies and rules.  (Price Dep., pp. 118-19). | Undisputed. |
| 155.    If there is an injury, Price conducts a walk back with Safety and he fills out a 5 Why form to determine the reason for the injury and develop countermeasures to prevent the injury from occurring again.  (Price Dep., pp. 122-23). | Undisputed. |
| 156.    As GL, Price will inform his TMs of what happened, what they need to do to prevent an accident from happening again, and then he will follow up to make sure that they do what is needed to prevent another accident.  (Price Dep., pp. 126-27). | Undisputed. |
| 157.    As GL, if a TM has medical restrictions, Price gets Medical to clear the stations in which the TM can work and then he makes sure that those stations are the only stations in which the TM works.  (Price Dep., pp. 136-37). | Undisputed. |
| 158.    As GL, Price will attend a monthly meeting with HR when he is available.  (Price Dep., pp. 49-50). | Undisputed. |
| 159.    HR policies and procedures are discussed at these meetings.  (Price Dep., p. 51). | Undisputed. |
| 160.    As GL, Price must make sure that | Undisputed. |

| | |
|---|---|
| all of his TMs follow procedure.  (Price Dep., p. 51). | |
| 161.    Price manages attendance in his group and ensures that his group is properly staffed.  (Price RFA #3). | Disputed.<br><br>As a GL, Price tracks attendance, he does not manage attendance.  (Price Dep., pp. 81-82). |
| 162.    As GL, Price is responsible for the attendance calendar and tracking attendance for his TMs and TLs.  (Price Dep., p. 134). | Undisputed. |
| 163.    Price manages vacation scheduling, timekeeping and attendance tracking for the members of his group.  (Price RFA #4). | Disputed.<br><br>As a GL, Price tracks attendance, he does not manage attendance.  (Price Dep., pp. 81-82).<br><br>As a GL, Price tracks vacation and reports absences to his AM.  (Price Dep., pp. 135-36). |
| 164.    As GL, Price approves vacation or emergency vacation based on the policy. (Price Dep., p. 136). | Undisputed. |
| 165.    Price evaluates the performance of TMs and TLs in his group.  (Price RFA #6). | Undisputed. |
| 166.    When completing a performance evaluation, Price will describe the TM's performance with respect to the performance criteria.  (Price Dep., p. 140). | Undisputed. |
| 167.    Price will evaluate the TM as satisfactory or not satisfactory.  (Price Dep., p. 140). | Undisputed. |
| 168.    If Price gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion. (Jones Decl. ¶ 33). | Undisputed. |
| 169.    Price will describe any steps that a TM can take to further develop in their position. (Price Dep., p. 140). | Undisputed. |
| 170.    Price will then appraise whether the TM or TL is ready for promotion to the next level and his opinion is given consideration and normally is followed in determining if the TM or TL will be promoted.  (Price Dep., p. 141; Price RFA #7; Jones Decl. ¶¶ 31-32). | Undisputed. |
| 171.    Price will refer to the Roles and Responsibilities Card to determine whether a | Undisputed. |

| | |
|---|---|
| TM or TL is ready to be promoted to the next level.  (Price Dep., pp. 141-42). | |
| 172.   Price directs training and retraining in skills for TMs in his group, and he does so if he deems appropriate.   (Price RFA #19). | Undisputed.<br><br>As a GL, Price develops training plans for new TMs, with the assistance of TLs in his group. (Price Dep., p. 129). |
| 173.   As GL, Price develops training plans for his TMs with the assistance of his TLs. (Price Dep., p. 129). | Undisputed. |
| 174.   As GL, Price tries to get as many of his TMs trained in different stations as possible.  (Price Dep., pp. 127-28). | Undisputed. |
| 175.   Before a TM may be moved to Level 3, Price must observe a TM's performance to ensure they are capable of performing the process on their own.  (Price Dep., p. 128). | Undisputed. |
| 176.   As GL, Price signs off on the Circle of Skills which reflects the level that each TL or TM has reached on a station each quarter. (Price Dep., pp. 128-29). | Undisputed. |
| 177.   As GL, Price will draft revisions or have TLs draft revisions to SMPs.   (Price Dep., p. 155). | Undisputed. |
| 178.   If a TL drafted a revised SMP, Price will review it, make sure the other shift's GL signs off on it and then sends it to the AM for approval. (Price Dep., pp. 155-56). | Undisputed. |
| 179.   If there is a quality issue and his AM instructs him to do so, Price will prepare a 5 why form for that issue.  (Price Dep., pp. 123-24). | Undisputed. |
| 180.   When Price was GL over the Z-2 Line, he would come in to work in the morning and check issues from the night before from the shift log. (Price Dep., pp. 87-88). | Undisputed. |
| 181.   Price would check his emails, check for call-ins and complete any evaluations or paperwork that he was required to do pre-shift. (Price Dep., pp. 89-90). | Undisputed. |
| 182.   As GL for the Z-2 Group, Price would attend a morning meeting with the Manager, AM and all of the GLs where the plan | Undisputed. |

| | |
|---|---|
| for the day and the issues from the prior shift would be discussed. (Price Dep., pp. 82-83). | |
| 183.    That meeting usually last fifteen to twenty minutes. (Price Dep., p. 84). | Undisputed. |
| 184.    From 6:15 to 6:20, Price would conduct a five minute communication meeting with his group at which they would discuss the issues from the day before and the plan for the day. (Price Dep., pp. 84-85). | Disputed.  Objection: misstates testimony.<br><br>Price testifies that during the five minute communication meetings he would discuss, "The information – issues from the day before or *the information we got out of the startup meeting* and the plan for that day."  (Price Dep., pp. 84-85). |
| 185.    Price would stay after the shift from five minutes to a couple of hours depending on what was going on.  (Price Dep., p. 91). | Undisputed. |
| 186.    After the shift, Price would finish his shift log, work on any evaluations, conduct any walk backs for quality issues that happened and check on any equipment issues.  (Price Dep., p. 91). | Undisputed. |
| 187.    Price would include SQDCM information on the shift logs.  (Price Dep., p. 94). | Undisputed. |
| 188.    Price would update the SQDCM Board whenever necessary.  (Price Dep., p. 93). | Undisputed. |
| 189.    Price would perform the same pre and post shift activities as GL for the Z-3.2 Line and the Dent Doctor Group.  (Price Dep., pp. 86, 90, 109). | Undisputed. |
| 190.    When Price was GL for the Dent Doctor Group, he would stay from a few minutes to a few hours depending on what was going on and complete his paperwork, conduct quality walk backs and feedback issues to other groups. (Price Dep., pp. 94-95). | Undisputed. |
| 191.    As GL, Price was instructed to walk throughout his group and observe the performance of his TMs and TLs throughout the day. (Price Dep., p. 101). | Undisputed. |
| 192.    Price would do this throughout the day as GL in the various groups in which he has been GL. (Price Dep., p. 101). | Undisputed. |
| 193.    As GL in Z-2 and Z-3.2 Lines, | Undisputed. |

