IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JEFF HICKS, | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | 7:08-cv-0536-LSC |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

## I. Introduction

Before this Court is the third in a series of motions for summary judgment filed by Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI").[1] The present motion, filed on September 12, 2011 (Doc. 107), seeks summary judgment as to claims that arose when the relevant Plaintiffs allegedly fit the "highly compensated" exemption to the Fair Labor Standards Act ("FLSA" or "the Act"). A brief in support of the motion (Doc. 108) was contemporaneously filed. After the Court

---

[1] This series of motions concerns the Plaintiffs who filed suit together in *Lawson v. MBUSI*, 7:09-cv-1157-LSC, and does not pertain to Jeff Hicks himself. The *Lawson* and *Hicks* cases were consolidated for discovery purposes, and on February 7, 2012, this Court ordered the claims of the individual *Lawson* Plaintiffs to be severed into individual cases. (*Hicks* Doc. 162.) These individual cases remain consolidated for case management purposed under *Hicks*, with the Court continuing to evaluate the already-filed set of summary judgment motions.

Unless otherwise noted, citations to the record are to the document numbers in the *Hicks vs. MBUSI* case, 7:08-cv-0536-LSC. Document numbers preceded by "*Lawson*" reflect the document number assigned in *Lawson v. MBUSI*, 7:09-cv-1157-LSC.

granted an unopposed extension of the briefing period (Doc. 120), Plaintiffs filed a response to the motion on October 17, 2011 (Doc. 129), and MBUSI filed a reply brief on November 7, 2011 (Doc. 137). This motion is now ripe for decision.

## II. Facts[2]

The present motion concerns just sixteen of the Plaintiffs and is directed only at specific years in which each is alleged to meet the criteria for the "highly compensated" exemption of 29 C.F.R. § 541.601. The claims at issue are those of Danny Bankston (2009),[3] Mario Cohen (2009), Thomas Daniels (2010), James Davis (2006–08), Marcus Garth (2010), Timothy Lee (2010), Robert Little (2006–08, 2010), Marianne Magner (2010), Steven Munoz (2006–07), Allen Ozier (2009), Kelly Pitman (2007), Susan Pope (2010), Jimmy Skelton (2006–08, 2010) Gene Upton (2009), and Cathy Williams (2008).

---

[2] The facts set out in this opinion are gleaned from the "Agreed Upon Undisputed Common Facts Applicable to Summary Judgment Motions," (Doc. 97), the parties' individual submissions of facts claimed to be undisputed, their respective responses to those submissions, as well as the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] The Claims of two of these Plaintiffs have already been dismissed with prejudice. On December 22, 2011, the Court granted summary judgement against the claims of seven Plaintiffs, including Danny Bankston, on grounds of judicial estoppel (Docs. 151–52). Plaintiffs did not oppose summary judgment as to Danny Bankston. (Doc. 113 at 2.) Kelly Pitman was one of four Plaintiffs whose claims were dismissed on statute-of-limitations grounds. (Doc. 163–64.) Thus, as to Danny Bankston and Kelly Pitman, the present motion is merely an alternate basis for the dismissal of their claims.

All of these Plaintiffs were employed by MBUSI as Group Leaders ("GLs") at the relevant time periods. While employed as GLs, these Plaintiffs were classified by MBUSI as exempt employees. MBUSI made changes to the overtime policy for exempt employees in February and March of 2005, and again in March of 2006. Following the March 2006 changes, GLs could be paid overtime only after completing five unpaid hours per week of pre- and post-shift work activities designated as "casual time." While overtime would still be paid for extra hours worked on weekends without the casual time requirement, the policy effectively required forty-five hours, rather than forty, to be worked before any weekday overtime could accrue. The "casual time" language was removed from the policy in a revision on April 7, 2008.

On June 10, 2009, a number of GLs and former GLs filed a complaint against MBUSI. The essence of the complaint is that, by mischaracterizing the GLs as exempt, MBUSI was "requiring [them] . . . to work overtime without payment of overtime . . . in violation of the [FLSA]." (*Lawson* Doc. 1 at 9.)

