IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JEFF HICKS, | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | 7:08-cv-0536-LSC |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION

## I. Introduction

Before this Court is the fourth in a series of motions for summary judgment filed by Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI").[1] The present motion, filed on September 26, 2011 (Doc. 114), seeks summary judgment as to the claims of eighteen Plaintiffs who allegedly meet the executive exemption to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act") because they "admit that their primary duty is management and that they perform no nonexempt

---

[1] This series of motions concerns the Plaintiffs who filed suit together in *Lawson v. MBUSI*, 7:09-cv-1157-LSC, and does not pertain to Jeff Hicks himself. The *Lawson* and *Hicks* cases were consolidated for discovery purposes, and on February 7, 2012, this Court ordered the claims of the individual *Lawson* Plaintiffs to be severed into individual cases. (*Hicks* Doc. 162.) These individual cases remain consolidated for case management purposes under *Hicks*, with the Court continuing to evaluate the already-filed set of summary judgment motions.

Unless otherwise noted, citations to the record are to the document numbers in the *Hicks vs. MBUSI* case, 7:08-cv-0536-LSC. Document numbers preceded by "*Lawson*" reflect the document number assigned in *Lawson v. MBUSI*, 7:09-cv-1157-LSC.

work." (*Id.* at 1.) A brief in support of the motion (Doc. 115) was contemporaneously filed. Plaintiffs filed a response to the motion on October 26, 2011 (Doc. 136), and MBUSI filed a reply brief on November 16, 2011 (Doc. 142). This motion is now ripe for decision.

## II. Facts[2]

The present motion concerns eighteen Plaintiffs, fifteen of which have claims remaining:[3] Hugh Boles, Brian Boyd, Gerald Chiabi, James Davis,[4] Billy Englebert, Curtis Gibbs, Mark Gothard, Chad Hampton, Daryl Hiott, Jay Houser, Kevin Martin, Kevin McCurley, Steven Munoz, Susan Pope, and Willie Mark Williams.

All of these Plaintiffs are, or were, were employed by MBUSI as Group Leaders ("GLs"). Each GL has a group which consists of Team Leaders ("TLs") and Team

---

[2] The facts set out in this opinion are gleaned from the "Agreed Upon Undisputed Common Facts Applicable to Summary Judgment Motions," (Doc. 97), the parties' individual submissions of facts claimed to be undisputed, their respective responses to those submissions, as well as the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Additional facts relating to specific Plaintiffs are addressed individually below.

[3] This motion is also addressed to Frank Coffin, Gary Quarles, and Donald White. Their claims have already been dismissed, on grounds of judicial estoppel, with Plaintiffs' consent. (*See* Doc. 113 at 2, Docs. 151 &152.) It is therefore unnecessary to consider the present motion as it applies to them.

[4] The claims of James Davis, Steven Munoz, and Susan Pope have already been dismissed for years in which they met the "highly compensated" exemption to the FLSA. The present motion addresses their surviving claims, and provides a potential alternate basis for summary judgment on the already dismissed claims.

Members ("TMs"). While employed as GLs, these Plaintiffs were classified by MBUSI as exempt employees. MBUSI made changes to the overtime policy for exempt employees in February and March of 2005, and again in March of 2006. Following the March 2006 changes, GLs could be paid overtime only after completing five unpaid hours per week of pre- and post-shift work activities designated as "casual time." While overtime would still be paid for extra hours worked on weekends without the casual time requirement, the policy effectively required forty-five hours, rather than forty, to be worked before any weekday overtime could accrue. The "casual time" language was removed from the policy in a revision on April 7, 2008.

On June 10, 2009, a number of GLs and former GLs filed a complaint against MBUSI. The essence of the complaint is that, by mischaracterizing the GLs as exempt, MBUSI was "requiring [them] . . . to work overtime without payment of overtime . . . in violation of the [FLSA]." (*Lawson* Doc. 1 at 9.)

## III. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for

summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.    Discussion

Section 13(a)(1) of the FLSA provides that its minimum-wage and overtime provisions do "not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). As with all FLSA exemptions, the executive exemption is to be "narrowly construed so that it applies to those plainly within its terms and spirit." *Gregory v. First Title of Am., Inc.,* 555 F.3d 1300, 1302 (11th Cir. 2009). In asserting that an exemption applies, "the employer 'bears the burden of proving the applicability of a[n] FLSA exception by clear and affirmative evidence.'" *Id.* (quoting *Klinedinst v. Swift. Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001)). The regulations provide a four-part test for determining whether an employee fits the executive exemption:

> (a) The term ''employee employed in a bona fide executive capacity'' in section 13(a)(1) of the Act shall mean any employee:
>
> > (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
> >
> > (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. Each one of these requirements is the subject of debate between the parties: MBUSI contends that all four are easily demonstrated, and that summary judgment is therefore appropriate; Plaintiffs hold to the other extreme, that none of the four can be established and that each presents genuine issues of material fact. Despite the breadth of the parties' disagreement, the crux of the dispute in this motion is relatively narrow: the "primary duty" of the Plaintiffs. MBUSI argues that this particular group of Plaintiffs should be found exempt as a matter law because they allegedly "admit their primary duty is management and that they perform no non-exempt work." (Doc. 144 at 2.) The Court thus begins its analysis here—with the second of the four requirements—determining if there is a genuine dispute of material fact as to whether Plaintiffs' "primary duty is management . . . of a customarily recognized department or subdivision" of MBUSI. 29 C.F.R. § 541.100(a)(2).

## A. Primary Duty

To meet the executive exemption, the "management" of a customarily recognized department or subdivision must be the employee's "primary duty." "Management" is defined by the regulations to include:

> [A]ctivities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. The term "primary duty" is broadly defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). MBUSI's first argument for the present set of Plaintiffs is that they all have admitted that their primary duty is management. Such a concession would indeed be dispositive of the issue, and the Plaintiffs' admissions are indeed important

to the Court's analysis below. Most of the Plaintiffs, however, do not concede the

ultimate issue in so sweeping a fashion as MBUSI suggests. Thus, in order to

determine an employee's "primary duty," the Court looks to the criteria established

by the regulations. They provide a set of nonexclusive factors, consisting of:

> [T]he relative importance of the exempt duties as
> compared with other types of duties; the amount of time
> spent performing exempt work; the employee's relative
> freedom from direct supervision; and the relationship
> between the employee's salary and the wages paid to other
> employees for the kind of nonexempt work performed by
> the employee.

