IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

JEFF HICKS,                          )
                                     )
          Plaintiff;                 )
                                     )
     vs.                             )          7:08-cv-0536-LSC
                                     )
MERCEDES-BENZ U.S.                   )
INTERNATIONAL, INC.,                 )
                                     )
          Defendant.                 )

MEMORANDUM OF OPINION

## I. Introduction

Before this Court is the fifth in a series of motions for summary judgment filed by Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI").[1] The present motion, filed on October 10, 2011 (Doc. 121), seeks summary judgment as to the claims of forty-four Plaintiffs who allegedly meet the executive exemption to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act") because they "admit that their primary duty is management and that they perform minimal

---

[1] This series of motions concerns the Plaintiffs who filed suit together in *Lawson v. MBUSI*, 7:09-cv-1157-LSC, and does not pertain to Jeff Hicks himself. The *Lawson* and *Hicks* cases were consolidated for discovery purposes, and on February 7, 2012, this Court ordered the claims of the individual *Lawson* Plaintiffs to be severed into individual cases. (*Hicks* Doc. 162.) These individual cases remain consolidated for case management purposed under *Hicks*, with the Court continuing to evaluate the already-filed set of summary judgment motions.

Unless otherwise noted, citations to the record are to the document numbers in the *Hicks vs. MBUSI* case, 7:08-cv-0536-LSC. Document numbers preceded by "*Lawson*" reflect the document number assigned in *Lawson v. MBUSI*, 7:09-cv-1157-LSC.

nonexempt work." (*Id.* at 2.) A brief in support of the motion (Doc. 122) was contemporaneously filed. Plaintiffs filed a response to the motion on November 10, 2011 (Doc. 141), and MBUSI filed a reply brief on November 30, 2011 (Doc. 147). This motion is now ripe for decision.

## II. Facts[2]

The present motion concerns forty-four Plaintiffs, forty-two that have claims remaining at this stage.[3] Joseph Arrington, Charles Ashcraft, Ronnie Bannerman, Delbert Bell, Larry Bell, Richard Clark, Mario Cohen,[4] Donnial Coleman, Timothy Conway, Phillip Cooper, Thomas Daniels, James Dial, James Dykes, Bobby Elkins, Jimmy Freeman, Marcus Garth, Kim Glass, Curtis Graves, Charles Hanks, Ronny Harbison, Coleman Harmon, Timothy Ivory, Steven King, Thomas Kirby, Raymond

---

[2] The facts set out in this opinion are gleaned from the "Agreed Upon Undisputed Common Facts Applicable to Summary Judgment Motions," (Doc. 97), the undisputed facts in the parties' briefs, as well as the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Additional facts specific to each Plaintiff are addressed in the Court's analysis below.

[3] The motion is also addressed to Melissa Martin and Alvin Williams. Their claims have already been dismissed, on grounds of judicial estoppel, with Plaintiffs' consent. (*See* Doc. 113 at 2, Docs. 151 &152.) It is therefore unnecessary to consider the present motion as it applies to them.

[4] The claims of Mario Cohen, Phillip Cooper, Thomas Daniels, Marcus Garth, Robert Little, Jimmy Skelton, and Gene Upton have been partially dismissed to exclude the years in which they met the "highly compensated exemption" to the FLSA. The present motion addresses their surviving claims, and provides a potential alternate basis for summary judgment on the already-dismissed claims.

Lewis, Jeffrey Lightsey, Robert Little, Eddie Lowery, Charles Madison, Brian Marshall, Valerie Marshall, Robin McGaughy, Jody Pinion, William Ray, Lee Roberts, Jimmy Skelton, Gary Smith, Joel Stewart, Anthony Thompson, Kenneth Thompson, Michael Tucker, and Gene Upton.

All of these Plaintiffs were employed by MBUSI as Group Leaders ("GLs").[5] While employed as GLs, these Plaintiffs were classified by MBUSI as exempt employees. MBUSI made changes to the overtime policy for exempt employees in February and March of 2005, and again in March of 2006. Following the March 2006 changes, GLs could be paid overtime only after completing five unpaid hours per week of pre- and post-shift work activities designated as "casual time." While overtime would still be paid for extra hours worked on weekends without the casual time requirement, the policy effectively required forty-five hours, rather than forty, to be worked before any weekday overtime could accrue. The "casual time" language was removed from the policy in a revision on April 7, 2008.

On June 10, 2009, a number of GLs and former GLs filed a complaint against MBUSI. The essence of the complaint is that, by mischaracterizing the GLs as

---

[5] Each GL has a group which consists of Team Leaders ("TLs") and Team Members ("TMs"). GLs, in turn, typically answer to Assistant Managers ("AMs") and Managers.

exempt, MBUSI was "requiring [them] . . . to work overtime without payment of overtime . . . in violation of the [FLSA]." (*Lawson* Doc. 1 at 9.)

## III. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56©. The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.    Discussion

### A. Plaintiffs Who Admit They Are Exempt

Before beginning its analysis of the FLSA's "executive exemption," the Court notes that this analysis is unnecessary for eleven of the forty-two Plaintiffs at issue. Each one provided an admission in response to Request for Admission ("RFA") #43, which states: "While a Group Leader at MBUSI, you were properly classified under the Fair Labor Standards Act as an exempt employee." Rule 36 of the Federal Rules of Civil Procedure provides that such admissions have special weight, unique among the various discovery mechanisms, such that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be

withdrawn or amended." FED. R. CIV. P. 36(b). *See also In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001) ("Since Rule 36 admissions, whether express or by default, are conclusive as to the matters admitted, they cannot be overcome at the summary judgement stage by contradictory affidavit testimony or other evidence in the summary judgment record.") In the Eleventh Circuit, it is reversible error for a district court to discount facts that are "conclusively established" through Rule 36 admissions, "even if it '[finds] more credible the evidence of the party against whom the admissions operate.'" *Williams v. City of Dothan*, 818 F.2d 755, 762 (11th Cir. 1987) (quoting *Brooks Village N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 73 (1st Cir. 1982)).

These ten Plaintiffs' responses to RFA #43 vary somewhat, but all are due to be treated as admissions under Rule 36(a)(4). Some of the Plaintiffs responded with a forthright "Admit," such as Donnial Coleman (Doc. 124-1 at 11), Thomas Daniels, (113-3 at 11), and Ronny Harbison (Doc. 125-7 at 11). James Dykes failed to answer RFA #43 altogether, despite answering the previous forty-two requests in the same document. (Doc 124-8 at 11.) Others responded with qualified admissions, evasive answers, etc. Each and every one, however, also ratified their admission to RFA #43 in Plaintiffs' own response brief. When confronting MBUSI's claim that each Plaintiff

in question "admitted . . . that he [or she] was properly classified under the FLSA as an exempt employee," their responses are identical. For all ten, the only response is "Undisputed." This is so for Joseph Arrington (Doc. 141 at 4), Larry Bell (*Id.* at 37), Donnial Coleman (*Id.* at 64), Thomas Daniels (*Id.* at 97), James Dykes (*Id.* at 119), Bobby Elkins (*Id.* at 129), Curtis Graves (*Id.* at 188), Ronny Harbison (*Id.* at 212), Timothy Ivory (*Id.* at 230–31), and Thomas Kirby (*Id.* at 266). As a result of these Plaintiffs' admissions to RFA #43, confirmed to be "undisputed" by Plaintiffs' own brief, the Court takes it to be "conclusively established" that each one was properly classified as exempt under the FLSA. Their claims are therefore due to be dismissed without further inquiry, and are excluded from the discussion below.

The claims of one additional Plaintiff are similarly due to be dismissed: Raymond Lewis. Although Plaintiffs provide a paragraph-by-paragraph response to MBUSI's facts for each of the Plaintiffs at issue, they do not contest a single fact relating to Raymond Lewis. In their brief, the responsive paragraph numbers skip from ¶2131 to ¶2227, omitting the MBUSI's entire section of facts concerning Lewis. (Doc. 141 at 281.) As noted in the Uniform Initial Order, "*[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*"

(Doc. 9 at 17.) MBUSI's uncontroverted facts demonstrate that Little was properly classified as exempt, and contain no facts which would raise a genuine question of material fact regarding his status. Since Plaintiffs raise none of their own, his claims are due to be dismissed and excluded from the analysis below.

## B. Requirements for the FLSA's "Executive Exemption"

Section 13(a)(1) of the FLSA provides that its minimum-wage and overtime provisions do "not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). As with all FLSA exemptions, the executive exemption is to be "narrowly construed so that it applies to those plainly within its terms and spirit." *Gregory v. First Title of Am., Inc.,* 555 F.3d 1300, 1302 (11th Cir. 2009). In asserting that an exemption applies, "the employer 'bears the burden of proving the applicability of a[n] FLSA exception by clear and affirmative evidence.'" *Id.* (quoting *Klinedinst v. Swift. Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001)).The regulations provide a four-part test for determining whether an employee fits the executive exemption:

> (a) The term ''employee employed in a bona fide executive capacity'' in section 13(a)(1) of the Act shall mean any employee:
>
>> (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the

Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. Each one of these requirements is the subject of debate between the parties: MBUSI contends that all four are easily demonstrated, and that summary judgment is therefore appropriate. Plaintiffs hold to the other extreme: that none of the four can be established and that each one presents genuine issues of material fact. Despite the breadth of the parties' disagreement, the real crux of the dispute in this motion is relatively narrow: the "primary duty" of the Plaintiffs. MBUSI argues that this particular group of Plaintiffs should be found exempt as a matter law because they allegedly "admit their primary duty is management and that they perform *minimal* non-exempt work." (Doc. 121 at 2, emphasis added.) The Court thus begins its analysis here—with the second of the four requirements—determining if there is a

genuine dispute of material fact as to whether Plaintiffs' "primary duty is

management . . . of a customarily recognized department or subdivision" of MBUSI.

29 C.F.R. § 541.100(a)(2).

### 1. Primary Duty

To meet the executive exemption, "management" must be the employee's

"primary duty." "Management" is defined by the regulations to include:

> [A]ctivities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. The term "primary duty" is broadly defined as "the principal,

main, major or most important duty that the employee performs." 29 C.F.R.

§ 541.700(a). In determining an employee's "primary duty," the regulations prescribe a variety of factors rather than a bright-line rule. The factors given are:

> [T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). The regulations are clear that these factors, while helpful, are not to be taken as exhaustive. Instead of relying on any set of fixed criteria, each determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id*. As the Eleventh Circuit observed in *Rodriguez v. Farm Stores*, "[w]hen it comes to deciding whether an employee is an executive within the meaning of the FLSA, the answer is in the details." 518 F.3d 1259, 1264 (11th Cir. 2008.)

