FILED

2012 Jul-03  AM 11:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JEFF HICKS, | ) | |
|      Plaintiff; | ) | |
| | ) | |
| vs. | ) | 7:08-cv-0536-LSC |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
|      Defendant. | ) | |

## MEMORANDUM OF OPINION

## I. Introduction

Before this Court is the sixth in a series of motions for summary judgment filed by Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI").[1] The present motion, filed on October 24, 2011 (Doc. 132), seeks summary judgment as to the claims of thirteen Plaintiffs who allegedly meet the executive exemption to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act"), because they "admit that their primary duty is management and they perform some non-exempt

---

[1] This series of motions concerns the Plaintiffs who filed suit together in *Lawson v. MBUSI*, 7:09-cv-1157-LSC, and does not pertain to Jeff Hicks himself. The *Lawson* and *Hicks* cases were consolidated for discovery purposes, and on February 7, 2012, this Court ordered the claims of the individual *Lawson* Plaintiffs to be severed into individual cases. (*Hicks* Doc. 162.) These individual cases remain consolidated for case management purposes under *Hicks*, with the Court continuing to evaluate the already-filed set of summary judgment motions.

Unless otherwise noted, citations to the record are to the document numbers in the *Hicks vs. MBUSI* case, 7:08-cv-0536-LSC. Document numbers preceded by "*Lawson*" reflect the document number assigned in *Lawson v. MBUSI*, 7:09-cv-1157-LSC.

work, but that work is directly related to their exempt duties." (Doc. 132 at 2.) A brief in support of the motion (Doc. 133) was contemporaneously filed. Plaintiffs filed a response to the motion on November 23, 2011 (Doc. 146), and MBUSI filed a reply brief on December 14, 2011 (Doc. 149). This motion is now ripe for decision.

## II. Facts[2]

The present motion concerns thirteen Plaintiffs, twelve of whom have claims remaining at this stage:[3] Steven Campbell, Timothy Crawford, Michael Crowley, Robert Fisher, Floyd Franklin, Derek Hendley, James Karpinski, Penny Kessler, Gary Oglesby, Frederick Rogers, Timothy Swindle, and Jassen Tidwell. All of these Plaintiffs were employed by MBUSI as Group Leaders ("GLs").[4] While employed as GLs, these Plaintiffs were classified by MBUSI as exempt employees. MBUSI made

---

[2] The facts set out in this opinion are gleaned from the "Agreed Upon Undisputed Common Facts Applicable to Summary Judgment Motions," (Doc. 97), the undisputed facts in the parties' briefs, as well as the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Additional facts specific to each Plaintiff are addressed in the Court's analysis below.

[3] The claims of one of these Plaintiffs, Kelly Pitman, have already been dismissed on statute of limitations grounds. (*See* Docs. 163 & 164.) Pitman also met the requirements for the "highly compensated" exemption of 29 C.F.R. § 541.601 for the year 2007, providing an alternate basis for his claims arising in that year. (*See* Docs. 182 & 183.) Because Pitman's claims have already been dismissed, it is unnecessary to consider the present motion as it applies to him.

[4] Each GL has a group which consists of Team Leaders ("TLs") and Team Members ("TMs"). GLs, in turn, typically answer to Assistant Managers ("AMs") and Managers.

changes to the overtime policy for exempt employees in February and March of 2005, and again in March of 2006. Following the March 2006 changes, GLs could be paid overtime only after completing five unpaid hours per week of pre- and post-shift work activities designated as "casual time." While overtime would still be paid for extra hours worked on weekends without the casual time requirement, the policy effectively required forty-five hours, rather than forty, to be worked before any weekday overtime could accrue. The "casual time" language was removed from the policy in a revision on April 7, 2008.

On June 10, 2009, a number of GLs and former GLs filed a complaint against MBUSI. The essence of the complaint is that, by mischaracterizing the GLs as exempt, MBUSI was "requiring [them] . . . to work overtime without payment of overtime . . . in violation of the [FLSA]." (*Lawson* Doc. 1 at 9.)

### III. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district

court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.   Discussion

### A. Plaintiffs Who Admit They Are Exempt

Before beginning an analysis under the FLSA's "executive exemption," the Court notes that such an analysis is unnecessary for five of the twelve Plaintiffs at issue. Each of the five provided an admission in response to Request for Admission ("RFA") #43: "While a Group Leader at MBUSI, you were properly classified under the Fair Labor Standards Act as an exempt employee."[5] Rule 36 of the Federal Rules of Civil Procedure provides that such admissions have special weight, unique among the various discovery mechanisms, such that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." FED. R. CIV. P. 36(b). *See also In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001) ("Since Rule 36 admissions, whether express or by default, are conclusive as to the matters admitted, they cannot be overcome at the summary judgement stage by contradictory affidavit testimony or other evidence in the summary judgment record.") In the Eleventh Circuit, it is reversible error for a district court to discount facts that are "conclusively established" through Rule 36 admissions, "even if it '[finds] more credible the evidence of the party against whom

---

[5] RFA #43 (*See* Doc. 146 at 25, 42, 62, 86, & 96.)

the admissions operate.'" *Williams v. City of Dothan*, 818 F.2d 755, 762 (11th Cir. 1987) (quoting *Brooks Village N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 73 (1st Cir. 1982)).

