FILED
2012 Jul-05  PM 03:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JEFF HICKS, | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | 7:08-cv-0536-LSC |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

## I. Introduction

Before this Court is the seventh in a series of motions for summary judgment filed by Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI").[1] The present motion, filed on November 7, 2011 (Doc. 138), seeks summary judgment as to the claims of just two Plaintiffs who allegedly meet the executive exemption to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act"), because "they admit their primary duty is management and they perform some non-exempt work,

---

[1] This series of motions concerns the Plaintiffs who filed suit together in *Lawson v. MBUSI*, 7:09-cv-1157-LSC, and does not pertain to Jeff Hicks himself. The *Lawson* and *Hicks* cases were consolidated for discovery purposes, and on February 7, 2012, this Court ordered the claims of the individual *Lawson* Plaintiffs to be severed into individual cases. (*Hicks* Doc. 162.) These individual cases remain consolidated for case management purposes under *Hicks*, with the Court continuing to evaluate the already-filed set of summary judgment motions.

Unless otherwise noted, citations to the record are to the document numbers in the *Hicks vs. MBUSI* case, 7:08-cv-0536-LSC. Document numbers preceded by "*Lawson*" reflect the document number assigned in *Lawson v. MBUSI*, 7:09-cv-1157-LSC.

but they decide if they will perform that work or direct TMs to perform the work." (Doc. 138 at 2.) A brief in support of the motion (Doc. 139) was contemporaneously filed. Plaintiffs filed a response to the motion on December 7 (Doc. 148), and MBUSI filed a reply brief on December 28, 2011 (Doc. 153). This motion is now ripe for decision.

## II. Facts[2]

The present motion concerns two Plaintiffs: Maurice Costes and Daniel Fenimore. Both are employed by MBUSI as Group Leaders ("GLs").[3] While employed as GLs, these Plaintiffs have been classified by MBUSI as exempt employees. MBUSI made changes to the overtime policy for exempt employees in February and March of 2005, and again in March of 2006. Following the March 2006 changes, GLs could be paid overtime only after completing five unpaid hours per week of pre- and post-shift work activities designated as "casual time." While overtime would still be paid for extra hours worked on weekends without the casual time

---

[2] The facts set out in this opinion are gleaned from the "Agreed Upon Undisputed Common Facts Applicable to Summary Judgment Motions," (Doc. 97), the undisputed facts in the parties' briefs, as well as the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Additional facts specific to each Plaintiff are addressed in the Court's analysis below.

[3] Each GL has a group which consists of Team Leaders ("TLs") and Team Members ("TMs"). GLs, in turn, typically answer to Assistant Managers ("AMs") and Managers.

requirement, the policy effectively required forty-five hours, rather than forty, to be worked before any weekday overtime could accrue. The "casual time" language was removed from the policy in a revision on April 7, 2008.

On June 10, 2009, a number of GLs and former GLs filed a complaint against MBUSI. The essence of the complaint is that, by mischaracterizing the GLs as exempt, MBUSI was "requiring [them] . . . to work overtime without payment of overtime . . . in violation of the [FLSA]." (*Lawson* Doc. 1 at 9.)

## III. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its

case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.   Discussion

Section 13(a)(1) of the FLSA provides that its minimum-wage and overtime provisions do "not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). As with all FLSA exemptions, the executive exemption is to be "narrowly construed so that it applies to those plainly within its terms and spirit." *Gregory v. First Title of Am., Inc.*,

555 F.3d 1300, 1302 (11th Cir. 2009). In asserting that an exemption applies, "the employer 'bears the burden of proving the applicability of a[n] FLSA exception by clear and affirmative evidence.'" *Id.* (quoting *Klinedinst v. Swift. Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001)).The regulations provide a four-part test for determining whether an employee fits the executive exemption:

> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> > (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
> >
> > (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
> >
> > (3) Who customarily and regularly directs the work of two or more other employees; and
> >
> > (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. Each one of these requirements is a subject of debate between the parties: MBUSI contends that all four are easily demonstrated, and that summary

judgment is therefore appropriate. Plaintiffs hold to the other extreme, that none of

the four can be established and that each one presents genuine issues of material fact.

