IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JEFF HICKS, | ) | |
| Plaintiff; | ) | |
| | ) | |
| vs. | ) | 7:08-cv-0536-LSC |
| | ) | |
| MERCEDES-BENZ U.S. | ) | |
| INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

## I. Introduction

Before this Court is the eighth in a series of summary-judgment motions filed by Defendant Mercedes-Benz U.S. International, Inc. ("MBUSI").[1] The present motion, filed on November 21, 2011 (Doc. 143), seeks summary judgment as to the claims of just two Plaintiffs who are allegedly exempt under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act"), because they fit "the executive, administrative and combination exemptions" to the FLSA. (Doc. 143 at 2.) A brief

---

[1] This series of motions concerns the Plaintiffs who filed suit together in *Lawson v. MBUSI*, 7:09-cv-1157-LSC, and does not pertain to Jeff Hicks himself. The *Lawson* and *Hicks* cases were consolidated for discovery purposes, and on February 7, 2012, this Court ordered the claims of the individual *Lawson* Plaintiffs to be severed into individual cases. (*Hicks* Doc. 162.) These individual cases remain consolidated for case management purposes under *Hicks*, with the Court continuing to evaluate the already-filed set of summary judgment motions.

Unless otherwise noted, citations to the record are to the document numbers in the *Hicks vs. MBUSI* case, 7:08-cv-0536-LSC. Document numbers preceded by "*Lawson*" reflect the document number assigned in *Lawson v. MBUSI*, 7:09-cv-1157-LSC.

in support of the motion (Doc. 144) was contemporaneously filed. Plaintiffs filed a brief in response to the motion on December 21, 2011 (Doc. 150), and MBUSI filed a reply brief on January 11, 2012 (Doc. 160). This motion is now ripe for decision.

## II. Facts[2]

The present motion concerns two Plaintiffs: Don Fillmore and Michael Price. Both are employed by MBUSI as Group Leaders ("GLs").[3] While employed as GLs, these Plaintiffs have been classified by MBUSI as exempt employees. MBUSI made changes to the overtime policy for exempt employees in February and March of 2005, and again in March of 2006. Following the March 2006 changes, GLs could be paid overtime only after completing five unpaid hours per week of pre- and post-shift work activities designated as "casual time." While overtime would still be paid for extra hours worked on weekends without the casual time requirement, the policy effectively required forty-five hours, rather than forty, to be worked before any weekday overtime

---

[2] The facts set out in this opinion are gleaned from the "Agreed Upon Undisputed Common Facts Applicable to Summary Judgment Motions," (Doc. 97), the undisputed facts in the parties' briefs, as well as the Court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). Additional facts specific to each Plaintiff are addressed in the Court's analysis below.

[3] Each GL has a group which consists of Team Leaders ("TLs") and Team Members ("TMs"). GLs, in turn, typically answer to Assistant Managers ("AMs") and Managers.

could accrue. The "casual time" language was removed from the policy in a revision on April 7, 2008.

On June 10, 2009, a number of GLs and former GLs filed a complaint against MBUSI. The essence of the complaint is that, by mischaracterizing the GLs as exempt, MBUSI was "requiring [them] . . . to work overtime without payment of overtime . . . in violation of the [FLSA]." (*Lawson* Doc. 1 at 9.)

## III. Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23. In

evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the movant has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

## IV.   Discussion

Section 13(a)(1) of the FLSA provides that its minimum-wage and overtime provisions do "not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The first two of these are at issue here. MBUSI contends that Fillmore and Price, throughout their time as GLs, satisfy the criteria for the "executive exemption." They also argue that, for limited periods of time, both Plaintiffs have also met the requirements of the

"administrative exemption." To the extent that these overlap, MBUSI relies on the "combination exemption" doctrine, whereby "work that is exempt under one section of this part will not defeat the exemption under any other section." 29 C.F.R. § 541.708.

As with all FLSA exemptions, each one of these is to be "narrowly construed so that it applies to those plainly within its terms and spirit." *Gregory v. First Title of Am., Inc.,* 555 F.3d 1300, 1302 (11th Cir. 2009). In asserting that an exemption applies, "the employer 'bears the burden of proving the applicability of a[n] FLSA exception by clear and affirmative evidence.'" *Id.* (quoting *Klinedinst v. Swift. Invs., Inc.*, 260 F.3d 1251, 1254 (11th Cir. 2001)). The Court will address the executive and administrative exemptions in turn.

## A. Executive Exemption

The regulations provide a four-part test for determining whether an employee fits the executive exemption:

> (a) The term ''employee employed in a bona fide executive capacity'' in section 13(a)(1) of the Act shall mean any employee:
>
> > (1) Compensated on a salary basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. Each one of these requirements is a subject of debate between the parties: MBUSI contends that all four are easily demonstrated, and that summary judgment is therefore appropriate. Plaintiffs hold to the other extreme, that none of the four can be established and that each one presents genuine issues of material fact. Each of the four requirements is addressed in turn below.