| | |
|---|---|
| Price would spend most of his time walking throughout the different areas and observing the TMs' performance and addressing any issues that arose.  (Price Dep., p. 102). | |
| 194.    Price was told not to be in the team room during the shift, to be on the Line and to be in the last station checking quality coming off the Line.  (Price Dep., pp. 110-14). | Undisputed. |
| 195.    As GL, Price's TLs would contact him by radio to alert him to issues and he would decide whether he could handle it by radio or needed to go see the issue in person.    (Price Dep., pp. 104-05). | Undisputed. |
| 196.    On some quality issues, Price would need to see the issue so he could understand what was the issue.  (Price Dep., p. 105). | Disputed.<br><br>Price testified that all quality issues must be seen in person so that he can understand what the issue is.  (Price Dep., p. 105). |
| 197.    When Price would see the issue, he would see what needed to be done, where the issue needed to be fed back and determine whether it needed to be escalated based upon how major or minor it was.  (Price Dep., p. 105). | Undisputed. |
| 198.    When looking at the issue, some could be repaired right there, some would have to have follow up, and some might need to be escalated immediately as they might need to shut down. (Price Dep., pp. 105-06). | Undisputed. |
| 199.    Price would contact Maintenance or Engineering if necessary.    (Price Dep., p. 106). | Undisputed. |
| 200.    If Price believed the issue was coming from another group, he would contact that GL so he could look at it.  (Price Dep., p. 106). | Undisputed. |
| 201.    As Dent Doctor GL, Price also spent most of his time walking throughout the different areas and observing the performance of his TMs.  (Price Dep., p. 132). | Undisputed. |
| 202.    As GL over the Dent Doctor Group, Price would also walk back issues, determine whether issues were Body Shop issues and whether they needed to be escalated.  (Price | Undisputed. |

| | |
|---|---|
| Dep., pp. 132-33). | |
| 203.   If Price's Dent Doctor Group could not address the issue, he would contact whoever needed to be contacted, including Engineering.  (Price Dep., p. 133). | Undisputed. |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## III.   <u>ARGUMENT</u>

Mercedes bears a heavy burden of demonstrating that no genuine dispute exists as to any material fact in this case.  The reason is twofold.

First, the party moving for summary judgment—i.e., Mercedes—always bears the burden of demonstrating the absence of a material dispute of fact and the Court must view all evidence and resolve all doubts about the facts in favor of the non-moving party—i.e., Plaintiffs.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Kohlheim v. Glynn County</u>, 915 F.2d 1473, 1476 (11th Cir. 1990) ("In evaluating a summary judgment motion, the burden of establishing the absence of a material dispute of fact is borne by the moving party; the reviewing court must view all evidence in the light most favorable to the non-movant and resolve all reasonable doubts about the facts in favor of the non-movant."); <u>Morrison v. Washington County, Alabama</u>, 700 F.2d 678, 682 (11th Cir. 1983) ("Summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all evidence is viewed in the light most favorable to the non-moving party.").  All reasonable doubts about the facts must be resolved in favor of the non-moving party.  <u>See</u> <u>Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.</u>, 750 F.2d 838, 841 (11th Cir. 1985).  And, "[w]hen more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one." <u>Carlin Communication, Inc. v. Southern Bell Telephone and Telegraph Co.</u>, 802 F.2d 1352, 1356 (11th Cir.1986) (citation omitted).

Second, "the application of an exemption under the Fair Labor Standards Act ["FLSA"] is a matter of affirmative defense on which the employer has the burden of proof." <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 196-197 (U.S. 1974).  The employer "bears the burden of proving the applicability of a FLSA exception *by clear and affirmative evidence*." <u>Klinedinst v. Swift  Invs., Inc.</u>, 260 F.3d 1251, 1254 (11th Cir. 2001) (quotation marks omitted) (emphasis

added).  The employer must meet this stringent "clear and affirmative evidence" standard under a similarly stringent constraint that the FLSA exemptions are to be narrowly construed against the employer.  Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1157 (11th Cir. 2008).

Here, Mercedes argues that Plaintiffs are exempt under (1) the executive exemption; (2) the administrative exemption, and (3) the combination exemption.  Based on the discussion below, Mercedes has failed to meet its summary judgment burden on each exemption.

### A.   Genuine Issues Remain As To Whether Plaintiffs Are Exempt Under The Executive Exemption.

Mercedes bears the burden of demonstrating that Plaintiffs are exempt from the FLSA on the grounds that they are "employed in a bona fide executive" capacity.  See 29 U.S.C. § 213(a)(1); Alvarez Perez, 515 F.3d at 1157 (11th Cir. 2008).  The FLSA does not define a "bone fide executive," but allows the Secretary of Labor to establish regulations to clarify this issue.[10]

There are two sets of regulations applicable to defining the executive exemption in this case: the bona fide executive regulation and the "working foreman" regulation.  In August 2004, the Secretary of Labor revised its white collar exemption regulations, stating that it was not changing the substance or intent of these regulations at all, but merely clarifying them.[11]   The

---

[10]  Regulations of the Secretary of Labor promulgated pursuant to an express delegation of legislative authority are to be given controlling weight unless found to be arbitrary, capricious, or contrary to the statute.  See Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 843-44 (1984).  Although agency opinion letters "do not warrant Chevron-style deference," they are "entitled to respect under . . . Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the power to persuade."  Christensen v. Harris County, 529 U.S. 576, 587 (2000).