## III. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for

summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.    Discussion

Section 13(a)(1) of the FLSA provides that its minimum-wage and overtime provisions do "not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Normally, determining whether employees are exempted by employment "in a bona fide executive capacity" requires a detailed examination of the employees' job duties. 29 C.F.R. § 541.100. This includes an inquiry into the "primary duty" of the employees, a determination of whether they "customarily and regularly" direct the work of at least two others, and an evaluation of their "authority to hire or fire other employees." 29 C.F.R. § 541.100(a)(2)–(4). But for "highly compensated employees"—those with "total annual compensation of at least $100,000"—this fact-intensive inquiry is simplified considerably. 29 C.F.R. § 541.601(a). If the $100,000 compensation threshold is met, employees are "deemed exempt under section 13(a)(1)" of the FLSA if they "customarily and regularly perform *any one or more* of the exempt duties" set forth in the regulations. *Id.* (emphasis added).

Plaintiffs argue, however, that this streamlining of the analysis is illusory. They point to subsection (d) of the same provision, which explains that the highly compensated exemption "applies only to employees whose primary duty includes performing office or non-manual work." 29 C.F.R. § 541.601(d). This, Plaintiffs

argue, creates a "circular conundrum," requiring the Court to perform the full executive exemption analysis and determine the "primary duty" of the employees in question. According to Plaintiffs, in other words, the Court must find that Plaintiffs fit the executive exemption in order to determine that the executive exemption analysis is unnecessary. (Doc. 129 at 4.) If this were the case, the highly compensated exemption would be meaningless; such an absurd result would be reason enough to doubt Plaintiffs' interpretation. Further, the previous subsection explicitly addresses this issue: it explains that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus *eliminating the need for a detailed analysis* of the employee's job duties."  29 C.F.R. § 541.601(c) (emphasis added).

Plaintiffs appear to overlook the significance of the word "includes" in subsection (d). There is a vast difference between fully determining an employee's "primary duty" as part of the executive-exemption analysis and simply determining whether that primary duty "*includes* performing office or non-manual work." 29 C.F.R. § 541.601(d). Rather than creating a "conundrum" that incorporates the entire executive-exemption test, subsection (d) simply clarifies what should be obvious: that employees who "customarily and regularly" perform one or more exempt duties must necessarily have some "office or non-manual work" included as part of their primary duty.

Accordingly, there are essentially two steps to determining whether summary judgment should be granted for MBUSI under the highly compensated exemption. First, the Court must ascertain whether there is a genuine issue of material fact as to the level of compensation, and whether it totals at least $100,000 for each of the sixteen Plaintiffs for each of the years in question. If the $100,000 threshold is reached, the second step is to determine whether the primary duties of these sixteen employees included some office or non-manual work, with one or more exempt duties "customarily and regularly" performed. Although MBUSI maintains that both requirements are easily demonstrated, Plaintiffs contend that neither is met.

### A. Compensation Requirement

In order to satisfy the requisite compensation threshold, an employee's compensation must total at least $100,000 within a "52-week period" — by default a "calendar year," unless the employer "identif[ies] some other year period in advance." 29 C.F.R. § 541.601(b)(4). In addition to reaching this overall amount, the compensation must also "include at least $455 per week paid on a salary or fee basis." 29 C.F.R. § 541.601(b)(1). Plaintiffs deny that the $100,000 threshold has been met, and they also dispute that Plaintiffs were paid on a "salary basis."

### 1. $100,000 Amount

MBUSI's account of the Plaintiffs' compensation is provided by a declaration of Mark Jones, the Manager of Human Resources for MBUSI. (Doc. 112.) Mr. Jones' declaration, based on MBUSI's payroll and compensation records, gives figures of over $100,000 for each of the Plaintiffs during the time periods in question. (Doc. 112 ¶¶ 4–19.) Plaintiffs assert that these compensation figures are "fatally flawed and cannot be relied upon," because the amounts provided by Mr. Jones include "medical, retirement, and fringe benefit payments." (Doc. 129 at 22.) According to Plaintiffs, "the only relevant indicator of an employee's 'total annual compensation' is the W-2 tax form." (*Id.* at 23.) Accordingly, Plaintiffs contend that "[t]his Court only needs to look at the Box 1—'wages, tips, other comp.'—of an employee's W-2 form to determine whether he or she meets the $100,000 threshold." (*Id.* at 3.)