29 C.F.R. § 541.700(a). Notably, three of these four factors presuppose that *some*

nonexempt work is performed. The first is concerned with the importance of

nonexempt work as compared to the employee's exempt work, and the second looks

to the amount of time spent on each. The fourth factor likewise requires that the

employee performs nonexempt work to identify the wages of comparable employees

performing such work. Of course, the regulations are clear that these factors, while

helpful, are not exhaustive. Instead of relying on any set of fixed criteria, each

determination "must be based on all the facts in a particular case, with the major

emphasis on the character of the employee's job as a whole." *Id.* Still central to this

holistic inquiry, however, is the degree to which a Plaintiff's "job as a whole" involves

the performance of nonexempt work. Thus, the performance of nonexempt work is of critical importance to the Court's analysis.

MBUSI argues that summary judgement is appropriate precisely for this reason, since Plaintiffs "do not allege that they perform production work or that they sit on the line checking quality." (Doc. 114 at 3.) Of course, MBUSI still bears "the burden of proving the applicability of [this] FLSA exemption." *Gregory*, 555 F.3d at 1302. That burden cannot be met simply by a lack of assertions on the part of Plaintiffs; their omissions are not alone sufficient even if MBUSI's correctly describes it. But if MBUSI can first demonstrate the exempt, managerial nature of Plaintiffs' work, then Plaintiffs' failure to allege the performance of any nonexempt work becomes significant, showing that there is no genuine issue of material fact on the issue. As the Eleventh Circuit observed in *Rodriguez v. Farm Stores*, "[w]hen it comes to deciding whether an employee is an executive within the meaning of the FLSA, the answer is in the details." 518 F.3d 1259, 1264 (11th Cir. 2008.) Accordingly, the relevant details are examined for each Plaintiff in turn below; first, with an eye to the exempt management duties that each performs, and then focusing on any nonexempt, nonmanagement duties that Plaintiffs allege.

### 1. Hugh Boles

Hugh Boles admitted in his deposition that "it's [his] primary duty. . . to oversee the work and performance of [his] Team Members and direct their work."(Doc. 116-2 at 35.)[5] Among other things, he conducts a shift start-up meeting, assesses the adequacy of the manpower available for the day, observes the work of his TMs, corrects them when they are not focusing on their work, and resolves conflicts between TMs. Boles spends most of his day responding to problems that arise in the

---

[5] MBUSI maintains that the Court should, in addition to noting Boles' deposition testimony, deem his response to Request for Admission ("RFA") #43 to be an admission on this issue as well. (Doc 115 at 7.) Request for admission#43 presented the following prompt: "While a Group Leader at MBUSI, you were properly classified under the Fair Labor Standards Act as an exempt employee."(Doc. 116-1 at 11.) Boles responded that he was "unsure as to whether or not he was."(*Id.*)This response, MBUSI contends, is deemed to be an admission "[b]y operation of Rule 36(a)(4)."(Doc. 115 at 7 n.8.) This is not necessarily the case. The rule in question requires a party to either admit a matter or "specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." FED. R. CIV. P. 36(a)(4). Lack of knowledge can be asserted as the reason for failing to admit or deny, but "only if the party states it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny." *Id.* It is true that Boles failed to properly satisfy this requirement, but the rule does *not* mandate that all such improper responses must be treated as admissions. Defective responses can—and should—be treated as admissions in some circumstances, as the Court finds with respect to other Plaintiffs' RFA responses below. But the remedy lies within the discretion of the court. *See Brown v. Arlen Mgmt. Corp.*, 663 F.2d 575, 577 (5th Cir. 1981). In situations such as this one indicating a lack of knowledge, the committee notes contemplate that the proper "sanction of a party for failure to inform himself before he answers lies in the award of costs after trial." FED. R. CIV. P. 36(a)(4) advisory committee notes. The Court does not find it appropriate to treat an "unsure" response to a complicated question of fact and law as an admission without prior notice or an opportunity to amend the answer in light of the rule's requirements.

Even though Boles' "unsure" response to RFA #43 does not itself warrant treatment as an admission, Plaintiffs have essentially made the same admission by a different route. MBUSI included this "admission" as a statement of fact in its summary-judgment motion (Doc. 115 at 7), and Plaintiffs have not disputed it. Both the Federal Rules of Civil Procedure and the Uniform Initial Order require a responding party to individually address the factual assertions made in a summary-judgment motion, supported by citations to the record. FED. R. CIV. P. 56(c), (e); (Doc. 9. at IV(A), Appx. II). Because MBUSI's assertions regarding Boles' admissions have gone unchallenged by Plaintiffs in their response brief (Doc. 136 at 5),Plaintiffs have conceded the admission.

shop. He is also responsible for overseeing the training of TMs. These are exactly the sort of activities included in the regulations' definition of "management," including "training of employees . . . directing the work of employees . . . appraising employees productivity and efficiency . . . handling employee complaints and grievances; disciplining employees . . . ." 29 C.F.R. § 541.102. The description of Boles' activities as a GL support his own acknowledgment that his "primary duty" is management.

Against this undisputed account of Boles' duties, Plaintiffs add only a few "facts" of their own. They allege that the majority of Boles' time "is *not* spent supervising and managing his group." (Doc. 136 at 5.) But this assertion is ungrounded, since the only support offered for it is Boles' denial of Request for Admission ("RFA") #39. (Doc. 116-1 at 11.) Although an *admission* to an RFA renders the matter "conclusively established," FED. R. CIV. P. 36(b), a party cannot rely on his own *denial* of a request for admission. Unlike admissions, denials do not constitute "materials in the record" that can be relied on in making or responding to a motion for summary judgment. FED. R. CIV. P. 56(c)(1)(A). A denial simply shows that the issue has not been conceded; it does not possess the heft of an affidavit, stipulation, interrogatory answer, or deposition testimony, let alone the "conclusively established" status of an admission. The same goes for qualifications to admissions,

on which Plaintiffs mistakenly rely when asserting that "Boles only occasionally counsels TMs and TLs on performance, quality of work, and conduct." (Doc. 136 at 5.)