In looking at these details, the Court pays close attention to the duties of each Plaintiff, specifically their performance of exempt, management duties, as well as any nonexempt, nonmanagement duties. Notably, of the four "primary duty" factors provided in § 541.700(a), three presuppose that at least *some* nonexempt work is performed. The first is concerned with the importance of nonexempt work as

compared to the employee's exempt work, and the second looks to the amount of time spent on each. The fourth factor requires that the employee performs nonexempt work in order to identify the wages of comparable employees who perform similar work. Even with a less rigid application of the factors, determining the composition of exempt and nonexempt duties is central to understanding the "character of the employee's job as a whole." Accordingly, the details specific to each Plaintiff are examined below, with an account of each Plaintiff's management duties followed by any alleged nonmanagement duties.[6]

### i. Charles Ashcraft

Evidence of the exempt, managerial duties of Charles Ashcraft is abundant. He admits that in his job as a GL, he "supervise[s] the team leaders and team members in [his] group," and give[s] [them] work directions and assignments."[7] (Doc. 123-4 at 3.) His job also involves "manag[ing] vacation scheduling, timekeeping and

---

[6] For each of the Plaintiffs discussed, there are many management duties that are not included here. Even aside from the reams of depositions, RFAs, and other exhibits, the factual *summaries* in the parties' briefs alone fill over 1000 pages. (*See* Doc. 122 at 10–499; Doc. 141 at 4–507; Doc. 147 at 7–19.) Although the Court earnestly attempts to include and discuss nearly every nonmanagement duty that is raised, the Court's recital of exempt management activities are, in the interest of brevity, only a representative sampling. Regardless, the Court has reviewed each managerial duty, taking it into consideration when appropriate.

[7] The facts recounted here are taken in the light most favorable to Plaintiff. The Court takes, however, the Plaintiffs' Rule 36 admissions to be "conclusively established," notwithstanding deposition testimony or other evidence to the contrary. Similarly, MBUSI's facts to which the Plaintiffs responds "disputed," without further explanation or citation to the record, are taken to be undisputed. *See* FED. R. CIV. P. 56(c),(e); Uniform Initial Order, Appx. II (Doc. 9 at 17).

attendance tracking" for the members of his group. (*Id.*) He directs the training and retraining of his team members as he deems appropriate. (*Id.* at 6.) He facilitates and monitors problem solving. (*Id.* at 5.) Ashcraft also "handle[s] employee issues and conflicts in his group and decide[s] when to involve higher management." (*Id.* at 6.) He "occasionally counsels team members and team leaders on performance, quality of work and conduct," and "ha[s] the authority to initiate a Corrective Performance Review" ("CPR") on team members when he deems necessary. (*Id.* at 4-5.) It is undisputed that Ashcraft provides an opinion regarding whether TMs and TLs are ready for promotion, and his recommendations are normally followed. (Doc. 141 at 19.) As a GL, he "ensure[s] that [his] group works safely" and "monitor[s] the environment for safety hazards." (Doc. 123-4 at 3.) He "leads change in [his] group," shares his knowledge and experience with the members of his group, and "show[s] and support[s] top performance in his group." (*Id.* at 8.) His performance as a GL is evaluated according to leadership criteria, and he has consistently received successful ratings. Ashcraft agrees with his 2007 performance evaluation that, as a GL, he "is an effective leader." (Doc. 141 at 19.)

As for Ashcraft's nonmanagement work, the record is all but nonexistent. According to Ashcraft, he "never stop[s] moving," spending all day walking the line

to check on his TMs and TLs. In doing so he tries to keep things organized—by sweeping, for example, if there is a mess on the floor. (Doc. 123-4 at 14–15.) Plaintiffs state that "[w]hen a defect is found in a car, Ashcraft repairs the car to keep the line moving." (Doc. 141 at 15.) In the cited portion of his deposition, however, it is far from clear that Ashcraft is referring to his individual actions, as opposed to those of his group:

> A. [I]f *we* get a defect, it's usually from the paint shop. But yeah, sometimes *we'll* have a missed part or a defective part from another station.
>
> Q. What will you do in those instances?
>
> A. Repair the car first, keep the line moving, and then the team leader feed[s] the issue back to the team member who made the error.

(Doc. 123-3 at 26, emphasis added.) Even if Ashcraft is referring to himself, however, it is undisputed that his manual labor is minimal at best. He "only occasionally fills in for a TM or a TL working on the line, and only does so if there is a manpower shortage." (Doc. 141 at 15.) From such facts, no reasonable jury could find that Ashcraft's "primary duty" is anything but management.

### ii. Ron Bannerman

Ron Bannerman admits that as a GL he "perform[s] duties that differ from those performed by the Team Members in [his] group." (Doc. 123-6 at 9.) He

acknowledges that he "uses leadership skills," and "take[s] control of situations that arise when [his] Assistant Manager is absent." Bannerman can—and does—lead his group "independently of [his] Manager or Assistant Manager." (Doc. 141 at 21; Doc. 123-6 at 8–9.) He makes decisions and plans regarding his group, then carries them out. (Doc. 123-6 at 35.) Bannerman walks his area to observe his TMs and TLs, making sure that they are performing their jobs correctly, and that they are injury-free. (Doc. 141 at 26.) Among other things, he "supervises" his TMs and TLs, gives them work directions and assignments, and evaluates their performance. (*Id.* at 3–4.) He provides an opinion as to whether his TMs and TLs are ready for promotion, which is normally followed. (Doc. 141 at 24.)

Bannerman's nonexempt work varied according to the area to which he was assigned. Since being promoted to a GL he has served as a GL in several different areas, including Assembly Repair Plant 2, Chassis Line Plant 2, and Body Shop Z1. (Doc. 141 at 20.) While a GL in Assembly, it is undisputed that he rarely had to work the line. (*Id.* at 26.) Plaintiffs contend, however, that he performed significant nonexempt work in both Body Shop and Chassis.

Bannerman's testimony regarding Body Shop is that he would sometimes fill in for his team members on the line. (Doc. 123-5 at 16–17.) He would do this for

"[r]oughly 45 minutes," but only on days when production was running continuously, requiring team members to take staggered lunch breaks. On such occasions, Bannerman would work during one of the lunch periods in the place of a team member. For some weeks, this happened on a daily basis; for others, not at all. (*Id.*)

Bannerman's work in Chassis presents a closer case. He was instructed by his AM to be at the end of the Chassis Line checking quality throughout the day. (*Id.* at 39.) Bannerman would begin his day by walking the line, and then spend the rest of the time positioned at end of the line. He would check for defects, and when one was found, either he or a TL would make the necessary repairs. During this time, Bannerman's management responsibilities "didn't diminish, but they would be impaired" by his position at the end of the line. (*Id.* at 40.) He could still, however, look down the line and see most of his team members, and would try to observe them from his position. (*Id.* at 40-41.) Team members would sometimes bring issues there to him; sometimes—if an issue couldn't be put off—Bannerman would leave his position to go address it. (*Id.*) This arrangement, with Bannerman stationed at the end of the line to check quality and sometimes make repairs, was the case "the entire time [he was GL] at the Chassis Line." (*Id.* at 39.)

Although the occasional 45-minutes of fill-in time presents no question of material fact when it comes to Bannerman's "primary duty," the same cannot be said for the amount of time he spent checking quality and making repairs at the end of the line. Although his "primary duty" as a GL in other areas was clearly management, Bannerman's "primary duty" as a GL in Chassis Line presents a legitimate jury question.

### iii. Delbert Bell

Delbert Bell embraces his managerial role. It is undisputed that he "considers himself the leader of his group," and agrees with the comments of his subordinates that he is "a group leader who leads." (Doc. 141 at 34.) He also concurs with his superior's comments that he is "very knowledgeable in his area of supervision," and that he has "no problems making decision relative to day-to-day production." (*Id*. at 35.) As an example of this discretionary decision-making ability, Bell "can move TMs and TLs from one process to another as he sees fit." (*Id*. at 34.) He leads a group start-up meeting at the beginning of the shift, and then walks his area—traveling miles over the course of a shift—making sure that his group members are okay and that they are performing their jobs correctly. (*Id*. at 32–33.) He tells group members when they are not doing their jobs correctly, and he addresses mistakes to make sure the mistakes do

not happen again. (*Id.*) He watches out for his group's safety, and has commented that if one of his group members were not wearing proper PPE (personal protective equipment), he "would probably hear about it." (*Id.* at 33.) Bell is charged with tracking overtime for his TMs and TLs, and is accountable to his superiors if his group exceeds its overtime budget. (*Id.* at 34.) He evaluates the performance of TMs and TLs, and can prevent their eligibility for promotion with a "not satisfactory" rating in any area but attendance. (*Id.* at 36.) In short, as Bell himself acknowledges, he "meets MBUSI's expectations of a GL."

The only instance of nonexempt work performed by Bell is tenuous at best. Bell testified that "if" he had a manpower shortage, he would first notify his AM. Then he would have a TL fill in for the missing TM, and—if no TL were available—he "would probably go" himself. (Doc. 123-7 at 46.) Needless to say, there is no genuine issue regarding Bell's "primary duty."

### iv. Richard Clark

Richard Clark admits that he—under the guidelines of MBUSI's Managers and AMs—supervises his TMs and TLs and gives them work directions and assignments. (Doc. 123-11 at 3.) He acknowledges that his job involves duties not performed by TMs and TLs. As a GL, he walks the line to check quality and to see whether his team

members are performing their job functions correctly. (Doc. 123-10 at 34.) He spends half the day "walking [his] group and observing [his] TMs" for this purpose. (*Id.* at 35.) Sometimes an AM is not present, in which case Clark follows company guidelines, and—depending on the issue—will take control of situations on his own. (Doc. 123-11 at 9.) He takes steps to ensure his group's compliance with countermeasures, and monitors the quality of their work based on MBUSI's quality standards. (Doc. 141 at 55–56.) He tracks attendance for his group members, and approves their vacation requests based on company policy. (*Id.* at 50.) Although Clark believes that his superiors still have the final decision regarding promotions, he acknowledges that his own rendering of a "not satisfactory" evaluation can destroy a TM's chances for promotion. (*Id.* at 54.)

The only example of Clark's nonexempt work is filling in on the line when production is running through breaks or lunch. (Doc. 123-10 at 35.) It is undisputed that "[i]f a fill-in is needed for a TM in his group, Clark will allow a TL to fill in if a TL is available, and if a TL is not available, he will fill in for the TM." (Doc. 141 at 52.) In their brief, Plaintiffs state that "Clark testifies that GLs work on the line quite a bit." (*Id.* at 48.) But Clark's claims do not depend on the habits of GLs in general. As to Clark himself, Plaintiffs concede that "[i]t is unusual for Clark, as a GL, to work

a process on the line." (*Id.* at 52.) Such an "unusual" occurrence, being the only example of nonexempt work that Clark performs, poses no obstacle to the conclusion that there is no genuine issue to present to the jury. His "primary duty" is management.