These five Plaintiffs' responses to RFA #43 differ, but all are due to be treated as admissions under Rule 36(a)(4). Timothy Swindle responded with an unvarnished "Admit."(Doc. 135-10 at 11.) The others' responses varied, but each constitute "defective answers" that could properly be considered admissions by the Court. *See* Fed. R. Civ. P. 36(a)(4) advisory committee notes ("Rule 36 . . . seems to contemplate that defective answers bring about admissions just as effectively as if no answer had been served."). Even if the Court were not so inclined on its own, Plaintiffs have themselves acknowledged that each defective response constituted an admission under the rule: for each of the Plaintiffs in question, the admission to RFA #43 is ratified in Plaintiffs' response brief; when confronting the assertion that each Plaintiff in question "admitted . . . that he [or she] was properly classified under the FLSA as an exempt employee," their responses are identical. In all five instances, the only response is "Undisputed." This is so for Michael Crowley (Doc. 146 at 25), Floyd Franklin (*Id.* at 42), Penny Kessler (*Id.* at 62), Frederick Rogers (*Id.* at 86), and Timothy Swindle (*Id.* at 96). As a result of these Plaintiffs' admissions, as confirmed

by Plaintiffs' own brief, the Court takes it to be "conclusively established" that each one was properly classified as exempt under the FLSA. Their claims are therefore due to be dismissed, and need not be addressed in the analysis below.

### B. The FLSA's "Executive Exemption"

Section 13(a)(1) of the FLSA provides that its minimum-wage and overtime provisions do "not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). As with all FLSA exemptions, the executive exemption is to be "narrowly construed so that it applies to those plainly within its terms and spirit." *Gregory v. First Title of Am., Inc.,* 555 F.3d 1300, 1302 (11th Cir. 2009). In asserting that an exemption applies, "the employer 'bears the burden of proving the applicability of a[n] FLSA exception by clear and affirmative evidence.'" *Id.* (quoting *Klinedinst v. Swift. Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001)).The regulations provide a four-part test for determining whether an employee fits the executive exemption:

> (a) The term ''employee employed in a bona fide executive capacity'' in section 13(a)(1) of the Act shall mean any employee:
>
> > (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. Each one of these requirements is a subject of debate between the parties: MBUSI contends that all four are easily demonstrated, and that summary judgment is therefore appropriate. Plaintiffs hold to the other extreme, that none of the four can be established and that each one presents genuine issues of material fact. Despite the breadth of the parties' disagreement, the real crux of the dispute in this motion is relatively narrow: the "primary duty" of the Plaintiffs. MBUSI argues that this particular group of Plaintiffs should be found exempt as a matter law because they allegedly "admit their primary duty is management and they perform some non-exempt work, but that work is directly related to their exempt duties." (Doc. 132 at 2.) The Court thus begins its analysis here—with the second of the four requirements—determining if there is a genuine dispute of material fact as to whether

Plaintiffs' "primary duty is management . . . of a customarily recognized department or subdivision" of MBUSI. 29 C.F.R. § 541.100(a)(2).

### 1. Primary Duty

To meet the executive exemption, "management" must be the employee's "primary duty." "Management" is defined by the regulations to include:

> [A]ctivities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. The term "primary duty" is broadly defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining an employee's "primary duty," the regulations prescribe a variety of factors rather than a bright-line rule. The factors given are:

> [T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). The regulations are clear that these factors, while helpful, are not to be taken as exhaustive. Instead of relying on any set of fixed criteria, each determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* As the Eleventh Circuit observed in *Rodriguez v. Farm Stores*, "[w]hen it comes to deciding whether an employee is an executive within the meaning of the FLSA, the answer is in the details." 518 F.3d 1259, 1264 (11th Cir. 2008).

In looking at these details, the Court pays close attention to the duties of each Plaintiff, specifically their performance of exempt management duties, as well as any nonexempt, nonmanagement duties. Notably, of the four "primary duty" factors provided in § 541.700(a), three presuppose that at least *some* nonexempt work is performed. The first is concerned with the importance of nonexempt work as compared to the employee's exempt work, and the second looks to the amount of time spent on each. The fourth factor requires that the employee in question perform

nonexempt work in order to identify the wages of comparable employees who perform similar work. Even with a less rigid application of the factors, determining the composition of exempt and nonexempt duties is central to understanding the "character of the employee's job as a whole." Accordingly, the details specific to each Plaintiff are examined below, with a focus on each Plaintiff's management duties in addition to any alleged nonmanagement duties.[6]

Before addressing the facts specific to each individual Plaintiff, there are numerous facts they share by virtue of their common RFA responses. These shared admissions "conclusively establish" an extensive amount of management responsibility for each one of them. All of them admit, for example, that they "supervise the team leaders and team members in [their] group[s]."[7] As GLs, they also "give work directions and assignments" to their group members.[8] All of them "manage attendance" in their groups, ensuring they are properly staffed, and they

---

[6] For each of the Plaintiffs discussed, there are numerous facts supporting management duties that are not included here. Although the Court earnestly attempts to include and discuss nearly every nonmanagement duty that is raised, the recital of exempt management activities are, in the interest of brevity, only a representative sampling. Regardless, the Court has reviewed each management duty, taking it into consideration where appropriate.

[7] RFA #1 (Docs. 134-2 at 3, 134-4 at 3, 134-8 at 3, 134-12 at 3, 135-2 at 3, 135-7 at 3, & 135-13 at 3).

[8] RFA #2 (Docs. 134-4 at 3, 134-8 at 3, 134-12 at 3, 135-2 at 3, 135-7 at 3, & 135-13 at 3). Only one of these Plaintiffs, Steven Campbell, did not admit RFA #2. Campbell does admit, however, that his job as GL includes the duty to "monitor and plan activities." (See Doc. 134-1 at 41, 67.)