Despite the breadth of the parties' disagreement, the real crux of the dispute in this

motion is relatively narrow: the "primary duty" of the Plaintiffs. MBUSI argues that

this particular pair of Plaintiffs should be found exempt as a matter law because they

allegedly "admit their primary duty is management and they perform some

non-exempt work, but they decide if they will perform that work or direct TMs to

perform the work." (Doc. 138 at 2.) The Court thus begins its analysis here—with the

second of the four requirements—determining if there is a genuine dispute of material

fact as to whether Plaintiffs' "primary duty is management . . . of a customarily

recognized department or subdivision" of MBUSI. 29 C.F.R. § 541.100(a)(2).

## A. Primary Duty

To meet the executive exemption, "management" must be the employee's

"primary duty." "Management" is defined by the regulations to include:

> [A]ctivities such as interviewing, selecting, and training of
> employees; setting and adjusting their rates of pay and
> hours of work; directing the work of employees;
> maintaining production or sales records for use in
> supervision or control; appraising employees' productivity
> and efficiency for the purpose of recommending
> promotions or other changes in status; handling employee
> complaints and grievances; disciplining employees;

> planning the work; determining the techniques to be used;
> apportioning the work among the employees; determining
> the type of materials, supplies, machinery, equipment or
> tools to be used or merchandise to be bought, stocked and
> sold; controlling the flow and distribution of materials or
> merchandise and supplies; providing for the safety and
> security of the employees or the property; planning and
> controlling the budget; and monitoring or implementing
> legal compliance measures.

29 C.F.R. § 541.102. The term "primary duty" is broadly defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining an employee's "primary duty," the regulations prescribe a variety of factors rather than a bright-line rule. The factors given are:

> [T]he relative importance of the exempt duties as
> compared with other types of duties; the amount of time
> spent performing exempt work; the employee's relative
> freedom from direct supervision; and the relationship
> between the employee's salary and the wages paid to other
> employees for the kind of nonexempt work performed by
> the employee.

29 C.F.R. § 541.700(a). The regulations are clear that these factors, while helpful, are not to be taken as exhaustive. Instead of relying on any set of fixed criteria, each determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id*. As the Eleventh Circuit observed in *Rodriguez v. Farm Stores*, "[w]hen it comes to deciding whether

an employee is an executive within the meaning of the FLSA, the answer is in the details." 518 F.3d 1259, 1264 (11th Cir. 2008).

In looking at these details, the Court pays close attention to the duties of each Plaintiff, specifically their performance of exempt management duties, as well as any nonexempt, nonmanagement duties. Notably, of the four "primary duty" factors provided in § 541.700(a), three factors presuppose that at least *some* nonexempt work is performed. The first is concerned with the importance of nonexempt work as compared to the employee's exempt work, and the second looks to the amount of time spent on each. The fourth factor requires that the employee in question perform nonexempt work in order to identify the wages of comparable employees who perform similar work. Even with a less rigid application of the factors, determining the composition of exempt and nonexempt duties is central to understanding the "character of the employee's job as a whole." Accordingly, the details specific to each Plaintiff are examined below, with a focus on each Plaintiff's management duties in addition to any alleged nonmanagement duties.[4]

---

[4] For each of the Plaintiffs discussed, there are numerous facts supporting management duties that are not included here. Although the Court earnestly attempts to include and discuss nearly every nonmanagement duty that is raised, the recital of exempt management activities are, in the interest of brevity, only a representative sampling. Regardless, the Court has reviewed each of the Plaintiffs' duties, taking them into consideration where appropriate.