### 1. Salary Basis

Plaintiffs assert that "as a threshold matter, the 'executive exemption' is inapplicable because GLs were not paid a true salary." (Doc. 150 at 6.) They repeat this point later in their brief: "As a threshold matter, Mercedes' motion must fail because there is a genuine issue of material fact whether GLs are compensated on a true salary basis." (*Id.* at 34.) Plaintiffs are correct that "compensat[ion] on salary

basis at a rate of not less than $455 per week" is indeed a threshold question to meeting the executive exemption, and constitutes the first of its four requirements. *See* 29 C.F.R. § 541.100(a)(1). They neglect to point out, however, that it is a threshold that they have voluntarily and unequivocally crossed. In discovery, both of these Plaintiffs received a Request for Admission posing the following prompt: "[i]n your job as Group Leader at MBUSI, you earn at least $455 per week salary." Both answered with an unadorned "Admit." (Doc. 145-2 at 11, Doc. 145-5 at 11.) By their own admissions, Plaintiffs have affirmatively answered this threshold question.

Even if this were not enough, this question is already well settled by this Court's previous opinions in this case. (*See, e.g.*, Doc. 71 at 6–9; Doc. 182 at 11–13.) The same analysis applies here with equal force. Plaintiffs once again claim that their compensation was "subject to reduction because of variations in the quality or quantity of the work performed." (Doc. 150 at 34 (quoting 29 C.F.R. § 541.602(a)).) As explained before, this argument fails because it relates solely to Plaintiffs' *overtime* compensation. The regulations specifically provide that "an employer may provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis."

29 C.F.R. § 541.604(a). Plaintiffs do not allege that their actual base salaries were impacted by the number of hours worked, only that it affected their payment for overtime. Because their salaries remained constant regardless of the amounts of overtime earned, MBUSI's choice to provide additional compensation for overtime does not diminish the "salary basis" on which Plaintiffs were paid.

Plaintiffs again attempt to buttress their argument by claiming that "deductions . . . [were] made for absences occasioned by Mercedes or by the operating requirements of the business."(Doc. 150 at 34.) As of 2008, MBUSI does not build cars at its Alabama plant on Fridays, although some non-production activities apparently still take place. GLs not scheduled to work on these non-production Fridays have various options: they can elect to use a paid vacation day, they can take an unpaid personal day off of work, or they can bank their unworked Friday hours against future overtime hours. Plaintiffs argue that this "Friday Bank" procedure requires MBUSI to "count[] hours worked, which violates the whole concept of a fixed salary." (Doc. 150 at 37.)

Plaintiffs continue to confuse the concept of counting hours for purposes of base compensation with counting hours for purposes of calculating overtime *above and beyond* the fixed salary. As noted above, employers may—but are not required—to

provide overtime compensation for exempt, salaried employees. MBUSI's decision to provide overtime in addition to a predetermined salary has no bearing on whether a "salary basis" exists. If MBUSI—of its own accord—chooses to pay an overtime premium, it may also determine how that overtime is paid, so long as employees still receive, in full, their predetermined salaries. There appears to be no dispute that Plaintiffs did receive their full salaries, even when "banking" Friday hours against future overtime. As such, even apart from their own admissions, Plaintiffs were plainly "[c]ompensated on a salary basis at a rate of not less than $455 per week." 29 C.F.R. § 541.100(a)(1).

### 2. Primary Duty

To meet the executive exemption, "management" must be the employee's "primary duty." "Management" is defined by the regulations to include:

> [A]ctivities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and

> sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. The term "primary duty" is broadly defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining an employee's "primary duty," the regulations prescribe a variety of factors rather than a bright-line rule. The factors given are:

> [T]he relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a). The regulations are clear that these factors, while helpful, are not to be taken as exhaustive. Instead of relying on any set of fixed criteria, each determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* As the Eleventh Circuit observed in *Rodriguez v. Farm Stores*, "[w]hen it comes to deciding whether an employee is an executive within the meaning of the FLSA, the answer is in the details." 518 F.3d 1259, 1264 (11th Cir. 2008).