[11]As stated in Heffelfinger v. Elec. Data Sys. Corp., "the amendments were not meant to effect any substantive change in the exemptions."  580 F. Supp. 2d 933, 950 (C.D. Cal. 2008); see also IntraComm, Inc. v. Bajaj, 492 F.3d 285, 295 n. 7 (4th Cir. 2007) ("This interpretation is strengthened by the fact that the preamble to the proposed amended regulations state that the

new regulations provide that in order to meet the "executive exemption," the employer must satisfy each of the following requirements:

(1)     Compensated on a salary basis at a rate of not less than $455 per week . . . exclusive of board, lodging or other facilities;

(2)     Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3)     Who customarily or regularly directs the work of two or more other employees; *and*

(4)     Who has the authority to hire or fire other employees, or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.[12]

29 C.F.R. § 541.100(a) (emphasis added).   The employer **must meet every one of the four parts** to this regulation if its claim for exemption is to prevail.

The "working foreman" concept is also useful because it helps to distinguish between a manager of a recognized subdivision and a mere strawboss or team lead of subordinate employees.   Shockley v. City of Newport News, 997 F.2d 18 (4th Cir. 1993).   Indeed, the old "working foreman" regulations even includes the term "Group Leaders" as an example of a class of non-exempt working foreman.   See 29 C.F.R. § 541.115 (1992).   Specifically, the former regulation provided:

One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates.  Such employees, sometimes known as

---

changes were made 'to simplify and update the current regulations' [quoting 58 Fed. Reg. 15,560, 15,573 (Mar. 31, 2003)], not to effect a major alteration in how exemptions are construed.").

[12]The new regulations say at 29 CFR 541.100(b) that "The phrase "salary basis" is defined at § 541.602; "board, lodging or other facilities" is defined at § 541.606; "primary duty" is defined at § 541.700; and "customarily and regularly" is defined at § 541.701.

strawbosses, or gang or ***group leaders*** perform the same kind of work as that performed by their subordinates, and also carry on supervisory functions.  Clearly, ***the work of the same nature as that performed by the employees' subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption does not apply. ("Substantial," as used in this section, means more than 20 percent.***  See discussion of the 20-percent limitation on non-exempt work in § 541.112.)  A foreman in a dress shop, for example, who operates a sewing machine to produce the product is performing clearly non-exempt work.  However, this should not be confused with the operation of a sewing machine by a foreman to instruct his subordinates in the making of a new product, such as a garment, before it goes into production. [13]

Id. (emphasis added).  The new regulation leaves the old regulation largely intact but uses the

term "working supervisor" as opposed to "working foreman."  29 C.F.R. § 541.106 (c).  The new

regulation provides the following:

> [W]orking supervisor whose primary duty is performing nonexempt work on the production line in a manufacturing plant ***does not become exempt merely because the nonexempt production line employee occasionally has some responsibility for directing the work of other nonexempt production line employees*** when, for example, the exempt supervisor is unavailable. Similarly, an employee whose primary duty is to work as an electrician is not an exempt executive even if the employee also directs the work of other employees on the job site, orders parts and materials for the job, and handles requests from the prime contractor.

Id. (emphasis added).  In Morgan v. Family Dollar Stores, the 11th Circuit used both the new

"Working Supervisor" regulations as well as the old "working foreman" regulations to explain

why 14,000 Dollar Family Store managers were not exempt executive employees.  551 F.3d

1233, 1266 (11th Cir. 2008).

Given remedial nature of the FLSA, the presumption that an employee is covered by the

FLSA's minimum wage and overtime protections, and that GLs fall within the "working

supervisor" or "working foreman" regulations, Mercedes cannot meet its burden to prevail on

summary judgment.

---

[13]According to the Department of Labor's explanation of the new regulations published in the federal register, one reason for the new regulation was to delete archaic terms like "strawboss" without disturbing the impact or effect of the concepts of the old regulations.

**1.     GLs Are Not Paid On A Salary Basis.**

As a threshold matter, Mercedes' motion must fail because there is a genuine issue of material fact whether GLs are compensated on a true salary basis.  While the Court was previously addressed this issue in <u>Hicks</u> (<u>see</u> <u>Hicks v. Mercedes</u>, 7:08-CV-0536-LSC, Memorandum of Opinion) Plaintiffs respectfully submit that the Court should revisit its decision in <u>Hicks</u>.

As with all elements of the executive exemption, Mercedes bears the burden of demonstrating that GLs are paid a predetermined amount of compensation that "is not subject to reduction because of variations in the quality or quantity of the work performed."  <u>See</u> 29 C.F. R. § 541.602(a); <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188 (1974) (stating that employers who claim an FLSA exemption have the burden of proof).  Mercedes cannot meet its burden if deductions from the GLs' predetermined compensation are made for absences occasioned by Mercedes or by the operating requirements of the business.  <u>Id.</u>  ("If the employee is ready, willing and able to work, deductions may not be made for time when work is not available.").  "[GLs] must receive a guaranteed salary that is not subject to docking based upon the number of hours worked."  <u>Asher, et al. v. Aphelion Tech Sys. Integrators, Inc., et al.</u>, 1999 U.S. Dist. LEXIS 8653 (April 23, 1999).

Mercedes' "non-production Friday" policy, a policy that was established due to the operational requirements of the production facility, is inconsistent with the salary basis test.  Under Mercedes' policy, GLs could "choose to take a vacation or holiday bank day off, use the Friday bank (in which [the GL] "withdrew" from a bank of future overtime premiums) ***or take an unpaid personal day off***."  <u>See</u> <u>Hicks v. Mercedes</u>, Case No. 7:08-CV-00536-LSC, Doc. 64 (Mercedes' Reply Brief In Support Of Its Motion For Summary Judgment), at p. 4 (emphasis added).  Forcing employees to use vested accrued benefits—i.e., vacation or holiday benefits—to

cover for absences occasioned by the employer does not necessarily violate the salary test.  But having a GL go into debt to Mercedes or take an unpaid day off indicates that GLs are not paid a true salary.