Even if the Court were to agree that the W-2 forms are controlling, Plaintiffs still concede that some of the individuals still "definitively earned over $100,000 in total annual compensation": Thomas Daniels (2010), Timothy Lee (2010), Robert Little (2006–08), Steven Munoz (2006), and Jimmy Skelton (in 2006-08 & 2010). Additionally, Plaintiffs' championing of the W-2 form is less ardent than it first appears: one page after referring to the the W-2 as "the only relevant indicator of an employee's 'total annual compensation,'" Plaintiffs ask the Court to ignore the W-2s

for four Plaintiffs whose W-2 forms indicate income over $100,000, which allegedly includes the payment of severance benefits.[4] (*Id.* at 24.)

Plaintiffs' attacks on Mr. Jones' figures, and their insistence on looking exclusively to the W-2 forms, appear to stem from misunderstandings about the nature of each. The accusation that Mr. Jones' figures include amounts for "medical, retirement, and fringe benefit payments" is, at best, a mischaracterization. (Doc. 129 at 23.) Mr. Jones' declaration explicitly states that it "do[es] *not* include the value of fringe benefits." (Doc. 112 ¶ 21, emphasis added.) The included "medical [and] retirement" amounts referenced by Plaintiffs are not payments made by MBUSI for such items, which MBUSI admits would be improper. *See* 29 C.F.R. § 541.601(b)(1) ("Total annual compensation . . . does not include payments for medical insurance, payments for life insurance, contributions to retirement plans and the cost of other fringe benefits."). Mr. Jones' figures exclude such contributions from MBUSI, but does "include pre[-]tax payments made *by each [Plaintiff]*, such as 401k contributions and health insurance premiums." (Doc 112 at 9, emphasis added.) There is a vast difference between payments made *by employers* towards an employee's insurance or

---

[4] Plaintiffs' brief references the existence and amounts of these severance benefits (ranging from $44,921.57 to $76,067.44), without providing any factual citations. The amounts and existence of such benefits are irrelevant for present purposes, however, because even if severance benefits were paid, they would not be excluded from the Plaintiffs' total annual compensation. *See* 29 C.F.R. § 778.211.

retirement, and the pre-tax payments that an *employee* elects to make on his or her own behalf. While the former is undisputedly a "fringe benefit" that does not count toward an employee's total annual compensation,  the latter is a voluntary use of funds that the employee would be free to spend elsewhere. The choice to spend those earnings on pre-tax contributions does nothing to alter what was earned.

The tax-exempt status of such transfers highlights the problems with looking to W-2s as the standard for determining an employee's income. Box 1 of the W-2 form, to which Plaintiffs direct the Court, displays only *taxable* compensation. *See, e.g,* I.R.S., General Instructions for Forms W-2 and W-3, Cat. No. 25979S, at 12-13 (available at http://www.irs.gov/pub/irs-pdf/iw2w3.pdf) (March 12, 2012) (instructing employers to show, in Box 1, "the total taxable wages, tips, and other compensation," but to "not include elective deferrals" in that figure). The relevant figure for purposes of this FLSA exemption is the employee's "total annual compensation," not just *taxable* compensation. 29 C.F.R. § 541.601(a) . Relying on Box 1 of the W-2 forms would improperly exclude the pre-tax spending made by Plaintiffs. The only evidence that includes the amounts paid to Plaintiffs before such pre-tax spending are the figures supplied by Mr. Jones' declaration. These figures are declared under penalty of perjury to be "the correct total compensation amount" for each Plaintiff. (Doc. 112 at 9.) Although Plaintiffs contend that the included amounts

are "fringe benefits," they do not dispute the accuracy or authenticity of the numbers provided by Mr. Jones. For the reasons just discussed, Plaintiffs' pre-tax spending does not somehow convert earnings into "fringe benefits." Instead, those earnings properly count toward the Plaintiffs' "total annual compensation." Because Mr. Jones' undisputed figures provide the only evidence of that figure, there is no genuine question of material fact as to those amounts. The total annual compensation of each of the sixteen Plaintiffs during the years in question exceeded $100,000.