Putting aside such unsupported assertions, the few remaining facts presented by Plaintiffs are of little consequence. Notably, they do not present any examples of nonexempt work, nor do they list even a single nonmanagement activity performed by Boles. Most of their assertions concern Boles' interactions with Human Resources ("HR") and his Assistant Manager ("AM") in various circumstances: that he "contacts" them if a TM violates safety policy, if a TM "continues to fail to comply with safety policies," or if "somebody gets hurt on the job." (Doc. 136 at 5.) If anything, the responsibility to contact HR or an AM in such situations only underscores Boles' management role. The FLSA and the regulations certainly do not require employees, in order to fit the executive exemption, to singlehandedly address all safety concerns without informing others.

Plaintiffs contend that "[t]he AM tells Boles whether to give a TM a minor or a major in the event of a safety violation." (Doc. 136 at 5.) This is the solitary example of something offered by Plaintiffs that could potentially detract from Boles' "relative freedom from direct supervision." 29 C.F.R. § 541.700(a). Even here, Boles described

the process as looking at the Safety Escalation Plan, "looking to see which area [the incident] is classified in," then "usually discuss[ing] it together" with his AM before a decision was reached. (Doc. 116-2 at 23.)

Plaintiffs also contend that Boles "does not develop an annual plan as described in roles and responsibilities card."(Doc. 136 at 5.) But the cited portion of Boles' deposition is ultimately not at all helpful to Plaintiffs' position: while acknowledging that he "never had to do an annual plan," he stated that he "tr[ies] to" live up to everything else printed on the card, and acknowledged that it correctly describes his roles and responsibilities as a GL. (Doc. 116-2 at 30–31.)The card contains a bulleted list of a dozen tasks which are explicitly managerial, such as "I manage the line staffing and attendance," "I manage manpower/material/machinery/methods," "I initiate, facilitate and monitor problem solving," and "I ensure further development of my Team Members." (Doc. 116-2 at 54.)The entire list is summarized with the statement that "I manage my line/group as an operational unit and I'm responsible for accomplishing our company's goals and targets." (*Id.*)

Far from showing that there is a genuine issue of material fact on this point, Plaintiffs' assertions only serve to emphasize that Boles performs no nonexempt duties, and that his "primary duty" is management.

### 2. Brian Boyd

As was the case for Boles, Plaintiffs have left unchallenged MBUSI's statement that "Brian Boyd ("Boyd")  admitted in Response to a Request for Admission that he was properly classified as an exempt employee."[6] If this were not enough, Boyd explicitly admits that his duties differ from the duties of the TMs in his group, and that his job as GL involves supervising the TMs and TLs. (Doc. 116-3 at 3, 9.) He also admitted that he "can and do[es] lead [his] group independently of [his] Manager or Assistant Manager." (*Id.* at 3.) He holds pre-shift meetings and start-up meetings with his group and gives work directions and assignments. Boyd claims to "fulfill all of the roles and responsibilities of [his] position as [GL]" as described above in the discussion of Hugh Boles. (*Id.* at 7.) Among other managerial tasks, Boyd walks throughout his area to observe the performance of his TMs, giving correction and directions where necessary.

Once again, Plaintiffs do not bother to dispute MBUSI's description of his tasks. Instead, they offer just two  brief points relating to Boyd's activities.[7] First is an

---

[6] Unlike Boles, who stated he was "unsure" about his correct classification under the FLSA, Boyd evaded the question by stating he "was never informed." (Doc. 116-3 at 11.) This response might well be treated by the Court as an admission, even if Plaintiffs objected to it. As it is, however, Plaintiffs concede the admission by failing to dispute it. *See* footnote 5, *supra*.

[7] Plaintiffs have only two facts after excluding those based only on his denial of RFA #39. As stated above, a party's own denials cannot be relied upon to defeat a summary-judgment motion. Here, and for all the Plaintiffs discussed below, such assertions are deemed to be struck from Plaintiffs' brief and excluded from the Court's consideration.

assertion that "Boyd was not accountable for the performance of his group." (Doc. 136 at 6.) The cited portion of Boyd's testimony, in context, paints a different picture. Boyd was asked if he "was accountable for the performance of his group." After first saying "[n]o, I wasn't accountable," he goes on to explain what he *was* accountable for: "I was tasked, you know, making sure we met our quality standards for the area, also tasked with, you know, reporting any downtime issues of if there was quality defects for the area . . . ." (Doc. 116-4 at 25.) In response to a follow-up question about whether he, as GL, was also responsible for "making sure that [the TMs] perform their job in accordance with Mercedes policies, procedures, standards of conduct, et cetera," Boyd simply stated "Yes, as best I can." (*Id.*) Plaintiffs' only other point is that Boyd did not have discretion to decide whether TMs would be issued an "occurrence" for an absence. (Doc. 136 at 6.) Boyd would administer the occurrence, but was following the attendance guidelines in doing so. Plaintiffs do not explain how this alone casts doubt on Boyd's overall managerial role.

The two "facts" cited by Plaintiffs are largely irrelevant. At issue is simply whether there is a genuine dispute concerning Boyd's "primary duty." There is not. Plaintiffs do not offer a single nonexempt duty that he performs, and they have not even contested MBUSI's description of his activities.