### v. Mario Cohen

Both parties acknowledge that, in his GL role, Mario Cohen has "described himself as a 'manager.'" (Doc. 141 at 58.) In his evaluations of TMs, he signs as their "supervisor." (*Id.* at 61.) In Plaintiffs' own words, Cohen "is to make sure that his entire group does their jobs, not just the TMs." (Id. at 58.) The members of his group are supposed to follow Cohen's instructions, and can face discipline if they do not. (*Id.* at 59.) Cohen holds meetings in the mornings where he relays instructions to TLs and TLs. (*Id.*) When Cohen was a TL, he handled the job rotation schedule, but called his GL to resolve any problems; since being promoted to GL, he approves changes in the rotation schedule. (*Id.* at 57.) He makes sure that his group follows company policy on safety. (*Id.* at 59.) If a problem occurs within his group, Cohen is "responsible for making sure it does not continue to happen." (*Id.* at 62.) Cohen manages the budget for overtime hours, and must report to an AM if overtime exceeds his budget. In

addition to all of these things, Cohen's responses[8] to MBUSI's RFAs affirm that he supervises his group, gives work directions and assignments, manages attendance, directs his group in meeting company objectives, and has the authority to initiate CPRs as he deems necessary. (Doc. 113 at 3–8.)

Evidence of Cohen's nonexempt work is minimal indeed. Plaintiffs concede that, as a GL, Cohen was not trained to work on all the stations in his group. (*Id.* at 58.) The only instance of manual work is Cohen's sanding of areas on a car that had been missed. Plaintiffs admit, however, that in all his years as a GL, he has done this "on only five to ten occasions." (Doc. 141 at 63.) This is clearly not enough to create a genuine issue concerning his "primary duty."

---

[8] In response to many of MBUSI's requests, Cohen responded that he "believes this information is in the possession of the defendant per his deposition." This response could be taken in three different ways, all deserving of treatment as an admission. First, this response could be taken as an explicit admission, i.e., an acknowledgment that because these matters were already admitted, they need not be admitted again. Second, looked at another way, Gibbs' refusal to answer the individual requests is no different than refusing to answer the RFAs altogether—except without room for debate about proper service of the requests. If treated as such a refusal, the rule is adamant about the result: an unanswered Request for Admission simply "is admitted." FED. R. CIV. P. 36(a)(3). *See also U.S. v. 2204 Barbara Lane*, 960 F.2d 126, 129 (11th Cir. 1992) ("Federal Rule of Civil Procedure 36 expressly provides that requests for admissions are automatically deemed admitted if not answered . . . ."). Third, his response—at best—falls outside the range of options provided by Rule 36: to admit, deny, object, or assert lack of knowledge after making a reasonable inquiry. As noted in the comments, Rule 36 "seems to contemplate that defective answers bring about admissions just as effectively as if no answer had been served." FED. R. CIV. P. 36(a)(4) advisory committee notes. Thus, regardless of how it is classified, Cohen's evasive responses are properly construed as admissions.

### vi. Timothy Conway

Timothy Conway performs most of the management duties discussed for the other Plaintiffs above, but a detailed treatment of his activities is unnecessary. Conway openly admits that as a GL he supervises and manages his group, and "spend[s] more of [his] time at work supervising and managing [his] group than [he] do[es] performing any other duties." (Doc. 124-5 at 10.) It is undisputed that he can and does lead his group independently of his Manager or AM. (Doc. 141 at 77.)

In opposition to such evidence of Conway's "primary duty" being management, the Court can locate only one statement in Plaintiffs' brief from which it might be gleaned that Conway performed any nonexempt work. Plaintiffs state that "[b]oth TLs and GLs make repairs to the vehicle[s]." (*Id.* at 73.) The citation is to a section of Conway's deposition discussing—in general—the differences between TLs and GLs. On that same page, Conway agrees that *his* primary duty as a GL is "to monitor the TMs in [his] group." (Doc. 124-3 at 18.) The Court has not located a single instance of Conway working on the line or otherwise performing nonexempt duties. There is therefore no question that his "primary duty" is management.

### vii. Phillip Cooper

Phillip Cooper supervises his group, gives them work directions and assignments, and "direct[s] [his] group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Doc. 111-6 at 3.) As GL, he is accountable for their performance; if the group does not perform well, that "affects his job." (Doc. 141 at 84, 87.) Cooper "certainly ha[s] the responsibility for directing team members' and team leaders' work," and is "sure that's the reason" that MBUSI has the GL position. (Doc. 111-5 at 45.) Unlike TLs, he is "responsible and accountable for the entire group; he has greater authority . . . and he has more responsibility for directing the work than they did." (Doc. 141 at 85.) It is undisputed that he "leads his group independently of a Manager or AM." (*Id.* at 86.) In fact, "[t]here is not a manager over Cooper." (*Id.*) Among many other managerial tasks, Cooper directs his TMs' training, and he conducts evaluations on their performance. If a TM violates policy, Cooper can initiate discipline by filling out a CPR to be approved by his superiors. (*Id.* at 92.) If the TM's behavior does not improve, and termination is warranted, it is Cooper's responsibility to inform HR of that fact. (*Id.* at 93.) In his own performance reviews, Cooper is "evaluated on [his] leadership competencies." (*Id.* at 95–96.)

Plaintiffs respond that Cooper "testifies that he works on the line almost daily." (Doc. 141 at 89.) But in the cited portion of his deposition, Cooper indicates that this happened only "when we have a quality issue or when they want to work through lunch or breaks or when we have a manpower issue," a manpower issue that "can't be addressed by a team leader." (Doc. 111-5 at 27.) Even then it would only involve "working during lunch or something like that," for a period of "forty-five minutes." (*Id.* at 28.) This would not happen every day; at most it might happen "a few days a week." (*Id.*) Typically, Cooper would be walking through the different areas under his supervision to answer questions, make sure his TMs are doing their jobs, and address quality issues. (*Id.*)

During one eight-month period, however, Cooper worked on the line more than usual. A TL was out on short-term disability. That TL's absence, combined with various "team members on vacation pretty much every day," led frequently to a two-person shortage. As a result, Cooper often had to fill in on the line. He testifies that "more than once a week" he would work a "half day on the line," and sometimes even a "full day." (Doc. 111-5 at 45.) But throughout that eight-month period, despite his work on the line, Cooper "would still remain responsible and accountable for the group." (*Id.* at 46.)

Cooper's "primary duty" is not genuinely in controversy due to the forty-five minute segments that he occasionally spends on the line. Nor is it in question due to the eight months in which he spent more time there. Although quantitatively different, his work during that eight-month span was qualitatively the same as the lunch breaks he occasionally covers: simply filling in for the members of his group. His situation differs from Bannerman, whose assignment to quality-checking work at the end of the Chassis Line—the entire time he was a GL there—creates an arguable question regarding his "primary duty" during that time. Unlike Bannerman, Cooper's work on the line arose simply from a temporary shortage of manpower. He still spent far more time on his exempt managerial duties, and he was still responsible and accountable for his group, even while filling in on the line. As the regulations note, one indication that employees are exempt is "remain[ing] responsible for the success or failure of business operations under their management while performing the nonexempt work." 29 C.F.R. § 541.106(a). In light of the contrast between Cooper and Bannerman, and the sheer breadth of Cooper's admissions regarding his management duties, the time he temporarily spent filling in for others does not create a genuine issue of material fact as to his "primary duty."

### viii. James Dial

It is undisputed that James Dial "uses leadership skills" as a GL. (Doc. 141 at 117.) He "think[s] strategically and establish[es] direction for [his] group," leading change in his group, and leading them to meet company standards. (*Id.* at 117–118, Doc. 124-7 at 8.) Dial "expects that his TLs will do what he tells them to do." (Doc. 141 at 116.) According to his AM, Dial "is quick to implement change based on the needs of the organization," an assessment that Dial agrees with. (*Id.* at 118.) He admits that he supervises his group, and gives them work assignments and instructions. He "walks his line, and assesses how his group members are performing their jobs." (Doc. 141 at 112.) It is undisputed that "[w]hen a problem arises in his group, Dial deals with it." (*Id.* at 113.) He initiates, facilitates, and monitors problem solving. (*Id.*) He tracks and documents the quality defects and errors made by his group members, keeps that information in a file, and refers to the file to detect patterns of mistakes. (*Id.* at 115.) He has the authority to initiate a CPR as he deems appropriate, and his opinions regarding promotions are normally followed. (*Id.* at 115–17.)

Only one example of Dial's nonmanagement work is provided by Plaintiffs. They state that when defects are found within Dial's group, that Dial "often fixes the

defects himself." (Id. at 114.) While Dial's deposition supports the claim that he fixed defects, his testimony does *not* support the claim that he does this "often." On the contrary, when asked "how often" he would fix defects, Dial responded, "I couldn't say I fix a lot of them, you know." (Doc. 124-6 at 43.) He also indicates that fixing defects is incidental to observing the line and supervising his group. (*Id.*) This does not present a genuine question as to Dial's "primary duty," and Plaintiffs have failed to identify any nonexempt work that would create such a question.

### ix. Jimmy Freeman

Jimmy Freeman takes an active role in the management of his group. He moved from one plant to another and "took over the end of the line" in order to implement a "production system which helped improve the efficiency of the area." (Doc. 141 at 157.) He rearranged his group, and "set them up in teams so that TMs reported to TLs and evened the flow and rotation." (*Id.*) He periodically conducted "rabbit runs," a training exercise that involves "intentionally sett[ing] up issues that TMs should catch to see if they catch them." (*Id.* at 149.) He comes behind TMs who have checked that repairs have been made, and will point out areas that they have missed. (*Id.*) Like most of the GLs discussed so far, Freeman has admitted that he supervises his TMs and TLs; gives them work directions and assignments; manages their

vacation scheduling, timekeeping, and attendance tracking; directs his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training, and team harmony; initiates, facilitates, and monitors problem solving; ensures that quality goals are met, and makes sure that company policies and work rules are enforced. (Doc. 124-13 at 3–5.) According to Freeman, he holds a pre-shift meeting for his group, and the remainder of his day consists of walking his line—achieving twenty-five miles per day—in order to observe TMs throughout his shift. (Doc. 141 at 148.) TMs and TLs will call him or stop him as he is walking by in order to talk to him. (*Id.*) Freeman oversees the training and cross-training of his TMs, and sometimes has to plan training a month in advance in order to make sure that training schedules do not create manpower shortages. (*Id.* 158.) When his group is behind, he gets volunteers to work through breaks in order to achieve company goals. (*Id.* at 156.) Freeman agrees with his supervisor's comments that he "is extremely knowledgeable of company policy, rules and regulations that allows [sic] him to give fair directions to every T/M that promotes 'order' even in uncomfortable situations." (*Id.* at 160.)

There is little in the parties' accounts of Freeman's duties that could even arguably be considered nonexempt. Freeman admits that he doesn't do "any sanding

of defects." (Id. at 150.) Plaintiffs' best argument is that Freeman sometimes "will bring vehicles to his TMs to cut down on their walk time," (*id.*), and that he "is called periodically to check behind TMs and TLs who have made repairs." (*Id.* at 149.) Even if these tasks were not related to his management duties, their insignificance in comparison to his management duties would still not create a genuine issue as to his "primary duty." Freeman's testimony, however, demonstrates that he checks behind his group for anything they miss *so that* he can "coach and show them how they should have been able to see the defect." (Doc. 124-12 at 49.) As part of the "training of employees," this activity is part and parcel of his management duties. 29 C.F.R. § 541.102. Likewise, his moving of vehicles—at his discretion—in order to lessen the time that TMs spend walking is a clear example of "apportioning the work" among employees, also part of the very definition of "management." *Id.* As such, there is no question that management is Freeman's "primary duty."