"manage vacation scheduling, timekeeping and attendance tracking."[9] Each one admits that he "direct[s] [his] group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony."[10] They also "ensure" that "quality goals are met" and that "company policies and work rules are enforced" in their groups.[11] As GLs they are responsible for monitoring their areas for safety hazards, and they "ensure that [their] group[s] work safely."[12] They have the authority to "direct training and retraining" as they deem appropriate.[13] They all acknowledge that their jobs involve the use of discretion, and they "use [their] best judgment" in performing all of their GL duties.[14] They "initiate, facilitate and monitor problem solving,"[15] and "handle employee issues and conflicts."[16] Their roles as GLs include the authority to "decide when to involve higher management or MBUSI's Team Relations Department" in

---

[9] RFA #3–4 (Docs. 134-2 at 3, 134-4 at 3, 134-8 at 3, 134-12 at 3, 135-2 at 3, 135-7 at 3, & 135-13 at 3).

[10] RFA #5 (Docs. 134-2 at 3, 134-4 at 3, 134-8 at 3, 134-12 at 3, 135-2 at 3–4, 135-7 at 3, & 135-13 at 3).

[11] RFA #13–14 (Docs. 134-2 at 5, 134-4 at 5, 134-8 at 5, 134-12 at 5, 135-2 at 5, 135-7 at 5, & 135-13 at 5).

[12] RFA #17 (Docs. 134-2 at 6, 134-4 at 6, 134-8 at 6, 134-12 at 6, 135-2 at 6, 135-7 at 6, & 135-13 at 6).

[13] RFA #19 (Docs. 134-2 at 6, 134-4 at 6, 134-8 at 6, 134-12 at 6, 135-2 at 6, 135-7 at 6, & 135-13 at 6).

[14] RFA #23 (Docs. 134-2 at 7, 134-4 at 7, 134-8 at 7, 134-12 at 7, 135-2 at 7, 135-7 at 7, & 135-13 at 7).

[15] RFA #12 (Docs. 134-2 at 5, 134-4 at 5, 134-8 at 5, 134-12 at 5, 135-2 at 5, 135-7 at 5, & 135-13 at 5).

[16] RFA #18 (Docs. 134-2 at 6, 134-4 at 6, 134-8 at 6, 134-12 at 6, 135-2 at 6, 135-7 at 6, & 135-13 at 6).

handling such conflicts.[17] All of these Plaintiffs—as part of their GL duties—evaluate the performance of TMs and TLs in their group[18] and provide an opinion about their group members' readiness for promotion.[19] Conversely, they also "have the authority to initiate a Corrective Performance Review on a team member when [they] deem necessary."[20]

Without even taking into account any management duties specific to each Plaintiff, these shared admissions establish that all have substantial management responsibilities. The remaining question, then, is whether each Plaintiffs' nonmanagement duties create a genuine issue as to that Plaintiffs' "primary duty." Accordingly, the nonmanagement activities of each Plaintiff are discussed in turn below.

---

[17] (*Id.*)

[18] RFA #6 (Docs. 134-2 at 4, 134-4 at 4, 134-8 at 4, 134-12 at 4, 135-2 at 4, 135-7 at 4, & 135-13 at 4).

[19] RFA #7 (Docs. 134-2 at 4, 134-4 at 4, 134-8 at 4, 134-12 at 4, 135-2 at 4, 135-7 at 4, & 135-13 at 4).

[20] RFA #10 (Docs. 134-2 at 4–5, 134-4 at 4–5, 134-8 at 4–5, 134-12 at 4–5, 135-2 at 5, 135-7 at 4–5, & 135-13 at 4–5).

### i. Steven Campbell

Plaintiffs allegations of Campbell's nonexempt work comes from a brief exchange during his deposition:

> Q. We've talked about some things that you do during your day. What do you spend most of your day doing?
>
> A. On line quality checks, making repairs, moving parts, answering line pulls, quality walk backs.

Doc. 134-1 at 29. There is no precise breakdown for how much time is spent on each of these individual tasks. Campbell's testimony indicates, however, that "answering line pulls" predominates among them. Campbell says that his need to address line pulls and radio calls "happens a lot," with the daily number of occurrences varying from "in the teens to all day long." (*Id.* at 30.) Overall, responding to line pulls takes up "a large part of [his] day." (*Id.*) Responding to line pulls, however, is the very essence of management work: it involves responding to an issue signaled by a group member and determining, as a supervisor, how to address it. When a line pull occurs, Campbell evaluates the situation, and then either provides a solution himself, calls the appropriate repair technician, or escalates the issue to his AM or manager. (*Id.*) While an issue is being resolved, he will "instruct[] [his] TMs on what to do to fix the problem" so it does not happen again. (*Id.*) Because answering line pulls is clearly

exempt management work, the considerable amount of time Campbell spends doing it does nothing to help Plaintiffs' position.

The other activities provide better—but still faulty—arguments. Plaintiffs contend that "a reasonable trier of fact could look at the evidence and conclude that Plaintiffs' primary duties are to inspect vehicles and make repairs." (Doc. 146 at 118.) Regarding the inspecting of vehicles, however, Plaintiffs admit that "[a] supervisor who spot checks and examines the work of subordinates [may be exempt] . . . so long as the checking is distinguishable from the work ordinarily performed by a nonexempt inspector." (*Id.*) (quoting 29 C.F.R. § 541.703(b)(3)) (alteration in original). They argue that Campbell's quality checking is *not* distinguishable from a nonexempt inspector, but they fail to provide any supporting evidence. Campbell's own testimony shows that his quality checking *is* distinguishable from a nonexempt inspector, since the focus of Campbell's inspecting is the performance of his group. When there is a quality issue, he "provide[s] feedback" to his TMs and "instruct[s] [his] TMs on how to correct" the problem. (Doc. 134-1 at 30.) He "do[es] not want [his] group to have a lot of quality issues," and acknowledges that if his group has continuous quality and defect issues, he hears from his superiors about it. (*Id.* at 30–31.) Campbell's own testimony regarding his quality checking shows that it forms a part of his management

duties rather than an exception. In short, Campbell inspects the quality of his group's work "to determine whether [his group members] are performing their duties properly." 29 C.F.R. 541.703(b)(3). There is no indication he was ever assigned, as a GL, to conduct quality inspecting apart from the supervision of his group. As such, his inspecting only emphasizes the primacy of his management work.