### 1. Maurice Costes

In addition to his own testimony, the management duties of Maurice Costes are established in large part by his responses to MBUSI's Requests for Admission ("RFAs"). Rule 36 of the Federal Rules of Civil Procedure provides that such admissions have special weight, unique among the various discovery mechanisms, such that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." FED. R. CIV. P. 36(b). *See also In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001) ("Since Rule 36 admissions, whether express or by default, are conclusive as to the matters admitted, they cannot be overcome at the summary judgement stage by contradictory affidavit testimony or other evidence in the summary judgment record."). In the Eleventh Circuit, it is reversible error for a district court to discount facts that are "conclusively established" through Rule 36 admissions, "even if it '[finds] more credible the evidence of the party against whom the admissions operate.'" *Williams v. City of Dothan*, 818 F.2d 755, 762 (11th Cir. 1987) (quoting *Brooks Village N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 73 (1st Cir. 1982)). Thus, the Court takes the admissions discussed below to be "conclusively established," despite Plaintiffs' efforts to gainsay these admissions in their brief.

In his RFA responses, Costes admitted that he "supervise[s] the team leaders and team members in [his] group," and he "give[s] [them] work directions and assignments." (Doc. 140-2 at 3.) He likewise admitted that he "manage[s] attendance in [his] group," and also "manage[s] vacation scheduling, timekeeping and attendance tracking." (Id.) As a GL, he "direct[s] [his] group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (Id.) He "ensure[s]" that "quality goals are met" and that "company policies and work rules are enforced" in his group. (Id. at 5.) Costes is also responsible for monitoring his area for safety hazards, and he "ensure[s] that [his] group works safely." (Id. at 6.) He admits that he has the authority to "direct training and retraining" as he deems appropriate. (Id.) Costes acknowledges that his job involves the use of discretion, and he "use[s] [his] best judgment" in performing all of his GL duties. (Id. at 7.) He "initiate[s], facilitate[s] and monitor[s] problem solving," and "handle[s] employee issues and conflicts." (Id. at 5–6.) As a GL he also has the authority to "decide when to involve higher management or MBUSI's Team Relations Department" in handling such conflicts. (Id. at 6.) His management responsibilities also include evaluating the performance of his TMs and TLs, and providing an opinion about their readiness for

promotion. (*Id.* at 4.) Conversely, as GL he also "ha[s] the authority to initiate a Corrective Performance Review on a team member when [he] deem[s] necessary," so long as his superiors agree. (*Id.* at 5.)

In addition to these Rule 36 admissions, Costes testified to his management responsibilities in his deposition. He agreed that he "direct[s] team members and team leaders in what they're supposed to be doing." (Doc. 140-1 at 26.) As a GL he "think[s] stragegically," and focuses on strategy for his group. (*Id.*) It is undisputed that "Costes agrees that leadership skills are important for a GL because a GL has to lead TLs and TMs and cannot be afraid to tell people what to do." (Doc. 148 at 7.) He believes that he does "the best job [he] can in overseeing the performance of [his] group." (*Id.* at 9, Doc. 140-1 at 42.) In short, there is abundant evidence of Costes' management duties from his own admissions and testimony.  The remaining question on this issue is whether Costes can point to nonmanagement duties of enough substance to put his "primary duty" in controversy.

The only nonmangement task that Plaintiffs discuss in their arguments is Costes' repair work. Although the frequency of his repair work has varied, the parties agree that he makes repairs from "[t]wenty to thirty times a day." (Doc. 148 at 16.) Depending on the type of repair and the manpower situation, some repairs may take

as little as five seconds to complete. Others can take as long as thirty minutes, although repairs of such length "may only happen once every few weeks." (*Id.*) Plaintiffs argue that the "majority of [Costes'] time is spent performing manual labor," (Doc. 148 at 34), but the facts simply do not support this assertion. In fact, Plaintiffs elsewhere agree that "Costes spends *most of his day* walking up and down the Line communicating with his TLs and TMs." (*Id.* at 15, emphasis added.)