In looking at these details, the Court pays close attention to the duties of each Plaintiff, specifically their performance of exempt management duties, as well as any nonexempt, nonmanagement duties. Notably, of the four "primary duty" factors provided in § 541.700(a), three factors presuppose that at least *some* nonexempt work is performed. The first is concerned with the importance of nonexempt work as compared to the employee's exempt work, and the second looks to the amount of time spent on each. The fourth factor requires that the employee in question perform nonexempt work in order to identify the wages of comparable employees who perform similar work. Even with a less rigid application of the factors, determining the composition of exempt and nonexempt duties is still central to understanding the "character of the employee's job as a whole." Accordingly, the details specific to each Plaintiff are examined below, with a focus on each Plaintiff's management duties in addition to any alleged nonmanagement duties.[4]

### i. Don Fillmore

Don Fillmore was promoted to GL in 1998 or 1999. (Doc. 150 at 7.) His first GL assignment was with a Quality Group in the Body Shop. He moved to the Body and

---

[4] For each of the Plaintiffs discussed, there are numerous facts supporting management duties that are not included here. Although the Court earnestly attempts to include and discuss nearly every nonmanagement duty that is raised, the recital of exempt management activities are, in the interest of brevity, only a representative sampling. Regardless, the Court has reviewed each of the Plaintiffs' duties, taking them into consideration where appropriate.

Paint Shop in Plant 2 when it opened in 2004, and then—"around 2008"—he went on to become GL over Quality in Plant 1 Assembly. (*Id.*) Most recently, in 2009, Fillmore "became GL for the Audit Area in Plant 1 for Quality." (*Id.*) In the Audit Area, "Fillmore's group is auditing vehicles that have been completed or that are in the process of being built." (*Id.* at 14.)

The extent of Don Fillmore's management duties, throughout his time as GL, are established in large part by his own responses to MBUSI's Requests for Admission ("RFAs"). Rule 36 of the Federal Rules of Civil Procedure provides that such admissions have special weight, unique among the various discovery mechanisms, such that "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." FED. R. CIV. P. 36(b). *See also In re Carney*, 258 F.3d 415, 420 (5th Cir. 2001) ("Since Rule 36 admissions, whether express or by default, are conclusive as to the matters admitted, they cannot be overcome at the summary judgement stage by contradictory affidavit testimony or other evidence in the summary judgment record."). In the Eleventh Circuit, it is reversible error for a district court to discount facts that are "conclusively established" through Rule 36 admissions, "even if it '[finds] more credible the evidence of the party against whom the admissions operate.'" *Williams v. City of*

*Dothan*, 818 F.2d 755, 762 (11th Cir. 1987) (quoting *Brooks Village N. Assocs. v. General Elec. Co.*, 686 F.2d 66, 73 (1st Cir. 1982)). Thus, the Court takes the admissions discussed below to be "conclusively established," despite Plaintiffs' attempts to dispute or downplay these admissions in their brief.

In his RFA responses, Fillmore admitted[5] that he "supervise[s] the team leaders and team members in [his] group," and he "give[s] [them] work directions and assignments." (Doc. 145-2 at 3.) He likewise admitted that he "manage[s] attendance in [his] group," and also "manage[s] vacation scheduling, timekeeping and attendance tracking." (*Id.*) As a GL, he "direct[s] [his] group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (*Id.* at 3–4.) He "ensure[s]" that "quality goals are met" and that "company policies and work rules are enforced"

---

[5] To many of these RFAs, Fillmore responded with a simple "Admit." To some RFAs, however, he provided evasive nonresponses. For example, in response to RFA #1, which states, "In your job as Group Leader at MBUSI, you supervise the team leaders and team members in your group," Fillmore responded, "Plaintiff admits to following verbal and written guidelines set forth by management and Human Resources at MBUSI." (Doc. 145-2 at 3.)

Such responses still constitute admissions, for two reasons. First, by admitting to following MBUSI's "verbal and written guidelines," Fillmore ratify's MBUSI's account of his job — for instance, that he was tasked at one point with "managing both Paint Shops," and that as GL he is expected to "think strategically and establish direction." (Doc. 145-1 at 57.) Second, such responses constitute "defective answers," since they fail to respond directly to the prompt with one of the responses permitted by FED. R. CIV. P. 36(a)(4)–(5) (requiring a response to admit, deny, assert lack of knowledge after reasonable inquiry, or object to the stated matter). Such "defective answers" are properly considered admissions by the Court. *See* FED. R. CIV. P. 36(a)(4) advisory committee notes ("Rule 36 . . . seems to contemplate that defective answers bring about admissions just as effectively as if no answer had been served.").

in his group. (*Id.* at 5.) Fillmore is also responsible for monitoring his area for safety hazards, and he "ensure[s] that [his] group works safely." (*Id.* at 6.) He admits that he has the authority to "direct training and retraining" as he deems appropriate. (*Id.*) Fillmore acknowledges that his job as GL involves the use of discretion, and he "use[s] [his] best judgment" in performing all of his GL duties. (*Id.* at 7.) As a GL he is required to "initiate, facilitate and monitor problem solving in [his] group," and to "handle employee issues and conflicts." (*Id.* at 5–6.) As a GL he also has the authority to "decide when to involve higher management or MBUSI's Team Relations Department" in handling such conflicts. (*Id.* at 6.) His management responsibilities include evaluating the performance of his TMs and TLs, and providing an opinion about their readiness for promotion. (*Id.* at 4.) Conversely, as GL he also "ha[s] the authority to initiate a Corrective Performance Review on a team member when [he] deem[s] necessary." (*Id.* at 5.) Importantly, Plaintiffs agree that "[a] Manager or AM is not always present in Fillmore's group, and *he leads his group independently of his Manager or AM* based on Company guidelines." (*Id.* at 9, Doc. 150 at 8, emphasis added.)