The Department of Labor has addressed this very same issue in a related scenario involving a health care provider that was experiencing low patient census.  The DOL opined that "[a]n employee **will not** be considered to be paid "on a salary basis," however, if any deductions from the salary are made for full or partial day absences occasioned by the employer ***or by the operating requirements of the business***."   WH Op. Letter FLSA2009-18 (Jan. 16, 2009) (emphasis added).   "If an employer requires that an exempt employee work less than a full workweek, the employer must pay the employee's full salary even if: (1) the employer does not have a bona-fide benefits plan; (2) the employee has no accrued benefits in the leave bank; (3) the employee has limited accrued leave benefits, and reducing that accrued leave will result in a negative balance; or (4) the employee already has a negative balance in the accrued leave bank." Id.

"[D]eductions from salary due to day-to-day or week-to-week determinations of the operating requirements of the business are precisely the circumstances the salary basis requirement is intended to preclude."    WH Op. Letter FLSA2009-14 (Jan. 15, 2009). "[S]alary deductions due to M[andatory] T[ime] O[ff] lasting less than a workweek violate the salary basis requirement and may cause the loss of exempt status."

This is precisely what Mercedes' has done here.  By having GLs take an "unpaid personal day," Mercedes' has impermissibly reduced GLs' salary dependent upon the operational requirements of the plant.

Mercedes' "Friday bank" similarly conflicts with the salary test.  Unlike requiring an employee to use a vested accrued benefit, the "Friday bank" forces GLs to go into debt

peonage—GLs are advanced their compensation upon the condition that they work a corresponding number of hours to pay off that debt.

Thus, GLs are faced with a Hobbesian choice in deciding whether to take the Friday bank or an unpaid day off.  Take the following three scenarios as an example.

Scenario 1:     A GL takes an unpaid day off week 1 and does not work any overtime for week 2.  His salary for the week 1 would be reduced by 8 hours pay.  His salary for week 2 would be his normal salary.  His Salary for the two week time span would be reduced by 8 hours pay.  Because his salary for the first week is reduced pursuant to the unpaid day off, the GL is not paid a true salary.  See WH Op. Letter FLSA2009-18 (Jan. 16, 2009).

Scenario 2:     A GL takes an unpaid day off week 1 but then works 8-hours of overtime for week 2.  His salary for the week 1 would be reduced by 8 hours pay.  His compensation for week 2 would be enhanced by 8 hours pay. His Salary for the two week time span would be the same as if he worked his normal shifts.  But because his salary for the first week is reduced pursuant to the unpaid day off, the GL is not paid a true salary.  See WH Op. Letter FLSA2009-18 (Jan. 16, 2009).

Scenario 3: A GL takes a Friday bank for week 1.  To pay off his debt, the GL works 8-hours overtime for week 2.  His Salary for the two week time span would be the same as if he worked his normal shifts.

Conclusion: Scenario 3 is no different than Scenario 2 and no different than Scenario 1; it is just presented in a different way.   In each scenario, a GLs pay is deducted.  Scenario 3 "hides the deduction" and passes the deduction on to a later paycheck just like any creative bookkeeper does to shield assets.  Even though Mercedes creatively engineered a system that purports to maintain GLs exempt status as salaried employees, the net effect of system is a salary reduction that is inconsistent with federal regulations.  See WH Op. Letter FLSA2009-18 (Jan. 16, 2009).

Indeed, a similar creative system was exposed in <u>Klein v. Rush-Presbyterian</u>, 990 F.2d 279, 284 (7th Cir. 1992) (disapproved on other grounds by <u>Muston v. MKI Sys.</u>, 1997 U.S. App. LEXIS 23548 (4th Cir. Va. Sept. 5, 1997)).   In <u>Klein</u>, the plaintiff was forced to compile negative comp time to cover her personal absences.  <u>Id.</u>  The Court stated that while the plaintiff may not have been actually paid less, she was going into a form of debt since any later accumulated comp time had to pay off that debt.  <u>Id.</u>  In concluding that the plaintiff was not paid on a salary basis, the Court stated that ***"this negative comp time is similar to docking an employee's pay because of the number of hours worked . . . ."*** <u>Id.</u>  (emphasis added).

When this policy of forcing employees to go into debt or take an unpaid personal day is viewed in the context with the fact that GLs are compensated based on the total number of hours worked, there are genuine issues of material fact as to whether GLs are paid a true salary. Mercedes has always compensated GLs based on their hours worked.  (<u>See</u> Docs. 46 (Agreed Upon Undisputed Facts, 46-1, (Exhibits to Agreed Upon Undisputed Facts).  If one GL worked 10 hours of overtime versus another GL who worked 20, the GL who worked 20 hours would make more money.  And, as previously mentioned in reference to the Friday bank policy, GLs' compensation is connected to the operational requirements of the production plant.  Obviously, one cannot maintain a bank of hours unless the defendant was counting hours worked, which violates the whole concept of a fixed salary for all hours worked required by the salary test of all the white collar exemptions.  The deduction for not working due to a lack of work rather than the needs of the employee is anathema to a salary concept, because it puts the burden of unproductive hours on the employee instead of the employer.  The "deal" with a salary is that the salary will be constant whether the employee works long and hard, or whether, through no fault of the employee, the employee cannot work a full week.  Otherwise, a salary is not a two-way street.  Several GLs have highlighted this injustice in their deposition:

A.    The biggest complaint about the way they did our overtime and the way they it's like, I mean, are you salary or are you not salary. *One minute we're salary, we don't get overtime and the next minute you're not going to be working but you're still going to have to pay it back, so are you salary or are you not salary.* . . .

Q.    And you said you can't recall a certain year that you didn't receive an annual base salary as a group leader?

A.    No, sir. But I can remember several paychecks where -- and I could probably produce credit card debt for times when salary wasn't what it was supposed to be because of work shortages and stuff, but everybody at Mercedes can do that as well. But as far as the overall annual, the bonus and everything, I can't do that *but I can produce biweekly paychecks that were a lot less than they should have been.*

Q.    But no annual salary –

A.    If you look at the whole in the annual, no, sir. *But if you look at the paychecks, you can definitely see the difference, a lot of difference.*

Q.    Based on how much overtime you worked?

A.    *The time you worked and the time that we didn't work because the plant wasn't running, but again, are we salary or are we not.*

Q.    When you say the plant wasn't running, are you referring to the nonproduction Fridays?

A.    Nonproduction days, yes. And those were days I took. And whenever I ran out of time, *there were several days I took unpaid.*

(Stewart Dep., pp. 169-71).[14]

A:    There were some Fridays that I covered a lot of them on vacation time but they let us use bank time to cover those days, but I had already worked nearly 40 hours that week when I got charged for eight hours bank time.