### 2. Salary Basis

In addition to meeting the $100,000 threshold, Plaintiffs' total annual compensation must "include at least $455 per week *paid on a salary or fee basis*." 29 C.F.R. § 541.601(b)(1) (emphasis added). Plaintiffs allege that they do not meet the salary-basis test for two reasons. First, they claim that their compensation was "subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). Second, they contend that "deductions . . . [were] made for absences occasioned by the . . . operating requirements of the business." *Id.* MBUSI does not deny that either of these conditions would preclude compensation from being on a "salary basis." Rather, MBUSI maintains—correctly—that neither situation applies here.

Plaintiffs' first argument fails because it relates solely to overtime compensation. Plaintiffs point out that "[i]f one GL worked 10 hours of overtime versus another GL who worked 20, the GL who worked 20 hours would make more money." (Doc. 129 at 26.) Because of this discrepancy, Plaintiffs argue, "GLs were not paid [on] a true salary basis." (*Id.*) The regulations, however, specifically provide that "an employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). Plaintiffs do not allege that their actual salaries were impacted by the number of hours worked, just that it affected their compensation for overtime. Because their salaries remained constant regardless of the amounts of overtime earned, MBUSI's choice to provide additional compensation for overtime does nothing to erode the "salary basis" on which Plaintiffs were paid.

Plaintiffs' second argument is that they are not paid on a salary basis because their "compensation is connected to the operational requirements of the production plant." (Doc. 129 at 26.) They point out that, as of 2008, MBUSI does not build cars at its Alabama plant on Fridays, although some non-production activities apparently still take place. GLs not scheduled to work on these non-production Fridays have

various options: they can elect to use a paid vacation day, they can take an unpaid personal day off work, or they can bank their unworked Friday hours against future overtime hours. Plaintiffs argue—without any supporting citations—that this "Friday Bank" procedure requires MBUSI to "count [] hours worked, which violates the whole concept of a fixed salary." (Doc. 129 at 27.)

Here, Plaintiff confuses the concept of counting hours for purposes of base compensation with counting hours for purposes of calculating overtime above and beyond the fixed salary. As noted above, employers may—but are not required—to provide overtime compensation for exempt, salaried employees. MBUSI's decision to provide overtime in addition to a predetermined salary has no bearing on whether a "salary basis" exists. If MBUSI—of its own accord—chooses to pay an overtime premium, it may also determine how that overtime is paid, so long as employees still receive, in full, their predetermined salaries.  There appears to be no dispute that Plaintiffs did receive their full salaries, even when "banking" Friday hours against future overtime. As such,  Plaintiffs plainly received "at least $455 per week paid on a salary or fee basis." 29 C.F.R. § 541.601(b)(1). Because their total annual compensation exceeded $100,000 for the years in question, and they were paid at least $455 per week on a salary basis, these sixteen Plaintiffs meet the compensation requirements for the highly compensated exemption.

## B. Customary and Regular Performance of Exempt Duties

In addition to the compensation requirement, the highly compensated employee exemption requires an employee's primary duty to "include performing office or non-manual work," 29 C.F.R. § 541.601(d), in that the employee must "customarily and regularly perform[] any one or more of the exempt duties" identified in the regulations. 29 C.F.R. § 541.601(a). "Customarily and regularly" is defined as "a frequency that must be greater than occasional but which, of course, may be less than constant." 29 C.F.R. § 541.701. It includes "work normally and recurrently performed every workweek," but not "isolated or one-time tasks." *Id.*

As previously discussed, the need to examine  job duties is considerably relaxed for the highly compensated exemption; an employee need only perform *one or more* exempt duties customarily and regularly. It is enough, for instance, if an employee customarily and regularly "directs the work of two or more other employees," one of the executive duties found in 29 C.F.R. § 541.100. In fact, the regulations use this very example:

> [A] highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive . . . . An employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the

employee does not meet all of the other requirements for the executive exemption under § 541.100.