### 3. Gerald Chiabi

Gerald Chiabi describes his own "primary duty" as "[m]onitoring the line, responding to line pulls[8] . . . assisting the team members . . . escalat[ing] the issues on the line . . . [and] enter[ing] time and attendance."(Doc. 116-7 at 10.) In responding to his set of RFAs, Chiabi admitted—without qualification—that as GL he "supervise[s] the team leaders and team members in his group," "give[s] work directions and assigments" to them, and "direct[s] his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Doc. 116-8 at 3.) He "manage[s] attendance" and "vacation scheduling," and "occasionally counsels team members and team leaders on performance, quality of work and conduct." (*Id.* at 3–4.) He "evaluate[s] the performance" of TMs and TLs, ensuring that "quality goals are met" and "company policies and work rules are enforced." (*Id.* at 4–5.) If TMs or TLs fall short, Chiabi "ha[s] the authority to initiate a Corrective Performance Review on a team member when [he] deems necessary." (*Id.*) Chiabi "admits that as a group leader he does use leadership skills," and does so "independently of [his] Manager or Assistant Manager." (*Id.* at 7–8.)

---

[8] "Pulling the line" is how TMs signal Chiabi's attention, whether to report a quality issue, to have parts changed, to ask vacation questions, or to let Chiabi know that they need a bathroom break. (Doc. 116-7 at 10–11.)

Plaintiffs' section of facts relating to Chiabi is much more extensive than their respective sections for Boles or Boyd. A great many of these, however, are either beside the point or are merely attempts to chip away at Chiabi's admissions. For example, the facts section of Plaintiffs' brief asserts that "Chiabi does not lead team members," (Doc. 136 at 8), contradicting Chiabi's admission that he "can and does lead [his] group." (Doc. 116-8 at 8.) Notwithstanding such contradictions, the Court is not free to reject facts that are "conclusively established" through Rule 36 admissions, "even if it '[finds] more credible the evidence of the party against whom the admissions operate.'" *Williams v. City of Dothan*, 818 F.2d 755, 762 (11th Cir. 1987) (quoting *Brooks Village N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 73 (1st Cir. 1982)). As between deposition testimony and admissions made under Rule 36, the admissions are controlling.

The only remaining facts are those that relate to Chiabi's performance of nonexempt work. As distinct from Boles and Boyd, Plaintiffs do assert that Chiabi "regularly works the production line and performs other manual labor tasks." (Doc. 136 at 6.) Plaintiffs cite to three sections of Chiabi's deposition in support. The first section demonstrates that, during a limited time range, he would sometimes engage in "filling out documents, fixing cars, sweeping, [or] mopping" for one to two hours after his shift ended. (Doc. 116-7 at 10.) The second citation simply explains that when

a TMs takes a bathroom break, one option is for Chiabi to temporarily "work the line" in his or her place. (Doc. 116-7 at 11.) Chiabi also has the option to have someone else do so, a decision he makes after assessing what the "manpower situation is like at the particular time." (*Id.*) The third citation, supposedly showing that Chiabi "regularly works the production line and performs other manual labor tasks," is completely unrelated to either working the line *or* doing other manual work. (Doc. 116-7 at 12.)

Even taking Chiabi's evidence in the light most favorable to him, it is not enough that he momentarily covers for TMs during their bathroom breaks, or performs an hour or two of post-shift work activities. Although employees with other factors supporting an exempt "primary duty" need not "spend more than 50 percent of their time" on nonexempt tasks, *see* 29 C.F.R. § 541.700(b), Chiabi's percentage is far smaller, and with no other supporting factors. Even taken together, the facts Plaintiffs offer do not show that there is a genuine question of material fact as to Chiabi's "primary duty."

### 4. James Davis

Unique among this set of Plaintiffs, James Davis responded with an unqualified, unambiguous "Admit" when asked to admit whether, "[w]hile a Group Leader at MBUSI, [he was] properly classified under the Fair Labor Standards Act as an exempt

employee." (Doc. 110-1 at 92.) Taking this fact as "conclusively established" under FED. R. CIV. P. 36(b), there is no need to discuss Davis' "primary duty" — or the other requirements for meeting the executive exemption. Summary judgment is manifestly warranted for his claims.

### 5. Billy Englebert

With only one minor exception,[9] Billy Englebert makes all of the same admissions detailed above for Gerald Chiabi.[10] (Doc. 116-12 at 3–8.) As discussed above, these admissions establish that Englebert's "primary duty" is management, at least in the absence of other nonexempt activities.

Plaintiffs make a single—but potentially significant—assertion regarding Englebert's nonexempt work. He was allegedly "instructed to never leave the end of a line unless he was assisting a TM," and so he "stood alone at the end of the line inspecting for issues such as parts missing from a car." (Doc. 136 at 16.) Such inspection of vehicles on the line, if indistinguishable "from the work ordinarily performed by a nonexempt inspector," would indeed be nonmanagement work.

---

[9] The only exception is Englebert's addendum that his authority to "initiate a Corrective Performance Review" requires that "Human Resources [be] involved." (Doc. 116-12 at 5.)

[10] *See supra* Part IV.A.3.

29 C.F.R. § 541.703(b)(3). The cited portion of the record does not, however, support this description.

First, although Englebert was indeed told at one point to stay in one area—at the end of the line—this instruction came midway through his time as a GL. Before that he "constantly" walked the line. (Doc. 116-11 at 20.) Even after the instruction was given, he would begin his day by going around the line to "greet everyone, welcome them back for that day of work" before going to his position at the end of the line. (*Id.*) Once he was stationed there, the purpose was *not* to inspect for missing parts. He was admittedly "not performing any work on the car" there. (Doc. 116-11 at 19.) Rather, Englebert was instructed only to "stay in that area unless there was a line pull or parts not making it to the line." (*Id.*) According to his own testimony, he "would be in that point to watch" for issues that occurred on his line, and he was put in that particular spot because "[i]t's a good visual point to the VMS board."[11] (*Id.*) From that vantage point he could quickly perceive any problems along the line and could respond accordingly. Instead of supporting the assertion that he was put at the end of the line to perform manual work, Englebert's testimony demonstrates that his position there was strategically and specifically designed to aid in the performance

---

[11] The "VMS board" is, according to Englebert, "a board that lights up when the team member pulls a cord with a problem or whatever." (Doc. 116-11 at 19.)

of his management duties. Plaintiffs have not alleged that he otherwise performed nonexempt work, so there is no real question concerning Englebert's "primary duty."