### x. Marcus Garth

The primary duty of Marcus Garth is not seriously disputed. Plaintiffs do not dispute that his "primary function as a GL is to oversee the performance of the TMs in his group and make sure they are doing what they are supposed to be doing." (Doc.

141 at 161–62.) Garth agrees that "the purpose of the GL position is to direct TLs and TMs in the execution of the teams' responsibilities." (*Id.* at 162.)

Plaintiffs' primary response in opposition to summary judgment on this point is to quibble with the terms at issue. They object to the term "supervise" without providing any basis for the objection (*id.*), despite Garth's admission to "supervising," and also despite the fact that he uses the term himself. (Doc. 111-10 at 27; Doc. 111-11 at 3.) They also take issue with the term "manage," and contend that "Garth does not 'manage' anyone because he does not have the final say in what goes on." (Doc. 141 at 162.) They provide no support for the notion that management requires "the final say in what goes on." On the contrary, "the fact that [Garth] had to adhere to certain guidelines or in certain instances obtain the . . . Manager's approval does not diminish [his] discretionary powers." *Jackson v. Advance Auto parts, Inc.*, 362 F. Supp.2d 1323, 1335 (N.D. Ga. 2005) (citing *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-522 (2nd Cir.1982)). Even Garth himself has stated that the term "supervise"—which he has used to describe his job—is "kind [of] interchangeable" with the term "manage." (Doc. 111-10 at 27.)

Garth's own account of his "primary duty" eliminates the need for further inquiry, but even if it were not alone dispositive, there would not be a genuine issue.

Garth's responses to the RFAs only bolsters the importance and scope of his management duties (Doc. 111-11 at 3–8), and it is undisputed that Garth works on the line "only when his manpower is 'way out of standard,'" something which has happened only five or six times in the course of two years. (Doc. 141 at 164–65.) No reasonable juror could find that his "primary duty" was anything but management.

### xi. Kim Glass

As with most of the Plaintiffs in this set, Kim Glass has admitted to a laundry list of management duties encompassed by his GL position. He "supervise[s] the team leaders and team members in his group," "give[s] work directions and assigments" to them, and "direct[s] his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Doc. 125-2 at 3.) He "manage[s] attendance" and "vacation scheduling," and "occasionally counsels team members and team leaders on performance, quality of work and conduct." (*Id.* at 3–4.) He "evaluate[s] the performance" of TMs and TLs, ensuring that "quality goals are met" and "company policies and work rules are enforced." (*Id.* at 4–5.) Glass "admits that as a group leader he does use leadership skills," he "leads [his] group in meeting Company standards," and he "lead[s] change in [his] group." (*Id.* at 7–8.) Glass observed the

output of his group, and was accountable for their work, including any defects. (Doc. 141 at 180.) As GL, Glass "initiated, facilitated, and monitored problem solving in his group." (Id.) His role required the use of discretion, and he "used his best judgment in performing all of his GL job duties." (*Id.* at 185.)

Despite all this, Plaintiffs claim that Glass's "primary duty" has not been management due to work he performed on the line. Glass testified that he worked on the line to fill in for manpower shortages and under certain other conditions. His filling in for manpower shortages happened on "one to two days a week," with eighty percent of these occasions lasting for less than an hour or two. (Doc. 125-1 at 51.) He also worked the line, at the direction of his AM, when there was an "escalation" due to production being "out of standard." (*Id.* at 49–50.) Being "out of standard" is determined by an hourly report, so Glass's work at these times lasted at least until the next report. The frequency of these escalations varied, averaging at least one a week. There could be weeks where his group would be on escalation every day for two weeks, but there could also be weeks free of any escalations. (*Id.*) During escalation, the meetings that Glass normally attended would be canceled. (*Id.*)

Although the amount of time Glass spent on the line exceeds some of the other Plaintiffs discussed, it is still greatly outweighed by the time spent on his management

duties. Additionally, as Plaintiffs themselves admit, Glass's time spent on the line during escalation was "not the ordinary situation." (Doc. 141 at 183.) It can hardly be said that his "primary duty" was to perform work that, ideally, he would not—and, for some weeks, did not—ever need to do. Glass does not dispute the fact that, barring such exigencies, he "spent the rest of his time attending meetings, observing the work of the TMs and reporting." (*Id.* at 183.) Glass himself has recommended training to another GL to "help develop his *management skills as a group leader*." (*Id.* at 186, emphasis added.) There is no question that Glass's "primary duty" as a GL was management.

### xii. Charles Hanks

Charles Hanks' "primary duty" is conceded by Plaintiffs, making a more complete discussion of his duties unnecessary. Plaintiffs do not dispute that Hanks' "primary duties were to check attendance, deal with issues from TMs, put TMs in touch with HR when needed, input payroll, perform evaluations, and contact the appropriate departments when there were part issues." (Doc. 141 at 201.) Plaintiffs also acknowledge that these management-related tasks "were different than the duties of a TM or TL." (*Id.*) In his own words, Hanks "spent 'pretty much the whole day' walking the line," and he took pains in his deposition to clarify that he meant the

supervision of his group rather than working on the line himself. (*Id.* at 202–03.) He worked a process on the line himself "only occasionally," and even then by choice, primarily to "see what TMs were seeing." (*Id.* at 203.) It is undisputed that Hanks' only duties—and, hence, his "primary duties" as well—were management.

### xiii. Coleman Harmon

Coleman Harmon agrees that his role as a GL "sounds like a manager." (Doc. 141 at 222.) It is undisputed that, at the start of his day, Harmon checks attendance, determines the manpower situation for the day, and reviews the turnover log from his GL counterpart. (*Id.* at 224.) He attends a meeting with AMs and other GLs, and then conducts a daily shift start-up meeting with his own group. (*Id.*) Following this meeting, he "walks his area" to observe the "work performance of the members of his group." (*Id.*) He attempts to speak with each member of his group, and makes himself available to each of his group members. (*Id.* at 224–25.) If he notices a problem or any issues, he will work to determine the cause of the problem. He then decides whether to talk to the TM directly or via the appropriate TL, and he also decides whether to involve HR. (*Id.* at 25.) Plaintiffs agree that Harmon "initiates, facilitates, and monitors problem solving in his group," and "uses his best efforts to correct members of his group with performance issues." (*Id.* at 227–28.) His other

responsibilities include tracking costs and keeping his group within budget, monitoring safety conditions, and setting a positive example for the members of his group. (*Id.* at 228–29.) He performs annual performance evaluations, in which a "not satisfactory" rating from Harmon renders a TM ineligible for promotion. (*Id.* at 230.)

Plaintiffs maintain that Harmon is nonetheless nonexempt because he performed nonexempt work on the line. It is undisputed, however, that he only did this "every now and then," to fill in when his group is low on manpower or is behind in production. (*Id.* at 226.) As discussed above, such infrequent work does not create a genuine question of material fact on the issue of his "primary duty."

### xiv. Steven King

Steven King's "primary duty" is all but conceded by Plaintiffs. They agree that his "primary responsibility as a GL is to oversee the work of his TMs and to direct them to perform work in accordance with MBUSI's policies, procedures and standards of conduct." (Doc. 141 at 253.) Although they downplay the extent of his management, Plaintiffs do not dispute that "[a]s a GL, King manages the group." (*Id.*) They also agree that King's duties differed from those of his TMs, and that he "spends more of his time at work supervising and managing his group than performing any other duties." (*Id.* at 253–54.) King "gives work directions and

assignments to the members of his group," and he "takes control of situations in his area that arise when his AM is absent." (*Id.* at 254.) He spends most of his time walking the line to observe his group, and in the course of doing so he is contacted by TLs needing his help "about fifty to sixty times a day." (*Id.* at 256.) In such situations, King exercises discretion to determine how to handle each situation. It is undisputed that King "supervises the TMs and TLs in his group, and he refers to himself as a supervisor." (*Id.* at 253.) King is also responsible for managing overtime for his group, and makes efforts to keep within the overtime budget. As part of this he "makes sure TMs are being efficient and working productively," and when there is overtime work available, he asks for volunteers. (*Id.* at 265.)

King has occasionally filled in for TMs on the line, but Plaintiffs admit that he has done so only "rarely and briefly." (*Id.* at 257.) In light of Plaintiffs' admissions, King's own description of his duties, and a lack of significant nonexempt work, there is no question that his "primary duty" is management.

### xv. Jeffrey Lightsey

When Jeffrey Lightsey was a TM, he was supervised by his GL. Now, as a GL himself, he admits that he supervises the team leaders and team members in his group. (Doc. 126-8 at 3.) He gives them work directions and assignments, manages their

attendance, ensures they are properly staffed, manages their vacation scheduling, and directs his group in meeting MBUSI's objectives related to safety, quality, accuracy, productivity, efficiency, and harmony. (*Id.*) He is responsible for signing off on the time of any temporary workers in his group. He conducts a shift start-up meeting, and then makes sure the proper people are in place as the line starts. (Doc. 141 at 285.) He then "walks his line 'all day' observing the members of his group." (*Id.*) He checks to see whether his group members have any problems, makes sure they are using proper safety equipment, and addresses any issues that arise. (*Id.* at 286.) If counseling is warranted, he meets with the TM to discuss the problem. (*Id.* at 287.) Lightsey evaluates the performance of his TMs and TLs, and his opinions are normally followed. (*Id.* at 284–85.) He is not aware of any member of his group who has been promoted without him first "indicating that the group member is 'ready' for promotion." (*Id.*) Lightsey agrees with a 2008 performance appraisal praising him for "look[ing] for ways to improve his area *without being directed.*" (*Id.* at 292, emphasis added.) According to Lightsey, as a GL he doesn't "have much interaction with his manager" as long as "everything's running well." (Doc. 126-7 at 14.) Although Plaintiffs object to the words "lead" and "manage" as being "just the terms that

Mercedes uses," they concede that Lightsey "follows the guidelines that Mercedes provides for him to 'lead' or 'manage' his group." (Doc. 141 at 289.)

There is scant treatment of Lightsey's nonmanagement work in Plaintiffs' brief. They agree with MBUSI's statement that he "works a station on the line as a GL on occasions when his group has a manpower shortage," and that he "works on the line checking quality when instructed to by his AM in situations where his group is producing abnormally poor quality." (*Id.* at 288.) They also agree, however, that "such situations are not normal," and that even when Lightsey is working on the line, he "retains all of his GL duties."(*Id.* at 288–89.) There is therefore no real debate concerning Lightsey's "primary duty."

### xvi. Robert Little

In his responses to the RFAs, Robert Little admits that he "supervise[s] the team leaders and team members in his group," "give[s] work directions and assignments" to them, and "direct[s] his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Doc. 110-3 at 3.) He "manage[s] attendance" and "vacation scheduling," and "occasionally counsels team members and team leaders on performance, quality of work and conduct." (*Id.* at 3–4.) He

"evaluate[s] the performance" of TMs and TLs, ensuring that "quality goals are met" and "company policies and work rules are enforced." (*Id.* at 4–5.) If TMs or TLs fall short, Little "ha[s] the authority to initiate a Corrective Performance Review on a team member when [he] deems necessary." (*Id.*) Little "admits that as a group leader he does use leadership skills," and does so "independently of [his] Manager or Assistant Manager." (*Id.* at 7–8.) He makes decisions about his group and carries out his plans for them. (*Id.* at 9.)