When it comes to making repairs, Campbell's work is also distinguishable from that of his group members. Campbell agrees that if TMs or TLs are available, he has a choice to make when addressing a defect. Campbell can choose to make the repair himself, or he can "have one of [his] TMs or TLs do it." (Doc. 134-1 at 29.) Even if he chooses to repair something himself, it is undisputed that Campbell still "retains his other GL responsibilities" as he does so. Speaking to this very point, the regulations provide that "mak[ing] the decision regarding when to perform nonexempt duties" and "remain[ing] responsible for . . . success or failure" are the very hallmarks of an exempt employee. 29 C.F.R. § 541.106(a). In contrast, a "nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." (*Id.*) There is no evidence that Campbell's repair work—or his quality checking—are performed during "defined time periods" or at the direction of a supervisor.

The case is similar for Campbell's two remaining activities: "moving parts" and performing "quality walk backs." A "walk back," according to Campbell, "is when there is a quality issue in the shop . . . where we would physically go check the car to see if this issue was present." (Doc. 134-1 at 27.) These walk backs—like Campbell's repair work—are sometimes performed by Campbell himself, but by his own choice: he usually can elect to send "a team leader or potentially even a team member" instead. (*Id.*) In fact, "most of the time" he sends a TL. (*Id.*) Conducting walk backs clearly does not raise a genuine question concerning Campbell's "primary duty."

The remaining task of "moving parts" is scarcely mentioned. Aside from the deposition section quoted above, it does not appear to be referenced anywhere in the parties' briefs or elsewhere in Campbell's deposition. To the extent it is even material, it provides little support to Plaintiffs' argument. The scope of "management" specifically includes "controlling the flow and distribution of materials." 29 C.F.R. § 541.102. This seems to squarely encompass the moving of parts. Additionally, the specific work examples that are "directly and closely related to the performance of exempt duties," and hence "considered exempt work," include "[t]he distribution of materials, merchandise or supplies to maintain control of the flow of . . . such

items." 29 C.F.R. § 541.703(a), (b)(3). Even if "moving parts" were more prominent among Campbell's activities, it appears to provide yet another example of Campbell's management duties.

Each of Plaintiffs' allegedly exempt duties appear to provide additional reasons for finding Campbell's "primary duty" to be management. Even if this were not the case with the rest of them, the predominance of "answering line calls," a clearly exempt task, would indicate that there is no genuine issue of material fact here. In light of Campbell's shared admissions and the absence of any colorably nonmanagement tasks, there is no question that his "primary duty" is management.

### ii. Timothy Crawford

There are two alleged examples of nonmanagement work for Timothy Crawford: repair work and quality checking. Regarding repair work, it is undisputed that "Crawford may have to perform a repair after shift that may take him forty-five minutes to an hour and a half." (Doc. 146 at 20.) It is also undisputed, however, that he does so only "about once a month." (*Id.*) No reasonable juror could find that such brief and infrequent repair work could constitute Crawford's "primary duty."

The other example of allegedly nonmanagement work is Crawford's quality checking. Crawford testified that he spends the first hour of his shift "going down [the

line] checking team members, greeting team members, looking at processes," and "looking at the cars at the same time." (Doc. 134-3 at 24.) Then, "for the next hour, [he's] dedicated to actually checking cars." (*Id.*) He also checks cars intermittently during the day, as well as spending an hour at the end of the shift checking cars. (*Id.*) This has been the case "for so long that [he] can't remember." (*Id.*)[21]

Although Crawford's time spent checking cars is not insignificant, it does not call into question his "primary duty" of management. His quality checking work is just the sort that the regulations deem to be exempt:

> A supervisor who spot checks and examines the work of subordinates to determine whether they are performing their duties properly, and whether the product is satisfactory, is performing work which is directly and closely related to managerial and supervisory functions, so long as the checking is distinguishable from the work ordinarily performed by a nonexempt inspector.

29 C.F.R. § 541.703(b)(3). Although Crawford testified that he checks quality in part because there is not "a quality person on Trim 1," his work is nonetheless "spot checking." (Doc. 134-3 at 23.) Crawford was told by his AM that he "should be checking for [quality issues]; *not trying to check everything*, but putting [his] hands on

---

[21] Crawford stated in his deposition that he "is expected" to spend over 50% of his time checking cars, as of a conversation with his AM two months before his deposition. (Doc. 134-3 at 23.) He goes on to say, however, that due to a medical condition he hasn't been back to work since that time. (*Id.*)

it and making sure [his] quality issues are addressed." (*Id.*, emphasis added.) Additionally, Crawford explicitly affirmed that the purpose of his quality checking is "to make sure that the team members are doing what they are supposed to do." (Doc. 134-3 at 24.) As such, his checking is easily "distinguishable from the work ordinarily performed by a nonexempt inspector." 29 C.F.R. § 541.703(b)(3). Throughout his day, Crawford "gives [his TMs] feedback, correcting them and documenting their performance." (Doc. 146 at 19.) When asked about his primary duty as GL, Crawford described his job as "to monitor the jobs of the team members and team leaders on the line and make sure they are in compliance with the standards and the policies that the company has established." (Doc. 146 at 17.) Crawford specifically acknowledges the close connection between his management duties and his quality checking work: "when I'm checking a car at the end of the line, that's verifying that the standards are being maintained or kept; or even if I'm sitting at my desk monitoring reports, I'm still trying to maintain that company standards are being maintained." (Doc. 134-3 at 38.) As Crawford himself appears to understand, his quality checking is directly and closely related to the performance of his exempt work, and therefore "is also considered exempt work." 29 C.F.R. § 541.703(b)(3). There is no question that Crawford's "primary duty" is management.