Of course, while the regulations provide that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," this is not always the case. 29 C.F.R. § 541.700(b). The same subsection goes on to clarify that "[t]ime alone is not the sole test." *Id.* An employee who spends a majority of his time on exempt work may yet be nonexempt—or vice versa—if the "other factors support such a conclusion." *Id.* Here, the other relevant factors do not offer any refuge to Plaintiffs. Where both exempt and nonexempt work is involved, the regulations provide that the hallmarks of an exempt employee are "mak[ing] the decision regarding when to perform nonexempt duties" and "remain[ing] responsible for . . . success or failure" while performing such duties. 29 C.F.R. § 541.106(a). Both circumstances are evident here.

The first—making the decision whether to perform the nonexempt work—is easily seen as related to Costes' repair work. Plaintiffs do not dispute that "Costes decides whether a repair can be performed on Line, if he needs to talk to the suppliers about an issue, *if he is going to make the repair himself*, and if the issue is something he should feed back to his TMs." (Doc. 148 at 15, emphasis added.) Costes agrees that when there is a quality issue, he decides "do I fix it myself, do I send a team leader to fix it or do I involve the assistant manager . . . ?" (Doc. 140-1 at 12.) It is clear that Costes' repair work is, at least often, the product of his own choice.

Likewise, it is clear that Costes remains responsible for the success or failure of his group even while making repairs. If he is already on the line when a call comes from the quality department, he decides, "am I going to go investigate it or am I going to send somebody to go investigate it?" (Doc. 140-1 at 12.) The parties agree that even while "Costes is making a repair, he is also directing his TMs." (*Id.* at 16.) Finally, it is undisputed that "Costes is responsible for his group producing a good quality vehicle *no matter what he is doing*." (Doc. 148 at 9, emphasis added.) Thus, the circumstances of his repair work, in addition to the amount of time he spends engaged in it, show that there is no genuine issue concerning Costes' "primary duty."

## 2. Daniel Fenimore

Like Costes, Daniel Fenimore's RFA responses demonstrate a considerable amount of management responsibility. Fenimore admits that he "supervise[s] the team leaders and team members in [his] group," and he "give[s] [them] work directions and assignments." (Doc. 140-4 at 3.) He likewise admits that he "manage[s] attendance in [his] group," and also "manage[s] vacation scheduling, timekeeping and attendance tracking." (*Id.*) As a GL, he "direct[s] [his] group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (*Id.* at 3–4.) He "ensure[s]" that "quality goals are met" and that "company policies and work rules are enforced" in his group. (*Id.* at 5.) Fenimore is also responsible for monitoring his area for safety hazards, and he "ensure[s] that [his] group works safely." (*Id.* at 6.) He admits that he has the authority to "direct training and retraining" as he deems appropriate. (*Id.*) Fenimore acknowledges that his job involves the use of discretion, and he "use[s] [his] best judgment" in performing all of his GL duties. (*Id.* at 7.) He "initiate[s], facilitate[s] and monitor[s] problem solving," and "handle[s] employee issues and conflicts." (*Id.* at 5–6.) As a GL he also has the authority to "decide when to involve higher management or MBUSI's Team Relations Department" in handling

such conflicts. (*Id.* at 6.) His management responsibilities also include evaluating the performance of his TMs and TLs, and providing an opinion about their readiness for promotion. (*Id.* at 4.) Conversely, as GL, Fenimore also "ha[s] the authority to initiate a Corrective Performance Review on a team member when [he] deem[s] necessary." (*Id.* at 5.) In addition to these "conclusively established" admissions, the parties agree that "[a]s GL, Fenimore is responsible for making sure the Company's policies are followed." (Doc. 148 at 20.) Tellingly, Fenimore agrees with MBUSI's summary of the GL position: "I *manage* my line/group as an operational unit and I am responsible for accomplishing our company's goals and targets." (Doc. 140-3 at 26–27, 51, emphasis added.)

Against this evidence of management duties, Plaintiffs point to Fenimore's repair work and production work. They contend that Fenimore "personally fixes the problem when responding to line pulls and works on the production line when there is insufficient manpower." (Doc. 148 at 34.) Both of these reasons are insufficient.