These admissions, taken together, "conclusively establish" a substantial degree of management work on Fillmore's part. Notably, the admissions are all addressed to

Fillmore's GL position as a whole, without distinction between the various areas in which he has worked in that capacity—including his most recent assignment to the "Audit Area." The remaining question, then, is whether Fillmore performs sufficient *non*management work to put his "primary duty" in controversy.

Plaintiffs argue that this is precisely the case—that "[t]he majority of [Fillmore's] time is spent performing manual labor on the line checking quality and performing clerical work." (Doc. 150 at 40.) They rely on two specific instances of such work. First, they allege that Fillmore, while a GL over Quality in the Paint and Body areas, spent an average of "three to four hours per day" working the line at the direction of his superiors. (*Id.*) Second, they contend that he now "spends a large portion of his day in the Audit area doing data entry." (*Id.*)

Fillmore *did* testify that he would spend, on average, "[p]robably three or four hours" a day checking quality on the line in the Paint and Body areas. This three-to-four hour estimate is the product of "factor[ing] in all the timeframes," since Fillmore would be "bouncing from line to line" throughout the day, interspersed with his other duties. (Doc 145-1 at 51.) But even if Fillmore worked exactly forty hours each week, a period of "three or four hours per day" would still not constitute "the majority" of Fillmore's time. Of course, in reality it constitutes an even smaller percentage, since

Fillmore's claims against MBUSI are premised on him working *over* forty hours. Moreover, Fillmore's three-to-four hour figure appears to refer especially to his work in Plant 1; there were "more breakdowns in Plant 1" because "it's such an old shop." (*Id.* at 50.) His work in Plant 1, however, predated the opening of Plant 2 in 2004, and would be outside the statute of limitations. (*Id.* at 9; *see* Doc. 163.) Throughout the relevant time period, there is no question that Fillmore's quality checking occupied less than half of his time.

Of course, while the regulations provide that "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," there are exceptions; "[t]ime alone is not the sole test." 29 C.F.R. § 541.700(b). *Id.* Employees who spend a majority of their time on exempt work may yet be nonexempt—or vice versa—if the "other factors support such a conclusion." *Id.* Where both exempt and nonexempt work is involved, such factors include determining whether employees "make the decision regarding when to perform nonexempt duties" or "remain responsible for . . . success or failure" even while performing such duties. 29 C.F.R. § 541.106(a). The first of these factors somewhat favors Plaintiffs position; Fillmore testified that he generally worked on the line at the request of his AM. (Doc. 145-1 at 51.) At times, however, he himself chose to work the

line in his TMs' place because he "wanted them to go to lunch on time." (*Id.* at 50.) The second factor does *not* favor Plaintiffs; whatever else he may be doing at a given moment, Fillmore "ensure[s] that quality goals are met in [his] group." (Doc. 145-2 at 5.) Other factors also point to Fillmore's exempt status. Notably, his work on the line was always to cope with exigencies of various degrees: Fillmore only checked quality on the line when there were "breakdowns," or "[d]uring lunch breaks or when people are out," or when extra help is needed, and a TM makes a "request to [Fillmore's] boss that, hey, I need Don to come up and help support us." (*Id.* at 50–51.) Thus, the circumstances in which Fillmore worked on the line—in addition to the time he spent doing it, and the other factors—conflict with Plaintiffs' contention that quality checking could reasonably be considered his "primary duty."

Plaintiffs' second proffer of allegedly nonmanagement work is that Fillmore "spends a large portion of his day in the Audit area doing data entry." (Doc. 150 at 40.) Plaintiffs cite three portions of Fillmore's deposition in support of this assertion, but only one specifically addresses the amount of time spent "entering the summary data and all of that." (Doc. 145-1 at 23.) The amount of time it takes "depend[s] on how many issues [they] have in the day." (*Id.*) At the least, it is "maybe 45 minutes to an hour," and on a busier day would be "an hour to two hours." (*Id.*) Even at the

high end of this range, data entry occupies a relatively small portion of Fillmore's workday. Consistent with this, Fillmore testified that supervising his group actually predominates his work in the Audit area. He is frequently called by his group members "when they find an issue," and they look to him for direction in dealing with problematic situations. (Doc. 145-1 at 26.) In his own words, Fillmore responds to such calls and looks at issues "all day throughout the day at any time of day." (*Id.*)

Even if data entry consumed more of his time, it would still pose no threat to the primacy of Fillmore's management duties. Rather, data entry is itself a part of managing his group: "So we compile all this data, and then that's how we keep up in terms of who turned in this stuff who doesn't." (Doc. 145-1 at 21–22.) Keeping such records for subordinates "is work directly and closely related to an exempt executive's function of managing a department and supervising employees." 29 C.F.R. § 541.703(b)(1). Thus, Fillmore's data entry does not genuinely put his "primary duty" in controversy.