Q.    All right. And you were paid for those Fridays that you didn't work.

A.    I was loaned time to cover those Fridays.

Q.    Okay.

---

[14] The deposition of Joel Stewart is attached as Ex. 158 to Mercedes' Evidentiary Submission (Volume 13).

A.      Then later when they said no overtime at all, I was not able to use any of my -- still any of my overtime I was working to pay back that bank time. ***I asked an assistant manager at one point could I not even count one third of my overtime towards that bank time and I was told no.***

Q.      ***So was there any Friday that you did not get paid, whether it was bank time, vacation time, regular pay, was there any Friday that you did not get paid?***

A.      ***None, other than the ones that we mentioned in '09 where we were told that we could not cover with anything.***

Q.      ***And how many of those do you believe there were?***

A.      ***I believe there were two.***

Costes Dep., pp. 67-68.

Fillmore testified at length that he had to "work off" his hourly debt to Mercedes when non-production Fridays rolled out.  Fillmore Dep., pp. 111-20.  He ended up volunteering to work the gate and do "gate check" to "pay off" his debt.  Id. at 112-13.  Ultimately, he paid off the debt and even accumulated some additional hours.  Id.  He was never paid for those additional hours.  Id.  Clearly, forcing employees to volunteer for other jobs in order to "pay off" their debts contravenes the very notion of being compensated on a salary basis.

Thus, as evidenced above, there was a companywide policy to vary the pay for GLs by the quantity or quality of their work by requiring the employee to "make up" time later or take an unpaid day off.  It is thus inconsistent for Mercedes to argue that it paid everyone a salary but that it diminished GLs pay in one form or another.  This policy exposes that GLs were not paid a true salary.

2.      **Mercedes Cannot Meet Its Burden That GLs' Primary Duty Is Management Of A Customarily Recognized Department.**

a.      *Plaintiffs' Primary Duty Is Not Management; Plaintiffs Are Non-Exempt "Working Foremen/Supervisors."*

The question of whether an employee's primary duty is management is a highly factual determination "must be based on all the facts in a particular case." Morgan, 551 F.3d at 1267; 29 C.F.R. § 541.700(a) (2006); 29 C.F.R. § 541.103 (2003).  In Morgan, the Eleventh Circuit re-affirmed  the ""necessarily fact-intensive  nature of the primary duty inquiry," that "the answer is in the details," and that "[w]here an issue turns on the particular facts and circumstances of a case, it is not unusual for there to be evidence on both sides of the question, with the result hanging in the balance.""  551 F.3d at 1269.    The factors to consider for the primary duty inquiry are "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."   29 C.F.R. § 541.700(a).

Plaintiffs are the classic "working foremen" or "working supervisors" as outlined in the regulations discussed above.  See 29 C.F.R. § 541.115 (1992) ("[G]roup leaders . . . [who perform] work of the same nature as that performed by the employees' subordinates must be counted as nonexempt work and if the amount of such work performed is substantial[, i.e., 20 percent,] the exemption does not apply."); 29 C.F.R. § 541.106 (c).  The majority of their time is spent performing manual labor on the line checking quality and performing clerical work. (Fillmore Dep., pp. 193-95) (Fillmore testified that three to four hours per day was an average amount of time that he would work on the line.  Fillmore was directed by management when he should work on the line.  This occurred both when Fillmore was working in Paint Final and in Body Final); (Fillmore Dep., pp. 63-65, 77-78, 82-84) (Fillmore testified that he spends a large portion of his day in the Audit area doing data entry); (Price Dep., pp. 111-12) (Price is directed by Vice President Phil Johnson to be at the end of the line checking quality).

Furthermore, Plaintiffs do not exercise independent discretion in running the business or a division or subdivision thereof.  See Morgan, 551 F.3d at 1270 ("Having discretionary power is one aspect of freedom from supervision [under the new regulations].").

- Plaintiffs do not decide how to spend time during their workday.  They are directed by the AM or upper management on what job duties to perform, including, being directed to work the production line.  (Fillmore Dep., pp. 193-96); (Price Dep., pp. 157-58).

- Plaintiffs cannot address attendance issues.  Plaintiffs input attendance data into a computer application and must relay attendance data to AMs; AMs decide how to address attendance issues.  (Fillmore Dep., pp. 140); (Price Dep., pp. 81-82, 135-36) (Price tracks attendance and vacation and reports absences to his AM).

- Plaintiffs do not control manpower. Plaintiffs notify AMs of manpower issues; AMs direct manpower resources.  (Price Dep., pp. 157-58) (testifying that he does not control manpower or materials).

- Plaintiffs do not track performance.  Plaintiffs relay performance data to AMs; AMs decide how to address performance issues and whether to counsel TMs.  (Fillmore Dep., p. 156-57); (Price Dep., pp. 157-58).

- Plaintiffs do not direct the flow of work.  Plaintiffs receive work directions from upper management and merely relay that information to TMs by holding brief meetings to relay such information and updating the SQDCM board (Maintaining a bulletin board about management tasks is not the same thing as managing, the former being clerical in nature).  (Fillmore Dep., pp. 193-95); (Price Dep., pp. 157-58).

- Plaintiffs do not have any authority to address TM complaints. They must escalate all issues to the AM or Human Resources. (Fillmore Dep., p. 156-57); (Price Dep., pp. 116-17, 157-58).

- Plaintiffs cannot remedy quality issues. They merely observe cars to see if quality issues arise and, if so, they tell their AM. (Fillmore Dep., pp. 63-65, 68, 77-78, 82-84) (testifying that his AM directs him what to do with all issues); (Price Dep., pp. 157-58, 160) (testifying that he must escalate all issues to his AM).

- Plaintiffs do not have the authority to discipline TMs. Only AMs have the authority to issue disciplinary action. (Fillmore Dep., p. 156-57); (Price Dep., pp. 157-58) (Price must get approval from his AM to initiate CPRs)

- Plaintiffs do not have any authority to hire, fire, or promote TMs. Only AMs have such authority. (Fillmore Dep., p. 156-57); (Price Dep., pp. 157-58) (Price must get approval from his AM to initiate CPRs).