29 C.F.R. § 541.601(c). This example is especially instructive here, since it is a fitting description of the sixteen Plaintiffs at issue. First, it is undisputed that, generally, "each GL has a group consisting of one or more teams." (Doc. 97 at ¶ 5.) All but two of the sixteen Plaintiffs have admitted that in their "job[s] as Group Leader at MBUSI, [they] supervise the team leaders and team members in [their] group."[5] The two Plaintiffs who did not openly admit this were Mario Cohen and Allen Ozier. Mario Cohen's response to this request for production—like his response to all the rest—was to evade the question (Doc. 113 at 3), and Allen Ozier responded with a qualified denial. (Doc. 110-15 at 3). But both Cohen and Ozier establish elsewhere that their GL roles involved regularly directing the work of two or more employees.

Mario Cohen has described his GL position as his "job as [a] manager[]." (Doc. 110-12 at 30.) He conceded that his team members are "supposed to follow [his] instructions," and that they "can be disciplined" if they fail to do so. (*Id.*) Ozier, on the other hand, repeatedly characterizes his giving of directions as "only relay[ing]

---

[5] This is true of Danny Bankston (Doc. 110-11 at 3), Phillip Cooper (Doc. 111-6 at 3), Thomas Daniels (Doc. 111-3 at 3), James Davis (Doc. 110-1 at 85), Marcus Garth (Doc. 111-11 at 3), Timothy Lee (Doc. 111-9 at 3), Robert Little (Doc. 110-3 at 3), Marianne Magner (Doc. 111-13 at 3), Steven Munoz (Doc. 110-7 at 3), Kelly Pitman (Doc. 110-9 at 3), Susan Pope (Doc 111-7 at 41), Jimmy Skelton (Doc. 110-5 at 3), Gene Upton (Doc. 111-2 at 3), Cathy Williams (Doc. 111-15 at 3).

messages to team leaders and team members in his group." (Doc. 110-15 at 3.) He admits, however, that this was to "make sure they were doing" what was instructed. (Doc. 110-14 at 30.) He would regularly "walk the [production] line," to "see what team members were doing and make sure that they were doing what they were supposed to do." (*Id.* at 30-31.) Nearly all of the Plaintiffs—including Allen Ozier—admit that they "give work directions and assignments to members of [their] group," they "manage attendance," and they "manage vacation scheduling, timekeeping and attendance." (Doc. 110-15 at 3–4.) Additionally, all the Plaintiffs but Cohen and Cooper admit that as GLs they "have the authority to initiate a Corrective Performance Review on a team member when [they] deem necessary." (*Id.* at 5.)

In short, the depositions and admissions of the sixteen Plaintiffs amply demonstrate that they, as GLs, would "customarily and regularly direct the work of two or more other employees." Whatever else their jobs may have entailed, this fact alone is enough to satisfy the "one or more . . . exempt duties" prong of 29 C.F.R. § 541.601(a). Even taking all the evidence in the light most favorable to Plaintiffs, there is clearly no genuine dispute of material fact on this point. The very purpose of the highly compensated employee exemption is to "eliminat[e] the need for a detailed analysis of the employee's job duties," so any further inquiry is unnecessary. 29 C.F.R. § 541.601(c).

**V. Conclusion**

All sixteen of these Plaintiffs meet the highly compensated exemption requirements for the years in question. As such, summary judgment is appropriate for their claims arising out of those years, and MBUSI's motion (Doc. 107) is due to be granted. A separate order consistent with this opinion will be entered.

Done this 30th day of April, 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[167037]