### 6. Curtis Gibbs

Instead of admitting, denying, objecting, or asserting lack of knowledge in response to his RFAs, Curtis Gibbs gives an identical nonresponsive answer to all but a handful of the requests. For nearly all of them—including RFA #43, the request to admit that he was properly classified under the FLSA as exempt, plus all of the requests admitted by Chiabi above—Gibbs gave the following response: "Plaintiff responds that this information is in the possession of defendants per his deposition." (Doc. 116-13 at 3–12.) Unlike Boles' claim that he was "unsure" of the answer, or Boyd's response that he "was never informed," Gibbs essentially admits that he *does* know the answer, but will not produce it on the grounds that he had already done so in his deposition. This response could be taken in three different ways, all deserving of treatment as an admission. First, the wording of Gibbs' response could be taken as an explicit admission—i.e., an acknowledgment that because these matters were already admitted, they need not be admitted again. Second, if looked at another way, Gibbs' refusal to answer the individual requests is no different than refusing to answer the RFAs altogether (except without room for debate about proper service of the

requests). If treated as such a refusal, the rule is adamant about the result: an unanswered Request for Admission simply "is admitted." FED. R. CIV. P. 36(a)(3). *See also U.S. v. 2204 Barbara Lane*, 960 F.2d 126, 129 (11th Cir. 1992) ("Federal Rule of Civil Procedure 36 expressly provides that requests for admissions are automatically deemed admitted if not answered . . . ."). Third, Gibbs' response—at best—falls outside the range of legitimate options provided by the rule: to admit, deny, object, or assert lack of knowledge after making a reasonable inquiry. As noted by the advisory committee, Rule 36 "seems to contemplate that defective answers bring about admissions just as effectively as if no answer had been served." FED. R. CIV. P. 36(a)(4) advisory committee notes. Thus, regardless of how it is classified, Gibbs' evasive response is properly construed as an admission to all the RFAs where it is employed, establishing that Gibbs was "properly classified under the Fair Labor Standards Act as an exempt employee." (Doc. 116-13 at 12.) Further consideration of his claims is therefore precluded.

### 7. Mark Gothard

Mark Gothard makes the same set of admissions discussed above for Gerald Chiabi. (Doc. 117-2 at 3–9.) As was the case for Chiabi, Gothard's factual assertions are aimed at detracting from his own "conclusively established" admissions, and seek

in vain to minimize the extent of his management activities. (Doc. 136 at 16–19.) Gothard does not, however, describe a single instance of "working the line" or performing any nonexempt labor. (*Id.*) In light of his admissions and the lack of any nonexempt work, there is no doubt his "primary duty" is management.

### 8. Chad Hampton

Chad Hampton makes all of the Chiabi admissions as well, with just one slight difference: he admits that he "can and do[es] lead [his] group independently of [his] Manager or Assistant Manager," but adds that "certain situations require him to inform either an assistant manager or a manager." (Doc. 117-4 at 9.) He admits without qualification, however, that he "take[s] control of situations in [his] area that arise when [his] Assistant Manager is absent." (*Id.*) Plaintiffs do not dispute MBUSI's facts concerning Hampton, and they add only two brief "facts" of their own. (Doc. 136 at 19.) Neither is related to the performance of nonexempt work, or otherwise demonstrates a genuine issue of material fact as to Hampton's "primary duty."

### 9. Daryl Hiott

Daryl Hiott denies that he "leads his group independently of [his] Manager or Assistant Manager." (Doc. 117-6 at 9.) Aside from that one denial, however, Hiott makes all of the Chiabi admissions, some with qualifications that he reports his

activities to an AM, or "is supported by his [AM]" in performing the admitted tasks. (*Id.* at 3–9.) Hiott does openly admit that he "take[s] control of situations in his area that arise when [his AM] is absent." (*Id.* at 9.) He also admits that he is "the leader of his group" and "does use leadership skills." (*Id.* at 8–9.) He "leads change in his group," and also "leads his group in meeting Company standards."(*Id.*) Hiott acknowledges that he "perform[s] duties that differ from those performed by the Team Members in his group." (*Id.* at 8–9.)

Hiott understood MBUSI's document listing "GL Roles & Responsibilities" to be the "expectations of his group leader job." (Doc. 117-5 at 24.) He states that he "fulfills all" of these various roles and responsibilities. (Doc. 117-6 at 8.) These "GL Roles & Responsibilities" are summarized as the duty to "**Manage Manpower**/material/machinery/methods (INPUT) in my area and **ensure** a successful OUTPUT of my business unit." (Doc. 117-5 at 46, emphases in original.)

As with the rest of this set of Plaintiffs, Hiott's own admissions are augmented by MBUSI's own undisputed facts. (Doc. 115 at 97–107.) Also, like many of the others examined so far, Hiott's own set of facts do not mention any nonexempt work, or anything else that would genuinely put his "primary duty" in controversy. (Doc. 136 at 20.)

### 10. Jay Houser

Like Mark Gothard, Jay Houser makes all of the Chiabi admissions (Doc 117-8 at 3–9), and does not dispute MBUSI's facts (Doc. 115 at 108–117). Plaintiffs' brief attempts to downplay Houser's own "conclusively established" admissions, but does not identify any nonexempt activities that he performs. (Doc. 136 at 20–26.) There is therefore no question that his "primary duty" is management.

### 11. Kevin Martin

Kevin Martin makes all but two of the Chiabi admissions. (Doc. 117-10 at 3–9.) He admits that "he gives work assignments to members of his group," but makes the distinction that he "does not give work directions." (*Id.* at 3.) He denies that he "leads his group independently of [his] Manager or Assistant Manager." (*Id.* at 9.) He admits, however, that he is "the leader of his group" and "he does use leadership skills." (*Id.* at 8–9.)  He "leads change in his group," and also "leads his group in meeting Company standards."(*Id.*) He admits that he "can direct training and retraining," and that he "do[es] so if he deem[s] appropriate." (*Id.* at 6.)