Little acknowledges that he does *not* "do any production work on the line." (Doc. 141 at 294; Doc. 110-2 at 19.) As a GL in maintenance, Little does, however, occasionally "work on the machinery." (Doc. 141 at 294.) He states that doing so is not unusual, but—"thankfully," in his own words—it is not a frequent event, either. (Doc. 110-2 at 14.) Little only has to work on machinery if "there's some major breakdown where it's kind of [an] all-hands-on-deck situation," and he also offers to help if they are "limited with people sometimes, if they need . . . an extra hand." (*Id.* at 14–15.) But even when lending a hand to machinery-repairing work, he still retains the same leadership and management responsibilities he otherwise has. (*Id.* at 15.) Given the extent of Little's management role, his infrequent assistance with machinery repair is not enough to put his "primary duty" in controversy.

### xviii. Eddie Lowery

Eddie Lowery makes all the same RFA admissions just discussed for Robert Little, in addition to others. (Doc. 126-10 at 3–9.) Lowery "spent most of his work day walking his group and observing the performance of the members of his group." (Doc. 141 at 304.) He verified that his group members followed proper procedure, and made sure that they received appropriate training. (*Id.* at 305–06.) When a line pull occurred in his group, Lowery would first allow the TL to address the problem, and then got involved if the TL was unable to correct it. (*Id.* at 308.) As the GL, "Lowery determined which issues to escalate to his AM." (*Id.* at 310.) His performance evaluations for group members were based on his own observations and opinions, and his recommendations for promotion were normally followed. (*Id.* at 307.)

The only mention of a nonmanagerial activity performed by Lowery is MBUSI's statement that he "worked on the line when there was a manpower issue." (*Id.* at 304.) By Lowery's own account, this was only for "15–20 minutes" at a time, and only happened "three to four times per week." (*Id.*) Plaintiffs admit that even while on the line "he retained all his GL responsibilities." (*Id.* at 305.) Notwithstanding what little time he spent on the line, it is clear that Lowery's "primary duty" was management.

### xix. Charles Madison

In addition to all the same RFA admissions discussed for Little and Lowery, Charles Madison admits that, as part of being a GL, he "thinks strategically and establishes direction for his group." (Doc. 126-12 at 3–9; Doc. 141 at 320.) It is undisputed that he "uses leadership skills" and "leads his group in meeting Company standards." (Doc. 141 at 320.) Madison mentors and coaches his TMs and TLs. (*Id.*) He "can direct training and retraining in skills for members of his group, and does so as he deems appropriate." (*Id.* at 319.) Not only can Madison direct training for his group, he himself has "developed training procedures" used by MBUSI. (*Id.* at 320.) In short, he supervises and manages his group, and "spends more time at work supervising and managing his group than performing any other duties."[9] (*Id.* at 313.)

The only hint of nonmanagement work comes from the undisputed assertion that Madison sometimes "inspects a vehicle himself." (*Id.* at 317.) It is also undisputed, however, that he does so as part of his supervisory role—to "determine whether a member of his group is making the quality check correctly," and then correcting them when he "observes a member of his group mak[ing] a mistake." (*Id.*)

---

[9] In their brief, Plaintiffs respond to MBUSI's recital of this RFA admission by stating "Objection: calls for a legal conclusion." (Doc. 141 at 313.) Notably, however, they did not object to the RFA itself. Answering by and through his counsel, Mark Thierman, Madison's only response there is "Admit." Even if their objection were raised at the proper time, the objection Plaintiffs raise is meritless: an RFA may properly relate to "facts, the application of law to fact, or opinions about either." FED. R. CIV. P. 36(a)(1)(A).

The checking of "the work of subordinates to determine whether they are performing their duties properly" is a prime example of exempt management work. 29 C.F.R. § 541.703(b)(3). Without offering any examples of work that is actually nonexempt, there is no doubt that Madison's "primary duty," if not his entire duty, is management.

### xx. Brian Marshall

It is undisputed that Brian Marshall's duties as a GL "differ from those performed by the members of his group." (Doc. 141 at 322.) He gives work directions and assignments to the members of his group, as he himself received work instructions from his GL when he was a TL. (*Id.*) He "received specialized training for the GL position, including leadership training and self-sufficiency training." (*Id.* at 323.) Marshall admits that he "can and does lead his group independently of his Manager or AM," and he likewise "takes control of situations in his area that arise when his AM is absent." (*Id.* at 322–23.) By his own account, Marshall spends 65–80% of his shift simply "walking his area and observing the work performance of the members of his group." (*Id.* at 325.) He also provides feedback to resolve quality problems, and makes corrections where a group member is performing his job incorrectly. (*Id.*) Marshall "believes that problem solving is an important skill for a GL." (*Id.*) He is

responsible for handling "employee issues and conflicts," and determines when to involved higher management or Team Relations in order to resolve a situation. (*Id.* at 328.) Plaintiffs admit that Marshall's position requires the exercise of judgment, and that Marshall "uses his best judgment in performing all the duties of his GL position." (*Id.* at 329.)

If Brian Marshall performs any nonmanagerial work, Plaintiffs fail to raise it in their brief. Careful review of their facts fails to suggest anything that could be construed as nonexempt work. Additionally, although Plaintiffs quibble about the definitions of "manage" and "supervise," they ultimately concede as "undisputed" the fact that Marshall's "primary duty or responsibility is to oversee the work and performance of his TMs and to direct the TMs' work so that it complies with MBUSI standards." (*Id.* at 322, 330.) By their own admission, then, his "primary duty" is not genuinely in controversy.

### xxi. Valerie Marshall

Like most of the Plaintiffs discussed so far, Valerie Marshall conducts a shift start-up meeting with her group at the start of the shift, and then "walks her line and observes the performance of the members of her group." (Doc. 141 at 334.) It is undisputed that she "spends the majority of her day walking her line, observing and

assisting the members of her group." (*Id.*) She supervises her group, gives them work directions, makes decisions about her group, and carries out her plans for them. (*Id.* at 331–32.) She takes control of situations in her area that arise when her AM is absent, and she agrees that she "lead[s] her group independently of her Manager or AM." (*Id.* at 331.) She also agrees with a 2006 performance appraisal that she had "improved in the area of giving directions to her team and her follow up." (*Id.* at 332.) Marshall can initiate a CPR on a member of her group as she deems necessary, and she has never been overruled by a superior after doing so. (*Id.* at 336–37.) She gives opinions on her group members' readiness for promotion, and she is unaware of anyone promoted after receiving a "needs improvement" evaluation from her. (*Id.*)

No specifics regarding Marshall's nonmanagerial work have been raised. The only mention of such work is MBUSI's declaration that Marshall sometimes had to work on the line, but "[o]nly under very unusual circumstances." (Doc. 122 at 341.) Plaintiffs respond, without elaborating, that this description is "undisputed." (Doc. 141 at 335.) Performing unspecified work under "very unusual circumstances," however, does not create a genuine issue as to Valerie Marshall's "primary duty."

### xxii. Robin McGaughy

Plaintiffs acknowledge that Robin McGaughy's GL role involves leadership and the use of "leadership skills." (Doc. 141 at 356.) They admit that her job duties "differ from those performed by the members of her group"—her role involves planning, making decisions, "think[ing] strategically and establish[ing] direction for her group." (*Id.* at 349–50.) In exercising her discretion she "uses her best judgment," and she "can and does lead her group independently of her Manager or AM." (*Id.* at 350, 356.) She exercises this leadership by supervising, giving work assignments, managing attendance and vacation scheduling, and directing her group in meeting MBUSI's objectives. (Doc. 127-9 at 3.) For the first hour of her shift, McGaughy "typically confirms quality in her group and walks her area speaking to her group members." (Doc. 141 at 352.) After this she walks the line to "observe the performance of the members of her group." (*Id.*) It is expected that the TMs in her group follow her instructions, and she has "never had the situation where [she has] asked a Team Member in [her] group to do something and he or she has not done it." (Doc. 127-8 at 26–27.)

The allegedly nonmanagerial task on which Plaintiffs apparently rely is McGaughy's "check[ing] the quality of the vehicles in her group" during the first

hour of her shift. (Doc. 141 at 352.) Plaintiffs admit that this took little of her time, since she "spends approximately 90% of her shift walking her area and observing the members of her group." (*Id.* at 351.) Even during the time that she is checking vehicle quality, McGaughy "also talks to her group members and observes their job performance." (*Id.* at 352.) She also "remains available to address issues which may arise in her group, and can stop checking quality in order to respond to any issue." (*Id.*) Even the checking of vehicle quality is undisputedly a part of her supervisory role—if she discovers a defect, she then "provides feedback to the appropriate TL who then addresses the quality issue with the TM who committed the defect." (*Id.*) As such, McGaughy's checking of vehicle quality does not affect her "primary duty" of management.

### xxiii. Jody Pinion

Jody Pinion worked as a GL over various groups before being promoted to AM in September of 2010. As a GL he received training in leadership and communications. (Doc. 141 at 359.) He walked his area, observing his TMs' and TLs' performance. (*Id.* at 361.) When he observed a member of his group working improperly, he "decided whether to speak to the appropriate TL about additional training for the TM." (*Id.*) As a GL, he considered it appropriate to issue CPRs in

several circumstances: if a TM "had too many attendance occurrences," if a TM "had too many quality defects," or if "a TM or TL disobeyed an instruction from their GL." (*Id.* at 359, 361.) As he monitored his group, he ensured that his group worked safely, and watched the area for any safety hazards. (*Id.* at 364.) He "handled employee issues and conflicts within his group." (*Id.* at 365.) Pinion also "developed members of his group by preparing performance evaluations, developing training plans, providing feedback, coaching and cascade training." (*Id.*) The opinions he gave in his performance evaluation were normally followed when it came to promotions. (*Id.* at 363–64.) A "not satisfactory" rating from him would render an employee ineligible for promotion. (*Id.*) Pinion acknowledges that, after becoming an AM, he "did not make any changes to performance evaluations completed by GLs." (*Id.* at 364.) While still a GL, Pinion assisted with developing a "GL Self-Sufficiency training plan." (*Id.* at 358.) He agreed with a 2008 evaluation noting that Pinion "was a 'self sufficient GL.'" (*Id.* at 360.) Pinion also agreed with 2009 evaluations stating that he "was particularly distinctive" in each of the following three areas: "thinking strategically and establishing direction for his group," "driving innovation and leading change in his group," and "executing decisions and delivering results." (*Id.*)

The duration and frequency of Pinion's nonmanagement work varied at different points. For about six months in 2009, Pinion worked as a Series Planning Engineer. Both before and after that time he served as GL over various groups. During the period before he worked in Series Planning, Pinion worked on the line as a GL for "approximately a half shift." (Doc. 141 at 362.) He did this "about once a week," with no more than "1 or 2 entire shifts on the line." (*Id.*) After his time in Series Planning, Pinion was, as a GL, "on the line for approximately 30 minutes to 1 hour, approximately 3 to 5 times per week." (*Id.*) Plaintiffs agree, however, that "[a]s a GL, Pinion spent most of his day observing his group," and that he "only worked on the line when no other TM or TL was available." (*Id.*) Even while on the line, it is undisputed that he "retained his GL job duties." (*Id.*) Given how little time he spent on the line, and that he only worked there to fill in for others while retaining his management duties, no reasonable jury could conclude that management was not Pinion's "primary duty."