### iii. Robert Fisher

Like Campbell and Crawford, Robert Fisher allegedly performs nonexempt quality checking and repair work. As was the case for those two Plaintiffs, this work does not actually put Fisher's "primary duty" in controversy. Fisher claims that he spends most of his day "[w]alking the line, checking quality." (Doc. 134-7 at 25.) Part of this quality checking involves "review[ing] the paperwork before the vehicle gets to the end of the line to determine if there are any issues with the vehicle that need to be addressed." (Doc. 146 at 40.) But it is undisputed that "Fisher has a TM who performs this job so there is no need for Fisher to do it unless the TM gets behind and Fisher will help him out." (*Id.* at 41.) On some days, that TM may consistently stay behind, but on other days he doesn't get behind at all. (*Id.*) Even while Fisher is checking quality, he is still observing and seeing that the group members around him are performing their jobs correctly. (*Id.*) The purpose of Fisher's quality checking is also important: rather than focusing on the quality of the product itself, he checks quality because "Fisher is responsible for making sure his group performs the work like it is supposed to do." (*Id.* at 40.) If his group does not, then "Fisher is held accountable." (*Id.*)

The same is true of Fisher's repair work. The parties dispute the number of repairs that Fisher makes on a daily basis: MBUSI says that there "may be two repairs a day," while Plaintiffs put the figure at "four or five repairs per day." (Doc. 146 at 41.) They agree, however, that "Fisher will normally spend maybe five minutes making these repairs." (*Id.*) At most, this puts Fisher's repair work at less than half an hour per day. Additionally, "[e]ven if Fisher is doing a repair, he is still responsible for the output of the TMs in his group." (*Id.*) His repair work is also often done at his own choice, "because [he] make[s] the decision to try to help the team member or team leader out." (Doc. 134-7 at 24.) Both Fisher's quality checking and repair work are clearly just aspects of—not obstacles to—his "primary duty" of management.

### iv. Derek Hendley

The situation is similar for Derek Hendley. Although his "work on the line" is briefly mentioned in Plaintiffs' brief, Plaintiffs concede that he "has not been instructed to work the line for a long time," and over a four or five month span has only worked on the line "two or three times." (Doc. 146 at 56.) Even when his work on the line was a daily occurrence, it was only to fill in on others' breaks to "run the line and process cars." (Doc. 134-11 at 36.) Hendley's work on the line presents no genuine question as to his "primary duty."

Instead, Plaintiffs focus on Hendley's quality checking, which allegedly occurred for "approximately four hours each day." (Doc. 146 at 56.) He did this at the end of his line, where he could spot-check vehicles before they left his area. (Doc. 134-11 at 26–27.) Plaintiffs admit, however, that this four-hour approximation includes time just observing the work of his group in addition to actually checking quality. (Doc. 146 at 56.) The end of the line is simply "the most important place for [him] to observe what's going on." (*Id.* at 26) As Hendley explained, "A lot of times, I stay at the end of the line because that station sets the tone for the whole line." (*Id.*) By his own description, the four hours Hendley spends at the end of the line is spread throughout his day, and quality checking accounts for only a fraction of it. Once "every hour or two" he will go to the end of the line and check up to seven or eight cars, generally spot checking "a couple panels" on just one side of each car. (*Id.*) Hendley testified that he has "never really timed [him]self" on the checking of individual vehicles, so he doesn't know exactly how long it takes. (*Id.*) But each car remains in his area for a total of just eighty-seven seconds, so any checking must fit within that eighty-seven-second window. (*Id.*) After checking cars, he then remains for a while to supervise, "just observing the general area to make sure things are

functioning correctly." (Doc. 146 at 56.) At most, the time he spends actually checking vehicles every hour or two is less than fifteen minutes.

Even if Hendley spent a more significant time checking quality, his testimony is clear that his quality checking—as with the other Plaintiffs discussed above—is distinct from the routine quality checking performed TMs or TLs; Hendley's focus is on the performance of his group members. It is undisputed that "As GL, Hendley walks the line, checks the *quality of the TMs* who are building the vehicle and makes general observations *of the TMs*." (Doc. 146 at 51, emphasis added.) He is supposed to make sure that his TMs "are doing what they are supposed to do throughout the day," (id.), and the quality checks at the end of his line provide an effective vantage point for doing so. Hendley's description of his own primary duty includes supervising the quality of his TMs' work. He does this because "[a]s GL, Hendley is held accountable for the quality that comes out of his group." (*Id.*) Like the other Plaintiffs discussed above, Hendley checked quality as part of managing his group. As such, it does nothing to suggest that his "primary duty" is something other than management.

### v. James Karpinski

James Karpinski spends a significant amount of time repairing cars, although the exact amount of time is unclear. It is undisputed that Karpinski spends "one hundred percent" of his day walking his area, looking for line pulls and quality issues. (Doc. 146 at 58; Doc. 135-1 at 17.) It is also undisputed, however, that "Karpinski estimates that he spends fifty percent of the shift making repairs." (Doc. 146 at 59.) When asked to clarify if this included answering line calls, Karpinski responded, "[t]hat's just making repairs." (Doc. 135-1 at 18.) Because the Court must view all evidence in the light most favorable to Plaintiffs, the Court accepts the fifty-percent figure for present purposes.