Regarding repair work, Fenimore did say that his response to line pulls is usually to fix a problem that he is capable of fixing himself. (Doc. 140-3 at 23.) He also indicated, however, that he is the one making that decision; depending on the circumstances, he has "the choice of whether or not a team leader fixes it or the team

member fixes it." (*Id.*) He also explained that he himself does not know how to fix every defect that comes up in his group; for some situations, he has to wait for someone with a higher "Circle of Skills level." (*Id.*) In fact, part of Fenimore's job as GL is to try to "strategically place" his group members, with the "best people in different places," in order for them to efficiently respond to such situations. (*Id.*) There is no indication that Fenimore spends a substantial amount of his time making repairs. On the contrary, it is undisputed that "[n]ormally, Fenimore walks up and down the line all day," in order to supervise his group. (Doc. 148 at 23.)

Fenimore does do production work on the line to fill in for others, but appears to do so infrequently at best. When asked how often, as a GL, he actually works a process, Fenimore responded, "Lately, *not any*." (Doc. 140-3 at 24, emphasis added.) While he was GL of another group he spent several days on the line because of a manpower shortage. (*Id.*) But aside from unusual manpower issues, Fenimore testified that there is not "any other reason that [he] would have to work on the line." (*Id.*) Indeed, Plaintiffs do not point to any other time that he has spent doing production work. The possibility of filling in for a manpower shortage—which he undisputedly has not done at all lately—could not possibly be the "principal, main, major or most important duty" that Fenimore performs. 29 C.F.R. § 541.700(a). Thus, neither his

repair work or production work create a genuine issue of material fact concerning his "primary duty."

### 3. Customarily Recognized Department or Subdivision

Before moving on to the other three executive exemption requirements, there is an additional issue to consider. To meet the second prong of the four-part test, an employee's "primary duty" must be "management of the enterprise . . . or of *a customarily recognized department or subdivision* thereof." 29 C.F.R. § 541.100(a)(2) (emphasis added). The purpose of this requirement is "to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.103(a). Plaintiffs argue that although GLs are "in charge of a team of people," those teams "change with the needs of production." (Doc. 148 at 40.) They contend that these teams or groups are therefore "not a department or other recognized subdivision." (*Id.*) Plaintiffs assert, for example, that "[w]hile the 'Paint Department' may have a permanent status and continuing function, each of the three to five 'groups' within the Paint Department does not." (*Id.*) Notably, Plaintiffs provide no citations to the record in support of this position. To the contrary, the groups identified in the parties' briefs and the Plaintiffs' depositions all appear to have distinct and permanent

designations. According to authority provided in Plaintiffs' own brief, a "department or subdivision can include small groups of employees . . . within a larger department, such as a group leader of four draftsmen in the gauge section of a much larger department." (Doc. 148 at 39–40, quoting 69 Fed. Reg. 22122, 22134 (Apr. 23, 2004) (internal quotation omitted)). An identical arrangement prevails at MBUSI, albeit on a larger scale.

Individually, the Plaintiffs certainly treat their groups as "recognized unit[s] with a continuing function," 29 C.F.R. § 541.103(c), in their individual descriptions of them. Together, they appear to tacitly acknowledge this in their "Agreed Upon Undisputed Common Facts." (Doc. 97 ¶ 5 ("Each Production group at MBUSI has a GL. Generally, each GL has a group consisting of one or more teams. Generally, each team is organized with a TL and multiple TMs.")) The record is clear that the groups supervised by GLs are much more than "mere collection[s] of employees assigned from time to time to a specific job," 29 C.F.R. § 541.103(a), and they therefore satisfy the "customarily recognized department or subdivision" requirement. There is thus no dispute that these Plaintiffs meet the "primary duty" prong of the executive exemption test. As Plaintiffs succinctly phrase it in their own

brief, "[a] GL is in charge of a team of people." (Doc. 148 at 40.) The Court now turns to the remaining three requirements.