In light of Fillmore's admissions and the analysis above, both of Plaintiffs' arguments fail to create a genuine question concerning Fillmore's "primary duty." Even if there were some doubt, Plaintiffs' own brief would settle it. They do not dispute that "Fillmore's primary duty as a GL is to follow the rules and guidelines and

to give the TMS in his group feedback so that they can follow the rules, guidelines and SMPs." (Doc. 150 at 9.) Specifically, Plaintiffs' agree that "[t]he main part of Fillmore's primary duty is *to ensure that the TMs*" are correctly performing their jobs. (*Id.* at 10.) Fillmore's "primary duty" is unquestionably the management of his group.

### ii. Michael Price

Like Fillmore, Michael Price's RFA responses demonstrate a considerable amount of management responsibility. Price admits that he "supervise[s] the team leaders and team members in [his] group," and he "give[s] [them] work directions and assignments." (Doc. 145-5 at 3.) He likewise admits that he "manage[s] attendance in [his] group," and also "manage[s] vacation scheduling, timekeeping and attendance tracking." (*Id.*) As a GL, he "direct[s] [his] group in meeting the Company's objectives for safety, product quality, accuracy, productivity, cost reduction, housekeeping, efficiency, training and team harmony." (*Id.* at 3.) He "ensure[s]" that "quality goals are met" and that "company policies and work rules are enforced" in his group. (*Id.* at 5.) Price is also responsible for monitoring his area for safety hazards, and he "ensure[s] that [his] group works safely." (*Id.* at 6.) He admits that he has the authority to "direct training and retraining" as he deems appropriate. (*Id.*) Price acknowledges that his job involves the use of discretion, and

he "use[s] [his] best judgment" in performing all of his GL duties. (*Id.* at 7.) He "initiate[s], facilitate[s] and monitor[s] problem solving," and "handle[s] employee issues and conflicts." (*Id.* at 5–6.) As a GL he also has the authority to "decide when to involve higher management or MBUSI's Team Relations Department" when handling such conflicts. (*Id.* at 6.) His management responsibilities include evaluating the performance of his TMs and TLs, and providing an opinion about their readiness for promotion. (*Id.* at 4.) Conversely, Price also "ha[s] the authority to initiate a Corrective Performance Review on a team member when [he] deem[s] necessary." (*Id.* at 5.) As with Fillmore, Price admits that a Manager or AM is not always present in his group, and he leads his group "independently of [his] Manager or AM." (*Id.* at 9.)

Against the evidence of his management duties, Plaintiffs point to Price's quality checking work while on the Z-2 and Z-3.2 lines. (Doc. 150 at 40.) They contend that Price was "directed by Vice President Phil Johnson to be at the end of the line checking quality." (*Id.*) In his deposition, Price did testify that Johnson "wanted me in the last station checking quality coming off that line." (Doc. 145-3 at 30.) This assignment, however, did not supplant his other duties; instead, it was a substitute for Price sitting in the "team room" when not otherwise engaged.

According to Price, "I was told that they didn't pay me to have my ass in the chair." (*Id.*) But it was only if he "wasn't called away from that station" that he would actually be checking quality; throughout the day he would get calls about problems, then "address the issue and come back." (*Id.* at 30–31.) It is undisputed that Price "was instructed to walk throughout his group and observe the performance of his TMs and TLs throughout the day." (Doc. 150 at 27.) This is true of all the "various groups in which he has been GL." (*Id.*) As it happened, Price "spen[t] *most* of his time walking throughout the different areas and observing the TMs' performance and addressing any issues that arose." (*Id.* at 27–28.) And even while Price was at the end of the line, checking quality, he was still held accountable for the quality and performance of his group. (*Id.* at 21; Doc. 145-3 at 31.) Price's quality checking at the end of the line took a back seat to the management of his group, and clearly was not his "principal, main, major or most important duty." 29 C.F.R. § 541.700. Instead, the management of his group constituted his "primary duty" as a GL—with one notable exception.