In fact, Plaintiffs perform almost none of the "management" duties set forth in the federal regulations. See 29 C.F.R. § 541.102.[15]  Plaintiffs do no interview or select employees for TM

---

[15] Specifically, 29 C.F.R. § 541.102 states:

Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

positions.  Plaintiffs do not set and adjust TM rates of pay and hours of work.  Plaintiffs do not direct the work of employees—they have no control over attendance, manpower, or disciplinary issues—the AM is the one with the control.  Plaintiffs do not maintain production or sales records for use in supervision or control—they give document for the AM.  Plaintiffs do not appraise employees' productivity and efficiency for the purpose of recommending promotions or other changes in status—again, they just document for the AM.  Plaintiffs do not handle employee complaints and grievances—they relay any dispute to the AM.  Plaintiffs do not discipline employees—AMs do.  Plaintiffs do not plan the work—the work flow is tightly controlled by upper management.  Plaintiffs do not determine the work techniques to be used.  Plaintiffs do not apportion the work among the employees—all manpower decisions reside with the AM.  Plaintiffs do not determine the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold in the production of the vehicles (but GLs frequently act as runners to get such materials and manually fix such machines).  Plaintiffs do not control the flow and distribution of materials or merchandise and supplies.  Plaintiffs do not provide for the safety and security of the employees or the property—each TM is responsible for safety.  Plaintiffs do not plan and control the budget—they just manually document scrap materials.  Plaintiffs do not monitor or implement legal compliance measures.[16]  Because Plaintiffs do not perform any of the quintessential management tasks outlined in the regulations, their "primary duty" cannot be to manage other TMs.

---

[16] The activity Plaintiffs arguable perform pursuant to the federal regulation's definition of "management" is that they assist in training other TMs.  But this too is misleading because all Plaintiffs really do is read off of a training script and many Plaintiffs indicate that TLs actually conduct the training.  (Fillmore Dep., pp. 51-52) (stating that he cannot direct training and receives notifications from the training center regarding training that is needed).

Rather than manage TMs, Plaintiffs do no more than lead a crew or group, transmit orders and observations to and from superiors, make self-evident decisions (and thus does not exercise discretion) based upon his skill and experience in the trade (rather than engage in intellectual independent selection based upon analysis and application of general principles of policy and business judgment).  The managers and AMs are the supervisory personnel of the plant.  Obviously, if the power and discretion is vested in the managers and AMs, it can't be vested in the GLs.  Having 116 GLs is simply too many "supervisors" to be exercising independent judgment in an assembly line situation where the goal is a consistency of quality in the product.  To say it another way, not since the invention/adoption of the assembly line in automotive manufacture by Henry Ford in the early 1900's does an automobile manufacture like Mercedes allow employees on the line to exercise idiosyncratic judgment and discretion.  The duties of a quality control GL on the line can't involve independent judgment, because all the cars or parts produced by one group must be identical to the same cars or parts produced by another group.  The fact that the groups are redundant; i.e., that two or more groups within a department do the same thing in parallel operation, belies that a GL makes any kind of decision 'of significance' independently.  If this were a "one time" or "one off" custom car manufacturer, maybe there would be more opportunity for GLs to make independent decisions of significance.  But the demands for a uniform product combined with a high level of on-site supervision by assistant managers, and the lack of opportunity to deviate from established policies, requires the GLs to follow established policies, make routine decisions based on experience and knowledge of the trade rather than exercise of independent judgment and the application of broad principles to specific problems and to perform almost clerical tasks on a repetitive basis.

In addition, Plaintiffs do not earn significantly more than other non-exempt employees they supposedly supervised.   See 29 C.F.R. § 541.700(a); Morgan, 551 F.3d at 1271.  Indeed,

depending on the work week, non-exempt TMs make more than GLs.  This is especially evident now after Mercedes changed its overtime policy so that GLs do not receive any overtime pay (i.e., time and a half) for hours worked over 40.  (See Docs. 46 (Agreed Upon Undisputed Facts, 46-1, (Exhibits to Agreed Upon Undisputed Facts). Ex, I, pp. 4-5.  Mercedes' current overtime policy for GLs is that GLs do not receive any additional pay for hours worked between 40-45 hours in a week and only receive straight time for all hours worked over 45 hours in a week.  Id.

GLs have a base salary of $67,000, which equals approximately $31.01 per hour in compensation.  See Plaintiffs' Evidentiary Submissions (Vol. 3), Exhibit 5 (N) Declaration of Jeff ("Toby") Hicks, at ¶ 24; Fillmore Dep., p. 102 (indicating that his base salary was between $66,000 to $67,000 in 2009); Price Dep., p. 42 (indicating that he had an annual salary of $61,700 in late 2003).  Non-exempt TLs make $29.16 per hour.  Hicks Decl., at ¶ 24.  Non-exempt TMs make $27.77 per hour.  Id.  Thus, if a GL, TL, and TM each work 45 hours in a particular week, their compensation would be as follows:

> **GL:**   **$1,240.40** ($31.01 times 40 hours because GLs do not get paid for the first 5 hours over 40 in a workweek);
>
> **TL:**   **$1,385.10** ($29.16 times 40 plus $43.74 times 5);
>
> **TM:**   **$1,319.08** ($27.77 times 40 plus $41.66 times 5).

***Incredibly, GLs make less than the employees they purportedly supervise!***  Certainly, a jury could reasonably conclude that a GLs' primary duty cannot be considered "management" if he or she makes less than his her non-exempt counterpart.  See 29 C.F.R. § 541.700(a).  Ultimately, this factor must be considered, in conjunction with the other primary duty factors, by a jury.