Although Plaintiffs do not describe any specific nonexempt activities that Martin performs, they emphasize that "Martin *stood on the line daily*." (Doc. 136 at 35.) But the cited paragraph of Martin's deposition explains that he did so in order to better manage, and "to make sure the team leaders are following the process." (Doc.

117-9 at 56.) Plaintiffs offer no nonmanagement tasks, or any nonexempt work that would create a genuine question of Martin's "primary duty."

### 12. Kevin McCurley

Kevin McCurley makes all of the Chiabi admissions (Doc 117-12 at 3–9), and does not dispute MBUSI's facts demonstrating that his "primary duty" is management. (Doc. 115 at 128–137). Plaintiffs do not identify any nonexempt activities that he performs. (Doc. 136 at 36–38.) Accordingly, his "primary duty" is not genuinely in dispute.

### 13. Steven Munoz

The same is true for Steven Munoz. He makes all of the Chiabi admissions (Doc. 110-7 at 3–9), and does not dispute any of MBUSI's extensive facts showing his management duties. (Doc. 115 at 137–149). Plaintiffs do not identify a single non-exempt activity in their own facts. (Doc. 136 at 38–39.) Munoz' "primary duty" is therefore not at issue.

### 14. Susan Pope

Pope admits that she was "properly classified under the Fair Labor Standards Act as an exempt employee," but qualifies her response to say that she had always been "paid for any overtime hours she worked" until the "casual time" policy was

implemented. (Doc. 111-7 at 49.) As discussed below in Part IV.B, payment of overtime is no obstacle to being considered exempt.

To the extent her admission to being properly classified as exempt does not dispose of her claims, Pope's "primary duty" is clear from the other evidence. Susan Pope makes all of the Chiabi admissions (Doc. 111-7 at 40–47), and fails to challenge MBUSI's facts showing that her "primary duty" is management. (Doc. 115 at 150–162.) Unlike most of the others discussed so far, Plaintiffs do allege that Pope engaged in nonexempt work; they claim that "Pope works side by side on the production line with her Team Members," and that "[h]er duties are no different [than] those of Team Leaders—she re-inspects vehicle[s] to verify that car[s] [are] correctly constructed." (Doc. 136 at 39.) The first of these  assertions is, at best, misleading. Pope did testify that at one point she "spent many an hour out in the cold doing the same job as . . . team members and team leaders." (Doc. 111-7 at 14.) The time period in question, however, was in 2005 — long before the "casual time" policy was implemented, and well outside the statute of limitations. Plaintiffs' second assertion, that her "duties are no different than those of Team Leaders," is also exaggerated. At best, Pope's testimony shows that the duties of TLs overlapped with hers in a particular area, thanks in part to her own directions: "I instruct the team leaders as to what's being missed, ask them to watch. The team leader also does the

same thing I do, they watch the team." (Doc. 111-7 at 29.) Plaintiffs give no significant examples of nonexempt work, and do nothing to diminish the primacy of Pope's management duties during the relevant time period.

### 15. Willie Mark Williams

Like most of the others discussed above, Willie Mark Williams makes all of the Chiabi admissions (Doc 117-18 at 3–9), and does not deny MBUSI's facts showing that his "primary duty" is management (Doc. 115 at 189–201). In their own statement of facts, Plaintiffs do not identify a single non-exempt activity that he performs. (Doc. 136 at 42–43.) Thus, Williams—like all of the Plaintiffs at issue—has not shown that his "primary duty" is genuinely in dispute.

### 16. Customarily Recognized Department or Subdivision

Before moving on to the other three requirements, there is an additional issue to consider. To meet the current prong of the four-part test, an employee's "primary duty" must be "management of the enterprise . . . or of *a customarily recognized department or subdivision* thereof." 29 C.F.R. § 541.100(a)(2) (emphasis added). The purpose of this requirement is "to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.103(a). Plaintiffs argue that although GLs are "in charge of a team of people," those teams "change with the needs of

production."(Doc. 136 at 63.) They contend that these teams or groups are therefore "not a department or other recognized subdivision." (*Id.*) Plaintiffs assert that, for example, "[w]hile the 'Paint Department' may have a permanent status and continuing function, each of the three to five 'groups' within the Paint Department does not." (*Id.*) Notably, Plaintiffs provide no citations to the record in support of their position. To the contrary, throughout the various depositions, the groups are referred to by name, such as "Body and Paint Quality Control," "Structure 1," "Conveyance," etc., and appear to have permanent designations. According to authority provided in Plaintiffs' own brief, a "department or subdivision can include small groups of employees . . . within a larger department, such as a group leader of four draftsmen in the gauge section of a much larger department." (Doc. 136 at 63, quoting 69 Fed. Reg. 22122, 22134 (Apr. 23, 2004) (internal quotation omitted)). A similar arrangement prevails at MBUSI, albeit on a larger scale.

Individually, the Plaintiffs certainly acknowledge their groups to be "recognized unit[s] with a continuing function," 29 C.F.R. § 541.103(c). Together they appear to tacitly acknowledge this fact in the "Agreed Upon Undisputed Common Facts." (Doc. 97 ¶ 5 ("Each Production group at MBUSI has a GL. Generally, each GL has a group consisting of one or more teams. Generally, each team is organized with a TL and multiple TMs.")) The record is clear that the groups supervised by GLs are much

more than "mere collection[s] of employees assigned from time to time to a specific job," 29 C.F.R. § 541.103(a), and they therefore satisfy the "customarily recognized department or subdivision" requirement.

Plaintiffs maintain, correctly, that determining an employee's "primary duty" ordinarily presents a jury question. But for each of the Plaintiffs just discussed, the evidence is completely one-sided, and all but devoid of nonexempt work. The four "primary duty" factors offer Plaintiffs no refuge: without establishing the existence of nonexempt work, it is nonsensical to attempt a comparison of its importance, the amount of time spent on it, or the wages given to other employees for similar nonexempt work.[12] The remaining factor—freedom from direct supervision—is foreclosed by each Plaintiffs' admissions on the subject.[13] Without putting anything on their side of the scales, Plaintiffs' demand to have a jury weigh the evidence would

---

[12] There are two reasons why the "wages for similar nonexempt work" factor is inapplicable here. First, without establishing that nonexempt work is performed, it is impossible to determine which employees should provide the comparison. Second, the earnings of the present Plaintiffs are not properly before this Court to enable comparison. Plaintiffs' salary-comparison argument is based solely on the statements of Jeff Hicks, who is not one of the Plaintiffs at issue here.