### xxiv. William Ray

William Ray admits that he "supervises" and "manages" his group as a GL, and that he "spends more of his time at work supervising and managing his group than he does performing any other duties." (Doc. 141 at 366, Doc 127-13 at 10–11.) Once

his line starts moving, he "walks his area" to check for quality concerns, and he looks for safety issues, checks to make sure his group members are wearing proper PPE, makes sure everyone has the appropriate tools, and ensures that they are focused and have a good attitude. (Doc. 141 at 370–71.) He addresses any abnormalities that he discovers in the process, and "engages in problem solving in response to issues that arise in his group." (*Id.* at 371.) Ray "spends 75% to 80% of his day walking his area." (*Id.* at 372.) He develops countermeasures to address the root causes of injuries that occur within his group. (*Id.*) He "takes steps to be sure his group meets its production goals," and "uses his best judgment in performing all duties of his GL position." (*Id.* at 374.)

Any nonmanagement work performed by Ray is barely hinted at in the parties' briefs. The only real acknowledgment of it is the undisputed statement that "[a]s a GL, it is rare for Ray to perform a process on the line." (*Id.* at 372.) It is implied that Ray sometimes inspects for quality issues, but it is undisputed that "he is not working on the line" when doing so. (*Id.* at 371.) Ray's response to finding such issues only further exemplifies his management role: "[w]hen Ray notices a quality issue in his group, he discusses the issue with his TLs and makes sure that the appropriate TM checks for the quality issue in the future in order to contain the quality defect." (*Id.*

at 371.) Plaintiffs have offered nothing to seriously suggest that Ray's "primary duty" was anything but management.

### xxv. Lee Roberts

In his résumé, Lee Roberts' description of his GL position includes the statement, "I *manage* my group using the Mercedes Production System." (Doc. 141 at 337, emphasis added.) In his deposition, Roberts stated that this statement "is accurate" in its context, but he also asserted that the word "manage" doesn't mean what it implies, since some decisions have to be escalated to an AM or Manager. (*Id.* at 377–78, Doc. 128-1 at 10–11.) Nevertheless, it is undisputed, by virtue of Roberts' RFA admissions, that—among other things—he supervised TMs and TLs in his group, led his group independently of his Manager or AM, took control of situations in his AM's absence, directed his group in meeting company objectives, and "made sure that his TMs had the resources, tools and SMPs that they needed to be successful." (Doc. 141 at 379.) Before becoming a GL, Roberts completed a self-nomination process, which involved a program in which he was "assessed for his ability to be a leader and to influence other people." (*Id.* at 380.) As a GL he directed training and retraining for his TMs, and he reviewed the training plan that his TLs prepared for their TMs. (*Id.*) Roberts "handled TM issues and conflicts in his group

and decided when to involve higher management or Team Relations in an employee issue or conflict." (*Id.* at 381.) He "had the whole organization at his disposal so if a TM had a problem he could get the TM in front of the appropriate people so that the issue could be resolved." (*Id.*) Roberts also had the authority to initiate a CPR on a TM when he deemed necessary. (*Id.*) He entered time, managed attendance, and ensured proper staffing of his group. (*Id.* at 383.) In doing so, he "could move TMs from one team to another if they were qualified." (*Id.*)

MBUSI points out that "three to five times a month, Roberts had to work on the line due to absences and if he had to do so, he still maintained all of his other duties as GL." (*Id.* at 385.) Such infrequent filling-in does not create a genuine issue of material fact concerning his "primary duty." But Plaintiffs assert—repeatedly—that "Roberts inspected and checked cars" as well. (*Id.* at 382, 385.) The cited portion of Roberts testimony, however, makes clear that he did this as part of managing his group, making sure that his group did their work "in accordance with the SMP." (Doc. 128-1 at 14.) As he checked the quality of their work he would "give them feedback if they [did] something incorrectly." (*Id.*) As such, Roberts' "primary duty" is management.

### xxvi. Jimmy Skelton

Jimmy Skelton thinks that the GL position is "an important role" at MBUSI in "keeping the lines running." (Doc. 110-4 at 6.) Skelton supervises his group and gives them work directions and assignments. (Doc. 141 at 387.) In fact, Plaintiffs concede that he "is very good at planning work." (*Id.* at 393.) Skelton leads his group "independently of his AM." (*Id.* at 389.) This is especially significant in his case, because his AM oversees two plants which are "about a quarter mile apart," and "spends more time in [the other plant] because there is more production there." (*Id.* at 388.) In addition to leading his group, Skelton also "ensures that his group works safely," and as part of this he "[d]ecides on a weekly safety topic to include on the board to help avoid accidents and injuries." (*Id.* at 391–92.) When he sees TMs making mistakes, he "corrects them so they will work better or safer." (*Id.* at 392.) Skelton has a hand in "planning and controlling the budget" by reporting how much his group spends each month for purposes of budgeting. (*Id.*) He can direct training and retraining for the TMs in his group as he deems appropriate. He completes annual evaluations for his group members, with his opinion "considered and normally followed." (*Id.* at 392–93.) In fact, every TL and TM in his group who has been promoted was first recommended by him. (*Id.* at 393.)

Despite all this, Plaintiffs claim in their brief that "Skelton's duties as a GL are the same as her [sic] duties were as a non-exempt TL—to observe the line to see if there were any issues with cars." (Doc. 141 at 385.) If true, this might create an issue of material fact. However, Plaintiffs cite to a page of Skelton's deposition which describes the duties he had as a TL—not a GL—and it also makes no mention of watching the line for issues with cars. (Doc. 110-4 at 34.)

Plaintiffs also state that Skelton "makes sure that team leaders have parts and tools." (Doc. 141 at 385.) Even so, Plaintiffs have not shown how this detracts, rather than adds, to Skelton's list of management duties. The regulations specifically state that "management" includes "determining the . . . tools to be used," and "controlling the flow and distribution of materials or merchandise and supplies." 29 C.F.R. § 541.102. Skelton included providing tools in a list of other things—including "providing them [his] expertise," communicating "if they need additional resources," and "even on occasion pull[ing] a wire or turn[ing] a wrench"—all of which he considers to be part of his "most important" job duty: "assisting the team leaders and team members in keeping the line running." (Doc. 110-4 at 35.) He agrees that he doesn't spend the majority of his day doing physical labor on the line. (*Id.* at 36.) In contrast, in his previous role as a TL, he "did actual maintenance on the line."

(Doc. 141 at 388.) In light of all this, it is clear that Skelton's "primary duty" is management.

### xxvii. Gary Smith

Gary Smith "admits that he manages attendance in his group and ensures that his group is properly staffed." (Doc. 128-4 at 3.) He also "admits that he manages vacation scheduling, timekeeping and attendance tracking for his group." (*Id.*) To both of these things also adds that he "reports his line condition to his Assistant Manager." (*Id.*) He admits to supervising his group and giving work directions, and agrees that "as a Group Leader at MBUSI, [he] ensure[s] that quality goals are met in [his] group." Plaintiffs do not dispute that "Smith's primary job duties . . . included the morning communication meeting, quality checks and various feedback loops." (*Id.* at 400.) If Smith finds a defect, he "may repair it, he may need to stop the Line to make the repair, and he may need to escalate it to his AM." (*Id.* at 401.) But he also sometimes "has TMs and TLs make repairs." (*Id.*) Smith then "follow[s] up with team members when they've had defects to see how they're doing." (*Id.*, Doc. 128-3 at 32.)

Smith has worked as a GL in several different areas: Trim 2, Trim 4, Trim 5, and most recently in Final Side Continuous Improvement ("CI") in the Assembly

Department. As GL in the various Trim areas, Smith only worked a process on the line "fifteen to twenty times in a year" for some portion of a day. (*Id.* at 403.) The situation is different, however, for his work as GL of the CI group. MBUSI acknowledges that Smith "spends as little as 10% and as much as 50% of his day monitoring the activities of his TMs on the line" in the CI group.[10] (*Id.* at 405.) Smith testified that in CI he is often assigned to "go check quality on a certain line," sometimes where he has no TMs working. (Doc. 128-3 at 22.) The TMs in CI are assigned to various lines to check quality. When assigned to a line himself, Smith is "doing the same kind of audit" that his TMs perform, and is "actually given the task to try to catch [a defect] before they catch it." (*Id.*) The time he spends doing this ranges from "an hour to two hours" to an "all day, eight-hour period." (*Id.*) Smith states that this time adds up to as much as four weeks within a three-month period. (*Id.*) At the time of his deposition, Smith stated that his duties in CI also include "repairing cars," which he had "been doing all week" alongside the members of his group. (*Id.* at 23.) He testified that he is not "monitoring those team members" while making repairs, but that "everyone is pretty much working and doing the same

---

[10] Although Plaintiffs indicate that this particular fact is "disputed," their dispute appears to be simply that the time Smith spent doing this was even *less*—that Smith actually spends "as little as 10% or 50% of *one day*" monitoring his TMs *each week*. (Doc. 141 at 405.) This construction goes beyond what a plausible reading of Smith's deposition testimony will allow (see Doc. 128-3 at 12), but the Court takes it as undisputed that Smith did not spend *more* than 50% of each day monitoring his TMs' work on the line in CI.

process." (*Id.* at 24.) There are other nonmanagement tasks which Smith claims to perform in CI, but there is no need to list any more. Although there is no question that Smith's "primary duty" was management during his time as GL in Trim, there is a genuine question of material fact as to his "primary duty" since he became GL of CI Group in December of 2009. (Doc. 141 at 396.)

### xviii. Joel Stewart

Stewart agrees that as a group leader he "monitors [his] group." (Doc. 128-5 at 14.) He admits that he directs his group "in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Doc. 141 at 414.) As a GL he "tries to lead by example," and "uses his best judgment in performing all of his GL job duties." (*Id.* at 414–15.) He makes plans and decisions for his group, and "thinks strategically and establishes direction for his group." (*Id.*) As is the case with nearly all the others discussed so far, Stewart handles employee issues and conflicts, decides when to involve higher management, and he can issue CPRs as he deems necessary. (*Id.* at 417–18.) He manages attendance and staffing, and can "move his people around within his group." (*Id.* at 418–19.) He checks for safety, watches for and deals with injuries, and makes sure his group is properly trained. (*Id.* at 420–21.)