In response to Karpinski's repair work, MBUSI argues that "[t]he concurrent performance by GLs of management duties and duties they consider to be non-exempt does not disqualify them from the executive exemption when they meet the requirements of the exemption." (Doc. 133 at 167.) Indeed, the regulations specifically provide that "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of § 541.100 are otherwise met." 29 C.F.R. § 541.106(a). As discussed above, such employees are more likely exempt if they can "make the decision regarding when to perform

nonexempt duties," and if they "remain responsible for . . . success or failure" while performing those duties. (*Id.*) MBUSI contends that these factors counsel in favor of Karpinski's exempt status. But when asked—repeatedly—whether he "made the decision whether or not" to make a given repair, Karpinski responded that "whoever is there" is supposed to repair it, "whoever's there first." (Doc. 135-1 at 18.) He denies getting to choose who makes repairs. (*Id.*) According to MBUSI, Karpinski is "still available to do his other duties as a GL" while making repairs. (Doc. 133 at 81.) Karpinski did agree that he "need[s] to be available to do [his] other duties as a Group Leader," but he also testified that sometimes he simply "can't be available," and has to stay with a repair to "get the line moving again." (Doc. 135-1 at 21.) While the weight of the evidence may still heavily favor Karpinski's exempt status, this Court's role is simply to determine whether a reasonable jury *could* find that repair work is his "primary duty." Because of the differences between Karpinski and the other Plaintiffs discussed above, summary judgment is inappropriate for his claims, and the analysis of the other executive exemptions requirements below does not apply to him.

### vi. Gary Oglesby

Gary Oglesby is GL of Offline Quality, where his group performs various quality checks and performs a road test of vehicles coming off the line. (Doc. 135-6 at 25.) It

is undisputed that Gary Oglesby "spends about half his time walking his group and observing their performance and the other half checking vehicles." (Doc. 146 at 72.) But he works on the line checking quality only to "fill in for somebody," and only "ha[s] to get in and drive cars" whenever "an abundance of cars coming out of repair . . . overloads [his] line." (Doc. 135-6 at 26.) Although he estimates that his time is split "about half and half," Oglesby agrees that "Mercedes doesn't want [him] working on the line," so he "want[s] to avoid [it] if possible." (*Id.*) Additionally, in contrast to Karpinski, Oglesby undisputedly "maintains his other GL responsibilities" while he performs his allegedly exempt work. (Doc. 146 at 72.) Throughout the day, he responds to problems within his group by going to the site of the issue, observing what the problem is, talking to the team member, and determining how to resolve the problem. (Doc. 135-6 at 26.) He also coordinates with other GLs "almost constantly during the day" to solve problems together, and he is contacted by GLs of other groups up to forty or fifty times per day "so they can work together to resolve a problem." (Doc. 146 at 72.) In light of the shared admissions and Ogleby's testimony concerning the primacy of his leadership responsibilities—even while he does check vehicles—there is no question that his "primary duty" is management.

### vii. Jassen Tidwell

MBUSI acknowledges that throughout Jassen Tidwell's time as a GL, he regularly "had to take on the responsibility of a TL due to manpower issues." (Doc. 133 at 149.) This occurred, according to Tidwell, "probably three out of five days a week," and would be for "the whole shift." (Doc. 135-12 at 19–20.) A TL would fill in for a TM whenever that TM had a vacation day or was sick, and Tidwell would then step into the TL position. When manpower was especially low, he would even take the position of a TM on the line. This happened about once a week, for "like a half a day or something" each week. (*Id.*)

According to the parties' briefs, it is undisputed that "[e]ven when Tidwell would have to fill in for a TM or for a TL, he would maintain his GL duties." (Doc. 146 at 108.) Unlike some of the previously discussed Plaintiffs, however, Tidwell did not retain management responsibilities *while he performed* nonexempt work. When asked, for example, if he would "still check on [his] other areas" while filling in for a TL, Tidwell replied, "No. The Assistant Manager would have to take that role." (Doc. 135-12 at 20.) Tidwell did acknowledge that "even if [he] had to fill in for a Team Leader or Team Member, [he] still had his Group Leader duties." (*Id.* at 45.) He went on to explain, however, that he was referring to his pre- and post-shift GL

activities, such as the morning safety meeting and the paperwork he had to complete for his group. According to Tidwell, he used to be able to work on that paperwork during the day, but then "upper management decided that [he] couldn't do any during production." (*Id.*) As a result, when he worked on the line, he would have to spend "a minimum of [an] hour-and-a-half, two hours casual time every day" in addition. (*Id.*) Accordingly, Tidwell's admission that he "would maintain his GL duties" indicates that he had extra work to do *before and after* his time filling in for TMs and TLs, not that he actively supervised others while filling in. Additionally, the facts do not indicate that Tidwell's work on the line was done by choice. Although his filling in for TMs would "usually be an emergency situation," (Doc. 146 at 108), a once-a-week frequency does not suggest an actual "emergency" as defined by the regulations. *See* 29 C.F.R. 541.706(b)("Emergencies generally occur only rarely, and are events that the employer cannot reasonably anticipate."). Tidwell's time spent filling in for TLs, at a weekly average of "probably three out of five days," indicates that a substantial amount of time was spent in that capacity. Some of the TL duties he performed may have themselves been exempt, but given his situation as a whole, there is at least a genuine question as to whether Tidwell's "primary  duty" was

management. Summary judgment is therefore not appropriate for his claims, which are excluded from the remaining analysis below.