### B. Salary Basis

Plaintiffs assert that "as a threshold matter, the 'executive exemption' is inapplicable because GLs were not paid a true salary." (Doc. 148 at 5.) They repeat this point later in their brief: "As a threshold matter, Mercedes' motion must fail because there is a genuine issue of material fact whether GLs are compensated on a true salary basis." (*Id.* at 28.) Plaintiffs are correct that "compensat[ion] on salary basis at a rate of not less than $455 per week" is indeed a threshold question to meeting the executive exemption. *See* 29 C.F.R. § 541.100(a)(1).They neglect to point out, however, that it is a threshold that they have voluntarily and unequivocally crossed. Every one of these Plaintiffs received a Request for Admission posing the following prompt: "[i]n your job as Group Leader at MBUSI, you earn at least $455 per week salary." Each Plaintiff answered with an unadorned "Admit." (Doc. 140-2 at 11, Doc. 140-4 at 10.) By their own admissions, Plaintiffs have affirmatively answered this threshold question.

Even if this were not enough, this question is now well settled by this Court's previous opinions in this case. (*See, e.g.*, Doc. 71 at 6–9; Doc. 182 at 11–13.) The same

analysis applies here with equal force. Plaintiffs once again claim that their compensation was "subject to reduction because of variations in the quality or quantity of the work performed." (Doc. 148 at 28 (quoting 29 C.F.R. § 541.602(a)).) As explained before, this argument fails because it relates solely to Plaintiffs' *overtime* compensation. The regulations specifically provide that "an employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). Plaintiffs do not allege that their actual base salaries were impacted by the number of hours worked, only that it affected their payment for overtime. Because their salaries remained constant regardless of the amounts of overtime earned, MBUSI's choice to provide additional compensation for overtime does not diminish the "salary basis" on which Plaintiffs were paid.

Plaintiffs again attempt to buttress their argument by claiming that "deductions . . . [were] made for absences occasioned by Mercedes or by the operating requirements of the business."(Doc. 148 at 28.) As of 2008, MBUSI does not build cars at its Alabama plant on Fridays, although some non-production activities apparently still take place. GLs not scheduled to work on these non-

production Fridays have various options: they can elect to use a paid vacation day, they can take an unpaid personal day off work, or they can bank their unworked Friday hours against future overtime hours. Plaintiffs argue that this "Friday Bank" procedure requires MBUSI to "count[] hours worked, which violates the whole concept of a fixed salary." (Doc. 148 at 31.)

Plaintiffs continue to confuse the concept of counting hours for purposes of base compensation with counting hours for purposes of calculating overtime above and beyond the fixed salary. As noted above, employers may—but are not required—to provide overtime compensation for exempt, salaried employees. MBUSI's decision to provide overtime in addition to a predetermined salary has no bearing on whether a "salary basis" exists. If MBUSI—of its own accord—chooses to pay an overtime premium, it may also determine how that overtime is paid, so long as employees still receive, in full, their predetermined salaries. There appears to be no dispute that Plaintiffs did receive their full salaries, even when "banking" Friday hours against future overtime. As such, even apart from their own admissions, Plaintiffs were plainly "[c]ompensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.100(a)(1).

## C. Directing the Work of Two or More Other Employees

The third prong of the executive exemption test requires an employee to "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). As with the requirements already discussed, Plaintiffs' own admissions do most of the heavy lifting on this issue.

Both Costes and Fenimore admit in RFA #1 that, as GLs, they "supervise the team leaders and team members in [their] group[s]." (Doc. 140-2 at 3, Doc. 140-4 at 3.) Not only do they "supervise," they specifically admit in RFA #2 that they "give work directions and assignments" to the members of their group. (*Id.*) To "supervise" employees and "give work directions" certainly constitutes "directing the work" of those employees. Additionally, both Plaintiffs' depositions are replete with instances of directing the work of their subordinates. (*See, e.g.*, Doc. 140-1 at 16–17, 23, 26; Doc. 140-3 at 17, 19, 21–23.)