In June of 2009, Price was assigned to the 166 Project Team, a special group tasked with designing and obtaining equipment used to produce new vehicles. Members of the 166 Project Team are drawn from "production, engineering,

maintenance, different aspects of the plant," with one or two employees from each area. (Doc. 145-3 at 20–21.) Although Price was still classified as a GL while on the 166 Project team, he "did not have any TMs in his group" at that time. (Doc. 150 at 19.) Instead, "he had a desk and an office, and he was in charge of making sure that all aspects of the Production side were looked at with respect to the new vehicle." (*Id.*) Without group members to manage, it can hardly be supposed that Price's "primary duty" at this time was management. As part of his role on the 166 Project Team, Price did apparently supervise groups of TMs on short-term trips to Germany, but the record does not establish exactly how much of his time on the 166 Project Team was spent on such trips, or the extent of his management duties while there. At the very least, there is a genuine issue of material fact as to Price's "primary duty" while on the 166 Project Team.

### iii. Customarily Recognized Department or Subdivision

Before moving on to the other three executive exemption requirements, there is one additional issue to consider. To meet the second prong of the four-part test, an employee's "primary duty" must be "management of the enterprise . . . or of *a customarily recognized department or subdivision* thereof." 29 C.F.R. § 541.100(a)(2) (emphasis added). The purpose of this requirement is "to distinguish between a mere

collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." 29 C.F.R. § 541.103(a). Plaintiffs argue that although GLs are "in charge of a team of people," those teams "change with the needs of production."(Doc. 148 at 40.) They contend that these teams or groups are therefore "not a department or other recognized subdivision." (*Id.*) Plaintiffs assert, for example, that "[w]hile the 'Paint Department' may have a permanent status and continuing function, each of the three to five 'groups' within the Paint Department does not." (*Id.*) Notably, Plaintiffs provide no citations to the record in support of this position. To the contrary, the groups identified in the parties' briefs and the Plaintiffs' depositions—like Body and Paint, Z-2, Z-3, Dent Doctor—all appear to have distinct and permanent designations. According to authority provided in Plaintiffs' own brief, a "department or subdivision can include small groups of employees . . . within a larger department, such as a group leader of four draftsmen in the gauge section of a much larger department." (Doc. 148 at 39–40, quoting 69 Fed. Reg. 22122, 22134 (Apr. 23, 2004) (internal quotation omitted)). An identical arrangement prevails at MBUSI, albeit on a larger scale.

Individually, the Plaintiffs certainly treat their groups as "recognized unit[s] with a continuing function,"29 C.F.R. § 541.103(c), in their individual descriptions

of them. They also appear to tacitly acknowledge this in their "Agreed Upon Undisputed Common Facts." (Doc. 97 ¶ 5 ("Each Production group at MBUSI has a GL. Generally, each GL has a group consisting of one or more teams. Generally, each team is organized with a TL and multiple TMs.")). It is clear that the groups supervised by these GLs are much more than "mere collection[s] of employees assigned from time to time to a specific job," 29 C.F.R. § 541.103(a), and they therefore satisfy the "customarily recognized department or subdivision" requirement. There is therefore no real dispute that these Plaintiffs meet the "primary duty" prong of the executive exemption test, except for Price's time on the 166 Project Team. Otherwise, as Plaintiffs succinctly phrase it in their own brief, "[a] GL is in charge of a team of people." (Doc. 150 at 46.) The Court now turns to the remaining three requirements.

### 3. Directing the Work of Two or More Other Employees

The third prong of the executive exemption test requires an employee to "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3). As with the requirements already discussed, Fillmore and Price made admissions which fulfill this requirement.

Both Fillmore and Price admit in RFA #1 that, as GLs, they "supervise the team leaders and team members in [their] group[s]." (Doc. 145-2 at 3, Doc. 145-5 at 3.) Not only do they "supervise," they admit in RFA #2 that they "give work directions and assignments" to the members of their group. (*Id.*) To "supervise" employees and "give work directions" certainly constitutes "directing the work" of those employees. Additionally, both Plaintiffs' depositions are replete with instances of directing the work of their subordinates. (*See, e.g.*, Doc. 145-1 at 14, 50; Doc. 145-3 at 23, 42.)

As to whether such direction is "customarily and regularly" done, the phrasing of the RFAs and the record as a whole indicates that directing the work of TMs and TLs is a constant aspect of the GL position. Nothing in the record would suggest that directing the work of TMs or TLs was even close to being a mere "isolated or one-time" occurrence for either of the Plaintiffs at issue. Rather, both Fillmore and Price testified that—with the exception of Price's time on the 166 Project Team—they spend most of their time walking their respective lines, addressing issues and directing the work of TMs and TLs as necessary. As such, the directing of other employees was certainly "customarily and regularly" performed as defined by the regulations. *See* 29 C.F.R. § 541.701.