> b.   *Plaintiffs Do Not Manage A Customarily Recognized Department Or Subdivision.*

The phrase "a customarily recognized department or subdivision" is intended to distinguish between a mere collection of employees assigned from time to time to a specific job

or series of jobs and a unit with permanent status and function.  Gorman v. Cont'l Can Co., 1986 U.S. Dist. LEXIS 30856 (N.D. Ill. Jan. 3, 1986).  While the regulations and the commentary in the federal register recognize that teams may constitute a recognized subdivision of the business, the regulations say this requires a case-by-case analysis and is rebutted when the teams do not do anything specialized and different from other teams.  As stated in the Federal Register:

> Finally, the Department observes that "groupings" or "teams" may constitute a department or subdivision under the existing definition, but a case-by-case analysis is required.  See Gorman v. Continental Can Co., 1985 WL 5208, at *6 (N.D. Ill. 1985) (department or subdivision can "include small groups of employees working on a related project within a larger department, such as a group leader of four draftsmen in the gauge section of a much larger department").

69 Fed. Reg. 22122, 22134.

A GL is in charge of a team of people, who may be doing the same thing as another team or who may be doing something different.  The teams change with the needs of production.  They are not a department or other recognized subdivision of the business.  "A customarily recognized department or subdivision must have a permanent status and a continuing function."  29 C.F.R. § 541.103.  While the "Paint Department" may have a permanent status and continuing function, each of the three to five "groups" within the Paint Department does not.  GLs do not run the departments in which they work.  There is more than one GL in the Paint Department, and there is more than one group in almost every other department of the company.  A group is not a subdivision of the Department and a group is not fixed and permanent.  A group is simply a crew of employees who are assigned a series of tasks, all of whom report to Mercedes' Departmental supervisor.  There were about 116 GLs which means there were 116 groups.  No factory has 116 different departments with each department being a unique operation within the plant.  Groups were often redundant, i.e. more than one group would do the same thing as another group at the same time, in a parallel operation.  Thus, the groups were not stand-alone

departments or recognized subdivisions of the business, but simply crews or teams of employees, one or more levels below a subdivision.  Therefore, they do not meet the test of the exemption.

### 3. Genuine Issues Remain As To GLs' Authority To Hire And Fire Or Whether GLs Recommendations Are Given Particular Weight.

It is undeniable that GLs do not hire or fire anyone.  The only question is whether GLs' recommendations given "particular weight" within the meaning of 29 C.F.R. § 541.100(a)(4). This determination—whether GLs hiring and firing determinations are given any particular weight—is a highly factual determination that includes "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon."  29 C.F.R. § 541.1045; see also Davis v. Mountaire Farms, Inc., 453 F.3d 554, 558 (3d Cir. 2006) (concluding that the employees were not exempt because "they had no responsibility for recruiting [chicken] catchers, no responsibility for making recommendations on the hiring or termination of individuals, and no power to hire or fire an employee, even within restricted guidelines.").

Here, GLs do not even have the direct authority to hire and fire.   (Fillmore Dep., p. 156-57); (Price Dep., pp. 157-58) (Price must get approval from his AM to initiate CPRs).  Rather, GLs give TMs annual performance evaluations ("PEs").  The PEs must be approved by an Assistant Manager and HR before the Group Leader is even allowed to sign the PE.  The Assistant Manager and HR can and do change the PEs.  Thereafter, the Manager must sign off. The PEs are only one of several evaluation tools utilized by MBUSI's Management in determining whether to promote an employee.   Management also takes into consideration performance in classes, peer reviews on a 1-5 score basis from all co-workers within the group, and scores from outside assessment teams.   As well, GLs are required to fill in standard

counseling forms when TMs and TLs in their group take "emergency vacations"; e.g., doctor's appointments, without a doctor's excuse.  GLs are required to fill out standard counseling forms when TMs or TLs fail to perform a quality control countermeasure.  Three such forms result in a Level I corrective performance review (CPR).  This is the limit of the GLs independent discretion relating to CPRs.  Level I and Level II CPRs must be approved by Department Manager/Assistant Manager, Team Relations Representative, and Employment/Team Relations Manager or Assistant Manager.  For a Level III CPR and final termination, a Unit Vice President and HR Vice President's approval is also required.  Thereafter, there is an appeal process of all performance reviews resulting in termination.  Obviously, Plaintiffs do not have the authority to hire or fire and his recommendations are given no particular weight in MBUSI's decisions relating to hiring, firing, promotion or advancement.

**B.    Genuine Issues Remain As To Whether Plaintiffs Are Exempt Under The Administrative Exemption.**

For the same reasons stated above, Mercedes cannot meet its burden under the first prong of the administrative exemption because Plaintiffs were never paid a true salary.  See *Supra*, pp. 34-39; 29 C.F.R. § 541.200.  Accordingly, the exemption fails on this basis alone.  See 29 C.F.R. § 541.200(a)(1).  Nevertheless, the exemption also fails under the second and third prong of the administrative exemption because Plaintiffs do not have a primary duty of performing office or manual work directly related to the management of Mercedes' general business operations or its customers and they do not have a primary duty that includes the "exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(2)-(3).

**1.    Plaintiffs duties are directly related to the day-to-day production of Mercedes vehicles.**

Plaintiffs purported "administrative" duties are not directly related to the management of Mercedes.  See 29 C.F.R. § 201(a) (stating that to qualify for the administrative exemption "an

employee must perform work directly related to assisting with the running or servicing of the business . . . ."). Rather, Plaintiffs' duties are directly related to the manufacture of vehicles.

The essence of the second prong's focus on "general business operations" is to separate "production" from "administration." See, e.g., Davis v. J.P. Morgan Chase & Co., 587 F.3d 529, 535 (2nd Cir. 2009) ("[W]e have drawn an important distinction between employees directly producing the good or service that is the primary output of a business and employees performing general administrative work applicable to the running of any business."); Wage and Hour Division, U.S. Dep't of Labor, Administrator's Interpretation No. 2010-1, at 3 (Mar. 24, 2010); Warshauer v. Solis, 577 F.3d 1330, 1335 (11th Cir. 2009) ("[A]n agency's interpretive guidance construing a statute is entitled to deference proportional to its power to persuade." (internal quotations omitted)). This so-called production/administration dichotomy is particularly useful in a manufacturing setting. See Roe-Midgett v. CC Servs., 512 F.3d 865, 872 (7th Cir. 2008). Whereas "administration" relates to running the business, and thus falls within the parameters of this prong, "production" work relates to the goods and services that the business contributes to the marketplace. Administrator's Interpretation No. 2010-1, at 3.