[13] Even if Plaintiffs' admissions did not altogether preclude their arguments about the lack of "relative freedom from direct supervision," this factor would not necessarily be in their favor. Plaintiffs argue that "[t]he managers and AMs are the supervisory personnel of the plant. Obviously, if the power and discretion is vested in the managers and AMs, it cant be vested in the GLs." (Doc. 136 at 60.) Plaintiffs' reasoning here is flawed, and would mean that only one individual in any company could truly have any "power and discretion." As other courts have noted, "the fact that Plaintiffs had to adhere to certain guidelines or in certain instances obtain the . . . Manager's approval does not diminish Plaintiffs' discretionary powers." *Jackson v. Advance Auto parts, Inc.*, 362 F. Supp.2d 1323, 1335 (N.D. Ga. 2005) (citing *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-522 (2nd Cir.1982)).

be pointless. In short, Plaintiffs' admissions and the undisputed facts establish that the "primary duty" of each one of them is "management . . . of a customarily recognized department or subdivision" of MBUSI. The Court therefore turns to the remaining three requirements of the executive exemption test.

## B. Salary Basis

Plaintiffs assert that "as a threshold matter, the 'executive exemption' is inapplicable because GLs were not paid a true salary." (Doc. 136 at 4.) They repeat this point later in their brief: "As a threshold matter, Mercedes' motion must fail because there is a genuine issue of material fact whether GLs are compensated on a true salary basis." (Doc. 136 at 49.) Plaintiffs are correct that "compensat[ion] on salary basis at a rate of not less than $455 per week" is indeed a threshold question to meeting the executive exemption. *See* 29 C.F.R. § 541.100(a)(1). They neglect to point out, however, that it is a threshold that they have voluntarily crossed. Every one of these Plaintiffs received an RFA with the following prompt: "[i]n your job as Group Leader at MBUSI, you earn at least $455 per week salary." Each Plaintiff answered with an unqualified "Admit."[14] Thus, by their own admissions, Plaintiffs have answered this threshold question in the affirmative.

---

[14] The only exception in this set of Plaintiffs is Gibbs, who gave the same evasive answer to this request as to nearly all the others: "Plaintiff responds that this information is in the possession of defendants per his deposition." (Doc. 116-13 at 11.) For the reasons explained above in Part IV.A.3, the Court takes this defective response to be an admission here as well.

Even if their admissions were not enough, this "threshold question" has previously been answered in this case (*see* Doc. 71 at 6–9; Doc. 182 at 11–13), and the same analysis applies here with equal force. Plaintiffs again claim that their compensation was "subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). As explained before, this argument fails because it relates solely to Plaintiffs' *overtime* compensation. The regulations specifically provide that "an employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). Plaintiffs do not allege that their actual base salaries were impacted by the number of hours worked, only that it affected their payment for overtime. Because their salaries remained constant regardless of the amounts of overtime earned, MBUSI's choice to provide additional compensation for overtime does not diminish the "salary basis" on which Plaintiffs were paid.

Plaintiffs again attempt to buttress their argument by claiming that "deductions . . . [were] made for absences occasioned by Mercedes or by the operating requirements of the business." (Doc. 136 at 49.) As of 2008, MBUSI does not build cars at its Alabama plant on Fridays, although some non-production

activities apparently still take place. GLs not scheduled to work on these non-production Fridays have various options: they can elect to use a paid vacation day, they can take an unpaid personal day off work, or they can bank their unworked Friday hours against future overtime hours. Plaintiffs argue that this "Friday Bank" procedure requires MBUSI to "count[] hours worked, which violates the whole concept of a fixed salary." (Doc. 136 at 53–54.)

In so arguing, Plaintiffs continue to confuse the concept of counting hours for base compensation with counting hours for overtime. As noted above, employers may—but are not required—to provide overtime compensation for exempt, salaried employees. MBUSI's decision to provide overtime *in addition* to a predetermined salary has no bearing on whether a "salary basis" exists. If MBUSI—of its own accord—chooses to pay an overtime premium, it may also determine how that overtime is paid, so long as employees still receive, in full, their predetermined salaries. There appears to be no dispute that Plaintiffs did receive their full salaries, even when "banking" Friday hours against future overtime. As such, Plaintiffs were plainly "[c]ompensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.100(a)(1).

## C. Directing the Work of Two or More Other Employees

The third prong of the executive exemption test requires an employee to "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). As with the requirements already discussed, Plaintiffs' own admissions do most of the heavy lifting on this issue.

All of these Plaintiffs admit in RFA #1 that as GLs, they "supervise the team leaders and team members in [their] group[s]."[15] Not only do they "supervise," they specifically admit in RFA #2 that they "give work directions and assignments."[16] A few Plaintiffs, like Hiott, qualify their response to RFA #2, to say that they direct others "with Assistant Manager's approval." (Doc. 117-6 at 3.) But the regulations certainly do not require that directing other employees be done without the knowledge of superiors, or contrary to established company policy. The approval of AMs only underscores the fact that GLs are expected, as part of their duties, to direct the work of their TMs and TLs.

---

[15] Boles, Doc. 116-1 at 3; Boyd, Doc. 116-3 at 3; Chiabi, Doc. 116-8 at 3; Davis, Doc. 110-1 at 84; Englebert, Doc. 116-12 at 3; Gibbs, Doc. 116-13 at 3; Gothard, Doc. 117-2 at 3; Hampton, Doc. 117-4 at 3; Hiott, Doc. 117-6 at 3; Houser, Doc. 117-8 at 3; Martin, Doc. 117-10 at 3; McCurley, Doc. 117-12 at 3; Munoz, Doc. 110-7 at 3; Pope, Doc. 111-7 at 41; Williams, Doc. 117-18 at 3.