Like Smith, Stewart served as GL in CI, although the description of his duties there are far different. As a GL in CI, Stewart focused on supervising, and "got the right TMs to do what needed to be done." (*Id.* at 426.) He was responsible for improving efficiency and was judged on meeting his targets, and therefore "made sure that his Group's tasks were performed." (*Id.*) While GL of CI, Stewart was also Safety GL in addition to Manpower Coordinator for the Assembly Shop. (*Id.* at 427.) In those roles he "coordinated safety walks" and "made sure the head count was correct for each Line and Team in Plant 1." (*Id.*) Unlike Smith, there is no indication that Stewart performed any manual work as GL of CI.

The only relevant fact Plaintiff adds concerning Stewart's nonmanagement work is to say that, generally, "[w]hen Stewart is not on the line, he is changing parts or covering for someone to go to the bathroom. He does whatever needs to get done." (*Id.* at 430.) Plaintiffs do not dispute, however, that Stewart "spends 80% to 90% of his day walking the Line." (*Id.* at 423.) As a "worst case" he might spend as much as half a day on line work, but only "when there's a manpower issue." (Doc. 128-5.) "Most days," Stewart testified, "it's not as bad." (*Id.*) He claimed that the minor repair work he does from day to day is only to fill in for others as part of the "overall team atmosphere," and that even his exempt AM "sometimes has to do stuff like that just

to help keep going." (*Id.*) Far from being an obstacle to it, Stewart's participation in the "overall team atmosphere" to occasionally change parts or cover for others' bathroom breaks only highlights that his "primary duty" was management.

### xxix. Anthony Thompson

Plaintiffs concede that, as a GL, Anthony Thompson has more responsibilities than the TMs in his group. (Doc. 141 at 444.) Thompson agrees that the purpose of the GL position is accurately listed in the MBUSI GL job description, which includes the responsibilities "to monitor events for problems," "to coordinate proper manning levels and allocation of TMs," "to monitor and plan activities," and "to take appropriate corrective action when warranted." (*Id.* at 442–43.) Accordingly, Thompson admits that he "may adjust his manpower within his group," and "can move people around within his group and ask for manpower from outside his group if necessary." (*Id.* at 439, 443.) He "facilitates all training that is required" for his group, and orders retraining where necessary. (*Id.* at 438.) He spends much of his day walking throughout the different areas to observe his TMs, addressing them as necessary. (*Id.* at 435.) If they are not performing tasks correctly he "tells them they need to follow the policies," and "tells them how to do the job." (*Id.*) Plaintiffs agree that, within the company policies, Thompson "has the authority *and responsibility* to

tell his TMs and TLs what to do." (*Id.* at 436, emphasis added.) If problems persist, Thompson determines whether he needs to address it with his AM, and escalates issues as needed. (Id at 435.) As a GL, "Thompson's appraisal that the TM or TL is ready to be promoted to the next level is one of the criteria required for that individual to be promoted." (*Id.* at 440.) Plaintiffs do not dispute that Thompson's "primary responsibility is to observe the work and performance of his TMs in accordance with MBUSI's policies, directives, standards of conduct and other rules; to correct, and if correction does not work, to escalate." (*Id.* at 443.)

Plaintiffs assert, however, that Thompson's "primary duty is *also* to inspect vehicles." (*Id.*, emphasis added.) Thompson did say in his deposition that "quality control" is a part of his responsibilities. (Doc. 128-7 at 44.) He is clear, however, that he inspects the quality of cars for the purpose of making sure that his "team members are doing what they're supposed to be doing with regard to the standards." (*Id.*) As such, his quality checking is simply an aspect of his supervision and management. *See* 29 C.F.R. § 541.703(b)(3). Even if it were construed to be a nonmanagement activity, however, this would still fail to create a genuine issue of material fact, as Thompson generally performs these checks only during "the first hour of the day" and "after each break." (*Id.* at 44–45.) Thompson's "primary duty" is management.

### xxx. Kenneth Thompson

It is undisputed that Kenneth Thompson's self-described primary duties are "to communicate, conduct morning meetings, roll call, time and attendance entry, daily reports, any meetings that may be called, and to observe his group." (Doc. 141 at 450.) Thompson manages attendance in his group, and manages vacation scheduling, timekeeping and attendance tracking for his group members. (*Id.* at 452, Doc. 128-11 at 3.) He makes sure that someone is in position at each of the various workstations, and he "has the ability to shift his TMs around within his group." (Doc. 141 at 453.) Thompson "initiates, facilitates and monitors problem solving in his group." (*Id.*) He admits that he "handle[s] employee issues and conflicts in [his] group and decide[s] when to involve higher management." (*Id.* at 454.) Thompson counsels his TMs, and decides with his Manager whether a CPR is warranted. If so, "Thompson will write up the corrective action." (*Id.* at 455.) He keeps track of his individual group members' activities, and uses his observations to prepare an annual evaluation for each of them. (*Id.* at 457–58.) As a GL he walks his line for hours at a time, checking on the safety and performance of his group and addressing any issues. (*Id.* at 458.) If a vehicle has "been in his area for a long time" he will spot-check it for

quality, and will bring any defects to the attention of the TM responsible. (*Id.* at 458–59.)

While no specifics are given concerning any nonmanagement work, it is implied that he performs at least some repairs, as the parties agree that he "spends at most two hours a day making repairs as a GL." (*Id.* at 459.) The parties also agree that doing so does not detract from his management responsibilities: Thompson "remains available to fulfill all of his other responsibilities and duties as a GL" while making such repairs. (*Id.*) There is no question that his "primary duty" is management.

### xxxi. Michael Tucker

Tucker's area covers the entire Plant, and as a result he "walks the Plant throughout the day observing the TMs in his group," doing so "hourly." (*Id.* at 465, 473.) As he walks the line he talks to his TMs, acknowledging good performance and addressing bad performance. (*Id.* at 466.) He also makes sure that his TMs are focused, uninjured, and wearing the appropriate PPE (*id.*), and is "responsible for monitoring the safety of his entire group when he walks the Line." (*Id.* at 468.) Tucker "initiates, facilitates, and monitors problem solving in his group." (*Id.* at 473.) When there are quality or performance issues, Tucker can counsel the TM, initiate

a CPR, or involve higher management or Team Relations as he sees fit. (*Id.* at 471.) Tucker believes that "thinking outside the box is important as a GL." (*Id.* at 467.)

The only reference to potentially nonmanagement work is random spot-checking of vehicles during the first and last hour of the day. (Id at 466.) Beyond this, Plaintiffs have shown nothing that could be construed as a nonmanagement duty. Plaintiffs do not dispute that Tucker "does not normally work processes on the line." (*Id.* at 466–67). There is therefore no real question regarding his "primary duty."

### xxxii. Gene Upton

Upton admits that he "supervised" the TMs and TLs in his group, and he described himself as "a supervisor" to people outside of MBUSI. (*Id.* at 141.) In his RFA responses, Upton admits that as GL he "supervise[d] the team leaders and team members in his group," "g[a]ve work directions and assignments" to them, and "direct[ed] his group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Doc. 111-2 at 3.) He "manage[d] attendance" and "vacation scheduling,"(*Id.* at 3–4), and "moved TMs from team to team to adjust the manpower in his group." (Doc. 141 at 483.) Upton admits he "occasionally counsel[ed] team members and team leaders on performance, quality of work and

conduct." (Doc. 111-2 at 3–4.) He "evaluate[s] the performance" of TMs and TLs, ensuring that "quality goals are met" and "company policies and work rules are enforced." (*Id.* at 4–5.) Where problems arose, Upton "ha[d] the authority to initiate a Corrective Performance Review on a team member when [he] deem[ed] necessary." (*Id.*) He "admits that as a group leader he d[id] use leadership skills," and did so "independently of [his] Manager or Assistant Manager." (*Id.* at 7–8.) He performed annual evaluations of his TMs and TLs, and based these opinion on his "observation as a supervisor." (Doc. 141 at 484.)

The Court can find just one reference to a nonmanagement task performed by Upton, which was to check quality during the first hour of every shift and when quality numbers "'were in the red,' which was about two hours a day." (*Id.* at 478.) This fails to create a genuine issue of material fact concerning Upton's "primary duty." Although the regulations provide that time, alone, is not dispositive, they indicate that a finding based on less than "50 percent of their time" should also have "other factors [in] support [of] such a conclusion." 29 C.F.R. § 541.700(b). Here, the time spend checking quality is far less than fifty percent, and the other factors—in addition to Upton's own admissions—point emphatically to the conclusion that Upton's "primary duty" was management.

### xxxiii. Customarily Recognized Department or Subdivision

Before moving on to the other three executive exemption requirements, there is an additional issue to consider, relevant to all the above Plaintiffs. To meet the current prong of the four-part test, an employee's "primary duty" must be "management of the enterprise . . . or of *a customarily recognized department or subdivision* thereof." 29 C.F.R. § 541.100(a)(2) (emphasis added). The purpose of this requirement is "to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.103(a). Plaintiffs argue that although GLs are "in charge of a team of people," those teams "change with the needs of production." (Doc. 141 at 523.) They contend that these teams or groups are therefore "not a department or other recognized subdivision." (*Id.*) Plaintiffs assert, for example, that "[w]hile the 'Paint Department' may have a permanent status and continuing function, each of the three to five 'groups' within the Paint Department does not." (*Id.*) Notably, Plaintiffs provide no citations to the record in support of this position. To the contrary, the groups identified in the parties' briefs and the Plaintiffs' depositions all appear to have distinct and permanent designations. According to authority provided in Plaintiffs' own brief, a "department or subdivision can include small groups of

employees . . . within a larger department, such as a group leader of four draftsmen in the gauge section of a much larger department." (Doc. 141 at 523, quoting 69 Fed. Reg. 22122, 22134 (Apr. 23, 2004) (internal quotation omitted)). An identical arrangement prevails at MBUSI, albeit on a larger scale.

Individually, the Plaintiffs certainly treat their groups as "recognized unit[s] with a continuing function," 29 C.F.R. § 541.103©, in their individual descriptions of them. Together, they appear to tacitly acknowledge this in their "Agreed Upon Undisputed Common Facts." (Doc. 97 ¶ 5 ("Each Production group at MBUSI has a GL. Generally, each GL has a group consisting of one or more teams. Generally, each team is organized with a TL and multiple TMs.")) The record is clear that the groups supervised by GLs are much more than "mere collection[s] of employees assigned from time to time to a specific job," 29 C.F.R. § 541.103(a), and they therefore satisfy the "customarily recognized department or subdivision" requirement. The Court now turns to the remaining three requirements of the executive exemption test.

### 2. Salary Basis

Plaintiffs assert that "as a threshold matter, the 'executive exemption' is inapplicable because GLs were not paid a true salary." (Doc. 141 at 4.) They repeat

this point later in their brief: "As a threshold matter, Mercedes' motion must fail because there is a genuine issue of material fact whether GLs are compensated on a true salary basis." (Doc. 141 at 512.) Plaintiffs are correct that "compensat[ion] on salary basis at a rate of not less than $455 per week" is indeed a threshold question to meeting the executive exemption. *See* 29 C.F.R. § 541.100(a)(1). They neglect to point out, however, that it is a threshold that they have voluntarily and unequivocally crossed. Every one of these Plaintiffs received an RFA posing the following prompt: "[i]n your job as Group Leader at MBUSI, you earn at least $455 per week salary." Each Plaintiff answered with an unadorned "Admit."[11] Moreover, Plaintiffs reinforce this point in their own brief, responding with "undisputed" to each instance of MBUSI's claim that "As a GL, [Plaintiff's name] earns at least $455 per week in salary."[12] Thus, by their own admissions *and* the facts provided in their own brief, Plaintiffs have affirmatively answered this threshold question.