### viii. Customarily Recognized Department or Subdivision

Before moving on to the other three executive exemption requirements, there is one additional issue to consider. To meet the second prong of the four-part test, an employee's "primary duty" must be "management of the enterprise . . . or of *a customarily recognized department or subdivision* thereof." 29 C.F.R. § 541.100(a)(2) (emphasis added). The purpose of this requirement is "to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.103(a). Plaintiffs argue that although GLs are "in charge of a team of people," those teams "change with the needs of production." (Doc. 146 at 124.) They contend that these teams or groups are therefore "not a department or other recognized subdivision." (*Id.*) Plaintiffs assert, for example, that "[w]hile the 'Paint Department' may have a permanent status and continuing function, each of the three to five 'groups' within the Paint Department does not." (*Id.* at 124–25.) Notably, Plaintiffs provide no citations to the record in support of this position. To the contrary, the groups identified in the parties' briefs and the Plaintiffs' depositions all appear to have

distinct and permanent designations. According to authority provided in Plaintiffs' own brief, a "department or subdivision can include small groups of employees . . . within a larger department, such as a group leader of four draftsmen in the gauge section of a much larger department." (Doc. 141 at 523, quoting 69 Fed. Reg. 22122, 22134 (Apr. 23, 2004) (internal quotation omitted)). An identical arrangement prevails at MBUSI, albeit on a larger scale.

Individually, the Plaintiffs certainly treat their groups as "recognized unit[s] with a continuing function," 29 C.F.R. § 541.103(c), in their individual descriptions of them. Together, they appear to tacitly acknowledge this in their "Agreed Upon Undisputed Common Facts." (Doc. 97 ¶ 5 ("Each Production group at MBUSI has a GL. Generally, each GL has a group consisting of one or more teams. Generally, each team is organized with a TL and multiple TMs.")) The record is clear that the groups supervised by GLs are much more than "mere collection[s] of employees assigned from time to time to a specific job," 29 C.F.R. § 541.103(a), and they therefore satisfy the "customarily recognized department or subdivision" requirement. The Court now turns to the remaining three requirements of the executive exemption test.

## 2. Salary Basis

Plaintiffs assert that "as a threshold matter, the 'executive exemption' is inapplicable because GLs were not paid a true salary." (Doc. 146 at 4.) They repeat this point later in their brief: "As a threshold matter, Mercedes' motion must fail because there is a genuine issue of material fact whether GLs are compensated on a true salary basis." (*Id.* at 112.) Plaintiffs are correct that "compensat[ion] on salary basis at a rate of not less than $455 per week" is indeed a threshold question to meeting the executive exemption. *See* 29 C.F.R. § 541.100(a)(1).They neglect to point out, however, that it is a threshold that they have voluntarily and unequivocally crossed. Every one of these Plaintiffs received a Request for Admission posing the following prompt: "[i]n your job as Group Leader at MBUSI, you earn at least $455 per week salary." Each Plaintiff answered with an unadorned "Admit." Moreover, Plaintiffs reinforce this point in their own brief, responding with "undisputed" to each instance of MBUSI's claim that "As a GL, [Plaintiff's name] earns at least $455 per week in salary."[22] Thus, by their own admissions *and* the facts provided in their own brief, Plaintiffs have affirmatively answered this threshold question.

---

[22] (Doc. 146 at 6, 17, 33, 49, & 68.)

Even if this were not enough, this question is now well settled in this Court's previous opinions in this case. (*See, e.g.*, Doc. 71 at 6–9; Doc. 182 at 11–13.) The same analysis applies here with equal force. Plaintiffs once again claim that their compensation was "subject to reduction because of variations in the quality or quantity of the work performed." (Doc. 146 at 113 (quoting 29 C.F.R. § 541.602(a)).) As explained before, this argument fails because it relates solely to Plaintiffs' *overtime* compensation. The regulations specifically provide that "an employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). Plaintiffs do not allege that their actual base salaries were impacted by the number of hours worked, only that it affected their payment for overtime. Because their salaries remained constant regardless of the amounts of overtime earned, MBUSI's choice to provide additional compensation for overtime does not diminish the "salary basis" on which Plaintiffs were paid.

Plaintiffs again attempt to buttress their argument by claiming that "deductions . . . [were] made for absences occasioned by Mercedes or by the operating requirements of the business." (Doc. 146 at 113.) As of 2008, MBUSI does

not build cars at its Alabama plant on Fridays, although some non-production activities apparently still take place. GLs not scheduled to work on these non-production Fridays have various options: they can elect to use a paid vacation day, they can take an unpaid personal day off work, or they can bank their unworked Friday hours against future overtime hours. Plaintiffs argue that this "Friday Bank" procedure requires MBUSI to "count[] hours worked, which violates the whole concept of a fixed salary." (Doc. 146 at 116.)

Plaintiffs continue to confuse the concept of counting hours for purposes of base compensation with counting hours for purposes of calculating overtime above and beyond the fixed salary. As noted above, employers may—but are not required—to provide overtime compensation for exempt, salaried employees. MBUSI's decision to provide overtime in addition to a predetermined salary has no bearing on whether a "salary basis" exists. If MBUSI—of its own accord—chooses to pay an overtime premium, it may also determine how that overtime is paid, so long as employees still receive, in full, their predetermined salaries. There appears to be no dispute that Plaintiffs did receive their full salaries, even when "banking" Friday hours against future overtime. As such, even apart from their own admissions,

Plaintiffs were plainly "[c]ompensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.100(a)(1).

### 3. Directing the Work of Two or More Other Employees

The third prong of the executive exemption test requires an employee to "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). As with the requirements already discussed, Plaintiffs' own admissions do most of the heavy lifting on this issue.