As to whether such direction is "customarily and regularly" done, the phrasing of the RFAs and the record as a whole indicates that directing the work of TMs and TLs is a constant aspect of the GL position. Nothing in the record would suggest that directing the work of TMs or TLs was  even close to being a mere "isolated or one-time" occurrence for either of the Plaintiffs at issue. Rather, both Costes and

Fenimore testified that they spend most of their time walking their respective lines, directing the work of TMs and TLs as necessary. As such, the directing of other employees was certainly "customarily and regularly" performed as defined by the regulations. *See* 29 C.F.R. § 541.701.

Additionally, the required number of "other employees" poses no difficulty. It is undisputed that each GL has a group that "consist[s] of one or more teams." (Doc. 97 at ¶ 5.) Each team, in turn, is generally "organized with a TL and multiple TMs." (*Id.*) Even a GL with the smallest possible group—a single team consisting of just one TL and one TM—would still satisfy the "two or more" requirement. Both Costes and Fenimore had considerably more than this throughout their time as GLs. (Doc. 148 at 6, 17.) Given all of this, there is no question that both of these Plaintiffs "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3).

## D. Recommendations Given Particular Weight

The final prong of the executive exemption test is whether each of these Plaintiffs "has the authority to hire or fire other employees," or whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29

C.F.R. § 541.100(a)(4). MBUSI does not contend that Plaintiffs have the authority to hire or fire, but *does* maintain that their suggestions and recommendations are given "particular weight." Here again the regulations provide a factor-based approach:

> To determine whether an employee's suggestions and recommendations are given ''particular weight,'' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. Once again, Plaintiffs go a long way toward establishing this with their own admissions. Each of them admit that, as part of their jobs as GLs, they "provide an opinion as to whether or not team members and team leaders in [their] group[s] are ready for promotion." (Doc. 140-2 at 4, Doc. 140-4 at 4.) The "frequency with which the employee's suggestions and recommendations are relied upon" is clearly seen from MBUSI's own written policies. (*See* Doc. 109-22.) As explained by Marcus Jones, MBUSI's HR Manager, "the GL's assessment of the TM or TL is followed barring exceptional circumstances." (Doc. 109-1 at 9.) Additionally, if a GL gives a TM or TL a negative performance evaluation in any area but attendance, that employee "cannot be promoted." (*Id.* at 9–10.) Such evaluations by GLs are made part of the employee's personnel file. (*Id.* at 10.)

In addition to Marcus Jones' explanation, both of these Plaintiffs have personally acknowledged the significant weight given to their opinions regarding promotion. Costes agrees that to even "be considered for a promotion, a team member has to have a satisfactory evaluation." (Doc. 140-1 at 29.) Likewise, Plaintiffs concede that a "not satisfactory" rating from Fenimore will destroy that group member's eligibility for promotion. (Doc. 148 at 20.) Plaintiffs also agree that "Fenimore's opinion on whether a TM or TL should be promoted normally is followed." (*Id.*) Although Costes and Fenimore do not have the final authority to make hiring or promotion decisions, there is no question that their suggestions and recommendations regarding promotions are given "particular weight." And in addition to their influence in promotion decisions, these Plaintiffs can—at their discretion—take steps that could lead to a team member's termination. They "have the authority to *initiate* a Corrective Performance Review on a team member *when [they] deem necessary*." (Doc. 140-2 at 4–5, Doc. 140-4 at 4–5, emphasis added.)

In their brief, Plaintiffs admit that GLs give performance evaluations and can initiate corrective performance reviews, but argue that such actions "must be approved by an Assistant Manager and HR," and in any case are "only one of several evaluation tools utilized by MBUSI's Management." (Doc. 148 at 41.) But the

regulations specifically address this issue. The relevant section provides that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105. In light of the relevant factors, there is no question that these Plaintiffs' suggestions and recommendations are given "particular weight."

## V. Conclusion

There are no genuine issues of material fact concerning the claims of either Costes or Fenimore, since both meet all of the requirements of the executive exemption to the FLSA. MBUSI's motion (Doc. 138) is therefore due to be GRANTED. Separate orders consistent with this opinion will be entered.

Done this 5th day of July 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

[167037]