Additionally, the required number of "other employees" poses no difficulty. It is undisputed that each GL has a group that "consist[s] of one or more teams." (Doc. 97 at ¶ 5.) Each team, in turn, is generally "organized with a TL and multiple TMs." (*Id.*) Even a GL with the smallest possible group—a single team consisting of just one TL and one TM—would still satisfy the "two or more" requirement. Fillmore's groups consisted of three to fourteen people. (Doc. 150 at 7–8.) Price managed groups of twenty-four to thirty-two people, except while working on the 166 Project Team (*Id.* at 18–19.) With the exception of that time period, as it relates to Price, there is no question that both of these Plaintiffs "customarily and regularly direct[] the work of two or more other employees." 29 C.F.R. § 541.100(a)(3).

### 4. Recommendations Given Particular Weight

The final prong of the executive exemption test is whether each of these Plaintiffs "has the authority to hire or fire other employees," or whether their "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a)(4). MBUSI does not contend that Plaintiffs have the authority to hire or fire, but *does* maintain that their suggestions and recommendations are given "particular weight." Here again the regulations provide a factor-based approach:

> To determine whether an employee's suggestions and recommendations are given ''particular weight,'' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

29 C.F.R. § 541.105. Once again, Plaintiffs go a long way toward establishing this with their own admissions. Each of them admit that, as part of their jobs as GLs, they "provide an opinion as to whether or not team members and team leaders in [their] group[s] are ready for promotion." (Doc. 145-2 at 4, Doc. 145-5 at 4.) The "frequency with which the employee's suggestions and recommendations are relied upon" is clearly seen from MBUSI's own written policies. (*See* Doc. 109-22.) As explained by Marcus Jones, MBUSI's HR Manager, "the GL's assessment of the TM or TL is followed barring exceptional circumstances." (Doc. 109-1 at 9.) Additionally, if a GL gives a TM or TL a negative performance evaluation in any area but attendance, that employee "cannot be promoted." (*Id.* at 9–10.) Such evaluations by GLs are made part of the employee's personnel file. (*Id.* at 10.)

In addition to Marcus Jones' explanation, Plaintiffs have themselves acknowledged the significant weight given to the opinions of Fillmore and Price. It is undisputed that their opinions regarding promotion are "given consideration and

normally [are] followed." (Doc. 150 at 12, 25.) Likewise, if either one "gives a TM or TL a not satisfactory rating in any area of the evaluation other than attendance, the TM or TL is not eligible for promotion." (*Id.* at 11, 25.) Although Fillmore and Price do not have the final authority to make hiring or promotion decisions, there is no question that their suggestions and recommendations regarding promotions are given "particular weight." And in addition to their influence in promotion decisions, these Plaintiffs can—at their discretion—take steps that could lead to a team member's termination. They "have the authority to *initiate* a Corrective Performance Review on a team member *when [they] deem necessary*." (Doc. 145-2 at 5, Doc. 145-5 at 4–5, emphasis added.)

In their brief, Plaintiffs admit that GLs give performance evaluations and can initiate corrective performance reviews, but argue that such actions "must be approved by an Assistant Manager and HR," and in any case are "only one of several evaluation tools utilized by MBUSI's Management." (Doc. 150 at 47.) But the regulations specifically address this issue. The relevant section provides that "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the

employee's change in status." 29 C.F.R. § 541.105. In light of the relevant factors, there is no question that these Plaintiffs' suggestions and recommendations are given "particular weight."

## B. Administrative and Combination Exemptions

In addition to the executive exemption, MBUSI argues that both Fillmore and Price meet the criteria—during certain intervals—for the administrative exemption to the FLSA. For Fillmore, the focus is on his work in the Audit area; for Price, his time on the 166 Project Team.

As discussed above, Fillmore has met the executive exemption throughout his career as GL, including his time in Audit. The administrative exemption may *also* apply to that time period, but it is unnecessary for the Court to decide: if the administrative exemption does *not* apply, the executive exemption still does; if the administrative exemption *does* apply, the outcome is the same, since "work that is exempt under one section of [the regulations] will not defeat the exemption under any other section." 29 C.F.R. § 541.708. The situation is completely different for Price, for whom the executive exemption is *not* established as to his time on the 166 Project Team. As a result, the Court must determine whether the administrative exemption applies.

The regulations provide a three-part test for determining whether an employee fits the administrative exemption:

> (a) The term ''employee employed in a bona fide administrative capacity'' in section 13(a)(1) of the Act shall mean any employee:
>
>> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week (or $380 per week, if employed in American Samoa by employers other than the Federal Government), exclusive of board, lodging or other facilities;
>>
>> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>>
>> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a). As with the executive exemption, the parties clash at all three points. Each are addressed in turn.

### 1. Salary Basis

The first prong is easily dispensed with. The requirement to be "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week" is identical to the first prong of the executive exemption test, discussed above at Part IV.1.A. The same analysis applies here: Price meets the first requirement.