Here, Fillmore and Price's duties directly related to the production side of the dichotomy. Fillmore spent six hours in the Audit area compiling information relating production issues. Fillmore Dep., pp. 63-65, 77-78, 82-84. He would work fill out pre-fabricated reports by sifting through piles of paper work, entering data, uploading photos, and disseminating the information to different departments. Id. Fillmore testified that all he does is input information into a prepared excel spreadsheet: "I'm inputting the data so that the reports can accurately show how well the organization is doing based on that format and the information that the team members put I and the issues that we have." Fillmore Dep., pp. 82-83.

During the time that Price was assigned to 166 Project, Price observed the operation of a

new production line.[17]  Indeed, Price was the guy from the production line who was supposed to make sure everything was running appropriately.  Price Dep., pp. 72-74.  He would look at the operation "from a production standpoint [to see i]f it's feasible for team members to use."  Price Dep., pp. 75.

Price and Fillmore's duties had nothing to do with the management of Mercedes as an organization or communicating with Mercedes' customers.  See Roe-Midgett, 512 F.3d at 872 (recognizing administrative employees work in an office communicating with customers and doing paperwork).  Rather, their duties were directly related to the production of vehicles.  Thus, a genuine issue of material fact remains whether Plaintiffs fall under this prong of the administrative exemption.

> ### 2.    Plaintiffs do not exercise any discretion or have independent judgment with respect to matters of independent significance.

In a somewhat comical fashion, Mercedes concludes that Fillmore exercises discretion and independent judgment in carrying out his duties because "he has to sift through information . . . [and] ensure the information is correct."  Def's Mot., at 38.  Under Mercedes' standard, all clerical personnel in the United States would exempt.  This is a ridiculous application of the law.

Here's the real standard:  "Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to:

> whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;

---

[17] Up until the middle of 2010, while Price was working as GL on the 166 Project Team, he did not have any TMs in his group.  Price Dep., pp. 72, 77.  Therefore, even if he was engaged in "management" duties (which he was not) he would not qualify for the managerial exemption during this time period because he did not have anyone to "manage."  See 29 C.F.R. §54100(a)(3).

whether the employee carries out major assignments in conducting the operations of the business;

whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;

whether the employee has authority to commit the employer in matters that have significant financial impact;

whether the employee has authority to waive or deviate from established policies and procedures without prior approval;

whether the employee has authority to negotiate and bind the company on significant matters;

whether the employee provides consultation or expert advice to management;

whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and

whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.

29 C.F.R. § 541.020(b).  The exercise of discretion and independent judgment also does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work.  See 29 C.F.R. § 541.020(e) ("An employee who simply tabulates data is not exempt, even if labeled as a "statistician."").

As evidenced by his testimony, Fillmore does not exercise any discretion or independent judgment.  Fillmore enters data into a pre-formatted report and sends the report out: "All of this stuff, we are just plugging in . . . numbers."  Fillmore Dep., pp. 63-65, 68, 77-78, 82-84.  He tells his AM if there is an issue, then "[w]hatever he wants, then we do it.  I take that direction and do it."  "[If] he or she says, go ahead and call the organization, and then I start calling [if there is an issue]."  Id. at 68.

Price likewise does not fall under this prong of the administrative exemption because he

simply reviews and tests new production mechanism that were created by engineers and planners.   At the very least, there remains a genuine issue as to whether Price's testing of these procedures represents independent discretion and judgment as to a matter of significance.   29 C.F.R. § 541.202(a).   In essence, Price is the production guy assigned see if the newly designed process will work.  Price Dep., pp. 72-74.  There is no "test worker" exemption under the FLSA. Thus, testing processes designed by others necessarily places Prices' duties outside this prong of the administrative exemption.

### C.    Genuine Issues Remain As To Whether Plaintiffs Are Exempt Under The Combination Exemption.

The combination exemption does not diminish or limit the burden that Mercedes must show under either the "executive" or "administrative" exemptions.   The combination exemption merely provides that "work that is exempt under one section of this part will not defeat the exemption under any other section."  29 C.F.R. § 541.708.  Because there are genuine issues of material fact as to whether Plaintiffs can be considered exempt under either the "executive" or the "administrative" exemptions, Mercedes certainly cannot attain summary judgment under a purported combination exemption.

## IV.    CONCLUSION

For each of the foregoing reasons, Mercedes' motion for summary judgment should be denied in their entirety together with any such relief that the Court deems proper.[18]

---

[18] Assuming that this Court enters summary judgment against the Plaintiffs, there is no just reason to enter final judgment at this time.  Indeed, as Mercedes recognizes, in determining whether a court should enter final judgment, the court should consider whether piecemeal appeals will result.  This is exactly what will happen.  The Eleventh Circuit will receive numerous appeals resulting from the same case and the same transactional facts and circumstances.  For example, the question of whether GLs are paid a true salary applies to every Plaintiff and, resolution of this question in favor of Plaintiffs, would resolve the entire case. Rather than burden the Eleventh Circuit with numerous separate appeals resulting from the same

Dated this 21th day of December, 2011.

THIERMAN LAW FIRM

_____/s/Joshua Buck_____

MARK R. THIERMAN
laborlawyer@pacbell.net
JOSHUA D. BUCK
josh@thiermanlaw.com
THOMAS F. CAMPBELL
tcampbell@campbelllitigation.com
D. KEIRON McGOWIN
kmcgowin@campbelllitigation.com

Attorneys for Plaintiffs

**OF COUNSEL:**
Mark R. Thierman (pro hac vice)
laborlawyer@pacbell.net
Joshua D. Buck (pro hac vice)
josh@thiermanlaw.com
**THIERMAN LAW FIRM, APC**
7287 Lakeside Drive
Reno, Nevada  89511
Tel: (775) 284-1500

And

Thomas F. Campbell, SB # ASB-5900-M60T
tcampbell@campbelllitigation.com
D. Keiron McGowin, SB # ASB-1623-I48D
kmcgowin@campbelllitigation.com
**CAMPBELL LAW**
A Professional Corporation
100 Concourse Parkway, Suite 115
Birmingham, Alabama  35244
Tel:  (205) 397-0307
Fax:  (205) 278-6654

---

case, any decision here, should not be entered as a final judgment until the entire case can be resolved.