[16] See the citations given in the previous footnote. Only one Plaintiff, Martin, makes a partial denial to RFA #2. He admits that "he gives work assignments to members of his group," but makes the distinction that he "does not give work directions." (Doc. 117-10 at 3–9.) This distinction makes no difference to the Court's analysis, since there is no conceivable scenario in which "giv[ing] work assignments" is not "directing the work" of others.

As to whether such direction is "customarily and regularly" done, the phrasing of the RFAs indicates that directing the work of TMs and TLs is an integral part of the GL position, and frequently—if not constantly—performed. Nothing in the RFAs, Plaintiffs' responses to them, or their various depositions suggests that directing the work of TMs or TLs is even close to being a mere "isolated or one-time" type of occurrence. As such, the directing of other employees was "customarily and regularly" performed as defined by the regulations. *See* 29 C.F.R. § 541.701.

Additionally, the required number of "other employees" poses no obstacle. It is undisputed that each GL has a group that "consist[s] of one or more teams." (Doc. 97 at ¶ 5.) Each team, in turn, is generally "organized with a TL and multiple TMs." (*Id.*) Even the smallest possible group—a single team consisting of just one TL and one TM—would still satisfy the "two or more" requirement. Most, however, appear to be significantly larger, with dozens of TMs and a handful of TLs. Given all of this, there is no question that each of these Plaintiffs "customarily and regularly directs the work of two or more other employees." 29 C.F.R. § 541.100(a)(3).

### D. Particular Weight of Suggestions and Recommendations

The final prong of the executive exemption test is whether each of these Plaintiffs "has the authority to hire or fire other employees," or whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion

or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). MBUSI does not contend that Plaintiffs have the authority to hire or fire, but that their suggestions and recommendations *are* given "particular weight." The regulations provide a set of nonexclusive factors for making this inquiry:

> To determine whether an employee's suggestions and recommendations are given ''particular weight,'' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. Once again, Plaintiffs go a long way toward establishing this with their own admissions. Each of them admit in RFA #7 that they "provide an opinion as to whether or not team members and team leaders in [their] group[s] are ready for promotion."[17] The "particular weight" of these opinions is evident, first, from MBUSI's own written policies. (*See* Doc. 109-22.) As explained by Marcus Jones, MBUSI's HR Manager, "the GL's assessment of the TM or TL is followed barring exceptional circumstances." (Doc. 109-1 at 9.) Additionally, if a GL gives a TM or TL a negative performance evaluation in any area but attendance, that employee "cannot

---

[17] Boles, Doc. 116-1 at 4; Boyd, Doc. 116-3 at 4; Chiabi, Doc. 116-8 at 4; Davis, Doc. 110-1 at 85; Englebert, Doc. 116-12 at 4; Gibbs, Doc. 116-13 at 4; Gothard, Doc.117-2 at 4; Hampton, Doc. 117-4 at 4; Hiott, Doc. 117-6 at 4; Houser, Doc. 117-8 at 4; Martin, Doc. 117-10 at 4; McCurley, Doc. 117-12 at 4; Munoz, Doc. 110-7 at 4; Pope, Doc. 111-7 at 42; Williams, Doc. 117-18 at 4.

be promoted." (*Id.* at 9–10.) Such evaluations by GLs are made part of the employee's personnel file. (*Id.* at 10.) Second, in addition to MBUSI's policies and Marcus Jones' explanations, each of these Plaintiffs has personally acknowledged, in some way, the significant weight given to their opinions regarding promotion. Their responses range from agreeing that a positive evaluation "certainly helps" a TL or TM get promoted, to stating that a negative evaluation would render someone completely ineligible for promotion.[18]

In addition to the role their recommendations play in promotion decisions, Plaintiffs can—at their discretion—take steps that could lead to a team member's termination. In their responses to RFA #10, each of the Plaintiffs admit that, as GLs, they "have the authority to initiate a Corrective Performance Review on a team member when [they] deem necessary."[19]

In their brief, Plaintiffs admit that GLs give performance evaluations and can initiate corrective performance reviews, but argue that such actions "must be approved by an Assistant Manager and HR," and in any case are "only one of several

---

[18] Boles, Doc. 116-2 at 29; Boyd, Doc. 116-2 at 9; Chiabi, Doc. 116-7 at 30–31; Davis, Doc. 110-1 at 72; Englebert, Doc. 116-11 at 13, 28; Gibbs, Doc. 116-14 at 29; Gothard, Doc. 117-1 at 26; Hampton, Doc. 117-3 at 14; Hiott, Doc. 117-5 at 43–44; Houser, Doc. 117-7 at 46; Martin, Doc. 117-9 at 12, 44–45; McCurley, Doc. 117-11 at 22; Munoz, Doc. 110-6 at 33; Pope, Doc. 117-7 at 35; and Williams, Doc. 117-17 at 17.

[19] Boles, Doc. 116-1 at 5; Boyd, Doc. 116-3 at 5; Chiabi, Doc. 116-8 at 5; Davis, Doc. 110-1 at 86; Englebert, Doc. 116-12 at 5; Gibbs, Doc. 116-13 at 5; Gothard, Doc.117-2 at 5; Hampton, Doc. 117-4 at 5; Hiott, Doc. 117-6 at 5; Houser, Doc. 117-8 at 5; Martin, Doc. 117-10 at 5; McCurley, Doc. 117-12 at 5; Munoz, Doc. 110-7 at 5; Pope, Doc. 111-7 at 43; Williams, Doc. 117-18 at 5.

evaluation tools utilized by MBUSI's Management." (Doc. 136 at 65.) But the regulations specifically provide that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105. In light of the factors listed above, there is no question that these Plaintiffs' suggestions and recommendations are given "particular weight."

## V. Conclusion

All fifteen of these Plaintiffs are exempt from the FLSA's overtime requirements under the "executive exemption." As such, summary judgment is appropriate as to their claims, and in each of their respective cases, MBUSI's motion (Doc. 114) is due to be granted. Separate orders consistent with this opinion will be entered.

Done this 29th day of June 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[167037]