Even if this were not enough, this question is now well settled in this Court's previous opinions in this case. (*See, e.g.*, Doc. 71 at 6–9; Doc. 182 at 11–13.) The same

---

[11] The only exception in this set of Plaintiffs is Delbert Bell, whose RFAs are not part of the record. Plaintiff's brief, however, declares his receipt of "at least $455 per week *in salary*" to be undisputed. (Doc. 141 at 31, emphasis added.)

[12] (Doc. 141 at 13, 20, 31, 47, 57, 73, 84, 110, 148, 161, 175, 201, 222, 252, 282, 292–93, 302, 313, 322, 331, 348, 359, 366, 376, 386, 396, 414, 433, 447, 462, and 476.)

analysis applies here with equal force. Plaintiffs once again claim that their compensation was "subject to reduction because of variations in the quality or quantity of the work performed." (Doc. 141 at 512 (quoting 29 C.F.R. § 541.602(a)).) As explained before, this argument fails because it relates solely to Plaintiffs' *overtime* compensation. The regulations specifically provide that "an employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). Plaintiffs do not allege that their actual base salaries were impacted by the number of hours worked, only that it affected their payment for overtime. Because their salaries remained constant regardless of the amounts of overtime earned, MBUSI's choice to provide additional compensation for overtime does not diminish the "salary basis" on which Plaintiffs were paid.

Plaintiffs again attempt to buttress their argument by claiming that "deductions . . . [were] made for absences occasioned by Mercedes or by the operating requirements of the business." (Doc. 141 at 512.) As of 2008, MBUSI does not build cars at its Alabama plant on Fridays, although some non-production activities apparently still take place. GLs not scheduled to work on these non-

production Fridays have various options: they can elect to use a paid vacation day, they can take an unpaid personal day off work, or they can bank their unworked Friday hours against future overtime hours. Plaintiffs argue that this "Friday Bank" procedure requires MBUSI to "count[] hours worked, which violates the whole concept of a fixed salary." (Doc. 141 at 515.)

Plaintiffs continue to confuse the concept of counting hours for purposes of base compensation with counting hours for purposes of calculating overtime above and beyond the fixed salary. As noted above, employers may—but are not required—to provide overtime compensation for exempt, salaried employees. MBUSI's decision to provide overtime in addition to a predetermined salary has no bearing on whether a "salary basis" exists. If MBUSI—of its own accord—chooses to pay an overtime premium, it may also determine how that overtime is paid, so long as employees still receive, in full, their predetermined salaries. There appears to be no dispute that Plaintiffs *did* receive their full salaries, even when "banking" Friday hours against future overtime. As such, even apart from their own admissions, Plaintiffs were plainly "[c]ompensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.100(a)(1).

### 3. Directing the Work of Two or More Other Employees

The third prong of the executive exemption test requires an employee to "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). As with the requirements already discussed, Plaintiffs' own admissions do most of the heavy lifting on this issue.

All of these Plaintiffs admit in RFA #1 that as GLs, they "supervise the team leaders and team members in [their] group[s]."[13] Not only do they "supervise," they specifically admit in RFA #2 that they "give work directions and assignments" to the members of their group.[14] To "supervise" employees and "give work directions" certainly constitutes "directing the work" of those employees. As to whether such direction is "customarily and regularly" done, the phrasing of the RFAs and the record as a whole indicates that directing the work of TMs and TLs is a constant aspect of the GL position. Nothing in the record would suggest that directing the work of TMs or TLs was even close to being a mere "isolated or one-time" occurrence for any of the Plaintiffs at issue. As such, the directing of other employees was

---

[13] Boles, Doc. 116-1 at 3; Boyd, Doc. 116-3 at 3; Chiabi, Doc. 116-8 at 3; Davis, Doc. 110-1 at 84; Englebert, Doc. 116-12 at 3; Gibbs, Doc. 116-13 at 3; Gothard, Doc. 117-2 at 3; Hampton, Doc. 117-4 at 3; Hiott, Doc. 117-6 at 3; Houser, Doc. 117-8 at 3; Martin, Doc. 117-10 at 3; McCurley, Doc. 117-12 at 3; Munoz, Doc. 110-7 at 3; Pope, Doc. 111-7 at 41; Williams, Doc. 117-18 at 3.

[14] Only Pinion fails to admit RFA #1 & #2. The undisputed facts in Plaintiff's brief, however, amply establishes that Pinion likewise "directed the work" of those in his group. (*See* Doc. 141 at 359–62.)

"customarily and regularly" performed as defined by the regulations. *See* 29 C.F.R. § 541.701.

Additionally, the required number of "other employees" poses no difficulty. It is undisputed that each GL has a group that "consist[s] of one or more teams." (Doc. 97 at ¶ 5.) Each team, in turn, is generally "organized with a TL and multiple TMs." (*Id.*) Even a GL with the smallest possible group—a single team consisting of just one TL and one TM—would still satisfy the "two or more" requirement. All of the groups, however, appear to be significantly larger, many with dozens of TMs and a handful of TLs.[15] Given all of this, there is no question that each of these Plaintiffs "customarily and regularly directs the work of two or more other employees." 29 C.F.R. § 541.100(a)(3).

### 4. Recommendations Given Particular Weight

The final prong of the executive exemption test is whether each of these Plaintiffs "has the authority to hire or fire other employees," or whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). MBUSI does not contend that Plaintiffs have the authority to

---

[15] See, e.g., Doc. 141 at 13 (Ashcraft, 22 TMs and TLs), 20 (Bannerman, 66 TMs and TLs), 64 (Coleman, 50 TMs and TLs), etc.

hire or fire, but *does* maintain that their suggestions and recommendations are given "particular weight." Here again the regulations provide a factor-based approach:

> To determine whether an employee's suggestions and recommendations are given ''particular weight,'' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. Once again, Plaintiffs go a long way toward establishing this with their own admissions. Each of them admit in RFA #7 that, as part of their jobs as GLs, they "provide an opinion as to whether or not team members and team leaders in [their] group[s] are ready for promotion."[16] The "frequency with which the[se] employee's suggestions and recommendations are relied upon" is clearly seen from MBUSI's own written policies. (*See* Doc. 109-22.) As explained by Marcus Jones, MBUSI's HR Manager, "the GL's assessment of the TM or TL is followed barring exceptional circumstances." (Doc. 109-1 at 9.) Additionally, if a GL gives a TM or TL a negative performance evaluation in any area but attendance, that employee "cannot

---

[16] (Docs. 123-4 at 4, 123-6 at 4, 123-11 at 4, 110-13 at 4, 124-5 at 4, 111-6 at 4, 124-7 at 4, 124-13 at 4, 111-11 at 4, 125-2 at 4, 125-6 at 4, 125-10 at 4, 126-2 at 4, 126-6 at 4, 126-8 at 4, 110-3 at 4, 126-10 at 4, 126-12 at 4, 127-2 at 4, 127-5 at 4, 127-9 at 4, 127-11 at 4, 127-13 at 4, 128-2 at 4, 110-5 at 4, 128-4 at 4, 128-6 at 4, 128-9 at 4, 128-11 at 4, 128-13 at 4, & 111-2 at 4.)

be promoted." (*Id.* at 9–10.) Such evaluations by GLs are made part of the employee's personnel file. (*Id.* at 10.)

In addition to Marcus Jones' explanation, each one of the Plaintiffs has personally acknowledged the significant weight given to their opinions regarding promotion. Most of the Plaintiffs agree that if they give a rating of "not satisfactory" to a TM in any area other than attendance, that TM is then "not eligible for promotion."[17] Most also do not dispute that their recommendations for promotion are considered—and normally followed—in determining if a TM or TL will be promoted.[18] Although these GLs do not have the final authority to make hiring or promotion decisions, there is no question that their suggestions and recommendations regarding promotions are given particular weight. In addition to their influence in promotion decisions, these Plaintiffs can—at their discretion—take steps that could lead to a team member's termination. In their responses to RFA #10, most of the

---

[17] (Doc. 141 at 19, 29, 44, 54, 68, 81, 117, 154, 168, 230, 260, 284, 296, 316, 344, 364, 373, 384, 393, 398, 422, 440, 457, 472, and 484.) While most of these citations show that this fact is "undisputed," Plaintiffs object to it in some instances. Their objections, however, either fail to state any grounds whatsoever, or object that Jones' declaration is "irrelevant." (*See, e.g.*, Doc. 141 at 422.) Plaintiffs' counsel would do well to recall that "Evidence is relevant if (a) it has *any tendency* to make a fact more or less probable than it would without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401 (emphasis added). Because Jones' declaration is clearly relevant, and not objected to on other grounds, Plaintiffs' objections are overruled.

[18] (Doc. 141 at 19, 24, 36, 54, 81, 92, 117, 125, 153, 179, 206, 217, 261, 296, 315–16, 326, 353, 364, 373, 38, 393, 422–23, 457, 472, and 484.)

Plaintiffs admit that, as GLs, they "have the authority to initiate a Corrective Performance Review on a team member *when [they] deem necessary*."[19]

In their brief, Plaintiffs admit that GLs give performance evaluations and can initiate corrective performance reviews, but argue that such actions "must be approved by an Assistant Manager and HR," and in any case are "only one of several evaluation tools utilized by MBUSI's Management." (Doc. 141 at 524.) But the regulations specifically address this issue. They provide that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105. In light of the relevant factors, there is no question that these Plaintiffs' suggestions and recommendations are given "particular weight."

---

[19] (Docs. 123-4 at 5, 110-13 at 5, 124-5 at 4–5, 111-6 at 4–5, 124-7 at 4–5, 124-13 at 4–5, 111-11 at 4–5, 125-6 at 4–5, 126-2 at 4–5, 126-6 at 4–5, 126-8 at 4–5, 110-3 at 4–5, 126-10 at 4–5, 126-12 at 4–5, 127-2 at 4, 127-5 at 4–5, 127-9 at 4–5, 128-2 at 4–5, 110-5 at 4–5, 128-6 at 4–5, 128-9 at 4–5, 128-13 at 4–5, & 111-2 at 5, emphasis added.)

**V. Conclusion**

Of these forty-two Plaintiffs, only two have claims with any genuine issues of material fact. MBUSI's motion (Doc. 121) is DENIED as to the claims of Ron Bannerman arising while he was GL in Chassis, and those of Gary Smith arising since he became GL of CI. MBUSI's motion is GRANTED as to the remainder of their claims, and GRANTED as to ALL the claims of the other forty Plaintiffs at issue. Separate orders consistent with this opinion will be entered.

Done this <u>2nd</u> day of <u>July 2012</u>.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[167037]