All of the Plaintiffs at issue admit in RFA #1 that, as GLs, they "supervise the team leaders and team members in [their] group[s]."[23] Not only do they "supervise," they specifically admit in RFA #2 that they "give work directions and assignments" to the members of their group.[24] To "supervise" employees and "give work directions" certainly constitutes "directing the work" of those employees. As to whether such direction is "customarily and regularly" done, the phrasing of the RFAs and the record as a whole indicates that directing the work of TMs and TLs is a constant aspect of the  GL position. Nothing in the record would suggest that directing the work of TMs or TLs was  even close to being a mere "isolated or

_____

[23] RFA #1 (Docs. 134-2 at 3, 134-4 at 3, 134-8 at 3, 134-12 at 3, & 135-7 at 3.)

[24] RFA #2 (Docs. 134-4 at 3, 134-8 at 3, 134-12 at 3, & 135-7 at 3). Only one of these Plaintiffs, Steven Campbell, did not admit RFA #2. Campbell does admit, however, that his job as GL includes the duty to "monitor and plan activities." (*See* Doc. 134-1 at 41, 67.)

one-time" occurrence for any of the Plaintiffs at issue. As such, the directing of other employees was "customarily and regularly" performed as defined by the regulations. *See* 29 C.F.R. § 541.701.

Additionally, the required number of "other employees" poses no difficulty. It is undisputed that each GL has a group that "consist[s] of one or more teams." (Doc. 97 at ¶ 5.) Each team, in turn, is generally "organized with a TL and multiple TMs." (*Id.*) Even a GL with the smallest possible group—a single team consisting of just one TL and one TM—would still satisfy the "two or more" requirement. All of the groups, however, appear to be significantly larger, many with dozens of TMs and a handful of TLs.[25] Given all of this, there is no question that each of these Plaintiffs "customarily and regularly directs the work of two or more other employees." 29 C.F.R. § 541.100(a)(3).

### 4. Recommendations Given Particular Weight

The final prong of the executive exemption test is whether each of these Plaintiffs "has the authority to hire or fire other employees," or whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29

---

[25] *See, e.g.*, Doc. 146 at 6 (Campbell, 4 TLs and 25 TMs), 16 (Crawford, 17 TMs), 64 (Fisher, 20 TMs and 4 TLs), etc.

C.F.R. § 541.100(a)(4). MBUSI does not contend that Plaintiffs have the authority to hire or fire, but *does* maintain that their suggestions and recommendations are given "particular weight." Here again the regulations provide a factor-based approach:

> To determine whether an employee's suggestions and recommendations are given ''particular weight,'' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. Once again, Plaintiffs go a long way toward establishing this with their own admissions. Each of them admit that, as part of their jobs as GLs, they "provide an opinion as to whether or not team members and team leaders in [their] group[s] are ready for promotion."[26] The "frequency with which the[se] employee's suggestions and recommendations are relied upon" is clearly seen from MBUSI's own written policies. (*See* Doc. 109-22.) As explained by Marcus Jones, MBUSI's HR Manager, "the GL's assessment of the TM or TL is followed barring exceptional circumstances." (Doc. 109-1 at 9.) Additionally, if a GL gives a TM or TL a negative performance evaluation in any area but attendance, that employee "cannot be

---

[26] RFA #7 (Docs. 134-2 at 4, 134-4 at 4, 134-8 at 4, 134-12 at 4, & 135-7 at 4).

promoted." (*Id.* at 9–10.) Such evaluations by GLs are made part of the employee's personnel file. (*Id.* at 10.)

In addition to Marcus Jones' explanation, each one of the Plaintiffs has personally acknowledged the significant weight given to their opinions regarding promotion. Most of the Plaintiffs agree that if they give a rating of "not satisfactory" to a TM in any area other than attendance, that TM is then "not eligible for promotion."[27] Most also do not dispute that their recommendations for promotion are considered—and normally followed—in determining if a TM or TL will be promoted.[28] Although these GLs do not have the final authority to make hiring or promotion decisions, there is no question that their suggestions and recommendations regarding promotions are given "particular weight." And in addition to their influence in promotion decisions, these Plaintiffs can—at their discretion—take steps that could lead to a team member's termination. In their responses to RFA #10, every one of the Plaintiffs at issue admit that—as GLs—they "have the authority to initiate a Corrective Performance Review on a team member *when [they] deem necessary.*"[29]

---

[27] (Doc. 146 at 13, 21, 36, 74, 106.)

[28] (Doc. 146 at 13–14, 21, 36, 54, 75 & 107.)

[29] RFA #10 (Docs. 134-2 at 4–5, 134-4 at 4–5, 134-8 at 4–5, 134-12 at 4–5, & 135-7 at 4–5).

In their brief, Plaintiffs admit that GLs give performance evaluations and can initiate corrective performance reviews, but argue that such actions "must be approved by an Assistant Manager and HR," and in any case are "only one of several evaluation tools utilized by MBUSI's Management." (Doc. 146 at 126.) But the regulations specifically address this issue. They provide that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105. In light of the relevant factors, there is no question that these Plaintiffs' suggestions and recommendations are given "particular weight."

**V. Conclusion**

Of these twelve Plaintiffs, only two have claims with genuine issues of material fact remaining for trial. MBUSI's motion (Doc. 132) is therefore DENIED as to the claims of James Karpinski and Jassen Tidwell, and GRANTED as to Steven Campbell, Timothy Crawford, Michael Crowley, Robert Fisher, Floyd Franklin, Derek Hendley, Penny Kessler, Gary Oglesby, Frederick Rogers, and Timothy Swindle.  Separate orders consistent with this opinion will be entered.

Done this <u>3rd</u> day of <u>July 2012</u>.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[167037]