## 2. Performance of Office or Non-Manual Work

As with the executive exemption, the second prong of the administrative exemption concerns the employee's "primary duty." But unlike the executive exemption, the administrative exemption requires an employee's "primary duty" to be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). The first part of this test is easily met for Price: he "had a desk and an office," and performed only non-manual work while with the 166 Project Team. (Doc. 150 at 19.) Plaintiffs maintain, however, that his work is still not "directly related to the management or general business operations" of MBUSI. (*Id.* at 48–50.)

In support of this argument, Price relies on the "so-called production/administration dichotomy" which other courts have discussed at length. (*Id.* at 49 (citing *Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 535 (2d Cir. 2009)).) Even assuming that this constitutes the proper approach, Plaintiffs' position is not helped. The very language that Plaintiffs cite from *Davis* shows why Price does not benefit from this production/administration dichotomy: "[W]e have drawn an important distinction between employees *directly producing the good or service* that is the primary

output of a business and employees *performing general administrative work* applicable to the running of any business." *Davis*, 587 F.3d at 535 (emphasis added). Administrative work is concerned with *how* business is performed, rather than simply performing it. As the court in *Davis* went on to note, other courts have recognized this as well, and "held that the 'essence' of an administrative job is that an administrative employee participates in 'the *running* of a business, and not merely . . . the day-to-day carrying out of its affairs.'" *Id.* (quoting *Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990)).

Using this framework, the undisputed facts show that Price's participation in the 166 Project Team was entirely administrative. He did not perform work on the line to "directly produce" the new car. Rather, was intimately involved in planning *how* to produce it, working with employees from engineering and maintenance in the design of new equipment. He reviewed those designs—and the equipment itself—looking at it "from a production standpoint to determine if it would be feasible for TMs to use it." (Doc. 150 at 19.) Price also reviewed manpower numbers so that MBUSI would be able to correctly allocate the TMs needed to run the production. (*Id.*) The very essence of his participation in the plans of the 166 Project Team was to make sure that "all aspects of the Production side were looked at with respect to the

new vehicle." (*Id.*) His work there was clearly integral to purchasing, procurement, research, and personnel management, each of which are "functional areas" defined as being "directly related to management or general business operations." 29 C.F.R. § 541.201(b). As such, there is no question that Price's work on the 166 Project Team meets the second requirement of the administrative exemption.

### 3. Exercise of Discretion and Independent Judgment

The final requirement of the administrative exemption also concerns the employee's "primary duty," requiring that it "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2). Generally, exercising such discretion and judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Determining whether this requirement is met involves considering "all the facts involved in the particular employment situation in which the question arises." 29 C.F.R. § 541.202(b). As Price observes, the regulations provide several factors that are relevant to this inquiry—but he fails to note that several of these are apt descriptions of his work on the 166 Project Team. These include "whether the employee has authority to formulate, affect, interpret, or implement management

policies or operating practices . . . whether the employee performs work that affects business operations to a substantial degree, *even if the employee's assignments are related to operation of a particular segment of the business* . . . [and] whether the employee provides consultation or expert advice to management." *Id.* (emphasis added).

Importantly, the regulations emphasize that "the exercise of discretion and independent judgment" does not require a position of absolute authority. It is not even necessary that an employee have final decision-making power whatsoever—the requisite level of discretion and independent judgment can "consist of recommendations for action rather than the actual taking of action." 29 C.F.R. § 541.202(c). In light of this, there is no question that Price's work on the 166 Project Team satisfies this third prong of the administrative exemption test. Plaintiffs do not dispute that "Price *reviewed* the production aspect of the [166 Project Team's] planning and *offered any input* he had." (Doc. 150 at 19.)

Any lingering point on this issue could be settled by resorting to Plaintiffs' own treatment of the facts. To MBUSI's assertion that "Price *uses his best judgment* in performing *all* of his GL job duties," Plaintiffs simply respond, "[u]ndisputed." (Doc. 150 at 21, emphasis added.) Even if Plaintiffs did not concede this point in their brief, the Court would still take it as "conclusively established" by virtue of Price's

response to RFA #23, where he admits that this is true. (Doc. 145-5 at 7.) Because Price meets all three requirements of the administrative exemption during his time on the 166 Project Team, summary judgment is due to be granted as to any claims that arose during his time there.

## V. Conclusion

There are no genuine issues of material fact concerning the claims of either of these Plaintiffs. Throughout his time as a GL, Don Fillmore has met the executive exemption to the FLSA. Michael Price has qualified under the administrative exemption while on the 166 Project Team, and under the executive exemption throughout the rest of his time as a GL. MBUSI's motion (Doc. 143) is therefore due to be GRANTED as to both Plaintiffs. Separate orders consistent with this opinion will be entered.

Done this 6th day of July 2012.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
[167037]